# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JAMES CONTANT, MARTIN-HAN TRAN, CARLOS GONZALEZ, UGNIUS MATKUS, JERRY JACOBSON, and PAUL VERMILLION, on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; THE BANK OF TOKYO MITSUBISHI UFJ LTD.; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS GROUP; BNP PARIBAS NORTH AMERICA, INC.; BNP PARIBAS SECURITIES CORP.; BNP PARIBAS PRIME BROKERAGE, INC.; CITIGROUP INC.; CITIBANK, N.A.; CITICORP; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO.; HSBC HOLDINGS PLC; HSBC BANK PLC; HSBC NORTH AMERICA HOLDINGS, INC.; HSBC BANK USA, N.A.; HSBC SECURITIES (USA) INC.; JPMORGAN CHASE & CO.; JPMORGAN CHASE BANK, N.A.; MORGAN STANLEY; MORGAN STANLEY & CO., LLC; MORGAN STANLEY & CO. INTERNATIONAL PLC; RBC CAPITAL MARKETS LLC; ROYAL BANK OF SCOTLAND GROUP PLC; RBS SECURITIES INC.; SOCIÉTÉ GÉNÉRALE S.A.; STANDARD CHARTERED BANK; UBS AG; UBS GROUP AG; and UBS SECURITIES LLC;**<br><br>**Defendants.** | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................ 1

JURISDICTION, VENUE, AND INTERSTATE COMMERCE ................................ 3

PARTIES ............................................................................................................ 4

    I.    Plaintiffs ................................................................................................ 4

    II.   Defendants .............................................................................................. 8

CLASS ACTION ALLEGATIONS ...................................................................... 15

FACTUAL ALLEGATIONS ............................................................................... 22

    I.    OVERVIEW OF THE FX MARKET ........................................................ 22

        A.    Background ................................................................................. 22

        B.    Benchmark Rates ....................................................................... 27

            1.    WM/Reuters ..................................................................... 28

            2.    The ECB Rates ................................................................. 29

        C.    The FX Market Is Concentrated and Dominated by Defendants ............. 29

        D.    The FX Market Is Susceptible to Collusion ................................ 31

    II.   DEFENDANTS CONSPIRED TO FIX FX PRICES ................................... 33

        A.    Defendants Conspired to Fix Prices and Carried Out the Conspiracy through Electronic Communications ....................................... 34

        B.    Defendants Conspired to Fix Bid-Ask Spreads ......................... 41

        C.    Defendants' Conspiracy to Fix the Benchmark Rates .............. 42

            1.    Defendants Shared Proprietary Trade Data In Order To Manipulate FX Benchmark Rates ................................. 43

            2.    Methods of Manipulating Benchmark Rates .................. 44

        D.    Other Conduct in Furtherance of the Conspiracy ..................... 49

    III.  DEFENDANTS' CONSPIRACY IMPACTED INDIRECT PURCHASES OF FX INSTRUMENTS ................................................................................ 49

    IV.  GOVERNMENT INVESTIGATIONS OF DEFENDANTS FOR ILLEGAL CONDUCT IN FX TRADING ................................................................. 51

    V.   DIRECT PURCHASER LITIGATION AND SETTLEMENTS ..................... 62

    VI.  DEFENDANTS TERMINATED AND SUSPENDED TRADERS, FORCED TRADERS TO RESIGN, AND IMPLEMENTED INTERNAL SAFEGUARDS AFTER THE CLASS PERIOD ................................................................. 63

ANTITRUST INJURY TO PLAINTIFFS ............................................................ 67

FRAUDULENT CONCEALMENT .................................................................... 69

CLAIMS FOR RELIEF ............................................................................................................. 71

REQUESTS FOR RELIEF ........................................................................................................ 84

DEMAND FOR JURY TRIAL ................................................................................................. 86

Plaintiffs James Contant, Martin-Han Tran, Carlos Gonzalez, Ugnius Matkus, Jerry Jacobson, and Paul Vermillion (collectively, "Plaintiffs"), on behalf of themselves and the proposed Classes (defined below), make these allegations against Defendants based upon personal knowledge as to matters relating to themselves, and upon information and belief, documents produced in related litigation and government investigations, and the investigations of counsel as to all other matters.

## NATURE OF THE ACTION

1.      This case involves a conspiracy among horizontal competitors to fix the prices of foreign currencies ("FX") and foreign currency instruments.  Plaintiffs bring this action for equitable and injunctive relief on behalf of a proposed Nationwide Class, and to recover for injuries caused by Defendants on behalf of the proposed State Classes.[1]  Plaintiffs and members of the proposed Classes are indirect purchasers of FX Instruments[2] from Defendants and/or Defendants' co-conspirators.

2.      Beginning at least as early as 2007 and continuing through at least 2013, Defendants conspired with each other to fix prices in the FX market.  Defendants communicated with each other daily, exchanging confidential customer information and coordinating their trading strategies to manipulate FX benchmark rates and fix FX prices.  These collusive communications were widespread throughout Defendants' FX trading departments.  As one FX trader at Barclays put it, "if you aint cheating, you aint trying."

---

[1] *See* Class definitions, *infra* at "Class Action Allegations."
[2] "FX Instrument" is defined in this Complaint and in the *FOREX* settlements as any FX spot transaction, forward, swap, future, option, or any other FX transaction or instrument the trading or settlement value of which is related in any way to FX rates. "FX Exchange-Traded Instrument" is defined in this Complaint and in the *FOREX* settlements as any FX Instrument that was listed for trading through a U.S. exchange, including, but not limited to, FX futures contracts and options contracts.

3.　　　Defendants' conspiracy impacted the prices of all forms of FX Instruments throughout the Class Period.

4.　　　Defendants' conspiracy has been the subject of antitrust investigations by multiple U.S., foreign, and international governmental authorities.  Several government authorities have imposed fines and other sanctions on one or more Defendants, including the U.S. Department of Justice, U.S. Commodity Futures Trading Commission, U.S. Federal Reserve, New York State Department of Financial Services, United Kingdom Financial Conduct Authority, the Swiss Financial Market Supervisory Authority, and the South African Competition Commission.  Thus far, Defendants have been ordered to pay over $11 billion in fines and settlements to government authorities for their involvement in the FX market manipulation conspiracy.

5.　　　Defendants' conspiracy is also the subject of a nationwide direct purchaser antitrust class action currently pending before this Court, brought on behalf of persons and entities that purchased FX Instruments directly from one or more Defendants or co-conspirators, and persons and entities that purchased FX Exchange-Traded Instruments directly on a U.S. exchange (collectively, the "Direct Purchaser Class Plaintiffs").  *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 1:13-cv-07789-LGS (S.D.N.Y.) ("*FOREX*").  On October 22, 2015, the d Direct Purchaser Class Plaintiffs in *FOREX* moved for preliminary approval of settlements totaling $2,009,075,000 with the following Defendants: Bank of America Corporation; Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Bank PLC; Barclays Capital Inc.; BNP Paribas Group; BNP Paribas North America Inc.; BNP Paribas Securities Corp.; BNP Prime Brokerage, Inc.; Citigroup Inc.; Citibank, N.A.; Citicorp; Citigroup Global Markets Inc.; The Goldman Sachs Group, Inc.; Goldman, Sachs & Co.; HSBC Holdings PLC; HSBC Bank PLC; HSBC North America Holdings Inc.; HSBC Bank USA, N.A.; HSBC Securities (USA) Inc.;

JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; The Royal Bank of Scotland Group PLC; The Royal Bank of Scotland PLC; RBS Securities Inc.; UBS AG; UBS Group AG; and UBS Securities LLC (collectively, the "Settling Defendants").  *See FOREX,* ECF No. 480.  On December 15, 2015, this Court preliminarily approved the settlements, designated a settlement administrator, and preliminarily certified a settlement class of persons and entities that entered into an FX Instrument directly with a Defendant or co-conspirator (the "Direct Settlement Class") and a settlement class of persons and entities that entered into an FX Exchange-Traded Instrument directly on a U.S. exchange (the "Exchange-Only Settlement Class").  *Id.* at ECF No. 536.  The *FOREX* litigation is ongoing against the remaining Defendants: Bank of Tokyo-Mitsubishi UFJ Ltd.; Credit Suisse Group AG; Credit Suisse AG; Credit Suisse Securities (USA) LLC; Deutsche Bank AG; Deutsche Bank Securities Inc.; Morgan Stanley; Morgan Stanley & Co., LLC; Morgan Stanley & Co. International plc; RBC Capital Markets, LLC; Société Générale S.A.; and Standard Chartered Bank (collectively, the "Non-Settling Defendants").  The Defendants currently named in *FOREX* (including Settling Defendants and Non-Settling Defendants) are identical to the Defendants named in this action.

6. Plaintiffs and members of the proposed Classes in this action purchased FX Instruments directly from members of the preliminarily-certified Direct Settlement Class in *FOREX*.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

7. This Court has subject matter jurisdiction under the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26, the Sherman Act, 15 U.S.C. § 1, and 28 U.S.C. §§ 1331 and 1337(a).  This Court also has subject matter jurisdiction for Plaintiffs' state-law claims under 28 U.S.C. § 1332(d) and 1367(a), in that: (a) this is a class action in which the aggregate amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed

Classes are citizens of a state different from some Defendants; and (b) Plaintiffs' state-law claims form all or part of the same case or controversy as their federal claims under Article III of the United States Constitution.

8.     The Court has personal jurisdiction over each Defendant because Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically and in the United States generally.  These acts were conducted by persons and entities subject to the laws of the United States, as well as New York, California, Florida, Illinois, Minnesota, North Carolina, and other states.  Each Defendant has continuously and systematically transacted FX in this District and throughout the United States.  Most Defendants are headquartered in, maintain their principal place of business in, or maintain offices in New York.  Defendant traders located outside of the United States communicated directly with Defendant traders located in New York to carry out and facilitate the conspiracy.  Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and throughout the United States.  Defendants' conduct was within the flow of, and had a substantial effect on, the interstate commerce of the United States, including in this District.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22.  All Defendants reside, transact business, are found, or have agents in this District.  Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

### I.     Plaintiffs

10.     Plaintiff James Contant is an individual and a resident of Monroe County, New York.  During the Class Period defined below, Plaintiff James Contant transacted FX Instruments

directly with an FX broker that transacted those FX Instruments directly with one or more Defendants. Specifically, Plaintiff James Contant engaged in FX spot transactions with currency pairs including EUR/USD, USD/JPY, EUR/JPY, AUD/USD, and USD/CHF directly with an FX broker where the FX broker transacted those FX Instruments directly with Defendants including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, RBC, SocGen, and UBS. As a result of Defendants' illegal conduct described herein, the FX broker paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges on FX Instruments to its customers, including Plaintiff James Contant. Thus, Plaintiff James Contant indirectly purchased FX Instruments from one or more Defendants during the Class Period and was injured as a result of Defendants' anticompetitive conduct alleged herein. Plaintiff James Contant is referred to herein as the "New York Plaintiff."

11. Plaintiff Martin-Han Tran is an individual and resident of Orange County, California. During the Class Period defined below, Plaintiff Martin-Han Tran transacted FX Instruments directly with an FX broker that transacted those FX Instruments directly with one or more Defendants. Specifically, Plaintiff Martin-Han Tran engaged in FX spot transactions with currency pairs including USD/JPY, AUD/USD, USD/CAD, USD/CHF, GBP/USD, EUR/JPY, EUR/USD, EUR/GBP, GBP/JPY, EUR/CHF, and GBP/AUD directly with an FX broker where the FX broker transacted those FX Instruments directly with Defendants including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, RBC, SocGen, and UBS. As a result of Defendants' illegal conduct described herein, the FX broker paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges on

FX Instruments to its customers, including Plaintiff Martin-Han Tran.  Thus, Plaintiff Martin-Han Tran indirectly purchased FX Instruments from one or more Defendants during the Class Period and was injured as a result of Defendants' anticompetitive conduct alleged herein.  Plaintiff Martin-Han Tran is referred to herein as the "California Plaintiff."

12.     Plaintiff Carlos Gonzalez is an individual and resident of Broward County, Florida. During the Class Period defined below, Plaintiff Carlos Gonzalez transacted FX Instruments directly with an FX broker that transacted those FX Instruments directly with one or more Defendants.  Specifically, Plaintiff Carlos Gonzalez engaged in FX spot transactions with currency pairs including EUR/USD, GBP/USD, USD/CHF, EUR/CHF, USD/JPY, AUD/JPY, CHF/JPY, NZD/USD, and EUR/GBP directly from an FX broker where the FX broker purchased those FX Instruments directly from Defendants including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, RBC, SocGen, and UBS.  Specifically, Plaintiff Carlos Gonzalez engaged in FX spot transactions with currency pairs including AUD/CAD, EUR/USD, GBP/USD, USD/JPY, AUD/USD, EUR/USD, AUD/CHF, EUR/JPY, NZD/USD, NZD/JPY, EUR/AUD, AUD/NZD, and GBP/JPY directly with an FX broker where the FX broker transacted those FX Instruments directly with Defendants including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, RBC, SocGen, and UBS.  As a result of Defendants' illegal conduct described herein, the FX broker paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges on FX Instruments to its customers, including Plaintiff Carlos Gonzalez.  Thus, Plaintiff Carlos Gonzalez indirectly purchased FX Instruments from one or more Defendants

during the Class Period and was injured as a result of Defendants' anticompetitive conduct alleged herein. Plaintiff Carlos Gonzalez is referred to herein as the "Florida Plaintiff."

13. Plaintiff Ugnius Matkus is an individual and resident of Cook County, Illinois. During the Class Period defined below, Plaintiff Ugnius Matkus transacted FX Instruments with several FX brokers, all of which entered into those FX Instruments directly with one or more Defendants. Specifically, Plaintiff Ugnius Matkus engaged in FX spot transactions with currency pairs including EUR/USD, AUD/USD, AUD/JPY, EUR/JPY, USD/CHF, CHF/JPY, and GBP/USD directly with FX brokers where the FX brokers transacted those FX Instruments directly with Defendants including Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, RBC, SocGen, and UBS. As a result of Defendants' illegal conduct described herein, those FX brokers paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges on FX Instruments to their customers, including Plaintiff Ugnius Matkus. Thus, Plaintiff Ugnius Matkus indirectly purchased FX Instruments from one or more Defendants during the Class Period and was injured as a result of Defendants' anticompetitive conduct alleged herein. Plaintiff Ugnius Matkus is referred to herein as the "Illinois Plaintiff."

14. Plaintiff Jerry Jacobson is an individual and resident of Wright County, Minnesota. During the Class Period defined below, Plaintiff Jerry Jacobson transacted FX Instruments directly with an FX broker that transacted those FX Instruments directly with one or more Defendants. Specifically, Plaintiff Jerry Jacobson engaged in FX spot transactions with currency pairs including AUD/USD, EUR/USD, GBP/USD, USD/CAD, USD/CHF, EUR/GBP, GBP/CHF, and EUR/JPY directly with an FX broker where the FX broker transacted those FX Instruments directly with Defendants including JPMorgan, Morgan Stanley, and RBS. As a result of

7

Defendants' illegal conduct described herein, the FX broker paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges on FX Instruments to its customers, including Plaintiff Jerry Jacobson. Thus, Plaintiff Jerry Jacobson indirectly purchased FX Instruments from one or more Defendants during the Class Period and was injured as a result of Defendants' anticompetitive conduct alleged herein. Plaintiff Jerry Jacobson is referred to herein as the "Minnesota Plaintiff."

15.     Plaintiff Paul Vermillion is an individual and resident of Guilford County, North Carolina. During the Class Period defined below, Plaintiff Paul Vermillion transacted FX Instruments with several FX brokers, all of which entered into those FX Instruments directly with one or more Defendants. Specifically, Plaintiff Paul Vermillion engaged in FX spot transactions with currency pairs including EUR/USD, USD/CAD, GBP/USD, AUD/USD, and EUR/JPY directly with FX brokers where the FX brokers transacted those FX Instruments directly with Defendants including Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBC, RBS, SocGen, Standard Chartered, and UBS. As a result of Defendants' illegal conduct described herein, those FX brokers paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges on FX Instruments to their customers, including Plaintiff Paul Vermillion. Thus, Plaintiff Paul Vermillion indirectly purchased FX Instruments from one or more Defendants during the Class Period and was injured as a result of Defendants' anticompetitive conduct alleged herein. Plaintiff Paul Vermillion is referred to herein as the "North Carolina Plaintiff."

## II.     Defendants

16.     **Bank of America:** Defendant Bank of America Corporation is a Delaware corporation headquartered at 100 North Tryon Street, Charlotte, North Carolina 28255. Bank of

America Corporation is a multi-national banking and financial services corporation, with its investment banking division located at the Bank of America Tower, One Bryant Park, 1111 Avenue of the Americas, New York, New York 10036. Defendant Bank of America, N.A. is a federally chartered national banking association headquartered at 101 South Tyron Street, Charlotte, North Carolina 28255, and is an indirect, wholly-owned subsidiary of Bank of America Corporation. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware corporation with its headquarters at One Bryant Park, New York, New York 10036, and is a wholly-owned subsidiary of Bank of America Corporation. Defendants Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Inc. are referred to collectively in this Complaint as "Bank of America."

