# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONTANT, SANDRA LAVENDER, VICTOR HERNANDEZ, MARTIN-HAN TRAN, FX PRIMUS LTD., CARLOS GONZALEZ, UGNIUS MATKUS, CHARLES G. HITCHCOCK III, JERRY JACOBSON, TINA PORTER, AND PAUL VERMILLION on behalf of themselves and all others similarly situated, | Case No. 1:17-cv-03139-LGS<br><br>[rel. 13-cv-7789-LGS]<br><br>ECF CASE |
| Plaintiffs, | |
| v. | |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

# MEMORANDUM OF LAW IN
## SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .............................................................................................................4

    A.    The Parties and Putative Classes ..........................................................4

    B.    Two Distinct Markets...........................................................................5

    C.    Plaintiffs' Various Descriptions Of Their Intermediaries .....................8

    D.    *FOREX* Consolidation, Settlements, And Injunction ...........................9

ARGUMENT.................................................................................................................10

I.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD THAT DEFENDANTS' PURPORTED ACTS IN THE FX SPOT MARKET PROXIMATELY CAUSED PLAINTIFFS' SUPPOSED LOSSES IN THE FX RETAIL INVESTOR MARKET ....................................................10

II.    THE *AGC* "EFFICIENT ENFORCER" FACTORS WEIGH STRONGLY IN FAVOR OF DISMISSAL ..............................................................................16

    A.    Plaintiffs' Damages Would Be Highly Speculative.............................18

    B.    The *FOREX* Plaintiffs Are More Direct Victims ...............................19

    C.    Plaintiffs' Claims Threaten Duplicative Recoveries............................20

III.   PLAINTIFFS' STATE LAW CLAIMS FAIL FOR ADDITIONAL REASONS ...........21

    A.    Due Process Requires Dismissal Of All Of Plaintiffs' State Law Claims Except Those Under New York Law ................................................21

    B.    Plaintiffs' North Carolina Antitrust Claim Fails Because The Alleged Misconduct Falls Within The Regulatory Scheme Exception .............24

    C.    Plaintiffs' Florida And Illinois Claims Fail Because Both States' Statutes Exempt Regulated Banks ...............................................................25

    D.    Plaintiffs' Florida Consumer Protection Claim Should Be Dismissed Because Plaintiffs Are Not Consumers...............................................27

E.      Plaintiffs' Massachusetts Consumer Protection Claim Should Be
        Dismissed Because Plaintiffs Failed To Plead They Engaged In Consumer
        Transactions ...........................................................................................................28

F.      Plaintiffs' Illinois Antitrust Act Claims Cannot Proceed As A Class Action .......30

G.      Plaintiffs' North Carolina Antitrust And California And Massachusetts
        Consumer Protection Claims Should Be Dismissed Because The
        Complaint Fails To Allege A Substantial Effect On Intrastate Commerce
        Or A Relation To The State.....................................................................................30

H.      Plaintiffs Fail to Comply with Arizona's Notice Provision ...................................32

IV.     INJUNCTIVE RELIEF IS UNAVAILABLE TO PLAINTIFFS .....................................32

V.      ALTERNATIVELY, PLAINTIFFS' CLAIMS SHOULD BE ENJOINED AS TO
        SETTLING DEFENDANTS AND CONSOLIDATED AS TO THE NON-
        SETTLING DEFENDANTS ...........................................................................................33

CONCLUSION.............................................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*ADA Solutions, Inc. v. Meadors*,
    98 F. Supp. 3d 240 (D. Mass. 2015)............................................................................32

*AEP Energy Services Gas Holding Co. v. Bank of America, N.A.*,
    626 F.3d 699 (2d Cir. 2010)......................................................................................34

*In re Aggrenox Antitrust Litigation*,
    No. 3:14-md-2516, 2016 WL 4204478 (D. Conn. Aug. 9, 2016)...................................29

*Allstate Insurance Co. v. Hague*,
    449 U.S. 302 (1981) ..........................................................................................21, 22

*In re Aluminum Warehousing Antitrust Litigation*,
    833 F.3d 151 (2d Cir. 2016).......................................................................................16

*Animal Science Products, Inc. v. China Minmetals Corp.*,
    34 F. Supp. 3d 465 (D.N.J. 2014)...............................................................................34

*In re Asacol Antitrust Litigation*,
    No. 15-cv-12730, 2016 WL 4083333 (D. Mass. July 20, 2016)..............................29, 32

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................10

*Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................................11

*AT&T Mobility LLC v. AU Optronics Corp.*,
    707 F.3d 1106 (9th Cir. 2013).............................................................................22, 23

*In re Automotive Parts Antitrust Litigation*,
    Nos. 2:12-cv-00202, 2:12-cv-00203,
    2014 WL 29935753 (E.D. Mich. July 3, 2014)............................................................30

*Axiom Investment Advisors, LLC v. Deutsche Bank AG*,
    No. 15-civ-9945-LGS, 2017 WL 590320 (S.D.N.Y. Feb, 13, 2017).........................28, 29

*Azimpour v. Sears, Roebuck & Co.*,
    No. 15-cv-2798, 2017 WL 1496255 (S.D. Cal. Apr. 26, 2017).......................................22

*Bache Halsey Stuart, Inc. v. Hunsucker*,
    248 S.E.2d 567 (N.C. Ct. App. 1978).........................................................................25

*Bankers Trust Co. v. Basciano*,
    960 So. 2d 773 (Fla. Dist. Ct. App. 2007) ...................................................................26

*In re Benkovitch v. Bank of America Corp.*,
 No. 14-36362, 2017 WL 543177 (Bankr. S.D. Fla. Feb. 6, 2017)..................................26

*Bio-Med Plus, Inc. v. Health Coalition, Inc.*,
 793 So. 2d 1092 (Fla. 3d DCA 2001)................................................................28

*Boyd v. AWB Ltd.*,
 544 F. Supp. 2d 236 (S.D.N.Y. 2008) ..............................................................14

*Cannova v. Breckenridge Pharmaceutical, Inc.*,
 No. 8-81145-civ, 2009 WL 64337 (S.D. Fla. Jan. 9, 2009)............................28

*In re Capacitors Antitrust Litigation*,
 154 F. Supp. 3d 918 (N.D. Cal. 2015)..............................................................22

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
 479 U.S. 104 (1986) .........................................................................................32

*Casavant v. Norwegian Cruise Line Ltd.*,
 952 N.E.2d 908 (Mass. 2011) ..........................................................................11

*Cascades Computer Innovation LLC v. RPX Corp.*,
 No. 12-cv-01143-YGR, 2016 WL 2993094 (N.D. Cal. Mar. 25, 2016) ..........17

*In re Commodity Exchange, Inc.*,
 213 F. Supp. 3d 631 (S.D.N.Y. 2016) ..............................................................17

*Continental Guest Services Corp. v. International Bus Services, Inc.*,
 939 N.Y.S.2d 30 (1st Dep't 2012).....................................................................17

*County of Cook v. Philip Morris, Inc.*,
 817 N.E.2d 1039 (Ill. App. Ct. 2004) ...............................................................17

*Crouch v. Crompton Corp.*,
 Nos. 2-cvs-4375, 03-cvs-2514, 2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004) .......17

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*,
 MDL No. 2013, 2015 WL 3988488 (N.D. Ill. June 29, 2015) ..................11, 17

*In re DDAVP Indirect Purchaser Antitrust Litigation*,
 903 F. Supp. 2d 198 (S.D.N.Y. 2012) ..............................................................32

*In re Digital Music Antitrust Litigation*,
 812 F. Supp. 2d 390 (S.D.N.Y. 2011) ..............................................................30

*Dixie Yarns, Inc. v. Plantation Knits, Inc.*,
 No. 3:93-cv-301-p, 1994 WL 910955 (W.D.N.C. July 12, 1994) .............22, 31

*In re Dynamic Access Memory (DRAM) Antitrust Litigation*,
  536 F. Supp. 2d 1129 (N.D. Cal. 2008) ............................................................... 17

*Ellis v. Louisiana-Pacific Corp.*,
  699 F.3d 778 (4th Cir. 2012) .............................................................................. 11

*In re Florida Cement & Concrete Antitrust Litigation*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) .............................................................. 11

*Fonte v. AT&T Wireless Services, Inc.*,
  903 So. 2d 1019 (Fla. D.C.A. 4th Dist. 2005) .................................................... 27

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) .................................................................... 8

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*,
  No. 13 Civ. 7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ....................... 14

*Frullo v. Landenberger*,
  814 N.E.2d 1105 (Mass. App. Ct. 2004) ............................................................. 29

*Gaebler v. N.M. Potash Corp.*,
  676 N.E.2d 228 (Ill. App. 1996) ......................................................................... 30

*Gatt Communications, Inc. v. PMC Associates*, LLC,
  711 F.3d 68 (2d Cir. 2013) ................................................................................. 17

*Gelboim v. Bank of America Corp.*,
  823 F.3d 759 (2d Cir. 2016) ............................................................................... 18

*Goodbys Creek, LLC v. Arch Insurance Co.*,
  No. 3:07-cv-947-J-33HTS, 2008 WL 2950112 (M.D. Fla. July 31, 2008) ........... 27, 28

*HAJMM Co. v. House of Raeford Farms, Inc.*,
  403 S.E.2d 483 (N.C. 1991) ............................................................................... 25

*Ho v. Visa U.S.A. Inc.*,
  3 Misc. 3d 1105(A), 2004 N.Y. Slip Op. (Sup. Ct. N.Y. Cty. 2004),
  *aff'd*, 16 A.D.3d 256 (1st Dep't 2005) ............................................................... 21

*Ho v. Visa U.S.A., Inc.*,
  16 A.D.3d 256 (1st Dep't 2005) .......................................................................... 19

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992) ........................................................................................... 14

*In re Interest Rate Swaps Antitrust Litigation*,
  Nos. 16-MD-2704, 16-MC-2704, 2017 WL 3209233 (S.D.N.Y. July 28, 2017) .......... 18

*International Brotherhood of Teamsters Local 734 Health & Welfare Trust Fund v.*
*Philip Morris, Inc.*,
34 F. Supp. 2d 656 (N.D. Ill. 1998), *aff'd*, 196 F.3d 818 (7th Cir. 1999) ........................ 11

*Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*,
329 F.3d 216 (1st Cir. 2003) ........................................................ 31

*Kertesz v. Net Transactions, Ltd.*,
635 F. Supp. 2d 1339 (S.D. Fla. 2009) ............................................ 28

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ........................................................ 17

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419,
No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ...................... 19

*Lefrak v. Arabian American Oil Co.*,
487 F. Supp. 808 (E.D.N.Y. 1980) .................................................. 17

*Lexmark International, Inc. v. Static Control Components, Inc.*,
134 S. Ct. 1377 (2014) .............................................................. 11

*In re LIBOR-Based Financial Instruments Antitrust Litigation ("LIBOR VI")*,
11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ...................... 11, 12, 13, 19

*Lindner v. Durham Hosiery Mills, Inc.*,
761 F.2d 162 (4th Cir. 1985) ........................................................ 25

*Lorenzo v. Qualcomm Inc.*,
No. 08cv2124 WQH, 2009 WL 2448375 (S.D. Cal. Aug. 10, 2009) .................. 11

*Luscher v. Bayer AG*,
No. CV 2004-014835, 2005 WL 6959406 (Ariz. Super. Ct. Sept. 16, 2005) .......... 17

*Lydia Security Monitoring, Inc. v. Alarm One, Inc.*,
No. 7-80145 CIV, 2007 WL 2446889 (S.D. Fla. Aug. 23, 2007) .................... 14

*In re Magnesium Oxide Antitrust Litigation*,
No. 10-5943, 2011 WL 5008090 (D.N.J. Oct. 11, 2011) ............................ 30

*Meridian Project Systems Inc. v. Hardin Construction Co.*,
404 F. Supp. 2d 1214 (E.D. Cal. 2005) ............................................ 31

*Mothershed v. Justices of the Supreme Court*,
410 F.3d 602 (9th Cir. 2005) ........................................................ 17

*Myun-Uk Choi v. Tower Research Capital LLC*,
232 F. Supp. 3d 337 (S.D.N.Y. 2017) .............................................. 8

*N.G.L. Travel Associates v. Celebrity Cruises, Inc.*,
  764 So. 2d 672 (Fla. 3d DCA 2000) .............................................................. 27, 28

*In re NASDAQ Market-Makers Antitrust Litigation*,
  169 F.R.D. 493 (S.D.N.Y. 1996) .................................................................... 9, 34

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016) ............................................................................. 32

*North Carolina ex rel. Cooper v. Ridgeway Brands Manufacturing, LLC*,
  646 S.E.2d 790 (N.C. App. 2007),
  *aff'd in part, rev'd in part*, 362 N.C. 431 (2008) ........................................... 25

