# EXHIBIT 10

H4RAFRO1ps

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   FRONTPOINT ASIAN EVENT DRIVEN
     FUND, LTD., et al.,
 4
                    Plaintiffs,
 5
                 v.                         16-cv-5263 (AKH)
 6
     CITIBANK, N.A., et al.,
 7
                    Defendants.
 8
     ------------------------------x
 9
                                         New York, N.Y.
10                                       April 27, 2017
                                         2:50 p.m.
11
     Before:
12
                        HON. ALVIN K. HELLERSTEIN
13
                                          District Judge
14

15                            APPEARANCES

16   LOWEY DANNENBERG COHEN & HART, P.C.
          Attorneys for Plaintiffs
17   BY:  CHRISTIAN LEVIS, ESQ.
          PETER D. ST. PHILLIP, JR., ESQ.
18
     SULLIVAN & CROMWELL LLP
19        Attorneys for the Barclays Defendants
     BY:  MATTHEW J. PORPORA, ESQ.
20
     SIMPSON THACHER & BARTLETT LLP
21        Attorneys for the JPMorgan Chase Defendants
     BY:  PAUL C. GLUCKOW, ESQ.
22
     PAUL WEISS RIFKIND WHARTON & GARRISON LLP
23        Attorneys for Defendant Deutsche Bank AG
     BY:  AIDAN SYNNOTT, ESQ.
24
     CAHILL GORDON & REINDEL LLP
25        Attorneys for the Credit Suisse Defendants
     BY:  JOEL L. KURTZBERG, ESQ.
```

H4RAFRO1ps

1           (In open court; case called)

2           THE COURT:  All right.  This is Frontpoint Asian Event

3   Driven Fund LP and Sonterra Capital Master Fund, Ltd. v.

4   Citibank and many others, 16 Civil 5263.

5           These are motions by defendants on various grounds

6   based on the alleged inadequacy of the first amended class

7   action complaint.

8           Defendants will tell me how they plan to divide up the

9   motions.

10          MR. PORPORA:  Good afternoon, your Honor.  Matthew

11  Porpora of Sullivan & Cromwell for the Barclays defendants and

12  speaking on behalf of the defendants today.

13          Your Honor, we've consulted with the plaintiff's

14  counsel and we've agreed that, if it's acceptable to your

15  Honor, we'll begin with arguing the defendants' motions to

16  dismiss on 12(b)(1) and (12)(b)(6) grounds.  Just for

17  simplicity's sake I'll call that the merits motion.  Defendants

18  would argue first.  That will be divided.  Myself, I'll be

19  handling Article III and antitrust claims.  Mr. Gluck, to my

20  right, will be handling the RICO claims.  Mr. Synnott, to his

21  right, will be handling the state law claims.  That's the

22  implied covenant claims and the unjust enrichment.  And then

23  after we make that affirmative presentation, your Honor, we

24  propose that the plaintiffs respond.  We would ask for a very

25  short period of time to provide any rebuttal arguments we need.

H4RAFRO1ps

1              THE COURT:  What is Mr. Kurtzberg going to do?

2              MR. PORPORA:  I'm going to get to that in just a

3      moment, your Honor.  The proposal would be that we handle the

4      merits motion first, and then once we're done with that we then

5      move over to the motion for lack of personal jurisdiction.

6              THE COURT:  I think I would like to do the personal

7      jurisdiction first.

8              MR. PORPORA:  That would be fine with us, your Honor.

9              THE COURT:  And rather than set arguments, I like to

10     go back and forth.  Is Mr. Kurtzberg going to do that?

11             MR. KURTZBERG:  Yes, your Honor.

12             THE COURT:  And who for the plaintiffs will argue

13     jurisdiction?

14             MR. ST. PHILLIP:  Your Honor, good afternoon.  Peter

15     St. Phillip from Lowey Dannenberg.

16             THE COURT:  And do you start with personal and go into

17     subject matter jurisdiction?

18             Let me do the jurisdictional arguments first.

19             MR. ST. PHILLIP:  That's fine.

20             THE COURT:  Whoever wants to argue them.

21             All right, Mr. Kurtzberg.  You start.

22             MR. KURTZBERG:  Thank you, your Honor.

23             Joel Kurtzberg from Cahill Gordon & Reindel on behalf

24     of the Credit Suisse defendants and speaking on behalf of the

25     foreign defendants who have moved on dismissal for lack of

H4RAFRO1ps

1     personal jurisdiction and venue in this case.

2               In my argument I want to focus on three main points

3     for you today.  The first is that the foreign defendants did

4     not consent to personal jurisdiction, as in general

5     jurisdiction, in the State of New York by registering to do

6     business under the New York Banking Law.

7               The second main point is that the plaintiffs cannot

8     make out a prima facie case of specific jurisdiction under the

9     purposeful availment or effects doctrine, for three reasons.

10    They fail to show a substantial connection between the

11    adequately pled stipulated conduct and either New York or the

12    United States, the relevant forum, and that's an open question

13    as well.  Second reason, they fail to adequately allege that

14    New York or the United States was the focal point or the

15    nucleus of the alleged wrongdoing.  And, third, the alleged

16    link to the United States is not at a minimum a but-for or a

17    proximate cause of the alleged wrongdoing.

18              And then my third point, main point, is that this

19    notion of what we call vicarious conspiracy jurisdiction cannot

20    save the day for the plaintiffs at the end of the day.

21              So with that overview, let me delve into the first

22    point, which pertains to the fact that the defendants did not

23    consent to general jurisdiction by registering branches or

24    agencies under New York Banking Law, Section 200.

25              THE COURT:  Mr. St. Phillip, I'm going to ask you to

H4RAFRO1ps

1    respond to each of these arguments in turn.  So you are not

2    going to wait for the completion of all the arguments.  Each

3    subject will deal with its own set of arguments and responses.

4          MR. ST. PHILLIP:  That's fine, your Honor.

5          MR. KURTZBERG:  My first point, your Honor, is that

6    the foreign defendants did not consent to general jurisdiction

7    through New York Banking Law § 200-b, which merely provides

8    that a New York resident may maintain an action against a

9    foreign banking corporation.  It does not confer general

10   personal jurisdiction over the foreign defendants.

11         Plaintiff's position here is that by registering to do

12   business under New York Banking 200-b, that the banks have

13   consented to be sued for any cause of action whatsoever,

14   whether it has any connection to New York or not.

15         THE COURT:  Let me take it away from you and put it to

16   Mr. St. Phillip.  The relevant clause has this condition: a

17   cause of action arising out of a transaction with its New York

18   agency, or agencies, or branch or branches.  That's key.  And

19   therefore anything that comes within that consent must satisfy

20   that condition.

21         MR. ST. PHILLIP:  Your Honor, where I'm looking in the

22   statute is 200-b(2)(e), which in (2) says, "An action against a

23   foreign banking corporation may be maintained by another

24   foreign corporation in the following cases."  And it enumerates

25   certain circumstances.  The last one says "where the defendant

H4RAFRO1ps

1    is a foreign banking corporation doing business in the state."

2            That articulates a general jurisdiction discussion, as

3    your Honor identified in the *Vera* case.

4            THE COURT:  Is that a consent?

5            MR. ST. PHILLIP:  That is the consequences of 200(3).

6            THE COURT:  Why didn't *Daimler-Benz* take away that

7    section?

8            MR. ST. PHILLIP:  Your Honor, I went through *Daimler*

9    in connection with the *Vera* decision.

10           THE COURT:  Well, *Vera* is a special case.  *Vera* is a

11   situation where we're involved with various kinds of

12   restrictions by the Treasury to deal with terrorist states.

13   *Vera* in particular was the government of Cuba.  And the

14   proposed jurisdiction in that case was someone who was looking

15   for assets that were lurking somewhere in the bank, an agency

16   which had registered in New York State.  I don't think you can

17   assimilate this case to *Vera*.

18           MR. ST. PHILLIP:  I would then go back to what the

19   Second Circuit said in *Brown* in connection with the

20   registration in New York.  And it said that the New York courts

21   have clearly for some time now -- it's beyond dispute -- have

22   said that when you register to do business under the General

23   Business Law, that you consent to jurisdiction here.  And that

24   provision goes back to 1916, Justice Cardozo's *Bagdon* decision

25   from the New York Court of Appeals, which your Honor cited in

H4RAFRO1ps

1   *Vera*.

2          There is no distinction in connection with what the

3   consents -- the breadth of the consent in connection with

4   whether it's a defendant or whether it's a third party as your

5   Honor identified in the *Vera* case.  The New York banking laws

6   operate -- and this is from the *Vera* decision -- insofar as the

7   local branches in New York can both sue and be sued.

8          THE COURT:  Wouldn't you say that Section 200 is the

9   consent provision and Section 200-b is the effects provision,

10  the consequence of registration in the state?

11         MR. ST. PHILLIP:  Yes.  § 200-b identifies what will

12  occur as a result of registration.  § 200(3) says --

13         THE COURT:  Wouldn't you say, then, that *Daimler-Benz*

14  trumps New York law?  200-b is not a consent provision.  It's a

15  consequence provision.  It's a consequence so that the foreign

16  banking corporation --

17         MR. ST. PHILLIP:  Well, it says an action may be

18  maintained against the foreign bank if the foreign bank is

19  doing business in the state.  So it directs the foreign banks

20  to register.  And the due process issue is what the notice to

21  the foreign banks are by the statute.  It says that if you

22  register in New York, you're subject to suit if you do business

23  in the state.  And that's 200-b(2)(e).

24         THE COURT:  Mr. Kurtzberg.

25         MR. KURTZBERG:  Your Honor, actually 200-b has been

H4RAFRO1ps

1    held to be a subject matter jurisdiction clause, not a personal

2    jurisdiction clause.  That's in the *eFX* case that was cited in

3    March of 2016 and in the New York Court of Appeals case

4    *Indosuez International Financial v. National Reserve Bank*.  It

5    does not set forth consent, as would be required in *Brown*.  And

6    it certainly does not set forth consent explicitly to general

7    jurisdiction over any cause of action.  And if it did, it would

8    be trumped by *Daimler*, as your question previously accepted.

9         THE COURT:  It would seem to me, I think this is

10   really consistent with your argument that consent is broader

11   than the effects of doing business.  The broadest kind of

12   jurisdiction flows on consent.  And in 200.3, consent is

13   conditioned to specific jurisdiction.

14        MR. KURTZBERG:  I would agree with that, your Honor,

15   absolutely.

16        THE COURT:  And so you can't have a statute dealing

17   with the consequences of doing business that is broader than

18   consent.  I think there has to be a way of limiting

19   jurisdiction under 200-b so it doesn't become more embracing

20   than a consent statute.

21        Furthermore, I think *Daimler-Benz* applies as well, and

22   limits the areas that can be sued to situations where

23   *Daimler-Benz* is satisfied.

24        But why do you say this is a subject matter clause?  I

25   can't understand that, because this has to do with when

H4RAFRO1ps

1   lawsuits can be made, can be served.

2           MR. KURTZBERG:  That's correct.  Again, perhaps it's

3   just nomenclature.  I think we may be saying the same thing,

4   your Honor.  But in the *Indosuez* decision that I cited to,

5   § 200-b was cited by the Court of Appeals when talking about

6   what cases could be brought, and that's what I mean by subject

7   matter jurisdiction.  When they discuss personal jurisdiction,

8   they didn't say -- I'm sorry.

9           THE COURT:  New York Court of Appeals?

10          MR. KURTZBERG:  Yes, sir.  And in the *FX* decisions

11  from the Southern District in March of 2016, the court made

12  clear also that this was a -- called it a subject matter

13  jurisdiction, not a personal jurisdiction situation.  And to

14  read it otherwise would take it too far, for the reasons your

15  Honor just stated.  It would violate *Daimler*'s rule because it

16  would allow for general jurisdiction over any banking

17  corporation doing business in the state for any cause of action

18  even if it had nothing to do with New York or its presence in

19  the state.  And it certainly doesn't provide the kind of

20  explicit consent required under *Brown*.

21          THE COURT:  I think the ambiguity in terminology is

22  because subject matter jurisdiction is different under New York

23  law, as compared to under federal law.  But 200-b is a statute

24  that regulates when lawsuits can be brought.  And it's not a

25  regulation of the subject matter of the lawsuit, as I read it.

H4RAFRO1ps

1          I'll explore the situation further, but my present

2     inclination is to hold that jurisdiction has to be limited to

3     the specific jurisdiction aspect of federal law, and it doesn't

4     apply here.

5          MR. ST. PHILLIP:  Your Honor, may I be heard just

6     briefly on that?

7          THE COURT:  Yes.

8          MR. ST. PHILLIP:  In the *Brown v. Lockheed Martin* case

9     from the Second Circuit, the Connecticut registration statute

10    was at issue, and the holding of the court is limited to the

11    determination that the Connecticut statute's text did not put

12    the defendants there on notice, Lockheed Martin, that by

13    registering it would be subject to general jurisdiction.  The

14    Second Circuit, however, made a distinction between Connecticut

15    and New York's statute by saying that jurisdictions other than

16    Connecticut have enacted registration statutes that more

17    plainly advise the registrant that enrolling in the state as a

18    foreign corporation and transacting business will vest the

19    local courts with general jurisdiction over the corporation.

