**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, et al., <br><br> *Defendants*. | No. 17-cv-3139-LGS <br><br> (related to No. 13-cv-7789-LGS) |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**
**PURSUANT TO FED. R. CIV. P. 12(b)(2) BY MOVING DEFENDANTS:**

- **The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU")**

- **Barclays Bank PLC ("Barclays")**

- **HSBC Holdings plc and HSBC Bank plc (together, "HSBC")**

- **The Royal Bank of Scotland Group plc ("RBS")**

- **Société Générale S.A. ("SocGen")**

- **Standard Chartered Bank ("Standard Chartered")**

- **UBS AG ("UBS")**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 3

    A.  CCAC Allegations......................................................................................... 3

    B.  The Moving Defendants' FX Activity in the United States ............................. 5

    C.  The Moving Defendants' Admissions of New York and United States Contacts .......... 7

    D.  Plea Agreements............................................................................................ 8

LEGAL STANDARD........................................................................................................ 9

ARGUMENT .................................................................................................................. 11

  I.    Personal Jurisdiction Is Proper On the Basis of Specific Jurisdiction ............................. 11

  II.   Personal Jurisdiction Is Proper On the Basis of Conspiracy Jurisdiction........................ 17

  III.  Personal Jurisdiction is Proper On the Basis of Pendent Jurisdiction ............................. 18

  IV.  Defendants Have Consented to Personal Jurisdiction ....................................... 19

  V.   Exercising Personal Jurisdiction over the Moving Defendants is Consistent with Due Process ....................................................................................................... 21

  VI.  In the Alternative, Plaintiffs Should be Granted Jurisdictional Discovery or Leave to Amend.................................................................................................. 23

CONCLUSION............................................................................................................... 24

# TABLE OF AUTHORITIES

**Federal Cases**

*A.I. Trade Fin., Inc. v. Petra Bank*
989 F.2d 76 (2d Cir. 1993) ................................................................. 10

*Achtman v. Kirby, McInerney & Squire, LLP*
464 F.3d 328 (2d Cir. 2006) ............................................................. 18

*Ainbinder v. Potter*
282 F. Supp. 2d 180 (S.D.N.Y. 2003) ............................................. 20

*Albrecht v. United States*
329 U.S. 599 (1947)............................................................................ 20

*APWU v. Potter*
343 F.3d 619 (2d Cir. 2010) ............................................................. 23

*Asahi Metal Indus. Co., Ltd. v. Superior Court*
480 U.S. 102 (1987)............................................................................ 22

*Atlantica Holdings, Inc. v. BTA Bank JSC*
No. 13-cv-5790, 2015 WL 144165 (S.D.N.Y. Jan. 12, 2015) .................. 15

*Ball v. Metallurgie Hoboken-Overpelt, S.A.,*
902 F.2d 194 (2d Cir. 1990) ............................................................. 10

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*
305 F.3d 120 (2d Cir. 2002) ............................................................. 11

*Beach v. Citigroup Alternative Invs. LLC*
No. 12-cv-717, 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014).................... 17

*Best Van Lines, Inc. v. Walker*
490 F.3d 239 (2d Cir. 2007) ............................................................. 11

*BPP Ill., LLC v. The Royal Bank of Scot. Grp., PLC*
2015 WL 6143702 (S.D.N.Y. October 19, 2015)................................ 15

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*
137 S. Ct. 1773 (2017)....................................................................... 15

*Burger King Corp. v. Rudzewicz*
471 U.S. 462 (1985)...................................................................... 21, 23

*Calder v. Jones*
465 U.S. 783 (1984)...................................................................... 12, 17

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*
722 F.3d 81 (2d Cir. 2013) ............................................................ 3, 9, 16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*
564 U.S. 915 (2011)............................................................................. 11

*Hanly v. Powell Goldstein, L.L.P.*
290 F. App'x 435 (2d Cir. 2008)........................................................ 19

*Hargrave v. Oki Nursery, Inc.*
646 F.2d 716 (2d Cir. 1980) ............................................................... 19

*In re Auto. Refinishing Paint Antitrust Litig.*
358 F.3d 288 (3d Cir. 2004) ............................................................... 12

*In re Foreign Exchange Benchmark Rates Antitrust Litig.,*
74 F. Supp. 3d 581 (S.D.N.Y. 2015) ........................................... passim

*In re Foreign Exchange Benchmark Rates Antitrust Litig.,*
No. 13-cv-7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016)........................ passim

*In re Foreign Exchange Benchmark Rates Antitrust Litig.,*
No. 13-cv-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) .............................. 17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*
No. 11-md-2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ................................ 12, 18, 19

*In re N. Sea Brent Crude Oil Futures Litig.*
No. 13-md-02475, 2017 WL 2535731 (S.D.N.Y. June 8, 2017)............................. 12

*In re Propranolol Antitrust Litig.*
No. 16-cv-09901, 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017) .............................. 13

*In re Vitamin C Antitrust Litig.*
No. 06-md-1738, 2012 WL 12355046 (E.D.N.Y. Aug. 7, 2012)............................. 15

*Int'l Shoe Co. v. Washington*
326 U.S. 310 (1945)............................................................................. 21

*IUE AFL-CIO Pension Fund v. Herrmann*
9 F.3d 1049 (2d Cir. 1993) .................................................................. 18

*JGB Enters., Inc. v. Beta Fluid Sys., Inc.*
No. 14-cv-1439, 2015 WL 5709088 (N.D.N.Y. Sept. 29, 2005)............................ 23

*Keeton v. Hustler Magazine, Inc.*
465 U.S 770 (1984)............................................................................. 11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*
   673 F.3d 50 (2d Cir. 2012) ........................................................................... 10, 11, 12

*Marine Midland Bank, N.A. v. Miller*
   664 F.2d 899 (2d Cir. 1981) ........................................................................... 10

*Meetings & Expositions, Inc. v. Tandy Corp.,*
   490 F.2d 714 (2d Cir. 1974) ........................................................................... 20

*Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*
   72 F. App'x 916 (4th Cir. 2003) ..................................................................... 21

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*
   84 F.3d 560 (2d Cir. 1996) ............................................................................. 22

*Morrissey v. Brewer*
   408 U.S. 471 (1972).......................................................................................... 16

*Sea Trade Mar. Corp. v. Coutsodontis*
   No. 09-cv-488, 2012 WL 3594288 (S.D.N.Y. Aug. 16, 2012) ................. 17

*SEC v. Comm. on Ways & Means of the United States House of Representatives*
   161 F. Supp. 3d 199 (S.D.N.Y. 2015) ........................................................ 22

*SEC v. Straub*
   921 F. Supp. 2d 244 (S.D.N.Y. 2013) ........................................................ 12

*Simon v. Philip Morris, Inc.*
   86 F. Supp. 2d 95 (E.D.N.Y. 2000) ............................................................ 15

*Sonera Holding B.V. v. Cukurova Holding A.S.*
   750 F.3d 221 (2d Cir. 2014) ......................................................................... 11

*Sullivan v. Barclays PLC*
   No. 13-cv-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ................. 12

*Theodore Broomfield v. Craft Brew Alliance, Inc*
   No. 17-cv-01027, 2017 WL 3838453 (N.D. Cal. Sept. 1, 2017)............. 15

