NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

In the Matter of

BARCLAYS BANK PLC,
BARCLAYS BANK PLC, NEW YORK BRANCH

**CONSENT ORDER UNDER**
**NEW YORK BANKING LAW §§ 44 and 44-a**

The New York State Department of Financial Services (the "Department"), Barclays Bank PLC, and Barclays Bank PLC, New York Branch (collectively, "the Parties") stipulate that:

**WHEREAS** Barclays Bank PLC is a major international banking institution with more than 132,000 employees and total assets exceeding $2 trillion;

**WHEREAS** Barclays Bank PLC has operated a foreign bank branch in New York State ("the New York Branch"), licensed, supervised and regulated by the Department since 1963;

**WHEREAS** the New York Branch has more than 500 employees and total assets exceeding $36 billion;

**WHEREAS** Barclays Bank PLC and the New York Branch (collectively, "Barclays" or the "Bank") engaged in manipulative conduct and attempted to manipulate benchmark foreign exchange ("FX") rates around the world, during at least 2008 through 2012, to benefit Barclays' own trading positions;

**WHEREAS** in some instances, Barclays conspired with other banks in order to coordinate trading, attempt to manipulate exchange rates, or coordinate bid/ask spreads charged;

**WHEREAS** the coordination and conspiracy to manipulate were intended to benefit Barclays trading results by maximizing profits or minimizing losses to the detriment of counterparties, thereby harming consumers of financial products and services;

employees to add mark-up without the client's knowledge.  However, some clients demanded to hear the Sales employees' communications with traders, and stayed on an open line while the FX Sales employees communicated with the traders.

46.     In such circumstances, at least two Barclays FX Sales employees used hand signals to ask traders to add hard mark-up without the client's knowledge.  For example, one finger held sideways would indicate a one-pip markup, while two fingers held sideways would indicate a two-pip mark-up.

47.     Mark-ups represented a key revenue source for Barclays and generating mark-ups was a high priority for Sales managers.  As the future Co-Head of UK FX Hedge Fund Sales (who was then a Vice President in the New York Branch) wrote in a November 5, 2010 chat: "markup is making sure you make the right decision on price . . . which is whats the worst price i can put on this where the customers decision to trade with me or give me future business doesn't change . . . if you aint cheating, you aint trying."

48.     Historically, specific targets were set for mark-ups, and although specific targets are no longer set, most FX Sales employees continued to believe mark-ups remained a significant factor in determining compensation.  Almost all FX Sales employees admitted they engaged in marking-up request-for-quotation and at-best orders, when possible.  As one FX Sales employee noted, the goal was to "give the rate that was most advantageous to the bank, but would not make the customer go away!"

49.     Even though more recent managers of Barclays' FX Sales group stated that they set no hard targets, certain FX Sales employees said they aimed for mark-ups to contribute at least 20% of the total revenue they were credited with.  Mark-ups were thus one of three primary

## SETTLEMENT PROVISIONS

### Monetary Penalty

72. Barclays shall pay a civil monetary penalty, pursuant to Banking Law §§ 44 and 44-a, to the Department in the amount of $485 million. Barclays shall pay the entire amount within ten days of executing this Consent Order. Barclays agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

### Employee Discipline

73. A number of Barclays employees that were involved in the wrongful conduct discussed in this Order, including a director on the FX Spot trading desk in London, a director on the FX Spot trading desk in New York, a director on the Emerging Markets desk in New York, a managing director in FX Hedge Fund Sales in New York, a director in FX Real Money Sales in New York, and an assistant vice president in FX Hedge Fund Sales in London, are no longer employed at the Bank.

74. As a result of the investigation, four Barclays employees have been terminated in the last month: the Global Head of FX Spot trading in London, an assistant vice president on the FX Spot trading desk in London, a director on the FX Spot trading desk in London and a director on the FX Spot trading desk in New York.

75. Certain employees involved in the wrongful conduct have been suspended or placed on paid leave but remain employed by the Bank. The Department orders the Bank to take all steps necessary to terminate the following four employees, who played a role in the misconduct discussed in this Consent Order but who remain employed by the Bank: a vice president on the Emerging Markets trading desk in New York, two directors on the FX Spot

trading desk in New York and a director on the FX Sales desk in New York (who previously was Co-Head of UK FX Hedge Fund Sales in London).

76. With respect to two of the employees referenced in paragraph 75 who remain under investigation by other authorities, the Department orders the Bank to take all steps necessary to terminate them as promptly as is consistent with its obligations to cooperate with those authorities. These two employees must remain suspended or on paid leave until termination.

77. If a judicial or regulatory determination or order is issued finding that the termination of any of the above employees is not permissible under local law, then such employees nevertheless shall not be allowed to hold or assume any duties, responsibilities, or activities involving compliance, FX benchmarks, or any matter relating to U.S. or U.S. Dollar operations.

**Matters Not Released By This Order**

78. This Order does not release the Bank from any claims concerning electronic systems used in FX trading and electronic trading of FX and FX-related products, and any potential related activities or misconduct arising out of or related to this areas. The Department will continue its review and investigation of this areas of activity.

**Continuation of Work of Independent Monitor**

79. Barclays will continue to engage the independent monitor previously selected by the Department to conduct, consistent with applicable law, a comprehensive review of compliance programs, policies, and procedures, with respect to the business activities discussed within this Order, now in place at the Bank that pertain to or affect activities conducted by or through the New York Branch. The monitor will continue to report directly to the Department.