**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JAMES CONTANT, *et al.*,

                    *Plaintiffs*,

v.

BANK OF AMERICA
CORPORATION, et al.,

                    *Defendants*.

No. 17-cv-3139-LGS

(related to No. 13-cv-7789-LGS)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**JOINT MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND .......................................................................................... 2

LEGAL STANDARDS ON A MOTION TO DISMISS ................................... 3

    A.  Antitrust Conspiracy ....................................................................... 3

    B.  Indirect Purchaser Standing ............................................................ 4

    C.  Injunctive Relief ............................................................................. 6

ARGUMENT .............................................................................................. 7

I.   Defendants' Request for a Stay is Unwarranted ................................... 7

II.  Plaintiffs Plausibly Allege an Anticompetitive Conspiracy in Violation of Federal and State Laws .......................................................................... 8

III. Plaintiffs Plausibly Allege that Defendants' Conspiracy Is the Material, But-For, and Proximate Cause of Plaintiffs' Damages ........................... 9

IV. *AGC* Does Not Apply to Plaintiffs' State-Law Damages Claims .................................... 15

    A.  Arizona ......................................................................................... 15

    B.  California ...................................................................................... 16

    C.  North Carolina .............................................................................. 17

    D.  New York ...................................................................................... 18

    E.  Illinois .......................................................................................... 19

V.  Even if *AGC* Applied, Defendants' Motion to Dismiss Would Fail ................................ 19

    A.  The Injuries Plaintiffs Allege Are the Type the Antitrust Laws Are Intended to Prevent, and Plaintiffs Are Participants in the Market for FX Spot Instruments ....... 20

    B.  Plaintiffs Are Sufficiently "Direct" Indirect Purchasers ............................ 22

    C.  Plaintiffs' Alleged Damages Are Not Speculative ..................................... 23

    D.  Duplicative Recoveries Are Not a Concern Here ...................................... 24

VI. Defendants' State-Law Specific Arguments Fail ................................ 24

A. Due Process Favors Allowing Plaintiffs' State-Law Claims to Proceed .................... 24

B. Florida and Illinois Regulated Banks Exceptions Do Not Apply Here ..................... 26

C. Florida Plaintiffs Have Standing under FDUTPA ........................................................ 28

D. The North Carolina Regulatory "Exemption" Does Not Apply Here ........................ 29

E. Hitchcock, the Massachusetts Plaintiff, Has Standing under MCPA ......................... 30

F. The CCAC Plausibly Alleges Injury Under the Laws of North Carolina, California, and Massachusetts......................................................................................................... 32

G. Plaintiffs' Illinois Claim May Proceed as a Class Action............................................ 33

H. Plaintiffs Have Served Notice Pursuant to Arizona's Notice Provision.................... 34

VII.   Plaintiffs Plausibly Allege a Claim for Injunctive Relief ............................................... 35

CONCLUSION.................................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Allstate Ins. Co. v. Hague*
    449 U.S. 302 (1981) ................................................................................ 25, 33

*Anderson News, LLC v. Am. Media, Inc.*
    680 F.3d 162 (2d Cir. 2012) ............................................................................. 3

*Asacol Antitrust Litig.*
    No. 15-cv-12730, 2016 WL 4083333 (D. Mass. July 20, 2016) ............................................ 34

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ....................................................................................... 3

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*
    459 U.S. 519 (1983) ................................................................................ passim

*AT&T Mobility LLC v. AU Optronics Corp.*
    707 F.3d 1106 (9th Cir. 2013) ......................................................................... 24

*Axiom Inv. Advisors, LLC v. Deutsche Bank AG*
    234 F. Supp. 3d 526 (S.D.N.Y. 2017) ............................................................... 28, 31

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ...................................................................................... 2

*California v. ARC Am. Corp.*
    490 U.S. 93 (1989) ....................................................................................... 5

*Cargill, Inc. v. Monfort of Colorado, Inc.*
    479 U.S. 104 (1986) ................................................................................... 6, 7

*Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*
    768 F.3d 183 (2d Cir. 2014) ............................................................................. 6

*Christie v. Bank of Am., N.A.*
    No. 813-cv-1371, 2014 WL 5285987 (M.D. Fla. Oct. 15, 2014) ......................................... 27

*Clinton v. Brown & Williamson Holdings, Inc.*
    No. 05-CV-9907 CS, 2013 WL 3111122 (S.D.N.Y. June 20, 2013) ....................................... 14

*D.R. Ward Const. Co. v. Rohm and Haas Co.*
    470 F.Supp.2d 485 (E.D. Pa. 2006) .................................................................... 16

*Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*
    No. 16-cv-16404, 2017 WL 1359599 (N.C. Sup. Ct. Apr. 11, 2017) ...................................... 17

iii

*DiFolco v. MSNBC Cable LLC*
   622 F.3d 104 (2d Cir. 2010) ........................................................................... 10

*Dixie Yarns, Inc. v. Plantation Knits, Inc.*
   No. 93-cv-301, 1994 WL 910955 (W.D.N.C. July 12, 1994) ................................... 32

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*
   No. 09-cv-00852, 2012 WL 3841397 (E.D. Wis. Sept. 5, 2012) ................................. 20, 21, 26

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*
   711 F.3d 68 (2d Cir. 2013) ........................................................................... 18

*Illinois Brick Co. v. Illinois*
   431 U.S. 720 (1977).............................................................................. passim

*In re Actos End-Payor Antitrust Litig.*
   848 F.3d 89 (2d Cir. 2017) ............................................................................ 9

*In re Aggrenox Antitrust Litig.*
   94 F. Supp. 3d 224 (D. Conn. 2015).............................................................. 33, 34

*In re Aluminum Warehousing Antitrust Litig.*
   833 F.3d 151 (2d Cir. 2016) ........................................................................ 12, 18

*In re Capacitors Antitrust Litig.*
   106 F. Supp. 3d 1051 (N.D. Cal. 2015) ............................................................ 17, 25

*In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*
   No. 14-md-2508, 2015 WL 5166014 (E.D. Tenn. June 24, 2015) ........................................ 32

*In re Commodity Exch., Inc.*
   213 F. Supp. 3d 631 (S.D.N.Y. Oct. 3, 2016).................................................. 13, 14, 22

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*
   2015 WL 3988488 (N.D. Ill. June 29, 2015) ........................................................ 17

*In re DDAVP Indirect Purchaser Antitrust Litig.*
   903 F. Supp. 2d 198 (S.D.N.Y. 2012) ............................................................... 10

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*
   No. 12-cv-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) ........................................... 18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*
   536 F. Supp. 2d 1129 (N.D. Cal. 2008) .............................................................. 16

*In re Flash Memory Antitrust Litig.*
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ......................................................... passim

*In re Foreign Exchange Benchmark Rates Antitrust Litig. (FOREX I)*
74 F. Supp. 3d 581, 590 (S.D.N.Y. 2015) ................................................................. 2, 8, 13, 15

*In re Foreign Exchange Benchmark Rates Antitrust Litig. (FOREX II)*
No. 13-cv-7789, 016 WL 1268267 (S.D.N.Y. Mar. 31, 2016)................................................... 2

*In re Foreign Exchange Benchmark Rates Antitrust Litig. (FOREX III)*
No. 13-cv-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ...................................... passim

*In re Grand Theft Auto Video Game Consumer Litig*
No. 06-md-1739, 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) .............................................. 26

*In re Graphics Processing Units Antitrust Litig.*
540 F.Supp.2d 1085 (N.D. Cal. 2007) .................................................................................. 20

*In re Intel Corp. Microprocessor Antitrust Litig.*
496 F. Supp. 2d 404 (D. Del. 2007) ...................................................................................... 20

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*
No. 11-md-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).............................................. 12

*In re Lidoderm Antitrust Litig.*
103 F. Supp. 3d 1155 (N.D. Cal. 2015) .................................................................................. 32

*In re Lithium Ion Batteries Antitrust Litig.*
No. 13-md-2420, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014).................................................. 5

*In re London Silver Fixing, Ltd. Antitrust Litig.*
213 F. Supp. 3d 530 (S.D.N.Y. 2016) ................................................................................. 9, 13

*In re Pharm. Indus. Average Wholesale Price Litig.*
491 F. Supp. 2d 20 (D. Mass. 2007) ..................................................................................... 31

*In re Platinum and Palladium Antitrust Litig.*
No. 1:14-cv-9391, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)...................................... 11, 12

*In re Propranolol Antitrust Litig.*
No. 16-cv-09901, 2017 WL 1287515 (S.D.N.Y. Apr. 6, 2017) ........................................ 33, 34

*In re Terazosin Hydrochloride Antitrust Litig.*
160 F.Supp.2d 1365 (S.D. Fla. 2001) .................................................................................... 25

*In re TFT-LCD Antitrust Litig.*
Nos. 07-md-1827, 09-cv-5609, 2010 WL 2629728 (N.D. Cal. June 29, 2010) ...................... 24

*In re Wellbutrin XL Antitrust Litig.*
260 F.R.D. 143 (E.D. Pa. 2009)............................................................................................. 25

*Knevelbaard Dairies v. Kraft Foods, Inc.*
  232 F.3d 979 (9th Cir. 2000) ........................................................................ 17

*LaFaro v. New York Cardiothoracic Group, PLLC*
  570 F.3d 471 (2d Cir. 2009) .......................................................................... 3

*Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*
  724 F. Supp. 2d 1228 (S.D. Fla. 2010) .................................................. 27, 28

*Laumann v. Nat'l Hockey League*
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ........................................................... 7

*Loeb Indus., Inc. v. Sumitomo Corp.*
  306 F.3d 469 (7th Cir. 2002) ....................................................................... 10

*Meridian Project Sys. Inc. v. Hardin Constr. Co.*
  404 F. Supp. 2d 1214 (E.D. Cal. 2005) ....................................................... 32

*Nypl v. JPMorgan Chase & Co.*
  No. 15-cv-9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ............... passim

*Nypl v. JPMorgan Chase & Co.*
  No. 15-cv-9300-LGS, 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) ....... 3, 25

*Pare v. Northborough Capital Partners, LLC*
  89 F. Supp. 3d 192 (D. Mass. 2015) ........................................................... 32

*Paycom Billing Servs, Inc. v. Mastercard Int'l, Inc.*
  467 F.3d 283 (2d Cir. 2006) ........................................................................ 22

*Ray v. United Family Life Ins. Co.*
  430 F. Supp. 1353 (W.D.N.C. 1977) ........................................................... 30

*Renfrow v. First Mortg. Am., Inc.*
  No. 08-cv-80233, 2011 WL 24162473 (S.D. Fla. June 13, 2011) ......... 27, 28

*Ret. Bd. of the Policemen's Annuity v. FXCM Inc.*
  No. 15-cv-3599, 2016 WL 4435243 (S.D.N.Y. Aug. 18, 2016) ................... 7

*Richardson v. L'Oreal United States, Inc.*
  991 F. Supp. 2d 181 (D.D.C. 2013) ............................................................. 35

*S & B Investments, LLC v. Motiva Enterprises, L.L.C.*
  No. 03-cv-61993, 2004 WL 3250306 (S.D. Fla. Dec. 6, 2004) ................... 29

*Sahagian v. Genera Corp.*
  No. 08-cv-7613, 2009 WL 9504039 (C.D. Cal. Jul. 6, 2009) ...................... 17

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*
   263 F.R.D. 205 (E.D. Pa. 2009) ................................................................ 26

