```
                                                      ┌─────────────────────────────┐
                                                      │ USDC SDNY                   │
                                                      │ DOCUMENT                    │
UNITED STATES DISTRICT COURT                          │ ELECTRONICALLY FILED        │
SOUTHERN DISTRICT OF NEW YORK                         │ DOC #:_____       │
------------------------------------------------- X   │ DATE FILED: 3/15/18         │
                                              :       └─────────────────────────────┘
   JAMES CONTANT, et al.,                     :
                                              :
                              Plaintiffs,     :          17 Civ. 3139 (LGS)
                                              :
                  -against-                   :       OPINION AND ORDER
                                              :
   BANK OF AMERICA CORPORATION, et al.,       :
                                              :
                              Defendants.     :
------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

Plaintiffs,[1] a group of individuals and businesses that purchased foreign currency from

retail foreign exchange dealers ("RFEDs"), bring this putative class action against eighteen

banks and their affiliates[2] seeking injunctive relief under the Sherman Antitrust Act, 15 U.S.C. §

1 et seq., and damages under certain state antitrust and consumer protection laws.  Plaintiffs

allege that they paid inflated foreign currency exchange rates caused by Defendants' alleged

conspiracy to fix prices in the foreign exchange ("FX") or foreign currency market.  Defendants

---

[1] The named plaintiffs are James Contant, Sandra Lavender, Victor Hernandez, Martin-Han
Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry
Jacobson, Tina Porter and Paul Vermillion.

[2] Defendants are Bank of America Corporation, Bank of America, N.A., Merrill Lynch, Pierce,
Fenner & Smith Incorporated, The Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank PLC,
Barclays Capital Inc., BNP Paribas, BNP Paribas North America, Inc., BNP Paribas Securities
Corp., BNP Paribas Prime Brokerage, Inc., Citigroup Inc., Citicorp, Citibank, N.A., Citigroup
Global Markets Inc., Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA)
LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., The Goldman Sachs Group, Inc.,
Goldman, Sachs & Co., HSBC Holdings plc, HSBC Bank plc, HSBC North America Holdings,
Inc., HSBC Bank USA, N.A., HSBC Securities (USA) Inc., JPMorgan Chase & Co., JPMorgan
Chase Bank, N.A., Morgan Stanley, Morgan Stanley & Co., LLC, Morgan Stanley & Co.
International PLC, RBC Capital Markets, LLC, The Royal Bank of Scotland Group plc, RBS
Securities Inc., Société Générale, Standard Chartered PLC, UBS AG, UBS Group AG and UBS
Securities, LLC.

move to dismiss the Consolidated Class Action Complaint (the "Complaint") pursuant to Federal

Rule of Civil Procedure 12(b)(6).  For the reasons stated below, Defendants' motion to dismiss is

granted.

## I.    BACKGROUND

The following facts are taken from the Complaint and assumed to be true for the purposes

of this motion.  *See Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).

On May 20, 2015, the United States Department of Justice ("DOJ") announced that

Defendants Citigroup, JPMorgan Chase, Barclays, RBS and UBS AG were pleading guilty to

conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency

exchange spot market.  Traders at Defendant banks used chat rooms with names such as "The

Cartel" "The Bandits' Club," "One Team, One Dream," "the 3 musketeers," "the A-team," "The

players," "the Essex Express" and "The Mafia" to manipulate benchmark exchange rates.  Those

exchange rates are set, among other ways, through daily fixing rates or "fixes," the most

important of which are the 1:15 P.M. European Central Bank fix and the 4:00 P.M. World

Markets/Reuters fix.  Third parties collect trading data at these times to calculate and publish a

daily "fix rate," which in turn is used to price orders for many large customers.  Defendants

allegedly coordinated their FX trading to manipulate benchmark rates set at the fixes in an effort

to increase their profits.

The traders also used these chat rooms to manipulate the exchange rates in other ways.

