## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JAMES CONTANT, *et al.*,

                  Plaintiffs,

v.

BANK OF AMERICA
CORPORATION, *et al.*,

                  Defendants.

Case No. 17-cv-3139-LGS

(related to No. 13-cv-7789-LGS)

ECF CASE

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE THE PROPOSED SECOND CONSOLIDATED CLASS ACTION COMPLAINT

# <u>TABLE OF CONTENTS</u>

**Page**

I.  PRELIMINARY STATEMENT ......................................................................... 1

II.  LEGAL STANDARDS ................................................................................... 4

III.  THE SCCAC PLAUSIBLY DEMONSTRAGES THAT THE CONSPIRACY
PROXIMATELY CAUSED PLAINTIFFS' INJURIES ....................................... 5

    A.  The SCCAC Plausibly Alleges That the Conspiracy Proximately Caused
Plaintiffs' Injuries ......................................................................... 7

    B.  The RFEDs Passed on Defendants' Anticompetitive Overcharges Directly
to Plaintiffs and Class Members .............................................. 13

IV.  THE SCCAC PLAUSIBLY ALLEGES ANTITRUST STANDING UNDER *AGC* ....... 15

    A.  The SCCAC Plausibly Alleges "Directness" for the Same Reasons It
Plausibly Alleges Proximate Cause ......................................... 17

    B.  Plaintiffs Are the Most "Direct" Indirect Purchasers ............................... 18

    C.  The SCCAC's Alleged Damages Are Not Speculative ........................... 20

    D.  There Is No Potential for Duplicative Recovery ...................................... 21

V.  THE SCCAC ADDS ALLEGATIONS SATISFYING DUE PROCESS ....................... 22

VI.  INJUNCTIVE RELIEF ................................................................................. 23

VII.  CONCLUSION ........................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Allstate Ins. Co. v. Hague,*
   449 U.S. 302 (1981) ........................................................................................... 22

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
   459 U.S. 519 (1983) ..................................................................................... *passim*

*AT&T Mobility LLC v. AU Optronics Corp.,*
   707 F.3d 1106 (9th Cir. 2013) ........................................................................... 23

*Bunker's Glass Co. v. Pilkington PLC,*
   75 P.3d 99 (Ariz. 2003) ..................................................................................... 21

*California v. ARC Am. Corp.,*
   490 U.S. 93 (1989) ............................................................................................ 18

*Chrysler Capital Corp. v. Century Power Corp.,*
   778 F. Supp. 1260 (S.D.N.Y. 1991) .................................................................. 22

*Ciardi v. F. Hoffmann-La Roche, Ltd.,*
   762 N.E.2d 303 (Mass. 2002) .............................................................................. 8

*Clayworth v. Pfizer, Inc.,*
   233 P.3d 1066 (2010) ........................................................................................... 8

*Crouch v. Crompton Corp.,*
   No. 02-cv-4375, 2004 WL 2414027 (N.C. Super. Oct. 28, 2004) ......................... 12

*D.R. Ward Constr. Co. v. Rohm & Haas Co.,*
   470 F. Supp. 2d 485 (E.D. Pa. 2006) .......................................................... *passim*

*Dicesare v. Charlotte-Mecklenburg Hosp. Auth.,*
   No. 16-cv-16404, 2017 WL 1359599 (N.C. Super. Apr. 11, 2017) ....................... 8

*Dixon v. Mack,*
   507 F. Supp. 345 (S.D.N.Y. 1980) .................................................................... 22

*Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.,*
   No. 09-cv-00852, 2012 WL 3841397 (E.D. Wis. Sept. 5, 2012) .................... 12, 16

*Gatt Communs., Inc. v. PMC Assocs., L.L.C.,*
   711 F.3d 68 (2d Cir. 2013) ................................................................................ 17

*Gelboim v. Bank of Am. Corp.,*
   823 F.3d 759 (2d Cir. 2016) .............................................................................. 15

*Hayden v. Cty. of Nassau,*
   180 F.3d 42 (2d Cir. 1999) .................................................................................. 4

*In re Auto. Parts Antitrust Litig.*,
No. 12-md-02311, WL 2456612 (E.D. Mich. June 6, 2013) ................................. 18

*In re Auto. Parts Antitrust Litig.*,
29 F. Supp. 3d 982 (E.D. Mich. 2014) ....................................................... 8, 9, 12

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
738 F. Supp. 2d 1011 (N.D. Cal. 2010) ........................................................... 12

*In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*,
No. 12-cv-169, 2013 WL 5503308 (D.N.J. Oct. 2, 2013) ......................... 11-12, 16

*In re Flash Memory Antitrust Litig.*,
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ....................................................... 12, 21

*In re Flonase Antitrust Litig.*,
798 F. Supp. 2d 619 (E.D. Pa. 2011) ............................................................ 9, 14

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
74 F. Supp. 3d 581 (S.D.N.Y. 2015) ......................................................... *passim*

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
No. 13-cv-7789-LGS, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ........... *passim*

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ....................................................................... 8

*In re Intel Corp. Microprocessor Antitrust Litig.*,
496 F. Supp. 2d 404 (D. Del. 2007) ................................................................. 16

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-md-2420, WL 4955377 (N.D. Cal. Oct. 2, 2014) ............................. *passim*

*In re Optical Disk Drive Antitrust Litig.*,
No. 3:10-MD-2143 RS, 2016 WL 467444 (N.D. Cal. Feb. 8, 2016) ..................... 14

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011) ........................................................... 25

*In re Static Random Access Memory Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ..................................................................... 24

*In re TFT-LCD Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................... 12, 18

*In re TFT-LCD Antitrust Litig.*,
No. 07-md-1827, 2010 WL 2609434 (N.D. Cal. June 28, 2010) ......................... 23

*In re TFT-LCD Antitrust Litig.*,
No. 07–md-1827, 2011 WL 3809767 (N.D. Cal. Aug. 29, 2011) ......................... 23

iii

*In re Warfarin Sodium Antitrust Litig.*,
   214 F.3d 395 (3d Cir. 2000) ................................................. 24

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143 (E.D. Pa. 2009) ........................................... 12

*Johnson v. Nextel Communs. Inc.*,
   780 F. 3d 128 (2d Cir. 2015) ............................................... 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S. Ct. 1377 (2014) ........................................................ 16

*Littlejohn v. City of N.Y.*,
   795 F.3d 297 (2d Cir. 2015) ................................................ 8

*Loeb Indus. v. Sumitomo Corp.*,
   306 F.3d 469 (7th Cir. 2002) .............................................. 17

*Lorix v. Crompton Corp.*,
   736 N.W.2d 619 (Minn. 2007) ....................................... 8, 21

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*,
   753 F.3d 395 (2d Cir. 2014) ............................................ 8, 9

*Mack v. Bristol-Myers Squibb Co.*,
   673 So. 2d 100 (Fla. Dist. Ct. App. 1996) ........................... 8

*Myun-Uk Choi v. Tower Research Capital LLC*,
   No. 17-cv-648, 2018 WL 1526360 (2d Cir. Mar. 29, 2018) ................. 8

*Nypl v. JPMorgan Chase & Co.*,
   No. 15-cv-9300-LGS, 2017 WL 1133446 (S.D.N.Y. Mar. 24, 2017) .............. 6

*Nypl v. JPMorgan Chase & Co.*,
   No. 15-cv-9300-LGS, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) .......... *passim*

*Nypl v. JPMorgan Chase & Co.*,
   No. 15-cv-9300-LGS, 2018 WL 1276869 (S.D.N.Y. Mar. 12, 2018) .......... *passim*

*Nypl v. JPMorgan Chase & Co.*,
   No. 15-cv-9300-LGS, 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) .............. 4

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ........................................................... 22

