# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONTANT, SANDRA LAVENDER, VICTOR HERNANDEZ, MARTIN-HAN TRAN, FX PRIMUS LTD., CARLOS GONZALEZ, UGNIUS MATKUS, CHARLES G. HITCH-COCK III, JERRY JACOBSON, TINA PORTER, AND PAUL VERMILLION on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>Defendants. | Case No. 1:17-cv-03139-LGS<br><br>[rel. 13-cv-7789-LGS]<br><br>ECF CASE<br><br>ORAL ARGUMENT REQUESTED |

 

 

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR LEAVE TO FILE THE PROPOSED
SECOND CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

PRELIMINARY STATEMENT ........................................................1

BACKGROUND ...............................................................................2

    A.    This Court's Order Dismissing The CCAC ........................3

    B.    Plaintiffs' Proposed Second Consolidated Class Action Complaint ......5

ARGUMENT ....................................................................................6

I.    PLAINTIFFS HAVE NOT CURED THEIR PREVIOUS FAILURE TO PLEAD FACTS SUFFICIENT TO SHOW PROXIMATE CAUSE OR ANTITRUST STANDING ....................................................................7

    A.    Plaintiffs May Not Delete Previously Pleaded Factual Allegations And Replace Them With Contradictory Allegations ........................7

    B.    Plaintiffs Still Fail To Plead Facts Sufficient To Show Proximate Cause ..............9

    C.    Plaintiffs Still Fail To Plead Facts Sufficient To Show Antitrust Standing .........14

II.    PLAINTIFFS HAVE FAILED TO CURE THE DUE PROCESS INFIRMITIES OF THEIR PREVIOUS COMPLAINT....................................................14

III.    PLAINTIFFS HAVE NOT CURED THEIR PREVIOUS FAILURE TO PLEAD FACTS SHOWING THEIR STANDING TO SEEK INJUNCTIVE RELIEF ...............16

IV.    PLAINTIFFS' PROPOSED COMPLAINT FAILS FOR SEVERAL REASONS NOT PREVIOUSLY ADDRESSED BY THIS COURT ................................18

    A.    The SCCAC Does Not Cure The Flaw In Plaintiffs' Claim Under The Arizona Antitrust Act.......................18

    B.    The SCCAC Does Not Cure The Flaw In Plaintiffs' Claim Under The California Antitrust And Unfair Competition Laws ............19

    C.    The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The Florida Deceptive And Unfair Trade Practices Act................19

    D.    The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The Illinois Antitrust Act .......................21

E.   The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The Massachusetts Consumer Protection Act ............................................................ 22

F.   The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The North Carolina Unfair And Deceptive Trade Practices Act ................................ 24

CONCLUSION .......................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)................................................................15

*ADA Solutions, Inc. v. Meadors*,
    98 F. Supp. 3d 240 (D. Mass. 2015), *aff'd in part, rev'd in part on other grounds*,
    665 F. App'x 3 (1st Cir. 2016)........................................................24

*Allstate Insurance Co. v. Hague*,
    449 U.S. 302 (1981)........................................................................16

*In re Asacol Antitrust Litigation*,
    No. 15-cv-12730, 2016 WL 4083333 (D. Mass. July 20, 2016) ................................19, 22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................23

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)..........................................................................3

*Austin v. Ford Models, Inc.*,
    149 F.3d 148 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ...................................................8

*In re Automotive Parts Antitrust Litigation*,
    Nos. 2:12-cv-00202, 2:12-cv-00203, 2014 WL 29935753 (E.D. Mich. July 3, 2014). ..........................................................................................22

*Axiom Investment Advisors, LLC v. Deutsche Bank AG*,
    234 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................21

*Bache Halsey Stuart, Inc. v. Hunsucker*,
    248 S.E.2d 567 (N.C. Ct. App. 1978)................................................24

*Bankers Trust Co. v. Basciano*,
    960 So. 2d 773 (Fla. Dist. Ct. App. 2007) ........................................19

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................23

*BLD Productions, LLC v. Remote Productions, Inc.*,
    509 F. App'x 81 (2d Cir. 2013) ..........................................................8

*Cannova v. Breckenridge Pharmaceutical, Inc.*,
　　No. 8-81145-CIV, 2009 WL 64337 (S.D. Fla. Jan. 9, 2009)............................................20

*City of Los Angeles v. Lyons*,
　　461 U.S. 95 (1983) ...................................................................................................17

*Colliton v. Cravath, Swaine & Moore LLP*,
　　No. 08 Civ. 0400 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) .........................8

*Contant v. Bank of America Corp.*,
　　No. 17 Civ. 3139 (LGS), 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018) ................. *passim*

*Crowell v. Morgan, Stanley, Dean Witter Services Co.*,
　　87 F. Supp. 2d 1287 (S.D. Fla. 2000) ...............................................................21

*In re DDAVP Indirect Purchaser Antitrust Litigation*,
　　903 F. Supp. 2d 198 (S.D.N.Y. 2012).............................................................17

*In re Digital Music Antitrust Litigation*,
　　812 F. Supp. 2d 390 (S.D.N.Y. 2011).............................................................22

*Dixie Yarns, Inc. v. Plantation Knits, Inc.*,
　　No. 3:93 CV 301-P, 1994 WL 910955 (W.D.N.C. July 12, 1994)...................................25

*Dozier v. Deutsche Bank Trust Co. Americas*,
　　No. 09 Civ. 9865 (LMM), 2011 WL 4058100 (S.D.N.Y. Sept. 1, 2011)...........................8

*Fonte v. AT&T Wireless Services, Inc.*,
　　903 So. 2d 1019 (Fla. Dist. Ct. App. 2005) ..........................................................20

*Gaebler v. N.M. Potash Corp.*,
　　676 N.E.2d 228 (Ill. App. 1996) ............................................................................21

*Goodbys Creek, LLC v. Arch Insurance Co.*,
　　No. 3:07-cv-947-J-33HTS, 2008 WL 2950112 (M.D. Fla. July 31, 2008) .....................20

*Hagy ex rel. Estate of Worley v. Advance Auto Parts, Inc.*,
　　No. 3:15-CV-509-RJC-DCK, 2016 WL 5661530 (W.D.N.C. Sept. 28, 2016)................25

*HAJMM Co. v. House of Raeford Farms, Inc.*,
　　403 S.E.2d 483 (N.C. 1991)..................................................................................25

*Harry v. Total Gas & Power North America, Inc.*,
　　No. 17-1199-cv, 2018 WL 2070553 (2d Cir. May 4, 2018)..............................................9

*Hayden v. County of Nassau*,
　　180 F.3d 42 (2d Cir. 1999)......................................................................................7

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...........................................................................................................14

*Johnson v. Nextel Communications Inc.*,
    780 F.3d 128 (2d Cir. 2015)..............................................................................................15

*Kachkar v. Bank of America Corp. (In re Benkovitch)*,
    No. 14-36362-BKC-AJC, 2017 WL 543177 (Bankr. S.D. Fla. Feb. 6, 2017) .................19

*Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*,
    329 F.3d 216 (1st Cir. 2003)..............................................................................................24

*Kertesz v. Net Transactions, Ltd.*,
    635 F. Supp. 2d 1339 (S.D. Fla. 2009) .............................................................................20

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419,
    No. 12-cv-3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)...........................13

*Lindner v. Durham Hosiery Mills, Inc.*,
    761 F.2d 162 (4th Cir. 1985) ............................................................................................24

*In re Magnesium Oxide Antitrust Litigation*,
    No. 10-5943 (DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011) .....................................22

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 586 (1986)..................................................................................................13

*Meridian Project Systems Inc. v. Hardin Construction Co.*,
    404 F. Supp. 2d 1214 (E.D. Cal. 2005).............................................................................19

*Minshall v. TD Evergreen*,
    No. 8:05-cv-1232-T-26TGW, 2005 WL 8145046 (M.D. Fla. Aug. 4, 2005)...................21

*N.G.L. Travel Associates v. Celebrity Cruises, Inc.*,
    764 So. 2d 672 (Fla. Dist. Ct. App. 2000) .......................................................................20

*Nairobi Holdings Ltd. v. Brown Brothers Harriman & Co.*,
    No. 02 Civ. 1230 (LMM), 2006 WL 2242596 (S.D.N.Y. Aug. 3, 2006) ...........................1

*Nardolilli v. Bank of America Corp.*,
    No. 12-81312-CIV, 2013 WL 12154541 (S.D. Fla. Dec. 5, 2013)...................................20

*In re Nexium (Esomeprazole) Antitrust Litigation*,
    968 F. Supp. 2d 367 (D. Mass. 2013) ..............................................................................22

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)..............................................................................................17

*North Carolina ex rel. Cooper v. Ridgeway Brands Manufacturing, LLC*,
646 S.E.2d 790 (N.C. App. 2007), *aff'd in part, rev'd in part on other grounds*,
362 N.C. 431 (2008) ...................................................................................24