17. **BTMU:** Defendant The Bank of Tokyo Mitsubishi UFJ Ltd. ("BTMU") is a Japanese company headquartered in Tokyo, Japan. BTMU's New York Branch is BTMU's "traditional hub" for FX trading, and is headquartered at 1251 Avenue of the Americas, New York, New York 10002. BTMU is registered with the New York Department of Financial Services ("NYDFS") as a foreign bank licensed to do business in New York through the BTMU New York Branch. At year-end 2013, BTMU reported for its New York branch gross notional outstanding spot FX contracts of $2.4 billion and FX derivatives of $69.8 billion, for a total of $72.2 billion. *See FOREX*, 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016) (denying BTMU's motion to dismiss for lack of personal jurisdiction).

18. **Barclays:** Defendant Barclays Bank PLC is a British public limited company headquartered in London, England. Barclays Bank PLC is licensed by the NYDFS with a registered address at 745 Seventh Avenue, New York, New York 10019. Defendant Barclays Capital Inc. is a wholly-owned subsidiary of Barclays Bank PLC and engages in investment

banking, wealth management, and investment management services.  Barclays Capital Inc. is headquartered at 745 7th Avenue New York, NY 10019.  Defendants Barclays Bank PLC and Barclays Capital Inc. are referred to collectively in this Complaint as "Barclays."

19.     **BNP Paribas:** Defendant BNP Paribas Group is a French bank and financial services company headquartered in Paris, France.  BNP Paribas Group is licensed by the NYDFS with a registered address at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas North America, Inc. is a Delaware corporation headquartered at 787 Seventh Avenue, New York, New York 10019.  BNP Paribas North America, Inc. provides corporate, investment banking, and securities brokerage services, and is an affiliate of BNP Paribas Group.  Defendant BNP Paribas Securities Corp. is a Delaware corporation with its principal place of business in New York, New York.  BNP Paribas Securities Corp. is a wholly-owned subsidiary of BNP Paribas North America, Inc.  BNP Paribas Prime Brokerage, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Defendants BNP Paribas Group, BNP Paribas North America, Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc. are referred to collectively in this Complaint as "BNP Paribas."

20.     **Citigroup:** Defendant Citigroup Inc. is a Delaware corporation headquartered at 399 Park Avenue, New York, New York 10022.  Defendant Citibank, N.A. is a federally chartered national banking association headquartered at 399 Park Avenue, New York, New York 10022 and is a wholly-owned subsidiary of Defendant Citigroup Inc.  Defendant Citicorp is a financial services holding company organized and existing under the laws of Delaware.  Defendant Citigroup Global Markets Inc. is a wholly-owned subsidiary of Citigroup Inc., organized and existing under the laws of New York and headquartered at 390 Greenwich Street, New York, New

York 10013.  Defendants Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. are referred to collectively in this Complaint as "Citigroup."

21.    **Credit Suisse:** Defendant Credit Suisse Group AG is a Swiss holding company headquartered in Zurich, Switzerland.  Defendant Credit Suisse AG is a wholly-owned subsidiary of Credit Suisse Group AG and is a bank organized under the laws of Switzerland, with its principal place of business located in Zurich, Switzerland.  Credit Suisse AG is licensed by the NYDFS and operates a foreign branch with a registered address at 11 Madison Avenue, New York, NY 10010.  Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company headquartered at 11 Madison Avenue, New York, New York 10010, and is a wholly-owned subsidiary of Credit Suisse Group AG.  Defendants Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse Securities (USA) LLC are referred to collectively in this Complaint as "Credit Suisse."

22.    **Deutsche Bank:** Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.  Deutsche Bank AG is licensed by the NYDFS with a registered address at 60 Wall Street, 4th Floor, New York, New York 10005.  Defendant Deutsche Bank Securities Inc. is a Delaware corporation with its principal place of business at 60 Wall Street, New York, New York, 10005.  Deutsche Bank Securities Inc. is an indirect, wholly-owned subsidiary of Deutsche Bank AG.  Defendants Deutsche Bank AG and Deutsche Bank Securities Inc. are referred to collectively in this Complaint as "Deutsche Bank."

23.    **Goldman Sachs:** Defendant The Goldman Sachs Group, Inc. is a Delaware corporation headquartered at 200 West Street, New York, New York 10282.  The Goldman Sachs Group, Inc. is a bank holding company and a financial holding company.  Defendant Goldman, Sachs & Co. is a wholly-owned subsidiary of The Goldman Sachs Group, Inc. and is its principal

operating subsidiary in the United States.  Goldman, Sachs & Co. is located at 200 West Street, New York, New York 10282.  Defendants The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. are referred to collectively in this Complaint as "Goldman Sachs."

24.     **HSBC:** Defendant HSBC Holdings PLC is a United Kingdom public limited company headquartered in London, England.  Defendant HSBC Bank PLC is a wholly-owned subsidiary of HSBC Holdings PLC, and is also a United Kingdom public limited company headquartered in London, England.  Defendant HSBC North America Holdings, Inc. is a Delaware corporation headquartered at 452 5th Avenue, New York, New York 10018, and is a wholly-owned subsidiary of HSBC Holdings PLC.  Defendant HSBC North America Holdings, Inc. is the holding company for HSBC Holdings PLC's operations in the United States.  Defendant HSBC Bank USA, N.A. is a national banking association with its principal place of business in New York, New York, and is an indirect wholly-owned subsidiary of HSBC North America Holdings, Inc.  Defendant HSBC Securities (USA) Inc. is a Delaware corporation with its principal place of business at 452 Fifth Avenue, New York, NY, United States.  Defendants HSBC Holdings PLC; HSBC Bank PLC; HSBC North America Holdings, Inc.; HSBC Bank USA, N.A.; and HSBC Securities (USA) Inc. are referred to collectively in this Complaint as "HSBC."

25.     **JPMorgan:** Defendant JPMorgan Chase & Co. is a Delaware corporation headquartered at 270 Park Avenue, 38th Floor, New York, New York 10017.  Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association, also headquartered at 270 Park Avenue, 38th Floor, New York, New York 10017, and is a wholly-owned subsidiary of Defendant JPMorgan Chase & Co.  Defendants JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. are referred to collectively in this Complaint as "JPMorgan."

26.     **Morgan Stanley:** Defendant Morgan Stanley is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.  Defendant Morgan Stanley & Co., LLC is a limited liability company organized and existing under the laws of Delaware, with its principal place of business in New York, New York.  Morgan Stanley & Co., LLC is a wholly-owned subsidiary of Morgan Stanley.  Defendant Morgan Stanley & Co. International plc is a United Kingdom public limited company with headquarters in London, England.  Defendants Morgan Stanley; Morgan Stanley & Co., LLC; and Morgan Stanley & Co. International plc are referred to collectively in this Complaint as "Morgan Stanley."

27.     **RBC:** Defendant RBC Capital Markets LLC ("RBC") is a limited liability company incorporated in Minnesota, with its principal place of business and headquarters located at Three World Financial Center, 200 Vesey Street, 5th Floor, New York, New York 10281.  Prior to 2010, RBC was RBC Capital Markets Corporation, which was also a Minnesota corporation headquartered in New York, New York.

28.     **RBS:** Defendant Royal Bank of Scotland Group PLC is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  Defendant Royal Bank of Scotland Group PLC is licensed by the NYDFS with a registered address at 1095 Avenue of the Americas, New York, New York 10036.  Defendant RBS Securities Inc. is a Delaware corporation headquartered at 600 Washington Boulevard, Stamford, Connecticut 06901.  Defendants Royal Bank of Scotland Group PLC and RBS Securities, Inc., are referred to collectively in this Complaint as "RBS."

29.     **SocGen:** Defendant Société Générale S.A. ("SocGen") is a financial services company headquartered in Paris, France.  SocGen's New York Branch is headquartered at 1221 Avenue of the Americas, New York, New York 10020.  SocGen is licensed by the NYDFS with a registered address of 245 Park Avenue, New York, New York 10167.  One of the SocGen New

York Branch's "primary activities" is the sale of FX Instruments, and its heads of emerging market FX trading and G10 FX trading are based in New York.  At year-end 2013, SocGen reported for its New York branch gross notional outstanding spot FX contracts of approximately $13 million and FX derivatives of $21.6 billion.  *See id.* (denying SocGen's motion to dismiss the FX direct purchaser complaint against SocGen for lack of personal jurisdiction).  According to SocGen's Twitter bio, SocGen opened its first office in the United States in 1938 and "is one of the largest foreign banking organizations in the US."

30.     **Standard Chartered:** Defendant Standard Chartered Bank ("Standard Chartered") is incorporated under the laws of England and Wales, with headquarters in London, England. Standard Chartered is licensed by the NYDFS with a registered address at 1095 Avenue of the Americas, New York, New York 10036.  Standard Chartered's New York Branch, located at 1095 Avenue of the Americas, New York, New York 10036, is the headquarters for Standard Chartered's "Americas" business and "primarily conducts a U.S. dollar clearing business," including the sale of FX Instruments.  At year-end 2013, Standard Chartered Bank reported for its New York branch gross notional outstanding spot FX contracts of $1.9 billion and FX derivatives of $141.4 billion.  *See id.* (granting motion to dismiss the FX direct purchaser complaint for lack of personal jurisdiction as to Standard Chartered Bank's parent company Standard Chartered plc, which does not conduct business in New York, but permitting an application to substitute Standard Chartered Bank as a defendant).

31.     **UBS:** Defendant UBS AG is a Swiss company based in Basel and Zurich, Switzerland, and is a wholly-owned subsidiary of Defendant UBS Group AG.  Defendant UBS Group AG is a Swiss company headquartered in Zurich, Switzerland.  Defendant UBS Securities LLC is a Delaware limited liability company headquartered at 677 Washington Blvd, Stamford,

Connecticut 06901, and is a wholly-owned subsidiary of UBS AG.  Defendants UBS AG, UBS

Group AG, and UBS Securities LLC are referred to collectively in this Complaint as "UBS."

32.     "Defendant" or "Defendants," as used herein, includes all Defendants named

specifically above, as well as all of the named Defendants' predecessors, direct or indirect parents,

subsidiaries, or divisions, including entities that merged with or were acquired by the named

Defendants that played a material role in the unlawful acts alleged in this Complaint.

33.     Whenever reference is made to any act of any corporation, the allegation means

that the corporation engaged in the act by or through its directors, officers, employees, or agents

while they were actively engaged in the management, direction, control, or transaction of the

corporation's business or affairs.

34.     Various other persons, firms, and corporations, that are unknown and not named as

Defendants, have participated as co-conspirators with Defendants and have performed acts and/or

made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for

the acts of their co-conspirators, whether named or not the co-conspirators are named as

Defendants in this Complaint.  "Co-conspirators," as used herein, includes direct or indirect

parents, subsidiaries, and divisions of all co-conspirator entities.

## CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action individually and as a class action pursuant to Rules 23(a)

and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief, on

behalf of the following proposed nationwide indirect purchaser class (the "Nationwide Class"):

> **Nationwide Class:** All persons and entities who, between December 1, 2007 and
> December 31, 2013 (inclusive) (the "Class Period"), indirectly purchased an FX
> Instrument[3] from a Defendant or co-conspirator in the United States and/or while
> domiciled in the United States, by entering into an FX Instrument with a member of the

---

[3] *See supra* note 2.

Direct Settlement Class,[4] where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

36.     The New York Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to New York antitrust law on behalf the following proposed New York indirect purchaser class or subclass (the "New York Class"):

> **New York Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in New York and/or while domiciled in New York, by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

37.     The California Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages

---

[4] "Direct Settlement Class" refers to the class of direct purchasers who purchased an FX Instrument directly from one or more Defendants or co-conspirators, which was granted preliminarily class certification for settlement purposes in *FOREX*, ECF No. 536 ("Preliminary Approval Order"). The Preliminary Approval Order defines the Direct Settlement Class as:

> All Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant, a direct or indirect parent, subsidiary, or division of a Defendant, a Released Party, or coconspirator where such Persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted FX Instruments in the United States or its territories. Specifically excluded from the Direct Settlement Class are Defendants; Released Parties; co-conspirators; the officers, directors, or employees of any Defendant, Released Party, or co-conspirator; any entity in which any Defendant, Released Party, or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, Released Party, or co-conspirator and any person acting on their behalf; provided, however, that Investment Vehicles shall not be excluded from the definition of the Direct Settlement Class. Also excluded from the Direct Settlement Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this Action.

*See also infra* at Factual Allegations, Section V ("Direct Purchaser Litigation and Settlements"). The Preliminary Approval Order also certified an "Exchange-Only Settlement Class" comprised of persons and entities that entered into an FX Exchange-Traded Instrument directly on a U.S. exchange. Although the Direct Class Settlement and the Exchange-Only Class Settlement (collectively, the "Direct/Exchange-Only Settlements") were entered into only between the Direct Purchaser Class Plaintiffs and the "Settling Defendants," the Direct Settlement Class is defined to include all direct purchasers who entered into an FX instrument with *any* Defendant named in *FOREX*, including the "Non-Settling Defendants." *See, e.g.*, *FOREX*, ECF No. 653-2 (Direct Purchaser Class Plaintiffs' Proposed Notice) (defining "Settling Defendants" and "Non-Settling Defendants" collectively as "Defendants"). The Defendants referred to in the Direct Settlement Class definition (including both the Settling Defendants and the Non-Settling Defendants) are identical to the Defendants named in this Complaint.

pursuant to California antitrust and consumer protection laws on behalf the following proposed California indirect purchaser class or subclass (the "California Class"):

> **California Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in California and/or while domiciled in California, by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

38.   The Florida Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to Florida consumer protection law on behalf the following proposed Florida indirect purchaser class or subclass (the "Florida Class")

> **Florida Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in Florida and/or while domiciled in Florida, by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

39.   The Illinois Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to Illinois antitrust law on behalf the following proposed Illinois indirect purchaser class or subclass (the "Illinois Class"):

> **Illinois Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in Illinois and/or while domiciled in Illinois, by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

40.   The Minnesota Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to Minnesota antitrust law on behalf the following proposed Minnesota indirect purchaser class or subclass (the "Minnesota Class"):

**Minnesota Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in Minnesota and/or while domiciled in Minnesota, by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

41.     The North Carolina Plaintiff also brings this action individually and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to North Carolina antitrust law on behalf the following proposed North Carolina indirect purchaser class or subclass (the "North Carolina Class"):

**North Carolina Class:** All persons and entities who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator in North Carolina and/or while domiciled in North Carolina, by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.

42.     The proposed New York, California, Florida, Illinois, Minnesota, and North Carolina Classes are referred to collectively herein as the "State Classes." The proposed Nationwide Classes and State Classes are referred to collectively herein as the "Classes."

43.     Excluded from the Classes are Defendants and their co-conspirators; the officers, directors, and employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator; federal, state, and municipal government entities and agencies; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; and any juror assigned to this action.

44.     Also excluded from the Classes are all indirect purchases of FX Instruments where the direct purchaser was operating outside of the U.S. at the time the direct purchase was made and the purchase was made with the foreign desk of a Defendant.

45.     While Plaintiffs do not know the exact number of the members of the proposed Classes, Plaintiffs believe there are (at least) thousands of members in each Class.  The Classes are readily ascertainable from existing records of members of the Direct Settlement Class.

46.     Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of federal antitrust laws, state antitrust laws, and state consumer protection laws.

47.     Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' and their co-conspirators' conspiracy, which was generally applicable to all members of the Classes, thereby making appropriate relief with respect to each Class as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of FX Instruments sold in the United States;

b.     The identities of the participants of the alleged conspiracy;

c.     The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated the Sherman Act, 15 U.S.C. § 1, as alleged in the First Claim for Relief;

e.     Whether the alleged conduct of Defendants and their co-conspirators caused injury to Plaintiffs and the members of the Classes;

f.      The effects of the alleged conspiracy on the prices of FX Instruments sold in the United States during the Class Period;

g.      Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

h.      Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

i.      The appropriate injunctive and related equitable relief for the Nationwide Classes;

j.      For the New York Class, whether the alleged conspiracy violated New York General Business Laws § 340, *et seq*. (the Donnelly Act), as alleged in the Second Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations;

k.      For the California Class, whether the alleged conspiracy violated California Business and Professions Code § 16720, *et seq*. (the Cartwright Act), as alleged in the Third Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations;

l.      For the California Class, whether the alleged conspiracy violated California Business and Professions Code § 17200, *et seq*. (California's Unfair Competition Law), as alleged in the Fourth Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations;

m.      For the Florida Class, whether the alleged conspiracy violated Fla. Stat. § 501.201, *et seq*. (the Florida Deceptive and Unfair Trade Practices Act), as alleged in the Sixth

Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations;

n.    For the Illinois Class, whether the alleged conspiracy violated 740 Ill. Comp. Stat. 10/1, *et seq.* (the Illinois Antitrust Act), as alleged in the Fifth Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations;

o.    For the Minnesota Class, whether the alleged conspiracy violated Minn. Stat. §§ 325D.49 to 325D.66 (the Minnesota Antitrust Law of 1971), as alleged in the Eighth Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations.

p.    For the North Carolina Class, whether the alleged conspiracy violated N.C. Gen. Stat. § 75-1, *et seq*. (the North Carolina Unfair Trade Practice Act), as alleged in the Seventh Claim for Relief, and the appropriate class-wide measures of damages and injunctive and related equitable relief for such violations; and

48.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes were similarly affected by Defendants' wrongful conduct in that they were overcharged for FX Instruments purchased indirectly from Defendants and/or Defendants' co-conspirators.