*Nypl v. JPMorgan Chase & Co.*,
  No. 15-civ-9300, 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ("*Nypl I*").............*passim*

*Nypl v. JPMorgan Chase & Co.*,
  No. 15-civ-9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ("*Nypl II*").............*passim*

*In re Opana ER Antitrust Litigation*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................................ 30

*In re Optical Disk Drive Antitrust Litigation*,
  MDL No. 2143, 2014 WL 1379197 (N.D. Cal. Apr. 8, 2014) ......................... 22

*Paycom Billing Services, Inc. v. Mastercard International, Inc.*,
  467 F.3d 283 (2d Cir. 2006) ............................................................................. 20

*Pecover v. Electronics Arts Inc.*,
  633 F. Supp. 2d 976 (N.D. Cal. 2009) .............................................................. 22

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985) ......................................................................................... 21

*In re Platinum & Palladium Antitrust Litigation*,
  No. 1:14-cv-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)............. 12, 13, 18

*PNR, Inc. v. Beacon Property Management, Inc.*,
  842 So. 2d 773 (Fla. 2003) ............................................................................... 27

*In re Propranolol Antitrust Litigation*,
  No. 16-cv-09901, 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017) ....................... 31

*Racek v. Rady Children's Hospital of San Diego*,
  No. D058173, 2012 WL 2947881 (Cal. Ct. App. July 20, 2012) .................... 17

*Reading Industries, Inc. v. Kennecott Copper Corp.*,
  631 F.2d 10 (2d Cir. 1980) ............................................................................... 19

*Robinson v. Tex. Auto Dealers Ass'n*,
  387 F.3d 416 (5th Cir. 2004)....................................................................13

*Romero v. Bestcare Inc.*,
  No. 15-cv-7397, 2017 WL 1180518 (E.D.N.Y. Mar. 29, 2017)......................................8

*Sahagian v. Genera Corp.*,
  No. CV 08-7613-GW, 2009 WL 9504039 (C.D. Cal. July 6, 2009)...............................17

*Skinner v. E.F. Hutton & Co.*,
  333 S.E.2d 236 (N.C. 1985).....................................................................25

*In re Suboxone Antitrust Litigation*,
  64 F. Supp. 3d 665 (E.D. Pa. 2014)........................................................29, 30

*Supreme Auto Transport LLC v. Arcelor Mittal*,
  No. 8-CV-5468, 2017 WL 839484 (N.D. Ill. Mar. 3, 2017)....................................*passim*

*Teague v. Bayer AG*,
  671 S.E.2d 550 (N.C. Ct. App. 2009)...........................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  MDL No. 1827, 2010 WL 4705518 (N.D. Cal. Nov. 12, 2010).....................................23

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  MDL No. 1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010) ...............................22, 23

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
  MDL No. 1827, 2013 WL 1891367 (N.D. Cal. May 6, 2013) ....................................23

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*,
  663 F. Supp. 494 (M.D.N.C. 1987) .........................................................22, 31

*Thomas v. Apple-Metro, Inc.*,
  No. 14-cv-4120, 2015 WL 505384 (S.D.N.Y. Feb. 5, 2015) .........................................34

*United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.*,
  74 F. Supp. 3d 1052 (N.D. Cal. 2014)............................................................30

*Vinci v. Waste Management, Inc.*,
  43 Cal. Rptr. 2d 337 (Cal. Ct. App. 1995)......................................................17

*Ward v. Zabady*,
  354 S.E.2d 369 (N.C. App. 1987) ..............................................................25

*Wei v. Robinson*,
  246 F.2d 739 (7th Cir. 1957)......................................................................8

*In re Wellbutrin XL Antitrust Litigation*,
    756 F. Supp. 2d 670 (E.D. Pa. 2010).................................................................30

*Wilson v. EverBank, N.A.*,
    77 F. Supp. 3d 1202 (S.D. Fla. 2015)..............................................................26

## STATUTES

7 U.S.C. § 1a(18) ..............................................................................................8

15 U.S.C. § 26....................................................................................................32

15 U.S.C. § 78c(a)(4) .........................................................................................9

44 U.S.C. § 1507 ...............................................................................................8

740 Ill. Comp. Stat. Ann. § 10/5(11) ................................................................26

740 Ill. Comp. Stat. Ann. § 10/7(2) ..................................................................30

Fla. Stat. § 501.204(1) .......................................................................................27

Fla. Stat. § 501.212(4)(c) ..................................................................................26

Mass. Gen. L. Ch. 93A §§ 9, 11 .......................................................................29

## REGULATIONS

17 C.F.R. § 5.1(h)(1) (2017)..............................................................................8

Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries,
    75 Fed. Reg. 3,282 (Jan. 20, 2010)...................................................................8

Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries,
    75 Fed. Reg. 55,410 (Sept. 10, 2015)............................................................8, 9

## OTHER AUTHORITIES

Board of Governors of the Federal Reserve System Federal Deposit Insurance Corporation,
    https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20160802a1.pdf...................................................................................................26, 27

CFTC, *Selected FCM Financial Data as of August 31, 2012 from Reports Filed by September 30, 2012*,
    http://www.cftc.gov/idc/groups/public/@financialdataforfcms/documents/file/fcmdata0812.pdf (last visited Aug. 3, 2017)....................................................................7

Credit Suisse, *Global Recovery and Resolution Plan*, June 2014,
https://www.federalreserve.gov/bankinforeg/resolution -plans/credit-suisse-1g-
20140701.pdf (last visited Aug. 4, 2017) ........................................................26

Federal Reserve Nat'l Information Center,
https://www.ffiec.gov/nicpubweb/nicweb ........................................................26

*In re Forex Capital Mkts., LLC*, CFTC No. 17-09 (Feb. 6, 2017),
http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpl
eading/enfforexcapitalorder020617.pdf.......................................................7, 12

Letter to BNP Paribas North America from Board of Governors of the Federal Reserve
System (Feb. 18, 2016), https://www.federalreserve.gov/econres/files/bnp-regyy-
20160218.pdf ....................................................................................................27

*Membership and Directories, National Futures Association*,
https://www.nfa.futures.org/registration-membership/membership-and-
directories.html (last visited Aug. 2, 2017).......................................................8

Mitsubishi UFJ Financial Group, Inc., *Resolution Plan*, December 2015,
https://www.federal reserve.gov/bankinforeg/resolution-plans/mitsubishi-fin-3g-
20151231.pdf ....................................................................................................26

The Goldman Sachs Group, Inc., *Resolution Plan*, July 1, 2017,
https://www.federalreserve.gov/supervisionreg/resolution-plans/goldman-sachs-
1g-20170701.pdf (last visited Aug. 4, 2017) ...................................................26

UBS, *US Resolution Plan*, July 2014,
https://www.federalreserve.gov/bankinforeg/resolutionplans/ ubs-1g-
20140701.pdf ....................................................................................................26

U.S. Department of the Treasury, Office of the Comptroller of the Currency, *List of
National Banks & Federal Branches & Agencies*,
http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-active-bank-
lists.html (last updated July 31, 2017)..............................................................26

## PRELIMINARY STATEMENT

Plaintiffs here allege yet another variation on the claims made in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 1:13-cv-7789 ("*FOREX*"), but fail to state a cognizable claim. The consolidated complaint—which is the fourth FX-related complaint that plaintiffs' counsel have now filed against defendants—largely parrots the *FOREX* pleadings (often paraphrasing paragraphs *seriatim*), but attempts to dodge this Court's *FOREX* injunction against <u>direct</u> purchaser claims by pleading that plaintiffs here are <u>indirect</u> purchasers who transacted with defendants only through non-conspiring intermediaries. This complaint—which seeks injunctive relief under federal antitrust laws and damages under myriad state antitrust and consumer protection laws—should be dismissed with prejudice for several reasons.

<u>First</u>, plaintiffs fail to adequately plead that their alleged injuries were proximately caused by defendants—a defect fatal to <u>all</u> of plaintiffs' claims, federal and state alike. Plaintiffs here allegedly suffered their injuries in the FX <u>retail</u> investor market, but only allege misconduct in the entirely separate FX <u>spot</u> market. They make no factual allegations explaining how their transactions in the former market were directly restrained by alleged misconduct in the latter. That plaintiffs never even transacted directly with defendants—only with non-conspiring intermediaries who set their own rates and prices in the separate and distinct FX retail investor market—only exacerbates plaintiffs' failure to allege a plausible chain of proximate causation. Moreover, unlike the Third Amended Complaint in *Nypl v. JPMorgan Chase & Co.*, which this Court recently granted plaintiffs leave to file, plaintiffs here fail to allege any "mechanical, direct correlation" between the allegedly manipulated prices in the spot market and the prices in the market in which they invested—in *Nypl*, the FX consumer end-user market; here, the FX retail investor market. *Nypl v. JPMorgan Chase & Co.*, No. 15-civ-9300, 2017 WL 3309759, at *2

(S.D.N.Y. Aug. 3, 2017) ("*Nypl II*").  Plaintiffs here also do not allege that these two markets are "linked by a benchmark that is both derived from one market and determinative of price in the other market."  *Id.* at *6.  Nor do they reference any empirical market data or any expert analysis linking prices in the two markets.

Plaintiffs' attempt to invoke various state antitrust and consumer protection statutes does not remedy this deficiency.  Like the Sherman Act, each of these statutes also requires, at a minimum, plausible allegations that defendants' purported conspiracy <u>proximately caused</u> plaintiffs' alleged injuries.  But plaintiffs make no such allegations here.  Aside from conclusory assertions that plaintiffs paid overcharges "as a result" of defendants' alleged conduct, the Complaint lacks any factual allegations establishing how defendants caused this purported harm.  And even assuming plaintiffs had supported these conclusory allegations, which they did not, these allegations remain deficient because assertions that "[a]s a result of Defendants' collusion, [plaintiffs] paid higher prices" (*e.g.*, Consolidated Complaint, ECF No. 84 ("CAC"), ¶ 201), at best, only allege but-for causation and not proximate cause.

<u>Second</u>, nearly all of plaintiffs' claims should be dismissed for the independent reason that plaintiffs have failed to show that they are efficient enforcers of the antitrust laws.  Plaintiffs fail to allege facts that would make their purported damages anything other than highly speculative, particularly in light of intervening market forces in the FX retail investor market and the lack of any explanation of how plaintiffs' asserted injuries can be traced back to defendants in a non-speculative way (such as, for example, with a substantiated mathematical relationship).  It is also undeniable that the *FOREX* plaintiffs are more direct victims and that any recovery here would be duplicative and derivative of the more than $2 billion in settlements already paid by the Settling Defendants in *FOREX* (and any additional recovery by *FOREX* plaintiffs).

Third, various of plaintiffs' state law claims should be dismissed for independent reasons:

- All of plaintiffs' state law claims, except those under New York law, should be dismissed on due process grounds because plaintiffs failed to plead sufficient contacts between the relevant states and defendants' conduct.

- Plaintiffs' North Carolina antitrust claim should be dismissed because it falls within an exception for conduct already subject to extensive federal oversight.

- Plaintiffs' Florida and Illinois claims should be dismissed because the applicable statutes bar suits against federally regulated banks.

- Plaintiffs' Florida and Massachusetts claims should be dismissed because plaintiffs fail to allege they are consumers or engaged in consumer transactions within the meaning of those statutes.

- Plaintiffs' Illinois antitrust claims cannot proceed as a class action under the express terms of the statute.

- Plaintiffs' North Carolina, California, and Massachusetts claims should be dismissed because plaintiffs fail to allege sufficient intrastate conduct.

- Plaintiffs' Arizona antitrust claim should be dismissed because plaintiffs fail to comply with the state statute's notice provision.

Fourth, plaintiffs' lone federal claim for injunctive relief fails because plaintiffs have not alleged any "real or immediate threat of injury" from an impending or continuing conspiracy that warrants prospective relief. Indeed, plaintiffs' counsel conceded to this Court that any supposed conspiracy already "has been circumscribed as part of the governmental investigations." *Baker*, No. 16-cv-7512, ECF No. 62 (Oct. 5, 2016 Hearing Tr. 4:21-5.5).

Finally, the prosecution of this case should be enjoined pending approval of the *FOREX* settlements and their claims against the non-settling defendants should be consolidated with *FOREX* because the Complaint at times alleges that the intermediaries with whom plaintiffs transacted were "brokers" rather than dealers. (In this regard, the Complaint appears to be internally inconsistent.) Brokers ordinarily act as agents on behalf of their customers, making plaintiffs direct purchasers, *i.e.*, members of the *FOREX* settlement class and putative members

3

of the *FOREX* OTC class.  Thus, plaintiffs' claims against the settling defendants should be enjoined pending final approval of the *FOREX* settlements and their claims against the non-settling defendants should be consolidated with *FOREX*.  At a minimum, before their claims can proceed, plaintiffs should be required to demonstrate that they are not members of the settlement class by identifying the intermediaries through whom they supposedly transacted—information almost certainly in their possession, but conspicuously omitted from their allegations.