20    And the next sentence says that the registration statute in the

21    State of New York has been definitively construed to accomplish

22    that end, and legislation has been introduced to ratify that

23    construction of the statute.  And this is 814 F.3d 619.  So the

24    Second Circuit recognized that the New York registration, as

25    opposed to the Connecticut registration statute, did grant

H4RAFRO1ps

1    general jurisdiction.  And they made a specific discussion of

2    the New York State.

3            THE COURT:  I'll consider the matter further,

4    Mr. St. Phillip, but I've expressed --

5            MR. KURTZBERG:  May I respond to that, your Honor, or

6    would you like to move on?

7            THE COURT:  I think it's pretty well clear.  Yes.  Go

8    ahead, Mr. Kurtzberg.

9            MR. KURTZBERG:  I just want to say that the dicta that

10   he's pointing to that really is dicta in *Brown* is first of all

11   making reference to a different statute than the one we're

12   talking about here.  It's New York Business Corporation Law, I

13   believe it's Section 1314, has nothing to do with what's

14   actually been alleged here, and that dicta also, I think, could

15   be called into question because the law review article that's

16   even cited for that proposition in *Brown* actually leads to a

17   different interpretation and suggests that there was a bill

18   proposed to put that into law as a statute, and that there

19   wouldn't really be a need to propose a bill if it were already

20   the case that it were the law.  So I don't think that dicta is

21   anything more than dicta, and it's not applicable here, and

22   shouldn't be followed even if it were.

23           THE COURT:  Thank you, Mr. Kurtzberg.

24           MR. KURTZBERG:  Unless your Honor has questions about

25   consent, I'm going to move on to my second main point, which is

H4RAFRO1ps

essentially that plaintiffs failed to make out a prima facie

showing of specific jurisdiction on the facts that they have

alleged here.

In order to show specific -- they concede that there

is no general jurisdiction.  They are not arguing general

jurisdiction.  But for specific jurisdiction -- and this is

straight out of the *Walden* decision by the U.S. Supreme

Court -- the defendant's suit-related conduct must create a

substantial connection with the forum state.

THE COURT:  Why don't we start with the allegations

that are in question, and examine the allegations of the first

amended complaint.

MR. KURTZBERG:  Sure.  The allegations of the

complaint basically focus on allegations that there was

manipulation of three benchmark rates, U.S. dollar SIBOR,

Singapore dollar SIBOR.

THE COURT:  But surely there must be some allegation

having to do with New York, or at least United States.

MR. KURTZBERG:  Well, I'll get there.  And the last

one is SOR.  The only connection to New York --

THE COURT:  The last one is what?

MR. KURTZBERG:  Sorry?

THE COURT:  SOR?

MR. KURTZBERG:  SOR, S-O-R, all caps.

The connection that they claim to New York,

H4RAFRO1ps

1   predominantly, quite frankly -- and this is a huge part of the

2   problem for their case -- has to do with transactions that have

3   nothing to do with their own claim.

4           THE COURT:  What is the allegation?

5           MR. KURTZBERG:  The allegation is that SOR and SIBOR

6   were manipulated --

7           THE COURT:  On the Singapore market.

8           MR. KURTZBERG:  -- outside of the United States, and

9   that that manipulation led to trades that brought in

10  derivatives that were based on those benchmarks.

11          THE COURT:  There's a link between them.  So we're

12  dealing with the Singapore interbank rate --

13          MR. KURTZBERG:  Correct.

14          THE COURT:  -- on the Singapore monetary models, which

15  then becomes communicated to Thomson Reuters.  Is Thomson

16  Reuters a company that's uniquely located in the United States?

17          MR. KURTZBERG:  No, your Honor.

18          THE COURT:  What does the complaint say?  What

19  paragraph of the complaint?

20          MR. KURTZBERG:  As to Thomson Reuters?

21          THE COURT:  As to anything.  Maybe Mr. St. Phillip is

22  the better one to answer the question.

23          What allegation, what paragraph, am I looking at?

24          MR. ST. PHILLIP:  Your Honor, since Mr. Levis is going

25  to go first, he has prepared for this question.

14

H4RAFRO1ps

1          THE COURT:  Mr. Levis.

2          MR. LEVIS:  I'm sorry.  We'll switch off.

3          Yes.  Thomson Reuters, to answer your question, is a

4    U.S. corporation that receives the transmission that you were

5    discussing on SIBOR-SOR rates.

6          THE COURT:  What allegation shall I look at?  What

7    paragraph?

8          MR. LEVIS:  Well, I have to find the paragraph that

9    talks about Thomson Reuters.  But while I'm looking for it --

10         THE COURT:  No, no.  I'll wait.

11         MR. LEVIS:  The process is described in paragraph 102

12   of the daily SIBOR rates that are published and distributed

13   throughout the United States by Thomson Reuters via U.S. wires,

14   where they are used to price, benchmark, and settle billions of

15   dollars of SIBOR derivatives trading in the United States.

16         THE COURT:  102?

17         MR. LEVIS:  102.

18         And then 103 discusses SOR.

19         THE COURT:  One moment.

20         (Pause)

21         what is ABS?

22         MR. LEVIS:  The Association of Banks in Singapore,

23   which is the defendants' trade group which organizes the rate

24   and manages them and controls the rate-setting process.

25         THE COURT:  Is Thomson Reuters a defendant?

H4RAFRO1ps

 1             MR. LEVIS:  No.

 2             MR. KURTZBERG:  That's the problem, your Honor.

 3             THE COURT:  One moment, Mr. Kurtzberg.

 4             MR. KURTZBERG:  Sure.

 5             THE COURT:  So why is an act of Thomson Reuters

 6    attributable to defendants?

 7             MR. LEVIS:  It's not the act of the rate being

 8    disseminated itself that's the issue.  What defendants are

 9    doing to try and move their conspiracy overseas is to split it

10    into separate parts, whereas the rate-setting process is

11    separate from the actual derivatives dealing that they do in

12    the United States to generate --

13             THE COURT:  The derivatives are the consequence.

14             MR. LEVIS:  The derivatives are the products through

15    which they make money off the conspiracy.  And if we look at

16    *United States v. Apple* in the Second Circuit, defendants cannot

17    separate the conspiracy into component parts and analyze it

18    into pieces.  That rationale goes back to the 1940s from the

19    Supreme Court's case in *Tomkin and Duvor* --

20             THE COURT:  You may be correct, but my function here

21    is to look at the allegations of the complaint.

22             MR. LEVIS:  Yes.

23             THE COURT:  And maybe you can amend to fix it up.  But

24    102 does not give you jurisdiction.

25             MR. LEVIS:  It's not 102 by itself.  What happens is,

H4RAFRO1ps

1   as the rate is set, it is incorporated into the price of the

2   contracts that our plaintiffs and other class members traded.

3   And those contracts, such as SIBOR-based swaps, that the

4   Frontpoint plaintiff purchased and the FX swaps and forwards

5   that Sonterra purchased incorporates --

6          THE COURT:  You will have to prove, consistent with

7   that theory, that it was the purpose of each and all the

8   defendants to manipulate the rates in order to gain some kind

9   of monetary advantage to a derivatives contract made with your

10  clients that caused injury to business or property of your

11  clients.  That needs to be alleged.  It doesn't need to be

12  divined by the judge.  It needs to be alleged.  And I don't see

13  an allegation that does that.

14         MR. LEVIS:  Our allegation is that we were overcharged

15  as a result of the rates being set, because when we entered

16  these contracts and the contracts, the swap contracts and

17  forward contracts that we purchased, which incorporate the rate

18  that defendants manipulated, we paid an artificial price that

19  was higher than what it should have been.

20         THE COURT:  Maybe.  And maybe you didn't.  But

21  conspiracy does not depend on consequence.  It depends on

22  intent.  One must have a shared intent with a co-conspirator.

23  Where do you allege the shared intent in a way that causes

24  specific jurisdiction?

25         MR. LEVIS:  Well, the shared intent comes from the

H4RAFRO1ps

1    government settlements, which describe the conspiracy.

2             THE COURT:  Settlements where?

3             MR. LEVIS:  What paragraph number?

4             THE COURT:  Exactly.  I have a technical job here.

5             MR. LEVIS:  I understand.

6             THE COURT:  And that is to find the allegation in the

7    complaint that satisfies specific jurisdiction.

8             MR. LEVIS:  We start talking about the government

9    settlements in paragraph 121.  And that's on page 44.  And

10   there we begin discussing what the Monetary Authority of

11   Singapore, who is the regulator that conducted the

12   investigation, found, and that was a conspiracy involving in

13   133 traders from 20 different banks to manipulate SIBOR and SOR

14   along with other benchmark interest rates that were used in the

15   foreign exchange market.  Those traders were manipulating for

16   profit.

17            THE COURT:  What relevance to me is a finding of a

18   Singapore authority?  Does that qualify under Fed.R.Evid.

19   803(8)

20            MR. LEVIS:  Whether or not it qualifies at this point

21   as admissible evidence, what we're dealing with is just whether

22   or not there's a plausible conspiracy or if we've alleged a

23   prima facie conspiracy for the purpose of jurisdiction.

24            THE COURT:  I don't see a jurisdiction allegation in

25   121 or the paragraphs following.

H4RAFRO1ps

1           MR. LEVIS:  We're going through the government

2    findings to show that the goal of the conspiracy was to

3    manipulate for profit.  And that's because the profit motive is

4    important to analyze the relevance of defendants' conduct and

5    contacts with the forum for jurisdictional purposes.  When we

6    look at analyzing jurisdiction in a conspiracy case, Judge

7    Buchwald in *LIBOR VI*, looking back to the *Socony Vacuum Oil*

8    case, said that the first step is to evaluate the goal of a

9    conspiracy.  And if the goal of the conspiracy here was to

10   increase profits are their derivatives transactions, then the

11   conspiracy's goal is absolutely important.  And if regulators

12   find --

13          THE COURT:  The conspirators in Singapore had in mind

14   that they would create derivative contracts other places in the

15   world, including New York.

16          MR. LEVIS:  Well, they knew it, because the benchmark

17   that they created and they set through the association of banks

18   in Singapore is a benchmark that's used worldwide.  The

19   defendants, in their U.S. offices, sell and market these

20   products in the U.S.  They knew that those products were

21   incorporated, incorporated a benchmark that they were

22   manipulating, and then they marked --

23          THE COURT:  That doesn't prove conspiracy.

24          MR. LEVIS:  Well, the conspiracy to manipulate the

25   rate and to profit from the sale of derivatives is a unified

H4RAFRO1ps

1    conspiracy that exists in Singapore, through the rate-setting

2    process, but also in the United States, through the derivative

3    sales that were in furtherance of that same conspiracy.

4           THE COURT:  You're alleging that intentions formed and

5    executed in Singapore had consequences in every financial

6    market around the world, including New York.  I don't see that

7    as satisfying the rule of specific jurisdiction.

8           MR. LEVIS:  Well, those intentions, regardless where

9    they were created or hatched, or regardless of whether the

10   defendants agreed to --

11          THE COURT:  "Regardless" won't do it.  Location is

12   crucial.

13          MR. ST. PHILLIP:  Your Honor, may I be heard?

14          THE COURT:  No, Mr. Levis has got this one.

15          MR. LEVIS:  Well, for specific jurisdiction, I

16   understand your position that the intention was formed in --

17          THE COURT:  Unfortunately I'm the judge.

18          MR. LEVIS:  I understand.  But there is no requirement

19   that anything be exclusively directed or exclusively aimed at

20   the United States.  The fact that this is a worldwide utilized

21   benchmark does not make specific jurisdiction impossible in the

22   United States.

23          THE COURT:  Before *Morrison*, in the Supreme Court, the

24   law was under the *Leasco v. Maxwell*, a decision by Judge

25   Friendly, who would accord jurisdiction and subject matter

H4RAFRO1ps

1    jurisdiction to wrongful acts committed abroad which had

2    substantial effects within the United States.  You don't even

3    satisfy the *Leasco v. Maxwell* tests, by the kinds of

4    allegations you have.  It may be that you could amend to show

5    jurisdiction.

6           Jurisdiction should not depend on the most

7    sophisticated judges.  It should depend on ordinary guys like

8    me to be able to say, oh, here's the jurisdiction.  I don't see

9    it, Mr. Levis.  If you want to amend, I'll let you amend, but I

10   don't see it in this complaint.

11          MR. LEVIS:  I understand.  I only think that that's

12   because you're viewing the conspiracy in Singapore separate

13   from the acts in the United States, which are acts in

14   furtherance of the same conspiracy.  Those sales are the

15   violations that gave rise to plaintiffs' antitrust claims.

16          THE COURT:  You're saying that the overt act is in the

17   United States.

18          MR. LEVIS:  Correct.

19          THE COURT:  You don't even allege that.  It has to be

20   plausibly connected with intentions formed in Singapore.  You

21   have to allege, to make out a specific jurisdiction claim, that

22   the conspirators in Singapore intended to profit by their

23   conspiracy and manipulation in derivative contracts made in New

24   York.  You've got to allege that.  And you've got to prove it.

25          MR. LEVIS:  Well, proving it --

21

H4RAFRO1ps