*Travelers Indem. Co. v. Calvert Fire Ins. Co.*
   798 F.2d 826 (5th Cir. 1986) ........................................................................ 21

*United States v. Manuel*
   371 F. Supp. 2d 404 (S.D.N.Y. 2005) ........................................................ 17

*United States v. Verdugo-Urquidez*
   494 U.S. 259 (1990).......................................................................................... 17

*Walden v. Fiore*
    134 S. Ct. 1115 (2014) ................................................................................. 11, 17

*Waldman v. Palestine Liberation Org.*
    835 F.3d 317 (2d Cir. 2016) ............................................................................ 15

*Wilkinson v. Austin*
    545 U.S. 209 (2005) .......................................................................................... 16

*Winston & Strawn v. Dong Won Secs. Co. Ltd.*
    No. 02-cv-0183, 2015 WL 31444625 (S.D.N.Y. Nov. 1, 2002) ............................ 23

**State Statutes**

N.Y. C.P.L.R. § 302(a) .......................................................................................... 10, 19

## PRELIMINARY STATEMENT

If the current Rule 12(b)(2) motion sounds familiar to the Court, it should. Two of the Defendants joining this motion—Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") and Société Générale S.A.("SocGen")—sought to be dismissed from *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 1:13-cv-7789-LGS (S.D.N.Y.) ("*FOREX*") on the same grounds and were denied, while other Moving Defendants—Barclays Bank PLC ("Barclays"), HSBC Holdings plc and HSBC Bank plc (together, "HSBC"), The Royal Bank of Scotland Group plc ("RBS"), Standard Chartered Bank ("Standard Chartered"), and UBS AG ("UBS")—declined to contest personal jurisdiction in *FOREX*.[1] In their prior attempt to evade personal jurisdiction before this Court, BTMU andSocGen raised largely the same arguments that the Moving Defendants raise here. The Court rejected those challenges, and only granted 12(b)(2) dismissal to a third defendant (not named in this action) where that defendant stated that it "has no employees" and "does not participate in the trading of FX instruments." *FOREX*, No. 13-cv-7789, 2016 WL 1268267, at *7 (S.D.N.Y. Mar. 31, 2016) ("*FOREX II*").[2] Defendants fail to explain why the Court should endorse the same arguments that it rejected in *FOREX II*. Nor do they explain why Barclays, HSBC, RBS, Standard Chartered, and UBS apparently recognized that this Court had personal jurisdiction over them in *FOREX*, but contest personal jurisdiction here, in the same District, with the same Defendants, involving the same anticompetitive conspiracy and the same Direct Purchaser Class members.

---

[1] The Defendants joining the 12(b)(2) Motion are referred to herein as "Moving Defendants."

[2] It appears that the plaintiffs in *FOREX* simply named the wrong Standard Chartered entity in their initial complaint. *FOREX II*, 2016 WL 1268267, at *7. The Court dismissed Standard Chartered plc (not named in this action) but granted leave for the plaintiffs to substitute Standard Chartered Bank (named here) as a defendant. The plaintiffs substituted, and Standard Chartered Bank did not contest personal jurisdiction.

1

In addition to the direct purchaser antitrust class action that has already generated over $2.1 billion in preliminarily approved settlements, Defendants' conspiracy has been the subject of antitrust investigations by multiple U.S. governmental authorities. Several government authorities have imposed fines and other sanctions on one or more Defendants, resulting in billions of dollars in fines for their involvement in the FX market manipulation conspiracy. CCAC ¶¶ 4, 151-175; *see In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 588-89 (S.D.NY. 2015) ("*FOREX I*") (taking judicial notice of settlements and penalties resulting from same FX conspiracy at issue in this case).

Despite the Court's clear holding in *FOREX II*, the Moving Defendants try to circumvent that ruling by arguing that Plaintiffs have failed to plead adequate specifics about the FX transactions at issue. Defendants' arguments fail; this Court has personal jurisdiction over Moving Defendants on multiple grounds. First, the Court has specific jurisdiction over the Moving Defendants for the same reasons it announced in *FOREX* and the Court should reach the same conclusion here: that the Moving Defendants participated in the FX conspiracy with the aim to cause harm in the United States. Second, Plaintiffs have established personal jurisdiction exists over Moving Defendants under the well-established theory of conspiracy jurisdiction. Third, jurisdiction is proper as to Plaintiffs' state-law claims under the rule of pendent personal jurisdiction. Fourth, Defendants have expressly consented to personal jurisdiction. Finally, the exercise of personal jurisdiction over the Moving Defendants is reasonable and consistent with due process.

## BACKGROUND

The Consolidated Class Action Complaint ("CCAC") and Dell'Angelo Declaration

("Dell'Angelo Dec.") submitted by Plaintiffs contain the following allegations, which must be

assumed as true for purposes of this motion. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722

F.3d 81, 85 (2d Cir. 2013).

### A.    CCAC Allegations

The CCAC contains the following allegations, *inter alia,* regarding the Moving

Defendants' collusive acts and FX activity in New York and the United States.

- "Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically and in the United States generally. . . . Each Defendant has continuously and systematically transacted FX in this District and throughout the United States. . . . Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and throughout the United States. Defendants' conduct was within the flow of, and had substantial effect on, the interstate commerce of the United States, including this District." CCAC ¶ 8.

- "Defendants all conduct significant business in New York, including business relating to FX trading. . . . Defendants Bank of America Corporation; The Bank of Tokyo Mitsubishi UFJ Ltd.; Société Générale S.A.; Standard Chartered Bank; UBS Securities LLC, Barclays Bank PLC; Credit Suisse AG; Deutsche Bank AG; and [The] Royal Bank of Scotland Group PLC all have major New York offices and conduct a substantial portion of their FX trading in New York." CCAC ¶ 228(c).

- At year-end 2013, BTMU reported for its New York branch gross notional outstanding spot FX contracts of $2.4 billion and FX derivatives of $69.8 billion, for a total of $72.2 billion. CCAC ¶ 22.

- At year-end 2013, SocGen reported for its New York branch gross notional outstanding spot FX contracts of approximately $13 million and FX derivatives of $21.6 billion. CCAC ¶ 34.

- At year-end 2013, Standard Chartered reported for its New York branch gross notional outstanding spot FX contracts of $1.9 billion and FX derivatives of $141.4 billion. CCAC ¶ 35; *see also* Dell'Angelo Dec. Ex. 5 (Standard Chartered's December 31, 2013 Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks).

- The Commodity Futures Trading Commission brought and settled charges against Barclays, Citigroup, HSBC, JPMorgan, RBS, and UBS for violations of the Commodity

3

Exchange Act relating to their involvement in the FX manipulation conspiracy. CCAC ¶ 152.[3]

- Defendants Citigroup, JPMorgan, Barclays, and RBS pled guilty to felony charges of conspiring to manipulate the prices of U.S. dollars and euros traded in the FX spot market, in violation of the Sherman Antitrust Act. CCAC ¶ 154.[4]

- Defendant UBS pled guilty for illegal FX-related conduct in violation of an earlier Non-Prosecution Agreement related to a conspiracy to manipulate benchmark interest rates. CCAC ¶ 155.