*State, Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC*
   946 So. 2d 1253 (Fla. Dist. Ct. App. 2007) ............................................. 28

*Supreme Auto Transp. LLC v. Mittal*
   238 F. Supp. 3d 1032 (N.D. Ill. 2017) ......................................... 13, 16, 17

*The 'In' Porters, S.A.* v. *Hanes Printables, Inc.*
   663 F. Supp. 494 (M.D.N.C. 1987) ........................................................... 32

*Tidenberg v. Bidz.com, Inc.*
   No. 08-cv-5553, 2009 WL 605249 (C.D. Cal. March 4, 2009) .................. 26

*U.S. Bank Nat. Ass'n v. Capparelli*
   No. 13-cv-80323, 2014 WL 2807648 (S.D. Fla. June 20, 2014) ........... 26, 28

*Walker v. Fleetwood Homes of N. Carolina, Inc.*
   653 S.E.2d 393 (N.C. 2007) ...................................................................... 29

*Wang v. OCZ Tech. Group, Inc.*
   276 F.R.D. 618 (N.D. Cal. 2011) .............................................................. 26

**State Cases**

*Barron v. Fidelity Magellan Fund*
   784 N.E.2d 634 (Mass. App. Ct. 2003) .................................................... 31

*Bunker's Glass Co. v. Pilkington PLC*
   75 P.3d 99 (Ariz. 2003). ........................................................................... 15

*Clayworth v. Pfizer*
   233 P.3d 1066 (Cal. 2010) ................................................................... 16, 17

*Cont''l Guest Servs. Corp. v. Int''l Bus Servs., Inc.*
   N.Y.S.2d 30 (N.Y. App. Div. 2012) .......................................................... 18

*County of Cook v. Philip Morris, Inc.*
   817 N.E.2d 1039 (Ill. App. Ct. 2004) ....................................................... 19

*Ellis v. Smith-Broadhurst, Inc.*
   268 S.E.2d 271 (N.C. Ct. App. 1980) ....................................................... 30

*Gossels v. Fleet Nat'l Bank*
   876 N.E.2d 872 (Mass. App. Ct. 2007) .................................................... 31

*Ho v. Visa U.S.A., Inc.*
    No. 112316/00, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004).......................................... 18

*Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680 (N.C. App. 1996) ................................................. 5, 17

*Kanne v. Visa U.S.A., Inc.*
    723 N.W.2d 293 (Neb. 2006) ................................................................................................... 19

*Luscher v. Bayer AG*
    No. 2004-cv-14835, 2005 WL 6959406, (Ariz. Super. Ct. Sept. 16, 2005)............................ 16

*Southard v. Visa U.S.A., Inc.*
    734 N.W.2d 192 (Iowa 2007) ................................................................................................... 19

*Teague v. Bayer AG*
    671 S.E.2d 550 (N.C. App. 2009).............................................................................................. 17

*Vinci v. Waste Mgmt., Inc.*
    43 Cal. Rptr. 2d 337 (Cal. App. 1995)....................................................................................... 17

**Statutes**

15 U.S.C. § 1 ...................................................................................................................... passim

15 U.S.C. § 15 .................................................................................................................... passim

Ariz. Rev. Stat. § 44-1402................................................................................................ 6, 15, 16

Cal. Bus. & Prof. Code § 16720 ........................................................................................ passim

Cal. Bus. & Prof. Code § 17200 ........................................................................................ passim

Fla. Stat. § 501.203(7) ....................................................................................................... passim

Ill. Comp. Stat. 10/3S......................................................................................................... passim

Mass. Gen. Laws ch. 93A. .................................................................................................. passim

Minn. Stat. § 325D.51......................................................................................................... 6

N.Y. Gen. Bus. Law § 340. ................................................................................................. passim

N.C. Gen. Stat. § 75-1.1...................................................................................................... passim

## PRELIMINARY STATEMENT

Plaintiffs' Consolidated Class Action Complaint ("CCAC") plausibly alleges a nationwide conspiracy, in violation of the laws of New York, Arizona, California, Illinois, Florida, Massachusetts, Minnesota, and North Carolina (collectively, "Indirect Purchaser States") and Section 1 of the Sherman Act, to fix the prices of foreign currency ("FX") Instruments and FX benchmark rates by Defendants and other non-Defendant co-conspirators (collectively with Defendants, "Cartel Members"). The CCAC also details how Defendants' anticompetitive conduct caused Plaintiffs to incur overcharges on FX Instruments where those FX Instruments were sold directly from Cartel Members to members of the Direct Settlement Class at supracompetitive rates, and then resold to Plaintiffs. *See* CCAC ¶ 40 n.4 (defining Direct Settlement Class). Defendants' Motion to Dismiss should therefore be denied.

Many of the arguments that Defendants now advance in support of dismissal of the CCAC have been previously rejected by this Court. No Defendant disputes that the CCAC supports a reasonable inference that all joined and carried out an anticompetitive conspiracy to manipulate FX prices.[1] At the risk of a blinding glimpse of the obvious: per the billions of dollars in cumulative settlements already preliminarily reached in related cases, Defendants plainly did so conspire. Nor do Defendants dispute that Plaintiffs failed properly to allege cognizable harm to competition or so-called injury in fact. Instead, Defendants advance a blunderbuss of technical arguments for why they should escape indirect purchaser liability for conspiring to fix the price of foreign currencies. That these arguments are technical does not, alone, render them illegitimate. However, hard facts make bad law; the hard facts of Defendants'

---

[1] Notably, only UBS was precluded from doing so; UBS agreed in a felony guilty plea that it would not "make any public statement, including in litigation . . ." contradicting facts in the plea agreement that confirm many of Plaintiffs' allegations, including that UBS "conspired with other financial services firms . . . to restrain competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere." CCAC ¶ 155.

indisputably wrongful conduct makes for some bad law, so to speak, for Defendants here. In the end, Defendants' instant dismissal arguments fail on their own terms, and this Court accordingly should deny Defendants' motion.

## BACKGROUND

Defendants correctly note in their Joint Memorandum of Law In Support of Defendants' Motion to Dismiss ("D. Br.") that the anticompetitive conspiracy Plaintiffs' allege is that alleged in the related action *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789 ("*FOREX*"). In the first motion to dismiss in *FOREX,* Defendants Bank of America, Barclays, BNP Paribas, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBS, and UBS argued that the direct purchaser plaintiffs' allegations did not adequately allege (1) an agreement in restraint of trade as required by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); (2) harm to competition; (3) injury in fact; and (4) antitrust injury. 74 F. Supp. 3d 581, 590 (S.D.N.Y. 2015) ("*FOREX I*"). This Court rejected those arguments. *Id.* The plaintiffs subsequently added additional Defendants including BTMU, SocGen, and Standard Chartered plc, all of whom moved to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction; the Court denied those motions as to BTMU and SocGen, but granted the motion as to Standard Chartered plc. 2016 WL 1268267, at *1 (S.D.N.Y. Mar. 31, 2016) ("*FOREX II*"). Several months later, Defendants BTMU, Credit Suisse, Deutsche Bank, Morgan Stanley, RBC, SocGen, and Standard Chartered filed a Rule 12(b)(6) motion in which they argued that plaintiffs failed to plausibly allege (1) a conspiracy; (2) that the moving Defendants joined the conspiracy; and (3) antitrust standing. 2016 WL 5108131, at *2 (S.D.N.Y. Sept. 20, 2016) ("*FOREX III*"). This Court again rejected Defendants' arguments. *Id.*

In *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300, 2017 WL 3309759, at *2 (S.D.N.Y. Aug. 3, 2017) ("*Nypl II*"), plaintiffs were direct purchasers in a market separate from the market for FX spot Instruments: the market for foreign currency purchased at retail banks. The Court initially dismissed the action for failure to plausibly allege that Defendants' anticompetitive acts restrained the market for retail foreign currency. *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2017 WL 1133446, at *4 (S.D.N.Y. Mar. 24, 2017) ("*Nypl I*"). However, in *Nypl II*, this Court granted the plaintiffs' motion to file an amended complaint, holding that the proposed amended complaint corrected the deficiencies of the prior complaint and sufficiently alleged that Defendants' manipulation of FX benchmark rates caused plaintiffs to incur overcharges in the separate market for retail currency. 2017 WL 3309759, at *4.

## LEGAL STANDARDS ON A MOTION TO DISMISS

### A.    Antitrust Conspiracy

Even post-*Twombly* and post-*Iqbal*, the Court in adjudicating Defendants' motion must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. New York Cardiothoracic Group, PLLC*, 570 F.3d 471, 475 (2d Cir. 2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]o present a plausible [antitrust conspiracy] claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). "[T]he plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct." *Id.* at 189-90.

### B.      Indirect Purchaser Standing

Defendants assert that Plaintiffs lack antitrust standing. But throughout their brief, Defendants improperly conflate the antitrust standing requirements for *direct purchasers* seeking damages pursuant to *federal law* with the requirements for *indirect purchasers* seeking damages under *state laws* as is the case here. The state laws under which Plaintiffs sue were enacted specifically in response to *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), to establish indirect purchaser antitrust remedies. The federalism aspect of this matters. Each Indirect Purchaser State expressly granted antitrust standing to indirect purchasers in the wake of *Illinois Brick*. It is quite literally impolitic for Defendants to ask this Court to abrogate such duly enacted state laws by dismissing Plaintiffs' claims – especially here, where Defendants conspired to rig markets because, as one Defendant's employee said, "if you aint cheating, you aint trying." CCAC ¶ 2. If duly enacted state antitrust laws do not reach Defendants' conduct, such laws are meaningless.

*Illinois Brick* frames this issue. In *Illinois Brick*, the Court held, with respect to federal claims for damages brought pursuant to Section 4 of the Clayton Act, only "the overcharged direct purchaser, and not others in the chain of manufacture or distribution," has standing to claim damages. 431 U.S. at 729. Therefore, indirect purchasers cannot sue for damages under federal antitrust law. *Id*. In direct response to *Illinois Brick*, a number of states enacted so-called "*Illinois Brick* repealer" laws that permitted indirect purchasers to recover damages for antitrust violations pursuant to state antitrust and consumer protection statutes. These states include New York, California, Illinois, and Minnesota (state antitrust statutes), as well as Florida and Massachusetts (state consumer protection statutes).[2] Other states, including North Carolina,

---

[2] *See* N.Y. GEN. BUS. LAW § 340(6); CAL. BUS. & PROF. CODE § 16750; 740 ILL. COMP. STAT. ANN. 10/7(2); MINN. STAT. ANN. § 325D.57; *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100 (Fla. Dist. Ct. App. 1996); *Ciardi v. F. Hoffmann-La Roche, Ltd*., 762 N.E.2d 303 (Mass. 2002). California permits indirect antitrust purchasers to recover

established through judicial precedent that state antitrust causes of action extend to persons who are indirectly injured by the defendants.[3] In *California v. ARC Am. Corp.*, 490 U.S. 93 (1989), the Supreme Court held that federal antitrust laws do not preempt state antitrust laws and that state laws permitting indirect purchasers to receive damages are not in conflict with federal antitrust laws. *Id.* at 105-06; *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *7 (N.D. Cal. Oct. 2, 2014) ("States are free to expand antitrust standing under their laws beyond what federal law permits.").