For example, the traders agreed to fix the bid-ask spreads paid by customers for various currency

pairs at artificially high levels.  Bid-ask spreads are a primary source of revenue for FX dealers,

and in a competitive market, a dealer would seek to gain customers and market share by offering

narrower spreads than those offered by competitors.  Customers want narrower spreads, allowing them to buy currency at lower prices and sell at higher prices.

Defendants entered into illegal price-fixing agreements to manipulate the foreign currency exchange rates to Plaintiffs' detriment by causing them to pay more for the currency they purchased than they otherwise would have paid.  Plaintiffs claim that the price-fixing agreements are violations of § 1 of the Sherman Antitrust Act; the state antitrust statutes of Arizona, California, Illinois, Minnesota, New York and North Carolina; and the consumer protection statutes of California, Florida and Massachusetts.

Plaintiffs claim to have purchased currency indirectly from Defendants by executing trades with non-conspiring RFEDs, who in turn executed covering trades with counterparties such as Defendants and charged Plaintiffs a markup.  The RFEDs quoted Plaintiffs exchange rates based on the rates in the price-fixed spot market, thereby passing on to Plaintiffs the costs caused by Defendants' anticompetitive practices.

This class action was the result of consolidating two separate actions by indirect purchasers represented by the same counsel against the same defendants, *Contant, et al. v. Bank of America Corporation, et al.*, No. 17 Civ. 3139, and *Lavender, et al. v. Bank of America Corporation, et al.*, No. 17 Civ. 4392.  Plaintiffs then filed the Consolidated Class Action Complaint.  Defendants moved to dismiss under Rule 12(b)(6).

## II.    STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d

Cir. 2017) (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a Rule 12(b)(6) motion, the court is limited to reviewing the complaint, any documents attached to that pleading or incorporated in it by reference, any documents heavily relied upon by the complaint as to their "terms and effect" and which are therefore integral to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## III.   DISCUSSION

The Complaint fails to plead facts sufficient to establish antitrust standing as to Plaintiffs' claims under the Sherman Act and the state antitrust law of California, Illinois and New York. The Complaint also fails to plead sufficient facts to establish proximate cause, which is required for each of Plaintiffs' claims. Plaintiffs' state law claims, including those under Arizona and North Carolina law, but excluding those under New York law, also fail under federal due process requirements for bringing state law claims. Finally, Plaintiffs' Sherman Act claim fails because the Complaint fails to establish the availability of injunctive relief. Defendants' motion to dismiss pursuant to Rule 12(b)(6) is thus granted.

### A.   Antitrust Standing

In addition to Article III standing, an antitrust plaintiff must demonstrate antitrust standing at the pleading stage. Although general "harm" to the plaintiff is sufficient to satisfy the constitutional standing requirement, "the court must make a further determination whether

the plaintiff is a proper party to bring a private antitrust action." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) ("*Aluminum Warehousing*") (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). "The limitation of antitrust standing to 'a proper party' arose because 'antitrust law has long recognized that defendants who may have violated a provision of the antitrust statutes are not liable to every person who can persuade a jury that he suffered a loss in some manner 'that might conceivably be traced' to the conduct of the defendants." *Id.* (quoting *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 12 (2d Cir. 1980)).

These "antitrust standing" doctrines have arisen primarily under federal law. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977), the Supreme Court created a "direct purchaser" doctrine limiting treble damage actions under § 4 of the Clayton Act to direct purchasers. In *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536–45 (1983) ("*AGC*"), the Court created a multi-factor "efficient enforcer" doctrine to measure the link between the defendant's conduct and the plaintiff's injury in a federal antitrust action. Those factors include:

> (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking [the plaintiffs'] asserted injury and the [defendants'] alleged price-fixing; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which [the plaintiffs'] damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

*Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) (quoting *AGC*, 459 U.S. at 540– 45). The *Illinois Brick* direct-purchaser doctrine and the *AGC* efficient enforcer doctrine are "analytically distinct." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982); *see also Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 484 n.105 (S.D.N.Y. 2012).

The direct purchaser doctrine and the efficient enforcer doctrine are the product of federal law.  They do no preempt state antitrust law.  *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) ("[T]he Court of Appeals erred in holding that the state indirect purchaser statutes are pre-empted.").  [F]ederal antitrust laws serve "to supplement, not displace, state antitrust remedies."  *Id*. at 102.  States are therefore free to adopt or reject either or both of the federal antitrust standing doctrines.