*Ricciuti v. N.Y.C. Transit Auth.*,
   941 F.2d 119 (2d Cir. 1991) ............................................... 4

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) .................................. 22

*Subaru Distribs. Corp. v. Subaru of Am., Inc.,*
   425 F.3d 119 (2d Cir. 2005) ............................................................................ 4-5

*Wortley v. Camplin,*
   333 F.3d 284 (1st Cir. 2003) ............................................................................ 8

## **Other Authorities**

Fed. R. Civ. P. 12 ............................................................................................... 1

Fed. R. Civ. P. 15 ............................................................................................... 4

Sherman Antitrust Act, 15 U.S.C. § 1 ................................................................ 1

I.       **PRELIMINARY STATEMENT**

Plaintiffs filed the first Consolidated Class Action Complaint ("CCAC") on June 30, 2017. ECF No. 84. On March 15, 2018, the Court granted Defendants' Rule 12(b)(6) motion, holding that the CCAC did not plausibly allege: (a) proximate cause, which is required for Plaintiffs' state-law claims as well as for antitrust standing and facts sufficient to satisfy the factors applicable under *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983), for the state law claims to which the Court determined those factors apply; (b) that Plaintiffs transacted and thus were injured in their home states, which is required to satisfy due process for Plaintiffs' state-law claims; and (c) a threat of future harm, which is required for Article III standing to bring an injunctive relief claim under the Sherman Act. ECF No. 136 (the "MTD Order").[1] Plaintiffs' proposed Second Consolidated Class Action Complaint ("SCCAC"), attached as Exhibit 1, addresses and satisfies each of the issues identified by the Court by adding substantial detailed allegations and, in part, by incorporating statistical analyses of FX trading data and prices during the Class Period.

First, the SCCAC substantially bolsters Plaintiffs' allegations supporting proximate cause which also address most of the Court's concerns under *ACG*. Plaintiffs and members of the proposed Classes purchased spot FX Instruments from retail foreign exchange dealers ("RFEDs") where the RFEDs—members of the Direct Settlement Class—purchased those same FX Instruments directly from Defendants and their co-conspirators. SCCAC ¶¶ 3, 151-185. The SCCAC explains in detail how, for every instance where a Defendant sold an FX Instrument to a RFED at an artificially inflated price and the RFED resold that FX Instrument directly to a

---

[1] Plaintiffs incorporate by reference their Opposition to Defendants' Joint Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Plaintiffs' MTD Brief"), and reserve their right to appeal the Court's findings in the MTD Order in the event that the Court denies this Motion.

member of the proposed Classes, the illegal overcharge incurred in the Defendant-to-RFED transaction was directly passed to the Class member in the RFED-to-Class member transaction. *Id*. This Court has repeatedly found that the alleged conspiracy in which Defendants and co-conspirators (collectively, "Cartel Members") manipulated FX benchmarks and prices on FX spot Instruments (the "Conspiracy"),[2] including those FX spot instruments sold by Cartel Members to direct purchasers such as RFEDs was plausibly alleged. Plaintiffs allege that the anticompetitive overcharges incurred by the RFEDs transacting FX Instruments directly with Cartel Members were directly passed on to Plaintiffs and members of the Class who purchased those same FX Instruments directly from the RFEDs. SCCAC ¶¶ 168-69. However, in the MTD Order, the Court held that the CCAC failed to adequately explain the mechanism of that pass-through. MTD Order at 11-12. In preparing the SCCAC, Plaintiffs consulted with Carol L. Osler, Ph.D., a professor of international economics and finance whose curriculum vitae includes extensive academic publications on and work related to the FX market. The new allegations in the SCCAC, as well as the Report of Carol L. Osler, Ph.D. ("Osler Report"), attached as Exhibit 2, explain in detail how the pricing of FX Instruments sold by RFEDs to their retail FX customers (such as Plaintiffs) pass-on to Plaintiffs the Defendants' anticompetitive overcharges arising from the Conspiracy. Dr. Osler's correlation and regression analyses, described below, confirm the tight link between the prices manipulated by the Conspiracy and the prices paid by Plaintiffs and members of the proposed Classes. Specifically, Dr. Osler determined that (a) the spot FX Instrument prices paid by retail FX customers, including Plaintiffs and members of the

---

[2] *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 590 (S.D.N.Y. 2015) ("*FOREX I*"); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS, 2016 WL 5108131, at *2 (S.D.N.Y. Sept. 20, 2016) ("*FOREX III*"); *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2017 WL 1133446, at *1 (S.D.N.Y. Mar. 24, 2017) ("*Nypl I*"); *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2017 WL 3309759, at *5 (S.D.N.Y. Aug. 3, 2017) ("*Nypl II*"); *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2018 WL 1276869, at *1 (S.D.N.Y. Mar. 12, 2018) ("*Nypl III*").

proposed Classes, are nearly perfectly correlated with the prices quoted by Defendants and paid by RFEDs; (b) any distortions in the spot FX Instrument prices quoted by Defendants directly caused equivalent distortions in the prices paid by Plaintiffs and members of the proposed Classes to RFEDs for those same spot FX Instruments; and (c) the spot FX Instrument prices paid by retail FX customers, such as Plaintiffs and members of the proposed Classes, are nearly perfectly correlated with the European Central Bank ("ECB") Fix rates which were manipulated by the Conspiracy. ¶¶ 17-19, 27-31. Dr. Osler explains that to avoid incurring losses, RFEDs must update their prices frequently based on the quotes that they receive from Defendants and therefore it would be impossible for an RFED to "absorb" an overcharge incurred in the direct transaction. *Id.* ¶¶ 7, 11-14; *see also* SCCAC ¶ 168.  Therefore, in every instance where an RFED incurred an anticompetitive overcharge in purchasing an FX Instrument from a Defendant, that overcharge was necessarily passed on to the indirect purchaser, such as Plaintiffs, when the RFED resold that same FX Instrument to a Plaintiff or other Class member. *Id.* ¶¶ 168-69; Osler Report ¶¶ 11, 27, 31. The SCCAC's detailed explanation of the tight and direct connection between the spot and benchmark rates manipulated by the Conspiracy and the prices paid by Plaintiffs and members of the Classes, confirmed by Dr. Osler's statistical analysis of actual pricing data during the Class Period, far exceeds what is required to satisfy proximate cause at the pleading stage. In addition, the SCCAC builds on the proximate cause allegations and Dr. Osler's work to demonstrate that Plaintiffs satisfy all of the *ACG* factors to the extent that those factors are applicable to their respective state law claims.

Second, as to due process, the SCCAC adds allegations making clear that Plaintiffs were located in their home states when they indirectly purchased FX Instruments from Defendants via RFEDs, as well as allegations detailing the co-conspirator Defendants' physical locations in each

Indirect Purchaser State. Thus, the SCCAC establishes each state's significant contacts with the dispute and one or more of the alleged co-conspirator Defendants, such that allowing state law claims to proceed comports with due process principles.

Finally, to address the Court's finding with respect to Plaintiffs' injunctive relief claim, the SCCAC plausibly alleges that Plaintiffs are at risk of future harm absent injunctive relief because Plaintiffs continue to trade in FX, the *FOREX* settlements do not provide for injunctive relief, and FX market conditions continue to create a risk of future misconduct.[3] Accordingly, the Court should grant Plaintiffs' motion for leave to file the SCCAC both as to their state law claims and their federal injunctive relieve claim.