*In re North Sea Brent Crude Oil Futures Litigation*,
256 F. Supp. 3d 298 (S.D.N.Y. 2017)...........................................................12

*Nypl v. JPMorgan Chase & Co.*,
No. 15 Civ. 9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) ......................13

*In re Opana ER Antitrust Litigation*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) ............................................................22

*In re Parmalat Securities Litigation*,
501 F. Supp. 2d 560 (S.D.N.Y. 2007), *aff'd sub nom Pappas v. Bank of America
Corp.*, 309 F. App'x 536 (2d Cir. 2009) ..........................................................1

*In re Petrobras Securities*,
862 F.3d 250 (2d Cir. 2017).........................................................................15

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985).....................................................................................15

*In re Platinum & Palladium Antitrust Litigation*,
No. 14 Civ. 9391 (GHW), 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ........11

*PNR, Inc. v. Beacon Property Management, Inc.*,
842 So. 2d 773 (Fla. 2003)...........................................................................20

*In re Propranolol Antitrust Litigation*,
249 F. Supp. 3d 712 (S.D.N.Y. 2017)...........................................................22

*Regions Bank v. Legal Outsource PA*,
No. 2:14-cv-476-FtM-29MRM, 2015 WL 7777516 (M.D. Fla. Dec. 3, 2015)...............19

*Rogers v. Cisco Systems, Inc.*,
268 F. Supp. 2d 1305 (N.D. Fla. 2003)..........................................................21

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013)...........................................................................11

*Sideshow, Inc. v. Mammoth Records, Inc.*,
751 F. Supp. 78 (E.D.N.C. 1990)..................................................................25

*Skinner v. E.F. Hutton & Co.*,
333 S.E.2d 236 (N.C. 1985)..........................................................................24

*Sovereign Bonds Exchange LLC v. Federal Republic of Germany*,
899 F. Supp. 2d 1304 (S.D. Fla. 2010), *aff'd sub nom. World Holdings, LLC v. Federal Republic of Germany*, 701 F.3d 641 (11th Cir. 2012)..........................20

*In re Suboxone Antitrust Litigation*,
64 F. Supp. 3d 665 (E.D. Pa. 2014) ..........................22

*Supreme Auto Transport LLC v. Arcelor Mittal*,
238 F. Supp. 3d 1032 (N.D. Ill. 2017) ..........................11

*TechnoMarine SA v. Giftports, Inc.*,
758 F.3d 493 (2d Cir. 2014)..........................7

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*,
663 F. Supp. 494 (M.D.N.C. 1987) ..........................25

*United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*,
74 F. Supp. 3d 1052 (N.D. Cal. 2014) ..........................22

*United States ex rel. Ladas v. Exelis, Inc.*,
824 F.3d 16 (2d Cir. 2016)..........................7

*Wallace v. New York City Department of Corrections*,
No. 95 Civ. 4404, 1996 WL 586797 (E.D.N.Y. Oct. 9, 1996), *aff'd*, 356 F. App'x 535 (2d Cir. 2009)..........................8

*In re Wellbutrin XL Antitrust Litigation*,
756 F. Supp. 2d 670 (E.D. Pa. 2010) ..........................22

*WestLB AG N.Y. Branch v. TPS McAdams, LLC (In re Enron Corp.)*,
370 B.R. 583 (Bankr. S.D.N.Y. 2007) ..........................8

*Xie v. JPMorgan Chase Short-Term Disability Plan*,
No. 15 Civ. 4546 (LGS), 2018 WL 501605 (S.D.N.Y. Jan. 19, 2018)..........................7

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337, 384 (S.D.N.Y 2016)..........................18

## STATUTES

15 U.S.C. § 1 ..........................3

740 Ill. Comp. Stat. Ann. § 10/5(11) ..........................21

740 Ill. Comp. Stat. Ann. § 10/7(2) ..........................21

Ariz. Rev. Stat. Ann. § 44-1415 A (2013) ..........................18

Mass. Gen. L. Ch. 93A § 9 ...............................................................................................22

Mass. Gen. L. Ch. 93A § 11 .............................................................................................22

## OTHER AUTHORITIES

*In re Forex Capital Mkts., LLC*, CFTC No. 17-09 (Feb. 6, 2017),
 http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpl
 eading/enfforexcapitalorder020617.pdf..........................................................................9

Heimer *et al.*, "Should Retail Investors' Leverage Be Limited?," *NBER Working Papers
 24176*, National Bureau of Economics Research, Inc. (2017).........................................12

## PRELIMINARY STATEMENT

Plaintiffs' proposed Second Consolidated Class Action Complaint ("SCCAC")—their fourth attempt at pleading a claim—does nothing to cure its predecessor complaints' fatal deficiencies.  This Court should deny as futile plaintiffs' motion for leave to replead yet again.[1]

This Court dismissed plaintiffs' most recent Consolidated Class Action Complaint ("CCAC") because plaintiffs lacked antitrust standing to bring their damages claims and could not plausibly plead that defendants' alleged conduct directly and proximately caused their claimed injury.  Plaintiffs' own factual allegations made clear that the business decisions of at least two sets of independent actors—retail foreign exchange dealers ("RFEDs") and retail customers—influenced the exchange rates on their retail foreign currency transactions and broke any causal chain between those retail currency transactions and defendants' transactions in the wholesale currency market.  The decisions of these independent actors precluded plaintiffs from satisfying either the directness requirement for antitrust standing or the proximate cause requirement under the relevant state antitrust and consumer protection laws.

The proposed SCCAC does not alter this conclusion.  In a transparent attempt to circumvent this Court's dismissal Order, plaintiffs strategically delete the particular factual allegations on which this Court based its dismissal and replace them with <u>contradictory</u> allegations.  But plaintiffs cannot erase their prior affirmative assertion that they and the RFEDs—and not de-

---

[1] Plaintiffs' counsel filed their original *Baker* complaint on September 26, 2016.  That complaint was amended on March 24, 2017, and voluntarily dismissed on April 28, 2017.  That same day, plaintiffs filed the original *Contant* complaint in a third attempt to plead an indirect purchaser antitrust case.  The CCAC was then filed on June 30, 2017, consolidating the *Contant* and the then newly filed *Lavender* actions, providing plaintiffs a fourth opportunity to plead plausible indirect purchaser claims.  At some point, enough is enough.  *See, e.g.*, *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 592-93 (S.D.N.Y. 2007) ("And this is a case in which further leave to amend would be a step too far. . . .  I see no excuse for allowing the plaintiffs more than the three strikes they already have had."), *aff'd sub nom Pappas v. Bank of Am. Corp.*, 309 F. App'x 536 (2d Cir. 2009); *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.*, No. 02 Civ. 1230 (LMM), 2006 WL 2242596, at *2 (S.D.N.Y. Aug. 3, 2006) (denying plaintiffs leave to amend for a third time).

fendants—determined the prices that plaintiffs paid for currency.  Moreover, plaintiffs' new alle-

gations do not cure the critical flaws of the CCAC.  Because currency is a completely fungible,

non-traceable financial instrument that, as plaintiffs continue to concede, RFEDs obtain from

many sources, including non-defendants, and because RFEDs comingle currency from those

sources with their own currency inventories, plaintiffs still have not pleaded facts to show that (i)

they can trace their transactions with independent RFEDs in the retail market to any defendant or

(ii) RFEDs and their counterparties do not engage in independent business conduct in determin-

ing the exchange rates at which plaintiffs traded currency, which breaks any direct causal chain.

Plaintiffs have likewise failed to cure the other flaws in the CCAC.  They have not re-

dressed this Court's ruling that due process precludes the application of various state laws to

their claims.  Under controlling Second Circuit law, the addition of boilerplate allegations that

plaintiffs traded electronically from their home states fails to establish that the transactions that

purportedly injured plaintiffs occurred in those states.  In addition, the SCCAC does not plead

facts to show any ongoing or recurring injury, precluding plaintiffs' federal injunctive relief

claim.  And plaintiffs do not address the numerous state law deficiencies that this Court did not

need to reach in dismissing the CCAC, but that independently render the filing of the SCCAC

futile.  Accordingly, this Court should deny plaintiffs' motion for leave to replead.

## BACKGROUND

Plaintiffs are individuals and businesses that allegedly purchased foreign currency from

unidentified RFEDs.  Plaintiffs claim that these RFEDs purchased that foreign currency from

multiple liquidity providers, including one or more of the eighteen bank defendants.[2]  In their

---

[2]  Although plaintiffs refer to their alleged purchases of "FX Instruments," it is clear from the SCCAC that they al-
legedly engaged in—and challenge the effects of defendants' alleged conduct on—FX "spot" transactions, which the
SCCAC defines as "an agreement to exchange sums of currency at an agreed-upon exchange rate on a value date

*(cont'd)*

CCAC, plaintiffs alleged that defendants manipulated the price of certain foreign currency that they sold to RFEDs, and acknowledged that plaintiffs themselves had not purchased foreign currency directly from any defendant.  Plaintiffs brought this putative class action seeking injunctive relief under the Sherman Act, 15 U.S.C. § 1, *et seq.*, and damages under (i) the state antitrust laws of Arizona, California, Illinois, Minnesota, New York, and North Carolina, and (ii) the consumer protection statutes of California, Florida, and Massachusetts.