49.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

50.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

51.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.     The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

52.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

**FACTUAL ALLEGATIONS**

I.     **OVERVIEW OF THE FX MARKET**

    A.     **Background**

53.     The FX market is the global financial market in which currencies are traded.  It is the largest, most actively traded, and most liquid financial market in the world.  Global FX trading grew from an average of $1.9 trillion per day in April 2004 to $5.3 trillion per day in April 2013. According to a report by the Bank for International Settlements (BIS), this rapid growth in trading volume was due in part to increased market participation by "the emergence of retail investors," including individuals and smaller institutions.

54.     There are over 200 different currencies used around the world, each with a distinct three-letter currency code used by FX traders.  The ten most heavily traded currencies in the world—called the "Group of 10," or "G10" currencies—are the U.S. dollar (USD), the Canadian dollar (CAD), the euro (EUR), the British pound (GBP), the Swiss franc (CHF), the New Zealand dollar (NZD), the Australian dollar (AUD), the Japanese yen (JPY), the Norwegian krone (NOK), and the Swedish krona (SEK).

55.     The market for facilitating and executing FX trades is highly concentrated.  A large majority of all FX trades are transacted by Defendants.  Other market participants include smaller dealer banks, central banks, smaller commercial banks, credit card companies and their customers, non-financial corporations, insurance companies, investment funds, and individual investors.

56.     The FX traders employed by Defendants were part of a geographically and socially concentrated group.  They lived in close proximity, attended the same social gatherings, and communicated frequently.  The close social and professional ties among FX traders facilitated and provided incentives for the conspiracy alleged herein.   As one former Citigroup trader acknowledged, "[t]his is a market in which price fixing and collusion could actually work."

57.     FX trades may be conducted either over-the-counter ("OTC") directly with another party, or on a centralized exchange.  During the Class Period, approximately 98 percent of FX trading occurred OTC, and a majority of those trades involved one or more Defendants.  The remaining 2 percent of all FX trades during the Class Period were made on U.S. exchanges.

58.     The OTC FX market is open and actively traded 24 hours a day during the week.  The FX market opens Monday at 7 a.m. local time in New Zealand.  One hour later, Sydney opens, followed by Tokyo, Hong Kong, and Singapore.  Later, trading shifts to Europe, where the main financial centers are London, Frankfurt, Zürich, Geneva, Paris, and Milan.  New York and London

(the two largest FX trading centers) are open simultaneously for four hours, between 8:00 a.m. and 12:00 p.m. U.S. Eastern Time ("ET"), which is between 1:00 p.m. and 5:00 p.m. London time. The New York FX market is open from 8:00 a.m. ET to 5:00 p.m. ET, and London is open from 3:00 a.m. to 12:00 p.m. ET.

59.     FX market centers officially close at 5:00 p.m. local time, but the market does not close during the week because, except on Friday, the new trading day starts immediately in other cities.  With the advent of electronic trading, it is possible to place FX trades over the weekends.

60.     Like the OTC market, trading on centralized U.S. financial exchanges is available 24 hours a day.  The two most actively traded U.S. FX exchanges are the Chicago Mercantile Exchange ("CME") and the Intercontinental Exchange ("ICE").

61.     Currencies are bought or sold in "currency pairs" of two different currencies.  The price to buy or sell a given currency pair is reflected by its exchange rate.  For example, EUR/USD refers to the exchange rate for the purchase or sale of euros in exchange for U.S. dollars.  In April 2013, the four most-traded currency pairs were EUR/USD (24.1 percent of all net FX trade volume), USD/JPY (18.3 percent), GBP/USD (8.8 percent), and AUD/USD (6.8 percent). Approximately 86.9 percent of daily FX trading in April 2013 had the U.S. dollar on one side of the currency pair.

62.     The advent of electronic FX trading has had a substantial impact on the FX market. Although large bank dealers such as Defendants still account for a large majority of all trades, electronic trading has enabled smaller companies and individuals to trade FX.  Electronic trading also enabled traders to employ new FX trading strategies.  Large, sophisticated traders have employed strategies such as rapid-fire arbitrage and algorithmic trading.  Electronic trading also

enhanced the ability of Defendants and co-conspirators to collusively manipulate FX benchmark rates, as alleged herein.

63.     Traders in the FX market engage in several types of transactions.  According to the BIS, the four most common types of FX transactions are:

a.     **Spot transaction** – an agreement to exchange sums of currency at an agreed-upon exchange rate on a value date that is within two business days' time;

b.     **Forward outright transaction** – an agreement to exchange sums of currency at an agreed-upon exchange rate on a value date that will be in more than two business days' time;

c.     **Forward swap** – a spot transaction plus a forward outright transaction, at a different exchange rate and in the reverse direction; and

d.     **Currency option –** a "put" or a "call" option contract on a specified quantity of FX.  A "put" option contract gives the owner the right to sell a specified quantity of currency at a specified exchange rate.  A "call" option contract gives the holder the right to buy a specified quantity of currency at a specified rate.

64.     In 2013, forward swaps accounted for 42 percent of the total FX trade volume.  Spot transactions accounted for 38 percent, forward outrights accounted for 13 percent, and currency options and other FX transactions accounted for 7 percent.

65.     Spot transactions occur in the private OTC market, which is dominated by Defendants.  To initiate a spot transaction, a customer contacts a dealer bank, such as one of the Defendants, for a quote.   These dealer banks are known as "market makers" or "liquidity providers."

66.     A spot transaction occurs when one party contacts a dealer for a "bid-ask" quote on a designated quantity of currency, and the party accepts the dealer's quote.  The "bid" is the price at which the dealer is willing to buy a given quantity of currency, and the "ask" is the price at

which the dealer is willing to sell the same quantity of currency.  FX dealers provide exchange rate quotes on demand.

67.     Dealers generally provide quotes for USD and EUR to four decimal points, with the final digit known as a "percentage in point" or "pip."  For example, suppose EUR/USD is quoted 1.1952-1.1954 on $10 million.  The first number, 1.1952, is the bid, and the second, 1.1954, is the ask.  The party receiving the quote can either sell $10 million USD and receive €8,366,800.54 EUR ($1.1952 per Euro) in exchange, or purchase $10 million USD for €8,365,400.70 EUR ($1.1954 per Euro).

68.     The difference between the bid and the ask is called the "bid-ask spread."  The bid-ask spread enables FX dealers to profit from FX trades by buying and selling FX at different exchange rates.

69.     FX traders can execute FX spot transactions by a direct telephone call, by sending an electronic request to a dealer, or through an electronic trading system.  Electronic trading systems are computer trading platforms that customers can use to execute orders with dealers over a network.  Electronic trading systems can be proprietary platforms operated by a single dealer, or a multi-bank platforms that allows customers to trade with multiple dealers.  Major multi-bank FX trading platforms include Reuters, Bloomberg, EBS, Hotspot, and Currenex.

70.     Dealer banks employ salespeople to interact with customers through electronic platforms, electronic messages, and telephone calls.  Dealer banks also employ FX currency traders to oversee bid-ask quotes and process trades.  A dealer's salespeople and traders are in constant communication.  Salespeople inform the traders of incoming potential orders, confirm bid-ask quotes, and convey orders to the trading desk for processing.  Traders receive information about potential and pending trades before the trades are actually processed.  Traders also record

and analyze their customers' trading histories.  As a result, dealers can often predict a customer's trading patterns, even before a customer places an order.

71.     Entities that trade FX Instruments directly with dealer banks often resell those instruments to individual and non-dealer entity customers.  These entities are often referred to as "FX brokers" or "retail foreign exchange dealers" ("RFEDs").  Retail FX customers trade FX Instruments with RFEDs for a variety of purposes, including long and short-term investing, portfolio diversification, and to hedge their foreign investments against risks of foreign currency fluctuations.

72.     Spot transaction exchange rates are the foundation for pricing of all FX Instruments. The prices for forward outright trades, forward swap trades, currency option contracts, and all other FX Instruments are all derived from the underlying FX spot rates.

73.     Because all FX transactions are affected by spot prices, Defendants' manipulation of benchmark spot rates had widespread effects on all FX transactions throughout the Class Period.

**B.     Benchmark Rates**

74.     In placing FX spot trades, customers often use what are called benchmark rates, daily fixing rates, or "Fixes."  A Fix is a published exchange rate based on FX trades placed in a moment in time or a short interval of time.  Several Fixes are published by private parties and central banks.  To place an order at a Fix, a customer gives an FX dealer instructions to buy or sell a quantity of currency at a specific Fix.  The dealer guarantees execution at whatever rate the Fix is later posted.

75.     The Fixes have widespread effects on all FX transactions.  Many businesses— including credit card companies, consumer banks, and credit unions—determine the rates at which they sell FX to their customers based on the Fixes.

76.    Prior to the publishing of the Fixes, customers will place orders with dealers to buy or sell a specific quantity of FX at a specified Fix.  Because these orders are placed in advance of the fixing rates being published, dealers that accept spot trade orders at the Fixes are exposed to unexpected movements in currency prices.

77.    Dealers can take advantage of the interim between the time a customer places a fixing rate order and the time a Fix is published.  If a dealer is able to buy the ordered quantity of currency at a price that is less than the fixing rate, the dealer profits from the customer's order.  However, if a dealer pays more than the fixing rate, it loses money on the order.

78.    Because the Fixes are so widely recognized as benchmark rates in the FX market, they play a crucial role in FX trading and in the pricing of all FX Instruments.

### 1.    **WM/Reuters**

79.    While there are a number of published Fixes available to FX market participants, the most widely used Fix is the WM/Reuters Closing Spot Rates (the "WM/Reuters Fix" or "4:00 p.m. Fix"), which are set at 4:00 p.m. London time (11:00 a.m. New York time).  WM/Reuters is a joint venture between the WM Company (a wholly-owned subsidiary of State Street Corporation) and Thomson Reuters Corporation.  The WM/Reuters Closing Spot Rates are widely used because they are set around the time when the FX market is most liquid – near the end of the trading day in London, while the New York market is also open.  WM/Reuters calculates fixing rates for major currencies every half hour from 6:00 a.m. in Hong Kong/Singapore to 10:00 p.m. in the U.K., and they publish fixing rates for spot and forward transactions.

80.    WM/Reuters calculates the 4:00 p.m. Fix based on actual bids and offers placed on certain electronic trading systems during a one-minute window ("the fix period").  The fix period begins 30 seconds before 4:00 p.m. London time and ends 30 seconds after.  WM/Reuters uses bids and offers placed on the Currenex, Reuters Dealing 3000, and EBS electronic trading systems.

81.     The consolidation of trading information and calculation of the 4:00 p.m. Fix rates is automated.  Throughout the Class Period, WM/Reuters calculated the 4:00 p.m. Fix rates based on the median exchange rates of the FX transactions placed during the fix period, but the volumes of those trades placed during the fix period were not taken into account.  This made the 4:00 p.m. Fix especially vulnerable to concerted manipulation.

82.     WM/Reuters also provides fix rates for FX forwards, which are published as premiums or discounts to the WM/Reuters spot rates.  Thus, when the WM/Reuters Fix rates were manipulated by Defendants, WM/Reuters forward fix rates were also directly affected.

### 2.      The ECB Rates

83.     The European Central Bank ("ECB") reference rate provides FX spot rate Fixes for currency pairs that are traded against the euro.  After the WM/Reuters Fixes, the ECB reference rates ("ECB Fix" or "1:15 p.m. Fix") are the second-most widely used global FX benchmark rate.

84.     The ECB publishes the exchange rates for various euro-denominated currency pairs, as determined by the European Central Bank, based on FX spot trades placed at or around 1:15 p.m. GMT.  For each currency pair, the ECB publishes one rate for the 1:15 p.m. Fix.  The ECB Fixes are published on the ECB's website shortly after they are calculated.

### C.      The FX Market Is Concentrated and Dominated by Defendants

85.     Beginning in the late 1990s, the FX market experienced a significant increase in concentration.

86.     Defendants dominated the FX market throughout the Class Period, and continue to do so today.  In 2013, Defendants collectively controlled more than 90 percent of the global FX market.  According to the 2012 and 2013 FX Surveys by industry publication EUROMONEY, the

individual and aggregate shares of the global FX market for Defendants and their affiliated corporations in 2012 and 2013 were, respectively:

| Defendant | 2012 Market Share (Rank) | 2013 Market Share (Rank) |
|---|---|---|
| Deutsche Bank | 14.57% (1) | 15.18% (1) |
| Citigroup | 12.26% (2) | 14.90% (2) |
| Barclays | 10.95% (3) | 10.24% (3) |
| UBS | 10.48% (4) | 10.11% (4) |
| HSBC | 6.72% (5) | 6.93% (5) |
| JPMorgan | 6.60% (6) | 6.07% (6) |
| RBS | 5.86% (7) | 5.62% (7) |
| Credit Suisse | 4.68% (8) | 3.70% (8) |
| Morgan Stanley | 3.52% (9) | 3.15% (9) |
| Goldman Sachs | 3.12% (10) | 2.75% (11) |
| BNP Paribas | 2.63% (11) | 2.52% (12) |
| Bank of America | 2.41% (12) | 3.08% (10) |
| SocGen | 1.76% (13) | 1.57% (13) |
| Standard Chartered | 0.89% (18) | 0.91% (17) |
| RBC | 0.84% (19) | 0.88% (18) |
| BTMU | 0.24% (30) | 0.31% (23) |
| **Defendants' Aggregate Market Share:** | **90.86%** | **90.92%** |

87.     The FX market in the U.S. is even more concentrated and dominated by Defendants than the FX global market.  According to the Federal Reserve Bank of New York, the top ten banks in April 2013 were responsible for 98 percent of all FX spot trade volume in the United States, and the top five banks alone accounted for 80 percent.   According to the Foreign Exchange Committee's April 2012 survey of the North American FX market, the five largest FX dealers in North America had a 75 percent market share for spot transactions, and a 61.2 percent market share for all forward outright transactions.  The next five largest dealers had a 17.7 percent market share for spot transactions and a 26.5 percent market share for forward outright transactions.

88.     Traders employed by Defendants have significant influence on the FX market. Collectively, these traders account for a substantial majority of all FX trades.  Defendant traders

are a small, interconnected group.  Many have worked with one another in prior trading jobs, and

traders frequently communicate and socialize with traders at other Defendant banks.  The strong

familiarity among traders facilitated Defendants' collusive conduct alleged herein.

        **D.**        **The FX Market Is Susceptible to Collusion**

        89.      The global FX market lacks a central organizing body, making it one of the least

regulated financial markets in the world.  Most trading takes place in the OTC market, away from

centralized exchanges.

        90.      No centralized exchange or institution publishes real-time trade information for the

OTC market.  Defendants' proprietary dealing platforms allow their traders to view real-time

orders and trade volume data, but Defendants do not make this information available to private

traders.  Absent an agreement to collude, each individual Defendant would not have access to

information about other Defendants' trade orders, and it would be in the economic interest of each

Defendant to keep its own trade data confidential.

        91.      Based on trade volume and price information from FX trades, Defendants can

analyze trading patterns, predict the direction of FX market movements, and exploit that

information.  A single dealer can only predict FX trading patterns if it has access to a large sample

size of FX trading data.  Private traders do not have this proprietary trading data, and are therefore

unable to analyze and accurately predict FX trading patterns.

        92.      Defendants' ability to predict and exploit FX trading patterns substantially grows

when they share confidential trade information with one another.

        93.      Throughout the Class Period, Defendants maintained internal accounts allocable to

individual FX traders, sometimes called "P-books," that allowed traders to trade and speculate on

FX with bank funds.  Revenues generated in an individual trader account accrued to the benefit of

the trader's employer bank, and those revenues were taken into account by Defendants for

purposes of evaluating and determining each trader's performance, promotion potential, salary, and bonuses.  Because aggregate trade data from multiple Defendants allows traders to predict and manipulate the movement of the market around the times of the Fixes, Defendants' maintenance of these "P-book" accounts incentivized traders to collude with traders at other Defendant dealers to manipulate FX rates.

94.     The sharing of confidential customer FX information by FX traders violates the Federal Reserve Bank of New York's "Guidelines for Foreign Exchange Trading Activities." However, throughout the Class Period, Defendants lacked adequate procedures and safeguards to prevent trader collusion.

95.     Defendant traders involved in the sharing of confidential information to predict and manipulate FX exchange rates included high-level employees such as the former global head of FX cash trading at HSBC, the head of HSBC's FX cash trading operations for Europe, the global head of spot trading at Barclays, the director of emerging markets FX trading at Barclays, the director of emerging markets FX trading at BNP Paribas, the head of European spot FX trading at Citigroup, and the head of FX spot trading at JPMorgan.  In several instances where Defendant supervisors were explicitly made aware that employees were sharing confidential customer information, Defendants took no disciplinary action or delayed disciplinary action until several years later, when Defendants' knowledge of this conduct was revealed to government investigators and the public.

96.     The FX traders employed by Defendants are a small, highly interconnected group. Even at the largest banks, FX trading desks are typically staffed with less than ten traders, many of whom have worked previously with their counterparts in other banks.