## BACKGROUND

### A.    The Parties and Putative Classes

Plaintiffs are ten individuals and one entity, each of whom allegedly transacted in foreign currency instruments with unnamed intermediaries variously described as retail "dealers" or "brokers."[1]  (CAC ¶¶ 10-20, 77.)  Because plaintiffs transacted through intermediaries and not directly with any defendant, they characterize themselves as "indirect purchaser[s]."  (*Id.* ¶ 40.) Plaintiffs allege that their intermediaries "concurrently" bought FX instruments from most of the defendants,[2] paying artificially inflated prices that they then supposedly passed on when they executed a "matching, back-to-back" sale to plaintiffs between December 1, 2007 through December 31, 2013 (the "Class Period").  (*Id.* ¶¶ 10-20, 40, 149.)

On behalf of a putative nationwide class, plaintiffs seek injunctive relief under Section 1 of the Sherman Act.  (*Id.* ¶¶ 40, 215-26.)  Plaintiffs also seek damages under New York,

---

[1]    To avoid the imprecision of plaintiffs' pleading, this brief uses the term "retail foreign exchange dealer" or "dealer" to refer to an intermediary with whom a retail FX investor customer enters into a principal-to-principal transaction and "broker" to refer to an intermediary who enters into a transaction as an agent on behalf of its FX customer.  The terms "dealer" and "broker" are used for purposes of clarity only.  In practice, an intermediary may have acted as a "broker" as defined herein, but marketed itself using the word "dealer."  The salient point is not the label used, but whether that intermediary transacted in FX instruments on a principal-to-principal basis with the retail customer or, alternatively, transacted as an agent on that customer's behalf.

[2]    Plaintiffs do not allege that they purchased any FX Instruments from <u>any</u> retail dealer or broker who <u>ever</u> transacted with defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU").  (*See* CAC ¶¶ 10-20.)  Indeed, the Complaint fails to allege any transactions with BTMU.

California, Florida, Illinois, Minnesota, North Carolina, Arizona, and Massachusetts laws on behalf of state-specific classes of persons who purchased an FX instrument indirectly from a defendant through a member of the *FOREX* Direct Settlement Class.  (*Id.* ¶¶ 41-48, 227-45.)[3] This Complaint is, in effect, the fourth FX-related complaint filed by plaintiffs' counsel on behalf of a purported indirect class.  The procedural history of this case has been recounted in prior correspondence to this Court (*see* ECF No. 79), and thus will not be repeated here.

By plaintiffs' own admission, their claims arise out of "the same anticompetitive conspiracy to manipulate foreign currency prices that is alleged by the direct purchaser plaintiffs in [*FOREX*]," against the same set of defendants.  *Baker*, Joint Letter, ECF No. 76 (Nov. 15, 2016).  The primary distinction between the Complaint here and the third amended class action complaint in *FOREX* ("*FOREX* TAC") is the manner in which plaintiffs allegedly transacted— *i.e.*, through some form of intermediary, whether it be a retail dealer or a broker.  (CAC ¶ 149.)

### B.    Two Distinct Markets

Plaintiffs base their allegations exclusively on defendants' alleged misconduct in the FX spot market.  (*Id.* ¶¶ 104-46.)  The Complaint alleges that defendants conspired to manipulate the World Market/Reuters and European Central Bank benchmarks, both of which are used by large FX traders in the FX spot market to price certain FX orders.  (*Id.* ¶¶ 143, 154.)  But there are no allegations that any of plaintiffs' intermediaries, much less any plaintiff, transacted at prices in any market based on any benchmark price or any rate determined by any defendant.  The Complaint also alleges that, again in the "spot market," defendants would episodically coordinate bid-ask spreads offered to certain customers for certain currency pairs in that market.  (*Id.* ¶¶

---

[3]    Although plaintiffs appear to be asserting claims on behalf of a New York Class (*see* CAC ¶¶ 10, 48, 53(j)), the operative consolidated complaint appears to have omitted plaintiffs' prior definition for this class and thus leaves the class undefined.  (*Compare* CAC ¶¶ 40-47, *with* ECF 1, Compl. ¶¶ 35-41.)

115-18.)  But there are no allegations that those bid-ask spreads were offered to or accepted by any of these plaintiffs nor any explanation as to how, if at all, the bid-ask spreads quoted in the FX retail investor market by non-defendant dealers and brokers relate to spreads quoted by defendants in the FX spot market.

### (1)    The FX Spot Market Where Defendants' Alleged Conduct Occurred

The FX spot market in which defendants operated is "the largest, most actively traded, and most liquid financial market in the world."  (*Id.* ¶ 59.)  It involves rapid, high-volume, over-the-counter transactions in FX instruments among institutional and high-net worth traders. Trading in this market is done directly with a counterparty.  (*Id.* ¶ 63.)  "To initiate a spot transaction, a customer contacts a dealer bank, such as one of the Defendants, for a quote."  (*Id.* ¶ 71.)  "A spot transaction occurs when one party contacts a dealer for a 'bid-ask' quote on a designated quantity of currency, and the party accepts the dealer's quote."  (*Id.* ¶ 72.)

### (2)    The Retail Investor Market Where Plaintiffs Allegedly Incurred An Injury

But plaintiffs here do not allege that they ever directly transacted in this FX spot market. Instead, plaintiffs allege that they transacted with intermediaries—sometimes identified as "retail foreign exchange dealers" ("RFEDs") and at other times as "FX Brokers"—who in turn transacted with defendants.  (*Id.* ¶¶ 77, 149.)  Plaintiffs characterize themselves as "[r]etail FX customers."  (*Id.* ¶ 77.)  But the Complaint says nothing about the FX retail investor market in which plaintiffs transacted except to describe it as "emerg[ing]."  (*Id.* ¶ 59.)  For example, the Complaint does not allege (1) when during the Class Period plaintiffs traded with brokers or retail dealers, (2) the rates plaintiffs paid, (3) the identities or locations of the brokers or retail dealers with whom plaintiffs allegedly transacted, or (4) the relationship, if any, between spot market rates, prices, or benchmarks and retail investor market prices.

Yet these markets are completely different and operate independently.  First, the two markets involve different market makers and liquidity providers.  There were important sources of liquidity other than defendants in the FX retail investor market, including sources not present in the spot market.  A recent action by the CFTC against Forex Capital Markets, LLC ("FXCM"), a retail FX dealer accounting for over 36% of the retail investor market in 2012, illustrates the diversity of liquidity in the retail investor market and the intervening pricing forces at play.[4]  Early in the Class Period, FXCM sourced liquidity for its retail FX customers "primarily through an internal dealing desk."  *In re Forex Capital Mkts.*, CFTC No. 17-09, at 3. FXCM later began sourcing liquidity from external providers, including "hedge funds and other [non-bank] financial institutions," through what it described as an "agency model."[5]  *Id.* at 7. Indeed, FXCM's largest liquidity provider for at least part of the Class Period was "an FXCM-backed startup firm," not a bank.  *Id.* at 6.  These additional sources of liquidity distinguish the retail investor market not only from the defendants' spot market but from the consumer end-user market in this Court's recent decision in *Nypl II*, where the alleged sources of liquidity were defendant banks.  Thus, even when plaintiffs' intermediaries allegedly engaged in "back-to-back" transactions with plaintiffs at cost plus a spread or margin, the idea that the prices paid by plaintiffs could be traced back to the prices charged by defendants as opposed to those of any other liquidity provider used by retail intermediaries is implausible and, tellingly, alleged in only the barest and most conclusory fashion.

---

[4]   *In re Forex Capital Mkts., LLC*, CFTC No. 17-09 (Feb. 6, 2017), http://www.cftc.gov/idc/groups/public/@ lrenforcementactions/documents/legalpleading/enfforexcapitalorder020617.pdf.  CFTC data from August 2012 shows FXCM as the largest retail FX dealer.  CFTC, *Selected FCM Financial Data as of August 31, 2012, from Reports Filed by September 30, 2012*, *available at* http://www.cftc.gov/idc/groups/public/@financialdatafor fcms/documents/file/fcmdata0812.pdf.

[5]   Any claims based on such purchases from defendants or alleged co-conspirators would be entitled to participate in the *FOREX* settlements.  *See* Section V.

Moreover, the two markets involve different participants.  The FX spot market is "only available to institutions that trade in large quantities," such as "banks, insurance companies, large corporations and other large financial institutions," Nat'l Futures Ass'n, *Trading in the Off-Exchange Foreign Currency Market* 4 (2004), and individuals who meet certain asset thresholds (more than $10 million in discretionary investments).[6]  In contrast, the retail investor market is comprised of retail investors.  Indeed, there is "no other market" for retail customers' FX trades besides this market.  75 Fed. Reg. 55,410, 55,434-35 (Sept. 10, 2015).  Critically, plaintiffs do not allege that any of the defendants participated in this retail investor market.[7]

### C.    Plaintiffs' Various Descriptions Of Their Intermediaries

Plaintiffs describe the intermediaries through whom they allegedly transacted in two different ways.  At times, the Complaint characterizes plaintiffs' transactions with their intermediaries as principal-to-principal transactions, referring to their intermediaries as "retail foreign exchange dealers."  (*See, e.g.*, CAC ¶ 77.)  Indeed, the CFTC regulations coined the term "retail foreign exchange dealers" for entities engaged in "principal-to-principal" trades.  *See* 75 Fed. Reg. 3,282, 3,285-86 (Jan. 20, 2010); *see also* 17 C.F.R. § 5.1(h)(1) (2017) (defining retail

---

[6]    *See* Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries, 75 Fed. Reg. 3,282, 3,284 n.23 (Jan. 20, 2010) (*to be codified at* 17 C.F.R. pt. 1, *et seq.*) ("Entities classified as ECPs include financial institutions, insurance companies, certain commodity pools and individuals who meet certain asset thresholds.  Non-ECPs, generally speaking, are retail customers."); 7 U.S.C. § 1a(18) (defining ECPs).  Individual plaintiffs here do not suggest—much less plead—that they meet these asset thresholds to qualify as participants in the spot market.  They are therefore retail customers, according to the CFTC.

This Court may take judicial notice of the contents of the Federal Register on a motion to dismiss.  44 U.S.C. § 1507; *Wei v. Robinson*, 246 F.2d 739, 743 (7th Cir. 1957) ("Contents of the Federal Register . . . are required to be judicially noticed."); *Romero v. Bestcare Inc.*, 2017 WL 1180518, at *3 n.5 (E.D.N.Y. Mar. 29, 2017).  Public CFTC documents are also judicially noticeable.  *FOREX*, 74 F. Supp. 3d 581, 588 n.4 (S.D.N.Y. 2015); *Myun-Uk Choi v. Tower Research Capital LLC*, 232 F. Supp. 3d 337, 342 n.3 (S.D.N.Y. 2017).

[7]    Indeed, none of the defendants is a licensed retail foreign exchange dealer.  *See Membership and Directories, National Futures Ass'n*, https://www.nfa.futures.org/registration-membership/membership-and-directories.html (last visited Aug. 2, 2017) (noting there are only two licensed retail foreign exchange dealers as of June 30, 2017, neither of whom is a defendant).

dealers as engaging in counterparty transactions with retail foreign exchange customers).

Plaintiffs suggest that by "concurrently purchas[ing] an FX Instrument from an FX Dealer and

then resell[ing] that FX Instrument to [plaintiffs]," these retail dealers are able to "avoid losses

associated with fluctuations in FX rates." (*Id.* ¶ 149.)

At other times, however, the Complaint alleges that plaintiffs' transactions were akin to

those with a broker, acting solely upon a customer's instructions. (*See id.* (alleging that a

plaintiff would "send[] an order . . . to the FX broker for an FX Instrument with a specific

currency pair, exchange rate, and volume" and "[i]f the FX broker accepts the trade," the FX

brokers then execute the transactions and plaintiffs would pay their broker a "commission" in

exchange).) Because "brokers are in the business of effecting transactions 'for the account of

others,' they do not constitute a distinct link in the chain of distribution." *In re NASDAQ Mkt.-*

*Makers Antitrust Litig.* 169 F.R.D. 493, 506 (S.D.N.Y. 1996); *see also* 15 U.S.C. § 78c(a)(4)

(defining "broker" as one who engages in the business of effecting transactions only "for the

account of others"). Accordingly, brokers who trade on their customers' behalf are not direct

purchasers—their customers are.