```
 1              THE COURT:  I don't see this complaint as doing
 2    anything but making a huge amorphous mess, out of which a judge
 3    or jury has to make a divination.  Divinations do not satisfy
 4    the law.
 5              MR. LEVIS:  Well, the profit motive was not specific
 6    to the United States.  They were profiting everywhere.  And the
 7    profit extended into the United States.
 8              THE COURT:  Maybe that's your problem.
 9              MR. LEVIS:  There is no requirement that it's
10    exclusively in the United States.
11              THE COURT:  Maybe that's your problem.  Maybe your
12    lawsuit should be brought in Singapore.  But unless you improve
13    it with some very good allegations, you're not going to be able
14    to do it in New York.
15              MR. ST. PHILLIP:  May I be heard?  Shortly?
16              THE COURT:  It's my rule that one person do an
17    argument, but I'll bend the rule for you, because you have such
18    a smiling face.
19              MR. ST. PHILLIP:  Perhaps not at the end of this
20    argument.
21              THE COURT:  And since you compete with me as to lack
22    of hair.
23              MR. ST. PHILLIP:  We're on the same level, that's for
24    sure.
25              But, your Honor, the matter in which this conspiracy
```

H4RAFRO1ps

```
 1   worked was that the defendants, the foreign banks that are at
 2   issue, set up shop in the United States.  They registered to do
 3   business.  But that's separate from the consent argument.
 4               THE COURT:  They have sister affiliates of the same
 5   company.
 6               MR. ST. PHILLIP:  No, it's the same company.  They're
 7   actually a branch, a New York branch.  They're not an affiliate
 8   entity.
 9               So they come to the United States.  They have trading
10   floors.  They have salespeople.  They go out to our clients,
11   these hedge funds and public pension funds, and they offer to
12   do this business, which is the interest rate swaps business.
13   The contracts that they enter into, Deutsche Bank, for example,
14   consents that -- we have that argument as well, and it is to
15   this Court, of any --
16               THE COURT:  I might feel differently if this were not
17   a class action and it was an action by your client saying they
18   overpaid, or unpaid, as it goes, with derivatives contracts,
19   that lost money, they were injured in their business or
20   property, in a specific contract, because of acts done abroad.
21               MR. ST. PHILLIP:  That's what we allege, your Honor.
22               THE COURT:  I can see that.  But as a class action,
23   there are all kinds of different people in different
24   situations, and different contracts.  You do not have a good
25   complaint.
```

23

H4RAFRO1ps

1            MR. ST. PHILLIP:  Let me suggest that you look at this

2    complaint as if it is not a class action, which under Rule 12 I

3    think we do.  Paragraph 20, we say, plaintiff Frontpoint

4    entered into 24 swap transactions.

5            THE COURT:  What paragraph?

6            MR. ST. PHILLIP:  Paragraph 20.

7            Plaintiff Frontpoint is in Greenwich, Connecticut.

8    They enter into 24 swap transactions, including based on one-

9    month SIBOR, directly with Deutsche Bank AG, which is one of

10   the foreign banks that's moving to dismiss from within the

11   United States during the class period, at artificial prices

12   proximately caused by the manipulation, as we describe in here,

13   and the government regulator.  That's just not the foreign

14   governments that have found this happen.

15           The contracts themselves have SIBOR as part of the

16   price, to determine who's going to pay whom under the swap.  So

17   they are here.  Deutsche Bank is here.  They are contracting

18   directly with the Greenwich plaintiff.  They are manipulating

19   the price of that contract.

20           THE COURT:  These are so general as not to satisfy the

21   rule of plausibility.  As I said before -- and I think we're

22   going to finish on this point now, Mr. St. Phillip -- you can

23   amend.  But your amendment has to focus on a jurisdictional

24   qualification that satisfies the most recent Supreme Court

25   decisions.

24

H4RAFRO1ps

```
 1              So that will be the ruling, that there is not
 2    sufficiently alleged in this first amended class action
 3    complaint the necessary requirements for specific jurisdiction.
 4              What's next, Mr. Kurtzberg?  Finished?
 5              MR. KURTZBERG:  I'm finished if that's your ruling,
 6    your Honor, yes.
 7              THE COURT:  That's my ruling.
 8              So as to general jurisdiction I reserve, and as to
 9    specific jurisdiction I've found.
10              MR. KURTZBERG:  Thank you, your Honor.
11              THE COURT:  Who's next?  Mr. Porpora.
12              MR. PORPORA:  Thank you, your Honor.
13              If I understood you correctly before, you want to move
14    on to subject matter jurisdiction at this point?
15              THE COURT:  Yes.
16              MR. PORPORA:  Your Honor, I'm going to explain why the
17    plaintiffs failed to allege subject matter jurisdiction,
18    because they failed to allege Article III injury or damages.
19    Now, your Honor, you've already talked about a little bit with
20    Mr. Kurtzberg the different benchmark interest rate at issue in
21    this case, but think it's worth again just emphasizing that
22    this case is about three benchmark interest rates and only
23    those benchmark interest rates.  That's USD, SIBOR, SGD SIBOR,
24    and SOR.
25              THE COURT:  Design the terms.
```

H4RAFRO1ps

1          MR. PORPORA:  Sure.  USD SIBOR, your Honor, is the

2     Singapore interbank offer rate for U.S. dollars.

3          THE COURT:  Traded in Singapore.

4          MR. PORPORA:  Yes.  It is the rate for borrowing U.S.

5     dollars in the Singapore market.  Then you have SGD SIBOR,

6     which is essentially the same type of rate but for Singapore

7     dollars in the Singapore market.  And then you have SOR, which

8     is the Singapore swap offer rate for Singapore dollars.  And

9     SOR is a touch more complicated, but represents the cost of

10     borrowing Singapore dollars by exchanging U.S. dollars in the

11     foreign exchange market.

12          The next fundamental factor I just want to point out

13     before I get into the presentation is that the plaintiffs here

14     are alleging that all 46 defendants named in this complaint

15     engaged in a widespread conspiracy for four years, from 2007 to

16     2011, to manipulate these three rates.  They alleged their

17     injury when they were trading certain financial products, at

18     unspecified times -- and they don't specify the positions they

19     took -- because they assert they paid more for or received less

20     than they should have, because of defendants' alleged

21     manipulation.

22          There are a variety of problems with that.  I'll get

23     to that in a moment.  But the fundamental point that I wanted

24     to point out to your Honor is, again, this case is only about

25     SIBOR or SOR.  And yet the plaintiffs' complaint and their

H4RAFRO1ps

1    papers in the opposition to the motion to dismiss routinely

2    point to alleged conduct with respect to other benchmark

3    interest rates.  This isn't a case about foreign exchange

4    rates.  It isn't a case about nondeliverable forwards.  This

5    isn't a case about foreign exchange rates.  It's not a case

6    about not knowing verbal forwards.  It's not about ISDA FX.

7    It's not about the dollar LIBOR or Euribor.  It's a case about

8    SIBOR or SOR.  And for these plaintiffs to establish that

9    either of those benchmarks were actually manipulated, they have

10   to point to language with respect to those rates, of course.

11        As the Second Circuit described almost a decade ago in

12   *In Re Elevator*, a plaintiff can't meet its pleading burden

13   simply by saying, if it happened there it's likely to happen

14   here.  And Judge Buchwald actually echoed that same exact

15   sentiment in the *LIBOR IV* decision when she said you can't

16   ascribe bad conduct with respect to one benchmark rate that

17   relates to different people, different conduct and different

18   countries, even to a different benchmark interest rate.  That's

19   what the plaintiffs seek to do here.

20        THE COURT:  It has nothing to do with jurisdiction,

21   does it?

22        MR. PORPORA:  Well, it has to do with jurisdiction

23   because, though plaintiffs haven't established that they were

24   harmed in any way, they haven't established that there is a

25   case or controversy for this court to hear.

H4RAFRO1ps

1        THE COURT:  They say that they overpaid in the

2   derivatives contracts.  Wouldn't that be an interest to

3   business or profit?

4        MR. PORPORA:  Yes, your Honor.  If that was a

5   well-pled allegation it would.  It's not a well-pled

6   allegation, however, because the way they get to the allegation

7   of manipulation is through misstating documents.  Let me walk

8   you through what they do.  I think you heard from the

9   plaintiffs before where they pointed to some paragraphs in the

10  complaint and said, well, your Honor, regulators found that

11  this stuff had been manipulated, regulators found that there

12  was a conspiracy to manipulate, so that gets the job done for

13  us, and then we say that manipulation hurts.  The problem is,

14  they don't point to anything that plausibly alleges that SIBOR

15  or SOR was ever manipulated during the class period, your

16  Honor.

17        First, they point to a press release from the Monetary

18  Authority of Singapore, MAS, as it's known, concerning MAS's

19  investigation into a number of benchmark interest rates,

20  including SIBOR or SOR.  They then point to certain regulatory

21  settlements between three of the 46 defendants here that dealt

22  with conduct on other benchmark interest rates.

23        Third, they deal with a handful of news reports, and

24  they say there is information in these various materials that

25  show that there was a conspiracy to manipulate SIBOR or SOR.

H4RAFRO1ps

```
1              So our papers, your Honor, particularly our reply

2    brief, lists all of these out.  I won't plod through all of

3    them, but I do want to focus on two examples.  First, the MAS

4    press release.

5              THE COURT:  I don't think it has anything to do with

6    jurisdiction.

7              MR. PORPORA:  Your Honor, in order for them to

8    establish that this Court has jurisdiction to hear this matter,

9    they have to show that there is some injury, there is some

10   controversy to adjudicate.