- The New York State Department of Financial Services ("NYDFS") entered into a consent order with "Barclays Bank plc" and "Barclays Bank plc, New York Branch" requiring Barclays  would be required to pay $485 million and ordered the termination of eight Barclays employees who engaged in New York Banking Law violations in connection with manipulating FX rates. Barclays admitted in the consent order with NYDFS that it had engaged in misconduct regarding the trading of FX "from at least 2008 through 2012." CCAC ¶ 157.

- Several months later, the NYDFS ordered "Barclays Bank plc" and "Barclays Bank plc, New York Branch" to pay an additional $150 million in fines and terminate another employee for further FX trading violations. *Id*.

- HSBC Bank plc's global head of FX cash trading, Mark Johnson, was arrested by U.S. authorities at JFK airport on charges of conspiracy and wire fraud. A warrant was also issued for the arrest of Stuart Scott, who was formerly Johnson's deputy and head of HSBC Bank plc's FX cash trading operations for Europe, the Middle East, and Africa. CCAC ¶ 158.[5]

- Former Barclays trader Jason Katz pled guilty to criminal charges in Manhattan federal court, admitting to participation in a conspiracy with other bankers to manipulate currency prices on electronic trading platforms while working at three different financial institutions from 2007 to 2013. That same day, the Federal Reserve Board announced that had permanently banned Katz from the banking industry. The Federal Reserve Board has also issued lifetime bans to Matthew Gardiner, a former FX trader at Barclays and UBS, and Christopher Ashton, the former head of spot trading at Barclays. Ashton was also fined $1.2 million by the Board. CCAC ¶ 161-62.

---

[3] The entities sanctioned by the CFTC included Moving Defendant HSBC Bank plc, The Royal Bank of Scotland plc, and UBS AG. *See* Dell'Angelo Dec. Exs. 11-13.

[4] The entities that pled guilty "to conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market" include Moving Defendants Barclays PLC, The Royal Bank of Scotland plc, UBS AG. *See* UBS Plea Agreement (Dell'Angelo Dec. Ex. 8); Barclays Plea Agreement (Dell'Angelo Dec. Ex. 9); RBS Plea Agreement (Dell'Angelo Dec. Ex. 10).

[5] These individuals' activities and conduct in the FX conspiracy are further detailed in a Complaint and Affidavit in Support of Application for Arrest Warrants. *See* Dell'Angelo Dec. Ex. 8. Johnson's trial began on September 25, 2017 in Brooklyn. *U.S. v. Johnson et al.*, No. 16-cr-457 (E.D.N.Y.), ECF No. 130.

- Former JPMorgan, Citigroup, and Barclays traders Richard Usher, Rohan Ramchandani, and Chris Ashton were indicted on charges for their alleged roles in a conspiracy to manipulate the price of U.S. dollars and euros. These three former traders were members of the chat group that dubbed themselves the "Cartel." A fourth member of the "Cartel," Matt Gardiner, a former trader at UBS, Barclays, and Standard Chartered, has been cooperating with the DOJ in their ongoing criminal investigation. Usher also worked for RBS during the Class Period. CCAC ¶ 163.

### B.    The Moving Defendants' FX Activity in the United States

Public filings show that Moving Defendants BTMU, SocGen, Standard Chartered, and UBS had, within the United States, billions of dollars worth of FX instruments outstanding each day. *See* Dell'Angelo Dec. Exs. 3-6 (FX Reports). Moreover, Moving Defendants BTMU, SocGen, and Standard Chartered were "reporting dealers" with the Federal Reserve Bank of New York ("FRBNY").[6] *Id.* at Ex. 1. Reporting dealers report the volume of FX they transact in North America, and the FRBNY then publishes this information in a survey that "covers all transactions that are priced or facilitated by traders in North America. . . ."[7] Further, all Moving Defendants or one of their affiliates, except SocGen, have had employees who sat on the FRBNY's FX Committee. *Id.* at Ex. 2. Additional details regarding Moving Defendants' New York and U.S. contacts have been revealed through public filings and news publications:

- As conditions of their settlements with the CFTC, Moving Defendants HSBC Bank plc, The Royal Bank of Scotland plc, and UBS AG are all required to, *inter alia*: (1) pay substantial monetary penalties to the CFTC; (2) "cooperate fully and expeditiously" with the CFTC in their ongoing investigation of other Defendants; (3) undergo a three-year period during which Defendants must preserve all records relevant to their involvement in the conspiracy and comply with all CFTC requests for information; and (4) "designate an agent located in the United States of America to receive all requests for information." *See*; Dell'Angelo Dec. Ex. 11, at 18-19 (HSBC CFTC Settlement); *id.* Ex. 12, at 14-15 (RBS CFTC Settlement); *id.* Ex. 13, at 14-15 (UBS CFTC Settlement). All three Defendants admitted to the CFTC that they conspired with other FX dealers to

---

[6] The other Moving Defendants—Barclays, HSBC, RBS, and UBS—have affiliates that are "reporting dealers." *See* Dell'Angelo Dec. Ex. 1.

[7] *See* FXC Explanatory Notes, available at https://www.newyorkfed.org/fxc/volumesurvey/explanatory_notes.html (last visited Sept. 26, 2017).

manipulate currency pairs involving the U.S. Dollar. *See id.* Ex. 11 at 2; *id.* Ex. 12 at 2; *id.* Ex. 13 at 2.

- At year-end 2013, UBS AG reported for its New York branch gross notional outstanding spot FX contracts of approximately $1 million and FX derivatives of $3.7 billion. *See id.* Ex. 6 (UBS's December 31, 2013 Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks).

- On August 21, 2017, Bloomberg reported that the "foreign exchange front-running conspiracy at HSBC Holdings Plc may have involved at least 11 bank employees beyond the two executives who have been charged with crimes."[8]

The May 20, 2015 Barclays Bank plc settlement with the NYDFS, *see* CCAC ¶ 157, provided:

- "A number of Barclays employees [] were involved in the wrongful conduct discussed in this Order, including . . . a director on the FX Spot trading desk in New York, a director on the Emerging Markets desk in New York, a managing director in FX Hedge Fund Sales in New York, [and] a director in FX Real Money Sales in New York . . ." *See* Dell'Angelo Dec. Ex. 14 at 19;

- As of May 20, 2015, the Barclays Bank plc New York branch had "more than 500 employees and total assets exceeding $36 billion." *Id.* at 1.

- The Barclays Bank plc New York Branch Vice President wrote in a November 5, 2010 chat: "markup is making sure you make the right decision on price . . . which is whats the worst price i can put on this where the customers decision to trade with me or give me future business doesn't change . . . if you aint cheating, you aint trying." *Id.* at 14.

- "As a result of the investigation, four Barclays employees have been terminated in the last month[, including] a director on the FX Spot trading desk in New York"; and that "The Department orders the Bank to take all steps necessary to terminate the following four employees, who played a role in the misconduct discussed in this Consent Order but who remain employed by the Bank: a vice president on the Emerging Markets trading desk in New York, two directors on the FX Spot trading desk in New York and a director on the FX Sales desk in New York (who previously was Co-Head of UK FX Hedge Fund Sales in London)." *Id.* at 19-20.