In *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983), the Court clarified *Illinois Brick*'s limitations on standing in **federal** antitrust damages claims, holding that "despite the broad wording of [Section 4 of the Clayton Act,] there is a point beyond which the wrongdoer should not be held liable." *Id.* at 534-35. To guide that evaluation, the Supreme Court set forth a multifactor balancing test for ascertaining whether direct purchaser plaintiffs suing for damages under Section 4 of the Clayton Act sufficiently allege antitrust standing. *Id.* at 537. Under that test, the plaintiff "must plausibly allege that (i) it suffered an antitrust injury, meaning injury 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' and (ii) that it is a suitable plaintiff in that it satisfies the so-called 'efficient enforcer' factors." *FOREX III*, 2016 WL 5108131, at *5. The "efficient enforcer factors" are:

> (i) the "directness or indirectness of the asserted injury," viewed in light of the "chain of causation" linking a plaintiff's alleged injury and the defendant's anticompetitive conduct; (ii) the "existence of more direct victims of the alleged conspiracy;" (iii) whether damages are "highly speculative;" and (iv) whether allowing the claim would pose "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

damages pursuant to its Unfair Competition Law. *Hall v. Time Inc.* 70 Cal.Rptr.3d 466 (Cal. App. 2008) (UCL standing satisfied when the plaintiff has "expended money due to the defendant's acts of unfair competition").
[3] *Hyde v. Abbott Labs., Inc.*, 473 S.E.2d 680, 686 (N.C. Ct. App. 1996) ("[T]he *Illinois Brick* limitation does not apply in North Carolina."), *rev. denied,* 478 S.E.2d 5 (N.C. 1996).

*Id.* at *7 (quoting *AGC*, 459 U.S. at 538-45).

Where Plaintiffs claim damages pursuant to state *Illinois Brick* repealer laws rather than federal law, antitrust standing is a matter of state law. Therefore, "[the] *AGC* factors apply to standing inquiries under state antitrust laws ***only to the extent that a state has adopted them***."[4] None of the Indirect Purchaser States adopted the *AGC* factors for evaluating indirect purchaser antitrust standing. Thus, Plaintiffs' standing must be evaluated under the corresponding state laws upon which Plaintiffs' claims for relief are based.[5] In determining whether a plaintiff has standing, courts must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 191 (2d Cir. 2014) (citation omitted).

### C.    Injunctive Relief

A plaintiff seeking relief under Section 16 of the Clayton Act must allege a threat of future antitrust injury, *i.e.*, threatened loss or damage of the type that the antitrust laws were designed to prevent. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986). Unlike with federal damages claims, indirect purchaser status does not bar plaintiffs from seeking injunctive relief under § 16 of the Clayton Act. *See, e.g.*, *Laumann v. Nat'l Hockey League*, 907

---

[4] *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 564 (E.D. La. 2013) (emphasis added); *see ARC Am. Corp.*, 490 U.S. at 105, 109; *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (holding that the Supreme Court's analysis in *AGC* was limited to statutory interpretation of the Clayton Act); *see also, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) ("*TFT*") ("[I]t is inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the repealer states' laws in the absence of a clear directive from those states' legislatures or highest courts"); *D.R. Ward Const. Co. v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 501 (E.D. Pa. 2006) (holding this is true even where state antitrust laws contain a "harmonization provision" stating state courts may use federal decisions as a guide).

[5] Those laws are: N.Y. GEN. BUS. LAW § 340 ("Donnelly Act"); ARIZ. REV. STAT. § 44-1402 ("Arizona Antitrust Act" or "AAA"); CAL. BUS. & PROF. CODE § 16720 ("Cartwright Act"); CAL. BUS. & PROF. CODE § 17200 ("California's UCL"); FLA. STAT. § 501.204 ("Florida Deceptive and Unfair Trade Practices Act" or "FDUTPA"); 740 ILL. COMP. STAT. ANN. 10/3 ("Illinois Antitrust Act" or "IAA"); MASS. GEN. LAWS ch. 93A ("Massachusetts Consumer Protection Act" or "MCPA"); MINN. STAT. § 325D.51 ("Minnesota Antitrust Law"); and N.C. GEN. STAT. § 75-1 ("North Carolina Unfair and Deceptive Trade Practice Act" or "NCUDTPA").

F. Supp. 2d 465, 480 n.80 (S.D.N.Y. 2012). Although courts often examine the *AGC* factors in determining whether plaintiffs have standing to bring federal claims for injunctive relief, "many of [the *AGC*] factors are not relevant to the standing inquiry under § 16 [of the Clayton Act]," where "standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries [once an injunction is imposed]." *Cargill*, 479 U.S. at 110 n.5, 111 n.6.

## ARGUMENT

### I.    Defendants' Request for a Stay is Unwarranted

The CCAC makes clear that all relevant Plaintiff trades were entered into directly with a member of the Direct Settlement Class, not with any Cartel Member. Purchases of FX Instruments from parties other than Cartel Members are not included in the settlements in *FOREX*. *See, e.g.*, *FOREX* at ECF No. 481-1 (JP Morgan Settlement, defining the Direct Settlement Class). Thus, Plaintiffs are not members of the Direct Settlement Class, and are not subject to the Court's injunction preventing Direct Settlement Class members from prosecuting related claims. *See id.* at ECF Nos. 536, 866; D. Br. at 33.

In support of their claim that Indirect Purchaser Class Plaintiffs are in fact members of the OTC Settlement Class in FOREX, Defendants attempt to confuse "FX brokers" (which enter into principal-to-principal transactions with retail FX customers) with agent brokers (which enter into a transaction as an agent on behalf of their customers). D. Br. at 33-35. As alleged in the CCAC, and as Defendants are undoubtedly aware, retail foreign exchange dealers ("RFEDs") act as counterparties in FX transactions with retail customers, and not as agents. RFEDs "are often referred to as 'FX brokers'" in the financial industry, and the CCAC uses those terms interchangeably. CCAC ¶ 77; *see Ret. Bd. of the Policemen's Annuity v. FXCM Inc.*, No. 15-cv-3599, 2016 WL 4435243, at *1-9 (S.D.N.Y. Aug. 18, 2016) (referring to an RFED

interchangeably as a "retail foreign exchange firm," "currency brokerage firm," "retail broker," and an "FX broker"), *vacated on other grounds,* 2017 WL 3180873 (2d Cir. July 27, 2017). At all relevant times, the RFEDs that Plaintiffs purchased from were registered with the CFTC as Retail Foreign Exchange Dealers, and those RFEDs were acting in their capacity as Retail Foreign Exchange Dealers when purchasing FX Instruments directly from Defendants (in a principal-to-principal transactions) and selling those FX Instruments directly to Plaintiffs and members of the Classes (also in principal-to-principal transactions).[6] The RFEDs from which Plaintiffs purchased FX Instruments are members of the Direct Settlement Class, but Plaintiffs clearly are not. Therefore, the *FOREX* injunction that prevents Direct Settlement Class members from bringing separate claims is inapplicable here.

## II.      Plaintiffs Plausibly Allege an Anticompetitive Conspiracy in Violation of Federal and State Laws

Defendants do not argue Plaintiffs fail to plausibly allege an anticompetitive conspiracy. Nor do they contest that the CCAC plausibly alleges that Defendants' conduct violates the state and federal laws under which Plaintiffs seek relief. Plaintiffs specifically allege how Cartel Members coordinated to manipulate FX benchmark rates and prices on FX spot Instruments, in violation of the federal Sherman Act as well as the antitrust and consumer protection laws of the Indirect Purchaser States. For the same reasons this Court found Defendants' alleged anticompetitive conspiracy plausible in *FOREX I*, *FOREX III*, and *Nypl II*, it should do so here and deny Defendants' Motion to Dismiss. *See FOREX I,* 74 F. Supp. 3d at 597; *FOREX III,* 2016 WL 5108131, at *6; *Nypl II,* 2017 WL 3309759, at *4.

---

[6] CFTC regulations define a "Retail foreign exchange dealer" as "any person that is, or that offers to be, the counterparty to a retail forex transaction," except for U.S. financial institutions, and certain persons registered as brokers or dealers registered pursuant to the Securities Exchange Act of 1934. 17 C.F.R. 5.1(h)(1); 7 U.S.C. § 2(c)(2)(B)(i)(II).

### III.   Plaintiffs Plausibly Allege that Defendants' Conspiracy Is the Material, But-For, and Proximate Cause of Plaintiffs' Damages

Defendants assert that the CCAC fails to plausibly allege that Defendants' fixing of FX Instruments and benchmark rates caused Plaintiffs' injuries. This argument fails. First, the chain of causation alleged in the CCAC is stronger than those found to be sufficient in many *direct purchaser* cases, including *FOREX III* and *Nypl II*. Defendants fixed and manipulated prices on FX Instruments, sold those FX Instruments to RFEDs at supracompetitive prices, and the RFEDs sold those FX Instruments to Plaintiffs, thereby passing on the supracompetitive overcharges to Plaintiffs. It is difficult to envision a more "direct" indirect purchaser case, as it were. Second, Defendants fail to explain how some other causal factor could have contributed to the overcharges that Plaintiffs here allege that they paid as a direct result of Defendants' conduct. Defendants do not assert—and the allegations in the CCAC do not indicate—that any intervening cause contributed to or detracted from the overcharges paid by Plaintiffs as a direct result of Defendants' fixing of FX Instrument prices and FX benchmark rates.

An indirect purchaser plaintiff in an antitrust case "must show that a defendant's anticompetitive act was a 'material' and 'but-for' cause of plaintiff's injury, although not necessarily the sole cause." *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017) (citation omitted). "Proximate cause" for purposes of antitrust liability exists where the complaint plausibly alleges that Defendants' anticompetitive acts were sufficiently related to the overcharges incurred by Plaintiffs. *See, e.g.*, *In re London Silver Fixing, Ltd. Antitrust Litig.*, 213 F. Supp. 3d 530, 568 (S.D.N.Y. 2016) ("*Silver*"). "'[A] plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury.'" *In re Actos End-Payor Antitrust Litig.*, 848 F.3d at 97-98 (citation omitted). On a motion to dismiss, it is improper to ask the Court to weigh competing causal theories drawn from the allegations in the

CCAC. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 113 (2d Cir. 2010). Courts have consistently found that indirect purchasers adequately alleged causation in cases such as this one where "Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002); *see, e.g.*, *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 222 (S.D.N.Y. 2012).

The CCAC clearly supports the inference that Defendants' price-fixing was a material, but-for, and proximate cause of the overcharges incurred by Plaintiffs. The connection between Defendants' price fixing and the overcharges alleged in the CCAC are more "mechanical" and "direct" than the alleged chains of causation that this Court found sufficient in the ***direct*** purchaser cases *Nypl II* and *FOREX III*. In *Nypl II*, the prices paid by those direct purchaser plaintiffs in the separate retail currency market were merely "linked by a benchmark that is both derived from one market and determinative of price in the other market." 2017 WL 3309759, at *6. Similarly, in *FOREX III*, the Court found the "Exchange Class" plaintiffs' allegations sufficient where the complaint alleged that the prices paid by persons that "entered into one or more FX Instruments on a U.S. exchange" were artificially inflated because "FX spot market prices, including benchmark rates, directly impact the prices of exchange-traded FX futures and options contracts." 2016 WL 5108131, at *5-6.