### 1.  State Applications of the AGC Test

While the highest courts of the states at issue have not considered whether the *AGC* factors apply to those states' respective antitrust statutes, Defendants claim that *AGC* should be applied to the state law antitrust claims except under Minnesota law.  As explained below, the Court is persuaded that the *AGC* efficient enforcer doctrine applies under California, Illinois and New York law.

### a.  California

At least one California intermediate appellate court and the Ninth Circuit have applied the *AGC* factors to claims under the Cartwright Act, California's state antitrust statute.  *See Vinci v. Waste Mgmt., Inc.*, 43 Cal. Rptr. 2d 337, 338-39 (Cal. Ct. App. 1995); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-92 (9th Cir. 2000) (cited in *In re Wholesale Elec. Antitrust Cases I & II*, 55 Cal. Rptr. 3d 253, 265 (Cal. Ct. App. 2007).  Several federal district courts have done the same.  *See, e.g.*, *Supreme Auto Transport LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1039 & n.4 (N.D. Ill. 2017) (holding that the *AGC* factors apply to a Cartwright Act claim); *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 257-59 & n.7 (E.D.N.Y. 2016), *aff'd*, 663 F. App'x 71 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 1826 (2017); *In re Dairy Farmers of Am. Inc. Cheese Antitrust Litig.*, No. 09 Civ. 3690, 2015 WL 3988488, at *7-8 (N.D. Ill. June 29,

2015); *Sahagian v. Genera Corp.*, No. 08 Civ. 7613, 2009 WL 9504039, at *6 (C.D. Cal. July 6,

2009); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072,

1088–89 (N.D. Cal. 2007).  The Court is mindful that the Ninth Circuit has noted in the context

of the Cartwright Act that "California law affords standing more liberally than does federal

law."  *Knevelbaard Dairies*, 232 F.3d at 987.

### b.  Illinois

The Illinois Appellate Court, the state's intermediate appellate court, cited *AGC*

approvingly in dismissing state antitrust claims because the injury alleged was not sufficiently

direct and the damages were too speculative.  *See County of Cook v. Philip Morris, Inc.,* 817

N.E.2d 1039, 1045-47 (Ill. App. Ct. 2004).  The Seventh Circuit held that federal antitrust

standing rules apply under the Illinois Antitrust Act.  *O'Regan v. Arbitration Forums, Inc.,* 121

F.3d 1060, 1066 (7th Cir. 1997); *see also United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104

F. Supp. 3d 901, 930 (N.D. Ill. 2015) ("[T]he Court sees no reason why the Illinois Supreme

Court would not follow *AGC*.").

### c.  New York

New York's Supreme Court, Appellate Division, its second-highest court, endorsed the

lower court's application of the *AGC* factors in an indirect-purchaser case.  *See Ho v. Visa USA,*

*Inc.,* 793 N.Y.S.2d 8, 8–9 (N.Y. App. Div. 2005) (affirming dismissal of plaintiffs' antitrust

claims due to "the remoteness of their damages from the alleged injurious activity"), *aff'g* 787

N.Y.S.2d 677 (N.Y. Sup. Ct. 2004) (applying the *AGC* factors in determining that "plaintiffs'

alleged injury is far too remote to provide antitrust standing under the Donnelly Act"); *see also*

*State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 840 N.Y.S.2d 8, 12 (N.Y. App. Div. 2007)

(affirming the dismissal of price-fixing claims under N.Y. Gen. Bus. Law § 349 where the

plaintiff's injury was "too remote" from the alleged wrongdoing), *aff'g in relevant part sub nom. State v. Daicel Chem. Indus., Ltd.*, 2005 WL 6056054 (Sup. Ct. Aug. 9, 2005); *Williams v. Citigroup, Inc.*, 954 N.Y.S.2d 762, at *4 (N.Y. Sup. Ct. 2012) (finding that plaintiffs "damages [we]re too remote 'from the alleged injurious activity' to confer standing") (citing *Ho*, 793 N.Y.S.2d at 8).  Federal district courts have likewise found that New York's highest court would apply the *AGC* factors to determine antitrust standing under the state's Donnelly Act. *See, e.g., Nichols v. Mahoney,* 608 F. Supp. 2d 526, 545 (S.D.N.Y. 2009) ("[I]f the plaintiffs do not have standing to assert a federal antitrust claim, they do not have standing to bring a Donnelly Act claim."); *Supreme Auto Transp.*, 238 F. Supp. 3d at 1039 & n.4; *Dairy Farmers*, 2015 WL 3988488, at *13-14; *In re Refrigerant Compressors Antitrust Litig.,* No. 2:09 MD 2042, 2013 WL 1431756, at *10 (E.D. Mich. Apr. 9, 2013); *Sahagian*, 2009 WL 9504039, at *6. *But see In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, No. 12 Civ. 169, 2013 WL 5503308, at *16 (D.N.J. 2013) ("The Court is not persuaded that the *AGC* test applies to New York . . . antitrust law.  In reaching this conclusion, the Court notes that Defendants have not cited any state appellate cases to show that the highest court in [New York] would apply the *AGC* factors in th[at] state[].").