## II.   <u>LEGAL STANDARDS</u>

"Leave to amend should be freely given when justice so requires." MTD Order at 19 (citing Fed. R. Civ. P. 15(a)); *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (leave to amend should not be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.") (citation omitted). However, motions to file an amended complaint are denied "where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999). "In

---

[3] The SCCAC also adds a class definition for the New York Class, which was inadvertently omitted from the CCAC. *Id.* ¶ 41. To address Defendants' concern that Massachusetts Plaintiff Charles G. Hitchcock III's purchases of FX Instruments may have been for a "business purpose," the SCCAC clarifies that Mr. Hitchcock's purchases were for personal use. *Id.* ¶ 17. Additionally, the CCAC referred to RFEDs as "FX brokers," which prompted Defendants to attempt to confuse that term in their Memorandum of Law in Support of Defendants' Motion to Dismiss, ECF No. 104 ("Defendants' MTD Brief"). The SCCAC eliminates any potential for confusion by clarifying the reference to those entities as "RFEDs" throughout. *See, e.g.,* SCCAC ¶¶ 10-20, 78. The SCCAC also adds allegations detailing developments from related litigation and government investigations that occurred after the filing of the CCAC. *Id.* ¶¶ 198, 211-216, 219, 245. Finally, following the Court's recent opinion in *Nypl* dismissing HSBC Holdings plc and The Royal Bank of Scotland Group plc for lack of personal jurisdiction, the SCCAC removes HSBC Holdings plc as a Defendant and substitutes The Royal Bank of Scotland plc for The Royal Bank of Scotland Group plc. *See Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2018 WL 1472506, at *1 (S.D.N.Y. Mar. 22, 2018).

reviewing such a motion, a court accepts as true all factual allegations and draws all reasonable inferences in the plaintiff's favor." *Nypl II*, WL 3309759, at \*2. "In determining the adequacy of the complaint, the court [also] may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint." *Id.* (quoting *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

## III.   THE SCCAC PLAUSIBLY DEMONSTRAGES THAT THE CONSPIRACY PROXIMATELY CAUSED PLAINTIFFS' INJURIES

In the MTD Order, the Court found that the CCAC was deficient for two reasons related to proximate cause. First, the Court held that Plaintiffs failed to show that their injuries had a sufficiently direct relationship to the Conspiracy because the CCAC did not allege "facts showing a sufficiently direct connection" between the prices at which Defendants sell spot FX instruments to RFEDs (the "direct purchaser prices") and the prices at which RFEDs resell those same spot FX instruments to retail customers (the "retail prices"). MTD Order at 11. Although the CCAC adequately alleged that Defendants artificially-inflated prices in the direct purchaser transaction,[4] the Court found that the CCAC did not adequately allege how those artificially inflated prices were passed on to Plaintiffs in the retail transaction. Second, the Court held that the CCAC "fails to explain the RFEDs' presumably independent and various pricing and execution strategies, which may well have broken the chain of causation," and therefore it was unclear "whether and to what extent the RFEDs absorbed the alleged price increases or passed them on to Plaintiffs." *Id.* at 11-12. The SCCAC, as confirmed by the Osler Report, resolves both issues—demonstrating that the chain of causation is not broken and that the RFEDs do not

---

[4] *See FOREX I*, 74 F. Supp. 3d at 590; *FOREX III*, 2016 WL 5108131, at \*2; *Nypl II*, 2017 WL 3309759, at \*5; *Nypl III*, 2018 WL 1276869, at \*1.

absorb Defendants' unlawful price increases, regardless of their pricing strategies, instead passing the overcharge on to Plaintiffs—and, therefore leave to amend should be granted.

The Court's holdings in *Nypl* are instructive. There, the plaintiffs are direct purchasers in the separate market for retail-bank foreign currency. *Nypl II*, 2017 WL 3309759, at *2. The Court initially dismissed *Nypl* for reasons similar to those in the MTD Order, finding insufficient allegations to support a reasonable inference that Defendants' manipulation of prices on FX Instruments affected the prices that the *Nypl* plaintiffs paid for foreign currencies, as required to satisfy proximate cause and antitrust standing. *Nypl I*, 2017 WL 1133446, at *4. The plaintiffs moved to amend, submitted an expert declaration, and proposed to add allegations describing how the Conspiracy caused them to incur overcharges. *Nypl* ECF Nos. 169, 171. The *Nypl* plaintiffs' expert simply compared the prices paid in twelve individual foreign currency transactions to the ECB Fix rates on those same dates and determined, based on that limited data, that those foreign currency prices were highly correlated with the benchmark prices that Defendants allegedly manipulated. *Nypl II*, 2017 WL 3309759, at *2. In *Nypl II*, the Court granted leave to amend, holding that the additional allegations were sufficient to allege that "the prices Plaintiffs paid in the consumer retail market were based, at least in significant part" on the FX Instrument prices that Defendants allegedly manipulated. *Id*. at *4.

The SCCAC describes in considerable detail how retail prices are determined and demonstrate, through statistical analysis based on considerable data sets consisting of actual pricing data during the Class Period, that the anticompetitive prices on FX Instruments charged by Defendants to RFEDs are the "primary component" of the prices paid by Plaintiffs and members of the class for those same FX Instruments. *Nypl II*, 2017 WL 3309759, at *4. The SCCAC not only shows that the prices Plaintiffs paid "were based, at least in significant part" on

the manipulated prices charged by Defendants; it also shows that *Defendants' pricing was fully incorporated into the prices paid by Plaintiffs* and therefore, any anticompetitive overcharge incurred in a Defendant-to-RFED transaction was passed on to the Class member in the parallel RFED-to-Class member transaction. Those allegations are amply supported by Dr. Osler's statistical analyses. *See* Osler Report. ¶¶4-26. In fact, Dr. Osler conducted two correlation analyses comparing the RFED prices for the EUR/USD currency pair that Class members actually paid with corresponding wholesale prices. The first analysis showed an almost perfect correlation between retail prices and the ECB Fix rates that were manipulated by the Conspiracy, using a methodology similar to (albeit more statistically robust and relying more observations than) the Nypl plaintiffs' expert that the Court found sufficient in *Nypl II*. *See* Osler Report ¶ 19; *Nypl II*, 2017 WL 3309759, at *2; *see also Nypl* ECF No. 169 (plaintiffs' expert declaration comparing the price paid by plaintiffs' counsel in a limited sample of twelve transactions with the ECB Fix rates on the same days).  That analysis shows that, as in *Nypl*, the prices paid by Class members were highly correlated with the ECB Fix rates that Defendants manipulated. Dr. Osler also conducted a correlation analysis comparing minute-by-minute RFED prices that Class members actually paid with wholesale prices during the entire month of February, 2012. For prices during the eight-hour active-trading interval the correlation was likewise essentially perfect. Accordingly, the Court's opinion in *Nypl II* strongly supports granting Plaintiffs' Motion here.

A.   **The SCCAC Plausibly Alleges That the Conspiracy Proximately Caused Plaintiffs' Injuries**

To survive a motion to dismiss, indirect purchasers seeking damages under state *Illinois Brick* repealer laws "must include two allegations: (1) Defendants overcharged the direct purchasers; and (2) some or all of the overcharge was passed on to them through each of the

various intermediate levels of the distribution chain." *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 997 (E.D. Mich. 2014) ("*Auto Parts*").[5] Defendants did not challenge the sufficiency of the allegations in the CCAC that they overcharged the direct purchasers; therefore, the MTD Order and this Motion address only the second prong. *See generally* Defendants' MTD Brief. Although Plaintiffs at the pleading stage must plausibly allege that the alleged anticompetitive conduct proximately caused the alleged injuries,[6] courts in each of the states at issue are clear that the causation requirement at the pleading stage is a modest one.[7]

---

[5] *See also In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478, 502 (N.D. Cal. 2008) (observing that "indirect purchasers must prove that an overcharge was levied on direct purchasers of the defendants' products, who then passed all or some of that overcharge through to the indirect purchasers"); *D.R. Ward Constr., Co. v. Rohm & Haas Co.,* 470 F. Supp. 2d 485, 492-93 (E.D. Pa. 2006) (holding that antitrust standing was satisfied where the plaintiffs alleged "that they paid inflated prices for products with plastics additives due to an overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain"); *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412-13 (2d Cir. 2014) (noting that "antitrust law has long recognized that anticompetitive injuries can be transmitted through multi-layered supply chains" to indirect purchasers).