### A.    This Court's Order Dismissing The CCAC

On March 15, 2018, this Court granted defendants' motion to dismiss the CCAC on several grounds.  This Court held that plaintiffs had not pleaded facts sufficient to show either (i) that they were "efficient enforcers" pursuant to *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-45 (1983) ("*AGC*"), and therefore had antitrust standing under the California, Illinois, and New York state antitrust laws, or (ii) that defendants' alleged conduct proximately caused plaintiffs' alleged injury, as required by all plaintiffs' claims.  *Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139 (LGS), 2018 WL 1353290, at *3-8 (S.D.N.Y. Mar. 15, 2018).  As this Court explained, under both the *AGC* "efficient enforcer" doctrine and general proximate cause analysis, a plaintiff must plead facts to show that its injury has a sufficiently direct relationship to the alleged conspiracy.  *Id.*

This Court held that the factual allegations of the CCAC affirmatively showed that defendants' alleged conduct did *not* directly or proximately cause plaintiffs' alleged injury.  *Id.* at *6.  This Court specifically relied on paragraphs 149 and 150 of the CCAC, in which plaintiffs averred that, to purchase currency, retail customers specify the volume of currency they wish to

_____

*(cont'd from previous page)*
that is within two business days."  (SCCAC ¶ 70; *see id.* ¶¶ 1, 81, 148, 168.)  Accordingly, plaintiffs' trades appear to consist solely of the exchange of one currency for another, such as the exchange of dollars for euros.

purchase and the exchange rate they are willing to pay.  *Id.* at *5-6.  According to the CCAC, the

RFED can then accept or decline to execute the order; if the RFED accepts the customer's order,

the RFED then looks to its liquidity providers (including, but not limited to, defendants) to fill

the order.  The RFED then independently determines whether to add a markup to the customer's

transaction and, if so, how much of a markup to add.  Specifically, the CCAC alleged:

> To purchase an FX instrument from an FX broker, *a customer* sends an order
> electronically or by phone to the FX broker for an FX Instrument with a specific
> currency pair, *exchange rate*, and volume.  If the FX broker accepts the trade, the
> customer pays the agreed-upon rate, often with an additional fee or commission
> determined by the broker, and the broker places the FX Instrument in the custom-
> er's account.  Upon receipt of an order from a customer, in order to hedge or cov-
> er its exposure on the resulting FX Instrument, the FX broker concurrently exe-
> cutes an FX Instrument with an FX dealer such as a Defendant with the same vol-
> ume and currency pair as the FX Instrument that the broker sells to the customer.

*Id.* at *5 (quoting CCAC ¶ 149 (emphasis supplied by the Court)).  This Court held that, taken as

true, the CCAC pleaded that the independent decisions of "two independent actors"—the RFED

and the retail customer—influenced the exchange rate on any retail currency purchase, which

precluded plaintiffs from satisfying either the directness prong of antitrust standing under *AGC*

or the requisite proximate cause analysis to withstand a motion to dismiss.  *Id.* at *6-8.

This Court also concluded that plaintiffs failed to plead facts sufficient to show that they

could meet the remaining *AGC* requirements that (i) there are no more direct victims of the al-

leged conspiracy, (ii) plaintiffs' damages would not be highly speculative, and (iii) the risk of

duplicative recovery or complex apportionment of damages could be avoided.  *Id.* at *6.  In addi-

tion, this Court held that plaintiffs had not pleaded facts showing a sufficient nexus between Ari-

zona, California, Florida, Illinois, Massachusetts, Minnesota, or North Carolina, on the one hand,

and the parties and alleged misconduct, on the other hand, to satisfy the Due Process Clause of

the Fourteenth Amendment.  *Id.* at *8.  Pleading only that one or more plaintiffs are currently

domiciled in each of the states "creates an insufficient state interest to justify applying a particular state's law under the Due Process Clause."  *Id.*  Finally, this Court held that plaintiffs lack Article III standing to assert an injunctive relief claim under the Sherman Act.  Having alleged that defendants terminated and suspended traders, forced traders to resign, and implemented internal safeguards following government investigations, plaintiffs were not threatened with ongoing or recurring injury—and were thus not entitled to injunctive relief.  *Id.* at *9.

> **B.**     ***Plaintiffs' Proposed Second Consolidated Class Action Complaint***

On April 5, 2018, plaintiffs sought leave to file their proposed SCCAC.  To try to remedy the CCAC's failure to plead facts showing the directness of their injury for antitrust standing purposes and proximate cause, plaintiffs simply deleted paragraphs 149 and 150 of the CCAC— the very two paragraphs that this Court quoted at length as demonstrating the lack of direct or proximately caused injury—and replaced them with wholly contradictory allegations.  Specifically, plaintiffs deleted their former allegations that retail customers send orders to RFEDs specifying the volume and exchange rates for the relevant currencies and that RFEDs then decide independently whether to accept or decline such orders and, if necessary, seek quotes from several liquidity providers to hedge their exposure created by those orders.  (CCAC ¶¶ 149-150.)  In a complete about-face, plaintiffs now assert that unidentified RFEDs purchase foreign currency from liquidity providers—including, but not limited to, defendants—and immediately resell that same currency for the same price (plus a markup) to retail consumers who must accept the RFEDs' automated algorithmic pricing.  (SCCAC ¶¶ 150-171.)  But plaintiffs still plead no facts that, given the fungibility of money and the RFEDs' many alternative—and comingled—sources of liquidity (including their own inventory), would show how the foreign currency that plaintiffs purportedly traded could be traced to currency that the RFEDs purchased from any defendant.

In an effort to cure their prior failure to plead facts sufficient to show that the application

of various states' laws to defendants' alleged foreign currency trading would satisfy due process, plaintiffs now plead that they traded electronically from their respective home states (*id.* ¶¶ 10-20), and that each defendant has operations—albeit not foreign currency trading operations—in some, though not all, of the states under whose laws plaintiffs bring this action (*id.* ¶¶ 21-36). Yet plaintiffs tellingly still do not allege the location of the RFEDs with which they purportedly traded foreign currency or where title to the foreign currency actually transferred to plaintiffs.

In an attempt to save their injunctive relief claim, plaintiffs now plead that some government investigations are ongoing (*id.* ¶ 218), that defendants continue to trade foreign currency, including with each other (*id.*), that government agencies are investigating the possible manipulation of financial instruments other than foreign currency (*id.* ¶ 219), that the Hong Kong Securities and Futures Commission recently fined Credit Suisse for alleged conduct unrelated to the alleged conduct challenged here (*id.* ¶ 246), and that some plaintiffs continue to trade foreign currency (*id.* ¶ 272). But none of these new allegations pleads facts showing the continuation or recurrence of the alleged trading misconduct underlying this action.

Finally, plaintiffs' proposed SCCAC does not even attempt to address several additional flaws of the CCAC that defendants briefed in their motion to dismiss, but that this Court did not need to reach in its dismissal Order. Specifically, plaintiffs' claims under various state statutes fail because: (i) defendants are exempt under the Florida, Illinois, and North Carolina statutes; (ii) plaintiffs are not proper parties under the Florida and Massachusetts statutes; (iii) the complaint does not allege sufficient intrastate commerce to invoke the California, Massachusetts, and North Carolina statutes; (iv) plaintiffs did not comply with the notice provisions of the Arizona statute; and (v) the Illinois statute bars class actions.

## ARGUMENT

In the Second Circuit, "where the plaintiff is unable to demonstrate that he would be able

to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).  Leave to amend should be denied where the plaintiff "fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014); *accord Xie v. JPMorgan Chase Short-Term Disability Plan*, No. 15 Civ. 4546 (LGS), 2018 WL 501605, at *2 (S.D.N.Y. Jan. 19, 2018) (Schofield, J.) (leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party") (quoting *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016)).  As demonstrated below, plaintiffs' proposed SCCAC does not cure the fatal deficiencies of plaintiffs' prior complaints.  Accordingly, their motion for leave to replead should be denied.