32

97.     With Defendants' dominant collective market share, a lack of government regulation, high barriers to entry, institutional incentives for traders to cheat, close social and professional ties among FX traders, and limited non-dealer access to pricing and trade information, the unique characteristics of the FX market make it highly susceptible to collusive activity.  As a former Citigroup trader noted, "[t]his is a market in which price fixing and collusion could actually work."

## II.      DEFENDANTS CONSPIRED TO FIX FX PRICES

98.     Beginning on or before December 1, 2007, Defendants conspired with one another to fix prices in the FX market on a daily basis.  In furtherance of the conspiracy, Defendants manipulated the exchange rates of over two dozen of the most frequently traded currency pairs.

99.     Defendants' conspiracy involved, *inter alia*: (1) the fixing of FX bid-ask spreads; and (2) the fixing of benchmark FX rates, including, but not limited to, the WM/Reuters Fixes and the ECB Fixes.

100.    In furtherance of their conspiracy, Defendants: (1) created and participated in chat rooms and other forms of electronic communication; (2) shared confidential client and proprietary trading information with other Defendants involved in the conspiracy; (3) coordinated trades with other Defendants in order to illegally manipulate FX benchmark rates and spot rates; (4) monitored the trades placed by traders employed by co-conspirator Defendants in order to ensure compliance with the conspiracy; and (5) used code names, code words, and deliberate misspellings in efforts to evade detection.

101.    As a result of Defendants' conspiracy, Plaintiffs and the members of the proposed Classes were injured in the form of overcharges on FX Instruments purchased indirectly from one or more Defendants or co-conspirators during the Class Period.

A.     **Defendants Conspired to Fix Prices and Carried Out the Conspiracy through Electronic Communications**

102.    Defendants' top-level traders held secret online meetings in chat rooms throughout the Class Period.  Plaintiffs are aware of thousands of electronic communications made between traders employed by dozens of banks, including each Defendant, in which traders coordinated trades and exchanged information about orders, spreads, exchange rates, and Fixes.  For example:

a.      Bank of America participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), Australian dollar (AUD), Swiss franc (CHF), and South African rand (ZAR).

b.      Barclays participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), Canadian dollar (CAD), Russian ruble (RUB), and South African rand (ZAR).

c.      BNP Paribas participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), Russian ruble (RUB), Mexican peso (MXN), and Thai baht (THB).

d.      BTMU participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), and Swiss franc (CHF).

e.      Citigroup participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Australian dollar (AUD), New Zealand dollar (NZD), and South African rand (ZAR).

f.      Deutsche Bank participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), the British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), New Zealand dollar (NZD), Canadian dollar (CAD), Russian ruble (RUB), South African rand (ZAR), Chinese yuan (CNY), Czech koruna (CZK), Hong Kong dollar (HKD), Singapore

34

dollar (SGD), Turkish lira (TRY), Indonesian rupiah (IDR), Indian rupee (INR), and South Korean won (KRW).

g.     Goldman Sachs participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), and Australian dollar (AUD).

h.     HSBC participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Swiss franc (CHF), Russian ruble (RUB), Mexican peso (MXN), and Thai baht (THB).

i.     JPMorgan participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), and Swiss franc (CHF).

j.     Credit Suisse participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Australian dollar (AUD), Swiss franc (CHF), Czech koruna (CZK), and South African rand (ZAR).

k.     Morgan Stanley participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), and Japanese yen (JPY).

l.     RBC participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Australian dollar (AUD), New Zealand dollar (NZD), Canadian dollar (CAD), Swiss franc (CHF), and Japanese yen (JPY).

m.     RBS participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), and New Zealand dollar (NZD).

n.     SocGen participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Australian dollar (AUD), Polish zloty (PLN), Brazilian real (BRL), Mexican peso (MXN), Chinese yuan (CNY), Israeli shekel (ILS), and Thai baht (THB).

o. Standard Chartered participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), Japanese yen (JPY), and Brazilian real (BKL).

p. UBS participated in chat rooms discussing the U.S. dollar (USD), euro (EUR), British pound (GBP), Japanese yen (JPY), Swiss franc (CHF), Australian dollar (AUD), New Zealand dollar (NZD), Canadian dollar (CAD), Chinese yuan (CNY), Singapore dollar (SGD), South Korean won (KRW), and Taiwan dollar (TWD).

103. The secret chat rooms were controlled by Defendants' top-level traders. Defendants referred to chat groups with names such as "The Cartel," "The Bandits' Club," "One Team, One Dream," "the 3 musketeers," "the A-team," "The players," "the Essex Express," and "The Mafia." The "Essex Express" focused on trading Japanese yen and included traders from UBS, Barclays, RBS, and BTMU. "The Mafia" included traders from Citigroup, Credit Suisse, and UBS. "The Cartel" included traders at Barclays, UBS, Citigroup, and JPMorgan.

104. Defendant traders participating in these secret chat rooms shared their "positions"—the amount of a specific currency that they had orders to trade at the Fix—prior to the WM/Reuters Fix and other Fixes. For example, that was uncovered by the Commodities Futures Trading Commission ("CFTC") in its investigation into Defendants' conduct, traders at RBS, HSBC, and an undisclosed third bank shared their positions prior to 4:00 p.m., then congratulated each other on successfully manipulating the rate after the 4:00 p.m. Fix:

| Trader | Time | Message |
| --- | --- | --- |
| RBS | 3:45:35 p.m. | im getting abt 80 quid now…fixing |
| HSBC | 3:45:54 p.m. | my ny 100 quid |
| RBS | 3:51:19 p.m. | getting more than u now [HSBC Trader] betty |
| HSBC | 3:51:26 p.m. | ok thx |
| Bank W | 3:52:23 p.m. | nice job gents |
| HSBC | 3:54:16 p.m. | [RBS Trader], just matched with [Bank 1] and [Bank 2] for 100, still lhs in about 140 |
| RBS | 3:54:26 p.m. | Cool |
| Bank Z | 4:00:58 p.m. | i don my hat |

| Bank W | 4:01:08 p.m. | what a job |
| Bank Z | 4:01:23 p.m. | welld one lads |
| Bank W | 4:01:28 p.m. | Bravo |
| RBS | 4:07:03 p.m. | 1.6218..nice |
| HSBC | 4:07:33 p.m. | worked ok that one |

105.    Many of Defendants' FX traders participated in multiple chat rooms, allowing them to communicate with many other Defendants each day.   For example, in several transcripts revealed by the CFTC, an HSBC trader participated in four separate chat rooms in the minutes leading up to the 4:00 p.m. Fix.   First, the HSBC trader entered a chat room to disclose to traders at Barclays and other banks that he was a seller in "cable" (GBP/USD):

| Trader | Time | Message |
|---|---|---|
| Barclays 1 | 2:50:21 p.m. | early days but im a seller cable at fix [. . .] |
| Bank S | 3:11:43 p.m. | here also |
| Bank R | 3:24:50 p.m. | u got much to do in fix [Bank Trader W] |
| Barclays 1 | 3:25:07 p.m. | im seller 130 cable that it [. . .] |
| Barclay 1 | 3:28:02 p.m. | hopefulyl a fe wmore get same way and we can team whack it |
| Bank R | 3:28:17 p.m. | ill do some digging [. . .] |
| Barclays 1 | 3:36:13 p.m. | im seller 170 gbp atmofix |
| Bank R | 3:36:26 p.m. | we sellers of 40 |
| HSBC | 3:38:26 p.m. | lhs in cable at the fix |
| HSBC | 3:38:29 p.m. | good amount [. . .] |

As the 4 p.m. Fix period closed, the participants in the chat room congratulated each other:

| Bank R | 4:00:35 p.m. | well done gents |
| Barclays 1 | 4:01:56 p.m. | hooray nice team work |
| HSBC | 4:02:22 p.m. | nice one mate |

Prior to the Fix that same day, the HSBC trader participated in a separate chat room and conveyed the information he had learned in the first room to another Barclays trader:

| Trader | Time | Message |
|---|---|---|
| HSBC | 3:25:19 p.m. | get lumpy cable at the fix ok |
| Barclays 2 | 3:25:32 p.m. | ta mate |
| Barclays 2 | 3:25:35 p.m. | 150 here |
| HSBC | 3:25:46 p.m. | 400 odd here |
| HSBC | 3:25:50 p.m. | lets go |

| Barclays 2 | 3:26:00 p.m. | yeah baby |
| HSBC | 3:26:03 p.m. | [Barclays Trader 1] is too [. . .] |
| Barclays 2 | 3:27:00 p.m. | sry thats the [Barclays] flow |
| Barclays 2 | 3:27:23 p.m. | [Barclays Trader 1] gets |
| HSBC | 3:28:26 p.m. | so its 150 all day wiht you guys? [. . .] |
| Barclays 2 | 3:36:34 p.m. | 170 here |

As the 4 p.m. Fix period closed, the traders celebrated:

| Trader | Time | Message |
| --- | --- | --- |
| Barclays 2 | 4:01:03 p.m. | nice job mate |
| HSBC | 4:03:34 p.m. | haha |
| HSBC | 4:03:40 p.m. | i sold a lot up there |
| HSBC | 4:03:46 p.m. | and over sold by 100 |
| HSBC | 4:03:48 p.m. | hahaha [. . .] |
| Barclays 2 | 4:04:06 p.m. | sweet nice job [. . .] |
| Bank W 2 | 4:05:04 p.m. | bravo |

At the same time, the HSBC trader disclosed that he was selling at the Fix in yet another private

chat with a trader at an unknown bank prior to the close of the Fix period:

| Trader | Time | Message |
| --- | --- | --- |
| HSBC | 3:28:45 p.m. | lhs in about 300 quid cable for the fix |
| Bank V | 3:28:54 p.m. | sweet |
| HSBC | 3:29:42 p.m. | can you do some digging and seeif anyoine is that way |
| Bank V | 3:29:52 p.m. | ofcourse mate |
| Bank V | 3:34:49 p.m. | im getting 83 at mom mate |
| HSBC | 3:34:56 p.m. | nice [. . .] |
| Bank V | 3:37:38 p.m. | someone tells a guy here he is getting 170 cble at fix |
| Bank V | 3:43:28 p.m. | see that [Bank U Trader] |
| HSBC | 3:43:57 p.m. | thx |

As the 4 p.m. Fix period ended, the traders continued:

| Trader | Time | Message |
| --- | --- | --- |
| Bank V | 4:00:51 p.m. | have that my son |
| Bank V | 4:00:52 p.m. | hahga |
| Bank V | 4:00:56 p.m. | v nice mate |
| HSBC | 4:04:53 p.m. | that worked nice mate |
| Bank V | 4:05:44 p.m. | big time mate. |

In a fourth chat room, the HSBC trader disclosed his position to traders at Barclays and other banks prior to the close of the Fix period.  The traders shared information about the size and direction of the net orders at the Fix period:

| Trader | Time | Message |
|---|---|---|
| Barclays 2 | 3:36:18 p.m. | see first seller now |
| Bank Z | 3:36:48 p.m. | you gettingt betty3 on the mumble still [Barclays Trader 2]? |
| Bank Z | 3:36:51 p.m. | we have nowt |
| Barclays 2 | 3:36:56 p.m. | yep |
| Barclays 2 | 3:36:59 p.m. | 170 |
| Bank Z | 3:37:05 p.m. | ta |
| Bank Z | 3:37:21 p.m. | get it up to 60/70 then bash the fck out of it |
| HSBC | 3:38:26 p.m. | lhs in cable at the fix |
| HSBC | 3:38:29 p.m. | good amount |
| Bank Z | 3:38:35 p.m. | ta [. . .] |
| Bank Z | 4:00:28 p.m. | nice work gents |

By participating in multiple chat rooms and sharing information, Defendants were able to amplify their influence on the FX market and successfully manipulate FX rates.

106.   Defendants' traders that were involved in the conspiracy actively monitored the activity of other co-conspirator traders in order to ensure compliance.  Traders that failed to comply with the conspiracy were threatened with punishment by other Defendant traders.

107.   Only a select group of traders were allowed into the secret groups, and traders were highly protective of their membership.  In a December 2011 chat room conversation uncovered by the CFTC, three Defendant traders discuss inviting another trader from Barclays into their chat group, called the "Cartel":

| Trader | Time | Message |
|---|---|---|
| Matt Gardiner (UBS) | 7:49:55 p.m. | are we ok with keeping this as is . . . |
| | 7:50:27 p.m. | ie the info & risk sharing? |
| Rohan Ramchandani (Citigroup) | 7:50:27 p.m. | Well . . . |
| Matt Gardiner (UBS) | 7:50:30 p.m. | that is the qu[estion] |
| Rohan Ramchandani (Citigroup) | 7:50:32 p.m. | you know him best obv . . . |
| | 7:50:39 p.m. | if you think we need to adjust it |
| | 7:50:43 p.m. | then he shouldn't be in chat |

| Richard Usher (JPMorgan) | 7:50:54 p.m. | yeah that is key |
|---|---|---|
| | 7:51:00 p.m. | simple question . . . |
| | 7:51:08 p.m. | I trust you implicitly . . . |
| | 7:51:13 p.m. | and your judgement |
| | 7:51:16 p.m. | you know him |
| | 7:51:21 p.m. | will he tell rest of desk stuff |
| | 7:51:26 p.m. | or god forbid his nyk [New York office] |
| Rohan Ramchandani (Citigroup) | 7:51:46 p.m. | yes |
| | 7:51:51 p.m. | that's really imp[ortant] qu[estion] |
| | 7:52:01 p.m. | don't want other nuptys in mkt to know |
| | 7:52:17 p.m. | but not only that |
| | 7:52:21 p.m. | is he gonna protect us |
| | 7:52:33 p.m. | like we protect each other against our own branches |
| | 7:52:46 p.m. | ie if you guys are rhs [right hand side, a code for buying the first currency listed in a currency pair] and my nyk is lhs [left hand side] . . . ill say my nick [New York office] lhs in few |
| Matt Gardiner (UBS) | 7:53:52 p.m. | what concerns me is that i know he'll never tell us when at risk |

After further discussion about whether the Barclays trader would "add huge value to this cartel," the three traders agreed to invite the Barclays trader into the chat room for a "1 month trial," although Citigroup trader Rohan Ramchandani warned the Barclays trader, "mess this up and sleep with one eye open at night."

108.   Defendants' traders used the chat rooms to coordinate their trades in order to move exchange rates in directions that favored Defendants, to the detriment of non-conspirator market participants.  Defendants used code names and words in the chat rooms in efforts to evade detection by governmental authorities.  For example, one message uncovered by regulators from a chat room involving traders from HSBC and Barclays said: "You getting betty on the mumble still?  We have nowt . . . Get it up to 60/70 then bash the fck out of it."  "Betty" in the message is a reference to Betty Grable, and Grable rhymes with cable – the term for USD/GBP trades.  Traders in chat rooms also used nicknames to refer to each other.  For example, in the chat group known to

members as the "Cartel," former RBS and JPMorgan trader Richard Usher was referred to as "Feston" because he resembled an overweight version of British chef Heston Blumenthal; Citigroup Rohan Ramchandani trader was called "Ruggy," and Barclays trader Chris Ashton was dubbed "Robocop."

### B.    Defendants Conspired to Fix Bid-Ask Spreads

109.    Beginning at least as early as December 1, 2007, as part of their conspiracy to fix prices in the FX market, Defendants conspired to fix the bid-ask spreads paid by customers for various currency pairs.   As alleged above, there are thousands of electronic communications between traders at two or more Defendant banks discussing FX bid-ask spreads and colluding to manipulate FX rates.

110.    Defendants quote bid-ask spreads directly to customers on demand throughout the trading day.

111.    Through electronic communications, traders employed by Defendants and their co-conspirators exchanged information about bid-ask spreads and customer orders, and coordinated quotes and orders between banks.   For example, in a November 4, 2010 chat, a Barclays trader discussed manipulating the USD/South African Rand rate with a JPMorgan trader, stating, "if you win this we should coordinate you can show a real low one and will still mark it little lower haha." The JPMorgan trader acknowledged the illegality of their scheme, suggesting that they "prolly shudnt put this on perma chat."   The Barclays trader responded, "if this is the chat that puts me over the edge than oh well. much worse out there."   Weeks later, on November 17, 2010, the same Barclays trader entered a chat room and told traders at other banks to "show them way to the left . . . if they come here I will show them little worse . . . you win . . . and get them cheap."   Months later, in a chat room on February 25, 2011, the same Barclays trader coordinated with a trader at Standard Chartered to fix bid-ask spreads.   The Standard Chartered FX trader asked "what bid you

want me to show if somwone calls" and the Barclays trader responded "up to 02."  The Standard Chartered trader replied, "okok" and "ill let you know if we get asked."  Later that year, on June 10, 2011, the Barclays trader showed up in another chat room to tell other traders that "we trying to manipulate it a bit more in ny now . . . a coupld buddies of mine and I."

112.    Bid-ask spreads are a primary source of revenue for FX dealers, and in a competitive FX market, absent collusion, a profit-maximizing dealer would seek to gain customers and market share by beating the spreads offered by competitor dealers.  On the other hand, a decision to increase bid-ask spreads would result in a loss of customers to dealers with more advantageous quotes.  Customers want narrower spreads, allowing them to buy currency at lower prices and sell currency at higher prices.  Only through coordinated price fixing could an FX dealer quote less desirable bid-ask spreads without losing market share.