### D. *FOREX* Consolidation, Settlements, And Injunction

On August 31, 2015, this Court ordered the consolidation of all actions by direct

purchasers of FX instruments and, on December 15, 2015, it preliminarily approved settlements

between the *FOREX* plaintiffs and many of the *FOREX* defendants,[8] including nine of the

---

[8] The settling defendants are: Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Incorporated; Barclays Bank PLC and Barclays Capital Inc.; BNP Paribas, BNP Paribas North America, Inc., BNP Paribas Securities Corp., and BNP Prime Brokerage, Inc.; Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc.; The Goldman Sachs Group, Inc. and Goldman Sachs & Co. LLC; HSBC Holdings plc, HSBC Bank plc, HSBC North America Holdings Inc., HSBC Bank USA, N.A. and HSBC Securities (USA) Inc.; JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A.; The Royal Bank of Scotland Group PLC, The Royal Bank of Scotland PLC, and RBS Securities Inc.; and UBS AG, UBS Group AG, and UBS Securities LLC ("Settling Defendants").

sixteen corporate families of defendants in this action. *FOREX* Preliminary Approval Order, Dec. 15, 2015, ECF No. 536 ("PA Order"), ¶ 21. The settling class consisted of "[a]ll Persons who . . . entered into an FX Instrument directly with a Defendant." *Id.* The preliminary approval order enjoined all class members "either directly, representatively, or in any other capacity . . . from prosecuting in any forum any Released Claim against any of the Released Parties." *Id.* On July 28, 2017, the *FOREX* plaintiffs submitted additional settlements for preliminary approval, involving five of the seven remaining corporate families of defendants in this action.[9]

## ARGUMENT

## I.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO PLEAD THAT DEFENDANTS' PURPORTED ACTS IN THE FX SPOT MARKET PROXIMATELY CAUSED PLAINTIFFS' SUPPOSED LOSSES IN THE FX RETAIL INVESTOR MARKET

"To survive a motion to dismiss under Rule 12(b)(6), 'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Nypl v. JPMorgan Chase & Co.*, No. 15-civ-9300, 2017 WL 1133446, at *2 (S.D.N.Y. Mar. 24, 2017) ("*Nypl I*") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Here, plaintiffs' Complaint fails to state a claim upon which relief may be granted because it does not plausibly allege a requirement of each claim it asserts—that defendants' purported conspiracy in the FX spot market was the <u>proximate cause</u> of plaintiffs' purported injuries in the FX retail investor market. Indeed, the fact that plaintiffs transacted with independent, non-conspiring intermediaries rather than defendants "break[s] the chain of causation between defendants' actions and a plaintiff's injury." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), 11 MDL 2262, 2016

---

[9]   The recently submitted settlements in *FOREX* are between the *FOREX* plaintiffs and BTMU; Morgan Stanley, Morgan Stanley & Co., LLC, and Morgan Stanley & Co. International PLC; RBC Capital Markets, LLC; Société Générale; and Standard Chartered Bank (collectively, the "New Settling Defendants"). *FOREX*, No. 13-cv-07953, ECF Nos. 820-23. The proposed order for these New Settling Defendants is identical to the preliminary approval order entered by this Court.

WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016).  This failure is fatal to <u>all</u> of plaintiffs' claims,

and requires dismissal of the Complaint with prejudice.

Proximate cause is a necessary element of every federal antitrust claim.  *Lexmark Int'l,*

*Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1391-92 (2014).  Although "[a]n

antitrust violation may be expected to cause ripples of harm to flow through the Nation's

economy," the proximate cause standard limits which of those ripples can give rise to recovery.

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534

(1983) ("*AGC*").  Likewise, every state law that plaintiffs invoke requires pleading proximate

cause, either as a standing requirement or as an element of the substantive cause of action.[10]

Here, plaintiffs have alleged that their injury flowed through an unspecified number of

intermediary parties, each of whom used an unknown (and unpleaded) pricing methodology and

execution strategy, and had access to multiple sources of liquidity other than defendants,

including internal dealing desks and hedge funds.  *In re Forex Capital Mkts.*, CFTC No. 17-09,

---

[10]   *See Supreme Auto Transp. LLC v. Arcelor Mittal*, No. 8-CV-5468, 2017 WL 839484, at *5 (N.D. Ill. Mar. 3, 2017) (dismissing complaint because plaintiffs' state antitrust and consumer protection claims, including under Arizona, California, Massachusetts, Minnesota, New York, and North Carolina law, "require a showing of proximate cause"); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL No. 2013, 2015 WL 3988488, at *20 (N.D. Ill. June 29, 2015) (the "same causation issue that plagued Indirect Plaintiffs' state-law antitrust [under California, New York, and Minnesota] claims also provides grounds for dismissal for Indirect Plaintiffs' state-law consumer-protection claims under . . . California, Florida, and North Carolina law"); *Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012) (affirming dismissal, explaining that under the NCUDTPA, "a plaintiff must show . . . 'the act proximately caused injury to the plaintiff'") (citation omitted); *Int'l Bhd. of Teamsters Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656, 664 (N.D. Ill. 1998) (dismissing Illinois antitrust claim where "the causal connection between the [plaintiffs'] injury and the alleged antitrust injury is riddled with rank speculation and thus barred by proximate cause"), *aff'd*, 196 F.3d 818 (7th Cir. 1999); *Casavant v. Norwegian Cruise Line Ltd.*, 952 N.E.2d 908, 912 (Mass. 2011) (explaining that the MCPA requires plaintiffs to show "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception") (citation omitted); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1322 (S.D. Fla. 2010) (dismissing indirect purchasers' Florida consumer protection claim for failure to adequately plead proximate causation); *Lorenzo v. Qualcomm Inc.*, No. 08cv2124 WQH, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (dismissing California consumer protection claim because "[a]side from conclusory allegations that Plaintiff suffered injuries 'as a result of' Qualcomm's conduct, and that Qualcomm's conduct was the 'proximate cause' of Qualcomm's injury," the complaint "does not allege[] facts to demonstrate how Qualcomm[] . . . proximately caused Plaintiff's alleged injury").

at *7.  Indeed, the intermediaries plaintiffs dealt with here might never have even backed their trades with plaintiffs using liquidity from any outside source at all—the trades could have simply been netted internally against those of other retail investors.

The recent dismissal of the antitrust claims in *In re Platinum & Palladium Antitrust Litigation*, No. 1:14-cv-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ("*Palladium*") is instructive here.  There, the court found proximate cause lacking because of "'significant intervening causative factors,' most notably, the 'independent pricing decisions of non-conspiring retailers,' [which] attenuate the causal connection between the violation and the injury."  *Id.* at *22 (quoting *LIBOR VI*, 2016 WL 7378980, at *15).  Holding defendants liable to such downstream plaintiffs "would result in damages disproportionate to wrongdoing."  *Id.* Moreover, in the context of damages, the court also rejected the proposition that plaintiffs' allegations could demonstrate causation through "the ripple effects of the Fixing" because those effects would be affected by "numerous market participants, many of whom had no relationship with Defendants."  *Id.* at *23.  The court emphasized the difficulty in computing damages even for those who had <u>direct</u> dealings with defendants, much less those who did not.  *Id.* at *24.  It underscored that prosecution of the case would require "financial models so attenuated as to approach hopeless speculation."  *Id.* at *25.

Here, plaintiffs' pleadings are even more remote and attenuated than those in *Palladium*. Plaintiffs' allegation that "FX brokers offer those [spot market] quotes to their customers, often with some additional markup determined by the brokers" (CAC ¶ 150) is insufficient.[11]  <u>First</u>, to the extent that this describes the conduct of a broker, acting as the agent of the retail customer,

---

[11]   The allegation that the claimed pass-through transaction is "often" accompanied by "an additional fee or commission determined by the broker" suffers from the same deficiencies.  (CAC ¶ 149.)

those transactions are covered by the existing *FOREX* settlements and should be enjoined. *See infra* Section V. Second, even if the allegation applies to an FX dealer, it says nothing about whether the final, all-in price to the retail customer bears the required nexus to spot market pricing. *See Robinson v. Tex. Auto Dealers Ass'n*, 387 F.3d 416, 423 (5th Cir. 2004) (antitrust claim requires that the "bottom-line" price have been higher). Finally, "independent pricing decisions of non-conspiring retailers" strongly attenuate any causal connection between defendants' acts and the prices plaintiffs allegedly paid. *Palladium*, 2017 WL 1169626, at *20-22 (in dismissing complaint, explaining the difficulty in overcoming "significant intervening causative factors" in cases where "plaintiffs' injuries arise from transactions with non-conspiring retailers who are able, but not required, to charge supra-competitive prices as the result of defendants' conspiracy"); *LIBOR VI*, 2016 WL 7378980, at *15 (in dismissing California and New York antitrust claims, emphasizing "significant intervening causative factors, most notably, the independent pricing decisions of non-conspiring retailers").

Plaintiffs cannot fall back on conclusory allegations that they were injured merely by participating in the downstream market. (CAC ¶ 202 ("Defendants' manipulation of the FX market was so pervasive that Plaintiffs and the other members of the proposed Classes could not have participated in the FX market during the Class Period without suffering damage as a result of Defendants' anticompetitive conduct.") (emphasis added).) These are "legal conclusion[s] and, without more, cannot survive a motion to dismiss." *Supreme Auto Transp. LLC v. Arcelor Mittal*, No. 8-cv-5468, 2017 WL 839484, at *5 (N.D. Ill. Mar. 3, 2017) (dismissing every state law claim due to the indirect purchasers' failure to plausibly allege proximate cause); *see, e.g.*, *Nypl I*, 2017 WL 1133446, at *5 (dismissing complaint, highlighting the lack of "factual allegations showing that Defendants' alleged anticompetitive conduct directly restrained the end-

13

user market"). "Merely stating '<u>as a result</u>' does not provide sufficient allegations to show causation." *Lydia Sec. Monitoring, Inc. v. Alarm One, Inc.*, No. 7-80145 CIV, 2007 WL 2446889, at *5 (S.D. Fla. Aug. 23, 2007) (emphasis added) (dismissing FDUTPA claim).

Moreover, even had plaintiffs supported these conclusory allegations, they remain deficient because allegations that "[a]s a result of Defendants' collusion, [plaintiffs] paid higher prices" (*e.g.*, CAC ¶ 201), at best, only allege but-for causation and not proximate cause. *Cf. Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992) (explaining that a plaintiff's right to sue under the Clayton Act "required a showing that the defendant's violation not only was a 'but for' cause of his injury, but the proximate cause as well"); *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 246 (S.D.N.Y. 2008) (dismissing Sherman Act claims because "although plaintiffs may have alleged a plausible theory of causation . . . [defendants' conduct] was, at most only a 'but for' cause of the alleged drop in wheat prices"). This concept of proximate cause is particularly important in cases like this one, where plaintiffs did not even transact with defendants, but only with non-conspiring retail dealers who utilized their own pricing methodologies and made their own independent pricing decisions.

Thus, plaintiffs here are distinguishable from those in *FOREX* or *Nypl II*, where plaintiffs at least alleged that the damage they suffered was ascertainable using a direct and consistent mathematical formula applied to empirical market data. *FOREX*, 2016 WL 5108131, at *8 (S.D.N.Y. Sept. 20, 2016); *Nypl II*, 2017 WL 3309759, at *6. Here, by contrast, the Complaint does not plausibly allege any direct relationship between the benchmark rates in the institutional <u>spot</u> market and the rates paid by, let alone the rates set by, the non-defendant intermediaries with whom plaintiffs transacted in the <u>retail</u> market. At the very least, the plaintiffs in *Nypl II* attempted to allege a constant relationship, based on a mathematical formula applied to empirical

14

market data, between the FX benchmark rates allegedly manipulated by defendants and the price at which the *Nypl II* plaintiffs transacted.  *Nypl*, ECF No. 174-1.[12]  Here, however, no such formula is alleged to exist.  First, unlike the direct transactional relationships in *Nypl II*, the transactions at issue here on both sides—plaintiffs and defendants—were with non-conspiring intermediaries who (1) are not parties to this case, (2) have multiple sources of liquidity outside of defendants, and (3) make their own pricing decisions.  Second, unlike in *Nypl II*, there is no allegation that pricing in the FX retail investment market is done once a day based on a published benchmark rate, which is what the *Nypl* plaintiffs (and their counsel during his investigation) relied on in alleging that such a relationship existed.  *Id.* ¶¶ 58-59.

Nor can plaintiffs meet their burden with the conclusory pleading that "overcharges were passed on by [RFEDs] to their customers" (CAC ¶ 150), which is unadorned by any factual allegations about the relationship between the spot market and retail investor market rates.  Although the Complaint alleges that retail dealers may hedge risk resulting from an FX retail customer's transaction by executing a "matching, back-to-back FX Instrument transaction[] with an FX Dealer" (*id.* ¶ 149), the temporal proximity of the spot market and retail investor market transactions says nothing about whether the all-in retail prices charged by FX dealers (not brokers) closely track the spot market prices.