11             THE COURT:  They allege that the three rates were

12   manipulated, that the effects of the manipulation was to

13   increase the price of derivatives contracts, and that they were

14   injured in their business or property.  Now, I grant you that

15   it took them a lot longer, with a lot more ambiguity, to get to

16   that point, but that's how I understand the case.  So if that's

17   the case, it has nothing to do with jurisdiction.  You want to

18   tell me about jurisdiction, you want to tell me about *Morrison*,

19   you want to tell me about conspiracies, things like that?

20             MR. PORPORA:  Your Honor, I want to speak explicitly

21   about the conspiracy alleged here, because there is no factual

22   basis for the allegation that there was such a conspiracy.  For

23   instance, your Honor, just by way of example --

24             THE COURT:  What do they have to allege to allege a

25   conspiracy?
```

H4RAFRO1ps

1              MR. PORPORA:  Any facts whatsoever to create a

2      plausible inference that the conspiracy occurred.

3              THE COURT:  They don't do that?

4              MR. PORPORA:  They don't do that, your Honor.

5              THE COURT:  Mr. St. Phillip, do you do that?

6      Mr. Levis, do you do that?

7              MR. ST. PHILLIP:  Mr. Levis.

8              MR. LEVIS:  Yes, we do.

9              THE COURT:  I always call the wrong person.

10             MR. LEVIS:  That's OK.  I wish it were easier to tell

11     us apart.

12             Yes.  I agree with your Honor that this is not a

13     question of jurisdiction.  What defendants are effectively

14     arguing is, they're trying to deny --

15             THE COURT:  Give me the paragraph.

16             MR. LEVIS:  OK.  I will point you to the paragraph.

17     It's a denial of the conspiracy allegations in the complaint.

18             THE COURT:  Where is the paragraph?

19             MR. LEVIS:  I'm looking for the paragraph.

20             THE COURT:  I have a brilliant law clerk.  I have all

21     these cases.  I have all these arguments.  I want to have the

22     paragraphs.  It's a very difficult complaint to read.

23             MR. LEVIS:  I'm starting again on paragraph 121, where

24     we describe the regulatory findings.  And if you look -- this

25     goes both to the regulatory findings and defendants' contention

H4RAFRO1ps

1    that there is no finding of conspiracy, and an article that we

2    cite in paragraph 124 of the complaint.

3          THE COURT:  Is a conspiracy formed abroad which has an

4    effect and not even a unique effect in the United States

5    cognizable under *Morrison*?

6          MR. LEVIS:  Well, under *Morrison*, if the Court was

7    dealing with trading specifically on a foreign exchange in a

8    situation where --

9          THE COURT:  And that's this?

10         MR. LEVIS:  Well, this is not an exchange.  So the

11   rate itself -- and this is just to reference something

12   Mr. Porpora said -- the rate is not traded in Singapore.

13         THE COURT:  The world doesn't function in exchanges

14   anymore.  It functions in different offices and massive

15   computers that in effect replace the -- they make a virtual

16   exchange out of what used to be a building or a location or a

17   floor.  The same thing as an exchange.

18         MR. LEVIS:  The difference, to talk about *Morrison*,

19   the difference is, in *Morrison*, you had foreign plaintiffs

20   trading securities in a foreign exchange, trying to bring

21   claims for foreign conduct in the United States.  Here,

22   plaintiffs are in the United States.  They traded products

23   price based on a rate in the United States, and we are suing

24   for harm in the United States.

25         THE COURT:  The conspirators were all abroad.  The

H4RAFRO1ps

1    conspirators were in the offices in Singapore calling one

2    another and saying, hey, let's fix the rate.

3              MR. LEVIS:  Well, the conspirators were not solely

4    located in Singapore.  This goes back the previous discussion

5    of the scope of the conspiracy.  When we look at what's in the

6    actual settlements themselves, the conspiracy was in Singapore,

7    but also in the United States and in London and Tokyo, and it

8    operated across the world.

9              THE COURT:  Show me one allegation showing a

10   conspirator in New York.

11             MR. LEVIS:  OK.  Hold on.  I will read from one of the

12   settlements that are cited in the complaint.

13             THE COURT:  Read a paragraph.

14             MR. LEVIS:  I'm going to give you the paragraph in one

15   second.  It cites to the Deutsche Bank CFTC settlement.

16             THE COURT:  Your answer should be "Paragraph

17   so-and-so, your Honor."

18             MR. LEVIS:  Paragraph 126.

19             THE COURT:  126.

20             MR. LEVIS:  Paragraph 126, where we describe Deutsche

21   Bank, cites to a page in Deutsche Bank's CFTC settlement and

22   alleges systematic pervasive misconduct directed at

23   manipulating SIBOR and SOR along with several other benchmark

24   interest rates.

25             When you read the section of the settlement that we

H4RAFRO1ps

1   are citing to --

2           THE COURT:  Excuse me.  Does this have to do with

3   findings of the Commodities Future Trading Commission?

4           MR. LEVIS:  That's correct.

5           THE COURT:  Having to do with a manipulation found

6   somewhere in the world?

7           MR. LEVIS:  That is correct.

8           THE COURT:  You don't say where.

9           MR. LEVIS:  When you look at the settlement, and part

10  of the settlement that we are citing, this is what I'm going to

11  read that is cited in the complaint.  That's where the

12  allegation comes from.  It cites the settlement on page 3.

13          THE COURT:  Page 3 of what?

14          MR. LEVIS:  Of the CFTC settlement.

15          THE COURT:  It's incorporated in the complaint?

16          MR. LEVIS:  Yes, it is.

17          It says, "Over a more-than-six-year period" --

18          THE COURT:  Where are you reading from?

19          MR. LEVIS:  Page 3, Deutsche Bank CFTC settlement.

20          THE COURT:  Where does the paragraph begin?

21          MR. LEVIS:  I don't know what paragraph -- it's on the

22  bottom of page 2 and continues to the top of page 3.  I think

23  the top of page 3 is the reference to New York.  It starts,

24  "Over more than a six-year period and across currencies,

25  Deutsche Bank submitters routinely took into account other

33

H4RAFRO1ps

1    Deutsche Bank traders' derivatives positions, as well as their

2    own cash and derivatives trading positions, when making the

3    bank's LIBOR and Euribor submissions.  On other occasions,

4    Deutsche Bank aided and abetted other panel banks' attempts to

5    manipulate Euribor and LIBOR.

6              THE COURT:  Euribor is?

7              MR. LEVIS:  It's a different benchmark.

8              THE COURT:  It's what?  The Frankfurt exchange?

9              MR. LEVIS:  It's set in the European Union.  I don't

10    know if it's in Frankfurt.

11              THE COURT:  So it's Frankfurt.  And the yen is Tokyo.

12              MR. LEVIS:  Yes.

13              THE COURT:  And what does this have to do with

14    Singapore?

15              MR. LEVIS:  I'm getting to the next sentence.  "The

16    conduct of Deutsche Bank's submitters, traders, debts managers,

17    and at least one senior manager was systemic and pervasive,

18    occurring across multiple trading desks and offices, including

19    London, Frankfurt, New York, Tokyo, and Singapore."

20              At the end of that sentence is a footnote.  And the

21    footnote says, "Deutsche Bank's misconduct extended beyond the

22    LIBOR and Euribor benchmarks.  Through its internal

23    investigations, Deutsche Bank identified evidence of similar

24    misconduct with respect to attempts to influence and at times

25    attempts to manipulate other interest rate benchmarks,

H4RAFRO1ps

1    including but not limited to Singapore interbank offered

2    rates -- that's SIBOR -- Singapore swap offer rate -- that's

3    SOR -- and the Tom-Next Indexed Swaps for Swiss franc.

4            So this is similar misconduct.  This is where the

5    settlement is referring to Deutsche Bank's manipulation of

6    SIBOR and SOR, and it is saying that this occurs through

7    systemic and persuasive conduct, involving offices in London,

8    Frankfurt, New York, Tokyo, and Singapore.

9            So the conspiracy is not only not limited to

10   Singapore.  It's operated in the United States out of New York.

11           THE COURT:  I can envision how you could properly fix

12   up your complaint to allege this.  But you haven't done it yet.

13   So maybe in the next try, you'll be able to do it.

14           Again, I do not want to divine this.  I want it simply

15   and clearly alleged in ways that will satisfy specific

16   jurisdiction and satisfy *Morrison*.

17           MR. LEVIS:  OK.

18           THE COURT:  OK.  So that's the ruling on jurisdiction.

19           OK, Mr. Porpora, what's next?

20           MR. PORPORA:  Your Honor, I'll move to --

21           THE COURT:  To summarize on jurisdiction -- we'll

22   finish the jurisdiction, right?

23           MR. PORPORA:  Your Honor, the defendants continue to

24   contend that the plaintiffs haven't stopped short of a 403

25   injury, but your Honor has made a ruling on that front, so

H4RAFRO1ps

1    we'll move on to --

2                THE COURT:  The Article III has to do with standing.

3                MR. PORPORA:  Yes, your Honor.

4                THE COURT:  I have not reached that yet.

5                MR. PORPORA:  OK.  I'm happy to take it up.

6                THE COURT:  But on the issue of general jurisdiction

7    and specific jurisdiction and subject matter jurisdiction, my

8    ruling is to reserve on general jurisdiction, to grant the

9    motion with leave to amend on specific jurisdiction and subject

10   matter jurisdiction, and we'll fix the times for amendment

11   later on.  Probably I'll do that when I deliver the rule on

12   general jurisdiction.

13               MR. KURTZBERG:  Your Honor, if I may ask a question to

14   clarify what you just said, you said you're reserving on

15   general jurisdiction.  The plaintiffs have said that they are

16   not moving on general jurisdiction grounds at all.  So I'm not

17   clear on what you mean by that.

18               THE COURT:  Plaintiffs are not basing the case on

19   general --

20               MR. KURTZBERG:  They have expressly disavowed any

21   argument under general jurisdiction.

22               MR. ST. PHILLIP:  That's nomenclature that we're

23   talking about.  The argument that I made to you in connection

24   with 200 of the New York Banking Law is not -- it's consent to

25   general jurisdiction.

H4RAFRO1ps

1          THE COURT:  That's what I meant by "general

2     jurisdiction."  That needs to be called general jurisdiction,

3     along with the appearances of doing business.

4          MR. KURTZBERG:  I understand, your Honor.  Thank you,

5     your Honor.

6          THE COURT:  I'm not sure it's clarified anything.

7          MR. KURTZBERG:  Thank you.

8          THE COURT:  OK?

9          MR. PORPORA:  Thank you, your Honor.

10          So I think similar --

11          THE COURT:  Case or controversy.

12          MR. PORPORA:  I think a similar issue with respect to

13     nomenclature.  Let me phrase my argument in terms of standing.

14     That's what I had intended to argue before.  Apologies for

15     confusion.

16          THE COURT:  No problem.

17          MR. PORPORA:  What I do want to point out to you, your

18     Honor, is that the plaintiffs have failed to adequately

19     establish that they have standing to bring a claim.

20          THE COURT:  Well, they've lost money, they say, on the

21     derivatives contracts.  Isn't that enough?

22          MR. PORPORA:  Your Honor, with your permission, could

23     I hand you two exhibits that are in the record that have been

24     filed?

25          THE COURT:  Yes.

H4RAFRO1ps

1          MR. PORPORA:  Your Honor, those are two separate

2     exhibits, the Porpora declaration, which was filed in support

3     of defendant's motion to dismiss the matter.  Those are also

4     highlighted for your Honor's convenience.  I'm going to

5     reference the reasons why.

6          THE COURT:  The picture looks like you.

7          MR. PORPORA:  That's unfortunate for me.

8          OK.  Your Honor skipped straight to the question of

9     whether or not they had been injured on their profit.  They

10     allege they have been injured on their profit.  But before we

11     get there, I think again have to deal with the fact of whether

12     they actually pled that these benchmarks have been manipulated.

13     In order for them to be injured, there has to be some

14     manipulation.  But although they say in a conclusory way in

15     their complaint that those benchmarks were manipulated, they

16     point to no facts suggesting that, your Honor.

17          THE COURT:  So the argument is that there is no

18     plausible allegation of manipulation.

19          MR. PORPORA:  That's absolutely correct.  And in a

20     moment I'll also talk about how, certainly, if there's no

21     plausible allegation of manipulation, there is certainly no

22     plausible allegation of manipulation by way of conspiracy.

23          So let's begin with manipulation.  What I just handed

24     up to you is a press release from us.  This is what I referred

25     to earlier.  And, your Honor, if I could get your Honor to look

H4RAFRO1ps

1    at paragraph 6 -- or, excuse me -- paragraph 7 of that MAS

2    press release.

3              THE COURT:  The one that you've highlighted.

4              MR. PORPORA:  Yes.  It is highlighted at paragraph 7,

5    correct, on the first page.

6              THE COURT:  These are merits arguments.

7              MR. PORPORA:  I'm sorry, your Honor?

8              THE COURT:  These are merits arguments.  These are

9    arguments that --

10             MR. PORPORA:  They are really not, your Honor.  The

11   point is --

12             THE COURT:  The point is, there is no merit to this

13   allegation.

14             MR. PORPORA:  Right.  It's not only that there's no

15   merit, your Honor.  It's that there is a misstatement.  The

16   plaintiffs say in their complaint, on 20 separate occasions,

17   that MAS concluded that the defendants have engaged in

18   manipulation to manipulate these rates.

19             THE COURT:  It's only to buttress their allegation

20   that they say this.

21             MR. PORPORA:  I'm sorry, your Honor?

22             THE COURT:  It's to buttress their allegation.

23             MR. PORPORA:  Yes.  Well, it's the fact that their

24   allegations lack any factual support whatsoever.  There is

25   literally nothing they point to that says, this is how we have