---

[8] *See* https://www.bloomberg.com/news/articles/2017-08-21/hsbc-currency-conspiracy-may-have-involved-11-others-u-s-says (last visited Sept. 26, 2017).

C.     **The Moving Defendants' Admissions of New York and United States Contacts**

The Moving Defendants' own Declarations and Answers filed in *FOREX* also point to substantial New York and United States contacts:[9]

- Barclays is registered as a financial holding company with the Federal Reserve Bank of New York; has branches in New York, New York and Miami, Florida; has representative offices in Newark, Delaware, Wilmington, Delaware, and New York, New York; derived $1.45 billion in revenue in 2016 from its U.S. branches; and has hundreds of employees located in the United States. Hyon Dec. at 2-4.

- HSBC derives external net operating income from its United States activities. Francis Dec. at 2.

- RBS derives revenue from its United States operating subsidiaries. Gougherty Dec. at 2.

- UBS maintains branches in California (2), Connecticut (1), Florida (2), Illinois (1), and New York (4); derived $11.1 billion in operating income in 2016 from its United States operations; and has thousands of employees in New York alone. Connors Dec. at 2.

- BTMU has a branch in New York, as well as branches and representative offices in other states; derives revenue from its United States operations; and has over 1,600 employees in the U.S. Sabella Dec. at 1-3. BTMU's New York branch had $101 billion in total assets as of March 31, 2013. *See* BTMU Answer, *FOREX* ECF No. 686, at ¶ 48. One of BTMU's traders participated in the chatroom Essex Express on occasion. *Id.* at ¶ 150.

- SocGen has a branch in New York, New York and in Chicago, Illinois, as well as agency or representative offices in Dallas, Texas, Houston, Texas, Atlanta, Georgia, Irvine, California, and Santa Monica, California; derives billions in dollars in revenue from its United States operations; and has hundreds of employees in the United States. Bourrinet Dec. at 2-3. SocGen's employees at times participated in chat rooms in which certain currencies may have been discussed. *See* SocGen Answer, *FOREX* ECF No. 683, at ¶ 132.

- Standard Chartered has a branch in New York, New York, as well as locations in New Jersey, Texas, California, Florida, and Washington, D.C.; has employees in the United States; and derives income from its U.S. operations. McAll Dec. at 2. Standard Chartered admitted that one of its employees communicated in one of the chat sessions and that other employees communicated electronically regarding certain currencies. *See* Standard Chartered Answer, *FOREX* ECF No. 688, at ¶ 132.

---

[9] Although Rule III(B)(3) of this Court's Individual Rules and Procedures for Civil Cases limits parties to five declarations per motion and limits exhibits to fifteen pages, Defendants have submitted ten Declarations and a 76-page exhibit. *See* Stock Dec. (attaching nine additional Declarations); *id.* at Ex. 10. However, for the reasons described herein, Defendants' motion fails even if the Court were to consider those improperly submitted materials.

**D.      Plea Agreements**

Several of the Moving Defendants, as well as other Defendants, have acknowledged their

roles in the FX conspiracy in plea agreements with the United States Department of Justice

("DOJ"). CCAC ¶¶ 154-55 (Citigroup, JPMorgan, Barclays, UBS, and RBS pled guilty to

"felony charges of conspiring to manipulate the prices of U.S. dollars and euros traded in the FX

spot market"). This Court took judicial notice of those plea agreements in *FOREX I. See* 74 F.

Supp. 3d at 588 n.4. In its plea agreement, UBS admits, *inter alia*:[10]

- UBS AG maintained an FX trading desk in Stamford, Connecticut during the Class
  Period and served as "an FX dealer/market maker" through their Connecticut trading
  desk, among other locations. Dell'Angelo Dec. Ex. 8, at 3.

- "Prior to, and continuing after the NPA, UBS, through one of its FX traders, conspired
  with other financial services firms acting as dealers in an FX spot market by agreeing to
  restrain competition in the purchase and sale of the EUR/USD currency pair in the United
  States and elsewhere. . . . UBS participated in this collusive conduct from in or about
  October 2011 and continued until at least January 2013." *Id.* at 8; CCAC ¶ 155.

- That it engaged in deceptive conduct related to FX, and engaged in collusive conduct
  related to the FX spot market, including conduct emanating from its Stamford location.
  Dell'Angelo Dec. Ex. 8, at 3-8.

- "UBS's instant conduct in connection with FX markets constitutes its fourth matter
  involving the [DOJ] over the course of approximately six years." *Id.* at 2.

- "[C]ertain UBS FX salespeople and traders entered into prior arrangements to add
  undisclosed markup to the [FX] price quoted by traders over the open line. These
  practices occurred on UBS's FX sales and trading desks in Zurich, London (sales only),
  and Stamford[, Connecticut.]"). *Id.* at 6.

- "On July 17, 2013, a UBS FX salesperson based in Stamford [emailed] colleagues on
  UBS's London and Singapore FX desks" requesting that the London and Singapore
  traders alter prices on a particular limit order. *Id.* at 7.

In a prior plea agreement with the DOJ in which UBS admitted to manipulating benchmark

interest rates UBS similarly acknowledged that "UBS AG has banking divisions and subsidiaries

---

[10] UBS agreed in the plea that it would not"through present or future attorneys, officers, directors, employees, agents
or any other person authorized to speak for UBS make any public statement, including in litigation . . ."
contradicting facts set forth in the plea agreement. Dell'Angelo Dec. Ex. 8.

around the world, including in theUnited States, with its United States headquarters located inNew York, New York and Stamford, Connecticut." Dell'Angelo Dec. Ex. 8, at 6. Barclays and RBS similarly admit in their plea agreements that they engaged in the conspiracy alleged with other co-conspirators, and that acts in furtherance of the conspiracy were carried out within the District of Connecticut and elsewhere. *Id.* Ex. 9, at 4-6; *id.* Ex. 10, at 3-7. Barclays admitted involvement in the conspiracy from as early as December 2007 until July 2011, and then from December 2011 until August 2012; RBS was involved from as early as December 2007 until at least April 2010. *Id.* Ex. 9, at 5-6; *id.* Ex. 10, at 3. The plea agreements also required Defendants Citicorp, Barclays, JPMorgan, RBS, and UBS to serve three-year terms of probation, during which those Defendants are cooperating with the federal government's ongoing criminal investigations. *Id.* Exs. 8-10.

Following those guilty pleas, Barclays cooperated extensively with the federal government, including by explaining how the FX spot market operates, providing large amounts of FX data and by defining and decoding certain jargon the traders used when describing their FX activity. Dell'Angelo Dec. Ex. 15 (*United States v. Barclays PLC*, No. 15-cr-00077 (D. Conn.) (Sentencing Memorandum filed by U.S. on Dec. 1, 2016, ECF No. 44, at 13-14)). Barclays also brought to the attention of the federal government additional evidence concerning the manipulation of other currency pairs. *Id.* at 14; *see* CCAC¶ 159 (Barclays, JPMorgan, and Citigroup provided the DOJ with evidence of antitrust conspiracy in the FX spot market that involves currency pairs other than EUR/USD).