Here, Defendants sold FX Instruments at supracompetitive prices to members of the Direct Settlement Class, and those Direct Settlement Class members resold the same FX Instruments to Plaintiffs. This is precisely the scenario that the Indirect Purchaser States envisioned in enacting laws that provide for causes of action to be brought by antitrust indirect purchasers. For every transaction where a member of the Direct Settlement Class paid an

10

overcharge on an FX Instrument to Defendants and then sold that FX Instrument to a Plaintiff, the Plaintiff incurred the same overcharge. But for Defendants' conspiracy to artificially inflate prices on FX Instruments, Plaintiffs would not have incurred those overcharges. The fact that there were a large number of those transactions does not render the chain of causation any less direct. *See* CCAC ¶ 51; *FOREX III*, 2016 WL 5108131, at *8.

Defendants' vague unsubstantiated speculation that "the intermediaries plaintiffs dealt with here ***might*** never have even backed their trades with plaintiffs using liquidity from any outside source at all . . .," D. Br. at 12 (emphasis added), directly contradicts the CCAC's definition of the Classes, which explicitly exclude such transactions from Plaintiffs' claims for relief. Plaintiffs and the Classes that Plaintiffs seek to represent are all specifically and narrowly defined as persons and entities who "indirectly purchased an FX Instrument from a Defendant or co-conspirator . . . by entering into an FX Instrument with a member of the Direct Settlement Class, ***where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator***." CCAC ¶¶ 40-47 (emphasis added). If an individual purchased an FX Instrument from an intermediary where the intermediary purchased that FX Instrument from some "source" other than the Cartel Members, that transaction does not qualify the individual for membership in the Classes. *Id.* The proposed Class, therefore, is limited to a specific and identifiable subset of indirect purchasers whose transactions can be traced only to the members of the Direct Settlement Class with whom most of the Defendants have already settled in *FOREX*. Defendants' purported concerns regarding some as yet-unknown and non-qualifying transactions emanated from their conspiracy are irrelevant here.

Defendants' distortion of *In re Platinum and Palladium Antitrust Litig.*, No. 1:14-cv-9391, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017), D. Br. at 12-13, is unavailing. Plaintiffs in

*Platinum* were sellers of platinum and palladium alleging that they incurred damages in violation of the Sherman Act and Commodities Exchange Act as a result of the defendants fixing prices at artificially low levels. *Id*. at *3. The court granted dismissal of the Sherman Act claims with leave to replead, holding that because the plaintiffs failed to allege that they transacted directly with defendants, they were not "efficient enforcers" and could not claim damages under the federal laws. *Id.* at *25. Defendants' selective quotations in their brief regarding "intervening causative factors" were not, as Defendants claim, the basis for the court's decision; in fact, after discussing the law on so-called "umbrella purchaser" standing, the court expressly designated those quotations as dicta, concluding that "analyzing Plaintiffs' claims under an umbrella theory of liability leads to no dispositive conclusions." *Id.* at *22. Because Plaintiffs here are indirect purchasers, the *Platinum* court's concern that the plaintiffs in that case did not transact directly with the defendants is inapposite. As discussed below, the "efficient enforcer" factors are not applicable to Plaintiffs' Indirect Purchaser State claims. And no "significant intervening causative factors" can be inferred from the CCAC, given that the proposed Classes are limited to those who "enter[ed] into an FX Instrument with a member of the Direct Settlement Class, *where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.*" CCAC ¶¶ 40-47 (emphasis added).[7]

---

[7] Defendants' reliance on *In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11-md-2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") is unavailing and misleading for the same reasons. As with *Platinum*, Defendants draw their quotations from dicta in which the *LIBOR VI* court noted cases from "[s]ome courts" discussing umbrella purchasers. *Compare* D. Br. at 13 *with LIBOR VI*, 2016 WL 7378980, at *15. The *LIBOR VI* court's holding that direct purchasers must transact directly with defendants to claim damages under federal law, *id.* at *16, does not affect the standing of indirect purchasers claiming damages under the state laws. Defendants' citation to *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016), is also inapposite. There, in the context of an antitrust conspiracy to fix the price of aluminum that involved the "exceedingly complex" mechanics of the aluminum futures, warehousing, and distribution markets, the court found that commercial and consumer end users of physical aluminum lacked antitrust standing because their injury "was not inextricably intertwined with whatever injury the defendants allegedly intended to inflict." *Id.* at 161-62. Here, by contrast, Plaintiffs' allegations tie their injuries directly to Defendants' FX manipulation through their transactions with members of the Direct Settlement Class. Finally, *Supreme Auto Transp. LLC v. Mittal*, 238 F. Supp. 3d 1032 (N.D.

Defendants incorrectly state that "there are no allegations [in the CCAC] that any of plaintiffs' intermediaries, much less any plaintiff, transacted at prices in <u>any</u> market based on <u>any</u> benchmark price or any rate determined by any defendant." D. Br. at 5 (emphasis in original). In fact, the CCAC alleges that prices for the FX spot Instruments purchased by Plaintiffs and the Classes were directly impacted by Defendants' manipulation of FX benchmark spot rates.[8] This Court has thrice found plausible allegations that Defendants' manipulation of FX benchmark rates impacted the prices of FX Instruments throughout the market and in related markets, including FX spot Instruments (*FOREX I*, 74 F. Supp. 3d at 592; *FOREX III,* 2016 WL 5108131, at *5-6), FX Exchange-Traded Instruments, (*FOREX III*, 2016 WL 5108131, at *6), and FX in the consumer retail market (*Nypl II*, 2017 WL 3309759, at *6).[9] Furthermore, the CCAC alleges that in addition to manipulating FX benchmark rates, Defendants also directly manipulated FX spot Instrument prices. *See, e.g.*, ¶¶ 106, 117, 154-55, 159. The CCAC details how Defendants' manipulation of FX benchmark rates *and* FX spot Instrument prices directly caused Plaintiffs to incur overcharges on FX Instruments:

> On any day that one or more of the Fixes or spot rates were manipulated by Defendants, all members of the Direct Settlement Class (i.e. all entities that purchased FX Instruments directly from Defendants and Defendants' co-conspirators) paid supracompetitive prices for those FX Instruments. Each time a member of the proposed Classes purchased an FX Instrument directly from a member of the Direct Settlement Class (and thus indirectly purchased from one or more Defendants or co-conspirators), the overcharge incurred by

Ill. 2017), a case involving alleged reduced steel production to drive up the price of steel, similarly fails to support Defendants' motion. Unlike here where the CCAC specifically alleges how Defendants' conspiracy caused Plaintiffs' damages, the plaintiffs in *Supreme Auto*, purchasers of consumer products made with steel and other materials, "[did] not even identify whether the steel in these products came from defendants' steel mills at all." *Id.* at 1040.

[8] *See, e.g.*, CCAC ¶¶ 79, 147, ¶ 155; *see also FOREX I*, 74 F. Supp. 3d at 59 ("Defendants conceded . . . that any particular transaction that a particular Plaintiff entered into with a particular Defendant on a day that the Fix was manipulated to that Plaintiff's detriment would sufficiently demonstrate injury in fact as to that Plaintiff.").

[9] *See also Silver*, 213 F. Supp. 3d 530, 54 (finding plausible that "Defendants suppressed the Fix Price, which had a direct (and negative) impact on the value of [Plaintiffs'] silver investments"); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 658 (S.D.N.Y. Oct. 3, 2016) ("Because the Court finds that [defendants fixing benchmark rates] was a price altering event, because exogenous factors affect price movements in most antitrust cases, and because the existence of such factors does not alone defeat standing, questions regarding the extent of Plaintiffs' injuries can best be resolved at a later stage.").

13

the direct purchaser as a result of Defendants' FX manipulation was directly passed on to the member of the proposed Classes.

¶ 204. Plaintiffs' allegations detailing how Defendants' anticompetitive conduct caused Plaintiffs' injuries exceed the "plausibility" threshold required to survive Defendants' Motion.

Finally, the fact that Direct Settlement Class members may have added some markup in reselling FX Instruments to Plaintiffs does not make the chain of causation any less direct where, as here, those transactions are easily traceable and calculable from readily available records of Direct Settlement Class members. *See FOREX III*, 2016 WL 5108131, at *8, *10. In *Nypl II*, this Court found plaintiffs' allegations sufficient where the complaint alleged that the prices paid by those direct purchaser plaintiffs in the separate retail currency market were "Benchmark exchange rates derived from FX spot trading plus a small fee for handling." *Nypl* Compl. ¶ 6 (*Nypl* ECF No. 190); *Nypl II*, 2017 WL 3309759, at *1. Here, the CCAC alleges that the prices for FX spot Instruments sold by RFEDs to Plaintiffs were the same prices that the RFEDs paid to Defendants for those same FX spot Instruments, plus "an additional fee or commission determined by the [RFED]." ¶ 149. Thus, the manner by which the alleged conspiracy affected the prices the Direct Settlement Class paid for FX Instruments purchased from Defendants is not meaningfully different from how the conspiracy affected the prices paid for those same FX Instruments resold from members of the Direct Settlement Class to Plaintiffs here. *C.f. FOREX III*, 2016 WL 5108131, at *6. Furthermore, inquiries into the extent and calculation of Plaintiffs' damages are inappropriate at the motion to dismiss stage, where the only burden on Plaintiffs is to plausibly allege that Defendants' anticompetitive conduct caused Plaintiffs to incur overcharges.[10] The CCAC easily meets that burden, and the Court should reject Defendants'

---

[10] *See Clinton v. Brown & Williamson Holdings, Inc.*, No. 05-CV-9907 CS, 2013 WL 3111122, at *16 (S.D.N.Y. June 20, 2013) ("[P]roximate cause is a quintessential jury question.") (citing cases); *In re Commodity Exch., Inc.*,

causation arguments for the same reasons that it rejected Defendants' similar arguments in *FOREX I*, *FOREX III*, and *Nypl II*.

### IV.    *AGC* Does Not Apply to Plaintiffs' State-Law Damages Claims

The *AGC* "efficient enforcer" standing test does not apply to state antitrust laws like the ones at issue here unless the state expressly adopts it. *See supra* n.4. All the states whose laws are at issue in this action have declined to apply the *AGC* "efficient enforcer" factors for purposes of determining an indirect purchaser's standing to bring state-law antitrust claims. As such, the *AGC* factors do not apply to Plaintiffs' state-law damages claims.

Defendants concede that the *AGC* factors do not apply to Plaintiffs' Florida, Massachusetts, and Minnesota claims, D. Br. at 17, but argue that the Court should apply all *AGC* factors to Plaintiffs' Arizona, California, Illinois, New York, and North Carolina claims. *Id.* at 28. The courts in Arizona, California, and North Carolina have made clear that the *AGC* factors do not apply to indirect purchaser claims brought pursuant to the AAA, the Cartwright Act, California's UCL, or NCUDTPA. Defendants admit that the highest courts in Illinois and New York "have yet to consider whether the *AGC* factors apply," but argue that several cases weigh in favor of applying *AGC* to Plaintiffs' IAA and Donnelly Act claims. D. Br. at 17 n.13. All of these arguments fail.

#### A.    Arizona

In *Bunker's Glass Co. v. Pilkington PLC*, the Arizona Supreme Court declined to apply the *AGC* factors, holding that indirect purchasers may sue under the AAA. 75 P.3d 99, 102 (Ariz. 2003). Following *Bunker's Glass*, federal courts have repeatedly held that the *AGC* factors do

---

213 F. Supp. 3d at 658; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819, 2010 WL 5071694, at *9 (N.D. Cal. Dec. 7, 2010) ("Plaintiffs' standing is not defeated because they have not quantified the extent of their injury throughout the entire class period.").

not apply to indirect purchaser claims under the AAA.[11] Defendants cite an unpublished Arizona

trial court decision, *Luscher v. Bayer AG*, No. 2004-cv-14835, 2005 WL 6959406, at *1-2 (Ariz.