### d.  Arizona

No Arizona appellate court has considered whether the *AGC* efficient enforcer doctrine applies to the Arizona Antitrust Act ("AAA").  The Arizona Supreme Court rejected *Illinois Brick* and concluded that an indirect-purchaser of goods and services has standing to sue under the AAA.  *See Bunker's Glass Co. v. Pilkington PLC,* 206 Ariz. 9, 75 P.3d 99, 102 (2003) (noting that nothing in the AAA precludes indirect purchaser claims).  There, the majority permitted claims by indirect purchasers of flat glass and tobacco based on allegations of passed

on overcharges without discussing the *AGC* factors, although the dissent stated that *AGC* should

apply.  At least one Arizona trial court has since decided that *AGC* does apply to state antitrust

law.  *See Luscher v. Bayer AG*, No. 04 Civ. 14835, 2005 WL 6959406, at \*1-2 (Ariz. Super. Ct.

Sept. 16, 2005) (applying *AGC* factors to dismiss Arizona state antitrust claims by indirect

purchasers).  Federal district courts are divided on the issue.  *See Supreme Auto Transp.*, 238 F.

Supp. 3d at 1039 & n.4 (dismissing AAA claims based on *AGC* analysis); *DRAM*, 536 F. Supp.

2d at 1134-42 (same).  *But see In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d

554, 567 (E.D. La. 2013) ("But given the Arizona Supreme Court's failure to

apply *AGC* in *Bunker's Glass,* the trial court's *Luscher* decision is unpersuasive."); *In re Flash*

*Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1152 (N.D. Cal. 2009) (declining to apply *AGC*

to the AAA considering the lack of supporting appellate court authority); *D.R. Ward Constr. Co.*

*v. Rohm and Haas Co.*, 470 F. Supp. 2d 485, 497 (E.D. Pa. 2006) ("Notwithstanding

the *Luscher* decision, this Court predicts that the Arizona Supreme Court would apply its

traditional standing approach, rather than an *AGC* analysis.").  The Court thus declines to decide

whether *AGC* applies to the AAA and decides the motion to dismiss the Arizona Antitrust claim

on other grounds.

### e.  North Carolina

An intermediate North Carolina state court declined to apply *AGC* and held that

"the *AGC* factors do not apply in determining which indirect purchasers have standing to sue

under the North Carolina antitrust statutes."  *See Teague v. Bayer AG*, 671 S.E.2d 550, 556-57

(N.C. Ct. App. 2009).  *But see Crouch v. Crompton Corp.*, No. 02 Civ. 4375, 2004 WL 2414027,

at \*18-19 (N.C. Super. Ct. Oct. 28, 2004) (applying modified *AGC* test to determine indirect

purchaser standing under North Carolina law).  Several federal district courts nonetheless have

concluded that North Carolina's high court would apply *AGC* to determine antitrust standing. *See Dairy Farmers*, 2015 WL 3988488, at \*15 (concluding that North Carolina's high court would apply *AGC* to assess antitrust standing, noting that "[d]espite its sometimes-dubious and often-difficult-to-follow analysis, *Teague* cannot be interpreted as a wholesale rejection of *AGC*"; following instead the "more persuasive" trial court decision in *Crouch*); *Sahagian*, 2009 WL 9504039, at \*6; *DRAM*, 516 F. Supp. 2d at 1094.  The Court thus declines to decide whether *AGC* applies to North Carolina antitrust law, and decides the motion to dismiss the North Carolina antitrust claim on other grounds.