[6] MTD Order at 13 ("To succeed on any of their claims, Plaintiffs must prove that Defendants' conspiracy in the FX spot market proximately caused Plaintiffs' injuries . . .").

[7] *See, e.g.*, *Myun-Uk Choi v. Tower Research Capital LLC*, No. 17-cv-648, 2018 WL 1526360, at *7 (2d Cir. Mar. 29, 2018) (holding that for related financial instrument manipulation claims brought under New York common law, "the requirement of a connection between plaintiff and defendant is a modest one"); *Dicesare v. Charlotte-Mecklenburg Hosp. Auth.*, No. 16-cv-16404, 2017 WL 1359599, at *8 (N.C. Super. Apr. 11, 2017) ("[U]nder binding North Carolina law, Plaintiffs are not required at the pleading stage to prove a causal chain between the [defendant's] challenged conduct and Plaintiffs' alleged injury."), *cert. denied*, 804 S.E.2d 541 (N.C. 2017); *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1078 (Cal. 2010) (holding that the indirect purchaser plaintiffs' allegation "that Manufacturers' price-fixing conspiracy caused them injury in the form of higher prices" satisfied the California Cartwright Act's causation requirement; *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007) (holding that the indirect purchaser plaintiff readily met the antitrust standing requirements under the Minnesota Antitrust Law where plaintiff was a purchaser of rubber tires and the products that defendants allegedly price-fixed were "rubber-processing chemicals"); *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 313 (Mass. 2002) (rejecting defendants' arguments that the indirect purchaser plaintiff "would be hard pressed to show how a portion of an overcharge was passed on at *each* stage of the distribution chain and by which defendants" because the plaintiff alleged that "defendants are manufacturing and distributing vitamin products that are intended for use by persons exactly like the plaintiff, the ultimate consumer"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 103 (Fla. Dist. Ct. App. 1996) (holding that standing under FDUTPA "shall be construed liberally to promote" the policy of protecting "the consuming public and legitimate business enterprises from those who engage in . . . unfair acts or practices in the conduct of any trade or commerce."). Therefore, the ultimate sufficiency of causal allegations is a determination reserved for the jury. *See In re Flonase Antitrust Litig.*, 798 F. Supp. 2d 619, 633 (E.D. Pa. 2011) ("[W]hether conduct is a proximate cause or an intervening cause of an injury is a question of fact for the jury."); *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003) ("Proximate causation and intervening cause are usually issues for the jury to resolve."). As with all allegations in the SCCAC, Plaintiffs' causal allegations are assumed to be true for purposes of this motion. *See* MTD Order at 2 (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015)).

The SCCAC, together with the Osler Report, describe in detail how the prices at which RFEDs resell FX instruments to retail customers are directly based on the prices at which Defendants sell spot FX instruments to RFEDs, and how the anticompetitive overcharges due to the Conspiracy were passed directly from Defendants to RFEDs to Plaintiffs and members of the Classes.[8] The SCCAC also alleges that RFEDs account for a significant portion of Defendants' FX business, and therefore, Defendants were well-aware that the Conspiracy would harm RFED customers including Plaintiffs and members of the Classes. SCCAC ¶¶ 153-54; *see* MTD Order at 14 (noting that courts evaluating proximate cause consider "whether the injury that resulted was within the scope of the risk created by the defendant's [wrongful] act" and "whether the injury was a natural or probable consequence of the [conduct]") (quoting *Lotes*, 753 F.3d at 412). Therefore, the SCCAC surpasses the requirement at this stage to merely allege that "some . . . of the [anticompetitive] overcharge was passed on to them through each of the various intermediate levels of the distribution chain." *Auto Parts*, 29 F. Supp. 3d at 997.

RFEDs, such as those with whom Plaintiffs transacted, employ a pricing model that mathematically incorporates the price at which the RFEDs purchase spot FX Instruments from a Defendant into the price at which the RFED sells that FX Instrument to the retail FX customer Class member. SCCAC ¶ 156.[9] Each RFED receives real-time bid-ask quotes from several dealer bank "liquidity providers," many of which are Defendants. *Id.* ¶ 157; see also id. ¶ 154

---

[8] The Court found in the MTD Order that the CCAC supported the conclusion that retail customer is an "independent actor" that "influences the exchange rate" paid to the RFED. *Id.* at 12. The SCCAC and Osler Report clarify the mechanics of RFED pricing, showing that prices are determined by the RFED's algorithm, and the only "influence" of the retail customer is to decide whether to trade at the RFED's posted prices.

[9] Defendants may, as they attempted to do in their MTD brief, argue that not every RFED during the Class Period used straightforward Defendant-to-RFED-to-indirect purchaser model described by Dr. Osler and in the SCCAC. However, because the SCCAC limits the proposed Classes to transactions that follow that model, any transaction that was indirectly purchased from a non-Cartel Member is excluded from Plaintiffs claims. And in any event, "[a]s is well established, '[a] court ruling on . . . a motion [to dismiss] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version,' . . . equally or even 'more plausible.'" *FOREX I*, 74 F. Supp. 3d at 597 (quotation omitted).

(listing Defendant liquidity providers for the three largest U.S. RFEDs). RFEDs determine the bid and ask prices offered to their retail customers (including Plaintiffs), using a computer algorithm that takes in prices from all of their liquidity providers (including Defendants), selects the best bid and ask prices from those quotes, and calculates prices for retail customers by adding (for the ask) or subtracting (for the bid) a "markup spread" to those bid and ask prices. SCCAC ¶ 159.[10] When Class members purchased an FX Instrument from an RFED during the Class Period, the following steps would have occurred for transactions where the RFED is a member of the Direct Settlement Class:

1. The RFED purchased the FX Instrument from the "liquidity provider" Defendant at the "ask" price that was quoted by the Defendant at the moment the trade was executed; and

2. The RFED delivered the FX Instrument to the Class member in exchange for the retail price that was posted on the RFED's website at the moment the order was placed.

*Id*. ¶ 162. Both steps are counterparty-to-counterparty transactions; therefore, the RFED is the direct purchaser from the Defendants and the Class member is the indirect purchaser. *Id*. The price paid by the Class member is equal to the price that the RFED paid to the Defendant for the FX Instrument, plus the "markup spread" charged by the RFED. *Id*. ¶ 161. Therefore, for every transaction where the RFED paid the Defendant an artificially inflated price, the exact amount of the overcharge was passed on from the RFED to the Class member. *Id*. ¶ 169.

To confirm the mathematical connection between Defendants' prices and the prices charged by RFEDs, Dr. Osler conducted a correlation analysis comparing actual quotes for the EUR/USD currency pair offered by Defendants and other dealer banks from the Reuters Tick History database ("Reuters prices") for a one-month sample period during the Class Period, February 2012, with the actual prices paid by Class members who purchased FX Instruments

---

[10] This "markup spread" is similar to the "small handling fee or commission" charged by Defendants in *Nypl*, which this Court held did not disturb causation. *See Nypl II*, 2017 WL 3309759, at *2.

directly from FOREX.com, currently the largest RFED in the U.S., during that same time period ("retail prices"). Osler Report ¶ 20.[11] Dr. Osler's analysis shows that retail and Reuters prices are nearly perfectly correlated, with a correlation coefficient of 0.99997, and that the two price series remained nearly perfectly correlated even around the times of the Fixes when FX prices were more volatile. *Id.* ¶¶ 17-18. Dr. Osler also conducted a regression analysis with those same two price series, regressing proportionate changes in the FOREX.com quotes with proportionate changes in the Reuters quotes. *Id.* ¶¶ 17-18. The results of that analysis confirm that the price series move extremely closely in parallel. *Id.* ¶ 24. Finally, to further corroborate the connection between Defendants' manipulated prices and the prices paid by Plaintiffs and members of the proposed Classes, Dr. Osler conducted a second correlation analysis, this time comparing the same FOREX.com prices for the EUR/USD currency pair with the ECB Fix rates throughout February 2012. *Id.* ¶ 29; s*ee also* SCCAC ¶¶ 106, 132, 138-140, 177-185 (alleging that Defendants manipulated the ECB Fix throughout the Class Period). Dr. Osler determined that the retail and ECB prices were also nearly perfectly correlated, with a correlation coefficient of 0.99996. *See* Osler Report ¶ 19.