## I.   PLAINTIFFS HAVE NOT CURED THEIR PREVIOUS FAILURE TO PLEAD FACTS SUFFICIENT TO SHOW PROXIMATE CAUSE OR ANTITRUST STANDING

### A.   *Plaintiffs May Not Delete Previously Pleaded Factual Allegations And Replace Them With Contradictory Allegations*

In their proposed SCCAC, plaintiffs simply delete the key factual admissions on which this Court relied to conclude that plaintiffs had not adequately pleaded proximate cause or antitrust standing, and replace them with entirely contradictory allegations of how they purchased foreign currency.  In their new account, plaintiffs assert that RFEDs purchase foreign currency (*e.g.*, euros) directly from liquidity providers (consisting of defendants and non-defendants) and then—using automated algorithms—resell the very same currency to plaintiffs at rates based entirely on the exchange rates allegedly manipulated by defendants plus a markup.

This Court should not permit plaintiffs so transparently to manipulate their factual plead-

ings to sidestep this Court's dismissal Order.  "Although the court 'must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally[,]' the court need not accept as true allegations that conflict with a plaintiff's prior allegations." *Dozier v. Deutsche Bank Tr. Co. Ams.*, No. 09 Civ. 9865 (LMM), 2011 WL 4058100, at *2 (S.D.N.Y. Sept. 1, 2011) (citations omitted).  "Where, as here, the plaintiff's proposed amended complaint contains factual allegations wholly inconsistent with the factual allegations of the prior complaint, the district court does not abuse its discretion in denying leave to amend." *BLD Prods., LLC v. Remote Prods., Inc.*, 509 Fed. App'x 81, 82 (2d Cir. 2013).[3]  "[A] court may refuse to allow an amendment where, by omitting allegations from the previously filed complaint, the plaintiff seeks to 'erase' admissions that are contained in it." *WestLB AG N.Y. Branch v. TPS McAdams, LLC (In re Enron Corp.)*, 370 B.R. 583, 597 (Bankr. S.D.N.Y. 2007) (citation omitted).[4]

Plaintiffs here may not erase the prior admissions that this Court found fatal to their ability to plead proximate cause and antitrust standing by simply omitting those admissions from the SCCAC and replacing them with contrary allegations.  In evaluating plaintiffs' motion, this Court should continue to accept as true the factual allegations in paragraphs 149 and 150 of the CCAC and should disregard new allegations in the SCCAC that conflict with those earlier allegations.  In light of those earlier allegations, this Court should once again conclude that, as a

---

[3]  *See also Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ. 0400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) ("Where a 'plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion . . . [and] directly contradicts the facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'") (quoting *Wallace v. New York City Dep't of Corrections*, No. 95 Civ. 4404, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996), *aff'd*, 356 F. App'x 535 (2d Cir. 2009)).

[4]  *See also Austin v. Ford Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998) (affirming denial of "motion for leave to file a second amended complaint, which omitted the admissions in the first amended complaint, on the basis that [plaintiff] could not by these omissions 'erase[ ]' the admissions in her first amended complaint"), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

matter of law, plaintiffs cannot plausibly plead that defendants' alleged conduct directly and proximately caused their alleged injury or that the essential elements of antitrust standing have been met. *Contant*, 2018 WL 1353290, at *5-8. Plaintiffs' motion should thus be denied.

### B.   Plaintiffs Still Fail To Plead Facts Sufficient To Show Proximate Cause

The unique fungibility of currency makes even plaintiffs' newly minted—and wholly conclusory—explanation of their foreign currency transactions inadequate to plead proximate cause. Plaintiffs concede in the SCCAC that not all RFEDs employ plaintiffs' reimagined "Defendant-to-RFED-to-Class member model," and acknowledge that RFEDs also trade foreign currency with retail customers, like plaintiffs, through many alternative arrangements. (SCCAC ¶ 166.) Indeed, RFEDs obtain the currency they trade with retail customers from numerous sources, including defendants, non-defendant banks, hedge funds and other non-bank financial institutions, as well as by netting customer orders on their internal trading desks and from their own currency inventories. *See In re Forex Capital Mkts.*, CFTC No. 17-09, at 3, 7.[5] Because one unit of currency is, by definition, indistinguishable from another unit of the same currency, plaintiffs have not plausibly explained how any particular retail currency transaction can be traced from a specific retail customer through a particular RFED to an individual defendant or how the effects of defendants' alleged conduct can be traced through a particular RFED to individual retail customers. *See*, *e.g.*, *Harry v. Total Gas & Power N. Am., Inc.*, No. 17-1199-cv, 2018 WL 2070553, at *8 (2d Cir. May 4, 2018) (where plaintiffs cannot plausibly plead facts to connect their alleged purchases with defendants' alleged misconduct, plaintiffs cannot allege proximate cause or be "efficient enforcers" of the antitrust laws).

---

[5] Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, *In re Forex Capital Mkts., LLC*, CFTC No. 17-09 (Feb. 6, 2017), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfforexcapitalorder020617.pdf.

Neither plaintiffs' previous pleadings nor their proposed SCCAC overcomes their inability to plead facts showing that defendants' alleged misconduct proximately caused plaintiffs' claimed injury.  Consider a simple example:  In quick succession, two customers A and B each places an order at the same price with an RFED for one million euros.  The RFED then sources one million in the interdealer market, drawing the other million from its inventory.  Was A's order allegedly filled from the wholesale market, such that, according to the SCCAC it was affected by purported misconduct, while B's was not?  Or vice versa?  Or were both affected?  These are precisely the types of imponderables that proximate cause requirements seek to avoid.

Plaintiffs cannot cure these flaws by asserting that the RFEDs employ an "algorithmic pricing mechanism" that removes all pricing discretion from the RFEDs and ensures that any alleged overcharge from defendants is passed on to plaintiffs.  (SCCAC ¶ 180; *see id.* ¶¶ 158-159, 161, 164, 169.)  According to plaintiffs and their expert, Dr. Osler, the algorithm on which they now rely "takes in bid/ask quotes from liquidity providers (including [but importantly not limited to] Defendants), selects the best bid and ask prices from those quotes, and calculates prices for retail FX customers" using "those best-available liquidity provider quotes."  (SCCAC ¶ 159; *see also* Osler Report ¶ 6.)  If, as plaintiffs contend, defendants' alleged conduct caused their own bid and ask quotes to be uncompetitive, and if, as plaintiffs and their expert assert, the bid and ask quotes of alternative, non-conspirator liquidity providers were more competitive, then the RFEDs' algorithms would have selected the more competitive bid and ask quotes of non-conspirators as the "best-available liquidity provider quotes" from which to calculate currency exchange rates for the RFEDs' transactions with plaintiffs.  Where the "best-available liquidity provider quotes" from non-defendants were selected, plaintiffs' transactions cannot be traced to any defendant.  And because the bid and ask quotes of defendants and other non-defendant li-

quidity providers are comingled in the RFEDs' algorithms, plaintiffs cannot rely on those algorithms—and their purported self-imposed absence of pricing discretion—to show that defendants' alleged conduct directly or proximately caused plaintiffs' claimed injury. *See, e.g.*, *Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) (dismissing Arizona, California, Minnesota, New York, and North Carolina antitrust and consumer protection claims because "the commingling of [defendant's price-fixed products] with other [non-price-fixed products] . . . means that the defendants did not legally cause the harm allegedly suffered"); *see also In re Platinum & Palladium Antitrust Litig.*, No. 14 Civ. 9391 (GHW), 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28, 2017) (plaintiffs cannot plead probable cause where complaint alleges facts showing "'significant intervening causative factors,' most notably, the 'independent pricing decisions of non-conspiring retailers,' [which] attenuate the causal connection between the violation and the injury" (citation omitted)).

The Second Circuit's discussion of proximate cause in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), is instructive in assessing plaintiffs' inability to trace any particular unit of currency from any defendant to any plaintiff. That case involved allegations under the Anti-Terrorism Act that a bank had transferred to Iran funds that, in turn, financed terrorist activity by Hizbollah and Hamas. The Second Circuit affirmed the district court's dismissal, holding that it "cannot agree that the Complaint sufficiently alleges proximate cause" because, among other things, the complaint "does not allege that U.S. currency [the bank] transferred to Iran was given to Hizbollah or Hamas." *Id.* at 97. The Second Circuit also made clear that conclusory allegations like the kind that plaintiffs plead here "do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by [the bank] to Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs." *Id.*

Here, plaintiffs offer no well-pleaded facts showing how any of their particular purchases from RFEDs could conceivably be traced to any RFED's particular purchase of the same currency from a defendant. Indeed, because RFEDs concededly obtain currency from multiple liquidity sources, including their own inventory (*see* Osler Report ¶ 12 (referring to the RFED's need to "restor[e] its inventory")), plaintiffs cannot plead such facts.[6]  Plaintiffs' conclusion, based on Dr. Osler's report, that the wholesale foreign currency exchange rates are highly correlated with retail foreign currency exchange rates does nothing to cure this deficiency. Dr. Osler explains that that correlation arises from the RFEDs' need to keep spreads close to avoid providing their customers with arbitrage opportunities. (*Id.*)  But that need would exist regardless of whether the RFEDs obtained their currency from a defendant, the RFEDs' own inventory, another customer, or any other available liquidity provider.  "Correlation is not the same as causation," *In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 313 (S.D.N.Y. 2017), and plaintiffs' allegation that wholesale rates are correlated with retail exchange rates does not adequately show that defendants' alleged conduct directly or proximately caused plaintiffs' alleged injury.