**C.    Defendants' Conspiracy to Fix the Benchmark Rates**

113.    Beginning at least as early as December 1, 2007, Defendants conspired to manipulate the Fixes.

114.    Defendants' traders carried out their conspiracy by communicating via chat rooms, instant messages, and email.  Through these communications, Defendants regularly shared confidential pricing and order information before the Fixes.  Armed with this shared confidential information, Defendants executed coordinated trading strategies designed to manipulate the Fixes.

115.    Defendants' conspiracy was successful in manipulating the Fixes, allowing Defendants to earn supracompetitive profits to the detriment of non-conspirator traders, including Plaintiffs and members of the proposed Classes.

     1.    **Defendants Shared Proprietary Trade Data In Order To Manipulate FX Benchmark Rates**

116.    Defendants regularly shared confidential customer trade data with traders employed at other Defendant dealers.  Each Defendant compiled trade order data to determine the amount of currency that it needed to buy or sell at the Fixes.  Defendants then shared that data with other Defendants through secret electronic communications, enabling each Defendant to predict and influence the movement of FX prices during and around the times of the Fixes.

117.    Defendants' sharing of information allowed their traders to predict how the market would move around the times of the Fixes much more accurately than they could without the sharing of proprietary information.

118.    The sharing of confidential customer FX information violates the Federal Reserve Bank of New York's "Guidelines for Foreign Exchange Trading Activities."  Specifically, the Guidelines provide:

> Confidentiality and customer anonymity are essential to the operation of a professional foreign exchange market.  Market participants and their customers expect that their interests and activity will be known only by the other party to the transaction . . . and an intermediary, if one is used.  It is inappropriate to disclose, or to request others to disclose, proprietary information relating to a customer's involvement in a transaction except to the extent required by law or upon the request of the appropriate regulatory body.
> * * *
> Staff should not pass on confidential and nonpublic information outside of their institution.  Such information includes discussions with unrelated parties concerning their trades, their trading positions, or the firm's position.  It is also inappropriate to disclose, or to request others to disclose, information relating to a counterparty's involvement in a transaction except to the extent required by law.  Institutions should develop policies and procedures governing the internal distribution of confidential information.  Trading room staff should take special precautions to avoid situations involving or appearing to involve trading on nonpublic information.

119.    Rather than taking precautions to prevent the sharing of nonpublic information, as required by the Federal Reserve Guidelines, Defendants actively shared information about customers, transactions, pending orders, and other nonpublic data.

2.      **Methods of Manipulating Benchmark Rates**

120.    Defendants employed a number of strategies in collusively manipulating the Fixes. Defendants had various nicknames for these strategies, including "trading ahead," "front-running," "banging the close," "painting the screen," "netting off," "building," "giving the ammo," "taking the ammo," "taking out the filth," and "clearing the decks."

121.    All of these strategies were accomplished by Defendants sharing confidential customer trade information with one another in order to gain anticompetitive advantage in the FX market and increase their chances of profiting from trades placed at the Fixes.

122.    Defendants' traders engaged in a market manipulation strategy called "trading ahead" when their shared customer trade order data indicated that trades placed at and around the Fix would move FX rates in a particular direction.  If the trade data indicates that trades placed around the Fix will cause a particular currency to rise in value, privy traders would order that currency in advance of the Fix, and/or sell after the Fix, and profit from the gains.

123.    Entities that purchase FX directly from Defendants often place substantial FX orders at the Fixes hours before the Fixes are actually set.  Sharing information about these upcoming trades allowed Defendants to predict the direction that the market would move for certain currencies.

124.    Absent collusion, no single Defendant would have had sufficient trade data to profitably predict the movement of the market around the times of the Fixes.  Although Defendants collectively dominated the market, no Defendant had sufficient market share to consistently and accurately project the direction of the market based solely on its own customer orders.

125.    In order to avoid the risk of incorrectly guessing the direction of the market leading up to and after the Fix, Defendants regularly agreed through secret communications to collectively

"front run" or "trade ahead," working together to sequence their customers' orders in order to push FX rates in a certain direction, then buying or selling the manipulated FX for a profit. Defendants employed this strategy to manipulate the WM/Reuters Fixes and the ECB Fixes.

126. In one detailed example of "front running" trader manipulation uncovered by the United Kingdom Financial Conduct Authority ("FCA"), an HSBC trader coordinated with co-conspirators at Barclays and other banks to manipulate the 4:00 p.m. Fix for GBP/USD by placing multiple smaller trades leading up to the Fix, then placing large trades at the Fix to take advantage of the manipulated rate. At around 3:30 p.m., the HSBC trader entered a chat room and told traders "Let's go." A trader at another bank replied "yeah baby," then "hopefuulyl a fe wmore get same way and we can team whack it." A third trader encouraged the second trader to "bask the fck out of it." The first trader informed the HSBC trader that he had a deal with another bank, which was buying: "Taken him out . . . so shud have iot rid of main buyer for u . . . im stilla seller of 90 . . . gives us a chance." HSBC ended up selling £70 million between 3:32 p.m. and the start of the Fix period. Those early trades were designed to take advantage of the expected downwards movement in the Fix rate following the discussions within the chat room. In that time period, the GBP/USD rate fell from $1.6044 to $1.6009. The HSBC trader then sold £311 million during the Fix period. HSBC, Barclays, and the two other banks involved in the chat room accounted for 63 percent of the volume of sales on the Reuters electronic trading platform that day. The 4:00 p.m. Fix price was $1.6003, and HSBC's profit in this trade was $162,000. After the Fix, the four traders congratulated each other on a successful manipulation, chatting: "Nice work gent . . . I don my hat," "dont mess with our ccy [currency]," "loved that mate . . . worked lovely . . . pity we coldn't get it below the 00 [below $1.6000]," and "we need a few more of those for me to get back on track this month."

127.   In another example of "front running" uncovered by the CFTC, traders from Barclays and HSBC discussed unloading positions just prior to the WM/Reuters Fix period, commencing at 3:54 p.m.:

| Trader | Time | Message |
|---|---|---|
| Barclays | 3:54:32 p.m. | can u let me know when are down to your last tenner |
| HSBC | 3:55:02 p.m. | ok |
| HSBC | 3:55:10 p.m. | i'm down to my last tenner |
| Barclays | 3:55:17 p.m. | ok ta |
| Barclays | 3:55:41 p.m. | just sold some more |
| HSBC | 3:55:49 p.m. | hahaha |
| Barclays | 3:55:51 p.m. | hehehe |
| Barclays | 4:00:57 p.m. | nice on[e] son |
| HSBC | 4:03:15 p.m. | learnt from a good fella |
| Barclays | 4:15:43 p.m. | there u go |
| Barclays | 4:16:48 p.m. | go early, move it, hold it, push it |

128.   In another example of "front running," traders at JPMorgan and an undisclosed co-conspirator bank agreed to "join forces" and "double team" euro trades prior to the Fix:

| Trader | Time | Message |
|---|---|---|
| Bank W | 3:46:53 p.m. | i'd prefer we join forces |
| JPMorgan | 3:46:56 p.m. | perfick 3:46:59 lets do this |
| JPMorgan | 3:47:11 p.m. | lets double team them |
| Bank W | 3:47:12 p.m. | YESsssssssssssss |

By the 4:00 p.m. Fix, JPMorgan had built orders of €278 million, while the other trader's orders totaled €240 million.  JPMorgan bought €57 million in the two minutes before the Fix window, attempting to take advantage of the expected upwards movement in the Fix rate following the discussions within the chat room.  During the Fix calculation period, JPMorgan bought €134 million and the other trader bought €125 million.  Between the two banks, they accounted for 41 percent of all EUR/USD trading at the Fix.  JPMorgan's profit in this trade was $33,000.  Shortly after the fixing window, the traders congratulated themselves:

| Trader | Time (U.S. Eastern) | Message |
|---|---|---|
| Bank W | 4:03:25 p.m. | sml rumour we haven't lost it |
| JPMorgan | 4:03:45 p.m. | we |

| JPMorgan | 4:03:46 p.m. | do |
| JPMorgan | 4:03:48 p.m. | dollarrr |

129.     Defendants also engaged in a market manipulation strategy that they referred to as "banging the close."  "Banging the close" refers to traders breaking large FX orders into multiple smaller trades, in order to artificially inflate the Fixes.

130.     Because the WM/Reuters Fixes were based on the median of spot rates for trades placed during the calculation window, but the volume of each trade was not taken into account, the WM/Reuters Fixes were particularly vulnerable to collusive manipulation by Defendants.  By splitting large trades into multiple smaller trades, Defendant traders working in conjunction could manipulate the median exchange rates of trades made during the WM/Reuters calculation window, thereby manipulating the WM/Reuters Fix.

131.     Defendants also employed these strategies, including "front running" and "banging the close," to manipulate the ECB Fixes.

132.     In one example of "banging the close" in a chat room transcript uncovered by the FCA, Citigroup had net buy orders of €200 million and stood to benefit if it was able to move the ECB Fix rate upwards.  The Citigroup traders were able to "build" this order by gathering information about euro orders from other co-conspirator banks.  Traders at the other banks agreed to transfer their buy orders to Citigroup, and with these additional trades, Citigroup traders accumulated €542 million in total buy orders.  In the 15 seconds before the ECB fix, Citigroup placed four buy orders of increasing size and price, which were priced at a level above the prevailing offer price.  According to the FCA, Citigroup's trading in this case generated a profit of $99,000.

133.     The converse of "banging the close" was called "clearing the decks."  By combining small trades into a lesser number of large trades, Defendant traders could manipulate

the WM/Reuters and ECB Fixes by artificially decreasing the number of trades placed during the calculation windows for the Fixes, thereby manipulating the median exchange rates of trades made during those windows.

134.    The FCA uncovered a specific example of an RBS trader working with other banks to manipulate the WM/Reuters GBP/USD Fix by "clearing the decks" on a day when the RBS trader had net client sell orders at the Fix and would benefit if it was able to manipulate the 4:00 p.m. Fix rate lower.  In advance of the Fix, the RBS trader shared information about its Fix orders with other traders in a chat room, and the traders worked to combine, or "net off," their trades by transferring their trades to other dealer banks and combining them into larger trades.  In a separate chat room, RBS told three other traders: "We getting a lot Betty at fix" referring to GBP/USD.  In the period leading up to the 4:00 p.m. Fix, RBS built up £399 million to sell at the Fix, which was designed to take advantage of the expected downward movement in the Fix rate following the discussions within the chat room.  RBS made $615,000 in profit on this trade.

135.    In another "clearing the decks" example, traders at RBS and other banks agreed to share "ammo" and combine their small trades into one large trade to manipulate the Australian dollar and New Zealand dollar:

| Trader | Time | Message |
| --- | --- | --- |
| Bank T Trader | 3:43:32 p.m. | buying aud and nzd at the fix |
| RBS Trader | 3:43:43 p.m. | Tkx |
| Bank T Trader | 3:43:52 p.m. | ntg big |
| RBS Trader | 3:43:59 p.m. | Im buying 50 aud can do yours if you want |
| Bank T Trader | 3:45:13 p.m. | ok . . .60 plse . . .**** |
| RBS Trader | 3:45:56 p.m. | Great |
| Bank P Trader | 3:50:00 p.m. | I need to buy 25 aud at the fix too.. any int? more ammo for you…? |
| RBS Trader | 3:50:21 p.m. | Sure [Bank P Trader] |
| Bank P Trader | 3:51:24 p.m. | cool all yours [RBS Trader] |
| RBS Trader | 3:51:46 p.m. | Buying 220 now |
| Bank P Trader | 3:51:57 p.m. | good luck |
| Bank T Trader | 3:52:20 p.m. | load up your 50 offrs . . . |

48

| Trader | Time | Message |
|---|---|---|
| Bank P Trader | 3:53:14 p.m. | ill do those ones if you want |
| RBS Trader | 3:53:19 p.m. | haah |
| Bank T Trader | 3:53:20 p.m. | ur fkg [RBS Trader], ramp it |
| Bank T Trader | 4:00:41 p.m. | nice one ***** |
| Bank P Trader | 4:00:56 p.m. | look at you! . . . well done mate . . . |

136.   Defendants also manipulated the WM/Reuters Fixes by placing phony orders with one another during the WM/Reuters calculation window.

**D.     Other Conduct in Furtherance of the Conspiracy**

137.   In addition to fixing bid-ask spreads and the WM/Reuters and ECB Fixes, Defendants engaged in other illegal conduct in furtherance of the conspiracy by manipulating limit orders and triggering stop-loss orders.

138.   A stop-loss order is an order placed with instructions to buy or sell FX once the currency reaches a certain price.  A stop-loss order is designed to limit an investor's loss on a currency position by allowing the investor to expressly limit their loss to a certain amount.

139.   When a customer places a stop-loss order to buy FX, the dealer can profit if it purchases the currency for a rate less than the price at which the customer has agreed to pay.  If a customer places a stop-loss order to sell, the dealer can profit if it sells the FX for a higher average rate than the rate at which it buys the FX from the customer.

140.   Defendants frequently colluded to manipulate FX Fixes in order to move the rates towards levels that would trigger stop-loss orders and force customers to buy or sell.

**III.   DEFENDANTS' CONSPIRACY IMPACTED INDIRECT PURCHASES OF FX INSTRUMENTS**

141.   Defendants' collusive manipulation of FX spot prices and benchmark rates significantly impacted prices throughout the market for FX Instruments.

142.    Plaintiffs and members of the proposed Classes purchased FX Instruments directly from entities that are members of the preliminarily-certified Direct Settlement Class in *FOREX*, where the members of the Direct Settlement Class purchased those FX Instruments directly from one or more Defendants or co-conspirators.  Because members of the Direct Settlement Class are allowed to recover overcharge damages regardless of whether they passed on those overcharges to their customers (under the *Illinois Brick* "direct purchaser rule" for federal antitrust claims), Plaintiffs and members of the proposed Classes bring this action under state *Illinois Brick* repealer statutes and related state consumer protection statutes to recover the overcharge damages that were directly passed on to them by members of the Direct Settlement Class.

143.    Many members of the Classes proposed here, including Plaintiffs James Contant, Martin-Han Tran, Carlos Gonzalez, Ugnius Matkus, Jerry Jacobson, and Paul Vermillion purchased FX Instruments indirectly from Defendants and Defendants' co-conspirators through FX brokers.  FX brokers, also known as retail foreign exchange dealers, allow customers to trade various types of FX Instruments directly with the broker.  To purchase an FX Instrument from an FX broker, a customer sends an order electronically or by phone to the FX broker for an FX Instrument with a specific currency pair, exchange rate, and volume.  If the FX broker accepts the trade, the customer pays the agreed-upon rate, often with an additional fee or commission determined by the broker, and the broker places the FX Instrument in the customer's account. Upon receipt of an order from a customer, in order to hedge or cover its exposure on the resulting FX Instrument, the FX broker concurrently executes an FX Instrument with an FX dealer such as a Defendant with the same volume and currency pair as the FX Instrument that the FX broker sells to the customer.  Thus, the FX broker concurrently purchases an FX Instrument from an FX dealer and then resells that FX Instrument to the customer.  By executing matching, back-to-back FX

Instrument transactions with an FX dealer and the FX broker's customer, the broker is able to cover its exposure on customer transactions and avoid losses associated with fluctuations in FX rates. In this scenario, the FX broker is a direct purchaser of an FX Instrument from a Defendant or co-conspirator, and the customer is an indirect purchaser.

144.    FX brokers generally receive quotes from several liquidity providers for each currency pair that they offer to their customers. The liquidity providers provide bid-ask quotes for FX spot transactions to the FX brokers, and the FX brokers offer those quotes to their customers, often with some additional markup determined by the brokers. During the Class Period, all sixteen Defendants were liquidity providers for one or more FX brokers with whom Plaintiffs and members of the proposed Classes transacted. As a result of Defendants' conspiracy alleged herein, FX brokers paid supracompetitive prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and those overcharges were passed on by the FX brokers to their customers, including Plaintiffs and members of the proposed Classes.

## IV.    GOVERNMENT INVESTIGATIONS OF DEFENDANTS FOR ILLEGAL CONDUCT IN FX TRADING

145.    Governmental law enforcement and regulatory authorities in the United States, United Kingdom, European Union, Brazil, Switzerland, South Africa, and several other sovereigns are conducting ongoing investigations of Defendants' conduct in the FX market.

146.    On November 11, 2014, the Commodity Futures Trading Commission brought and settled charges against Citigroup, HSBC, JPMorgan, RBS, and UBS for violations of the Commodity Exchange Act relating to their involvement in the FX manipulation conspiracy. The CFTC settlements required the five Defendants to pay combined fines of over $1.4 billion, including $310 million each for Citigroup and JPMorgan, $290 million each for RBS and UBS, and $275 million for HSBC. On May 20, 2015, the CFTC brought and settled similar charges

against Barclays for violations of the Commodity Exchange Act relating to its involvement in the FX manipulation conspiracy.  The CFTC settlement with Barclays requires the bank to pay $400 million in fines.

147.   On November 12, 2014, the U.S. Office of the Comptroller of the Currency ("OCC") announced that it assessed files of $250 million against Bank of America, $350 million against Citigroup, and $350 million against JPMorgan "for unsafe or unsound practices related to their foreign exchange (FX) trading businesses."  In addition to assessing monetary penalties, the OCC issued cease and desist orders requiring the three Defendants to correct deficiencies and enhance oversight of their FX trading activity.  The OCC found that between 2008 and 2013, some of the banks' traders held discussions in online chat rooms for purposes of coordinating FX trading strategies to manipulate exchange rates to benefit traders and the banks.