Plaintiffs' attempt to characterize their case as an "indirect purchaser" case does not change this result.  The FX spot market is not simply the upstream portion of a retail investor market; the two markets are entirely independent, and no factual allegations in the Complaint show otherwise.  The allegedly manipulated benchmarks here were used to price spot market

---

[12]   Defendants respectfully disagree with the Court's decision in *Nypl II*, but even under the standard articulated in that decision, plaintiffs' allegations fall far short of stating a claim.

trades by large institutional transactors, not retail investment products.  Even under state laws

that allow indirect purchaser claims, courts routinely dismiss claims by self-styled "indirect

purchasers" who transact in a market not shown to be "directly restrained."  *See, e.g.*, *In re*

*Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161-62 (2d Cir. 2016) (dismissing

indirect purchaser claims).

      Moreover, the uniquely fungible nature of currency merely underscores the implausibility

of proximate cause here.  Because one unit of currency is, by definition, indistinguishable from

another unit of the same currency, the idea that the purported effects of defendants' alleged

conspiracy in one market could be traced to transactions in separate markets is implausible, a

deficiency plaintiffs' conclusory allegations fail to overcome.  This makes allegations of

proximate cause even more necessary in the context of markets for currency products than in just

about any other market—even markets for completely standardized and fungible physical

products, which can at least be identified as unique lots and tracked through sequential sales.

*See, e.g.*, *Supreme Auto*, 2017 WL 839484, at *5 (dismissing Arizona, California, Minnesota,

New York, and North Carolina antitrust and consumer protection claims because "the

commingling of [defendant's price-fixed products] with other [non-price-fixed products] . . .

means that the defendants did not legally cause the harm allegedly suffered").  Because plaintiffs

fail to plausibly allege how defendants' purported conspiracy in the FX spot market proximately

caused plaintiffs' purported injuries in the distinct FX retail investor market—which was subject

to its own independent and intervening forces—the Complaint should be dismissed.

## II.    THE *AGC* "EFFICIENT ENFORCER" FACTORS WEIGH STRONGLY IN FAVOR OF DISMISSAL

      Nearly all of plaintiffs' claims should also be dismissed for the independent reason that

plaintiffs are not efficient enforcers of the antitrust laws.  The *AGC* efficient enforcer test "helps

to control the floodgates to excessive litigation which threaten general business behavior,"
*Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808, 824 (E.D.N.Y. 1980), by considering the
following factors:  (1) the directness of the injury; (2) the speculative measure of the purported
harm; (3) the existence of more direct victims; and (4) the risk of duplicative recovery.  *Nypl I*,
2017 WL 1133446, at *6.  This analysis applies not only to plaintiffs' federal claim but also to
their claims under Arizona, California, Illinois, New York, and North Carolina law.[13]  Because
the first factor, directness of injury, "is essentially a proximate cause analysis," *In re Commodity
Exch., Inc.*, 213 F. Supp. 3d 631, 654 (S.D.N.Y. 2016), plaintiffs are not efficient enforcers for
the reasons set forth above in Section I.  All of the remaining factors also support dismissal.

---

[13]   *Supreme Auto*, 2017 WL 839484, at *3 & n.4 (dismissing all state antitrust claims, noting that Arizona,
California, New York, and North Carolina have adopted the *AGC* test or a modified version); *Luscher v. Bayer
AG*, No. CV 2004-014835, 2005 WL 6959406, at *1-*2 (Ariz. Super. Ct. Sept. 16, 2005) (dismissing Arizona
claim based on *AGC* factors); *Cty. of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1045-47 (Ill. App. Ct. 2004)
(citing *AGC* factors and affirming dismissal of Illinois antitrust claim); *Crouch v. Crompton Corp.*, Nos. 2-cvs-
4375, 03-cvs-2514, 2004 WL 2414027, at *10 (N.C. Super. Ct. Oct. 28, 2004) (applying a modified *AGC* test).
Although California, Illinois, and New York's highest courts have yet to consider whether the *AGC* factors
apply to the Cartwright Act, the IAA, and the Donnelly Act, those states' intermediate appellate courts—along
with the Ninth and Second Circuits—have applied *AGC* to claims made under these statutes.  *See Vinci v. Waste
Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338-39 (Cal. Ct. App. 1995) (Cartwright Act); *Knevelbaard Dairies v. Kraft
Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000) (same); *Nypl II*, 2017 WL 3309759, at *7 (Cartwright Act);
*Philip Morris, Inc.*, 817 N.E.2d at 1047 (IAA); *Cont'l Guest Servs. Corp. v. Int'l Bus Servs., Inc.*, 939 N.Y.S.2d
30, 34 (1st Dep't 2012) (Donnelly Act); *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 81 (2d Cir.
2013) (same).  Similarly, while no Arizona appellate court has considered *AGC*'s applicability to the state
antitrust statute, at least one Arizona trial court has done so.  *Luscher*, 2005 WL 6959406, at *1-2 (dismissing
complaint under *AGC*); *see also In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 536 F. Supp.
2d 1129, 1134-42 (N.D. Cal. 2008) (dismissing Arizona antitrust claims under *AGC*).  The Ninth Circuit also
recognizes that the Arizona Antitrust Act is interpreted in conformity with federal antitrust laws and therefore
claims under the acts generally rise and fall together.  *See Mothershed v. Justices of the Supreme Court*, 410
F.3d 602, 609-10 (9th Cir. 2005).  Although some North Carolina courts have declined to apply *AGC* to the
facts of the case, *see Teague v. Bayer AG*, 671 S.E.2d 550 (N.C. Ct. App. 2009), several courts have
nonetheless concluded that North Carolina's high court would apply *AGC* to determine whether an antitrust
plaintiff has standing.  *In re Dairy Farmers*, 2015 WL 3988488, at *15 ("Despite its sometimes-dubious and
often-difficult-to-follow analysis, *Teague* cannot be interpreted as a wholesale rejection of *AGC*"); *Sahagian v.
Genera Corp.*, No. CV 08-7613-GW, 2009 WL 9504039 (applying modified *AGC* analysis from *Crouch*).
Although Minnesota has not adopted the efficient enforcer test, the Minnesota antitrust claims should still be
dismissed for lack of proximate causation for the reasons described in Section I.  *See also* Appendix A.

Moreover, California UCL claims predicated upon antitrust violations (as plaintiffs' are here) must be dismissed
if the underlying California antitrust claims are dismissed.  *See Racek v. Rady Children's Hosp.*, No. D058173,
2012 WL 2947881, at *6 (Cal. Ct. App. July 20, 2012) (dismissing UCL claim because plaintiffs failed to allege
Cartwright Act claim); *see also Cascades Comput. Innovation LLC v. RPX Corp.*, No. 12-cv-01143-YGR, 2016
WL 2993094, at *2 (N.D. Cal. Mar. 25, 2016) (same).

### A. Plaintiffs' Damages Would Be Highly Speculative

The second factor—speculative damages—weighs in favor of dismissal.  The Complaint's "lack of allegations regarding <u>how</u> prices in [plaintiffs' retail investor] market are determined and the relationship between the FX spot market and [plaintiffs' retail investor] market means that Plaintiffs' alleged damages 'would necessarily be 'highly speculative.'''" *Nypl I*, 2017 WL 1133446, at *7 (emphasis added) (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 780) (2d Cir. 2016).  Absent some plausible factual allegation (for example, the existence of a mathematical formula) about the way in which FX spot market benchmark rates affected the FX retail investor market prices plaintiffs paid, plaintiffs' damages claims remain conclusory and unduly speculative.  *See, e.g.*, *In re Interest Rate Swaps Antitrust Litig.*, Nos. 16-MD-2704, 16-MC-2704, 2017 WL 3209233, at *45-46 (S.D.N.Y. July 28, 2017) (holding damages claim unduly speculative except for a limited class of plaintiffs for which there is "empirical research, academic analyses, and analyst reports of the effects" of defendants' alleged misconduct on plaintiffs' asserted injuries); *Palladium*, 2017 WL 1169626, at *23-25 (in dismissing complaint, emphasizing the difficulty of computing damages, particularly for those who did not deal directly with defendants, because any computation would require "financial models so attenuated as to approach hopeless speculation").  But plaintiffs here make <u>no</u> factual allegations that even attempt to allege any "mathematical relationship between the FX benchmark rates and the prices Plaintiffs paid," or even the rates that plaintiffs' intermediaries paid, nor do they allege any "identifiable transactions in which Plaintiffs paid inflated prices due to Defendants' manipulation."  *Nypl II*, 2017 WL 3309759, at *6.  Nor would such an allegation (had it been made) be plausible, as plaintiffs transacted only with non-conspiring intermediaries who made their own independent pricing decisions and have non-defendant sources of liquidity.

Moreover, where, as here, the currency instruments purportedly affected by defendants' misconduct were completely fungible and almost certainly commingled with others, damages become unduly speculative. *Supreme Auto*, 2017 WL 839484, at *4 (dismissing antitrust claim, explaining that "calculating damages for these plaintiffs would be a highly speculative task" where multiple influences on price could not "easily be segregated and priced after the fact").

Accordingly, proof of plaintiffs' claims would require precisely the type of speculation precluded as a matter of law in antitrust cases. *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980) (explaining that the antitrust laws "exclude claims based on conjectural theories of injury and attenuated economic causality that would mire the courts in intricate efforts to recreate the possible permutations in the causes and effects of a price change"); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *10 (S.D.N.Y. Mar. 28, 2014) (explaining that the speculativeness of the alleged injury favored dismissal, emphasizing the "[i]ndirectness of damages and independent factors contributing to the effect on the Plaintiff"); *LIBOR VI*, 2016 WL 7378980, at *17 ("[T]he injury is so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions."); *Supreme Auto*, 2017 WL 839484, at *4 (dismissing antitrust claims where price-fixed goods "contained a wide variety of materials, each of which influences the retail price and cannot easily be segregated and priced after the fact"); *Ho v. Visa U.S.A., Inc.*, 16 A.D.3d 256, 257 (1st Dep't 2005) (affirming dismissal because "[w]hatever damages [plaintiffs] suffered are barely in the zone of injury and would be virtually impossible to calculate"). This factor thus supports dismissal.

## B.   The *FOREX* Plaintiffs Are More Direct Victims

The next factor—whether more direct victims exist—also supports dismissal. The parties best situated to prosecute claims based on defendants' alleged manipulation of FX prices in the

spot market are those who directly transacted with defendants in the spot market—the *FOREX*

plaintiffs.  *See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.,* 467 F.3d 283, 294 (2d Cir.

2006) (denying standing where more directly affected plaintiffs already "addressed the exact

violation now asserted").  Plaintiffs here seek to recover from the same asserted injury that

*FOREX* class members are seeking to recover.  (*Compare* CAC ¶ 107 (describing plaintiffs'

injuries as "overcharges on FX Instruments purchased indirectly from one or more Defendants"),

*with FOREX* TAC ¶ 368 (describing plaintiffs' injury as "overcharges" on FX instruments).)

Plaintiffs here failed to allege (for all the reasons set forth above) how the retail investor market

was "directly restrained" by defendants' alleged manipulation in the spot market.  *Nypl II*, 2017

WL 3309759, at *6.  Thus, plaintiffs cannot show that they fall in the category of those "whose

self-interest would most motivate [them] to vindicate the public interest in antitrust

enforcement."  *Paycom*, 467 F.3d at 294 (affirming dismissal).  That the *FOREX* claims have

been litigated for over three years and resulted in significant settlements shows that the *FOREX*

plaintiffs are more efficient enforcers than the indirectly, speculatively injured plaintiffs only

now seeking relief for the very same conduct.  Because plaintiffs have failed to show that they

are direct victims of defendants' alleged misconduct and that their alleged injuries are not

derivative of the alleged injuries by *FOREX* class members, this factor supports dismissal.

### C.    Plaintiffs' Claims Threaten Duplicative Recoveries

The final *AGC* factor favors dismissal because the relief demanded by plaintiffs here

duplicates the recovery already obtained by the direct purchaser plaintiffs in *FOREX*.  Plaintiffs

here have failed to tie their claims to "specific transactions in which they participated," and thus

failed to allege any "direct influence the manipulated FX benchmark rates had on [plaintiffs']

retail prices."  *Nypl II*, 2017 WL 3309759, at *7.  This is particularly true "in light of the fact that

[direct purchasers] have already brought and resolved their claims . . . and have obtained a multi-

billion dollar settlement." *Ho v. Visa U.S.A. Inc.*, 3 Misc. 3d 1105(A), 2004 N.Y. Slip Op., at *3 (Sup. Ct. N.Y. Cty. 2004), *aff'd*, 16 A.D.3d 256 (1st Dep't 2005) (dismissing complaint).  Thus, plaintiffs' Arizona, California, Illinois, New York, and North Carolina claims should be dismissed because plaintiffs are not efficient enforcers.