1    determined that there has been manipulation of these rates.

2    What they say is, MAS conducted an investigation of a bunch of

3    different conduct with respect to a whole bunch of different

4    benchmark interest rates.  And they came out with a press

5    release.  And in the press release they said that there were a

6    bunch of problems with a bunch of different benchmark rates and

7    as a rule they were going to require some sanction on a number

8    of banks.

9              THE COURT:  Haven't they alleged that there was an

10   agreement among traders to have an artificially low or high

11   rate?

12             MR. PORPORA:  There is nothing, in any of the

13   materials that they tell you say that, that does say that.

14             Why don't we move on to the second document that I

15   handed to you, your Honor.  That's Exhibit F.  And also

16   highlighted for your Honor --

17             THE COURT:  I'd be happier if you talked about

18   paragraphs in the complaint and either their sufficiency or

19   insufficiency.  This is a function of the complaint.

20             MR. PORPORA:  It is, your Honor.  That's absolutely

21   correct, that it's a function of the complaint.  What they do,

22   and I think Mr. Levis pointed this to you before, the

23   plaintiffs don't begin to make any allegations whatsoever about

24   any misconduct until paragraph 120.  Up until that point, the

25   first 43 pages of the complaint, there's a little bit of an

H4RAFRO1ps

1    introduction, but then they sort of plod through who each

2    defendant is, where the defendant operates, etc.  The first

3    time you get to any substantive allegations of any misconduct

4    is at page 44.  And what the plaintiffs do is, they simply

5    refer to a number of things.  They refer to the three

6    categories of materials I mentioned earlier: the MAS press

7    release, certain regulatory findings by the CFTC and the FSA,

8    and certain newspaper articles.

9            And so, your Honor -- and I apologize that I have to

10   hand up newspaper articles -- but there is no way to test the

11   sufficiency of the complaint on the face of the complaint,

12   because there are no specific allegations in the complaint that

13   point out what plaintiffs did.  They say in conclusory terms

14   things like, oh, all the defendants manipulated the rates, all

15   of the defendants engaged in block trading.  But those are

16   conclusions, your Honor.  Those are factual allegations.  And

17   they say the support for those conclusions come by way of these

18   different materials.  But when you look at the materials, they

19   don't say what the plaintiffs tell you they say.

20           Your Honor, I see that you're reading.  I don't want

21   to interrupt you, but if I can take you to the article --

22           THE COURT:  No, I have separate ears and eyes.

23           MR. PORPORA:  That is a fair point.

24           THE COURT:  We all experience this.

25           I'm looking at the paragraphs beginning at around 130

1    and going on through the beautiful chart on page 50 dealing

2    with various spreads.  It looks to me like they have alleged

3    manipulation.

4           MR. PORPORA:  Your Honor, I'm happy to take those in

5    turn.

6           The paragraphs at 130, beginning at 130, relate to

7    more newspaper articles.  And the plaintiffs misrepresent in

8    here that, for example, 131, "a Macquarie bank trader was fired

9    for inappropriately collaborating with staff at other banks" --

10   that's the quote -- to rig the SIBOR, SOR, and foreign exchange

11   rates.  Do you know why that part isn't quoted, your Honor?

12   The article doesn't say that.  The article doesn't offer any

13   plausible reason for someone to glean that when you read that

14   newspaper article.

15          Same thing with the article that I handed up to you a

16   moment ago.  The article I handed you --

17          THE COURT:  133 talks about Commerzbank and a

18   particular trader who was fired and a conversation that was

19   found in his chat, a function on, I guess, the phone, where he

20   discusses manipulation with traders from other banks.

21          MR. PORPORA:  That's exactly right, your Honor.  And

22   that paragraph relates to, if you look at the very first

23   sentence, "Commerzbank trader Eugene Wong Ming-Wey was fired in

24   January 2013 for manipulating foreign exchange forward rates."

25          THE COURT:  And 134 talks about the effects of

H4RAFRO1ps

1    spreads.

2         MR. PORPORA:  Yes.  Your Honor, I'll get to the

3    economic analysis in just one moment but --

4         THE COURT:  Please, you may be right.  It may be these

5    allegations can't stand.  But they're sufficient.  They're

6    really sufficient.  It could be made a lot cleaner.  It could

7    be more succinct.  It could be made more effectively.  But it's

8    there.

9         MR. PORPORA:  Your Honor, just responding to the

10   paragraphs, the foreign exchange forward rate is not SIBOR or

11   SOR at all.  This takes us back to the beginning of my

12   presentation, your Honor.  What the plaintiffs do is, they

13   point to manipulation of other benchmark rates.  And even if,

14   your Honor, some of these rates are germane, there is nothing

15   in here that suggests that there was actually a conspiracy to

16   manipulate them.

17        THE COURT:  137.

18        MR. PORPORA:  Right.  So what the plaintiffs then go

19   on to do is, they're offered a series of economic analysis,

20   right.  And what they basically do is, they say, here are

21   depictions of spreads between two of the three relevant

22   benchmark rates in the case, right.  Again, there is U.S.

23   dollar SIBOR.  There's SGD SIBOR.  And there's SOR.

24        THE COURT:  They don't distinguish.

25        But then what they say is, there's indicia in terms of

H4RAFRO1ps

1   spreads that indicate manipulation.

2          First of all, manipulation is very hard to show.  It's

3   very hard to show differences between competitive rates and

4   manipulated rates.  So we're dealing pretty much with

5   inferences.  And they allege that one of the ways you can tell

6   is that spreads are official.  So they make an analysis of

7   spreads in the SOR and SIBOR.  And that's figure 1 on page 50.

8   I'm sure they've taken this out of one of the reports of the

9   agencies.  And they allege an inference of manipulation.  It's

10  good enough.  It may not work.  It may not be proveable.  But

11  it's good enough at this point.

12         MR. PORPORA:  Your Honor --

13         THE COURT:  Good try, Mr. Porpora, but this one

14  doesn't work.  The motion to that extent is denied.

15         MR. PORPORA:  Very well, your Honor.

16         Perhaps I can move on, then --

17         THE COURT:  And in terms of case or controversy, there

18  is an adequate allegation that the plaintiffs were hurt by

19  having to pay too much in their derivatives contracts based on

20  a relationship between the derivative contracts and the

21  manipulated rates of the Singapore market of SIBOR and SOR.  So

22  there is a case or controversy as alleged and there is standing

23  that is alleged.

24         MR. PORPORA:  Your Honor, if I could, just on that

25  last point, just point out to the Court that Judge Buchwald in

H4RAFRO1ps

1    the U.S. dollar LIBOR case in fact did not make an assumption

2    that because there was an alleged manipulation, that plaintiffs

3    who made allegations exactly similar to the ones that the

4    plaintiffs are making here, that there would have been harm.

5        THE COURT:  She's smarter than me and has a more

6    sophisticated understanding of this.

7        MR. PORPORA:  Your Honor, the only reason why I raise

8    that is because I think it is important for the Court to

9    realize the type of manipulation being alleged here.  This is

10   sporadic, multidirectional manipulation that they're alleging.

11   In other words, it happened on some days, it didn't happen on

12   other days.

13       THE COURT:  I don't really understand how you do a

14   manipulation, other than having telephone calls with a whole

15   bunch of traders and everybody agreeing on a certain price.  I

16   don't know if this is going to be proved or how it's going to

17   be proved.  I'm only dealing with the complaint.  It's good

18   enough at this point.

19       MR. PORPORA:  Thank you, your Honor.

20       I think if we dealt with the standing question, the

21   next topic for me is to address the antitrust claims.  So, your

22   Honor, I've been talking about the allegations of conspiracy

23   with respect to Article III.  I'm going to presume that you're

24   not going to entertain those same arguments on a *Twombly* basis

25   for purposes of failure to plead a conspiracy.

H4RAFRO1ps

1          THE COURT:  I'll be consistent with my own rulings.

2          MR. PORPORA:  Yes.  In any event, your Honor, there

3     are two other grounds that I would raise for the Court's

4     consideration.

5          The first of those two is that plaintiff's antitrust

6     claim should be dismissed because the claims are premised

7     entirely on improper group pleading, your Honor.  There are no

8     specific allegations in this complaint with respect to specific

9     defendants.  What the plaintiffs do is, they name --

10          THE COURT:  Yes, I understand that.  For example,

11     Citibank, Citigroup, there are lots of affiliates and

12     subsidiaries that come into play.  Shouldn't there be specific

13     allegations against each particular corporate subsidiary?  The

14     same is true for Bank of America, JPMorgan Chase, and so on.

15     That's what you mean, right?

16          MR. PORPORA:  Well, I think the problem is twofold,

17     your Honor.  I think, even more fundamentally, they don't state

18     individual claims.  I represent Barclays, your Honor.  It is

19     certainly true that they have engaged in improper pleading by

20     naming, for instance, Barclays PLC, which is a holding company

21     that, by definition, does not trade derivatives and certainly

22     does not submit to SIBOR or any other benchmark.  So there's no

23     way that a complaint against Barclays PLC makes any sense under

24     these circumstances.  That's a matter of naming corporate

25     affiliates in an improper way.

H4RAFRO1ps

1          THE COURT:  And there are so many of the same nature.

2          MR. PORPORA:  Your Honor, I don't mean to interrupt,

3    but even before we get there, the point is, there are no

4    allegations against any Barclays entity.  All they say is --

5          THE COURT:  They allege against the whole group.

6          MR. PORPORA:  That is true.  And, for example, in

7    their summary of allegations that they filed with the Court not

8    that long ago, what they say -- again, misrepresenting facts --

9    is that MAS found that all of the defendants were guilty of

10   manipulation.  That's what they said.  That is, again,

11   impossible, because there is no way that the --

12         THE COURT:  It's a group pleading within a network of

13   banks.  It's a group pleading within a particular banking

14   conglomerate.  And it's a group pleading among the various

15   conglomerates.

16         MR. PORPORA:  That's exactly right.

17         THE COURT:  Got it.  And I'm sympathetic to it, so,

18   Mr. Levis, how are you going to get me out of my sympathy?

19         MR. LEVIS:  Sure.  So, as to the banks and the

20   entities that were named in the complaint, we named the

21   entities first based on who was identified by the government

22   regulators.  So when MAS sanctioned the 20 entities for

23   participating in a conspiracy, that's the first group of banks

24   that we named.  Those are the entities that are listed in here.

25   The allegation that we don't specifically identify what they

H4RAFRO1ps

1    did in the course of the conspiracy is because MAS didn't

2    release the particular underlying source documents that they

3    found in their investigation.  They identified --

4              THE COURT:  How should that affect me now?

5              MR. LEVIS:  Well, those banks are identified as having

6    participated in a conspiracy, and the regulator has made a

7    finding that they were part of this manipulation.  That is

8    sufficient to allege plausible claims against them.  We don't

9    need to allege what each bank or each trader at each bank did

10   on an individual basis in order it state a plausible claim.

11   It's plausible that MAS identifies these specific entities as

12   being part of a conspiracy to state claims against them.

13             The other banks that you name come from, for example,

14   other government settlements.  So there are other entities that

15   are identified in the CFTC settlements of Deutsche Bank, RBS,

16   and UBS, as engaging in the similar misconduct in manipulating

17   SIBOR and SOR as they did in other benchmark rates.

18             One of the articles that Mr. Porpora handed up to you

19   before, the second article -- I don't know what exhibit was

20   attached to the complaint, but it is titled "Exclusive Bank

21   Probe Finds Manipulation in Singapore Offshore FX Market."  If

22   you go to the next-to-last page of that article, it says,

23   "Through its internal investigations, UBS identified evidence

24   of similar misconduct involving submissions for at least the

25   Hong Kong interbank offered rate, the Singapore interpank

H4RAFRO1ps

1    offered rate, the Singapore swap offer rate, and the Australian

2    bank bill swap rate."

3            We name, for example, the entities that were

4    identified in UBS's settlements, because that's the conduct

5    that is described, that they engaged in similar manipulative

6    conduct.

7            Now, Mr. Porpora challenges that.  As I said, we don't

8    identify specific individual acts by every single defendant,

9    but that's just because the regulator didn't specify

10   individually on every day what the traders did.

11           THE COURT:  And you probably have no way of knowing.

12           MR. LEVIS:  And we can't tell at that time because,

13   right, we don't have the underlying source documents.  That's

14   something that will come out in discovery later.  We'll get the

15   checks and we'll be able to specify what people did on an

16   individual basis.  But a regulator's finding of manipulative

17   conduct as to a specific defendant is surely enough to raise a

18   plausible inference of a conspiracy and sustain antitrust

19   claims against those banks.

20           THE COURT:  So, Mr. Porpora, supposing that the

21   plaintiff is correct that there was a manipulation and that

22   there was a conspiracy to cause a fixing of prices by traders

23   of one or another subsidiary of all the foreign banks, but he

24   can't know which particular subsidiary at this point in time,

25   should I dismiss the complaint?

H4RAFRO1ps