## LEGAL STANDARD

On a "Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Dorchester Fin. Sec., Inc.*, 722 F.3d

at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).

Plaintiffs' factual allegations are assumed to be true for purposes of the motion, and "pleadings

and affidavits [are construed] in the light most favorable to plaintiffs, resolving all doubts in their

favor." *Id.* (internal quotation marks and citation omitted). "Eventually, of course, the plaintiff

must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary

hearing or at trial. But until such a hearing is held, a prima facie showing suffices,

notwithstanding any controverting presentation by the moving party, to defeat the motion."

*Marine Midland Bank*, *N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see also A.I. Trade Fin.,*

*Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

A prima facie showing of personal jurisdiction requires: (1) procedurally proper service

of process, (2) "a statutory basis for personal jurisdiction that renders such service of process

effective" and (3) that "the exercise of personal jurisdiction [] comport[s] with constitutional due

process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d

Cir. 2012). The Moving Defendants have waived service, ECF No. 11, and do not contest both

New York and federal antitrust laws provide statutory bases for personal jurisdiction.[11] Here, the

---

[11] *See, e.g.*, 15 U.S.C.§ 15 ("[A]ny person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent . . ."); Fed R. Civ. P. 4(k)(2) ("For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and(B) exercising jurisdiction is consistent with the United States Constitution and laws."); N.Y. C.P.L.R. § 302(a) ("As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . transacts any business within the state . . .; or commits a tortious act within the state . . .; or commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state."). Section 302 "is a single-act statute requiring but one transaction—albeit a purposeful transaction—to confer jurisdiction in New York[,]" provided there is a "substantial nexus" between the act and the cause of action. *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 166 (2d Cir. 2005) (quotation and citation omitted). "For jurisdictional

key issue concerns whether the exercise of personal jurisdiction comports with due process.[12]

For the reasons discussed below, Plaintiffs have that established personal jurisdiction exists.

## ARGUMENT

### I.    Personal Jurisdiction Is Proper On the Basis of Specific Jurisdiction

"Specific or conduct-linked jurisdiction . . . 'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation.'" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)); *see Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.") (quotation and citation omitted). Minimum contacts to support specific jurisdiction "exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being hauled into court there." *Licci ex rel. Licci*, 732 F.3d at 170 (quoting *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)).

Specific jurisdiction exists "when the cause of action arises out of the very activity being conducted, in part," inside the forum. *Keeton v. Hustler Magazine, Inc.*, 465 U.S 770, 780 (1984). Under the "effects test," it may also exist even if none of the relevant conduct took place inside the forum. *See Licci*, 732 F.3d at 173; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of

---

purposes, anti-trust violations are considered tortious acts." *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01-cv-1574, 2002 WL 719471, at *3 (E.D.N.Y. Mar. 1, 2002).

[12] The moving Defendants appear to agree. D. 12(b)(2) Br. at 9 (the "critical question here is 'whether . . . the exercise of personal jurisdiction would violate constitutional due process.'") (quoting *FOREX II*, 2016 WL 1268267, at *1)).

demonstrating minimum contacts"). "The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. Under this theory, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

The Moving Defendants' contacts throughout the United States are relevant for personal jurisdiction purposes. *FOREX II*, 2016 WL 1268267, at *5 nn.2-3; *see In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004) ("[P]ersonal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* No. 11-md-2262, 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) (noting that courts in this Circuit commonly hold that when a case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole); *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) (holding that "the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state").[13]

---

[13] Moving Defendants assert that nationwide service of process is not available here, Def. 12(b)(2) Br. at 9 n.10, a position that directly contradicts this Court's ruling in *FOREX II*. 2016 WL 1268267, at *5 n. 3 ("the New Defendants' contacts throughout the United States are considered for personal jurisdiction purposes"); *Id.* at *5 n.2 ("The New Defendants do not dispute that their contacts throughout the United States are considered for personal jurisdiction purposes.") (collecting cases). As this Court recognized in that case, Plaintiffs' injunctive relief claim under the Sherman Act provides for nationwide service of process. *See In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-02475, 2017 WL 2535731, at *4 (S.D.N.Y. June 8, 2017) ("Plaintiffs allege claims under the Commodities Exchange Act and the Sherman Act, both of which provide for nationwide service of process. Accordingly, personal jurisdiction extends to the 'limit permitted by the Due Process Clause of the Fifth Amendment.'" (citation omitted)); *Sullivan v. Barclays PLC*, No. 13-cv-2811, 2017 WL 685570, at *42 (S.D.N.Y. Feb. 21, 2017) ("As to plaintiffs' claim under the Sherman Act, Section 12 of the Clayton Act provides for national service of process as to defendant corporations."). Moving Defendants also argue that this nationwide service of process/national contacts approach to personal jurisdiction is constitutionally questionable. D. Br. at 9 n.10. Such an

Specific jurisdiction exists here for the same reasons the Court expressed in *FOREX II*. There, this Court found that the core allegation was that "Defendants conspired to fix [FX] benchmark rates for their own profit." *FOREX II*, 2016 WL 1268267, at *5 (citing *FOREX I*, 74 F. Supp. 3d at 587). The Court held that *FOREX* plaintiffs had tied Defendants' unlawful conduct to the United States through allegations in their complaint regarding the collusive conduct taking place in or directed at New York and the United States in general and through additional information regarding Defendants' extensive FX activity in the United States:

> Here, Plaintiffs plead collusive conduct within the United States, give examples of each New Defendants' participation in the alleged conspiracy (albeit in chatrooms whose participants' locations are presently unknown), and provide undisputed averments concerning the New Defendants' extensive U.S.-based FX operations. Taken as a whole, the [complaint] plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the New Defendants' substantial FX businesses here.

*Id*. at *6. The same is true here.

The Moving Defendants acted in furtherance of the conspiracy in New York, communicated with co-conspirator Defendants who were in New York, and sold FX instruments at fixed prices in New York. Moreover, the New York Plaintiff and proposed New York Class members purchased FX Instruments indirectly from Defendants at supracompetitive prices while residing in New York and thereby incurred the alleged overcharges in New York. CCAC ¶ 228. The CCAC contains extensive allegations about the Defendants' conspiracy to manipulate the FX market, including detailed descriptions of chatroom discussions to further the conspiracy. CCAC ¶¶ 104-46. And Plaintiffs have submitted supplemental information showing that many

---

argument is unavailing. *See In re Propranolol Antitrust Litig.*, No. 16-cv-09901, 2017 WL 1287515, at *6-7 (S.D.N.Y. Apr. 6, 2017) (finding such an argument "unpersua[sive]" and holding that the Fifth Amendment does not prohibit this approach to personal jurisdiction).

Moving Defendants engage in extensive FX activity in the United States. *See* Dell'Angelo Dec.[14]
Moreover, the Moving Defendants' own submissions and previous admissions show their
presence in New York and the United States. *See supra* pp. 7-9.