Super. Ct. Sept. 16, 2005), which applied *AGC* to prohibit a suit against synthetic rubber

manufacturers by indirect purchasers of end products containing synthetic rubber. D. Br. at 17

n.13 (citing *Luscher*, 2005 WL 6959406, at *1-2).[12] However, federal courts have consistently

held that, in light of *Bunker's Glass*, *Luscher* "is unpersuasive." *Pool Prods.*, 946 F. Supp. 2d at

567; *D.R. Ward*, 470 F.Supp.2d at 489 ("[N]otwithstanding the *Luscher* decision, this Court

predicts that the Arizona Supreme Court would apply its traditional standing approach, rather

than an *AGC* analysis."). Given the Arizona Supreme Court's clear indication that *AGC* does not

apply to the AAA, this Court should decline to apply it.

### B.    California

While some early cases applied *AGC* in determining whether indirect purchasers had

standing to claim damages under California law, the California Supreme Court's more recent

decision in *Clayworth v. Pfizer, Inc.* abrogated those earlier cases. 233 P.3d 1066, 1069 (Cal.

2010) (permitting suit by indirect purchasers under the Cartwright Act and California's UCL

without applying *AGC*). Since *Clayworth*, courts have repeatedly recognized that the *AGC*

factors do not apply in evaluating indirect purchaser standing under the Cartwright Act and

California's UCL. *See Pool Prods.*, 946 F. Supp. 2d at 564 (defendants' citations to pre-

*Clayworth* cases applying *AGC* "cannot overcome the California Supreme Court's decision

---

[11] *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1151 (N.D. Cal. 2009) ("*Flash*"); *D.R. Ward Const. Co. v. Rohm and Haas Co*., 470 F.Supp.2d 485, 489 (E.D. Pa. 2006); *Pool Prods.*, 946 F. Supp. 2d at 567.
[12] Defendants also cite to *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032 (N.D. Ill. 2017), which stated without citation to any authority that Arizona, California, New York, and North Carolina adopted *AGC*. As noted herein and below, that court clearly erred by contravening the high courts of Arizona, California, and North Carolina. And as Defendants concede in the same footnote, New York has not expressly adopted *AGC*. D. Br. at 17 n.13. The one other case Defendants cite in support of the notion that *AGC* applies to AAA claims is *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1135 (N.D. Cal. 2008). There, the plaintiffs declined to contest that the *AGC* factors applied, so the court did not decide on the issue. *Id.* at 1135.

in *Clayworth* to allow suit by indirect purchasers under the Cartwright Act and the UCL without applying the *AGC* factors."). In support of their contention that *AGC* applies to Plaintiffs' Cartwright Act claim here, Defendants cite two cases that were abrogated by *Clayworth*, and one case that does not even mention indirect purchaser standing.[13] Defendants' assertion that the *AGC* factors apply to California claims, then, is plainly wrong.

## C. North Carolina

Contrary to Defendants' claim that the *AGC* analysis applies to North Carolina claims, North Carolina courts have consistently affirmed that "the *AGC* factors do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes,"[14] and the federal courts have accordingly refused to apply *AGC* to indirect purchaser claims brought pursuant to North Carolina law.[15] This Court should do the same.

---

[13] *Compare Vinci v. Waste Mgmt., Inc.,* 43 Cal. Rptr. 2d 337, 338-39 (Cal. App. 1995) (considering *AGC* factors 15 years before *Clayworth*), *and Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 987 (9th Cir. 2000) (same, 10 years before *Clayworth*), *with Pool Prods.,* 946 F. Supp. 2d at 564 (noting that *Vinci* was abrogated by *Clayworth*), *and In re Capacitors Antitrust Litig.,* 106 F. Supp. 3d 1051, 1073 (N.D. Cal. 2015) (noting *Knevelbaard* was abrogated by subsequent California Supreme Court decisions). Defendants also cite *Nypl II,* 2017 WL 3309759, at *7, in which this Court noted the *AGC* factors in holding that the *direct purchaser* plaintiffs sufficiently established standing. Because *Nypl II* did not involve indirect purchaser claims, this Court did not address whether those same factors apply for purposes of determining indirect purchaser standing. *See id.*

[14] *Teague v. Bayer AG,* 671 S.E.2d 550, 557 (N.C. App. 2009) (rejecting analogies to *AGC* and other state cases applying *AGC* factors to state-law claims because they did not involve indirect purchasers); *see also Hyde v. Abbott Labs., Inc.,* 473 S.E.2d 680, 686 (N.C. App. 1996) (affirming indirect purchaser standing without applying *AGC*).

[15] *See, e.g., Static Control Components, Inc. v. Lexmark Int'l, Inc.,* 697 F.3d 387, 411 (6th Cir. 2012) ("North Carolina has held that the *AGC* factors 'do not apply in determining which indirect purchasers have standing to sue under the North Carolina antitrust statutes.'") (quoting *Teague,* 671 S.E.2d at 557), *aff'd,* 134 S. Ct. 1377 (2014); *Flash,* 643 F. Supp. 2d at 1151 (same). The cases Defendants cite on this point are unpersuasive. Two of those cases state that North Carolina applies *AGC* to antitrust claims without any independent citation to authority and with no attempt to address *Teague. See Supreme Auto,* 238 F. Supp. 3d at 1038-39 & n.4; *Sahagian v. Genera Corp.,* No. 08-cv-7613, 2009 WL 9504039, at *4 (C.D. Cal. Jul. 6, 2009). Defendants' reliance on *Crouch v. Crompton* (a trial court decision) is outdated. *See Dicesare v. Charlotte-Mecklenburg Hosp. Auth.,* No. 16-cv-16404, 2017 WL 1359599, at *10 (N.C. Sup. Ct. Apr. 11, 2017) (stating that *Teague* "unequivocally" rejected *Crouch* and held that the *AGC* factors do not apply to indirect purchaser standing under North Carolina's antitrust laws). Finally, the court in *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,* 2015 WL 3988488 (N.D. Ill. June 29, 2015), chose to follow a trial court decision (*Crouch*) over a state appellate court decision (*Teague*), which was improper for the same reasons that Defendants' citation to *Crouch* is improper.

### D.      New York

Defendants admit that "New York's highest court[] ha[s] yet to consider whether the

*AGC* factors apply to . . . the Donnelly Act." D. Br. at 17 n.13. That alone is sufficient to show

that this Court should not apply *AGC* to the indirect purchaser claim here, as Defendants have

failed to demonstrate "a clear directive from [New York's] legislature[] or highest court[]" that

*AGC* applies. *See TFT*, 586 F. Supp. 2d at 1123. In support of their claim that New York applies

*AGC* to indirect purchaser claims, Defendants cite two inapt non-indirect purchaser cases,[16] and

one unpublished New York trial court opinion which was affirmed in a three-paragraph,

unreported intermediate appellate decision that made no mention of *AGC*.[17] Other courts faced

with the same argument have rejected it; this Court should do the same. *See, e.g.*, *Lithium*, 2014

WL 4955377, at *9 (noting defendants' citation of the *Ho* trial court and intermediate appellate

court cases fell "well short" of establishing that the New York courts would apply *AGC* to

indirect purchaser claims). For example, in *In re Ductile Iron Pipe Fittings (DIPF) Indirect*

*Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013), the court

rejected the defendants citation to *Ho* in arguing that New York applies *AGC*, emphasizing that

they failed to cite "any state appellate cases to show that the highest court in those states would

apply the *AGC* factors in those states" and thus held it inappropriate to "'undertake the back-

breaking labor involved in deciphering the state of antitrust standing in each of those states'

---

[16] In *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68 (2d Cir. 2013), the plaintiff was a distributor who alleged unlawful exclusion from defendants' distribution network. *Id.* at 81. Similarly, *Cont'l Guest Servs. Corp. v. Int'l Bus Servs., Inc.*, N.Y.S.2d 30 (N.Y. App. Div. 2012) was an intermediate appellate case involving monopolization claims by a hotel operator against tour bus operators. Neither case commented on whether New York applies *AGC* to *indirect purchaser* claims. Following *Gatt*, the Second Circuit expressly declined to decide whether *AGC* applies to indirect purchaser claims under New York law. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d at 158 (holding the court "need not resolve the parties' vigorous dispute over which, if any, of the efficient enforcer factors apply . . .").

[17] *Ho v. Visa U.S.A., Inc.,* No. 112316/00, 2004 WL 1118534, at *5 (N.Y. Sup. Ct. Apr. 21, 2004) (unreported), *aff'd*, 793 N.Y.S.2d 8 (N.Y. App. Div. 2005).

where a party has not 'show[n] that *AGC* has been adopted as the law of those states.'" *Id.* at

*16. Because Defendants here similarly failed to cite a single case indicating that New York's

highest court would apply *AGC* to indirect purchaser claims brought under the Donnelly Act, this

Court should decline to apply *AGC* here.

### E.      Illinois

As with New York, Defendants concede that "Illinois['] highest court[] ha[s] yet to

consider whether the *AGC* factors apply to the [IAA]," but argue that this Court should do so

regardless. D. Br. at 17 n.13. The only authority Defendants offer is *County of Cook v. Philip

Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004), an Illinois intermediate appellate court ruling

affirming summary judgment dismissal of state consumer fraud and antitrust claims. The court in

*Philip Morris* quoted a portion of *AGC* discussing "directness" in evaluating whether the

plaintiffs adequately demonstrated on summary judgment that their injuries were proximately

caused by defendants. *Id.* at 1045. The court did not discuss any *AGC* factors other than

directness and duplicative damages, and certainly did not hold that *AGC* applies for purposes of

evaluating indirect purchaser standing under the IAA. *See id.* at 1045-47. Absent any indication

that the Illinois Supreme Court would apply *AGC* to indirect purchaser claims, this Court should

decline to do so.

### V.      **Even if *AGC* Applied, Defendants' Motion to Dismiss Would Fail**

Some states not at issue here have adopted the *AGC* factors for state-law antitrust claims.

*See Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 198 (Iowa 2007); *Kanne v. Visa U.S.A., Inc.*,

723 N.W.2d 293, 300-02 (Neb. 2006). Other courts have noted the *AGC* factors but declined to

decide whether they should be applied to particular state antitrust laws, reasoning that the

plaintiffs had standing regardless of whether the *AGC* factors were applied.[18] The limited subset

of courts that have used *AGC* "as a guide" in evaluating indirect purchaser claims recognize that

the "efficient enforcer" factors are less significant in assessing indirect purchaser standing under

state repealer statutes. *See, e.g.*, *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp.

2d 404, 410 (D. Del. 2007) (holding plaintiffs sufficiently alleged antitrust injury and but-for

causation and that "the remaining three *AGC* factors . . . carry less weight in the standing

analysis in jurisdictions rejecting *Illinois Brick*"). Even if the Court applies *AGC* or some

modified version to Plaintiffs' state-law claims here, it should find that Plaintiffs adequately

alleged standing.