### 2.  Antitrust Standing Analysis

To summarize, the Court concludes that the highest courts in three of the states at issue -- California, Illinois and New York -- would apply some version of the *AGC* factors in determining whether Plaintiffs have antitrust standing to assert their claims under the respective state antitrust laws.  With regard to these claims (Counts V, VII and II), the Complaint fails adequately to allege antitrust standing.

The Supreme Court recently discussed the *AGC* factors in the context of the Lanham Act, noting that the first factor "must be met in every case" but the third and fourth factors (as enumerated in *Gelboim*, 823 F.3d at 778) are "problematic," and the "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014); *see also In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 552 (S.D.N.Y. 2016) (citing *Lexmark* in connection with claims under the

Sherman Antitrust Act); *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422, 430 (S.D.N.Y. 2014) (same).

As to the first factor, the Complaint fails to show that Plaintiffs' injury has a sufficiently direct relationship to the alleged conspiracy. "Directness in the antitrust context means close in the chain of causation." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013). The Complaint does not allege facts showing a sufficiently direct connection between the FX spot market, where Defendants allegedly manipulated prices, and the retail trading market, where Plaintiffs purchased foreign currency.

The Complaint alleges that Plaintiffs executed FX trades with non-conspiring RFEDs, who in turn executed covering trades with Defendants, among other counterparties. According to the Complaint, Defendants set supracompetitive prices for their trades with the RFEDs, who passed these markups on to Plaintiffs. The Complaint fails to explain the RFEDs' presumably independent and various pricing and execution strategies, which may well have broken the chain of causation.

> As stated in the Complaint:
>
> To purchase an FX instrument from an FX broker, *a customer* sends an order electronically or by phone to the FX broker for an FX Instrument with a specific currency pair, *exchange rate*, and volume. If the FX broker accepts the trade, the customer pays the agreed-upon rate, often with an additional fee or commission determined by the broker, and the broker places the FX Instrument in the customer's account. Upon receipt of an order from a customer, in order to hedge or cover its exposure on the resulting FX Instrument, the FX broker concurrently executes an FX Instrument with an FX dealer such as a Defendant with the same volume and currency pair as the FX Instrument that the broker sells to the customer. . . .
>
> FX brokers generally receive quotes from several liquidity providers for each currency pair that they offer to their customers. The liquidity providers provide bid-ask quotes for FX spot transactions to the FX brokers, and the FX brokers offer those quotes to their customers, often with some additional markup determined by the brokers.

(emphasis added).  According to this description, for any given trade the customer, rather than

the RFED, proposes an exchange rate, which the RFED may then accept or decline.  The

exchange rate may or may not come with an additional fee, commission or markup.  The

Complaint contains no allegations as to how any such additional fee, commission or markup is

computed.  The Complaint further alleges that the liquidity providers such as Defendants provide

quotes to the RFEDs, which the RFEDs provide to customers, "often" with a markup.  But the

Complaint provides no explanation as to how these quotes from various sources relate to the

exchange rates customers propose to the RFEDs, and how the RFEDs then determine whether to

accept the proposed trades.  Thus, as alleged, for each transaction there are two independent

actors -- the RFEDs and the customers themselves -- who influence the exchange rate of the

trades at issue in this case after Defendants' alleged overpricing.  In particular, it is unclear from

the non-conclusory allegations in the Complaint whether and to what extent the RFEDs absorbed

the alleged price increases or passed them on to Plaintiffs.