Proximate cause in indirect purchaser cases is clearly satisfied where plaintiffs allege that the price-fixed products "follow a traceable physical chain from the [direct sellers] to the purchasers of the finished products'" *In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *17 (D.N.J. Oct. 2, 2013) ("*DIPF*"). Numerous courts have held that indirect purchaser plaintiffs adequately alleged causation where

---

[11] The FOREX.com data is comprised of actual bid/ask quotes that were posted on FOREX.com and made available to retail FX customers including Plaintiffs and members of the proposed Classes during the Class Period. The Reuters data is comprised of the best-available quotes from the major dealer trading platforms—including EBS, Reuters Matching, Reuters Dealing, and others—updated at high frequencies.  Because Defendants collectively dominate more than 90% of the FX dealer bank market, a substantial portion of the Reuters prices are direct quotes from Defendants.

the products sold by defendants were merely a *component* of the final products purchased by the

indirect purchasers.[12] Here, the chain of causation is far more direct. Unlike in the component

cases, where the product sold by the defendants is just one small piece of the end product

purchased by the indirect purchaser plaintiffs, the product sold by Cartel Members to RFEDs

here is the *exact same product* as the one resold by the RFEDs to the Class members. *See, e.g.*,

SCCAC ¶ 156; *see generally Crouch v. Crompton Corp.*, No. 02-cv-4375, 2004 WL 2414027, at

*19 (N.C. Super. Oct. 28, 2004) ("Purchasers who buy the product which is the subject of the

restraint are more likely to be able to show sufficiently direct injury than those who purchase a

product with a component which is the subject of the restraint.").

    Even under the higher standard applicable to direct purchaser actions, the Court in

*FOREX III* found sufficient allegations of "a highly correlated relationship between the FX

futures markets and the spot prices that Defendants allegedly manipulated." 2016 WL 5108131,

at *11. Similarly, in *Nypl II*, the Court held that the plaintiffs adequately alleged causation where

the prices paid by those direct purchaser plaintiffs in the separate retail currency market were

merely "linked by a benchmark that is both derived from one market and determinative of price

---

[12] *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *14 (N.D. Cal. Oct. 2, 2014) (holding that indirect purchasers alleged standing "[e]ven assuming arguendo that each state identified by defendants were to apply *AGC*" where the price-fixed product was batteries, but the products purchased by indirect purchasers were portable consumer electronics that contained those batteries); *Auto Parts*, 29 F. Supp. 3d at 997 (price-fixed product was auto parts, products purchased by indirects were automobiles containing the parts); *Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co.*, No. 09–cv–00852, 2012 WL 3841397 at *4 (E.D. Wis. Sept. 5, 2012) (same); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1024 (N.D. Cal. 2010). (price-fixed product was cathode ray tubes ("CRTs"), products purchased by indirects were television sets and computer monitors containing CRTs); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143 (E.D. Pa. 2009) (product impacted by the conspiracy was an antidepressant drug, indirect purchasers were employee benefit plans who reimbursed their members' purchases the drug); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1154-55 (N.D. Cal. 2009) (holding that the indirect purchaser plaintiffs satisfied proximate cause and the "directness" *AGC* factor where they alleged that "that the [price-fixed] flash memory, whether in the form of a product or as a component of a finished product, remains discrete and traceable to its [direct seller defendant]"); *In re TFT-LCD Antitrust Litig.*, 586 F. Supp. 2d 1109, 1122 (N.D. Cal. 2008) (price-fixed product was LCD panels, products purchased by indirects were laptops, televisions, and other products containing the panels); *D.R. Ward Const. Co.*, 470 F. Supp. 2d at 503 (price-fixed product was plastic additives, products purchased by indirects were products containing the additives).

in the other market." 2017 WL 3309759, at *6. Here, not only does the SCCAC allege, as Dr. Osler's analysis establishes, a highly correlated relationship between the prices charged by Defendants and the prices charged by RFEDs; the regression analyses performed by Dr. Osler strongly confirm that correlation. *See* Osler Report ¶¶ 24-27.  Those analyses, combined with the highly detailed allegations in the SCCAC showing that the prices paid by RFEDs to Defendants are directly passed on by RFEDs to retail FX customers including Plaintiffs and members of the proposed Classes, go far beyond what is required at the pleading stage to allege proximate cause under the *Illinois Brick* repealer laws of the states at issue in the SCCAC.

**B.      The RFEDs Passed on Defendants' Anticompetitive Overcharges Directly to Plaintiffs and Class Members**

The MTD Order found that the CCAC "fails to explain the RFEDs' presumably independent and various pricing and execution strategies, which may well have broken the chain of causation," and therefore it was unclear "whether and to what extent the RFEDs absorbed the alleged price increases or passed them on to Plaintiffs." *Id.* at 12. To address the Court's concerns, the SCCAC details those pricing and execution strategies, and shows that in every Defendant-to-RFED-to-Class member transaction, the anticompetitive overcharge was directly passed from the Defendant to the RFED to the Class member. SCCAC ¶¶ 153-185. Dr. Osler explains why this is so. *See* Osler Report ¶¶ 12, 13.

The mere fact that the price paid by a customer to a retailer is higher than the price paid by the retailer to the wholesaler does not by itself defeat causation; such a rule would necessarily preclude any indirect purchaser actions from surviving a motion to dismiss. *See Nypl III*, 2018 WL 1276869, at *3 (holding that the fact that the retailer charges "a small commission" does not affect the chain of causation where the prices manipulated by the Conspiracy are the primary

determinant of retail prices).[13] Instead, causation is only defeated due to an "intervening cause" if the allegations in the complaint lead the court to conclude that the intermediary "absorbed" any anticompetitive overcharge rather than passing it on to the indirect purchaser.[14] Therefore, to allege proximate cause here, as they do in the SCCAC, Plaintiffs need only allege that RFED pricing for their FX Instrument purchases was structured in a way that passed the overcharge incurred in the direct transaction directly to the indirect purchaser customer.

As described above, the price paid by the retail FX customer to the RFED for an FX Instrument is equal to the price that the RFED paid to the liquidity provider-Defendant for that FX Instrument, plus the markup charged by the RFED. The amount of that markup can be precisely determined from the RFEDs' transactional data that Plaintiffs will obtain in discovery. The only two inputs affecting the prices paid by Plaintiffs are the prices that the RFED paid to purchase the FX Instrument from the liquidity provider, and the markups charged by the RFED. SCCAC ¶ 156; Osler Report ¶ 27. Therefore, the anticompetitive overcharge incurred by the Class member can be calculated by subtracting the markup and the competitive price that the RFED would have paid to the liquidity provider but-for the Conspiracy from the price paid by the customer to the RFED. SCCAC ¶ 167. Like the "small commission" charged by the retail

---

[13] *See also In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *13 (indirect purchasers had antitrust standing where they alleged that the anticompetitive overcharges "can be, and commonly are, isolated through regression analyses such that the impact of the overcharge 'can be measured and quantified'"). Further, "[e]ven if an antitrust violation is not the material cause of an injury and the only material cause is some intervening conduct, courts have consistently found the causation requirement satisfied and the chain of causation intact where that intervening conduct was the foreseeable consequence of the original antitrust violation." *In re Flonase Antitrust Litig.*, 798 F. Supp. 2d at 628. As alleged in the SCCAC, numerous Defendants here were "liquidity providers" for RFEDs during the Class Period, SCCAC ¶¶ 153-167, so the resale of FX Instruments by those RFEDs and the resulting injuries to Plaintiffs and members of the Classes were clearly foreseeable.