Nor can plaintiffs cure their sustained failure to plead proximate cause as to their own transactions by artificially limiting their putative class to foreign currency investors who transacted with RFEDs who in turn transacted with a defendant. Assuming the existence of direct and proximate cause is not a substitute for pleading facts to establish direct and proximate cause.

---

[6]  An academic article on which Dr. Osler relies supports plaintiffs' original allegations about the independent decision-making of RFEDs and the many sources of liquidity to which they can turn. In Heimer *et al.*, "Should Retail Investors' Leverage Be Limited?," *NBER Working Papers 24176*, National Bureau of Economics Research, Inc., at 7, 15 (2017) (cited in Osler Report ¶ 5), the authors explain that RFEDs look to the pricing of their "own inventory" as the first input for their pricing algorithms, and "tend to use their own inventory (rather than the interbank market) to fill traders' orders."  The authors note that an RFED "actually trades with clients as opposed to simply matching trades (though over time it can offload these positions to other clients or to the interbank market)."  *Id.*  Accordingly, state the authors, "there is no strong reason for the spread in the retail market to be greater than in the interbank market—the spread in each market depends on its own characteristics."  *Id.*

And plaintiffs plead no facts to trace the currency that members of the putative class—even as purportedly limited—allegedly bought to any defendant, rather than to the undisputed myriad other comingled sources of liquidity to which the RFEDs can and do turn.[7]

Plaintiffs' reliance on *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300 (LGS), 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017), is also misplaced. Unlike the *Nypl* plaintiffs, plaintiffs here did not purchase foreign currency directly from defendants and, accordingly, cannot plausibly plead that they can trace their purchases to defendants. In *Nypl*, there were no alleged intervening decision makers that obtained their currency from multiple sources—including non-conspirator wholesalers, their own inventory, and other retail customers—and independently set the rates at which they traded foreign currency with plaintiffs. Furthermore, unlike in *Nypl*, plaintiffs here rely on an analysis of average exchange rates and fail to plead how their "claims are tied to specific transactions in which they participated." *Id.* at *7. That failure, too, renders their claims distinguishable from the claims in *Nypl*.[8]

In short, plaintiffs still have not shown themselves to be, as they proclaim, "indirect purchasers" of foreign currency from defendants. Unlike a traditional indirect purchaser case, this case—even as plaintiffs seek to reframe it in the SCCAC—does not involve the traceable move-

---

[7] Despite plaintiffs' claim that certain retail customers would be excluded from the class, the SCCAC does nothing to limit or narrow the previous class definitions. (*Compare* SCCAC ¶¶ 40-48 *with* CCAC ¶¶ 40-47.) Even though the SCCAC states that, "[t]o the extent that those RFEDs [with which plaintiffs traded foreign currency] sold FX Instruments to other customers using pricing models that did not follow the Defendant-to-RFED-to-Class member model described herein, those customers are excluded from the proposed Classes, which limit Class membership to persons who purchased FX Instruments that followed that model" (SCCAC ¶ 166), plaintiffs continue to seek to represent a putative class of indirect purchasers who traded foreign currency with any Direct Settlement Class member, including hedge funds and asset managers, who are not RFEDs.

[8] Indeed, the SCCAC's failure to "identify or describe a single actual transaction underlying [their] claim[s]," *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014)—information they uniquely possess—makes it impossible to determine whether the alleged conduct helped them, hurt them, or had any effect on them at all, and demonstrates that plaintiffs cannot plead facts sufficient to show antitrust injury. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("alleged conspiracies could not have caused respondents to suffer an 'antitrust injury,' because they actually tended to benefit respondents") (citation omitted).

ment of a product (like cement blocks) down the chain of distribution.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Plaintiffs here allege that they purchased currency from an unidentified RFED that dealt with a defendant, but they cannot plausibly allege a direct and proximate connection between their completely fungible currency transactions in the retail foreign currency market and any antecedent transaction between their RFED and one of the defendants.  Accordingly, plaintiffs' motion for leave to file the SCCAC should be denied.

### C.    *Plaintiffs Still Fail To Plead Facts Sufficient To Show Antitrust Standing*

Nothing in the SCCAC disturbs this Court's prior ruling, which is now law of the case, that the "*AGC* efficient enforcer doctrine applies under California, Illinois and New York law" as well as federal law.  *Contant*, 2018 WL 1353290, at *3.  The first *AGC* factor—the "directness or indirectness of the asserted injury"—"is in essence a proximate cause requirement" and "must be met in every case."  *Id.* at *3, 5, 7.  Because, as explained above, plaintiffs cannot plead proximate cause, leave to amend plaintiffs' federal, California, Illinois and New York claims should be denied as futile for the independent reason that plaintiffs cannot plead facts showing that they were direct victims of the alleged conspiracy with antitrust standing to assert these claims.[9]

## II.    PLAINTIFFS HAVE FAILED TO CURE THE DUE PROCESS INFIRMITIES OF THEIR PREVIOUS COMPLAINT

Plaintiffs have not cured their prior failure to satisfy the Due Process Clause by alleging that each plaintiff traded electronically from his home state (SCCAC ¶¶ 10-20) and that each defendant has business operations—albeit not foreign currency trading operations—in some, though not all, of the states whose laws plaintiffs invoke (*id.* ¶¶ 21-36).  These additional allega-

---

[9]  Furthermore, plaintiffs' inability to trace the foreign currency they purchased in the retail market to any defendant's conduct in the wholesale market prevents plaintiffs from pleading facts sufficient to show that they could meet the remaining *AGC* antitrust standing requirements, *i.e.*, that there are no more direct victims of the alleged conspiracy, that plaintiffs' damages would not be highly speculative, and that the risk of duplicative recovery or complex apportionment of damages could be avoided.  *See Contant*, 2018 WL 1353290, at *6.

tions are insufficient to subject each defendant's foreign currency trading to the state laws of Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina.

This Court explained in dismissing the CCAC that, "a state law may not be applied unless that state has 'a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" *Contant*, 2018 WL 1353290, at *8 (quoting *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818 (1985)).  The factors relevant to determining a state's interest are "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties in centered." *Id.* (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 142 (2d Cir. 2015)).

This Court already held that allegations about each plaintiff's current residence were inadequate to show that Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina have sufficient contacts with the challenged activity to fairly subject that activity to their state laws. *Id.*  Plaintiffs' new allegations—that they traded foreign currency electronically from their home states—add little to the prior allegations, and do not render the application of state laws to defendants' foreign currency trading conduct consistent with due process.  In the context of electronic trading, the location of the transaction, and thus of a plaintiff's injury, is where title to the traded currency was transferred, not where plaintiff's computer is located.  *See*, *e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017) ("The location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction.") (citation omitted); *Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 68 (2d Cir. 2012) (affirming dismissal of a complaint and noting that "a sale of securities can be understood to take place

15

at the location in which title is transferred").

Plaintiffs here still plead no facts from which this Court could determine where title to the currency that plaintiffs allegedly traded with unnamed non-defendant RFEDs was transferred. There are no allegations even as to the locations of the RFEDs with which plaintiffs allegedly traded. Plaintiffs know those facts, and if those facts were helpful to plaintiffs, they would presumably have been included in the SCCAC. Because plaintiffs did not trade directly with defendants, plaintiffs have not pleaded sufficient facts to show that Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina have significant contacts with defendants' foreign currency trading activities such that application of their state laws to those activities would comport with due process and would not be arbitrary or fundamentally unfair.

Plaintiffs may not satisfy due process by pleading that defendants operate retail bank branches or conduct other non-currency trading activities within one or more of the relevant states. The question of whether a state has a sufficient interest such that choice of its law is neither arbitrary nor fundamentally unfair is not a general inquiry into the parties' activities in the state, but rather focuses on whether there are sufficient contacts to create state interest with the parties and the occurrence or transaction underlying the litigation. *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 309 (1981). "[I]f a State has only an insignificant contact with the parties and the occurrence or transaction, application of its law is unconstitutional." *Id.* Plaintiffs have not pleaded that defendants engaged in currency exchange activities in Arizona, California, Florida, Illinois, Massachusetts, Minnesota, or North Carolina. Applying the laws of those states in this case would not comport with due process and would be arbitrary and fundamentally unfair.