148.   On May 20, 2015, the U.S. Department of Justice ("DOJ") announced that Defendants Citigroup, JPMorgan, Barclays, and RBS had agreed to plead guilty to felony charges of conspiring to manipulate the prices of U.S. dollars and euros traded in the FX spot market, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.  As part of the plea deals, the four Defendants agreed to pay criminal fines totaling more than $2.5 billion.  The Defendants also agreed to "a three-year period of corporate probation," and are required to cooperate in the DOJ's ongoing criminal investigations of other Defendants and co-conspirators.  Each of the four Defendants admitted in their plea agreement that "[h]ad this case gone to trial, the United States would have presented evidence sufficient to prove the following facts: . . . The defendant and its co-conspirators carried out the conspiracy to eliminate competition in the purchase and sale of the EUR/USD currency pair by various means and methods including, in certain instances, by: . . . coordinating the trading of the EUR/USD currency pair in connection with European Central Bank

and World Markets/Reuters benchmark currency 'fixes' which occurred at 2:15 PM (CET) and 4:00 PM (GMT) each trading day. . . ." The four Defendants also admitted in their plea agreements that the conspiracy began "at least as early as December 2007 and continued until at least January 2013."

149.    Also on May 20, 2015, the DOJ announced that UBS had agreed to plead guilty and pay a $203 million criminal penalty for illegal FX-related conduct in violation of a Non-Prosecution Agreement that was entered into between UBS and the DOJ Fraud Section on December 18, 2012. The Non-Prosecution Agreement was signed in connection with the DOJ's previous investigation into UBS's involvement in a conspiracy to manipulate benchmark interest rates, including the London InterBank Offered Rate ("LIBOR"). The May 20, 2015 plea agreement provides that "UBS expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for UBS make any public statement, including in litigation . . . contradicting the facts set forth in Exhibit 1." The facts in Exhibit 1 of the plea agreement include:

- "Certain employees of UBS engaged in conduct after December 18, 2012, . . . namely, (i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat, to the detriment of UBS's customers, and (ii) collusion with other participants in certain FX markets.";

- "UBS's compliance program . . . did not detect collusive and deceptive sales-related conduct in FX markets until an article was published pointing to potential misconduct in the FX markets."; and

- "Prior to, and continuing after [December 18, 2012], UBS, through one of its FX traders, conspired with other financial services firms acting as dealers in an FX spot market by agreeing to restrain competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere. This was achieved by, among other things: (i) coordinating the trading of the EUR/USD currency pair in connection with ECB and WMR benchmark currency "fixes" which occurred at 2:15 PM (CET) and 4:00 PM (GMT) each trading day, and (ii) refraining from certain trading behavior, by withholding bids and offers, when one conspirator held

53

an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position. UBS participated in this collusive conduct from in or about October 2011 and continued until at least January 2013."

150.    In connection with the DOJ investigation, the U.S. Federal Reserve imposed additional combined fines of over $1.6 billion on Citigroup, JPMorgan, Barclays, RBS, and UBS.

151.    Also on May 20, 2015, the New York State Department of Financial Services ("NYDFS") announced that Barclays would be required to pay $485 million and ordered the termination of eight Barclays employees who engaged in New York Banking Law violations in connection with manipulating FX rates.  Barclays admitted in the consent order with NYDFS that it had engaged in misconduct regarding the trading of FX "from at least 2008 through 2012."  On November 18, 2015, the NYDFS ordered Barclays to pay an additional $150 million in fines and terminate another employee for further FX trading violations.

152.    In July 2016, HSBC's global head of FX cash trading, Mark Johnson, was arrested by U.S. authorities at the John F. Kennedy airport in New York on charges of conspiracy and wire fraud.  A warrant was also issued for the arrest of Stuart Scott, who was formerly Johnson's deputy and head of HSBC's FX cash trading operations for Europe, the Middle East, and Africa, until he left HSBC in 2014.  U.S. prosecutors announced in October 2016 that they would institute formal extradition proceedings for Scott, who has remained in England since the warrant was issued.  In a criminal complaint filed against Johnson and Scott on July 19, 2016, the DOJ alleges that Johnson and Scott conspired to defraud a client company by "front running" the client's $3.5 billion FX spot transaction for GBP/USD executed in December 2011.  According to the DOJ complaint, Johnson and Scott misled the client into agreeing to trade the entire $3.5 billion transaction at the WM/Reuters 3:00 p.m. Fix.  When the client agreed, Johnson and Scott discussed on a recorded phone call how high they could "ramp" up the price of GPB/USD before the client would "squeal,"

and then placed "front running" FX orders in anticipation that the client's order would drive up the price of GBP/USD.  Johnson and Scott encouraged other HSBC traders in New York and London to purchase GBP in their individual trader "P-book" accounts, and Scott purchased GBP in his P-book account.  When the client authorized the trade, Scott told Johnson, "full amount" (indicating that the client had authorized the full order), to which Johnson replied, "Ohhhh, f***ing Christmas."  The DOJ complaint alleges that HSBC earned approximately $5 million from its execution of the trade, and an additional $3 million from trades placed in their traders' "P-book" accounts.  Two years prior to the arrests, HSBC conducted its own investigation into the $3.5 billion trade, but found no wrongdoing.  HSBC is currently reviewing that investigation.

153.    In December 2016, the DOJ filed sentencing memoranda indicating that Barclays, JPMorgan, and Citigroup had provided the DOJ with evidence of another antitrust conspiracy in the FX spot market that involves currency pairs other than EUR/USD.   That new evidence led the DOJ to broaden its long-running investigation into the manipulation of FX markets to include additional currencies.  The DOJ requested that the criminal fines for Barclays, JPMorgan, and Citigroup be reduced due to the three banks' assistance in the ongoing investigation.

154.    On January 10, 2017, the U.S. District Court for the District of Connecticut entered judgments against Citigroup, Barclays, JPMorgan, UBS, and RBS.  The criminal fines imposed against each Defendant were $925 million for Citigroup, $710 million for Barclays, $550 million for JPMorgan, $203 million for UBS, and $395 million for RBS.  All five Defendants were sentenced to probation for three years.

155.    On January 4, 2017, former Barclays trader Jason Katz pleaded guilty to federal charges.  Katz worked for a year as director of emerging markets-foreign exchange trading at Barclays beginning in 2010, joined BNP Paribas in September 2011 as director of emerging

markets-foreign exchange trading for two years, and then moved to work for Australia & New Zealand Banking Group Ltd.  In his guilty plea, Katz admitted to participating in a conspiracy with other bankers to manipulate currency prices on electronic trading platforms by creating bogus trades and coordinating bids with other traders while working at three different financial institutions from 2007 to 2013.  As part of the plea deal, Katz has agreed to cooperate with the government's ongoing investigation into Defendants' conspiracy.  The conspiracy charge Katz admitted to has a maximum penalty of 10 years in prison and a $1 million fine, which may be increased to twice the gain derived from the crime or twice the losses suffered by victims if either amount is greater than $1 million.

156.    That same day, the Federal Reserve Board announced that had permanently banned Katz from the banking industry.  The Federal Reserve Board has also issued lifetime bans to Matthew Gardiner, a former FX trader at Barclays and UBS, and Christopher Ashton, the former head of spot trading at Barclays.  Ashton was also fined $1.2 million by the Board.

157.    On January 10, 2017, a federal grand jury returned indictments for criminal conspiracy against former JPMorgan, Citigroup, and Barclays traders Richard Usher, Rohan Ramchandani, and Chris Ashton for their alleged roles in a conspiracy to manipulate the price of U.S. dollars and euros.  The three former traders were members of the chat group that dubbed themselves the "Cartel."  The indictment found that Usher and Ramchandani started conspiring in December 2007, while Ashton joined the conspiracy four years later.  Usher worked as a currency trader at RBS starting in 2003, then joined JPMorgan in 2010 as their head of FX spot trading.  Ramchandani worked at Citigroup as their head of European spot FX trading.  Both Usher and Ramchandani served until as recently as December 2012 as members of the Bank of England's Chief Dealers Sub Group, a committee of currency traders and central bank officials tasked to

recommend "industry guidance" for the FX market.  Ashton was the global head of spot trading at Barclays.  In a 2012 performance review, one of Ashton's managers at Barclays described him as a "superstar" and noted: "Content is a huge part of what we do.  Whether that's in chats, on the phone or in person.  You have transformed our approach to content and made it a huge advantage to the firm."  A fourth member of the "Cartel," Matt Gardiner, a former trader at UBS, Barclays, and Standard Chartered, has been cooperating with the DOJ in their ongoing criminal investigation.

158.    On January 12, 2017, former Citigroup trader Christopher Cummins became the second individual to plead guilty to conspiring to fix prices in the FX market.  Cummins— a former trader of central and eastern European, Middle Eastern, and African Citigroup—admitted to working with other FX traders at competing firms from 2007 until 2013 to manipulate FX prices on an electronic trading platform "through the creation of non-bona fide trades, coordinat[ing] the placement of bids and offers on that platform[,] and agree[ing] on currency prices they would quote specific customers, among other conduct," according to a press release from the DOJ.

159.    On April 20, 2017, the Federal Reserve announced that Deutsche Bank would be required to pay $156.6 million for failure to detect and address its traders' use of electronic chatrooms to discuss their positions with competitors, and for deficiencies in Deutsche Bank's oversight and internal controls regarding FX traders trading FX in proprietary accounts for the benefit of the bank.

160.    On November 12, 2014, the United Kingdom Financial Conduct Authority announced that it had imposed fines totaling £1.1 billion ($1.8 billion) on Defendants Citigroup ($358 million), HSBC ($343 million), JPMorgan ($352 million), RBS ($344 million), and UBS ($371 million) for failing to control business practices in their FX trading operations.  The FCA

found that between January 1, 2008 and October 15, 2013, "the Banks did not exercise adequate and effective control over their G10 spot FX trading businesses," and that the Defendants' traders "shared the information obtained through [groups of traders at multiple Defendant banks]" and "then attempted to manipulate fix rates and trigger client 'stop loss' orders (which are designed to limit the losses a client could face if exposed to adverse currency rate movements)."  On May 20, 2015, the FCA fined Barclays £284 million ($441 million) for "improperly sharing confidential client information in attempts to manipulate spot FX currency rates, including in collusion with traders at other firms, in a way that could disadvantage those clients and the market."  The FCA press release announcing the fine stated that between January 1, 2008 and October 15, 2013, "Barclays' systems and controls over its FX business were inadequate" and "[t]hese failings gave traders in those businesses the opportunity to engage in behaviours that put Barclays' interests ahead of those of its clients, . . . [which] included inappropriately sharing information about clients' activities and attempting to manipulate spot FX currency rates, including in collusion with traders at other firms, in a way that could disadvantage those clients and the market."  The Bank of England is supporting the FCA in its ongoing investigation of the FX manipulation conspiracy.

161.    On July 21, 2014, the United Kingdom Securities Fraud Office ("SFO") launched a criminal investigation into allegations of fraudulent conduct in the FX market.  On December 19, 2014, the SFO and City of London Police arrested RBS trader Paul Nash in connection with the investigation.   The SFO also sought interviews with several former Defendant traders, including Citigroup's ex-European head of spot trading Rohan Ramchandani; Richard Usher, who moved from RBS to become JPMorgan's chief currency dealer in London; Matt Gardiner, who was at Barclays before joining UBS; and Chris Ashton, the former head of spot trading at Barclays. The SFO closed its investigation in March 2016.

162.   The Swiss Financial Market Supervisory Authority ("FINMA") and the Swiss competition commission, "Weko," is currently investigating numerous Defendants, including RBS, Barclays, UBS, Credit Suisse, JPMorgan, and Citigroup.  FINMA initiated enforcement proceedings against UBS for suspected market abuse in FX trading in October 2013, and on November 11, 2014, FINMA announced that it was imposing several sanctions on UBS after finding that UBS "severely violated" proper conduct in FX markets.  In addition to imposing a fine of 134 million Swiss francs ($130 million), FINMA required UBS to limit salaries for FX traders and managers, and to automate at least 95 percent of its FX trading in order to limit opportunities for trader manipulation.  In December 2015, FINMA announced that it was imposing sanctions on at least six former UBS managers and traders.  The announcement noted that "[t]raders shared confidential client information, sometimes revealing the identity of clients to third parties, deliberately triggered stop-loss orders and engaged in front running.  They also repeatedly attempted to manipulate foreign exchange benchmarks."  The sanctioned former traders were banned for up to five years for their alleged participation in conspiracies to manipulate prices for FX and precious metals.  FINMA and Weko are continuing their investigations of UBS and other Defendants.

163.   In 2013, the European Commission launched an antitrust investigation into allegations of manipulation of currency rates.  The European Commission investigation is currently ongoing.  As recently as June 2016, the European Commission asked banks to gather sales data that could be used to calculate eventual penalties.

164.   On February 15, 2017, following a two-year antitrust investigation, the Competition Commission of South Africa filed a complaint against Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, HSBC, JPMorgan, and Standard Chartered; as well as

Commerzbank AG, Investec Ltd., Macquarie Bank Limited, Nomura International Plc., Standard Bank of South Africa Ltd., and Standard New York Securities Inc. The Competition Commission alleges that from at least 2007 to 2013, the banks conspired to manipulate U.S. Dollar to South Africa Rand exchange rates, in violation of South African antitrust laws. Specifically, the Competition Commission alleges that the banks colluded on prices for bids, offers, and bid-offer spreads for spot trades on rand-to-dollar exchanges; and that they manipulated rates by coordinating trades and creating fictitious bids and offers. The Competition Commission referred the matter to a tribunal for formal prosecution, and is seeking fines of 10 percent of each bank's gross revenues in South Africa.

165.  On February 20, 2017, the Competition Commission of South Africa filed a settlement with Citigroup. Under the terms of the settlement, Citigroup agreed to cooperate with the Commission and provide witnesses to assist the prosecution of the other banks, and to pay an administrative penalty of 69,500,860 Rand (approximately $5.4 million). The Competition Commission press release announcing the settlement states that "from at least 2007, Citibank N.A. and its competitors had a general agreement to collude on prices for bids, offers and bid-offer spreads for the spot trades in relation to currency trading involving US Dollar / Rand currency pair. Further, the Commission found that Citibank N.A. and its competitors manipulated the price of bids and offers through agreements to refrain from trading and creating fictitious bids and offers at particular times."

166.  Brazil's antitrust agency, the Administrative Council for Economic Defense ("CADE"), launched an investigation in 2015 of Bank of America, BTMU, Barclays, Citigroup, Credit Suisse, Deutsche Bank, HSBC, JPMorgan, Morgan Stanley, RBC, RBS, Standard Chartered, and UBS for their roles in the FX manipulation conspiracy. On July 14, 2015, CADE

confirmed the names of 30 bankers under investigation, including former RBS and JPMorgan trader Richard Usher; former Barclays and UBS trader Chris Ashton; Ashton's former colleague and former RBS trader Michael Weston; Ashton's former Barclays colleague Mark Clark; Citigroup's former European head of spot trading Rohan Ramchandani; Paul Nash from RBS; former UBS and Standard Chartered trader Matthew Gardiner; Gardiner's former boss at UBS Niall O'Riordan; and former Standard Chartered trader Eduardo Hargreaves.  CADE alleged that the banks colluded to influence benchmark FX rates by aligning positions and pushing transactions in a way that deterred competitors from the market between from at least 2007 to 2013.   In December 2016, CADE announced that Barclays, Citigroup, Deutsche Bank, HSBC, and JPMorgan had admitted to participating in a conspiracy to manipulate foreign exchange markets. In agreements approved by a Brazilian tribunal, the banks were required to pay fines of 183.5 million reals ($54.4 million).  CADE also announced that there were "strong indications" that BNP Paribas was also involved in the conspiracy.

167.    Other countries, including Germany, Singapore, Australia, Hong Kong, and New Zealand, have opened investigations of one or more Defendants for their anticompetitive conduct in the FX market.

168.    On September 30, 2014, the Financial Stability Board, an international financial oversight body, released a report on FX benchmark rates with recommendations for reform in the FX markets, and especially the WM/Reuters Fix, in order to prevent wrongful manipulation of benchmark rates in the future.

169.    All sixteen Defendants have confirmed in public filings that they have been the subjects of government investigations into the manipulation of FX rates.

## V.    DIRECT PURCHASER LITIGATION AND SETTLEMENTS

170.    On November 1, 2013, plaintiff Haverhill Retirement System filed a class action complaint in this District on behalf of persons and entities that purchased FX Instruments directly from Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, JPMorgan, RBS, and UBS, seeking damages for the same FX manipulation conspiracy alleged in this Complaint under the Section 1 of the Sherman Act.  *See FOREX* at ECF No. 1.

171.    On January 28, 2015, the court denied a motion, made by the eleven Defendant groups named at the time, to dismiss the direct purchaser claims under Rule 12(b)(6).  *See FOREX,* 74 F. Supp. 3d 581, 601 (S.D.N.Y 2015) (ECF No. 242).  The January opinion dismissed, however, two separate "Foreign Complaints" that alleged antitrust violations on behalf of persons who traded FX with Defendants in South Korea and Norway.  *Id.* at 589, 598.