## III.   PLAINTIFFS' STATE LAW CLAIMS FAIL FOR ADDITIONAL REASONS

Plaintiffs' various state law claims are defective for distinct and independent reasons.

### A.   Due Process Requires Dismissal Of All Of Plaintiffs' State Law Claims Except Those Under New York Law

All of plaintiffs' state law claims, except those under New York law, should be dismissed because plaintiffs fail to allege that they made any purchases in those states or that defendants engaged in any conspiratorial conduct in those states, as due process principles require.[14]  The only allegations pertaining to these states are that certain plaintiffs reside in them.  (CAC ¶¶ 10-20.)  Residency alone does not, however, create sufficient contacts to invoke those states' laws.

The Due Process Clause of the Fourteenth Amendment prohibits application of a state law unless that state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818-22 (1985) (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)).  Plaintiffs must plead sufficient contacts "with the parties and the occurrence or transaction[s]" giving rise to the claim.  *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1111, 1114 (9th Cir. 2013) (remanding for individual due process inquiry as to whether plaintiffs alleged sufficient conspiratorial conduct within California for each

---

[14]   New York is the only state in which plaintiffs attempt to allege that any plaintiffs purchased FX Instruments or where defendants engaged in conspiratorial activity.  (CAC ¶¶ 8, 64, 158.  *Compare* ¶ 228(c) (representing that the "New York Plaintiff and all members of the proposed New York Class were domicile in New York during the Class Period and/or purchased FX Instruments in New York indirectly from one or more Defendants"), *with* ¶ 231 (omitting any allegation that Arizona plaintiffs ever purchased FX Instruments in Arizona).)

defendant).  These contacts must be more than "slight and casual."  *Id.* at 1113-14 (due process requires that "more than a *de minimis* amount of [] defendant's alleged conspiratorial activity leading to the sale of price-fixed goods to plaintiffs took place in [that state]").[15]

In alleged price-fixing cases such as this one, plaintiffs must allege that they purchased the price-fixed goods within the state <u>or</u> that the conspiratorial conduct giving rise to plaintiffs' claims occurred there.  *Id.* at 1112-13.  Simply pleading that one resides in that state is not enough.  *Azimpour v. Sears, Roebuck & Co.*, No. 15-cv-2798, 2017 WL 1496255, at *10-11 (S.D. Cal. Apr. 26, 2017); *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918, 927 (N.D. Cal. 2015) ("[R]esidence in a state alone—without a purchase or any other conduct amounting to 'injury'—cannot be sufficient, or even relevant, for Article III purposes.").  For example, in *In re TFT-LCD (Flat Panel) Antitrust Litigation*, MDL No. 1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010) ("*TFT I*"), the court dismissed all 20 of plaintiffs' state antitrust and consumer protection claims on due process grounds, explaining that "in order to invoke the various state laws at issue, plaintiffs must be able to allege that 'the occurrence or transaction giving rise to the litigation' . . . occurred in the various states."  *Id.* at *3 (quoting *Allstate Ins. Co.*, 449 U.S. at 308).  As the court explained, "the fact that plaintiffs have a presence in the various states does not establish a link between plaintiffs' antitrust claims and the States."  *Id.*  The court further explained that "the fact that some defendants ha[d] admitted to selling price-fixed goods to

---

[15]   *See In re Optical Disk Drive Antitrust Litig.*, MDL No. 2143, 2014 WL 1379197, at *3 (N.D. Cal. Apr. 8, 2014) (dismissing Florida claim on due process grounds because plaintiffs failed to allege that "direct sales" of the price-fixed goods or other "conspiratorial activity related to those sales" took place in Florida); *Pecover v. Elecs. Arts Inc.*, 633 F. Supp. 2d 976, 984-85 (N.D. Cal. 2009) (dismissing antitrust and consumer protection claims of 18 states in which plaintiffs did not allege they purchased the price-fixed product); *Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 3:93-cv-301-p, 1994 WL 910955, at *2 (W.D.N.C. July 12, 1994) (declining to apply NCUDTPA based on the "constitutional and statutory limits on [the NCUDTPA's] reach" and the Commerce Clause's limitation on state regulation to reach cases involving only a "substantial effect on . . . in-state operations") (citation omitted); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502-03 (M.D.N.C. 1987) (dismissing NCUDTPA claim based on due process limitations on the scope of the statute).

customers in [California] does not establish the requisite connection with California because those plea agreements do not state, nor have plaintiffs alleged, that any defendants sold products to any of the plaintiffs in California." *Id.* Thus, all state law claims were dismissed.

The *TFT* plaintiffs filed an amended complaint, this time preparing "a chart summarizing the allegations of the SAC organized by plaintiff, the states where each plaintiff allegedly purchased LCD products, and the state law claims asserted by each plaintiff." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2010 WL 4705518, at *1 (N.D. Cal. Nov. 12, 2010) ("*TFT II*"), *rev'd on other grounds*, *AT&T Mobility LLC*, 707 F.3d 1106 (9th Cir. 2013). The court found that <u>only</u> those plaintiffs who actually purchased products in certain states could allege claims under those states' laws.[16]

Here, plaintiffs do not even try to meet this standard. They do <u>not</u> allege that they made any purchases in the states whose laws they invoke or that conspiratorial conduct occurred in any of those states, other than perhaps New York, where defendants are alleged to have FX trading operations. (CAC ¶ 8; *id.* ¶ 228(c).) Indeed, plaintiffs do not even identify the intermediaries with whom they transacted, much less where plaintiffs transacted with them. And, as due process jurisprudence makes clear, allegations that plaintiffs reside in these states is insufficient.

This result does not change because, in granting in part the *Nypl* plaintiffs' motion for leave to file an amended complaint, this Court reasoned that a plaintiff's residency in the state of

---

[16] On appeal, the Ninth Circuit reversed, but it did so only because the district court had to consider not only the location of plaintiffs' <u>purchases</u>, but also the location of the "alleged agreements and conspiracies to fix LCD prices." *AT&T Mobility LLC*, 707 F.3d at 1112. It remanded the case for an "individual determination . . . with respect to each Defendant as to whether Plaintiffs have alleged sufficient conspiratorial conduct within California, that is not 'slight and casual.'" *Id.* at 1114. Only after alleging conspiratorial conduct occurring specifically in California, including allegations that defendants implemented their conspiracy "through the offices they maintained in California" and that "Defendants' employees in their California offices engaged in communications and meetings with other defendants to exchange price and supply information and reach agreements" did the district court ultimately reverse dismissal and find that plaintiffs' California claims satisfied due process for pleading purposes. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, 2013 WL 1891367, at *2-*3 (N.D. Cal. May 6, 2013) (citations omitted).

California could be sufficient for that plaintiff to assert a UCL claim, even against non-resident

defendants for conduct that occurred outside of California.  *Nypl II*, 2017 WL 3309759, at *7-8.

As an initial matter, no due process argument was raised in the *Nypl* briefing; nor did this Court

indicate that it was addressing the due process doctrine.  Moreover, the nature of the *Nypl*

allegations is distinct in critical respects from the ones here.  In *Nypl*, plaintiffs are individual

retail "end user" customers, who allege that they suffered injury while exchanging foreign

currency at retail branches of defendant banks.  It may be reasonable to assume that plaintiffs

would visit retail branches convenient to their place of residency, making the state of residency

coincident with the state where defendants allegedly caused the *Nypl* plaintiffs' asserted injuries.

Here, by contrast, plaintiffs do not allege that they transacted, much less suffered injury, at any

physical branch locations.  Nor do they allege that the FX retail intermediaries with whom they

transacted even have physical locations in the relevant states.  And, because plaintiffs are indirect

purchasers, they cannot allege that defendants chose to do business in the plaintiffs' home states,

highlighting the dubious nature of their attempt to subject defendants to state laws with which

they have no connection other than the residency of alleged indirect purchasers.

Accordingly, plaintiffs failed to allege that any of these state claims may be applied to

defendants without violating due process and those claims should be dismissed.

**B.     Plaintiffs' North Carolina Antitrust Claim Fails Because The Alleged
Misconduct Falls Within The Regulatory Scheme Exception**

Plaintiffs' antitrust claim pursuant to the North Carolina Unfair and Deceptive Trade

Practices Act ("NCUDTPA") should be dismissed because it is precluded by the regulatory

scheme exception, which precludes NCUDTPA claims when applying the statute "would create

unnecessary and overlapping supervision, enforcement, and liability" in the face of existing state

or federal laws and regulatory schemes.  *North Carolina ex rel. Cooper v. Ridgeway Brands*

*Mfg., LLC*, 646 S.E.2d 790, 798 (N.C. App. 2007), *aff'd in part*, *rev'd in part*, 362 N.C. 431 (2008). When such overlap exists, the North Carolina "Supreme Court has given a very narrow interpretation to [the NCUDTPA]," *Ward v. Zabady*, 354 S.E.2d 369, 373 (N.C. App. 1987), largely to avoid "overlapping supervision and enforcement" by regulatory or enforcement agencies. *Skinner v. E. F. Hutton & Co.*, 333 S.E.2d 236, 241 (N.C. 1985); *see also Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 166, 168 (4th Cir. 1985) ("the presence of other federal or state statutory schemes may limit the scope of [the NCUDTPA]"); *Bache Halsey Stuart, Inc. v. Hunsucker*, 248 S.E.2d 567, 570 (N.C. Ct. App. 1978) (concluding commodities transactions are outside the scope of section 75-1.1 because of the "pervasive" federal scheme for regulating them already in place); *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 493-94 (N.C. 1991) (revolving fund certificates are beyond the scope of the NCUDTPA).

This exception applies here as well. Defendants have found no North Carolina authority for extending the NCUDTPA to alleged conduct over which numerous regulators in the United States and abroad, including the Office of the Comptroller of the Currency ("OCC") and the Federal Reserve Board of Governors, have asserted jurisdiction, conducted exhaustive investigations, and imposed more than $11 billion in fines and settlements based upon various federal and foreign laws and regulatory schemes. (CAC ¶¶ 4, 151-75.) This Court should decline to be the first to do so. Accordingly, plaintiffs' NCUDTPA claim should be dismissed.

**C.    Plaintiffs' Florida And Illinois Claims Fail Because Both States' Statutes Exempt Regulated Banks**

The statutes governing plaintiffs' Florida and Illinois claims do not apply to federally regulated banks. *See Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1221 (S.D. Fla. 2015) ("By its express terms, FDUTPA 'does not apply to . . . [b]anks or savings and loan associations regulated by federal agencies'") (quoting Fla. Stat. § 501.212(4)(c)); *In re Benkovitch v. Bank of*

25

*Am. Corp.*, No. 14-36362, 2017 WL 543177, at *8 (Bankr. S.D. Fla. Feb. 6, 2017) (dismissing FDUTPA claims because banks "are exempt from FDUTPA's private right of action"); *Bankers Trust Co. v. Basciano*, 960 So. 2d 773, 779 (Fla. Dist. Ct. App. 2007) ("FDUTPA clearly excludes banks from its grasp."); 740 Ill. Comp. Stat. Ann. § 10/5(11) (exempting "the activities of any state or national bank to the extent that such activities are regulated or supervised by officers of the state or federal government").  Here, nearly every defendant is a bank regulated by at least one federal agency.[17]  Plaintiffs themselves recognize that defendants are overseen by various regulatory agencies, alleging that the CFTC, the OCC, and Federal Reserve have already assessed fines on defendants for their practices related to their FX trading businesses and cease and desist orders requiring defendants to enhance oversight of their FX trading activity.  (CAC ¶¶ 152-153, 156.)  Accordingly, plaintiffs' Florida and Illinois claims should be dismissed.