```
 1              MR. PORPORA:  You should, your Honor, for a number of
 2     reasons.  Number one, the premise is faulty.  MAS says
 3     explicitly that it levied sanctions -- and I'm quoting -- for
 4     deficiencies in the government's risk management internal
 5     controls and surveillance systems relating to benchmark
 6     submission processes.  There is nothing in there about, these
 7     banks were sanctioned because they engaged in a conspiracy to
 8     manipulate.  The regulator doesn't say that.  What Mr. Levis
 9     just did was say, because MAS determined that the banks who
10     were sanctioned in the MAS investigation --
11              THE COURT:  The conduct which was not really
12     supervised and which was not detected was the manipulated
13     conduct of which Mr. Levis is complaining.
14              MR. PORPORA:  That is a possibility, your Honor.  But
15     what *Twombly* teaches, your Honor --
16              THE COURT:  It's more than a possibility.  It's a
17     finding.
18              MR. PORPORA:  It's not --
19              THE COURT:  It's not my finding.  It's their finding.
20              MR. PORPORA:  I understand that, your Honor.  But MAS
21     itself says explicitly that there has been no conclusive
22     finding of manipulation.  It explicitly says that, in its press
23     release.
24              THE COURT:  I'm disinclined, at this point in time, to
25     dismiss the case on that ground, because there was an
```

H4RAFRO1ps

1    actionable manipulation.  And if there is jurisdiction, I can't

2    expect the plaintiff to know what the role of each particular

3    banking system was and which part of the banking system of each

4    company effectuated the transactions and benefited from the

5    transactions.  It's something, I think, that needs to be done

6    later in the case.

7              It would bother me a whole lot if, as I say, there was

8    a good cause of action and there is jurisdiction to dismiss

9    because the plaintiff can't know and make the distinctions that

10   eventually the plaintiff will have to make.

11             MR. PORPORA:  Your Honor, I understand all of those

12   principles and thank you for that guidance.  The only point I'm

13   raising is --

14             THE COURT:  I don't know if the law says what I'm

15   saying.  That's my question.  It's a nice sentiment, but I

16   don't know --

17             MR. PORPORA:  I don't think the law does, your Honor.

18   For example -- and I'll go back to my -- the example I used

19   before -- Barclays PLC is merely a holding company.  How the

20   plaintiffs could plausibly state --

21             THE COURT:  I'll tell you what I'd do.  If there is a

22   judgment that is obtained against any one of the subsidiaries

23   of Barclays, I feel sure that the judgment will be paid,

24   whether by that subsidiary or by a parent.  I would love this

25   complaint to be simplified.  And one way of simplifying it is

H4RAFRO1ps

1    to name just one entity, preferably the parent entity or any

2    other entity, of any one of all these banks, with the assurance

3    that, if there is a judgment, and the whole group of companies

4    can pay it, the judgment will be paid.

5         MR. ST. PHILLIP:  It is our expectation, your Honor,

6    that very shortly in this case, defendants have put in some

7    declarations -- some are very plausible -- in connection with,

8    maybe this entity was not a part of -- did not hire any of

9    these traders, etc.  I think it is premature at this time to do

10   that.

11        THE COURT:  I agree.  It's premature.

12        MR. ST. PHILLIP:  But we will be able to, eventually.

13        THE COURT:  It's premature at this time, for me to

14   require you to make distinctions among the various plaintiffs,

15   assuming that you've alleged a good cause of action and

16   assuming that there is jurisdiction.  All right so far.

17        MR. ST. PHILLIP:  Thank you.

18        MR. PORPORA:  Your Honor, I'll move to the third

19   ground on which the Court should dismiss the plaintiff's

20   antitrust claims.  Put simply, the plaintiffs lack antitrust

21   standing because they're not efficient enforcers under the

22   antitrust laws.

23        THE COURT:  What does that mean?

24        MR. PORPORA:  Whether or not the plaintiffs actually

25   are in a position to bring antitrust claims because they've

H4RAFRO1ps

1    been sufficiently and directly injured by the antitrust

2    violation.

3         THE COURT:  What do they have to allege?  Do they

4    allege a monetary amount?

5         MR. PORPORA:  Courts consider a variety of factors in

6    determining enforcer status.  It includes causation,

7    directness, and the speculative nature of damages.

8         THE COURT:  So they've alleged causation, and they've

9    alleged directness.  I don't know anything about the damages.

10        MR. PORPORA:  Your Honor, they don't allege,

11   respectfully, causation or directness.  I'll deal with those

12   together.  They don't allege in any way a sufficiently direct

13   causal relationship between the alleged manipulation and the

14   plaintiffs' supposed losses.

15        We'll take Sonterra for starters.  Sonterra is far two

16   remote to be an efficient enforcer because it transacted solely

17   with nondefendant entities.  It doesn't transact with any of

18   the defendants in this case, your Honor.  And as the Second

19   Circuit recently expounded in *Gelboim*, in the *Gelboim* decision,

20   indirect purchasers in benchmark cases are remote victims.

21   Three different judges in this district -- Judge Buchwald,

22   Judge Castel, and Judge Woods -- have held that plaintiffs like

23   Sonterra, who allege no direct dealings with defendant, lack

24   antitrust standing.  There is literally no reason for the Court

25   to depart from that ruling here.

H4RAFRO1ps

1          THE COURT:  Does the plaintiff have to allege

2     efficiency?

3          MR. PORPORA:  I'm sorry, your Honor.

4          THE COURT:  Does the plaintiff have to allege

5     efficiency?

6          I guess, did plaintiff have to allege injury to

7     business or property?  And then the consequence comes out of

8     that.

9          So the question then becomes, Mr. Levis and

10    Mr. St. Phillip, if you've done a contract, a derivatives

11    contract, with a nondefendant, can you sue the defendant for

12    damages?

13         MR. LEVIS:  Well, your Honor, the analysis as to

14    causation and directness, just to put it plainly, is a

15    proximate cause question.  And as to whether or not defendants'

16    manipulation, assuming there is a manipulation, because the

17    antitrust standing analysis assumes the existence of a

18    violation at the time you evaluate plaintiffs' standing,

19    assuming that the violation occurred and the rate was

20    manipulated, we purchased contracts that incorporated those

21    manipulated rates.

22         THE COURT:  Did you purchase contracts or did you make

23    contracts?

24         MR. LEVIS:  We purchased contracts.  They are kind of

25    like financial products.  I mean, they're called derivatives

H4RAFRO1ps

1    contracts, but it's a financial product.  You buy it from a

2    dealer, who is one of the defendants, and they sell it to you.

3              THE COURT:  Usually the dealer has created the

4    contract.

5              MR. LEVIS:  Correct.  So someone creates the contract.

6              THE COURT:  And you look to the terms of the contract

7    for what you can sue for.

8              MR. LEVIS:  And in the contract, we're talking about

9    contracts that incorporate these rates.  So we're buying and

10   selling essentially derivatives that -- the price is reflected

11   by the rate when we buy it.

12             THE COURT:  But there have to be representations and

13   warranties there will affect whether you can sue or not.

14             MR. LEVIS:  There are.  And to the extent that exists,

15   it's covered by the master agreement, which is a broad kind of

16   umbrella contract that sets the trading relationship.  And in

17   that trading agreement, it incorporates all the transactions

18   between the parties and contains in that agreement a

19   representation that the parties will abide by all applicable

20   laws in entering these contracts.  And certainly if defendants

21   are conspiring and fixing the price of the contracts, if we're

22   looking at this strictly in terms of a contract claim, then

23   they violated the provisions of the agreement.

24             But the antitrust standing analysis is not really

25   concerned with the contract in that sense.  We're looking at

H4RAFRO1ps

1    whether or not defendants are the proximate cause of our

2    injury.  And the conspiracy alleged in fixing the SIBOR and SOR

3    benchmark proximately caused our harm and resulted in our

4    damages, which gives us standing to bring these claims.

5              THE COURT:  If you're not bound by the contract and if

6    you're suing on the antitrust conspiracy made in Singapore, I

7    have even less faith than I had before of the jurisdictional

8    aspects of your claim.

9              MR. LEVIS:  Just speaking in terms of antitrust

10   claims, there is no requirement that you have a contract with

11   the defendant.  It doesn't require privity.

12             THE COURT:  I understand that.  But the contract is

13   what's made in the U.S.

14             MR. LEVIS:  Yes.

15             THE COURT:  And generally speaking a contract will

16   define your rights of action.  If you're saying, no, judge,

17   don't even look at that, it doesn't count, we're suing on the

18   antitrust conspiracy in Singapore, you're telling me that the

19   local aspects of jurisdiction don't mean anything.

20             MR. LEVIS:  Well, we're not --

21             THE COURT:  You're telling me that there's no

22   jurisdiction.

23             MR. LEVIS:  That's not what we're saying.

24             THE COURT:  I understand that.  But that's the effect

25   of what you're saying.

1          MR. LEVIS:  Well, the contract doesn't define or say

2     anything that we can't sue for antitrust claims and it doesn't

3     limit our remedy to the contract.  It actually doesn't get rid

4     of any of these claims.  We can sue for a breach of contract

5     claim, which is a separate cause of action, from our antitrust

6     claims, which resulted from fixing the prices of these

7     derivatives by manipulating SIBOR --

8          THE COURT:  Yes.  The question is clear.  All right.

9          MR. LEVIS:  But in terms of just whether or not we

10    have antitrust standing, we are the proximate cause --

11    defendants from the proximate cause of our injury.

12         THE COURT:  So you're saying that if there was an

13    antitrust conspiracy, if there is jurisdiction, the fact that

14    you suffered your damage through business transactions with

15    another doesn't prevent you from suing the defendants.

16         MR. LEVIS:  That's right.

17         THE COURT:  Mr. Porpora says just the opposite.  So

18    what's the law?

19         MR. LEVIS:  Mr. Porpora referenced *Gelboim* and said

20    that *Gelboim* expounded that you have to transact directly with

21    the defendant.  *Gelboim* offered some guidance and came up with

22    some concerns about allowing plaintiffs that didn't transact

23    directly with the defendant to bring antitrust claims.  It

24    didn't definitively say that they couldn't.  It just issued

25    some concerns.

57

H4RAFRO1ps

1          Now, since *Gelboim*, every court to consider the issue,

2     as Judge Buchwald did in the *U.S. v. LIBOR* case, Judge Castel

3     did in the *Euribor* case, Judge Caproni did in the *Silver Fixing*

4     case, have found at least that those who purchased directly

5     from a defendant, like Frontpoint did from Deutsche Bank, are

6     efficient enforcers and have antitrust standing.

7          As to whether those who purchased not directly from a

8     defendant have antitrust standing, they do.  And the reason

9     they do is really consistent with what Judge Caproni looked at

10     in the *London Silver Fixing* case.  And what we're talking about

11     here is, again, an issue of proximate causation and whether or

12     not defendants caused the injury.  The concern about allowing

13     non-parties, people who didn't transact with the defendant, to

14     sue them comes out of a concern really that they will be

15     subject to overkill damages and that it would be unfair for

16     them to have to pay damages to people they didn't transact

17     with.

18          And what happens, though, is because we're dealing

19     with a benchmark manipulation case, when defendants set the

20     price, as Judge Caproni observed, they determine prices for the

21     entire market.  So the issue of whether or not they transacted

22     directly with someone doesn't go to whether or not damages here

23     are going to be disproportionate to the wrongdoing, because

24     they are proportionate to the wrongdoing.  Defendants, in

25     choosing to fix a financial benchmark, set the price for

H4RAFRO1ps

1    everyone, including Sonterra, who, while they didn't transact

2    directly with one of the defendants, purchased a contract that

3    was fixed at an artificial price as a result.

4              THE COURT:  Did Judge Buchwald hold that there is a

5    cause of action by the so-called indirect plaintiff?

6              MR. LEVIS:  No.  Judge Buchwald dismissed the claims

7    of indirect purchasers.

8              THE COURT:  And how about Judge Caproni?

9              MR. LEVIS:  Judge Caproni did sustain claims of

10   indirect purchasers.

11             THE COURT:  Two smart judges have done opposite

12   things.

13             MR. LEVIS:  And Judge Caproni's analysis focused on

14   the fact that plaintiffs do not need to directly purchase from

15   a defendant because it's not a matter of privity.  What she was

16   analyzing --

17             THE COURT:  You don't need privity for the antitrust.

18             MR. LEVIS:  You don't need privity for antitrust.

19             THE COURT:  But there is or indirect consequences in

20   antitrust law.

21             MR. LEVIS:  She was looking at the fact that

22   indirectness is the directness of the injury, in fixing the

23   benchmark that controls the price of the contract that

24   plaintiffs purchased.  That is a direct injury that is

25   sufficiently direct to confer antitrust standing.

H4RAFRO1ps

1        THE COURT:  Which other of my intelligent comrades

2   have done different things?

3        MR. LEVIS:  Well, Judge Castel, in Euribor, followed

4   Judge Buchwald.  And Judge Caproni -- she had two cases, so

5   both in *Silver* and *Gold* she reached the same conclusion.

6        THE COURT:  So it's Buchwald and Castel against

7   Caproni.

8        MR. LEVIS:  Yes.

9        MR. PORPORA:  Your Honor, if I could briefly respond.

10        THE COURT:  Sure.

11        MR. PORPORA:  We'll add in Judge Woods as well in the

12   *Platinum and Palladium* case, who did follow the Second

13   Circuit's guidance in *Gelboim* and did not sustain the claim of

14   an indirect purchaser.

15        THE COURT:  How could Judge Caproni go against the

16   Second Circuit?

17        MR. PORPORA:  Well, your Honor, Judge Caproni -- and I

18   think Mr. Levis referenced the differentiating aspect there.

19   Judge Caproni based her ruling on the fact that the wrongdoer

20   there had set the case for the entire market.  That is simply

21   not the case with respect to SIBOR, whether the SGD versus

22   SIBOR or SOR.

23        THE COURT:  Yes.  That's what they allege.

24        MR. PORPORA:  Your Honor, they allege a number of

25   things without factual support.  But the point is, for example,

H4RAFRO1ps

1    Mr. Levis referenced one of the concerns with allowing indirect

2    purchaser claims to go forward.  We talk about overkill

3    recoveries.  As the Second Circuit said in *Gelboim*, this could

4    potentially lead to the financial ruin of the largest financial

5    institutions.  That's one concern, your Honor.

6             THE COURT:  Only if it's a class action.

7             MR. PORPORA:  That's certainly true, your Honor.  That

8    is certainly true.

9             But it goes beyond just the fact that there is

10   significant expansion of the scope of damages in the antitrust

11   world, your Honor.  It's also not necessary.

12            THE COURT:  So let me sum up here.  As to Frontpoint,

13   clearly it can efficiently enforce the law.  As Sonterra,

14   decision is reserved.  And I think I'll probably follow

15   Caproni, but I'm not sure.

16            MR. PORPORA:  Your Honor, can I address the Frontpoint

17   claim for one moment?  I have not done that.

18            THE COURT:  Yes.  I know you have not.  Come talk

19   anytime.

20            MR. PORPORA:  No, I appreciate that.

21            It is not a natural consequence of the fact that

22   Frontpoint had certain purchasers, that it automatically is an

23   efficient enforcer.  First of all, again, this case is about

24   three benchmark interest rates.  Frontpoint only alleges they

25   were engaged in swaps that were SGD SIBOR.  That's one of the

H4RAFRO1ps