    The Moving Defendants' attempts to distinguish this case from *FOREX* are irrelevant for
purposes of personal jurisdiction. The Moving Defendants argue that the CCAC "does not
identify any of the purported intermediaries from which Plaintiffs allegedly purchased FX
instruments; nor does it identify which FX Instruments the intermediaries purportedly transacted
in; nor even where or when the intermediaries purportedly undertook such transactions." D. Br.
at 2. Such information has no bearing on the personal jurisdiction analysis as it bears no relation
to the overwhelming evidence of the Moving Defendants' acts in furtherance of the FX
conspiracy in the United States.[15] Indeed, this is the type of information this Court found
amounts to "a demand for specifics that are not required . . ." in rejecting the argument that
*FOREX* plaintiffs had not identified a single trade at issue. *FOREX II* at 2016 WL 1268267, at *6
(quoting *FOREX I*, 74 F. Supp. 3d at 595). "What is sufficient is a 'plausible inference' based on
factual allegations that a defendant acted illegally in the United States or 'intended his [actions]
to cause injury in the United States.'" *Id.* (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714
F.3d 659, 679 (2d Cir. 2013)). Further, all "intermediaries" that Plaintiffs purchased FX
Instruments from are members of the Direct Settlement Class in *FOREX*, CCAC ¶¶ 40-47, and in
*FOREX II*, this Court found plausible allegations that Defendants "each had, within the United
States, tens of billions of dollars' worth of FX Instruments outstanding each day, including,
undoubtedly, transactions with members of the proposed [Direct Purchaser] Classes during the

---

[14] Indeed, the Court found BTMU's and SocGen's U.S. operations sufficient to exercise personal jurisdiction in
*FOREX II*, and Moving Defendants Barclays, UBS and Standard Chartered have as many or more US and NY
contacts than those Defendants. *See supra* p. 1.

[15] *See, e.g.*, CCAC ¶¶ 92, 93, 101, 104-46, 154-55, 158, 162-63, 187, 197, 212.

Class Period." 2016 WL 1268267, at *6. And in addition to Defendants' U.S. sales to Direct

Settlement Class members, the CCAC alleges that all Plaintiffs purchased FX Instruments from

those Direct Settlement Class members in the United States. CCAC ¶¶ 10-20.

Plaintiffs' allegations are unlike those in *Waldman v. Palestine Liberation Org.*, 835 F.3d

317 (2d Cir. 2016), on which Moving Defendants rely. In *Waldman*, terrorist attacks in Israel

killed or injured U.S. citizens traveling abroad. The trial evidence failed to show that "defendants

participate[d] in these acts in the United States or that their liability for these acts resulted from

their actions that did occur in the United States." *Waldman*, 835 F.3d at 337.[16]

Defendants advert to *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S.

Ct. 1773 (2017) ("*BMS*"), several times in support of their position. D. Br. at 2, 9, 12, 13, 17. But

*BMS* offers Defendants no support because *BMS* does not change the law on personal jurisdiction

in federal question cases, it does not change the law on class actions, and Moving Defendants'

forum contacts relate to the claims alleged. The Supreme Court in *BMS* expressly noted that the

opinion does not apply to personal jurisdiction asserted by federal courts in federal-question

---

[16] Other cases cited by Moving Defendants are similarly inapposite and in no way controvert or undermine the Court's well-reasoned analysis in *FOREX II*. Moreover, in the context of fact-specific personal jurisdiction inquiries, it is hardly surprising that personal jurisdiction has been found lacking in other cases. And it is not surprising that personal jurisdiction over Moving Defendants has been established in other cases in this Circuit. *FOREX II*, 2016 WL 1268267, at *7 (finding personal jurisdiction existed as to BTMU and SocGen); *see BPP Ill., LLC v. The Royal Bank of Scot. Grp., PLC*, 2015 WL 6143702, at *3 n.1 (S.D.N.Y. October 19, 2015) (noting that RBS had withdrawn any defense based on lack of personal jurisdiction, and consented to personal jurisdiction in New York); *see also Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-cv-5790, 2015 WL 144165, at *5 (S.D.N.Y. Jan. 12, 2015) (jurisdiction upheld over a bank with no U.S. offices or business operations where securities were "denominated in United States dollars" and available for sale in New York), *aff'd*, 859 F.3d 188 (2d Cir. 2017); *In re Vitamin C Antitrust Litig.*, No. 06-md-1738, 2012 WL 12355046, at *12 (E.D.N.Y. Aug. 7, 2012) (Chinese defendant satisfied effects test by participating in a cartel intended to inflict "supracompetitive prices on foreign countries such as the United States."); *Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 132 (E.D.N.Y. 2000) (jurisdiction upheld where "intentional and purposeful acts" were undertaken "in furtherance of the alleged conspiracy" targeting individuals in the U.S.).

cases. 137 S. Ct. at 1777.[17] The dissent also noted that the opinion does not apply to class actions. *Id*. at 1789 n. 4. And *BMS* does not affect the hornbook rule that in cases alleging that Defendants entered into a conspiracy, the acts of co-conspirators are attributed to all Defendants for purposes of personal jurisdiction. The *BMS* Court did not address the issue of co-conspirator jurisdiction because respondents in that case did not allege that theory. *Id*. at 1783. The Supreme Court refused to disturb the law on personal jurisdiction in these circumstances for good reason: if each Plaintiff was required to file a separate complaint in their state or residence alleging the conspiracy against the same Defendants, the result would impose severe burdens on all parties involved, risk conflicting rulings including inconsistent damages awards, and subject the federal court system to substantial burdens and inefficiencies.

Here, Defendants all but concede that Plaintiffs have plausibly alleged an anticompetitive conspiracy that involved substantial collusive conduct within the United States. *See* Plaintiffs' Opposition to Defendants' Joint Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Pl. 12(b)(6) Br."). The CCAC includes numerous examples of the Moving Defendants' participation in the alleged conspiracy and allegations concerning the Moving Defendants' extensive U.S.-based operations in general and FX operations specifically. *See, e.g.*, CCAC ¶¶ 8, 22, 34, 35, 92, 93, 101, 104-46, 154-55, 158, 162-63, 187, 197, 212, 228(c).

Taken as a whole, the CCAC plausibly alleges suit-related conduct that took place in the United States and had effects expressly aimed inside the country due to the Moving Defendants' substantial FX businesses here. Construing the pleadings and declarations in the light most

---

[17] *See also Theodore Broomfield v. Craft Brew Alliance, Inc.*, , No. 17-cv-01027, 2017 WL 3838453, at *15 (N.D. Cal. Sept. 1, 2017) ("Regardless of the temptation by defendants across the country to apply the rationale of *Bristol-Myers* to a class action in federal court, its applicability to such cases was expressly left open by the Supreme Court and has yet to be considered by lower federal courts."); *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) ("Because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,' we generally have declined to establish rigid rules and instead have embraced a framework to evaluate the sufficiency of particular procedures." (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

favorable to Plaintiffs, *Dorchester*, 722 F.3d at 85, the Moving Defendants' suit-related conduct created a substantial connection with this forum, *Walden*, 134 S. Ct. at 1121, and Plaintiffs thus have made a prima facie showing of specific jurisdiction sufficient to defeat the instant motion.