### A.    The Injuries Plaintiffs Allege Are the Type the Antitrust Laws Are Intended to Prevent, and Plaintiffs Are Participants in the Market for FX Spot Instruments

"The first factor under *AGC* is whether the injury alleged by Plaintiffs is the type the

antitrust laws are intended to prevent." *Flash*, 643 F. Supp. 2d at 1153. In *FOREX III*, this Court

recognized that "being forced to pay supra-competitive prices as a result of the defendants'

anticompetitive conduct] plainly is 'of the type the antitrust laws were intended to prevent'" and

held that "[t]he Complaint therefore pleads antitrust injury." 2016 WL 5108131, at *6 (citations

omitted). Accordingly, this factor weighs strongly in favor of denying Defendants' motion.

Defendants do not dispute that the overcharges Plaintiffs allege they incurred are of the type that

the antitrust laws are intended to prevent. Instead, Defendants attempt to parse the market for FX

Instruments, claiming that the market in which FX spot Instruments sold from Defendants to

---

[18] *See In re Graphics Processing Units Antitrust Litig.*, 540 F.Supp.2d 1085, 1097 (N.D. Cal. 2007); *Flash*, 643 F. Supp. 2d at 1153; *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09-cv-00852, 2012 WL 3841397, at *4 (E.D. Wis. Sept. 5, 2012).

RFEDs is distinct from the market where those same FX spot Instruments are sold from RFEDs. This argument is incorrect, irrelevant, and procedurally premature.

Indirect purchasers are clearly participants in the same market as Defendants where the products sold from Defendants to direct purchasers are the same as the products that the direct purchasers then resell to indirect purchasers. *See, e.g.*, *Fond du Lac Bumper Exch.*, 2012 WL 3841397, at *3. Indeed, courts reject attempts to parse markets incident to dismissal briefing in indirect purchaser cases even where the products sold by defendants are merely a component of the final products purchased by the indirect purchasers.[19] Here, Plaintiffs purchased FX spot Instruments from members of the Direct Settlement Class in the same market where Defendants sold those same FX spot Instruments to those same Direct Settlement Class members. Not only are those FX Instruments are only "linked by a benchmark" (D. Br. at 2) – they are the ***same*** FX Instruments, purchased from Defendants and resold to Plaintiffs. *See* CCAC ¶ 148.

Even if the FX spot Instruments sold by Defendants to the RFEDs were in a separate market from those same FX spot Instruments sold by the RFEDs to Plaintiffs, the CCAC alleges a highly correlated relationship between the spot prices that Defendants manipulated and the spot prices that Plaintiffs paid in purchasing FX Instruments indirectly from Defendants. CCAC ¶¶ 10-20, 40-47, 148. "[D]ifferent injuries in distinct markets may be inflicted by a single antitrust conspiracy." *FOREX III*, 2016 WL 5108131, at *11 (citation omitted). If the FX Instruments sold from Defendants to Direct Settlement Class are in some distinct market from the one where Direct Settlement Class members resold the same FX Instruments to Plaintiffs, the relationship between those markets alleged in the CCAC is at least as plausible as those found sufficient by

---

[19] *See, e.g.*, *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041, at *7-8 (Nov. 5, 2009 N.D. Ill.); *TFT*, 586 F. Supp. 2d at 1123 (holding that the first *AGC* factor is met where indirect purchaser plaintiffs may have participated in the relevant market through purchases of component-containing products).

this Court in *FOREX III*, *id.* at *11, and *Nypl II*, 2017 WL 3309759, at *5. To the extent any ambiguity exists as to the precise nature of the market in which Plaintiffs purchased FX Instruments indirectly from Defendants, that determination is better suited for resolution at summary judgment or trial. *See Flash*, 643 F. Supp. 2d at 1154 (the "actual determination of whether indirect purchasers are 'participants' in the same 'relevant market' for purposes of antitrust standing is better suited to resolution upon a fuller record").

### B.    Plaintiffs Are Sufficiently "Direct" Indirect Purchasers

As noted by Defendants, the "directness of injury" factor "is essentially a proximate cause analysis." D. Br. at 17 (quoting *In re Commodity Exch., Inc.,* 213 F. Supp. 3d at 654). As discussed in Section III, the CCAC plausibly alleges that Defendants' anticompetitive conduct was the material, but-for, and proximate cause of Plaintiffs' injuries. In support of their argument that Plaintiffs are not sufficiently "direct" for purposes of *AGC*, Defendants state the obvious – that the *FOREX* plaintiffs are direct purchasers. D. Br. at 19-20. However, the fact that the *FOREX* plaintiffs have standing under the federal laws does not affect indirect purchaser standing under the state laws. *See ARC*, 490 U.S. at 100. If the existence of direct purchasers with antitrust damages claims under federal law was dispositive of claims of indirect purchasers under state *Illinois Brick* repealer laws, indirect purchaser claims would not exist. Defendants offer no relevant support for their argument that the existence of the *FOREX* direct purchaser plaintiffs in a federal-law damages action affects the standing of the indirect purchaser Plaintiffs here in a state-law damages action.[20] In *FOREX III* and *Nypl II*, this Court held that the *direct* purchaser plaintiffs satisfied this factor by alleging the prices they paid in separate markets

---

[20] The one case Defendants cite, *Paycom Billing Servs, Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006), is inapposite. *Paycom* merely held that indirect purchasers cannot claim damages under *federal* law, and did not involve or discuss state-law claims. *Id.*

flowed from Defendants' manipulation of FX spot Instrument prices and FX benchmark rates. *See FOREX III*, 2016 WL 5108131, at *9; *Nypl II*, 2017 WL 3309759, at *5. Here, Plaintiffs' alleged overcharges are even more direct. The Classes are narrowly defined as including only individuals who purchased an FX Instrument from a member of the Direct Settlement Class, where the Direct Settlement Class directly purchased that FX Instrument from a Cartel Member. CCAC ¶¶ 40-47. Thus, even if the Court were to apply the "directness" *AGC* factor, Defendants' motion fails.

### C.     Plaintiffs' Alleged Damages Are Not Speculative

Even in direct purchaser cases, alleged injuries are not highly speculative where "they are based on a specifically alleged relationship" between the anticompetitive conduct and Plaintiffs' injuries. *FOREX III,* 2016 WL 5108131, at *9. Damages are not unduly speculative in indirect purchaser cases where, as here, "plaintiffs have sufficiently alleged that overcharges are passed on to consumers, and that such overcharges can be traced through the relatively short distribution chain." *TFT*, 586 F. Supp. 2d at 1124. Further, "[t]he breadth of the alleged conspiracy . . . does not render damages in this case speculative, as any harm from the alleged conspiracy can be shown on a transaction-by-transaction basis." *Id*. at *8. Contrary to Defendants' suggestion, inquiries into the extent and calculation of Plaintiffs' damages are inappropriate at this stage. *TFT*, 586 F. Supp. 2d at 1124. As detailed above, Plaintiffs' overcharges are easily traceable and calculable from readily available records from Direct Settlement Class members. For the same reasons that the CCAC plausibly alleges causation, it also supports the inference Plaintiffs' damages are not speculative.

### D.      Duplicative Recoveries Are Not a Concern Here

Courts uniformly reject the notion that a separate direct purchaser action claiming

damages under federal law prevents indirect purchasers from claiming damages. *See, e.g.*, *Flash*,

643 F. Supp. 2d at 1156. Plaintiffs' Class Definition and the terms of the settlements in *FOREX*

ensure that any recovery by the Indirect Purchaser Class will not be duplicative.

### VI.      <u>Defendants' State-Law Specific Arguments Fail</u>

### A.      Due Process Favors Allowing Plaintiffs' State-Law Claims to Proceed

Defendants contend that, to satisfy due process, "[p]laintiffs must allege that they

purchased the price-fixed goods within the state or that the conspiratorial conduct giving rise to

plaintiffs' claims occurred there." D. Br. at 22. Defendants rely primarily on the district court's

rulings in *In re TFT-LCD Antitrust Litig*., Nos. 07-md-1827, 09-cv-5609, 2010 WL 2629728

(N.D. Cal. June 29, 2010) ("*TFT II*"), that were disapproved by the Ninth Circuit. D. Br. at 22-

33. In *TFT II*, the court held that "to invoke the various state laws at issue, plaintiffs must be able

to allege that 'the occurrence or transaction giving rise to the litigation'—plaintiffs' purchases of

allegedly price-fixed goods—occurred in the various states." *Id.* at *4 (citation omitted).

Contrary to Defendants' assertion that *TFT II* was reversed "on other grounds," D. Br. at 23, the

Ninth Circuit directly addressed and rejected the lower court's formulation of the due process

rule on appeal, holding that "the district court's place-of-purchase rule represents a return to [a]

'wooden' and 'now largely abandoned'" approach to due process. *AT&T Mobility LLC v. AU*

*Optronics Corp.*, 707 F.3d 1106, 1111-12 (9th Cir. 2013). Specifically, the Ninth Circuit held

that "[t]he Due Process Clause [] requires a court to invalidate the application of a state's law

only where the state has 'no significant contact or significant aggregation of contacts creating

state interests, with the parties and the occurrence or transaction.'" *Id.* at 1111 (quoting *Allstate*

*Ins. Co. v. Hague*, 449 U.S. 302, 308, 320 (1981)). Pursuant to this "highly permissive standard," due process concerns only defeat state law claims where the contacts with the state at issue are so minor that allowing the claims to proceed would be "arbitrary or fundamentally unfair." *Id.* at 1111-13.[21]

Even if the court were to adopt Defendants' formulation of the due process threshold in a price-fixing case, the allegations of the CCAC meet the relaxed standard for due process applicable here.[22] The CCAC specifically alleges that a named plaintiff residing in each Indirect Purchaser State suffered an injury-in-fact by incurring overcharges on purchases of FX Instruments in those states. *See* CCAC ¶¶ 11-20, 229-45. Moreover, Plaintiffs allege that Defendants' conspiratorial conduct giving rise to Plaintiffs' claims was directed nationwide and had effects on each state at issue. *See* ¶¶ 11, 229-31 (Arizona); ¶¶ 12-13, 232-35 (California); ¶¶ 14-15, 236-37 (Florida); ¶¶ 16, 238-39 (Illinois); ¶¶ 17, 240-41 (Massachusetts); ¶¶ 18, 242-43 (Minnesota); ¶¶ 19-20, 244-45 (North Carolina).[23]

Finally, even if Plaintiffs had not alleged that they incurred overcharges in the states where they reside, it would be appropriate for this Court to presume that is where the purchases took place. In *Nypl II*, this Court presumed that plaintiffs who alleged they suffered injury while

---

[21] Multiple courts have held that only minimal contacts are required to maintain a state-law-based claim. *See, e.g.*, *Nypl II*, 2017 WL 3309759, at *7 (holding California resident plaintiff could bring California UCL claim, even without expressly alleging that any misconduct occurred in California or that the purchases took place in California); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 161 (E.D. Pa. 2009) (holding the FDUTPA "contains no language limiting its application to in-state activity"); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F.Supp.2d 1365, 1370–71 (S.D. Fla. 2001) (dismissing plaintiffs' claims based on standing only in states where the plaintiffs *neither resided nor purchased* the product at issue).

[22] Although each Plaintiff did in fact purchase FX Instruments in their states of residence, that specific allegation is not required to survive Defendants' Motion. However, if the Court determines that additional details should be alleged, Plaintiffs respectfully request leave to amend.