The Complaint therefore does not support a reasonable inference that Plaintiffs are direct

victims of the alleged conspiracy.  *See AGC*, 459 U.S. at 540 (finding the directness factor not

pleaded where "the chain of causation between the Union's injury and the alleged restraint in the

market . . . contains several somewhat vaguely defined links"); *In re Dig. Music Antitrust Litig.*,

812 F. Supp. 2d 390, 402 (S.D.N.Y. 2011) (finding that CD purchasers did not plead a

sufficiently direct relationship between prices in the CD market and alleged misconduct in the

Internet Music market because they failed to allege "how the pricing of Internet Music affected

CD pricing, how the CD market operated generally . . . or any kind of tie . . . between CD pricing

and Internet Music pricing").

The second factor -- whether there are more direct victims of the alleged conspiracy -- weighs against finding that Plaintiffs are efficient enforcers based on the allegations in the Complaint.  As participants in the FX spot market, the plaintiffs in *In re Foreign Exchange Benchmark Rates Antitrust Litigation,* No. 13 Civ. 7789, 2016 WL 5108131, at \*9 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*") are more direct victims of the alleged conspiracy to manipulate prices in that market than Plaintiffs in this case.  *See id.* (holding that Exchange Plaintiffs, in addition to Over-the-Counter Plaintiffs, are efficient enforcers with respect to the alleged conspiracy in the FX spot market).

The third and fourth factors also weigh against Plaintiffs.  Regarding the third factor, the Complaint's failure to allege how prices in the retail trading market are determined and the relationship between the FX spot market and the retail trading market means that Plaintiffs' alleged "damages would necessarily be 'highly speculative.'"  *Gelboim*, 823 F.3d at 780 (quoting *AGC*, 459 U.S. at 542).  Under the fourth factor, the Complaint's failure to allege facts showing a direct relationship between the alleged conspiracy and Plaintiffs' injuries raises the risk that Plaintiffs' damages are derivative of the *FOREX* plaintiffs' damages, and therefore would be duplicative and excessive of any judgment in *FOREX*.  *See id.* at 780 (noting that existence of other actions seeking damages on behalf of victims raises issue of duplicate recovery).  Based on the allegations in the Complaint, none of the efficient enforcer factors weigh in Plaintiffs' favor. Plaintiffs lack antitrust standing to bring their claims under federal antitrust law as well as California, Illinois and New York antitrust law.

## B.      Proximate Cause

To succeed on any of their claims, Plaintiffs must prove that Defendants' conspiracy in the FX spot market proximately caused Plaintiffs' injuries in the FX retail investor market.

Courts "generally presume that a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute. For centuries, it has been a well established principle of the common law, that in all cases of loss, [courts] are to attribute it to the proximate cause, and not to any remote cause." *Lexmark*, 134 S. Ct. at 1390. The proximate cause inquiry is meant to determine "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* In determining proximate cause, courts ask:

> whether the injury that resulted was within the scope of the risk created by the defendant's [wrongful] act; whether the injury was a natural or probable consequence of the [conduct]; whether there was a superseding or intervening cause; whether the [conduct] was anything more than an antecedent event without which the harm would not have occurred.

*Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014) (alterations in original) (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 717 (2011) (Roberts, C.J., dissenting)).

Directness, the first *AGC* factor discussed above, is in essence a proximate cause requirement. *Lexmark*, 134 S. Ct. at 1392. Although "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy . . . there is a point beyond which the wrongdoer should not be held liable." *AGC*, 459 U.S. at 534. For the same reasons that Plaintiffs are unable to show directness of injury under *AGC*, they are likewise unable to show that their injuries were proximately caused by Defendants' conduct.