[14] A common example of this occurs where the retailer prices are often set at fixed "price points" (for example, prices ending in "99" cents or dollars) which retailers may not change in response to relatively small changes in costs. *See, e.g.*, *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143, 2016 WL 467444, at *8 (N.D. Cal. Feb. 8, 2016) (noting that retailers generally sell computers "at prices just under the next $100 mark"). This is not an issue here, where the RFEDs update their prices based on the prices charged to them by Defendants many times a minute and often multiple times per second, often in tiny increments such as $0.00001, and do not employ any "price points." *See, e.g.*, SCCAC ¶¶ 164, 176.

banks in *Nypl III*, the retail markup here is readily identifiable and distinguishable from Defendants' anticompetitive overcharge. 2018 WL 1276869, at *3. The SCCAC's allegations therefore eliminate the possibility that an overcharge incurred in the Defendant-to-RFED transaction was "absorbed" by the RFED rather than passed on to the indirect purchaser Class members.[15]

## IV.   THE SCCAC PLAUSIBLY ALLEGES ANTITRUST STANDING UNDER *AGC*

For the same reasons that the SCCAC establishes proximate cause, it also establishes standing under the laws of the states that consider the federal-law "efficient enforcer" factors in evaluating antitrust standing.[16] Although the Court found that the "efficient enforcer" factors need only be considered in evaluating Plaintiffs' claims under California, Illinois, and New York law,[17] the MTD Order also recognized that the "version" of those factors applicable to *Illinois Brick* repealer claims is distinct from the test used to evaluate direct-purchaser standing. *See id.* at 10 (holding that those states "would apply *some version* of the *AGC* factors") (emphasis added). Courts have consistently recognized that "even where some states' courts have specifically invoked *AGC*, they have perceived in their respective legislatures' passage of *Illinois Brick* repealer statutes an intent to extend antitrust standing to indirect purchasers and,

---

[15] Any hypothetical intervening causes or alternative theories of causation that Defendants might conjure in their reply brief are inappropriate for consideration at the pleading stage. *See FOREX I*, 74 F. Supp. 3d at 597.

[16] Those factors are: "(1) the 'directness or indirectness of the asserted injury,' which requires evaluation of the 'chain of causation' linking [the plaintiffs'] asserted injury and the [defendants'] alleged price-fixing; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [the plaintiffs'] damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) (quoting *Associated Gen. Contractors*, 459 U.S. 519 at 540-45.

[17] The Court did not find that the *AGC* efficient enforcer doctrine applied to Plaintiffs' claims under Arizona, Florida, Minnesota, Massachusetts and North Carolina law. MTD Order at 6, 9-10, 14. Therefore, if the Court finds that the SCCAC plausibly alleges proximate cause, those claims should be allowed to proceed. Plaintiffs' respectfully disagree with the Court's conclusion that the *AGC* efficient enforcer factors would be applied by the highest courts of California, Illinois, and New York. *See* Plaintiffs' MTD Brief at 15-24. However, because the SCCAC establishes antitrust standing under *AGC* in addition to establishing proximate cause, all of Plaintiffs' state-law claims should be allowed to proceed regardless of which analysis is applied.

accordingly, modified, or indicated they would modify, their application of *AGC* principles to accommodate indirect-purchaser suits more readily." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420, 2014 WL 4955377, at *9-11 (N.D. Cal. Oct. 2, 2014) (holding that "[e]ven assuming arguendo that each state identified by defendants were to apply *AGC,* the Court concludes, as have numerous other rulings addressing similar allegations, that the [indirect purchaser plaintiffs] have adequately alleged facts that satisfy *AGC* for pleading purposes").[18] Thus, as the MTD Order noted, the Supreme Court has held that the application of the third and fourth *AGC* factors to damages claims brought under statutes other than the federal Sherman Act is "problematic," and that "the 'potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." MTD Order at 10 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014)) (emphasis in original).[19]

---

[18] *See also In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404, 410 (D. Del. 2007) ("As for the remaining three *AGC* factors, the Court concludes that they carry less weight in the standing analysis in jurisdictions rejecting *Illinois Brick*.").

[19] In *Lexmark*, the Supreme Court held that the *AGC* factors do not apply to claims brought under the federal Lanham Act because "*Associated General Contractors* rested on statutory, not 'prudential,' considerations." *Id.* at 1391.

[19] *See, e.g., In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *12 ("Here, the [indirect purchaser plaintiffs] allege facts sufficient to conclude, for pleading purposes, that battery cells, batteries, and battery products reside in the same market, or inextricably linked markets."); *DIPF*, 2013 WL 5503308, at *17 ("[C]ourts have recognized that 'even if the plaintiffs were not participants in the relevant market, the [factor] still favored standing . . . because the plaintiffs had alleged that the products were identifiable, discrete physical objects that did not change form or become an indistinguishable part of the product in which they are contained, therefore they follow a traceable physical chain from the [manufacturers] to the purchasers of the finished products'"); *Fond du Lac Bumper Exch., Inc.,* 2012 WL 3841397 at *4 (indirect purchasers of automobiles are participants in the auto parts market, because they are "end users of [auto] parts, and that they are being injured because the higher prices defendants charge for [auto] parts are being passed on to end users by direct purchasers and others in the chain of distribution").

**A.      The SCCAC Plausibly Alleges "Directness" for the Same Reasons It Plausibly Alleges Proximate Cause**

 "Directness, the first *AGC* factor discussed above, is in essence a proximate cause requirement." MTD Order at 14 (citation omitted); *see Gatt Comms., Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013) ("Directness in the antitrust context means close in the chain of causation."). Therefore, for the same reasons that the SCCAC plausibly alleges proximate cause, the "directness" factor favors granting Plaintiffs' Motion here.

The closest-possible chain of causation for indirect purchaser claims under *Illinois Brick* repealer statues is the case where "Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C." *See generally Loeb Indus. v. Sumitomo Corp.*, 306 F.3d 469, 482 (7th Cir. 2002). The SCCAC and Osler Report demonstrate that Plaintiffs' transactions followed that model. Defendants fixed and manipulated prices on FX Instruments, sold those FX Instruments to RFEDs at supracompetitive prices, and the RFEDs sold those same FX Instruments to Plaintiffs at prices that fully incorporated overcharges. Any FX Instrument transactions that did not follow that direct chain of causation are explicitly excluded from Plaintiffs' claims. SCCAC ¶¶ 40-48 (defining the Classes as limited to persons who "indirectly purchased an FX Instrument from a Defendant or co-conspirator . . . by entering into an FX Instrument with a member of the Direct Settlement Class, *where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator.*") (Emphasis added).