## III. PLAINTIFFS HAVE NOT CURED THEIR PREVIOUS FAILURE TO PLEAD FACTS SHOWING THEIR STANDING TO SEEK INJUNCTIVE RELIEF

Plaintiffs' proposed SCCAC does not provide any basis to alter this Court's prior conclu-

sion that plaintiffs lack Article III or statutory standing to assert an injunctive relief claim under the Sherman Act because, just as in the CCAC, the SCCAC contains no well-pleaded facts showing that plaintiffs are threatened with ongoing or recurring manipulation of foreign currency by defendants.  *Contant*, 2018 WL 1353290, at *9.  Injunctive relief under the Sherman Act is available only on a showing of ongoing or recurring misconduct or harm and, absent factual allegations showing the likelihood of such ongoing or recurring misconduct or harm, a plaintiff lacks standing to assert a claim for injunctive relief.[10]

Nothing in the SCCAC suggests that defendants are continuing to engage in any misconduct or that plaintiffs are threatened with future harm.  Certainly the allegation that some government agencies continue to investigate past alleged conduct (SCCAC ¶ 218) does not plausibly suggest that there is a threat that defendants are likely to continue to manipulate foreign currency exchange rates.  Likewise, the allegation that defendants continue to engage in foreign currency trading, including with each other (*id.*), proves too much.  That conclusion would suggest that *any* plaintiff could secure injunctive relief against *any* defendant previously investigated for prior wrongdoing that still participated in the relevant industry.  Moreover, the allegation that government agencies are investigating possible unrelated misconduct (*id.* ¶¶ 219, 246) does not support a claim of ongoing or recurring manipulation of foreign currency exchange rates.  And pleading that plaintiffs continue to trade foreign currency (*id.* ¶ 272) is irrelevant to a showing of ongoing or recurring manipulation of exchange rates sufficient to confer standing to seek injunctive relief.

---

[10]  *See, e.g., City of Los Angeles v. Lyons*, 461 U.S. 95-96, 109 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects") (citation omitted); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (affirming dismissal of injunctive relief claim because plaintiffs have no standing to assert such claims unless they plead facts showing that they are "likely to be harmed again in the future"); *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 209 (S.D.N.Y. 2012) ("lingering monetary injury, without any ongoing threat of recurrent violations . . ., is not sufficient to confer standing to seek an injunction") (citation omitted).

In short, the SCCAC pleads no facts to overcome plaintiffs' prior concession that their federal claim for injunctive relief "may no longer be necessary," as "it appears the conduct has been circumscribed" by the various governmental investigations, fines and prosecutions.  (*Baker*, ECF No. 62, Oct. 5, 2016 Hearing Tr. at 4:21-5:5.)  Plaintiffs' motion to replead their Sherman Act claim should be denied.

## IV.   PLAINTIFFS' PROPOSED COMPLAINT FAILS FOR SEVERAL REASONS NOT PREVIOUSLY ADDRESSED BY THIS COURT

Finally, like the CCAC, the SCCAC fails to state a cognizable claim for relief under the antitrust and consumer protection laws of Arizona, California, Florida, Illinois, Massachusetts, and North Carolina for several separate and discrete reasons that defendants presented as bases for their motion to dismiss the CCAC, but that this Court did not reach in its Order granting that motion.[11]  These reasons render the repleading of plaintiffs' claims under those states' laws futile, and compel the denial of plaintiffs' motion for leave to file the SCCAC.[12]

### A.   *The SCCAC Does Not Cure The Flaw In Plaintiffs' Claim Under The Arizona Antitrust Act*

Plaintiffs cannot cure their failure to comply with the notice provision of Arizona's antitrust statute.  Ariz. Rev. Stat. Ann. § 44-1415 A (2013) (any plaintiff filing suit under the antitrust laws must "simultaneously with the filing of the pleading . . . in the federal court, serve a

---

[11]  Plaintiffs still do not allege that they purchased any foreign currency from any RFED who ever transacted with defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU").  (*See* SCCAC ¶¶ 10-20.)  Indeed, the SCCAC fails to allege any indirect transactions with, or any specific misconduct by, BTMU.  Plaintiffs' improper group pleading further warrants denial of their motion as to BTMU.  *See, e.g.*, *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) ("there is a strong basis to dismiss these defendants for lack of specific allegations against them").

[12]  In addition, several foreign defendants—namely, BTMU, Barclays Bank PLC, HSBC Holdings plc and HSBC Bank plc, The Royal Bank of Scotland Group plc, Société Générale, Standard Chartered Bank, and UBS AG—separately moved to dismiss the CCAC for lack of personal jurisdiction under Rule 12(b)(2).  (Dkt. 105 (Aug. 11, 2017).)  This Court denied that motion as moot because it granted the prior motion under Rule 12(b)(6).  *Contant*, 2018 WL 1353290, at *9.  The foreign defendants named in the SCCAC hereby reserve their Rule 12(b)(2) defense, as the proposed SCCAC once again fails to allege personal jurisdiction over these defendants for substantially the same reasons set forth in the prior motion.

copy of the complaint . . . on the attorney general" and file proof of service with the court); *In re Asacol Antitrust Litig.*, No. 15-cv-12730-DJC, 2016 WL 4083333, at \*14-15 (D. Mass. July 20, 2016) (dismissing Arizona claim for this reason).  This statutory notice requirement serves to discourage "forum shopping and the inequitable administration of laws," *id.* at \*15, and should not be overlooked.  The SCCAC cannot cure this deficiency in plaintiffs' Arizona state law claim and plaintiffs' motion to replead this claim should be denied.

### B.    The SCCAC Does Not Cure The Flaw In Plaintiffs' Claim Under The California Antitrust And Unfair Competition Laws

California's antitrust statute and its Unfair Competition Law ("UCL") apply to misconduct occurring within California.  *See, e.g.*, *Meridian Project Sys. Inc. v. Hardin Constr. Co.*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005).  The SCCAC pleads "no specific intrastate misconduct" within California and, on that basis, it cannot state a claim for relief under either statutory scheme.  Because the SCCAC does not cure this flaw in plaintiffs' California state law claims, the motion for leave to replead these claims should be denied.

### C.    The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The Florida Deceptive And Unfair Trade Practices Act

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") does not apply to federally regulated banks, and no amount of repleading can cure that defect in plaintiffs' Florida state law claim.[13]  This exemption applies to a regulated bank in its entirety, without regard to whether "the activity at issue is subject to the federal regulatory authority."  *Regions Bank v. Legal Outsource PA*, No. 2:14-cv-476-FtM-29MRM, 2015 WL 7777516, at \*5 (M.D. Fla. Dec. 3,

---

[13]  *See, e.g.*, *Kachkar v. Bank of Am. Corp. (In re Benkovitch)*, No. 14-36362-BKC-AJC, 2017 WL 543177, at \*8 (Bankr. S.D. Fla. Feb. 6, 2017) (dismissing FDUTPA claims because banks "are exempt from FDUTPA's private right of action"); *Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 779 (Fla. Dist. Ct. App. 2007) ("FDUTPA clearly excludes banks from its grasp.").

2015).[14]  Here, nearly every defendant is a bank regulated by at least one federal agency (SCCAC ¶¶ 21-36), and the SCCAC itself pleads facts showing that defendants are overseen by various regulatory agencies, including the Commodity Futures Trading Commission ("CFTC"), the Office of the Comptroller of the Currency ("OCC"), and the United States Federal Reserve, which have already assessed fines and issued cease and desist orders requiring enhanced oversight of defendants' foreign currency trading businesses.  (*Id.* ¶¶ 186-188, 191, 197, 210-212.) Accordingly, plaintiffs' motion for leave to replead their Florida law claim should be denied.

In addition, FDUTPA "is a remedial statute designed to protect consumers," *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. Dist. Ct. App. 2005), and "[o]nly consumers may bring private suit under FDUTPA."  *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947-J-33HTS, 2008 WL 2950112, at *8-9 (M.D. Fla. July 31, 2008) ("find[ing] no basis for conferring consumer status on [plaintiff] as the beneficiary of construction bonds").[15]  Plaintiffs here are not consumers.  A "consumer" is defined as a "purchaser of goods and services." *N.G.L. Travel Assocs. v. Celebrity Cruises, Inc.*, 764 So. 2d 672, 674 (Fla. Dist. Ct. App. 2000) (affirming dismissal of FDUTPA claim because travel agency's "actions were not that of a *consumer*").  Consumers are "those who purchase goods and services for personal, family or house-

---

[14]  *See also Nardolilli v. Bank of Am. Corp.*, No. 12-81312-CIV, 2013 WL 12154541, at *3 (S.D. Fla. Dec. 5, 2013) (dismissing FDUTPA claim because "FDUTPA unambiguously excludes banks"); *Sovereign Bonds Exch. LLC v. Fed. Republic of Ger.*, 899 F. Supp. 2d 1304, 1315-16 (S.D. Fla. 2010) (dismissing FDUTPA claim because defendant banks "are subject to federal regulation"), *aff'd sub nom. World Holdings, LLC v. Fed. Republic of Ger.*, 701 F.3d 641 (11th Cir. 2012).