172.    Subsequent plaintiffs (collectively, "Direct Purchaser Class Plaintiffs") filed complaints with similar allegations against all Defendants named in this action, on behalf of persons and entities that entered into FX Instruments directly with Defendants and directly on U.S. exchanges, seeking damages under the Sherman Act and the Commodity Exchange Act.  On February 13, 2016, the *FOREX* complaints were consolidated before this Court. *Id.* at ECF No. 96.

173.    On October 22, 2015, the Direct Purchaser Class Plaintiffs in *FOREX* moved for preliminary approval of settlements totaling $2,009,075,000 with nine of the sixteen Defendant groups named in this action: (1) JPMorgan; (2) UBS; (3) Citigroup; (4) Barclays; (5) Bank of America; (6) Goldman Sachs; (7) RBS; (8) BNP Paribas; and (9) HSBC.  *Id.* at ECF Nos. 480-81. The remaining seven Defendants groups named in *FOREX*, all of whom are also named in this Complaint, were not parties to the Direct Purchaser Class Settlements: (1) BTMU; (2) Credit Suisse; (3) Deutsche Bank; (4) Morgan Stanley; (5) RBC; (6) SocGen; and (7) Standard Chartered.

*Id.*  The motion for preliminary approval also requested that the court certify the Direct and Exchange-Only Settlement Classes for purposes of the Direct Purchaser Class Settlements.  *Id.*

174.    On December 15, 2015, this Court preliminarily approved the Direct/Exchange-Only Class Settlements, designated a settlement administrator, and preliminarily certified the Direct and Exchange-Only Settlement Classes.  *Id.* at ECF No. 536.

175.    On August 31, 2016, the Direct Purchaser Class Plaintiffs filed a motion for approval of a plan of notice, allocation, and distribution of the Direct/Exchange-Only Class Settlements.  *Id.* at ECF No. 653.

## VI.    DEFENDANTS TERMINATED AND SUSPENDED TRADERS, FORCED TRADERS TO RESIGN, AND IMPLEMENTED INTERNAL SAFEGUARDS AFTER THE CLASS PERIOD

176.    Since allegations of Defendants' illegal manipulation of FX rates first became public, Defendants have terminated and suspended numerous traders and trade supervisors involved in FX operations.  Defendants have also put traders on leave and forced traders to resign their positions.   These terminations and punitive measures highlight the seriousness of the government investigations into Defendants' FX operations, and of Plaintiffs' allegations herein.

177.    In response to government fines and sanctions beginning in 2014, Defendants including Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS have instituted policies banning their traders from participating in multi-bank chat rooms.  Those Defendants also fired more than 50 FX traders and trading supervisors.

178.    Citigroup announced in February 2014 that its head of FX operations Anil Prasad would be leaving the bank to "pursue other interests."  Citigroup also fired its head of European FX spot trading, Rohan Ramchandani.  In addition to FX executives, Citigroup also fired and/or suspended several less-senior FX traders.  In 2015, one of these fired Citigroup traders, Perry Stimpson, sued Citigroup in London for wrongful discharge.  Stimpson argued at trial that he was

pressured by senior Citigroup FX employees into using electronic chat rooms to share information with traders at other banks, and stated at trial that his "actions were normal across the industry" and at the bank.  Several other former traders from Citigroup and other Defendant banks have brought similar wrongful termination claims against their former employers.

179.    In February 2017, former Citigroup trader Baris Ozkaptan prevailed in his unfair dismissal suit against Citigroup in a U.S. employment tribunal.  Ozkaptan was fired by Citigroup for sharing the identities of clients in electronic chats, but he alleged in his suit that the bank turned a "blind eye" to traders sharing confidential client information.  Ozkaptan testified in November 2016 that Citigroup traders would routinely disclose client orders to competitors and salespeople would warn preferred customers about trades before they moved markets if it benefited Citigroup.

180.    Former Citigroup traders Perry Stimpson, Carly McWilliams, and Robert Hoodless have all received favorable rulings in U.K. courts on at least part of their claims alleging that they were wrongfully dismissed by Citigroup.  The judge hearing Stimpson's claims found that there were "serious inadequacies" in Citigroup's investigation before Stimpson's dismissal, and held that "[t]his was a very serious failure to investigate despite having very substantial resources."  In her witness statement at trial, McWilliams stated that sharing information with rivals was part of her "everyday job" at Citigroup.  Hoodless alleged that his bosses at Citigroup "made him a scapegoat" for the FX market-manipulation scandal.

181.    UBS terminated and suspended a number of traders in connection with the FX conspiracy.  In 2013, UBS suspended its global co-head of G10 FX trading in London, Niall O'Riordan.  Also in 2013, UBS fired two traders in Singapore, Mukesh Kumar Chhaganlal and Prashan Parmeshwar Sunny Miripuri.  Chhaganlal and Miripuri sued UBS in Singapore's High Court in March 2013 for wrongful dismissal, alleging that the bank fired them to lessen UBS's

perceived role in the alleged manipulation of FX rates.  In March 2014, UBS suspended at least six more traders in the U.S., Singapore, and Switzerland.  In June 2015, after UBS had paid substantial fines and conducted an independent investigation into its involvement in the FX manipulation conspiracy, UBS reinstated one of the traders that it had previously fired or suspended.

182.   Deutsche Bank in January 2014 dismissed three of its New York-based FX traders—Diego Moraiz, who dealt in Latin American currencies; Robert Wallden, a director in Deutsche Bank's New York FX trading unit; and Christopher Fahy, a managing director at Deutsche Bank's New York FX office and a former FX trader at Merrill Lynch—following an internal investigation into alleged FX manipulation.  Robert Wallden had previously been questioned by the U.S. Federal Bureau of Investigation in 2013, regarding his electronic communications with other FX traders.

183.   RBS has terminated and suspended several FX employees.  In October 2013, RBS suspended London-based FX spot traders Julian Munson and Paul Nash.

184.   In 2015, former RBS trader Ian Drysdale brought an unfair dismissal lawsuit against RBS in London.  Drysdale told a London tribunal that RBS "had to find relevant scapegoats, of which I was one," and issued a statement claiming that "the real reason for my dismissal was to deflect attention from the respondent's (RBS's) own admitted failures."  The London judge ruled that RBS's termination of Drysdale was unfair, but awarded the trader no compensation because "[h]e, along with a number of others, was doing something he knew was fundamentally wrong."

185.    HSBC suspended two of its London-based FX traders on January 17, 2014, amid multiple government investigations into HSBC's FX operations.   One of the suspended traders was Serge Sarramegna, HSBC's chief trader for major foreign currencies.

186.    Barclays suspended at least six FX traders on or about October 31, 2013, including chief global FX dealer Chris Ashton, Tokyo trader Jack Murray, and London trader Mark Clark. The New York Department of Financial Services required Barclays to terminate eight FX traders as a part of Barclays' penalties for its involvement in the FX rate manipulation conspiracy.

187.    JPMorgan placed senior FX trader Richard Usher, the former head of spot G10 currency trading for the bank, on paid leave in October 2013 amid government inquiries into potential manipulation of the FX market.   In October 2014, Usher formally left the bank.

188.    Goldman Sachs dismissed one of its FX traders, Frank Cahill, in November 2014 for his alleged involvement in FX manipulation.  Prior to Goldman Sachs, Cahill worked at HSBC.

189.    Bank of America suspended several senior FX traders in 2014.

190.    BNP Paribas placed several senior FX traders on leave in 2014, after the bank became a subject of government investigations into the FX manipulation conspiracy.  At least one of the suspended traders worked at Citigroup as an FX trader prior to working at BNP Paribas.

191.    SocGen has fired at least one currency trader for involvement in the FX conspiracy. In 2015, SocGen dismissed Ilan Botbol for several instances of misconduct regarding FX trading. Later that year, Botbol sued SocGen in French court for unfair dismissal.  SocGen responded to the suit by arguing that the termination was justified in part because Botbol shared confidential customer information with a Morgan Stanley trader in 2009 and invited the trader to profit from that information.  However, SocGen did not terminate Botbol until six years after that incident took place.  Botbol argued that SocGen's claims are undermined by the bank's failure to monitor

66

employee behavior and to act promptly upon learning of the alleged infringements. Botbol also alleged that SocGen encouraged traders to gain market intelligence by sharing information with traders at other banks.

192.    In February 2017, Deutsche Bank purchased full-page advertisements in the German newspapers Frankfurter Allgemeine Zeitung and Sueddeutsche Zeitung to publish a letter from CEO John Cryan apologizing to Deutsche Bank customers for the bank's "serious errors" in the U.S. subprime mortgage crisis as well as unspecified "other cases as well." The letter states that "some time ago serious errors were made," "[t]he conduct of our bank did not meet our standards and was unacceptable" in the mortgage case and "other cases as well," and "[i]n the name of the board of the Deutsche Bank I would now like to take this opportunity to express our deep regret for what has happened."

193.    Defendants have recently implemented surveillance systems to prevent their traders from manipulating the FX market in the future. According to PricewaterhouseCoopers' 2016 Market Abuse Surveillance Survey, FX dealer banks have recently hired large surveillance teams to review messages and listen in on phone calls between traders, in order to detect and deter illegal collusion by FX traders. The PricewaterhouseCoopers report, published in February 2016, states that FX dealer banks participating in their survey expect to substantially increase their investments in trader surveillance in the next year, with most projecting between $7 million and $14 million in additional spending. Some banks employ as many as 50 people to parse through trader emails and messages and listen to trader calls in efforts to detect illegal conduct.

## ANTITRUST INJURY TO PLAINTIFFS

194.    Defendants are the largest and most dominant FX traders in the global financial system, and particularly in the U.S. FX market. Defendants are horizontal competitors, competing to buy and sell FX by supplying quotes for FX trades. In a competitive FX market, absent

collusion, bid-ask spreads on FX Instruments would be extremely narrow, as Defendants would drive down spreads by competing with each other to offer customers more desirable rates.  As a result, bid-ask spreads on FX Instruments purchased indirectly from Defendants would be similarly narrow.

195.    Defendants' conspiracy harmed competition among dealers in the FX market.  As a result of Defendants' collusion, indirect purchasers, including Plaintiffs and members of the proposed Classes, paid higher prices for FX Instruments than they would have in a competitive market.

196.    As alleged above, Defendants' manipulation of the Fixes and FX spot rates resulted in anticompetitive prices for all FX Instruments.  Defendants' manipulation of the FX market was so pervasive that Plaintiffs and the other members of the proposed Classes could not have participated in the FX market during the Class Period without suffering damage as a result of Defendants' anticompetitive conduct.  As a direct and proximate result of Defendants' conspiracy, Plaintiffs and members of the proposed Classes were deprived of the advantageous prices, exchange rates, and bid-ask spreads that would have resulted from normal price competition in the FX market.

197.    Defendants' conduct in furtherance of the conspiracy harmed Plaintiffs and the Class members in several ways.  Defendants conspired to fix prices and conform their FX trade quotes.  Defendants also agreed to coordinate the timing and volume of trades in order to manipulate the market, to the benefit of Defendants and the ultimate detriment of Plaintiffs and the members of the Proposed Classes.  These actions, individually and collectively, had the effect of artificially increasing the prices paid by non-Defendant FX purchasers and decreasing the prices received by non-Defendant FX sellers, thereby overcharging FX customers.  Thus, Defendants'

actions deprived Plaintiffs and the members of the Proposed Classes of a competitive marketplace and exposed them to artificial pricing and volatility.

198.    The injuries suffered by Plaintiffs and members of the proposed Classes are directly traceable to Defendants' anticompetitive conduct alleged herein.  On any day that one or more of the Fixes or spot rates were manipulated by Defendants, all members of the Direct Settlement Class (i.e. all entities that purchased FX Instruments directly from Defendants and Defendants' co-conspirators) paid supracompetitive prices for those FX Instruments.  Each time a member of the proposed Classes purchased an FX Instrument directly from a member of the Direct Settlement Class (and thus indirectly purchased from one or more Defendants or co-conspirators), the overcharge incurred by the direct purchaser as a result of Defendants' FX manipulation was directly passed on to the member of the proposed Classes.

199.    Absent collusion, each individual Defendant would have had an independent incentive to quote tighter bid-ask spreads in order to stay competitive with other dealers in the FX market.  Thus, no single Defendant would have fixed its own bid-ask spread but for a conspiracy among multiple Defendants.

200.    Absent collusion, an individual Defendant's attempt to manipulate FX rates would have little to no effect on the FX market.  Thus, no single Defendant could have consistently manipulated FX rates but for the conspiracy.

## FRAUDULENT CONCEALMENT

201.    Throughout the Class Period, Defendants knowingly, fraudulently, and deliberately concealed their conspiracy to fix FX prices from Plaintiffs and members of the proposed Classes.

202.    Concealment of the secret communications between Defendants was an essential element of the conspiracy to manipulate FX prices.  Defendants communicated through non-public chat rooms, phone calls, instant messages, text messages, email, and at in-person meetings.

203.     On June 11, 2013, Bloomberg Business published an article reporting that several Defendants had colluded to manipulate the WM/Reuters Fixes by collectively front-running customer orders.  To Plaintiffs' knowledge, this was the first public report concerning Defendants' price manipulation in the FX market.  Subsequent news articles and government investigation reports further revealed the involvement of all Defendants and the nature of Defendants' widespread conspiracy.

204.     Prior to the Bloomberg article, information regarding Defendants' conspiracy was not reasonably available to Plaintiffs or members of the proposed Classes.

205.     Defendants only allowed high-level traders to participate in secret communications regarding the conspiracy.  In efforts to avoid detection, these traders used code words and names, phone calls, encrypted messages, and other communication platforms that are difficult or impossible to trace.

206.     In one example of a trader attempting to conceal FX manipulation, a JPMorgan FX trader warned a Barclays trader that they should not discuss their plan to manipulate the USD/South African Rand rate via instant message.  In a November 4, 2010 chat transcript that was later uncovered by the New York Department of Financial Services, the Barclays trader stated, "if you win this we should coordinate you can show a real low one and will still mark it little lower haha."  The JPMorgan trader replied that they "prolly shudnt put this on perma chat," and Barclays trader responded "if this is the chat that puts me over the edge than oh well. much worse out there."

207.     As a result of Defendants' efforts to conceal their conspiracy, Defendants successfully prevented Plaintiffs from being able to learn of the facts needed to bring suit against Defendants for conspiring to manipulate FX prices until at least June 11, 2013.

208.    Because Defendants fraudulently concealed their conspiracy in deliberate efforts to prevent Plaintiffs and members of the proposed Classes from commencing suit, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1
### (On Behalf of All Plaintiffs against All Defendants)

209.    Plaintiffs incorporate each allegation above as if fully set forth herein.

210.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

211.    The acts done by each of Defendant as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

212.    At least as early as 2007, and continuing until at least 2013, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for FX Instruments, thereby creating anticompetitive effects.

213.    The anticompetitive acts were intentionally directed at the United States market for FX Instruments and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for FX Instruments throughout the United States.

214.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for FX Instruments.

215.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class have been harmed in the form of overcharges on FX Instruments.

216.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

217.    Defendants' conspiracy had the following effects, among others:

a.    Price competition in the market for FX Instruments was restrained and suppressed in the United States;

b.    Prices for FX Instruments were fixed, raised, maintained, and stabilized at artificial, non-competitive levels throughout the United States; and

c.    Plaintiffs and members of the Nationwide Class who purchased FX Instruments indirectly from Defendants and their co-conspirators were deprived of the benefits of free and open competition.

218.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for FX Instruments purchased indirectly from Defendants and their co-conspirators than they would have paid in the absence of the conspiracy.