---

[17]    *See, e.g.*, U.S. Dep't of the Treasury, Office of the Comptroller of the Currency, List of National Banks & Federal Branches & Agencies, http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-active-bank-lists.html (last updated July 31, 2017) (listing Bank of America, N.A.; Citibank N.A.; HSBC Bank USA, N.A.; and JPMorgan Chase Bank, N.A. as banks regulated by the Office of the Comptroller of the Currency); *id.* (listing Barclays Bank PLC and Deutsche Bank AG as banks regulated by the Federal Reserve) (last visited Aug. 2, 2017); Mitsubishi UFJ Financial Group, Inc., Resolution Plan at 6, December 2015, https://www.federal reserve.gov/bankinforeg/resolution-plans/mitsubishi-fin-3g-20151231.pdf  (BTMU is regulated by the Federal Reserve) (last visited Aug. 9, 2017); Board of Governors of the Federal Reserve System Federal Deposit Insurance Corporation, https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20160802a1.pdf (listing Société Générale as a bank regulated by the Federal Reserve); Federal Reserve Nat'l Information Center, https://www.ffiec.gov/nicpubweb/nicweb (identifying Morgan Stanley as regulated by the Federal Reserve); UBS US Resolution Plan, July 2014, https://www.federalreserve.gov/bankinforeg/resolutionplans/ubs-1g-20140701.pdf  (UBS AG is supervised by the Federal Reserve and OCC) (last visited Aug. 8, 2017). Credit Suisse and Goldman Sachs are both regulated by the Federal Reserve Bank of New York.  *See* Credit Suisse Global Recovery and Resolution Plan, June 2014, https://www.federalreserve.gov/bankinforeg/resolution -plans/credit-suisse-1g-20140701.pdf (last visited Aug. 4, 2017); The Goldman Sachs Group, Inc. 2017, Resolution Plan, July 1, 2017, https://www.federalreserve.gov/supervisionreg/resolution-plans/goldman-sachs-1g-20170701.pdf (last visited Aug. 4, 2017).  BNP Paribas is regulated by the Federal Reserve as a Foreign Banking Organization.  *See* Letter to BNP Paribas North America from Board of Governors of the Federal Reserve System (Feb. 18, 2016), https://www.federalreserve.gov/econres/files/bnp-regyy-20160218.pdf.

**D.    Plaintiffs' Florida Consumer Protection Claim Should Be Dismissed Because Plaintiffs Are Not Consumers**

Plaintiffs' consumer protection claim under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") should be dismissed because plaintiffs are not consumers within the meaning of the statute and are therefore barred from bringing suit. *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947-J-33HTS, 2008 WL 2950112, at *8-9 (M.D. Fla. July 31, 2008) ("Only consumers may bring private suit under FDUTPA."); *Fonte v. AT&T Wireless Servs., Inc.*, 903 So.2d 1019, 1024 (Fla. D.C.A. 4th Dist. 2005) (explaining that the "FDUTPA is a remedial statute designed to protect consumers"). The FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The Florida Supreme Court has defined an "unfair practice" under the statute as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to <u>consumers</u>," and "deception" under the statute as "a representation, omission, or practice that is likely to mislead the <u>consumer</u> acting reasonably in the circumstances, to the <u>consumer's detriment</u>." *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (emphases added) (citations and internal quotation marks omitted). A "consumer" is defined as a "purchaser of goods and services." *N.G.L. Travel Assoc. v. Celebrity Cruises, Inc.*, 764 So.2d 672, 674 (Fla. 3d DCA 2000) (citation omitted).

Here, plaintiffs, as individuals who purportedly traded in FX instruments, are not "consumers" under the FDUTPA. The fact that plaintiffs traded in the "retail" investor market does not make them consumers. As this Court has explained, "[e]lectronic FX trading is not consumer-oriented conduct. Individuals do not trade FX the way they purchase traditional consumer products. Similar to securities, FX is traded as investments, not as goods to be consumed or used." *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, No. 15-civ-9945-LGS,

2017 WL 590320, at *6 (S.D.N.Y. Feb. 13, 2017) (citation and internal quotation marks omitted) (dismissing New York consumer protection claims because "'[c]onsumers,' in this context, are 'those who purchase goods and services for personal, family or household use'" and FX trading does not fall within that definition) (citation omitted). Therefore, plaintiffs are not consumers as defined by Florida courts, and their FDUTPA claims should be dismissed. *See, e.g.*, *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009) (dismissing FDUTPA claim because plaintiff was a non-consumer); *Cannova v. Breckenridge Pharm., Inc.*, No. 8-81145-civ, 2009 WL 64337, at *3 (S.D. Fla. Jan. 9, 2009) (dismissing FDUTPA claim because plaintiff failed to allege he acted as a consumer); *Goodbys Creek, LLC*, 2008 WL 2950112, at *8-*9 ("find[ing] no basis for conferring consumer status on [plaintiff] as the beneficiary of construction bonds"); *Bio-Med Plus, Inc. v. Health Coal., Inc.*, 793 So.2d 1092, 1092 (Fla. 3d DCA 2001) (affirming denial of relief where appellant was not a "consumer of the appellee"); *N.G.L. Travel Assocs.*, 764 So.2d at 674 (affirming dismissal of FDUTPA claim because travel agency's "actions were not that of a consumer").[18]

### E.    Plaintiffs' Massachusetts Consumer Protection Claim Should Be Dismissed Because Plaintiffs Failed To Plead They Engaged In Consumer Transactions

Plaintiffs also assert a claim under the Massachusetts Consumer Protection Act ("MCPA"), but do not state whether their claim arises under Section 9 or Section 11 of the statute. Section 9 provides a cause of action for <u>consumers</u>, whereas Section 11 provides a cause

---

[18]   Although some courts have concluded that amendments to the FDUTPA have broadened its scope to include non-consumers, the *Kertesz* decision explained that those courts failed to account for the legislative history of the amendments. In *Kertesz*, a college student whose photograph appeared on a website sued the website owner under the FDUTPA, arguing that 2001 amendments expanded the FDUTPA to include non-consumers by replacing the word "consumer" with "person." The court disagreed, analyzing the legislative history of the amendments and explaining that the change was only meant to "clarify that businesses, just like individuals, could obtain monetary damages in FDUTPA cases." 635 F. Supp. 2d at 1349. The court criticized the cases relied on by the plaintiff for "not analyz[ing] the legislative history of the amendment or rest[ing] on the interpretation given the statute by Florida state cases." *Id.* at 1350 ("Because the legislative history of the amendment supports the contrary conclusion, the court will not follow this non-binding authority").

of action for unfair or deceptive trade practices between <u>businesses</u>.[19]   *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 700-01 (E.D. Pa. 2014) (citing Mass. Gen. L. Ch. 93A §§ 9, 11 to explain this distinction).   In either case, plaintiffs' claim fails.

Plaintiffs cannot state a claim under Section 9 because they do not allege that they were engaged in consumer transactions for their own personal use.   *See In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (explaining that plaintiffs "cannot bring a claim under § 9 as they cannot show that they undertook the relevant transactions 'for purely personal reasons (such as the purchase of an item for personal use)'" (quoting *Frullo*, 814 N.E.2d at 1112)).   As explained above, plaintiffs here allegedly engaged in FX transactions, which are not transactions for personal consumption.   *Axiom*, 2017 WL 590320, at *6.   Additionally, as a business entity, FX Primus Ltd. cannot bring a claim under Section 9 unless it pleads it transacted for purely personal reasons, which it has not done here.   *See In re Aggrenox Antitrust Litig.*, No. 3:14-md-2516, 2016 WL 4204478, at *8-9 (D. Conn. Aug. 9, 2016) (dismissing Section 9 MCPA claims because plaintiffs were business entities and failed to plead they made the alleged purchases for purely personal reasons).   Accordingly, plaintiffs have failed to plead a Section 9 claim.

Nor can plaintiffs state a claim under Section 11 because they are self-proclaimed indirect purchasers (*e.g.*, CAC ¶ 40), and thus lack standing to sue under Section 11.   *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d at 700-01 (explaining that the legislature extended *Illinois Brick*'s bar on indirect purchaser suits to Section 11, but not Section 9); *United Food & Commercial Workers Local 1776 v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1084-86

---

[19]   This distinction between a business and consumer claim turns on "whether a given party has undertaken the transaction in question for business reasons, or has engaged in it for purely personal reasons (such as the purchase of an item for personal use)."   *In re Asacol Antitrust Litig.*, No. 15-cv-12730, 2016 WL 4083333, at *13 (D. Mass. July 20, 2016) ("[A]ny transaction in which the plaintiff is motivated by business considerations gives rise to claims only under the statute's [Section 11] business section.") (citing *Frullo v. Landenberger*, 814 N.E.2d 1105, 1112 (Mass. App. Ct. 2004)).

(N.D. Cal. 2014) (dismissing indirect purchasers' Section 11 claims with prejudice).

Accordingly, plaintiffs' MCPA claim should be dismissed.

###### F.     Plaintiffs' Illinois Antitrust Act Claims Cannot Proceed As A Class Action

Plaintiffs' Illinois claims should also be dismissed because the Illinois Antitrust Act

prohibits class actions by indirect purchasers.  740 Ill. Comp. Stat. Ann. § 10/7(2) (except for the

state attorney general, "no person shall be authorized to maintain a class action in any court . . .

for indirect purchasers asserting claims under th[e] [IAA]"); *Gaebler v. N.M. Potash Corp.*, 676

N.E.2d 228, 230 (Ill. App. 1996) (affirming dismissal for this reason).  This bar applies in federal

court.  *In re Digital Music Antitrust Litig.* 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011)

(dismissing Illinois antitrust claim); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723

(N.D. Ill. 2016) (dismissing Illinois claim with prejudice, noting "[t]he Illinois restrictions on

indirect purchaser actions are intertwined with Illinois substantive rights and remedies.").[20]

###### G.     Plaintiffs' North Carolina Antitrust And California And Massachusetts Consumer Protection Claims Should Be Dismissed Because The Complaint Fails To Allege A Substantial Effect On Intrastate Commerce Or A Relation To The State

Plaintiffs' North Carolina antitrust (NCUDTPA) and California consumer protection

(UCL) claims should be dismissed because these statutes require plaintiffs to plausibly allege

that defendants' conduct had a "substantial effect on in-state business."  *See Dixie Yarns, Inc.*,

1994 WL 910955, at *2 (dismissing NCUDTPA claim for this reason); *The "In" Porters, S.A.*,

---

[20]   While federal courts are not unanimous on this point, a majority agrees with Judge Preska's *Digital Music* decision and bars Illinois indirect purchaser class actions.  *See, e.g., Teikoku*, 74 F. Supp. 3d at 1083-84 (dismissing Illinois antitrust claims with prejudice); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2014 WL 2993753, at *17 (E.D. Mich. July 3, 2014) (dismissing Illinois antitrust claim); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013) (same); *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *8 n.9 (D.N.J. Oct. 11, 2011) (same); *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 676-77 (E.D. Pa. 2010) (denying motion to amend complaint to include Illinois antitrust claims).  *But see In re Propranolol Antitrust Litig.*, No. 16-cv-09901, 2017 WL 1287515, at *12 (S.D.N.Y. Apr. 6, 2017) (minority view).

663 F. Supp. at 502-03 (dismissing claim, explaining that "[a]pplication of the [NCUDTPA] in cases having only an incidental local effect not only would be contrary to the Fourth Circuit's interpretation of the Act, but also would render the Act constitutionally suspect" ); *Meridian Project Sys. Inc. v. Hardin Constr. Co.,* 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (dismissing UCL claim because plaintiff alleged "no specific intrastate misconduct").

Here, plaintiffs fail to plead any non-conclusory allegations that defendants' purported conspiracy had a substantial effect on intrastate commerce in these states. They do not even plead that they transacted with their intermediaries in these states. Instead, plaintiffs repeat the conclusory incantation that defendants conspired "for purposes of . . . artificially manipulating the prices of FX Instruments, including FX Instruments sold in California and to California residents," and that as a result of defendants' conduct, "prices for FX Instruments have been fixed . . . in the State of California and throughout the United States." (CAC ¶ 233; *id.* ¶¶ 241, 245 (alleging the same for Massachusetts and North Carolina).) This incantation is not enough.

Similarly, the MCPA permits relief "only for unfair or deceptive actions that primarily and substantially occur within the Commonwealth of Massachusetts." *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 234 (1st Cir. 2003). Because plaintiffs have not alleged that defendants' conduct occurred "primarily and substantially" within Massachusetts, their MCPA claim should be dismissed. *Id.* at 234-36 (concluding that MCPA claim failed because although defendants made certain misrepresentations in Massachusetts, the "center of gravity" of the allegedly unfair or deceptive conduct occurred primarily outside of Massachusetts); *ADA Solutions, Inc. v. Meadors*, 98 F. Supp. 3d 240, 266-67 (D. Mass. 2015) (dismissing MCPA claim because "the only connection to Massachusetts is that it is where the aggrieved party [] is based and where it may have suffered harm").

31

### H.       Plaintiffs Fail to Comply with Arizona's Notice Provision

Plaintiffs' Arizona claim should be dismissed because they have failed to comply with the notice provision of Arizona's antitrust statute.  Ariz. Rev. Stat. Ann. § 44-1415.A (any plaintiff filing suit under the antitrust laws must "simultaneously with the filing of the pleading . . . in the federal court, serve a copy of the complaint . . . on the attorney general" and file proof of service with the court); *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *14–15 (dismissing Arizona claim for this reason).