```
1    three.  They cannot possibly be an efficient enforcer with

2    respect to instruments that are linked to USD SIBOR or to SOR.

3    They are completely different sets of proof there.

4            THE COURT:  And you remind me that the allegations of

5    damage are very vague and we don't know which particular

6    derivatives contract they really complained about and how you

7    can answer.  I don't know if this is part of your motion or

8    someone else is going to pick that up.

9            MR. PORPORA:  That is -- you had me right for the next

10   point, your Honor, and I appreciate it.

11           THE COURT:  That allegation, of injury to business or

12   property, is so general and so conclusory as to be worthless.

13   It cannot be properly answered by defendant, and I'll grant

14   that motion, unless I'm persuaded differently.

15           MR. PORPORA:  Your Honor, just for clarity, when you

16   say you will grant the motion, the motion to dismiss the

17   antitrust claim on the ground that they have not adequately

18   allege that they have suffered damages, either Sonterra or

19   Frontpoint.

20           THE COURT:  Sorry?

21           MR. PORPORA:  Either Sonterra or --

22           THE COURT:  Either one, yes.

23           (Continued on next page)

24

25
```

H4RYFROC2

1          THE COURT:  Mr. Levis, do you want to say something?

2          MR. LEVIS:  I think we have your ruling.  I think we

3   understand.

4          THE COURT:  Next.

5          MR. PORPORA:  All right, your Honor.  That concludes

6   my presentation.  I'll turn things over to Mr. Gluckow.

7          MR. GLUCKOW:  Good afternoon, your Honor.  I'm Paul

8   Gluckow with Simpson Thacher.  We represent the JP Morgan

9   defendants.  I'll be addressing the RICO claims.

10          Your Honor, the RICO claims here should be dismissed

11   for a few separate and independent reasons.  Importantly, the

12   same counsel representing the plaintiffs here --

13          THE COURT:  I've ruled on that already.

14          MR. GLUCKOW:  So that's going to be dismissed.

15          THE COURT:  With leave to replead.

16          MR. GLUCKOW:  I appreciate that, your Honor.

17          Separate from that, there are a couple of other

18   reasons why the RICO claim should be dismissed, and I would

19   submit without leave to amend because I don't think that these

20   issues can be cured.

21          The same counsel representing these plaintiffs here on

22   behalf of some of the same named plaintiffs have already tried

23   to assert RICO claims in other IBOR benchmark cases, and in

24   every single one of those instances, the RICO claims have been

25   dismissed, and the same result should obtain here.

1          Judge Daniels in the Yen LIBOR case and then more

2     recently Judge Castel in the Euribor have rejected the same

3     very RICO arguments that the plaintiffs have advanced here and

4     dismissed those RICO claims with prejudice and without leave to

5     amend.

6          Your Honor, for the very sound reasons already

7     articulated by Judge Daniels and Judge Castel, the RICO claims

8     here should be dismissed.  The first reason, your Honor,

9     separate and apart from a lack of injury to business or

10    property, is that the RICO claims are impermissibly

11    extraterritorial.

12         Both Judge Daniels and Judge Castel concluded after

13    recent decisions that the RICO claims asserted in the Yen LIBOR

14    case and the Euribor case were impermissibly extraterritorial.

15    Just as in those cases, the only alleged basis for RICO here is

16    alleged wire fraud.

17         Your Honor, there's no dispute that the wire fraud

18    theory doesn't apply extraterritorially and that plaintiffs

19    must allege a domestic violation of the wire fraud statute.

20         THE COURT:  What happens if the purpose of the wire

21    frauds brought were to create artificial business opportunities

22    and losses in the U.S.?

23         MR. GLUCKOW:  That was considered by both Daniels and

24    Castel and was rejected, your Honor.

25         THE COURT:  Why?

H4RYFROC2

1           MR. GLUCKOW:  The reason is because in order to state

2      a domestic wire fraud claim and thus a RICO claim, the

3      plaintiffs must allege facts sufficient to show that the scheme

4      they're claiming was either directed from the United States or

5      specifically directed to the United States, and both judges

6      went on citing the Second Circuit's case in *Petroleos* to say

7      that some domestic conduct is not enough and that if the U.S.

8      was one of many places where the conduct was directed, that

9      that's also not enough.

10          As Judge Nathan just recently found in the *Worldwide*

11     *Directors* case, which wasn't a benchmark case but was a similar

12     RICO issue, the court said that use of the U.S. wires may be

13     necessary, but *Petroleos*, the Second Circuit case, makes it

14     clear that it is not sufficient.

15          If the domestic conduct alleged is peripheral to the

16     overall scheme and the scheme is not directed to or from the

17     U.S. --

18          THE COURT:  It's not peripheral on their theory, but

19     it's not unique.  What is the significance of that?

20          MR. GLUCKOW:  Your Honor, I can't be more clear about

21     this.  The allegations in this case, in this SIBOR SOR case,

22     are just about verbatim the same as they were in the Yen LIBOR

23     case that Judge Daniels looked at and in the Euribor case.

24          THE COURT:  They're going to allege -- and you're

25     telling me -- that I should dismiss without giving them leave

H4RYFROC2

1    to replead.

2              MR. GLUCKOW:  I don't think they can replead.  In

3    other words, the facts are what they are.

4              THE COURT:  What is to say that the purpose of the

5    RICO violations in Singapore were to create opportunities for

6    wrongful profits in the United States?

7              MR. GLUCKOW:  Right.  The whole point of the decisions

8    that Judge Daniels rendered and that Judge Castel rendered is

9    that that's not enough.  First of all, they point out, just

10   like here, that the core conspiracy that's alleged is alleged

11   to have taken place overseas.

12             In the Yen case with Judge Daniels, it was Japan.  In

13   the Euribor case with Judge Castel, it was Europe.  Here it's

14   obviously Singapore, but in no case was it the U.S.

15             Then the plaintiffs' next argument is, well, the

16   counterparties, our clients, were in the United States, and the

17   courts looked at that, and they all concluded that some U.S.

18   effects are not sufficient.

19             They don't allege that the scheme was directed

20   specifically to the U.S.  It was in fact directed, as we heard

21   earlier, worldwide, which included the U.S., but that's not

22   enough under *Petroleos* to sustain a RICO claim.

23             THE COURT:  I was saying the same thing with specific

24   jurisdiction, that the pattern of racketeering activity

25   occurring in Singapore has to have as its purpose a substantial

H4RYFROC2

1    effect in the United States, perhaps not unique but certainly

2    substantial and perhaps distinctive.

3              I don't know of any case on that particular point the

4    way I phrase it.

5              MR. GLUCKOW:  Your Honor, I would say that the cases I

6    just referred to -- the *Petroleos* case out of the Second

7    Circuit, Judge Daniels' decision in the Yen case, Judge

8    Castel's very recent decision from February of this year in the

9    Euribor case, and the *Worldwide Directories* case from

10   Judge Nathan -- all say if the conduct was directed outside the

11   U.S. and it had effects in lots of places, including the U.S.,

12   that's not sufficient.  The RICO claim should be dismissed with

13   prejudice without leave to amend.

14             THE COURT:  Is there any district judge who has taken

15   any opposite point?

16             MR. GLUCKOW:  No, your Honor.  Every single one of

17   these similar cases with any kind of a RICO claim in a

18   benchmark context has resulted in a dismissal with prejudice

19   without leave to amend.

20             It just went to your Honor after the briefing in fact

21   because it came out in February of this year.  The plaintiffs

22   originally submitted to your Honor Judge Castel's decision from

23   February 21 in the Euribor case.  They didn't mention his

24   holdings about RICO.  We then submitted a letter on March 24

25   highlighting the RICO holdings in our letter.

H4RYFROC2

1          THE COURT:  I think I've got the point.

2          How do you answer it, Mr. Levis?

3          MR. LEVIS:  Again, it's the same argument as to

4    splitting up the conspiracy.  The racketeering activity is not

5    limited solely to the benchmark setting in Singapore.

6          It's the conduct in the United States in selling off

7    the derivatives, the derivatives that FrontPoint purchased from

8    Deutsche Bank that resulted in an injury to its business or

9    property because it was purchasing these derivatives at a time

10   when defendants were fixing their prices.

11         THE COURT:  That may have been the purpose of the

12   racketeering activity, but the racketeering activity has to be

13   the manipulation.  The manipulation is taking place in

14   Singapore.

15         MR. LEVIS:  The sales to the plaintiffs in the

16   United States are certainly part of the racket.

17         THE COURT:  It depends on how you allege and prove

18   intent and how you deal with issues of pattern.

19         MR. LEVIS:  The marketing and the activities in the

20   U.S. that led to these transactions certainly constitute enough

21   in the United States that that's how the racket was operating,

22   in targeting our plaintiffs and selling them manipulated

23   derivatives.

24         THE COURT:  It depends how you allege it and how

25   you're going to prove it.  The motion is granted with leave to

68

H4RYFROC2

1    amend.

2              MR. GLUCKOW:  Your Honor, the other point I would make