## II.     Personal Jurisdiction Is Proper On the Basis of Conspiracy Jurisdiction

Where Plaintiffs allege that Defendants entered into a conspiracy, the acts of co-conspirators are attributed to all Defendants for purposes of personal jurisdiction. *See In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013); *Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-cv-488, 2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012) ("It is settled that co-conspirators may be considered 'agents' for establishing personal jurisdiction under Section 302(a)."). "The Supreme Court has specifically upheld the exercise of jurisdiction over conspirators who have never entered the United States, where the conspiracy 'was directed to violation of the United States law within the United States.'" *United States v. Manuel*, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) (quoting *Ford v. United States*, 273 U.S. 593, 620 (1927)).[18] To demonstrate conspiracy jurisdiction, a plaintiff must "(1) make a prima facie factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy, and (3) set forth evidentiary facts to connect the defendants with transactions occurring in [the forum]." *Beach v. Citigroup Alternative Invs. LLC*, No. 12-cv-717, 2014 WL 904650, at *12 (S.D.N.Y. Mar. 7, 2014).

Each of these requirements is met here. This Court has already found that the *FOREX* plaintiffs have plausibly alleged the existence of an anticompetitive conspiracy involving all

---

[18] Moving Defendants question whether conspiracy jurisdiction remains valid after *Walden*. But *Walden* did nothing to alter *Ford*'s standards for jurisdiction based upon the contacts of co-conspirators. *Walden* merely clarified *Calder* by finding that jurisdiction must be based on the defendant's meaningful connection to the harmful effects in the forum in a case where there were no co-conspirators (and therefore no conspirator contacts to impute). *Walden*, 134 S. Ct. at 1123-27 (2014). *Ford* remains binding law. *See e.g*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 280 n.4 (1990) ("[B]road construction of federal conspiracy statutes may permit prosecution of foreign nationals who have had no direct contact with anyone or anything in the United States.") (citing *Ford*, 273 U.S. at 619-20).

Defendants. *See FOREX 1*, 74 F. Supp. 3d at 590; *FOREX III*, 2016 WL 5108131, at *27-28. For

the reasons set forth in Plaintiffs' response in opposition to Defendants' 12(b)(6) Motion,

Plaintiffs here have done the same. Pl. 12(b)(6) Br.; *see* CCAC ¶¶ 92, 93, 101, 104-46, 154-55,

158, 162-63, 187, 197, 212. Furthermore, as outlined above and in the Dell'Angelo Dec.,

Moving Defendants transacted billions of dollars' worth of FX Instruments with U.S. customers,

including those members of the Direct Settlement Class that resold the same FX Instruments to

Plaintiffs. No Defendant contests that this Court has personal jurisdiction over all non-Moving

Defendants. Thus, if the Court finds that the CCAC adequately alleges that the Moving

Defendants' involvement in the conspiracy, it should deny Defendants' Motion on the basis of

conspiracy jurisdiction.

### III.      Personal Jurisdiction is Proper On the Basis of Pendent Jurisdiction

"[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes

nationwide service of process, and the federal and [non-federal] claims 'derive from a common

nucleus of operative fact', the district court may assert personal jurisdiction over the parties to

the related [] claims even if personal jurisdiction is not otherwise available." *IUE AFL-CIO

Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993) (citations omitted). A common

nucleus of operative fact exists between claims where "the facts underlying the federal and

[state] claims substantially overlap[] [or] the federal claim necessarily [brings] the facts

underlying the [state] claim before the court." *Achtman v. Kirby, McInerney & Squire, LLP*, 464

F.3d 328, 335 (2d Cir. 2006) (citations omitted). District courts have discretion as to whether to

exercise pendent personal jurisdiction, the exercise of which should be informed by

"considerations of juridical economy, convenience, and fairness to litigants." *See In re LIBOR-*

*Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262, 2015 WL 6243526, at *23 (S.D.N.Y.

Oct. 20, 2015) (citation omitted).

Those considerations counsel the recognition of pendent jurisdiction over the Moving

Defendants with respect to Plaintiffs' state-law claims. The exercise of pendent personal

jurisdiction in this case is warranted particularly because the Moving Defendants are already

litigating the same issues in this Court in *FOREX*. And, here, the Sherman Act and state-law

claims derive from the same underlying allegations and legal theories, namely that the Moving

Defendants conspired to fix the FX market and that Plaintiffs were overcharged for FX

Instruments they indirectly purchased from Defendants and their co-conspirators. There would

be no inconvenience or unfairness to the Moving Defendants in requiring them to litigate the

same facts before the same court, nor would splitting up the claims between multiple courts do

anything to conserve judicial resources. The Court should exercise pendent personal jurisdiction

over the Moving Defendants for Plaintiffs' state-law claims.[19]

### IV.    Defendants Have Consented to Personal Jurisdiction

As noted above, all of the Moving Defendants have entered into settlements with the

*FOREX* plaintiffs, and those settlements have all been preliminarily approved by this Court.

*FOREX* ECF Nos. 536, 866. Each of those settlement agreement provides:

> [Defendant], Class Plaintiffs, their respective counsel, and the Class Members
> hereby irrevocably submit to the exclusive jurisdiction of the United States
> District Court for the Southern District of New York, for any suit, action,
> proceeding or dispute arising out of or relating to this Settlement Agreement or

---

[19] The Second Circuit also recognizes a version of pendent personal jurisdiction under which a federal court may "entertain [state-law] claims that are not expressly covered by the long-arm statute, so long as they derive from the same nucleus of operative fact as claims that are." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262, 2015 WL 13122396, at *18 n.40 (S.D.N.Y. Oct. 19, 2015) (citing *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 438 (2d Cir. 2008)); *see Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716 (2d Cir. 1980). Under this theory, in the unlikely event that the Sherman Act claim is not valid, the Court would still have pendent personal jurisdiction over Plaintiffs' state-law claims by virtue of their New York Donnelly Act claim, which falls under New York's long-arm statute. *See* N.Y. C.P.L.R. § 302(a).

> the applicability of this Settlement Agreement, including, without limitation, any
> suit, action, proceeding, or dispute relating to the release provisions herein.

*Id*. In their 12(b)(6) brief, submitted concurrently with their 12(b)(2) brief, Defendants claim that

that "the prosecution of this case should be enjoined pending approval of the *FOREX* settlements

and their claims against the non-settling defendants should be consolidated with *FOREX* because

the Complaint at times alleges that the intermediaries with whom plaintiffs transacted were

'brokers' rather than dealers." *Id.* at 3. Thus, Defendants have raised a "dispute" arising out of

and relating to the applicability of their Settlement Agreements in *FOREX*, and pursuant to those

agreements, Defendants have "irrevocably submit[ted] to the exclusive jurisdiction of the United

States District Court for the Southern District of New York" in this Action. *See FOREX* ECF

Nos. 536, 866.[20] It is well-established that the exercise of jurisdiction where a party has

"express[ly] or impl[icitly] consent[ed] to the personal jurisdiction of the court . . . does not

offend due process." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985)

 Defendants cannot be permitted to avail themselves of the *FOREX* Settlement

Agreements in their 12(b)(6) Motion to raise a dispute regarding those Settlement Agreements

here, and then disavow the provisions of those same Settlement Agreements in which Moving

Defendants expressly consent to litigate that dispute in this District. *See Albrecht v. United

States*, 329 U.S. 599, 603 (1947) ("[W]here a party to such a contract stands upon its terms to

enforce them for his own advantage, he cannot at the same time successfully disavow those

terms so far as he conceives them to be to his disadvantage."); *Meetings & Expositions, Inc. v.