[23] Defendants' citations to *Azimpour* and *Capacitors* conflate due process concerns with Article III standing. *See* D. Br. at 22. Here, Plaintiffs all allege that they were injured-in-fact when they "incurred overcharges" and purchased FX Instruments at supracompetitive prices as a result of Defendants' anticompetitive conduct. *See Nypl I*, 2017 WL 1133446 at *3 ("For Article III standing, . . . it suffices that the Complaint alleges that Defendants manipulated the foreign currency exchange rates and that Plaintiffs paid more for foreign currency as a result.").

exchanging foreign currency at retail banks made the relevant purchases at retail branches in their states of residence. *See* 2017 WL 3309759, at *7.[24] The same logic applies here, where Plaintiffs purchased FX Instruments online. *See Tidenberg v. Bidz.com, Inc.,* No. 08-cv-5553, 2009 WL 605249, at *4 (C.D. Cal. March 4, 2009) (presuming that the plaintiff made an online purchase in her state of residence). Because the CCAC alleges that Defendants' anticompetitive conduct was directed at all Indirect Purchaser States and that as a result of Defendants' conduct, all Plaintiffs incurred overcharges in violation of the laws of their respective states, Plaintiffs have alleged sufficient contacts with each Indirect Purchaser State such that allowing Plaintiffs' claims to proceed would neither be "arbitrary nor fundamentally unfair." *See AT & T Mobility LLC*, 707 F.3d at 1113. Defendants' motion to dismiss on due process grounds should therefore be denied.

### B.    Florida and Illinois Regulated Banks Exceptions Do Not Apply Here

Contrary to Defendants' misstatements of the laws, the FDUTPA and IAA exemptions are clear that for these exemptions to apply, the ***conduct at issue*** must be subject to regulation by a federal banking regulatory body. See 740 Ill. Comp. Stat. Ann. 10/5(11) (bank activities exempted only "to the extent that such activities are regulated or supervised by officers of the state or federal government under the banking laws of this State or the United States"); *U.S. Bank Nat. Ass'n v. Capparelli*, No. 13-cv-80323, 2014 WL 2807648, at *5 (S.D. Fla. June 20, 2014) ("Florida courts [] resolve questions about the applicability of this provision by looking to

---

[24] *See also In re Grand Theft Auto Video Game Consumer Litig*, No. 06-md-1739, 2006 WL 3039993, at *1 n.1 (S.D.N.Y. Oct. 25, 2006) (assuming for the purposes of a motion to dismiss that the named plaintiffs made their purchases in their respective states of residency); *Fond du Lac Bumper Exch.*, 2012 WL 3841397, at *4 (same); *Wang v. OCZ Tech. Group, Inc*., 276 F.R.D. 618, 629 (N.D. Cal. 2011) (same); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 211 (E.D. Pa. 2009) ("Economic impact and personal injury are assumed in those states where plaintiffs reside or have a principal place of business.").

the activity which is the subject of the lawsuit, and whether that activity is subject to the regulatory authority of the federal agency.").[25] Even when a defendant is regulated under banking laws, the exemptions do not apply when a bank acts as a "dealer" rather than a bank. *See Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*, 724 F. Supp. 2d 1228, 1238 (S.D. Fla. 2010). Defendants do not assert that their FX activities at issue were regulated by any state or federal banking authority. And Defendants were acting as dealers rather than banks in selling FX Instruments. *See id.* Thus, the Court should reject Defendants' attempts to expand the Florida and Illinois statutory exemptions.

As to Florida, Defendants concede that the FDUTPA statutory exemption is limited to "banks or savings and loan associations regulated by federal agencies," and that a number of Defendants are not regulated banks. D. Br. at 25-26.[26] Defendants fail to acknowledge, however, that this exception only applies where the *specific activities* at issue were subject to federal banking laws. Courts have consistently permitted FDUTPA claims against banks where the alleged violations were not activities specifically regulated under banking laws, including claims against Defendants named here. *See, e.g.*, *Christie*, 2014 WL 5285987, at *4 (Bank of America, N.A.); *Renfrow v. First Mortg. Am., Inc.*, No. 08-cv-80233, 2011 WL 2416247, at *3 (S.D. Fla. June 13, 2011) (J.P. Morgan Chase & Co).

The same holds true for the analogous exemption under the Illinois Antitrust Act. Defendants argue, without citation to any authority, that their conduct in the FX market falls

---

[25] *See also Christie v. Bank of Am., N.A.*, No. 813-cv-1371, 2014 WL 5285987, at *4 (M.D. Fla. Oct. 15, 2014) ("[T]he challenged activity in this action, which includes the defendants' administration of an insurance policy, might not constitute a regulated 'activity' under laws administered by banks").

[26] According to the Office of the Comptroller of the Currency, only four Defendants named here are "banks" subject to federal banking regulations. *See* National Banks Active As of 8/31/2017, *available at* https://www.occ.treas.gov/topics/licensing/national-banks-fed-savings-assoc-lists/national-by-name-pdf.pdf (last accessed Sept. 26, 2017); D. Br. at 25-6. The sources offered by Defendants do not support their claim that they are banks or savings and loan institutions subject to federal banking regulators. *See* D. Br. at 26 n.17. Regardless, for the reasons set forth herein, the exemptions do not apply even to those four entities that are actually banks.

under the IAA exemption for "the activities of any state or federal savings and loan association

to the extent that such activities are regulated or supervised by officers of the state or federal

government under the savings and loan laws of this State or the United States." D. Br. at 26.

However, no courts have held that the exemption applies to activities that are not regulated under

savings and loan laws. To the contrary, the Illinois Bar Committee's 1967 Comments make

clear, "[i]t is assumed that all of the provisions of [the Act's exemptions] will be strictly

construed and narrowly applied." 740 ILL. COMP. STAT. ANN. 10/5.

Finally, to the extent that Defendants dispute that they were acting as dealers rather than

banks, or that their conduct in the FX market was not subject to banking regulations, the

resolution of that dispute is inappropriate at this stage.[27] Accordingly, the Court should reject

Defendants' "regulated banks" arguments.

### C.       Florida Plaintiffs Have Standing under FDUTPA

Defendants next contend that Plaintiffs are not "consumers" within the meaning of the

FDUTPA, relying primarily on *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d

526 (S.D.N.Y. 2017), in which this Court interpreted ***New York*** state consumer protection law

claims in the context of the FX market. New York's consumer protection statute is limited to

claims relating to activity conducted for "personal, family, or household use." FDUTPA is not so

cabined. *See State, Office of Attorney Gen., Dep't of Legal Affairs v. Commerce Commercial*

*Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007) ("The Act simply is not limited

to contracts for 'personal, family or household purposes' as defined in the Uniform Commercial

---

[27] *See Larach*, 724 F.Supp.2d at 1238; *Capparelli*, 2014 WL 2807648, at *5; *Renfrow*, 2011 WL 2416247, at *3 ("Plaintiffs are correct that the Court cannot make a factual determination at this time as to whether [J.P. Morgan Chase & Co] is actually a national bank that falls within the statutory exceptions."); *Bowen v. Wells Fargo Bank, N.A.*, No. 11-cv-91, 2011 WL 3627320, at *6 (M.D. Fla. Aug. 17, 2011) ("[T]he status of Wells Fargo as an FDIC insured bank cannot be determined by a review of the allegations in the First Amended Complaint alone.").

Code."). The definition of "consumer" under FDUTPA is "an individual; child, by and through its parent or legal guardian; business; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; any commercial entity, however denominated; or any other group or combination." FLA. STAT. § 501.203(7); *see also S & B Investments, LLC v. Motiva Enterprises, L.L.C.*, No. 03-cv-61993, 2004 WL 3250306, at *6 (S.D. Fla. Dec. 6, 2004) (holding the FDUTPA "protects both individual consumers and 'legitimate business enterprises' from deceptive and unfair trade practices" so long as the plaintiff is "engaged in the purchase of goods or services"). Plaintiffs meet this definition; Defendants' motion should therefore be denied.

### D.   The North Carolina Regulatory "Exemption" Does Not Apply Here

Defendants do not argue, as they do with Florida and Illinois, that NCUDTPA explicitly excludes banks or regulated entities from liability. Instead, Defendants incorrectly state that North Carolina courts created a blanket exemption to NCUDTPA that shields regulated entities from liability even where those entities commit unfair and deceptive acts that harm North Carolina consumers. D. Br. at 24-25. The North Carolina Supreme Court has not created the broad exemption that Defendants ask this Court to apply. In fact, the North Carolina Supreme Court has expressly held that "a violation of a regulatory statute which governs business activities 'may also be a violation of N.C. GEN. STAT. § 75-1.1.'" *Walker v. Fleetwood Homes of N. Carolina, Inc.*, 653 S.E.2d 393, 398 (N.C. 2007).[28]

---

[28] None of the cases cited by Defendants bar claims under North Carolina law because of regulations at the federal or international level, as Defendants assert. *North Carolina ex rel. Cooper v. Ridgeway Brands Mfg.* involved the violation of a separate North Carolinian law regulating tobacco product manufacturers. 646 S.E.2d 790, 798 (N.C. Ct. App. 2007), *aff'd in part, rev'd in part*, 362 N.C. 431 (N.C. 2008). The Fourth Circuit in *Linder v. Durham Hosiery Mills, Inc.*, 761 F.2d 162 (4th Cir. 1985) held that NCUDTPA should not be applied to securities claims, noting that federal law provided a cause of action to the plaintiffs. *Id.* at 166. Similarly, in *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483 (N.C. 1991), the North Carolina Supreme Court held that the statute did not apply to revolving fund certificates issued to build up capital because "revolving fund certificates are, in essence,

North Carolina courts have declined to apply NCUDTPA only where state laws and regulations already provide "an extensive remedy" for the damages suffered by plaintiffs. *See, e.g.*, *State ex rel. Cooper*, 646 S.E.2d at 798. Where no alternative private right of action exists, courts have consistently declined to create a new exemption to NCUDTPA beyond those specified in the statute. *See, e.g.*, *Ellis v. Smith-Broadhurst, Inc.*, 268 S.E.2d 271, 273 (N.C. Ct. App. 1980) (rejecting defendants' argument that plaintiff could not recover damages under NCUDTPA because unfair and deceptive acts and practices in the insurance industry were regulated exclusively by state insurance statutes, and noting that state insurance statutes "do not contain a private right of action."); *Ray v. United Family Life Ins. Co.*, 430 F. Supp. 1353 (W.D.N.C. 1977). The fact that alternate remedies exist for *direct* purchasers is irrelevant where, as here, North Carolina expressly elected to create a remedy for indirect antitrust purchasers as here. Plaintiffs cannot seek damages under federal law, and Defendants fail to cite an alternate North Carolina law that provides "an extensive remedy" to Plaintiffs here. Thus, Defendants have failed to meet their burden to demonstrate that they are exempt. *See* N.C. GEN. STAT. § 75-1.1 ("Any party claiming to be exempt from the provisions of this section shall have the burden of proof with respect to such claim").

### E.   Hitchcock, the Massachusetts Plaintiff, Has Standing under MCPA

Defendants argue that Plaintiffs' claims under the MCPA should be dismissed because Mr. Hitchcock, the Massachusetts Plaintiff, is a "business" who must bring his claim under Section 11 of the MCPA rather than Section 9.[29] The MCPA makes clear that "[a]ny person,

---

corporate securities," and noted that part of the rationale for excluding securities from the act was that they were regulated extensively by other statutory schemes which provide adequate causes of action. *Id*. at 493.