Proximate cause is required to bring an antitrust action under Minnesota, Arizona and North Carolina law. Although the Court has declined to apply the *AGC* analysis to antitrust claims under Minnesota law, Minnesota imposes at least a proximate cause requirement for bringing an antitrust claim. *See, e.g.*, *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007) ("Standing under Minnesota antitrust law must be defined by some prudential limits

informed by foreseeability, proximate cause, remoteness, and relation of the injury to the

purposes of the antitrust law; otherwise, almost any antitrust violation would provide almost any

citizen with a cause of action arising from the resulting ripples of harm throughout the state's

economy.").  Similarly, the Arizona Supreme Court opinion declining to follow *Illinois Brick*

acknowledges that plaintiffs should not be able to bring an antitrust action if they "have

sustained injuries [that are] too remote."  *Bunker's Glass*, 75 P.3d at 110.  The North Carolina

Supreme Court has likewise held that proximate cause is required to recover under the state's

antitrust law.  *Lewis v. Archbell*, 154 S.E. 11, 12 (N.C. 1930); *see also Mayton v. Hiatt's Used*

*Cars, Inc.*, 262 S.E.2d 860, 863 (N.C. Ct. App. 1980) (quoting *Lewis*, 154 S.E. at 12).  The

Fourth Circuit affirmed the dismissal of a claim under the North Carolina Unfair Trade Practices

Act, which governs both antitrust and general consumer protection claims, explaining that under

the statute, "a plaintiff must show . . . the act proximately caused injury to the plaintiff."  *Ellis v.*

*Louisiana-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012) (citation omitted).  *But see Dicesare v.*

*Charlotte-Mecklenburg Hosp. Auth.*, No. 16 CVS 16404, 2017 WL 1359599, at *8 (N.C. Super.

Ct. Apr. 11, 2017) ("Plaintiffs are not required at the pleading stage to prove a causal chain

between the . . . challenged [anticompetitive] conduct and Plaintiffs' alleged injury."), *cert.*

*denied*, 804 S.E.2d 541 (N.C. 2017).

Each of Plaintiffs' state consumer protection claims also requires allegations plausibly

showing proximate cause to survive a motion to dismiss.  *See, e.g.*, *Jane Doe No. 1 v.*

*Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016) (Under Massachusetts's consumer

protection law, "the plaintiff must lay the groundwork for findings of both actual and proximate

causation.  If an examination of the claim leads to the conclusion that it fails plausibly to allege a

causal chain sufficient to ground an entitlement to relief, that claim is susceptible to dismissal

under Rule 12(b)(6)."), *cert. denied*, 137 S. Ct. 622 (2017); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1321-22 (S.D. Fla. 2010) (dismissing indirect purchasers' Florida consumer protection claim for failure to adequately plead proximate causation); *Lorenzo v. Qualcomm Inc.*, No. 08 Civ. 2124, 2009 WL 2448375, at *6 (S.D. Cal. Aug. 10, 2009) (dismissing California consumer protection claim because, aside from conclusory allegations as to proximate cause, the complaint "does not allege[] facts to demonstrate how Qualcomm . . . proximately caused Plaintiff's alleged injury.").

For the same reasons that the Complaint fails to satisfy the AGC efficient enforcer factors, it also fails to allege proximate cause. All of Plaintiffs' claims are dismissed for failure to allege facts plausibly showing proximate cause.

### C.     Due Process Requirements to Bring State Law Claims

Plaintiffs' state law claims, other than those under New York law, also fail because the Complaint fails to allege any nexus between those states and the parties and events in this case, apart from a plaintiff's domicile. Under the Due Process Clause of the Fourteenth Amendment, a state law may not be applied unless that state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). The Due Process Clause requires a court to invalidate the application of a state's law where the state has "no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Allstate*, 449 U.S. at 308. The Court's decision in *Allstate* places "modest restrictions on the application of forum law." *Shutts*, 472 U.S. at 818.

Plaintiffs' state law claims fail to clear even these "modest restrictions." "[A]n action alleging violations of the antitrust laws is a claim for injuries sustained, and therefore in the nature of a tort." *Fashion Two Twenty, Inc. v. Steinberg*, 339 F. Supp. 836, 841 (E.D.N.Y. 1971) (analyzing antitrust actions for purposes of the New York long-arm statute); *see also Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 231–32 (W.D.N.Y. 1997) (same); *Saratoga Harness Racing Inc. v. Veneglia*, 897 F. Supp. 38, 44 n.8 (N.D.N.Y. 1995) (same). For tort claims, the factors relevant to determining a state's interest are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 142 (2d Cir. 2015) (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)).