The SCCAC further shows that the market for retail FX Instruments is not a separate product market from the market for spot FX Instruments. SCCAC ¶ 6 (defining the relevant market as the U.S. market for spot FX Instruments, and making clear that Plaintiffs are participants in that market). An FX Instrument sold by a Defendant to an RFED does not

somehow become a different product when it is resold by the RFED to a retail customer. Courts consistently reject attempts to parse markets at the pleading stage in indirect purchaser cases even where the products sold by defendants are just a component of the final products purchased by the indirect purchasers.[20] In *Nypl II*, the Court held that the plaintiffs in the separate foreign currency market plausibly alleged that they "were consumers in a market where competition was restrained" because the prices manipulated by the Conspiracy "were the primary component of the prices Plaintiffs paid for foreign currency in the consumer retail market." 2017 WL 3309759, at *4. The same is true here, where the allegations in the SCCAC make clear that the price charged by the Cartel Member to the RFED is the primary component of the price charged by the RFED to the retail customer, and that the anticompetitive overcharges are readily traceable under the methodology explained by Dr. Osler. SCCAC ¶¶ 153-185; *see In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2013 WL 2456612, at *17 (E.D. Mich. June 6, 2013) (holding that indirect purchaser plaintiffs satisfied the "directness" factor because they alleged that "that they can trace overcharges through the distribution chain," where plaintiffs were automobile purchasers alleging that defendants fixed prices on the "automotive wire harness" component of the automobiles). Therefore, the "directness" factor strongly supports granting Plaintiffs' Motion.

**B.** **Plaintiffs Are the Most "Direct" Indirect Purchasers**

The Court held that the second *AGC* factor—whether there are more direct victims of the alleged conspiracy—weighed against a decision to sustain the CCAC. MTD Order at 13. The SCCAC and Osler Report demonstrate that there are no more direct victims than Plaintiffs for purposes of their indirect purchaser claims.

---

[20] *See supra* n. 13.

18

As the Supreme Court held in *California v. ARC Am. Corp.*, the existence of a direct-purchaser action alleging federal-law claims is not a barrier to antitrust standing for indirect purchasers alleging state-law claims based on the same anticompetitive conduct. 490 U.S. 93, 103 (1989) ("It is one thing to consider the congressional policies identified in *Illinois Brick* and *Hanover Shoe* in defining what sort of recovery federal antitrust law authorizes; it is something altogether different, and in our view inappropriate, to consider them as defining what federal law allows States to do under their own antitrust law.").[21] However, courts applying *AGC* to indirect purchaser claims still consider a modified version of the second factor in evaluating indirect purchaser standing. In *Crouch*, which Defendants cited in their MTD Brief, the court clarified that for indirect purchaser claims, the question relevant to the second *AGC* factor is not whether there are more direct purchasers, but rather, "[w]hether there exist *other indirect purchasers in the distribution chain who are more directly impacted* by the alleged violation." 2004 WL 2414027, at *19 (emphasis added); *see also In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *9 (noting that the "modified" factors considered by states that consider *AGC* in evaluating indirect purchaser standing may include "a loosening of requirements of directness, a greater tolerance for the existence of other parties who may bring suit, or lessened concern over duplicative recoveries"). Plaintiffs readily satisfy that factor.

By definition, the Classes proposed in the SCCAC are limited to persons who transacted directly with a member of the Direct Settlement Class as defined in *FOREX*. SCCAC ¶¶ 40-48. Thus, under the Defendant-to-RFED-to-Class member model alleged in the SCCAC, the Direct

---

[21] *See also D.R. Ward Const. Co.*, 470 F. Supp. 2d at 503 (holding that the second *AGC* factor "loses relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers" and that "the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of *Illinois Brick* repealer statutes").

Settlement Class Member is the RFED. No person or entity stands between the RFED Direct Settlement Class Member and the indirect purchaser Plaintiffs and Class members here. *Id*. ¶¶ 149, 160. Thus, there are no and can be no indirect purchasers in the distribution chain who are more directly impacted by the alleged violation than Plaintiffs and the proposed Class members. Therefore, the second *AGC* factor, to the extent applicable to the SCCAC's state-law claims, favors granting Plaintiffs' motion to amend.

### C.      The SCCAC's Alleged Damages Are Not Speculative

The MTD Order held that the third *AGC* factor favored dismissal because the CCAC failed "to allege how prices in the retail trading market are determined." *Id.* at 13. As described above, the SCCAC adds allegations detailing that pricing mechanism. In *FOREX III*, the Court held that "any holding that . . . damages would be speculative is premature" because the complaint alleged "a highly correlated relationship between the FX futures markets and the spot prices that Defendants allegedly manipulated" and "[i]f such a linkage is proven, Plaintiffs will seek to prove damages by comparing the prices an Exchange Plaintiff paid in identifiable transactions with what the price would have been but for collusion." 2016 WL 5108131, at *11. Here, the SCCAC similarly alleges a direct and highly correlated relationship between the spot prices charged by Defendants and the spot prices that Plaintiffs paid. Although Plaintiffs are clearly not required to propose a damages methodology at the pleading stage, the Osler Report concludes that "given sufficient data from Defendants and the RFEDs, [Dr. Osler] would be able to specify a model (or models) capable of reliably computing aggregate damages to the Classes." Osler Report ¶ 3; *c.f. FOREX III*, 2016 WL 5108131, at *8 (noting that "any harm from the alleged conspiracy can be shown on a transaction-by-transaction basis"). Because the SCCAC

specifically alleges how RFED prices are mathematically determined based on Defendants' prices, the third *AGC* factor is met.

>    **D.       There Is No Potential for Duplicative Recovery**

As to fourth *ACG* factor, the Court held that the CCAC did not allege a direct relationship between the alleged Conspiracy and Plaintiffs' injuries which raised the risk the Plaintiffs' damages were derivative of the *FOREX* plaintiffs' damages and therefore duplicative and excessive of any judgment in *FOREX.* MTD Order at 13. The SCCAC satisfies the fourth *AGC* factor. As described above, the allegations in the SCCAC establish a direct relationship between the alleged Conspiracy and Plaintiffs' injuries. Courts have found that indirect purchasers are even more "direct" victims of antitrust violations than the direct purchasers where, as here, the direct purchasers passed on all overcharges to the indirect purchasers. *See Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 109 (Ariz. 2003) (holding that where the direct purchasers "can pass along overcharges to [indirect] purchasers . . ., the indirect purchaser is the truly injured party, and likely the only party with impetus to sue to redress the antitrust injury.").

Moreover, it is well-established that under the fourth *AGC* factor, the existence of a federal-law direct-purchaser action is not a barrier to indirect purchaser claims under *Illinois Brick* repealer laws. *See, e.g.*, *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1156 ("States . . . which have repealed *Illinois Brick* and allowed indirect purchasers to sue for antitrust violations, have necessarily made the policy decision that duplicative recovery may permissibly occur") (citation omitted); *D.R. Ward Const. Co.*, 470 F. Supp. 2d at 504 (holding that the fourth AGC factor "proves inapposite when used to determine standing under state antitrust statutes that permit indirect purchaser claims"); *Lorix*, 736 N.W.2d at 628 (duplicative

recovery "is not a risk that our court may remedy by restricting Minnesota antitrust law in ways that our legislature has not").

## V.      THE SCCAC ADDS ALLEGATIONS SATISFYING DUE PROCESS

The MTD Order held that with respect to Plaintiffs' state law claims, except those under New York law, the CCAC failed to satisfy due process by alleging "any nexus between those states and the parties and events in this case, apart from a plaintiff's domicile." *See* Order at 16. The SCCAC includes specific allegations to remedy this issue and satisfies due process.[22]

Under the Due Process Clause of the Fourteenth Amendment, to invoke a given state's law, a party must show that state has "a significant contact or significant aggregation of contracts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). However, this rule of law places only "modest restrictions on the application of forum law." *Shutts*, 472 U.S. at 818. For antitrust claims, the factors relevant to determining a state's interest are "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Johnson v. Nextel Commc'ns Inc.*, 780 F. 3d 128, 142 (2d Cir. 2015) (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)); *see also* MTD Order at 17. The acts of one co-conspirator in each state are attributed to all co-conspirators for purposes of evaluating due process.[23]

---

[22] If Defendants argue that some additional allegations of intrastate conduct or effects are required for any of Plaintiffs' state-law claims. However, courts consistently hold allegations that the defendants' conduct caused individuals in each named state to pay supracompetitive prices are sufficient. *See, e.g.*, *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 403 (E.D. Pa. 2010).
[23] *See, e.g.*, *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991) ("It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction."); *Dixon v. Mack*, 507 F. Supp. 345, 352

The SCCAC addresses and resolves the Court's due process concerns by adding express allegations that all Plaintiffs purchased FX Instruments in, and were thereby injured by the Conspiracy in, their respective states of residence. SCCAC ¶¶ 10-20. Moreover, the SCCAC adds additional allegations establishing that many of the Defendants have significant physical presences in each of the states at issue, and thus have a significant impact on commerce in each of the states, thereby further bolstering the contacts alleged under factor (c) of the due process analysis. *Id.* ¶¶ 21-36.