[15]  *See also Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1349-50 (S.D. Fla. 2009) (dismissing FDUTPA claim because plaintiff was a non-consumer); *Cannova v. Breckenridge Pharm., Inc.*, No. 8-81145-CIV, 2009 WL 64337, at *3 (S.D. Fla. Jan. 9, 2009) (dismissing FDUTPA claim because plaintiff failed to allege he acted as a consumer).  FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).  The Florida Supreme Court has defined an "unfair practice" under the statute as "one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to <u>consumers</u>," and "deception" under the statute as "a representation, omission, or practice that is likely to mislead the <u>consumer</u> acting reasonably in the circumstances, to the <u>consumer's detriment</u>."  *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (emphases added) (citations omitted).

hold use." *Axiom Inv. Advisors, LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017) (citation omitted).

Individuals who purportedly traded foreign currency are not "consumers" under the FDUTPA.  This Court has explained that "[e]lectronic FX trading is not consumer-oriented conduct.  Individuals do not trade FX the way they purchase traditional consumer products.  Similar to securities, FX is traded as investments, not as goods to be consumed or used." *Id.* (citation omitted).[16]  For this independent reason, plaintiffs cannot cure the defects in their Florida law claims and their motion to replead that claim should be denied.

**D.   The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The Illinois Antitrust Act**

Like Florida's consumer protection law, the Illinois Antitrust Act ("IAA") does not apply to regulated banks, and plaintiffs cannot replead around that bar.  740 Ill. Comp. Stat. Ann. § 10/5(11) (exempting "the activities of any state or national bank to the extent that such activities are regulated or supervised by officers of the state or federal government").  On this ground alone, plaintiffs' motion to replead their IAA claim should be denied.

In addition, the SCCAC does not cure another fatal defect in plaintiffs' Illinois claim:  the IAA prohibits class actions by indirect purchasers.  740 Ill. Comp. Stat. Ann. § 10/7(2) (except for the state attorney general, "no person shall be authorized to maintain a class action in any court . . . for indirect purchasers asserting claims under [the IAA]"); *Gaebler v. N.M. Potash Corp.*, 676 N.E.2d 228, 230 (Ill. App. 1996) (affirming dismissal for this reason).  The statutory bar in the IAA on antitrust class actions by indirect purchasers is "intertwined with Illinois sub-

---

[16]   *Accord Crowell v. Morgan, Stanley, Dean Witter Servs. Co.*, 87 F. Supp. 2d 1287, 1294-95 (S.D. Fla. 2000) (dismissing FDUTPA claim, holding that FDUTPA does not apply to the sale of securities); *Minshall v. TD Evergreen*, No. 8:05-cv-1232-T-26TGW, 2005 WL 8145046, at *1 (M.D. Fla. Aug. 4, 2005) (FDUTPA does not apply to securities transactions); *Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1316 (N.D. Fla. 2003) (same).

21

stantive rights and remedies" and is not simply procedural. *In re Wellbutrin XL Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010) (denying motion to amend complaint to include Illinois antitrust claims). The bar, enacted as part of the substantive IAA, applies only to the state anti-trust statute and serves to reduce the risk of duplicative recoveries. *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011) (Preska, J.) (dismissing Illinois antitrust claim); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) (dismissing Illinois claim with prejudice, noting "[t]he Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies."). Federal courts have repeatedly held that the IAA bars Illinois indirect purchaser class actions, and this Court should do likewise, denying plaintiffs' motion to replead their Illinois state antitrust claims.[17]

### E.  The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The Massachusetts Consumer Protection Statute

Like its Florida analog, Section 9 of the Massachusetts Consumer Protection Act ("MCPA") provides a cause of action for consumers. Mass. Gen. L. Ch. 93A § 9.[18] Whether a plaintiff is a consumer under the statute turns on whether he or she "has undertaken the transaction in question . . . for purely personal reasons (such as the purchase of an item for personal use)." *In re Asacol Antitrust Litig.*, 2016 WL 4083333, at *13 (citation omitted). As explained

---

[17] A majority of federal courts agrees with the *Digital Music* decision and bars Illinois indirect purchaser class actions. *See, e.g.*, *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1083-84 (N.D. Cal. 2014) (dismissing Illinois antitrust claims with prejudice); *In re Auto. Parts Antitrust Litig.*, No. 12-md-02311, 2014 WL 2993710, at *17 (E.D. Mich. July 3, 2014) (dismissing Illinois antitrust claim); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013) (same); *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943 (DRD), 2011 WL 5008090, at *8 n.9 (D.N.J. Oct. 20, 2011) (same); *but see In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 727-28 (S.D.N.Y. 2017) (minority view).

[18] Section 11 of the MCPA provides a cause of action for unfair or deceptive trade practices between businesses. Mass. Gen. L. Ch. 93A § 11. But plaintiffs cannot state a claim under Section 11 because they are self-proclaimed indirect purchasers (*e.g.*, SCCAC ¶ 46), and thus lack standing to sue under Section 11. *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 700-01 (E.D. Pa. 2014) (explaining that the Massachusetts Legislature extended *Illinois Brick*'s bar on indirect purchaser suits to Section 11, but not Section 9); *United Food & Commercial Workers Local 1776*, 74 F. Supp. 3d at 1084-86 (dismissing indirect purchasers' Section 11 claims).

above, trading in foreign currency instruments is not a consumer-oriented activity; as this Court

has recognized, market participants do not enter into foreign currency transactions for personal

consumption. *Axiom*, 234 F. Supp. 3d at 537. They do not, therefore, fall within the purview of

Section 9 of the MCPA.

Yet plaintiffs seek to cure this failing of the CCAC with the implausible declaration that

the sole Massachusetts plaintiff, Charles G. Hitchcock III, "purchased FX Instruments for per-

sonal use, and his FX Instruments were not used for any business purpose." (SCCAC ¶ 17.)

This conclusory allegation squarely contradicts the allegation that "[r]etail FX customers, such as

Plaintiffs, trade FX Instruments for a variety of purposes, including long and short-term invest-

ing, portfolio diversification, and to hedge their foreign investments against risks of foreign cur-

rency fluctuations." (SCCAC ¶ 78.) The SCCAC does not identify "personal use" as a purpose

of plaintiffs' foreign currency trading.

In any event, this new assertion is insufficient to state a claim under Section 9. To cure

plaintiffs' Massachusetts state law claim and survive a motion to dismiss it, the SCCAC "must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). A plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to

relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (citation omitted).

Plaintiffs' bald assertion that Mr. Hitchcock "purchased FX Instruments for his personal use" is

nothing more than a conclusory statement of one element of a Section 9 claim, and not a plausi-

ble factual allegation that would cure the flaw in plaintiffs' MCPA claim.

Furthermore, the MCPA permits relief "only for unfair or deceptive actions that primarily

and substantially occur within the Commonwealth of Massachusetts." *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 234 (1st Cir. 2003). The SCCAC does not—indeed, cannot—plead that defendants' alleged conduct occurred "primarily and substantially" within Massachusetts, and plaintiffs' inability to so plead compels the denial of their motion for leave to replead the MCPA claim. *See id.* at 234-36 (concluding that MCPA claim failed because, though defendants made certain misrepresentations in Massachusetts, the "center of gravity" of the challenged conduct occurred primarily outside of Massachusetts); *ADA Solutions, Inc. v. Meadors*, 98 F. Supp. 3d 240, 266-67 (D. Mass. 2015) (dismissing MCPA claim because "the only connection to Massachusetts is that it is where the aggrieved party . . . is based and where it may have suffered harm"), *aff'd in part, rev'd in part on other grounds*, 665 F. App'x 3 (1st Cir. 2016).

### F.   The SCCAC Does Not Cure The Flaws In Plaintiffs' Claim Under The North Carolina Unfair And Deceptive Trade Practices Act

Plaintiffs' claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") is precluded by the regulatory scheme exception, which bars such claims when application of the statute "would create unnecessary and 'overlapping supervision, enforcement, and liability'" in the face of existing state or federal laws and regulatory schemes. *North Carolina ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 646 S.E.2d 790, 798 (N.C. App. 2007) (citation omitted), *aff'd in part, rev'd in part on other grounds*, 362 N.C. 431 (2008).[19]  A concurrent state regulatory scheme is not required, and an overlapping federal scheme is sufficient to exempt activity from NCUDTPA's scope.[20]  Likewise, the exemption has never required that pri-

---

[19]  *See also Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 166, 168 (4th Cir. 1985) ("the presence of other federal or state statutory schemes may limit the scope of [the NCUDTPA]").