219.    The alleged contract, combination, or conspiracy is a *per se* violation of the Sherman Act.

220.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violations of the Donnelly Act,**
**New York General Business Laws § 340,** *et seq.*
**(On Behalf of the New York Plaintiff against All Defendants)**

221.    Plaintiffs incorporate each allegation above as if fully set forth herein.

222.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws § 340, *et seq.* (the "Donnelly Act").  The New York Plaintiff, on behalf of the proposed statewide New York Class of indirect FX purchasers, alleges as follows:

a.    Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in an agreement, arrangement, or combination, in violation of New York General Business Laws § 340, *et seq.*, by engaging in the acts and practices detailed above.  Each Defendant has acted in violation of § 340 to restrain competition and fix, raise, and maintain artificial prices for FX Instruments.

b.    Defendants' and their co-conspirators' agreement, arrangement, or combination had the following effects: (i) FX Instrument price competition was restrained, suppressed, and eliminated throughout New York; (ii) FX Instrument prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (iii) the New York Plaintiff and members of the New York Class were deprived of free and open competition; and (iv) the New York Plaintiff and members of the New York Class were overcharged for FX Instruments that they indirectly purchased from Defendants and Defendants' co-conspirators.

c.    Throughout the Class Period, Defendants' anticompetitive conduct alleged herein substantially affected intrastate New York commerce.  The New York Plaintiff and all members of the proposed New York Class were domiciled in New York during the Class Period and/or purchased FX Instruments in New York indirectly from one or more Defendants during the

73

Class Period.  Many Defendants are headquartered in New York City and/or maintain their principal places of business in New York, and Defendants all conduct significant business in New York, including business relating to FX trading.  Defendants Merrill Lynch, Pierce, Fenner & Smith Inc.; Barclays Capital Inc.; BNP Paribas North America, Inc.; BNP Paribas Securities Corp.; BNP Paribas Prime Brokerage, Inc.; Citigroup Inc.; Citibank, N.A.; Citigroup Global Markets Inc.; Credit Suisse Securities (USA) LLC; Deutsche Bank Securities Inc.; The Goldman Sachs Group, Inc.; Goldman, Sachs & Co; HSBC North America Holdings, Inc.; HSBC Bank USA, N.A.; HSBC Securities (USA) Inc.; JPMorgan Chase & Co.; JPMorgan Chase Bank, N.A.; Morgan Stanley; Morgan Stanley & Co., LLC; and RBC Capital Markets LLC all have their principal places of business and/or headquarters in New York, New York.  Defendants Bank of America Corporation; The Bank of Tokyo Mitsubishi UFJ Ltd.; Société Générale S.A.; Standard Chartered Bank; UBS Securities LLC; Barclays Bank PLC; Credit Suisse AG; Deutsche Bank AG; and Royal Bank of Scotland Group PLC all have major New York offices and conduct a substantial portion of their FX trading in New York.  All Defendants communicated regularly with Defendant traders in New York for purposes of carrying out the unlawful conspiracy alleged herein.

        d.      Defendants' agreement, arrangement, or combination caused the New York Plaintiff and the members of the New York Class to incur anticompetitive overcharges on FX Instruments.  The New York Plaintiff and the members of the New York Classes thereby suffered injury in fact in the form of lost money or property.

        e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the Donnelly Act, New York General Business Laws § 340, *et seq*. The conduct set forth above is a *per se* violation of the Act.  Accordingly, the New York Plaintiff

and members of the New York Class seeks treble damages, costs of suit (up to $10,000), and reasonable attorneys' fees.

### THIRD CLAIM FOR RELIEF
### Violations of the Cartwright Act,
### California Business and Professions Code § 16720, *et seq.*
### (On Behalf of the California Plaintiff against All Defendants)

223.    Plaintiffs incorporate each allegation above as if fully set forth herein.

224.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, § 16700, *et seq.* (the "Cartwright Act") The California Plaintiff, on behalf of the proposed statewide California Class of indirect FX purchasers, alleges as follows:

a.    Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce, as described above, in violation of California Business and Professions Code § 16720.  Each Defendant has acted in violation of § 16720 to fix, raise, and maintain artificial prices for FX Instruments.

b.    Defendants' unlawful trust consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.  Defendants entered into and participated in the unlawful trust for purposes of, *inter alia*, (i) creating and carrying out restraints in the FX market; (ii) artificially manipulating the prices of FX Instruments, including FX Instruments sold in California and to California residents; (iii) preventing competition and competitive prices in the FX market; (iv) establishing and settling prices for FX Instruments between Defendants, so as to preclude unrestrained competition among themselves and all purchasers and owners of FX Instruments; and (v) creating and carrying out agreements to

pool and combine Defendants' financial interests connected with their sales and purchases of FX Instruments.

      c.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (i) price competition in the market for the sale of FX Instruments has been restrained and suppressed in the State of California and throughout the United States; (ii) prices for FX Instruments have been fixed, raised, stabilized, and pegged at artificial levels in the State of California and throughout the United States; and (iii) those who purchased FX Instruments directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

      d.     As a direct and proximate result of Defendants' unlawful conduct, the California Plaintiff and members of the California Class have been injured in their business and property in that they incurred overcharges on FX Instruments that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.

      e.     As a result of Defendants' violations of the Cartwright Act, the California Plaintiff and members of the California Class seek treble damages and their cost of suit, including reasonable attorney's fees, pursuant to § 16750(a) of the California Business and Professions Code.

**FOURTH CLAIM FOR RELIEF**
**Violations of California's Unfair Competition Law,**
**California Business and Professions Code § 17200, *et seq.***
**(On Behalf of the California Plaintiff against All Defendants)**

225.    Plaintiffs incorporate each allegation above as if fully set forth herein.

226.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* (California's Unfair Competition Law). The California Plaintiff, on behalf of the proposed statewide California Classes of indirect FX purchasers, alleges as follows:

a.      Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants committed acts of unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.  Each of the Defendants has acted in violation of § 17200 to fix, raise, and maintain artificial prices for FX Instruments.

b.      Defendants' conduct as alleged herein violated § 17200, *et seq.* of the California Business and Professions Code.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of § 17200, *et seq.*, including, but not limited to, the following: (i) violations of Section 1 of the Sherman Act, as set forth above; and (ii) violations of the Cartwright Act, as set forth above.

c.      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 1 of the Sherman Act and the Cartwright Act, and whether or not concerted or independent acts, were otherwise unfair, unconscionable, unlawful, or fraudulent.

d.      Defendants' acts and practices were unfair to indirect purchasers of FX Instruments in the State of California within the meaning of § 17200 of the California Business and Professions Code.

e.      Defendants' acts and practices were fraudulent or deceptive within the meaning of § 17200 of the California Business and Professions Code.

f.      The California Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.      The unlawful and unfair business practices of Defendants caused the California Plaintiffs and the members of the California Class to incur overcharges on FX Instruments.  The California Plaintiffs and the members of the California Class suffered injury in fact in the form of lost money or property as a result of such unfair competition.

h.      As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. The California Plaintiff and the members of the California Class are accordingly entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201, *et seq*.**
**(On Behalf of the Florida Plaintiff against All Defendants)**

227.    Plaintiffs incorporate each allegation above as if fully set forth herein.

228.    Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.201, *et seq*. (the "Florida Deceptive and Unfair Trade Practices Act").  The Florida Plaintiff, on behalf of the proposed statewide Florida Class of indirect FX purchasers, alleges as follows:

a.      Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in unfair methods

of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act. Each Defendant has acted in violation of the Florida Deceptive and Unfair Trade Practices Act by entering into and engaging in a conspiracy to restrain competition and unfairly and deceptively fix and inflate prices for FX Instruments.

b.      Defendants' unlawful combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators. Defendants entered into and participated in the unlawful conspiracy for purposes of engaging in unfair methods of competition and unfair trade practices to fix, control, and maintain the prices charged for FX Instruments throughout the United States, including in the State of Florida.

c.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (i) price competition in the market for the sale of FX Instruments was restrained and decreased in Florida and throughout the United States; (ii) prices for FX Instruments were fixed, controlled, and maintained at artificial levels in the State of Florida and throughout the United States; (iii) those who purchased FX Instruments directly or indirectly from Defendants and their co-conspirators were deprived of the benefits of free and open competition; and (iv) Florida Plaintiff and the Florida Class paid supracompetitive, artificially inflated prices for FX Instruments.

d.      Throughout the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

e.      As a direct and proximate result of Defendants' unlawful conduct, the Florida Plaintiffs and members of the Florida Class have been injured in their business and property in that they incurred overcharges on FX Instruments that they otherwise would not have

incurred in the absence of Defendants' unlawful conduct.  As a result of Defendants' violations of

the Florida Deceptive and Unfair Trade Practices Act, the Florida Plaintiff and members of the

Florida Class seek actual damages plus attorney's fees and court costs, pursuant to Fla. Stat. §

501.211.

**SIXTH CLAIM FOR RELIEF**
**Violations of the Illinois Antitrust Act,**
**740 Ill. Comp. Stat. 10/1,** *et seq.*
**(On Behalf of the Illinois Plaintiff against All Defendants)**

229.    Plaintiffs incorporate each allegation above as if fully set forth herein.

230.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of 740 Ill. Comp. Stat. 10/1, *et seq.* (the "Illinois Antitrust Act").  The Illinois Plaintiff,

on behalf of the proposed statewide Illinois Class of indirect FX purchasers, alleges as follows:

f.    Beginning at least as early as December 1, 2007, and continuing throughout

the Class Period, Defendants and their co-conspirators entered into and engaged in a combination

or conspiracy, in violation of the Illinois Antitrust Act, by engaging in the acts and practices

detailed above.  Each Defendant has acted in violation of the Illinois Antitrust Act to restrain

competition and fix, control, and maintain prices for FX Instruments and to unreasonably restrain

trade and commerce in the market for FX Instruments.

g.    Defendants' unlawful combination or conspiracy consisted of a continuing

agreement, understanding, and concerted action among Defendants and their co-conspirators.

Defendants entered into and participated in the unlawful trust for purposes of fixing, controlling,

and maintaining the prices charged for FX Instruments.

h.    The combination and conspiracy alleged herein has had, *inter alia*, the

following effects: (i) price competition in the market for the sale of FX Instruments was restrained

and decreased in the State of Illinois and throughout the United States; (ii) prices for FX

80

Instruments sold by Defendants and their co-conspirators were fixed, controlled, and maintained at artificial levels in the State of Illinois and throughout the United States; and (iii) those who purchased FX Instruments directly or indirectly from Defendants and their co-conspirators were deprived of the benefits of unhampered commerce and free and open competition.

i.      Defendants' conduct in furtherance of the conspiracy that occurred at Defendant offices outside of the United States had a direct, substantial, and reasonably foreseeable effect on trade and commerce in the State of Illinois and throughout the United States.

j.      As a direct and proximate result of Defendants' unlawful conduct, the Illinois Plaintiff and members of the Illinois Class have been injured in their business and property in that they incurred overcharges on FX Instruments that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.  As a result of Defendants' violations of the Illinois Antitrust Act, the Illinois Plaintiff and members of the Illinois Class seek treble damages, plus reasonable attorneys' fees and court costs, pursuant to 740 Ill. Comp. Stat. Ann. 10/7.

## SEVENTH CLAIM FOR RELIEF
### Violations of the Minnesota Antitrust Law of 1971,
### Minn. Stat. §§ 325D.49 to 325D.66
### (On Behalf of the Minnesota Plaintiff against All Defendants)

231.    Plaintiffs incorporate each allegation above as if fully set forth herein.

232.    Defendants have entered into an unlawful combination or conspiracy in unreasonable restraint of trade in violation of Minn. Stat. §§ 325D.49 to 325D.66 (the "Minnesota Antitrust Law of 1971").  The Minnesota Plaintiff, on behalf of the proposed statewide Minnesota Class of indirect FX purchasers, alleges as follows:

k.      Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in a combination or conspiracy, in violation of the Minnesota Antitrust Law of 1971, by engaging in the acts and

practices detailed above.  Each Defendant has acted in violation of the Minnesota Antitrust Law of 1971 to restrain competition and fix, control, and maintain the market prices for FX Instruments; to affect, fix, control, maintain, or limit the sale or supply of FX Instruments with the effect of affecting, fixing, controlling, or maintaining the market price for FX Instruments; and to unreasonably restrain trade and commerce in the market for FX Instruments.

l.     Defendants' unlawful combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators. Defendants entered into and participated in the unlawful trust for purposes of fixing, controlling, and maintaining the prices charged for FX Instruments.

m.     The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (i) price competition in the market for the sale of FX Instruments was restrained and decreased in the State of Minnesota and throughout the United States; (ii) prices for FX Instruments sold by Defendants and their co-conspirators were affected, fixed, controlled, and maintained at artificial levels in the State of Minnesota and throughout the United States; (iii) price quotations of bids on FX Instruments were fixed and controlled by Defendants; and (iii) those who purchased FX Instruments directly or indirectly from Defendants and their co-conspirators were deprived of the benefits of free and open competition.

n.     As a direct and proximate result of Defendants' unlawful conduct, the Minnesota Plaintiff and members of the Minnesota Class have been injured in their business and property in that they incurred overcharges on FX Instruments that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.  As a result of Defendants' violations of the Minnesota Antitrust Law of 1971, the Minnesota Plaintiff and members of the Minnesota Class

seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Minn. Stat. Ann. § 325D.57.

**EIGHTH CLAIM FOR RELIEF**
**Violations of the North Carolina Unfair Trade Practice Act**
**N.C. Gen. Stat. § 75-1, *et seq*.**
**(On Behalf of the North Carolina Plaintiff against All Defendants)**

233.    Plaintiffs incorporate each allegation above as if fully set forth herein.

234.    Defendants have entered into an unlawful conspiracy in restraint of trade or commerce in violation of N.C. Gen. Stat. § 75-1, *et seq.* (the "North Carolina Unfair Trade Practice Act").  The North Carolina Plaintiff, on behalf of the proposed statewide North Carolina Class of indirect FX purchasers, alleges as follows:

a.    Beginning at least as early as December 1, 2007, and continuing throughout the Class Period, Defendants and their co-conspirators entered into and engaged in a combination or conspiracy, in violation of the North Carolina Unfair Trade Practice Act, by engaging in the acts and practices detailed above.  Each Defendant knowingly entered the conspiracy and acted in violation of the North Carolina Unfair Trade Practice Act to restrain competition and fix, control, and maintain prices for FX Instruments and to unreasonably restrain trade and commerce in the market for FX Instruments.

b.    Defendants' unlawful combination or conspiracy consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators. Defendants willfully entered into and participated in the unlawful trust for purposes of fixing, controlling, and maintaining the prices charged for FX Instruments.

c.    Defendants carried out the conspiracy through unfair methods of competition and unfair or deceptive acts or practices.  These methods, acts, and practices substantially affected commerce in the State of North Carolina and throughout the United States.

83

d.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (i) price competition in the market for the sale of FX Instruments was restrained and decreased in the State of North Carolina and throughout the United States; (ii) prices for FX Instruments sold by Defendants and their co-conspirators were fixed, controlled, and maintained at artificial levels in the State of North Carolina and throughout the United States; and (iii) those who purchased FX Instruments directly or indirectly from Defendants and their co-conspirators were deprived of the benefits of unhampered commerce and free and open competition.

e.      Defendants' conspiracy in restraint of trade violates the principles of North Carolina common law, in further violation of the North Carolina Unfair Trade Practice Act.

f.      Defendants' conspiracy was continuous throughout at least the Class Period.

g.      As a direct and proximate result of Defendants' unlawful conduct, the North Carolina Plaintiff and members of the North Carolina Class have been injured in their business and property in that they incurred overcharges on FX Instruments that they otherwise would not have incurred in the absence of Defendants' unlawful conduct.

h.      As a result of Defendants' violations of the North Carolina Unfair Trade Practice Act, the North Carolina Plaintiff and members of the North Carolina Class seek treble damages, plus reasonable attorney's fees and court costs, pursuant to N.C. Gen. Stat. § 75-16.

## **REQUESTS FOR RELIEF**

Plaintiffs respectfully request the following relief:

A.      That the Court determine that the claims alleged herein are suitable for class treatment and certify the proposed Classes pursuant to Federal Rule of Civil Procedure 23;

B.      That the Court appoint Plaintiffs as the representatives of the Classes;

C.      That Plaintiffs' counsel be appointed as counsel for the Classes;

D.      That the Court award the New York Plaintiff and the New York Class damages in amounts according to proof against Defendants for Defendants' violations of New York state antitrust law, trebled;

E.      That the Court award the California Plaintiff and the California Class damages in an amount according to proof against Defendants for Defendants' violations of California state consumer protection and antitrust laws, trebled;

F.      That the Court award the Florida Plaintiff and the Florida Class damages in an amount according to proof against Defendants for Defendants' violations of Florida state consumer protection law;

G.      That the Court award the Illinois Plaintiff and the Illinois Class damages in an amount according to proof against Defendants for Defendants' violations of Illinois state antitrust law, trebled;

H.      That the Court award the Minnesota Plaintiff and the Minnesota Class damages in an amount according to proof against Defendants for Defendants' violations of Minnesota state antitrust law, trebled;

I.      That the Court award the North Carolina Plaintiff and the North Carolina Class damages in an amount according to proof against Defendants for Defendants' violations of North Carolina state antitrust and consumer protection law, trebled;

J.      That Defendants be enjoined from engaging in further unlawful conduct;

K.      That Plaintiffs and the Classes be awarded their costs of suit, including reasonable attorneys' fees; and

L.      That Plaintiffs and the Classes be awarded pre- and post-judgment interest on all sums awarded, and other relief as the Court deems necessary and justified.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all claims alleged herein so triable.

Dated: April 28, 2017                     Respectfully submitted,

                                          /s/ Joshua T. Ripley
                                          Joshua T. Ripley
                                          Merrill G. Davidoff
                                          Michael Dell'Angelo
                                          **BERGER & MONTAGUE, P.C.**
                                          1622 Locust Street
                                          Philadelphia, PA 19103
                                          Tel: (215) 875-3000
                                          Fax: (215) 875-4604
                                          jripley@bm.net
                                          mdavidoff@bm.net
                                          mdellangelo@bm.net

                                          Garrett W. Wotkyns
                                          **SCHNEIDER WALLACE COTTRELL
                                          KONECKY WOTKYNS LLP**
                                          8501 North Scottsdale Road, Suite 270
                                          Scottsdale, AZ 85253
                                          Tel: (480) 428-0142
                                          Fax: (866) 505-8036
                                          gwotkyns@schneiderwallace.com

                                          Joseph C. Peiffer
                                          **PEIFFER ROSCA WOLF ABDULLAH
                                          CARR & KANE LLP**
                                          201 St. Charles Ave. Suite 4610
                                          New Orleans, LA 70170
                                          Tel: (504) 523-2434
                                          Fax: (504) 523-2464
                                          jpeiffer@prwlegal.com

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Boulevard, Suite 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*