## IV.    INJUNCTIVE RELIEF IS UNAVAILABLE TO PLAINTIFFS

Plaintiffs' request for injunctive relief under federal antitrust statutes should be denied because plaintiffs fail to allege any ongoing misconduct and therefore lack standing to seek prospective injunctive relief.  15 U.S.C. § 26; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 113 (1986); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (affirming dismissal of injunctive claim because past injuries do not confer standing unless plaintiffs can show they are "likely to be harmed again in the future").  "[L]ingering monetary injury, without any ongoing threat of recurrent violations [to the plaintiffs], is not sufficient to confer standing to seek an injunction."  *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 209 (S.D.N.Y. 2012).

Plaintiffs allege no threat of ongoing or recurrent violations.  To the contrary, the Complaint appears to concede that the alleged conspiracy ended more than three years ago, as it defines the Class Period to end on December 31, 2013.  (CAC ¶ 40.)  Plaintiffs' counsel even conceded before this Court that their federal claim "may no longer be necessary," as "it appears the conduct has been circumscribed." (*Baker*, ECF No. 62, Oct. 5, 2016 Hearing Tr. at 4:21-5:5.)  Plaintiffs' request for an injunction, the sole basis of their federal claim, should be denied.

32

## V.   ALTERNATIVELY, PLAINTIFFS' CLAIMS SHOULD BE ENJOINED AS TO SETTLING DEFENDANTS AND CONSOLIDATED AS TO THE NON-SETTLING DEFENDANTS

To the extent plaintiffs allege that they transacted with defendants through brokers that acted on plaintiffs' behalf in return for a fee (CAC ¶ 149), plaintiffs (and not their brokers) are members of both the settlement class and the putative litigation class in *FOREX*.  As such, if this Complaint is not dismissed now, it should be stayed as to Settling Defendants pending this Court's final approval of the *FOREX* settlements and consolidated with *FOREX* as to Non-Settling Defendants.  This Court has mandated that "[p]ending final determination of whether the settlements set forth in the Settlement Agreements should be approved," all members of *FOREX* Direct Settlement Class, "shall be enjoined from prosecuting in any forum any Released Claim against any [Settling Defendant]."  PA Order ¶ 21.  This injunction applies to plaintiffs if they transacted with defendants through agents.  With respect to the New Settling Defendants, assuming that the Court approves these settlements and includes the same injunction language as the Preliminary Approval Order, plaintiffs would be barred from pursuing claims against New Settling Defendants pending final approval of those settlements.  As to Non-Settling Defendants, these claims would simply duplicate the *FOREX* claims and should thus be consolidated.[21]

In the sole paragraph in which plaintiffs try to explain how the "Defendants' Conspiracy Impacted Purchasers of FX Instruments," they refer to an "FX broker."  (CAC ¶ 149.)  And the hypothetical transaction on which they rely to illustrate their allegations describes an agency

---

[21]   *See Thomas v. Apple-Metro, Inc.*, No. 14-cv-4120, 2015 WL 505384, at *2 (S.D.N.Y. Feb. 5, 2015) ("well-established" Second Circuit first-filed rule gives a district court "broad discretion" to dismiss a competing lawsuit in favor of the first-filed case where issues are substantially the same); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 722 (2d Cir. 2010) ("Deference to the first filing embodies considerations of judicial administration and conservation of resources and recognizes that a party who first brings an issue into a court of competent jurisdiction should be free from the vexation of concurrent litigation over the same subject matter.") (citations and internal quotation marks omitted).

paradigm—the "FX Broker" acting as an agent to acquire currency on its retail customers' behalf and simply adding its own fee. (*Id.*)  In those circumstances, this case should be enjoined because "brokers are in the business of effecting transactions 'for the account of others,'" and thus "do not constitute a distinct link in the chain of distribution." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 506 (citation omitted); *Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 513 n.20 (D.N.J. 2014) ("a broker is not equivalent to a purchaser for purposes of determining antitrust standing").  Thus, brokers who trade on their customers' behalf are not direct purchasers—their customers are.

Therefore, if plaintiffs indeed purchased foreign currency instruments through brokers, they are direct purchasers enjoined from prosecuting this action against Settling Defendants. This follows directly from the Preliminary Approval Order:  First, as direct purchasers, plaintiffs would be members of the Direct Settlement Class in *FOREX.  See* PA Order (defining the Direct Settlement Class as "[a]ll Persons who, between January 1, 2003 and the date of the Preliminary Approval Order, entered into an FX Instrument directly with a Defendant").  Second, plaintiffs' claims are indisputably "Released Claims," because they "arise[] from . . . communications related to FX Instruments." (*E.g.* JPMorgan Settlement Agreement § 2(nn).)  Indeed, the Complaint itself has borrowed its allegations of defendants' wrongdoing—all of which occurred in the "FX spot market"—directly from the *FOREX* pleadings.  Lastly, there can be no dispute that Settling Defendants are "Released Parties." *See* PA Order ¶ 21.

Further, as direct purchasers, plaintiffs would be putative members of the OTC Class in *FOREX.  FOREX* TAC ¶ 67 ("All persons who . . . entered into an FX Instrument directly with a Defendant . . .").  On August 31, 2015, this Court ordered consolidation of all actions by direct purchasers of FX Instruments.  PA Order.  Therefore, if plaintiffs transacted with FX brokers,

34

then plaintiffs have run afoul of this Court's injunction against litigation pending final approval of the *FOREX* Settlement, and this action should be stayed as to Settling Defendants and consolidated with *FOREX* for the Non-Settling Defendants.

## CONCLUSION

For the foregoing reasons—summarized for the Court's convenience in a chart at Appendix A—each of the claims in this action should be dismissed with prejudice or, alternatively, stayed as to Settling Defendants and consolidated with *FOREX* as to Non-Settling Defendants. Plaintiffs' own counsel has already filed multiple complaints—including on behalf of an entirely separate class of plaintiffs—over the past year. Indeed, plaintiffs admitted to this Court that the initial *Contant* complaint filed on March 24, 2017—in response to defendants' prior motions to dismiss—constituted an "amended complaint." *Baker*, No. 16-cv-7512, ECF No. 179; *Contant*, ECF Nos. 82 & 90. Plaintiffs and their counsel have had years to draft and re-draft their complaint, and yet it still does not present a cognizable claim. Accordingly, no leave to amend should be countenanced for reasons of fairness and futility.

Dated:  August 11, 2017                      Respectfully submitted,

SULLIVAN & CROMWELL LLP          SKADDEN, ARPS, SLATE, MEAGHER &
                                                              FLOM LLP

By: /s/ Matthew A. Schwartz            By: /s/ Boris Bershteyn
Matthew A. Schwartz                      Peter E. Greene
David H. Braff                                  Boris Bershteyn
Yvonne S. Quinn                             Tansy Woan
125 Broad Street                             Four Times Square
New York, New York 10004             New York, New York 10036
Telephone: (212) 558-4000              Telephone: (212) 735-3000
schwartzmatthew@sullcrom.com     peter.greene@skadden.com
braffd@sullcrom.com                        boris.bershteyn@skadden.com
quinny@sullcrom.com                       tansy.woan@skadden.com

*Attorneys for Defendant Barclays Bank PLC*     *Attorneys for Defendants JPMorgan Chase & Co.*
*and Barclays Capital Inc.*                                   *and JPMorgan Chase Bank, N.A.*

SHEARMAN & STERLING LLP          DAVIS POLK & WARDWELL LLP

By: /s/ Adam S. Hakki                     By: /s/ Joel M. Cohen
Adam S. Hakki                                Joel M. Cohen
Richard F. Schwed                          Melissa C. King
Jeffrey J. Resetarits                         450 Lexington Avenue
599 Lexington Avenue                     New York, New York 10017
New York, New York 10022             Telephone: (212) 450-4000
Telephone: (212) 848-4000             joel.cohen@davispolk.com
ahakki@shearman.com                    melissa.king@davispolk.com
rschwed@shearman.com
jeffrey.resetarits@shearman.com

*Attorneys for Defendants Bank of America*     *Attorneys for Defendants The Royal Bank of*
*Corporation, Bank of America, N.A. and*        *Scotland Group plc and RBS Securities Inc.*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated*

ALLEN & OVERY LLP

By: /s/ David C. Esseks
David C. Esseks
Laura R. Hall
Rebecca Delfiner
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
david.esseks@allenovery.com
laura.hall@allenovery.com
rebecca.delfiner@allenovery.com

John Terzaken
1101 New York Avenue
Washington, D.C. 20005
Telephone: (202) 683-3800
john.terzaken@allenovery.com

*Attorneys for Defendants BNP Paribas, BNP
Paribas North America, Inc., BNP Paribas
Securities Corp., and BNP Paribas Prime
Brokerage, Inc.*

LOCKE LORD LLP

By: /s/ Gregory T. Casamento
Gregory T. Casamento
3 World Financial Center
New York, New York 10281
Telephone: (212) 812-8325
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone: (214) 740-8000
rcowie@lockelord.com

J. Matthew Goodin
Julia C. Webb
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 443-0700
jmgoodin@lockelord.com
jwebb@lockelord.com

*Attorneys for Defendants HSBC Holdings plc,
HSBC Bank plc, HSBC North America Holdings,
Inc., HSBC Bank USA, N.A., and HSBC
Securities (USA) Inc.*

37

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: /s/ Thomas J. Moloney
Thomas J. Moloney
George S. Cary
Sue S. Guan
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
tmoloney@cgsh.com
gcary@cgsh.com
sguan@cgsh.com

*Attorneys for Defendants The Goldman
Sachs Group, Inc. and Goldman Sachs &
Co. LLC*

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Eric J. Stock
Eric J. Stock
Indraneel Sur
200 Park Avenue, 48th Floor
New York, New York 10166
Telephone: (212) 351-4000
estock@gibsondunn.com
isur@gibsondunn.com

D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
jarp@gibsondunn.com
mkatsur@gibsondunn.com

*Attorneys for Defendants UBS AG, UBS Group
AG, and UBS Securities, LLC*

COVINGTON & BURLING LLP

By: /s/ Andrew A. Ruffino
Andrew A. Ruffino
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
aruffino@cov.com

Alan M. Wiseman
Thomas A. Isaacson
Andrew D. Lazerow
Jamie A. Heine
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
Telephone: (202) 662-6000
awiseman@cov.com
tisaacson@cov.com
alazerow@cov.com
jheine@cov.com

*Attorneys for Defendants Citibank, N.A.,
Citigroup Inc., Citicorp and Citigroup Global
Markets Inc.*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: /s/ Kenneth A. Gallo
Kenneth A. Gallo
Michael E. Gertzman
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
kgallo@paulweiss.com
mgertzman@paulweiss.com

*Attorneys for Defendant The Bank of Tokyo-
Mitsubishi UFJ, Ltd.*

CAHILL GORDON & REINDEL LLP

By: /s/ David G. Januszewski
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse Group
AG, Credit Suisse AG, and Credit Suisse
Securities (USA) LLC*

WACHTELL, LIPTON, ROSEN & KATZ

By: /s/ Jonathan Moses
Jonathan Moses
Bradley R. Wilson
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
JMMoses@wlrk.com
BRWilson@wlrk.com

*Attorneys for Defendants Morgan Stanley,
Morgan Stanley & Co., LLC, and Morgan Stanley
& Co. International PLC*

KIRKLAND & ELLIS LLP

By: /s/ Robert Khuzami
Robert Khuzami
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
robert.khuzami@kirkland.com

G. Patrick Montgomery (*pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
patrick.montgomery@kirkland.com

LATHAM & WATKINS LLP

By: /s/ Joseph Serino, Jr.
Joseph Serino, Jr.
885 Third Avenue
New York, New York 10022
joseph.serino@lw.com
Telephone: (212) 906-1717

*Attorneys for Defendant Deutsche Bank AG
and Deutsche Bank Securities Inc.*

LINKLATERS LLP

By: /s/ James R. Warnot, Jr.
James R. Warnot, Jr.
Adam S. Lurie
Patrick C. Ashby
1345 Avenue of the Americas
New York, New York 10105
Telephone: (212) 903-9000
james.warnot@linklaters.com
adam.lurie@linklaters.com
patrick.ashby@linklaters.com

*Attorneys for Defendant Société Générale*

MOORE AND VAN ALLEN PLLC

By: /s/ James P. McLoughlin, Jr.
James P. McLoughlin, Jr.
Mark A. Nebrig
Joshua D. Lanning
Moore and Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone: (704) 331-1000
jimmcloughlin@mvalaw.com
marknebrig@mvalaw.com
joshlanning@mvalaw.com

*Attorneys for Defendant
RBC Capital Markets, LLC*

SIDLEY AUSTIN LLP

By: /s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300

*Attorneys for Defendant Standard Chartered Bank*