3    on RICO, in addition to the extraterritorial issue, is in order

4    to plead a RICO claim on a 1962(c), they have to allege at

5    least two acts of wire fraud specifically for each defendant,

6    and they also have to satisfy Rule 9(b).

7              In that same February 2017 Euribor decision from

8    Judge Castel, Judge Castel also dismissed the RICO claims with

9    prejudice and without leave to amend because the plaintiffs

10   there, just like here, failed to plead at least two acts of

11   wire fraud for each of the defendants.

12             THE COURT:  I think they do it but not very

13   succinctly.  In the various submissions they quote from the

14   various government agencies' reports.  An amendment should make

15   it clear.

16             MR. GLUCKOW:  Your Honor, for example, for my client,

17   JP Morgan, they don't allege any acts of wire fraud.  That's

18   true for most of the defendants.  They simply allege no facts

19   to show two acts of wire fraud for the defendant.  Again --

20             THE COURT:  They show two of each defendant.  They

21   need to show a pattern of various defendants.  That's their

22   theory.

23             Do you know of any law that says they have to show two

24   of each one, two of each member of the racketeering activity?

25             MR. GLUCKOW:  They do, your Honor.  They have to show

H4RYFROC2

1   two acts of wire fraud on behalf of each of the defendants.

2   That's very clearly set forth in Judge Castel's recent decision

3   from February of this year.  And as part of that, he also cites

4   the *Merrill Lynch v. Young* case previously decided in this

5   court in 1994.

6          THE COURT:  I don't think that's sound.  I don't think

7   the law requires that.  I'll consider it again.  The motion is

8   granted with leave to replead.

9          MR. GLUCKOW:  Your Honor, for the other points that we

10  raised, as to RICO, the lack of RICO standing and failure to

11  plead RICO conspiracy --

12         THE COURT:  That's answered by the better allegation

13  of injury of business or property.

14         MR. GLUCKOW:  Leave to amend?

15         THE COURT:  Yes.

16         MR. GLUCKOW:  Thank you, your Honor.

17         MR. LEVIS:  I only just want to respond, your Honor.

18  In terms of this specifying the acts of the members of the

19  conspiracy, as we discussed earlier, the defendants are

20  identified, and the government findings identify the members of

21  the conspiracy and that they participated in the conspiracy.

22         As your Honor recognized earlier, the underlying

23  source materials and the documents are not released.  That

24  doesn't affect the plausibility of our argument that they

25  participated in a conspiracy because the regulators that

H4RYFROC2

1    reviewed these materials reached the conclusion that the

2    conspiracy existed and that they did manipulate the rate.

3          THE COURT:  You're alleging RICO, which means you have

4    to allege a pattern of racketeering activity.  That's

5    different.

6          MR. GLUCKOW:  It is different, your Honor.  Again, I

7    would just point to -- it wasn't just a dicta or a side

8    comment.  Judge Castel specifically dismissed --

9          THE COURT:  I will reread the decisions.

10          MR. GLUCKOW:  Thank you, your Honor.

11          THE COURT:  Next.

12          MR. SYNNOTT:  Good afternoon, your Honor.  Aidan

13    Synnott from Paul Weiss for Deutsche Bank.  I'm here to address

14    the two state law claims that appear in the complaint.

15          The first is directed only to my client, Deutsche

16    Bank, and to Citibank, and it is based on a paragraph that

17    your Honor has now read several times, paragraph 20, which

18    talks about at least 24 swap transactions, including based on

19    one month's SIBOR that one plaintiff --

20          THE COURT:  I'm sorry.  What aspect of the motion are

21    you making?

22          MR. SYNNOTT:  The two state law claims, your Honor,

23    the first for breach of the implied covenant of good faith and

24    fair dealing, which is directed only to Citibank and to

25    Deutsche Bank, and then the second state law claim, which is

H4RYFROC2

1    unjust enrichment.

2              THE COURT:  There is no claim for good faith and fair

3    dealing in the contract.

4              MR. SYNNOTT:  Yes, your Honor, there is.

5              THE COURT:  Hold on a minute.

6              MR. LEVIS:  There is.  There's a claim for the implied

7    covenant of good faith and fair dealing.

8              THE COURT:  Implied in the contract?

9              MR. LEVIS:  Implied in the contract that you will not

10   do something to frustrate the benefit of that contract,

11   for example, by manipulating SIBORs.

12             THE COURT:  Are you pleading a breach of contract?

13             MR. LEVIS:  It's a breach of the implied covenant,

14   which in this case is evidenced by defendants' participation in

15   a conspiracy and Deutsche Bank's participation in a conspiracy

16   to manipulate SIBOR against FrontPoint who it was selling swaps

17   to.

18             MR. SYNNOTT:  That claim, your Honor, appears on page

19   66 of the amended complaint as the fourth claim for relief.

20             MR. LEVIS:  Judge Buchwald and Judge Castel both

21   sustained similar claims based on the manipulation of LIBOR and

22   Euribor in those cases.

23             THE COURT:  Either it's a breach of contract or it's

24   not a breach of contract.  There is no implied covenant outside

25   of contract.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          MR. LEVIS:  Well, there is an implied covenant not to

2     do something to stop your counterparty from getting the benefit

3     of that contract.

4          THE COURT:  Yes.  It's a breach of contract.

5          MR. LEVIS:  I think then it might just be a difference

6     of terminology.  Then that's what we're talking about.  The

7     claim arises out of defendants' --

8          THE COURT:  In order to set up a breach of the implied

9     covenant of good faith and fair dealing, you have to identify

10    the contract that is involved and the particular aspect of

11    enjoyment that is being frustrated.

12         Clearly you cannot burden another party's ability to

13    perform a contract.  It's all derivative of the existence of a

14    contract and a breach of a contract, and you haven't really

15    pleaded that.  There's no in-the-air covenant of good faith and

16    fair dealing.  It's all bound by contract terms and conditions.

17         MR. LEVIS:  I will say that other judges have

18    recognized that there is a covenant of good faith and fair

19    dealing.

20         THE COURT:  Maybe they know something I don't know,

21    but I've never held that and do not propose to do that.

22         MR. LEVIS:  As to the term that was being breached,

23    FrontPoint was purchasing swaps from Deutsche Bank where a

24    contract term with SIBOR, and by manipulating that rate, they

25    were harmed, and they paid too much for those contracts.

73
H4RYFROC2

1      That's the injury.

2              THE COURT:  That's not an implied covenant of good

3      faith and fair dealing.  That's an argument of fraud or an

4      argument of conspiracy to commit a fraud or something of that

5      nature, or it's a breach of contract in terms of the contract

6      itself.

7              Am I wrong, Mr. Synnott?

8              MR. SYNNOTT:  No.  I don't think you're wrong,

9      your Honor.  I think that's one of many reasons why this claim

10     should be dismissed.

11             THE COURT:  You could plead a breach of contract, but

12     you can't plead an implied covenant of good faith and fair

13     dealing.  So the motion is granted with leave to amend if you

14     want to allege a contract.

15             I'd advise you that the only way you're going to get

16     specific jurisdiction is through a breach of contract, and the

17     allegations of a breach of contract require you to set out the

18     terms and conditions of the contract that you claim were

19     breached.

20             There's a master contract pursuant to which there are

21     many other contracts.  You may be able to find it in the

22     mechanisms of pricing.

23             MR. PHILLIP:  Thank you for your ruling, your Honor.

24     Is that without prejudice?

25             THE COURT:  Leave to amend.

H4RYFROC2

 1              MR. PHILLIP:  Thank you.

 2              THE COURT:  As to unjust enrichment, in violation of

 3     the common law, this is a tort that is derivative of other

 4     torts.  It's a remedy.  It's not a cause of action in itself.

 5     There has to be some independent tort for an enrichment.

 6              What's alleged here is a benefit by the defendants

 7     because they committed conspiracies to violate the antitrust

 8     laws or to violate RICO or to commit a fraud or a breach of

 9     contract.

10              This is derivative of other remedies.  In itself, it

11     is not a cause of action.  The motion is granted to that

12     extent.  You can embellish any other cause of action you want

13     by claims for unjust enrichment.

14              MR. SYNNOTT:  Thank you, your Honor.

15              THE COURT:  Great argument, Mr. Synnott.

16              MR. SYNNOTT:  Thank you, your Honor.  I know when to

17     stop.

18              THE COURT:  Anyone else?

19              All right.  I've done all of my day's work.

20              MR. LEVIS:  Yes, your Honor.

21              THE COURT:  So I will be delivering a summary order of

22     what I did plus an opinion on what I reserved, which I hope

23     won't take too long.  I'll give you a month from the date of

24     that to amend, if that's okay.

25              MR. PHILLIP:  That's fine with the plaintiffs,

H4RYFROC2

 1   your Honor.   Thank you.

 2             THE COURT:   Okay.   Then the defense will either make

 3   another motion or answer.   Thank you all very much.

 4             (Adjourned)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25