Tandy Corp.,* 490 F.2d 714, 717 (2d Cir. 1974)) ("[W]hen a defendant submits to a court-ordered

settlement agreement, the court maintains personal jurisdiction over that party in a suit to enforce

---

[20] For the reasons set forth in Plaintiffs' 12(b)(6) Brief, Defendants' argument for an injunction fails. But this does not change the fact that Defendants have raised a "dispute" arising out of and relating to the applicability of their Settlement Agreements in *FOREX*, and therefore have consented to personal jurisdiction in this action.

the settlement."); *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,* 72 F. App'x 916, 923 (4th Cir. 2003) (defendants cannot use a contract "as both a sword and a shield"); *Travelers Indem. Co. v. Calvert Fire Ins. Co.,* 798 F.2d 826, 834 (5th Cir. 1986) (explaining that "where a party agrees to a stipulation and settlement, it has consented to the court's jurisdiction and cannot later contest personal jurisdiction in a suit to enforce the settlement agreement"). By electing to litigate the applicability of the *FOREX* Settlement Agreements in this Action and agreeing in those Settlement Agreements that all such litigation must take place in this District, Defendants have expressly consented to personal jurisdiction here. Therefore, the Court should deny their Motion on the basis of that consent.[21]

### V.   Exercising Personal Jurisdiction over the Moving Defendants is Consistent with Due Process

"Once it has been decided that [respondents] purposefully established minimum contacts within the forum . . . these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp.*, 471 U.S. at 476 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). "The Supreme Court has held that the court must evaluate the following factors as part of this 'reasonableness' analysis: (1) the burden that the exercise of jurisdiction will impose on the [respondents]; (2) the interests of the forum state in adjudicating the case; (3) the [applicant]'s interest in obtaining convenient and effective relief; (4) the interstate judicial

---

[21] In addition to providing Defendants' consent to jurisdiction, Moving Defendants' Settlement Agreements and the provisions therein are significant contacts for purposes of evaluating specific jurisdiction. *See, e.g.,* *International Longshoremen's Ass'n v. West Gulf Maritime Ass'n,* 605 F.Supp. 723, 728 n. 7 (S.D.N.Y.1985) (holding, where the plaintiff sought enforcement of an administrative arbitration award, that the defendant's participation in those proceedings created jurisdiction both "on the ground of consent, and on the ground that they transacted business in New York out of which this litigation arises."); *Sasso v. Gallucci,* 112 Misc.2d 865, 447 N.Y.S.2d 618 (1982) (holding that the defendant had "transacted business" under Section 302(a)(1) by entering into a court-ordered settlement agreement concerning stock that later became the subject of suit).

system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citing *Asahi Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 113-14 (1987)). All five factors weigh heavily in favor of granting personal jurisdiction here. In any event, this inquiry is "largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process[, however,] because of the strong federal interests involved." *SEC v. Comm. on Ways & Means of the United States House of Representatives*, 161 F. Supp. 3d 199, 223 (S.D.N.Y. 2015) (citations omitted).

The Moving Defendants do not even attempt to identify ***any*** burden that would result from litigating Plaintiffs' claims in the same court in which they are already litigating *FOREX*. As described previously, Moving Defendants have transacted billions of dollars' worth of FX Instruments in the United States. They derive substantial income from their U.S. operations, own or operate U.S. offices, and employ hundreds or thousands of full-time employees in this District and elsewhere in the United States.[22] All Defendants have retained counsel in New York, and it appears that a large majority of discovery will take place in New York.[23] Defendants Barclays, RBS, and UBS are currently providing cooperation to the DOJ in its ongoing investigation, and all Moving Defendants pledged in settlement agreements to provide cooperation and discovery to the *FOREX* plaintiffs in this District. Defendants Barclays, HSBC, RBS, and UBS all have affiliated Defendant entities that have not moved to dismiss pursuant to Rule 12(b)(2) and will therefore continue to litigate this Action regardless of whether their Moving Defendant entities prevail on this Motion. This Action includes a New York plaintiff and New York claims.

---

[22] *See FOREX II*, 2016 WL 1268267, at *3-7; *supra* pp. 3-9.
[23] To Plaintiffs' knowledge, only five depositions have been scheduled thus far in *FOREX*. All five are in New York City.

Moving Defendants stipulated that this Action should be designated as related to *FOREX*, which is also pending in this District. ECF No. 5. All reasonable factors weigh in favor of exercising personal jurisdiction over Moving Defendants.

Any argument that the Moving Defendants' due process rights would be violated by having to answer for their wrongs in this Court disingenuously ignores their substantial presence and FX-related operations within this District. The Moving Defendants had clear notice that they could be subject to suit in this Court, *see Burger King Corp.*, 471 U.S. at 475 n.17, and may not avoid responding in this Court for the harm they caused to Plaintiffs and the proposed Classes.

**VI.** **In the Alternative, Plaintiffs Should be Granted Jurisdictional Discovery or Leave to Amend**

The Moving Defendants' billions of dollars of FX Instruments transacted in the United States, substantial contacts with the U.S. and this forum, and consent to jurisdiction have established prima facie jurisdiction. At a minimum, these facts demonstrate a "sufficient start towards establishing personal jurisdiction" that warrants permitting jurisdictional discovery before granting Moving Defendants' motion to dismiss. *See JGB Enters., Inc. v. Beta Fluid Sys., Inc.*, No. 14-cv-1439, 2015 WL 5709088 at *5-7 (N.D.N.Y. Sept. 29, 2005) (collecting cases). Plaintiffs should be permitted "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2010). This is especially so in light of the fact that Plaintiffs have engaged in no discovery of the Moving Defendants. *See Winston & Strawn v. Dong Won Secs. Co. Ltd.*, No. 02-cv-0183, 2015 WL 31444625, at *5 (S.D.N.Y. Nov. 1, 2002) (denying motion to dismiss "where the facts necessary to establish personal jurisdiction . . . lie exclusively within the defendant's knowledge"). Finally, if the Court were to both grant Defendants' Motion to Dismiss and deny Plaintiffs limited jurisdictional

discovery, Plaintiffs would request leave to amend to add additional jurisdictional allegations and/or substitute parties as necessary.

## **CONCLUSION**

For the reasons set forth above, the Moving Defendants' motions to dismiss for lack of personal jurisdiction should be denied in its entirety.

Dated:   September 27, 2017

Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Merrill G. Davidoff
Joshua T. Ripley
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
mdellangelo@bm.net
jripley@bm.net

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 North Scottsdale Rd., Ste. 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

Joseph C. Peiffer
**PEIFFER ROSCA WOLF ABDULLAH CARR& KANE LLP**
201 St. Charles Ave., Ste. 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504)523-2464
jpeiffer@prwlegal.com

24

R. Bryant McCulley
Stuart H. McCluer
Frank B. Ulmer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Blvd., Ste. 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com
fulmer@mcculleymccluer.com

***Counsel for Plaintiffs and the Proposed Classes***

25