[29] Defendants assert that the CCAC does not indicate whether the Massachusetts Plaintiff asserts his claim under § 9 or § 11. However, the CCAC alleges that Plaintiffs served Defendants with a demand letter which is required by § 9 but not by § 11. CCAC ¶ 241(g).

other than a person entitled to bring action under section eleven of this chapter" can bring claims under Section 9 for violations of the Act. MASS. GEN. LAWS ch. 93A, § 9. Section 11 grants a similar cause of action to businesses engaging in business-to-business transactions. *Id*. § 11. A person's MCPA claim falls under Section 11 rather than Section 9 *only* when purchases at issue were made for "business reasons." *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 80 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009). Contrary to Defendants' suggestions otherwise, Section 9 applies to transactions involving financial instruments where the purchases were made for reasons other than business. *Gossels v. Fleet Nat'l Bank*, 876 N.E.2d 872, 885, 887-88 (Mass. App. Ct. 2007) (holding bank's foreign exchange rate disclosures in the process of collecting on checks are subject to suit under Section 9), *rev'd on other grounds*, 902 N.E.2d 370 (Mass. 2009); *Barron v. Fidelity Magellan Fund*, 784 N.E.2d 634, 639 n.14 (Mass. App. Ct. 2003) (holding claim may be brought under Section 9 in connection with the sale of securities).

Here, it is alleged that the Massachusetts Plaintiff "Charles G. Hitchcock III is an *individual*," and no facts in the CCAC indicate that he purchased FX Instruments for business use. CCAC ¶ 17 (emphasis added).[30] Defendants recognize the distinction between individuals and entities, as they correctly note that Florida Plaintiff FX Primus Ltd. is a business entity that cannot assert claims under Section 9 of the MCPA. D. Br. at 29. Of course, FX Primus Ltd. is a Florida Plaintiff, and Florida Plaintiffs do not assert claims under Massachusetts law. CCAC ¶¶ 14-15, 236-37. Hitchcock does so as "an individual" and, therefore, Defendants' argument fails.

---

[30] Defendants' citation to the *Axiom* case bolsters the inference that Massachusetts Plaintiff did not make his purchases for "business considerations." D. Br. at 29. The *Axiom* court the court based its decision on whether a product is generally sold to consumers or businesses. 234 F. Supp. 3d at 537. Unlike direct purchasers, indirect purchasers of FX Instruments are generally individual consumers and not businesses. In fact, the CFTC defines "Retail forex customer" to mean "a person . . . *acting on its own behalf* and trading in any account, agreement, contract or transaction [in foreign currency]." 17 C.F.R. 1.3(pppp) (emphasis added). This definition necessarily excludes persons acting on behalf of a business.

### F.     The CCAC Plausibly Alleges Injury Under the Laws of North Carolina, California, and Massachusetts

Although Plaintiffs do in fact allege substantial effects on intrastate commerce in California, North Carolina, and Massachusetts, they are not required to do so under those statutes. Neither California nor North Carolina impose the "intrastate commerce" limitations that Defendants ask this Court to apply. To the contrary, courts have consistently held that the "intrastate" requirements for California's UCL and NCUDTPA are met where the plaintiff alleges an in-state injury. *See, e.g.*, *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, No. 14-md-2508, 2015 WL 5166014, at *31 (E.D. Tenn. June 24, 2015) ("As the Indirect Purchasers are located in California and operated their business in California at the time of the alleged injuries, the Court finds this sufficient to establish an intrastate nexus."); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1174 (N.D. Cal. 2015) (allegations of "in-state injury and that defendants' products were being [indirectly] sold in North Carolina" are sufficient under NCUDTPA).[31]

Defendants' attack on the MCPA claims also fails. Although Section 11 of the MCPA expressly requires that the alleged unfair practices occur "primarily and substantially" within Massachusetts, Section 9 has no such requirement. *Compare* MASS. GEN. LAWS ch. 93A, § 11 *with id.* § 9; *see also Pare v. Northborough Capital Partners, LLC*, 89 F. Supp. 3d 192, 193 (D. Mass. 2015) ("Unlike actions under § 9, an action brought under § 11 must allege unfair practices that occur 'primarily and substantially within the Commonwealth.'"). Both cases

---

[31] Defendants falsely claim that the court in *Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 93-cv-301, 1994 WL 910955 (W.D.N.C. July 12, 1994) granted dismissal for failure to plead a "substantial effect on in-state business." D. Br. at 30. The *Dixie Yarns* court held that because the plaintiff was a business, it was required to allege "an in-state injurious effect on [plaintiff's] business operations in North Carolina," and that the injury was "substantial . . . on a plaintiff's in-state business . . .," and the plaintiff failed that test because it was not a North Carolina resident. 1994 WL 910955, at *2. Similarly, the other cases cited by Defendants involve foreign plaintiffs who failed to allege any in-state injury. *See The 'In' Porters, S.A.* v. *Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987) (dismissing NCUDTPA claim where all of plaintiff's business was in France and there was thus zero in-state impact); *Meridian Project Sys. Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005) (dismissing UCL claim because the Canadian plaintiff could not allege any in-state injury).

Defendants cite involved Section 11 claims. D. Br. at 31. Because the Massachusetts Plaintiff, Mr. Hitchcock, brings claims as an individual pursuant to Section 9, Defendants' argument fails.

Finally, although Plaintiffs are not required to do so at this stage, the CCAC specifically alleges the substantial effects that this conspiracy had in each of the states at issue. *See*, *e.g.*, ¶¶ 19-20, 245 (alleging that Defendants' conduct resulted in artificially inflated prices for FX Instruments in North Carolina, and that the North Carolina Plaintiff "paid supracompetitive, artificially inflated prices for FX Instruments"); ¶¶ 12-13, 233-35 (same for California); ¶¶ 17, 241 (same for Massachusetts). Accordingly, Plaintiffs plausibly allege that Defendants' conspiracy impacted FX Instruments, such that prices in *all* of the 50 states—including California, North Carolina, and Massachusetts—were artificially inflated, thereby substantially affecting intrastate commerce in each of these states.

### G.     Plaintiffs' Illinois Claim May Proceed as a Class Action

The IAA states that only the Illinois Attorney General may bring a class action based on indirect purchasers' claims under the Act in any Illinois court. 740 ILL. COMP. STAT. § 10/7. However, because this provision is procedural rather than substantive, recent cases in this Circuit have held that Fed. R. Civ. P. 23 applies, and individuals may bring class action IAA claims in federal court. *See In re Propranolol Antitrust Litig.*, No. 16-cv-09901, 2017 WL 1287515, at *12 (S.D.N.Y. Apr. 6, 2017); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4204478, at *6 (D. Conn. Aug. 9, 2016).

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. (2010), the Supreme Court held that Rule 23 applied in federal court to claims brought under New York law despite New York's general class action bar. *Id.* at 399-400. Some courts have since held that the holding in *Shady Grove* is narrowed by the scope of Justice Stevens's concurrence, which stated

that state procedural rules can control in federal court when they are "part of a State's framework of substantive rights or remedies." *Id.* at 419 (Stevens, J., concurring).[32] However, courts in this Circuit have held that Rule 23 controls in federal courts. *See Propranolol*, 2017 WL 1287515, at *12 (holding that the IAA's class action limitation "does not control in federal court, where Rule 23 sets the only relevant requirements to file a class action"); *Aggrenox*, at 2016 WL 4204478, at *6. The same result holds here.

### H.   Plaintiffs Have Served Notice Pursuant to Arizona's Notice Provision

Defendants argue that Plaintiffs' claims under Arizona state law should be dismissed because Plaintiffs did not serve Arizona's Attorney General with a copy of their complaint contemporaneously with the filing of that complaint. As a preliminary matter, the relevant Arizona provision is procedural rather than substantive and is therefore inapplicable here. *See, e.g.*, *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 254 (D. Conn. 2015) (analogous provision of the Hawaii Antitrust Act is inapplicable in federal courts). Regardless, the issue is moot because Plaintiffs' have since served the Arizona Attorney General and filed a proof of service with the Court. ECF No. 108. The only case Defendants cite in support of their position dismissed the plaintiffs' claims without prejudice to refile when notice had been accomplished. *See In Re Asacol Antitrust Litig.*, No. 15-cv-12730, 2016 WL 4083333, at *1 (D. Mass. July 20, 2016). Because Plaintiffs have already filed notice, dismissal here is unwarranted.

---

[32] When interpreting the "narrowest opinion" in a split U.S. Supreme Court decision, the courts should look to the position that represents "a common denominator of the Court's reasoning" and "embod[ies] a position approved by at least five Justices who support the judgment." *Aggrenox*, 2016 WL 4204478, at *5 (internal citations omitted). The Stevens concurrence is not the logically narrowest ground because it is not the common denominator of the Court's reasoning. *Id*; *see also*, *In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 653 (S.D. Cal. 2014) (holding that Justice Stevens's opinion is not the "logical subset" or "common denominator" of the plurality opinion). In fact, the other Justices in the majority explicitly rejected Stevens's approach of allowing some state procedural rules to control. *Shady Grove*, 559 U.S. at 411-412.

VII.   **Plaintiffs Plausibly Allege a Claim for Injunctive Relief**

Contrary to Defendants' assertion, Plaintiffs need not allege *currently* ongoing misconduct to establish standing for injunctive relief, but merely a plausible threat of future harm. *See supra* pp. 6-7 (overviewing legal standards). Plaintiffs have done so. The CCAC alleges that the Defendants engaged in an ongoing conspiracy dating back to at least 2007, there are ongoing government investigations, and Defendants have not been sufficiently enjoined. ¶¶ 151-75.[33] Because Plaintiffs need not allege that the conduct is *currently* ongoing, but rather only that there is a plausible threat that it may be resumed in the future, the fact that the Class Period ends in 2013 has no bearing on whether there exists a current threat of future harm. *See supra* pp. 6-7.[34] Moreover, because the Plaintiffs and Class Members are retail FX customers, it is likely that they will make future purchases of FX Instruments. *See, e.g.*, *Richardson v. L'Oreal United States, Inc.*, 991 F. Supp. 2d 181, 195 (D.D.C. 2013).

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety. If, however, the Court should find that there are deficiencies in the CCAC, Plaintiffs respectfully request leave to amend. *See* FED. R. CIV. P. 15(a) (requiring that a "court should freely give leave [to amend] when justice so requires."); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (leave to amend should not be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.").

---

[33] Facts alleged in the CCAC demonstrate that Defendants have not taken adequate measures to prevent further manipulation in the future. *See id.* ¶ 185 (tribunal found in February 2017 that Citigroup turned a blind eye to trader misconduct); ¶ 197 (SocGen discovered in 2009 that a trader shared confidential information with other firms but did not fire that trader until 2015); ¶ 199 (Defendants are still implementing systems to monitor trading activities).

[34] This Court declined to dismiss the injunctive relief claim in *FOREX*. *See FOREX III*, 2016 WL 5108131, at *5. If an injunction is granted in *FOREX* sufficient to prevent future injury to Plaintiffs here, the claim will be mooted. Until that time, Plaintiffs plausibly alleged a claim for injunctive relief and Defendants' Motion should be denied.

Dated:   September 27, 2017                   Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Merrill G. Davidoff
Joshua T. Ripley
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
mdellangelo@bm.net
jripley@bm.net

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL KONECKY
WOTKYNS LLP**
8501 North Scottsdale Rd., Ste. 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

Joseph C. Peiffer
**PEIFFER ROSCA WOLF ABDULLAH
CARR& KANE LLP**
201 St. Charles Ave., Ste. 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504)523-2464
jpeiffer@prwlegal.com

R. Bryant McCulley
Stuart H. McCluer
Frank B. Ulmer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Blvd., Ste. 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com
fulmer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*