As to Plaintiffs' state law claims (except those brought under New York law), the Complaint alleges facts relevant only to factor (c) -- that at least one plaintiff is domiciled in each of the relevant states. The Complaint fails to allege that Plaintiffs transacted and thus were injured in their home states (factor (a)), or that the alleged conspiratorial activity took place in any of those states (factor (b)). Factor (d) confers no interest in this case because, as alleged, Plaintiffs did not transact with Defendants and thus had no relationship with them. Plaintiffs' domicile alone creates an insufficient state interest to justify applying a particular state's law under the Due Process Clause. *See Allstate*, 449 U.S. at 308, 320. Plaintiffs' state law claims, except those under New York law, are dismissed for failing to meet due process requirements.

17

###### D.        Standing to Bring a Sherman Act Claim

Plaintiff's Sherman Act claim fails additionally because the Complaint fails to allege

Article III standing as to that claim.  "[T]he irreducible constitutional minimum of standing

contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The

plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Spokeo, Inc. v Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted).

As to their Sherman Act claims, Plaintiffs seek only injunctive relief, presumably because

they may not seek damages under *Illinois Brick*.  431 U.S. at 735.  But Plaintiffs are ineligible

for injunctive relief because they fail to allege any ongoing misconduct.  15 U.S.C. § 26; *see also*

*Cargill, Inc. v. Montfort of Colo., Inc.*, 479 U.S. 104, 113 (1986); *Nicosia v. Amazon.com, Inc.*,

834 F.3d 220, 239 (2d Cir. 2016) (affirming dismissal of injunctive claim because past injuries

"do not confer standing . . . unless the plaintiff can demonstrate that she is likely to be harmed

again in the future in a similar way").

The Complaint alleges no threat of ongoing or recurring violations. Rather, the Complaint

alleges a Class Period ending on December 31, 2013, suggesting an end to the alleged violations

in 2013.  The Complaint further alleges that following government investigations, guilty pleas

and fines, "Defendants terminated and suspended traders, forced traders to resign and

implemented internal safeguards after the class period," supporting an inference that Defendants

have changed their practices, and the threat of recurring violations has passed.  Plaintiffs are thus

not entitled to injunctive relief.

Because Plaintiffs may obtain neither damages nor injunctive relief under the Sherman

Act, their alleged injury under the act is not "likely to be redressed by a favorable judicial

decision." *Spokeo*, 136 S.Ct. at 1547.  Plaintiffs lack Article III standing to bring their Sherman

Act claim.

### E.      Leave to Replead

Plaintiffs ask, in the event of dismissal, for leave to file a Third Amended Complaint.

Leave to amend should be freely given when justice so requires.  Fed. R. Civ. P. 15(a).

"However, where the plaintiff is unable to demonstrate that he would be able to amend his

complaint in a manner which would survive dismissal, opportunity to replead is rightfully

denied."  *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).  Leave to amend also may be

denied where the plaintiff "fails to specify either to the district court or to the court of appeals

how amendment would cure the pleading deficiencies in its complaint."  *TechnoMarine SA v.

Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).  Any motion for leave to replead must be

consistent with this Opinion and shall be filed as provided below.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint pursuant to Rule

12(b)(6) for failure to state a claim is GRANTED.  Should Plaintiffs choose to attempt to

replead, they must file a motion to do so, a supporting memorandum of law and proposed Third

Amended Consolidated Class Action Complaint, together with a redline showing how it differs

from the Consolidated Class Action Complaint dismissed here, within 21 days.

Defendants The Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays PLC, HSBC Holdings

plc, HSBC Bank plc, The Royal Bank of Scotland Group plc, Société Générale S.A., Standard

Chartered Bank and UBS AG's separate motion to dismiss the claims against them pursuant to

Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction is denied as moot.

The Clerk of Court is respectfully directed to close the motion at Docket Nos. 103, 105

and 120.

Dated:  March 15, 2018
        New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**