Numerous courts have held that allegations of injury within a state are sufficient to meet the "modest" state contacts required for due process.[24] Indeed, Defendants conceded in their MTD Brief that due process requirements would be met if the plaintiffs alleged *either* "that they purchased the price-fixed goods within the state or that the conspiratorial conduct giving rise to plaintiffs' claims occurred there," as they have now done. Defendants' MTD Brief at 22 (emphasis in original). The SCCAC readily meets this test and, therefore, satisfies due process requirements for each of the state law claims.

## VI.   INJUNCTIVE RELIEF

The Court found that the Plaintiffs failed to allege Article III standing to bring a Sherman Act injunctive relief claim because the CCAC did not allege they were "likely to be harmed

---

(S.D.N.Y. 1980) (holding that due process was satisfied where the defendant joined a conspiracy with knowledge that acts in furtherance of conspiracy had taken place in New York). Therefore, if the Court finds that the SCCAC satisfies due process for one Defendant, it should find that due process is satisfied for all Defendants.

[24] *See, e.g., AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1110-1112 (9th Cir. 2013) (holding due process is satisfied for indirect purchasers' price-fixing claims under the Cartwright Act where either the relevant purchase took place in the state or the conspiratorial activity leading to the price-fixing took place in the state); *In re TFT-LCD Antitrust Litig.*, No. 07-md-1827, 2010 WL 2609434, at *3 (N.D. Cal. June 28, 2010) ("[I]n order to invoke the various state laws at issue, plaintiffs must be able to allege that 'the occurrence or transaction giving rise to the litigation' – plaintiffs' purchases of allegedly price-fixed goods -- occurred in the various states."); *In re TFT-LCD Antitrust Litig.*, No. 07-md-1827, 2011 WL 3809767, *3 (N.D. Cal. Aug. 29, 2011) (holding plaintiff alleged sufficiently significant contacts to satisfy due process for state price-fixing claim under Illinois antitrust statute by alleging it issued purchase orders from within Illinois).

23

again in the future in a similar way." MTD Order at 18. The SCCAC addresses that holding in

two ways. First, the SCCAC alleges that several Plaintiffs are currently active retail FX

purchasers, meaning that any future price manipulation by Defendants would harm Plaintiffs.

SCCAC ¶¶ 272. Second, the SCCAC adds allegations from recent developments in government

investigations into the Conspiracy, showing that the risk of future FX-related misconduct by

Defendants has not been adequately curtailed. This Court has twice allowed injunctive relief

claims to proceed in cases alleging similar threats of future injury. In the *FOREX I* opinion

denying Defendants' motions to dismiss, the Court allowed the plaintiffs' injunctive relief claim

to proceed. *FOREX I,* 74 F. Supp. 3d at 598.[25] More recently, the Court allowed a similar

injunctive relief claim to proceed in *Nypl. See Nypl II*, 2017 WL 3309759, at *5; *Nypl III*, 2018

WL 1276869, at *1.

It is well-established that direct purchasers and indirect purchasers may maintain parallel

injunctive relief claims where both have alleged a threat of future injury.[26] Because the Court

allowed the injunctive relief claims to proceed in *FOREX I* and *Nypl* where the plaintiffs alleged

the same Conspiracy and the same risk that Defendants will manipulate FX Instrument prices in

the future, the Court should allow Plaintiffs' injunctive relief claim to proceed here.

Additionally, the SCCAC adds allegations that the same market conditions that facilitated

the Conspiracy continue today. *See* SCCAC ¶ 245. In certifying an indirect purchaser class

claiming injunctive relief, the court in *SRAM* held:

> [Indirect purchaser] Plaintiffs allege that the same market conditions that facilitated the
> conspiracy . . . continue today. They allege that Defendants' price-fixing resulted from a
> systematic, repeated pattern of sharing sensitive competitive information which was

---

[25] The *FOREX* plaintiffs subsequently abandoned their injunctive relief claim, *FOREX* ECF No. 368, and the
*FOREX* settlements do not provide for injunctive relief. *See, e.g.*, FOREX ECF No. 481-1 (JPMorgan settlement).
[26] *See, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 611 (N.D. Cal. 2009)
("*SRAM*"); *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (status as an indirect purchaser
"is not fatal to a plaintiff's request for injunctive relief under section 16 of the Clayton Act").

greatly facilitated by the cross-competitor business relationships that still exist. Thus, there is alleged a significant risk that the conspiracy will persist or reform in the future.

264 F.R.D. at 611. Here, similar allegations in the SCCAC support the inference that there is a risk of future Defendant misconduct. The FX market is one of the least regulated financial markets in the world, SCCAC ¶ 96, and Defendants' dominant collective market share, a lack of government regulation, high barriers to entry, and other unique characteristics of the FX market make it highly susceptible to collusive activity. *Id.* ¶ 104.[27] The SCCAC adds allegations that several Plaintiffs are active retail FX traders who plan to purchase FX Instruments in the future. SCCAC ¶ 272. If Defendants continue to be able to manipulate FX prices, those Plaintiffs will continue to be harmed.

Moreover, new allegations in the SCCAC demonstrate that Defendants have not taken adequate measures to prevent further FX manipulation in the future. Government investigators have found that Defendants engaged in FX-related misconduct as recently as July 2017, *id.* ¶ 246, and as recently as February 2018, the Federal Reserve Board announced that it is seeking to sanction Defendant traders that participated in the Conspiracy. *Id.* ¶ 246. The recent government investigation developments alleged in the SCCAC show that the risk of future Defendant misconduct is far from over. *Id.* ¶ 219. Therefore, the Court should allow Plaintiffs to retain their injunctive relief claim.

**VII.   <u>CONCLUSION</u>**

For the reasons described herein and in the Osler Report, Plaintiffs respectfully request that the Court grant their Motion for leave to file the SCCAC.

---

[27] Although the SCCAC alleges a Class Period that ends on December 31, 2013, the SCCAC makes clear that threat of Defendants engaging in similar conduct in the future is significant. SCCAC ¶ 2 n.3; *see In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 669 (E.D. Mich. 2011) ("Plaintiffs are not constrained from seeking injunctive relief simply because they allege a class period ending on March 6, 2008, where the [complaint] indicates that the exact dates of the continuing conspiracy are unknown to Plaintiffs.").

Dated:   April 5, 2018                                   Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Merrill G. Davidoff
Joshua T. Ripley
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
mdellangelo@bm.net
jripley@bm.net

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 North Scottsdale Rd., Ste. 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

Joseph C. Peiffer
**PEIFFER ROSCA WOLF ABDULLAH CARR& KANE LLP**
201 St. Charles Ave., Ste. 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504)523-2464
jpeiffer@prwlegal.com

R. Bryant McCulley
Stuart H. McCluer
Frank B. Ulmer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Blvd., Ste. 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com
fulmer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*