[20]  *See, e.g., Skinner v. E.F. Hutton & Co.*, 333 S.E.2d 236, 241 (N.C. 1985) (exemption applies because of a "'pervasive' federal scheme for regulating" securities transactions); *Bache Halsey Stuart, Inc. v. Hunsucker*, 248 S.E.2d 567, 570 (N.C. Ct. App. 1978) (exemption applies because of a "pervasive federal regulatory scheme" for commodities); *Hagy ex rel. Estate of Worley v. Advance Auto Parts, Inc.*, No. 3:15-CV-509-RJC-DCK, 2016 WL 5661530, at
*(cont'd)*

vate plaintiffs retain any remedy under state laws.  The deciding question is not whether plaintiffs have a particular remedy, but rather whether application of NCUDTPA exposes a defendant's regulated conduct to "overlapping supervision, enforcement, and liability."  *HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 493 (N.C. 1991).

This exception applies here.  The SCCAC itself pleads that numerous federal and state regulators, including the CFTC, the OCC and the Federal Reserve, have asserted jurisdiction, conducted exhaustive investigations, and imposed more than $11 billion in fines and settlements based upon various federal and foreign laws and regulatory schemes.  (SCCAC ¶¶ 4, 186-220.)  Because plaintiffs' NCUDTPA claims overlap with this regulatory supervision and liability, repleading this claim would be futile.

Plaintiffs' proposed SCCAC does not state a claim under NCUDTPA for the additional reason that it does not plausibly allege that defendants' conduct had a "substantial effect on in-state business."  *Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 3:93 CV 301-P, 1994 WL 910955, at *2 (W.D.N.C. July 12, 1994) (dismissing NCUDTPA claim for this reason).[21]  Plaintiffs cannot allege the requisite, and their motion for leave to replead should be denied.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for leave to file their Second Consolidated Class Action Complaint should be DENIED.

_____

(*cont'd from previous page*)
*2-3 (W.D.N.C. Sept. 28, 2016) (exemption applies because of extensive federal Medicare regulations); *Sideshow, Inc. v. Mammoth Records, Inc.*, 751 F. Supp. 78, 81 (E.D.N.C. 1990) (exemption applies because the Lanham Act "demonstrates a pervasive federal scheme in regulating trademarks").

[21] *See also The "In" Porters, S.A. v. Hanes Printables, Inc*, 663 F. Supp. 494, 502-03 (M.D.N.C. 1987) ("Application of the [NCUDTPA] in cases having only an incidental local effect not only would be contrary to the Fourth Circuit's interpretation of the Act, but also would render the Act constitutionally suspect.").

Dated:  May 10, 2018                          Respectfully submitted,

SULLIVAN & CROMWELL LLP                       SKADDEN, ARPS, SLATE, MEAGHER &
                                              FLOM LLP

By: /s/ Matthew A. Schwartz                   By: /s/ Boris Bershteyn
Matthew A. Schwartz                           Peter E. Greene
David H. Braff                                Boris Bershteyn
Yvonne S. Quinn                               Peter S. Julian
125 Broad Street                              Tansy Woan
New York, New York 10004                      Four Times Square
Telephone: (212) 558-4000                     New York, New York 10036
schwartzmatthew@sullcrom.com                  Telephone: (212) 735-3000
braffd@sullcrom.com                           peter.greene@skadden.com
quinny@sullcrom.com                           boris.bershteyn@skadden.com
                                              peter.julian@skadden.com
*Attorneys for Defendant Barclays Bank PLC*   tansy.woan@skadden.com
*and Barclays Capital Inc.*
                                              *Attorneys for Defendants JPMorgan Chase &*
                                              *Co. and JPMorgan Chase Bank, N.A.*


SHEARMAN & STERLING LLP                       DAVIS POLK & WARDWELL LLP

By: /s/ Adam S. Hakki                         By: /s/ Joel M. Cohen
Adam S. Hakki                                 Joel M. Cohen
Richard F. Schwed                             Alyssa B. Gomez
Jeffrey J. Resetarits                         450 Lexington Avenue
599 Lexington Avenue                          New York, New York 10017
New York, New York 10022                      Telephone: (212) 450-4000
Telephone: (212) 848-4000                     joel.cohen@davispolk.com
ahakki@shearman.com                           alyssa.gomez@davispolk.com
rschwed@shearman.com
jeffrey.resetarits@shearman.com               *Attorneys for Defendants The Royal Bank of*
                                              *Scotland Group plc and RBS Securities Inc.*
*Attorneys for Defendants Bank of America*
*Corporation, Bank of America, N.A. and*
*Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated*

26

ALLEN & OVERY LLP

By: /s/ David C. Esseks

David C. Esseks
Laura R. Hall
Rebecca Delfiner
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 610-6300
david.esseks@allenovery.com
laura.hall@allenovery.com
rebecca.delfiner@allenovery.com

*Attorneys for Defendants BNP Paribas, BNP Paribas North America, Inc., BNP Paribas Securities Corp., and BNP Paribas Prime Brokerage, Inc.*

MOORE AND VAN ALLEN PLLC

By: /s/ James P. McLoughlin, Jr.
James P. McLoughlin, Jr.
Mark A. Nebrig
Joshua D. Lanning
Moore and Van Allen PLLC
100 N. Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone: (704) 331-1000
jimmcloughlin@mvalaw.com
marknebrig@mvalaw.com
joshlanning@mvalaw.com

*Attorneys for Defendant RBC Capital Markets, LLC*

LOCKE LORD LLP

By: /s/ Gregory T. Casamento

Gregory T. Casamento
3 World Financial Center
New York, New York 10281
Telephone: (212) 812-8325
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2800
Dallas, TX 75201
Telephone: (214) 740-8000
rcowie@lockelord.com

J. Matthew Goodin
Julia C. Webb
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 443-0700
jmgoodin@lockelord.com
jwebb@lockelord.com

*Attorneys for Defendants HSBC Bank plc, HSBC North America Holdings, Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc.*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: /s/ Thomas J. Moloney
Thomas J. Moloney
George S. Cary
Sue S. Guan
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
tmoloney@cgsh.com
gcary@cgsh.com
sguan@cgsh.com

*Attorneys for Defendants The Goldman
Sachs Group, Inc. and Goldman Sachs &
Co. LLC*

GIBSON, DUNN &
CRUTCHER LLP

By: /s/ Eric J. Stock
Eric J. Stock
Indraneel Sur
200 Park Avenue, 48th Floor
New York, New York 10166
Telephone: (212) 351-4000
estock@gibsondunn.com
isur@gibsondunn.com

D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
jarp@gibsondunn.com
mkatsur@gibsondunn.com

*Attorneys for Defendants UBS AG, UBS Group
AG, and UBS Securities, LLC*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: /s/ Kenneth A. Gallo
Kenneth A. Gallo
Michael E. Gertzman
Maxwell A.H. Kosman
Anand Sithian
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
kgallo@paulweiss.com
mgertzman@paulweiss.com
mkosman@paulweiss.com
asithian@paulweiss.com

*Attorneys for Defendant MUFG Bank, Ltd.*
(f/k/a *The Bank of Tokyo-Mitsubishi UFJ, Ltd.*)

CAHILL GORDON & REINDEL LLP

By: /s/ David G. Januszewski
David G. Januszewski
Herbert S. Washer
Elai Katz
Jason M. Hall
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
djanuszewski@cahill.com
hwasher@cahill.com
ekatz@cahill.com
jhall@cahill.com

*Attorneys for Defendants Credit Suisse Group
AG, Credit Suisse AG, and Credit Suisse
Securities (USA) LLC*

SIDLEY AUSTIN LLP

By: /s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
787 Seventh Avenue
New York, New York 10019
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com
Telephone: (212) 839-5300

*Attorneys for Defendant Standard Chartered Bank*

WACHTELL, LIPTON, ROSEN & KATZ

By: /s/ Jonathan Moses
Jonathan Moses
Bradley R. Wilson
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
JMMoses@wlrk.com
BRWilson@wlrk.com

*Attorneys for Defendants Morgan Stanley, Morgan Stanley & Co., LLC, and Morgan Stanley & Co. International PLC*

KIRKLAND & ELLIS LLP

By: /s/ G. Patrick Montgomery
G. Patrick Montgomery (*pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone: (202) 879-5000
patrick.montgomery@kirkland.com

LATHAM & WATKINS LLP

By: /s/ Joseph Serino, Jr.
Joseph Serino, Jr.
885 Third Avenue
New York, New York 10022
joseph.serino@lw.com
Telephone: (212) 906-1717

*Attorneys for Defendant Deutsche Bank AG and Deutsche Bank Securities Inc.*

LINKLATERS LLP

By: /s/ James R. Warnot, Jr.
James R. Warnot, Jr.
Adam S. Lurie
Patrick C. Ashby
1345 Avenue of the Americas
New York, New York 10105
Telephone: (212) 903-9000
james.warnot@linklaters.com
adam.lurie@linklaters.com
patrick.ashby@linklaters.com

*Attorneys for Defendant Société Générale*

29