**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al.*,<br><br>　　　　　　Plaintiffs,<br>v.<br><br>BANK OF AMERICA<br>CORPORATION, *et al.*,<br><br>　　　　　　Defendants. | Case No. 17-cv-3139-LGS<br><br>(related to No. 13-cv-7789-LGS)<br><br>ECF CASE |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR LEAVE TO FILE THE PROPOSED
SECOND CONSOLIDATED CLASS ACTION COMPLAINT**

# **TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................... 1

II.   THE SCCAC ADEQUATELY ALLEGES CAUSATION AND STANDING.................. 1

    A.   The SCCAC Does Not Contradict the CCAC ......................................................... 1
    B.   The SCCAC Adequately Alleges Proximate Cause ................................................. 2
        1. Plaintiffs' Claims Do Not Involve "Fungible Currency" ....................................... 4
        2. RFEDs Do Not "Comingle" FX Instruments.......................................................... 6
        3. Plaintiffs' Classes and Claims are Limited to Defendant-to-RFED-to-Class Member Transactions................................................................................................. 6

III.  THE SCCAC ADEQUATELY ALLEGES ANTITRUST STANDING ............................ 8

IV.   THE SCCAC SATISFIES DUE PROCESS...................................................................... 8

V.    THE SCCAC ADEQUATELY ALLEGES A CLAIM FOR INJUNCTIVE RELIEF ..... 10

VI.   DEFENDANTS' STATE-LAW ARGUMENTS FAIL ..................................................... 10

VII.  CONCLUSION................................................................................................................. 10

# **TABLE OF AUTHORITIES**

Cases

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d. Cir. 2012)..................................................................................................... 9

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302 (1981).............................................................................................................. 10

*BLD Prods., LLC v. Remote,*
  *Prods.*, 509 F. App'x 81 (2d Cir. 2013).................................................................................. 2

*Contant v. Bank of Am. Corp.*,
  No. 17 CIV. 3139 (LGS), 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018) .............................. 1, 9

*Dozier v. Deutsche Bank Tr. Co. Ams.*,
  No. 09-cv-9865, 2011 WL 4058100 (S.D.N.Y. Sep. 1, 2011) ................................................ 2

*Hamilton v. Marx*,
  No. 10-cv-07278, 2012 WL 12882947 (C.D. Cal. July 24, 2012)............................................ 2

*In re Dental Supplies Antitrust Litig.*,
  No. 16-cv-696, 2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ............................................... 1

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13-cv-7789-LGS, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) (*Forex II*)...................... 7

*In re Initial Pub. Offering Sec. Litig.*,
  260 F.R.D. 81 (S.D.N.Y. 2009) .............................................................................................. 2

*In re Petrobras Securities Litig.*,
  862 F.3d 250 (2d Cir. 2017).................................................................................................... 9

*In re Platinum & Palladium Antitrust Litig.*,
  No. 14 Civ. 9391 (GHW), 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ............................... 7

*In re TFT-LCD Antitrust Litig.*,
  No. 09-cv-4997, 2012 WL 3727221 (N.D. Cal. Aug. 27, 2012) .............................................. 9

*In re Tronox, Inc. Sec. Litig.*,
  No. 09 CIV. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010).................................. 3

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).................................................................................................... 3

*Lieb v. Am. Motors Corp.*,
  538 F. Supp. 127 (S.D.N.Y. 1982).......................................................................................... 2

*North Sea Brent Crude Oil Futures Litig.*,
    256 F. Supp. 3d 298 (S.D.N.Y. 2017) ................................................................. 3

*Nypl v. JP Morgan Chase & Co.*,
    No. 15-cv-9300-LGS, 2016 WL 3211440 (S.D.N.Y. June 8, 2016) ................... 4, 5

*Nypl v. JPMorgan Chase & Co.*,
    No. 15-cv-9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) (*Nypl II*) ............ 1, 3, 7

*Phillips Petroleum v. Shutts*,
    472 U.S. 797 (1985) ....................................................................................... passim

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ................................................................................... 5

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ................................................................................. 2

*Streit v. Bushnell*,
    424 F. Supp. 2d 633 (S.D.N.Y. 2006) .................................................................. 2

*Supreme Auto Transp. LLC v. Arcelor Mittal*,
    238 F. Supp. 3d 1032 (N.D. Ill. 2017) .................................................................. 6

*WestLB AG N.Y. Branch v. TPS McAdams, LLC (In re Enron Corp.)*,
    370 B.R. 583 (Bankr. S.D.N.Y. 2007) .................................................................. 2

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 1, 3

**Regulations**

17 C.F.R. 5.7(c) ............................................................................................................ 5

# GLOSSARY OF ABBREVIATIONS

| | | |
|---|---|---|
| Plaintiffs' Consolidated Class Action Complaint | CCAC | ECF No. 84 |
| Memorandum of Law in Support of Defendants' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) | D. MTD Br. | ECF No. 104 |
| Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) | P. MTD Br. | ECF No. 115 |
| *Contant v. Bank of Am. Corp.*, No. 17 CIV. 3139 (LGS), 2018 WL 1353290 (S.D.N.Y. Mar. 15, 2018) | the "MTD Order" | ECF No. 136 |
| *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) | *FOREX II* | |
| *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300, 2017 WL 3309759 (S.D.N.Y. Aug. 3, 2017) | *Nypl II* | |
| Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Leave to File the Proposed Second Consolidated Class Action Complaint | P. Br. | ECF No. 139 |
| Plaintiffs' Proposed Second Consolidated Class Action Complaint | SCCAC | ECF No. 139-1 |
| Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to File the Proposed Second Consolidated Class Action Complaint | D. Br. | ECF No. 144 |

I.      **INTRODUCTION**

The MTD Order held that Plaintiffs inadequately alleged (a) proximate cause, (b) that Plaintiffs transacted in their home states, and (c) a threat of future harm.[1] The SCCAC remedies all three issues. In the face of Plaintiffs' well-plead allegations, Defendants mischaracterize Plaintiffs' claims and assert factual arguments that are inappropriate on a motion to amend.[2] Accordingly, as in *Nypl II*, Plaintiffs respectfully request that the Court grant their Motion and allow the filing of the SCCAC.

II.     **THE SCCAC ADEQUATELY ALLEGES CAUSATION AND STANDING**

A.      **The SCCAC Does Not Contradict the CCAC**

Defendants claim that the SCCAC contradicts allegations that were in the CCAC, and then suggest that these contradictions somehow provide a basis for denying Plaintiffs' Motion. D. Br. 7-9. Defendants are wrong. The *only* purportedly "contradictory" allegation Defendants point to is an allegation in which the CCAC described, albeit inartfully, how a retail FX customer places a *limit* order, a very specific type of order where the customer specifies the price at which she is willing to buy an FX Instrument, and the RFED automatically executes the order when the

---

[1] *Contant v. Bank of Am. Corp.*, No. 17 CIV. 3139 (LGS), 2018 WL 1353290, at *9 (S.D.N.Y. Mar. 15, 2018) (the "MTD Order"). Defendants claim that the MTD Order "held that the factual allegations of the CCAC affirmatively showed that defendants' alleged conduct did *not* directly or proximately cause plaintiffs' alleged injury." D. Br. 3. To the contrary, the Court simply held that the CCAC failed "to allege facts plausibly showing proximate cause." *Contant*, 2018 WL 1353290, at *8.

[2] *See Nypl II* at *2 (S.D.N.Y. Aug. 3, 2017) (the Court on a motion to amend is required to "accept[] as true all factual allegations [in the complaint] and draws all reasonable inferences in the plaintiff's favor"); *In re Dental Supplies Antitrust Litig.*, No. 16-cv-696, 2016 WL 5415681, at *1 (E.D.N.Y. Sept. 28, 2016) ("[D]efendants' efforts to have me disassemble plaintiffs' theory and reassemble it in the manner that defendants' request is inappropriate on a Rule 12(b)(6) motion."). Defendants disingenuously claim that the SCCAC would be Plaintiffs' "fourth attempt at pleading a claim" in this Action. D. Br. 1. Plaintiffs' counsel filed an amended complaint in *Baker* that included the claims of many of the *Contant* Plaintiffs, but Defendants ***insisted*** that Plaintiffs withdraw that complaint and re-file it as a new action (*Contant*), to which Plaintiffs agreed rather than put the question to the Court. Plaintiffs subsequently filed the *Lavender* action bringing similar claims as the *Contant* complaint but with different Plaintiffs and state-law causes of action. Defendants ***insisted*** that Plaintiffs consolidate the two actions by including the Plaintiffs and claims from both actions in a single Consolidated Class Action Complaint. Again, in the interests of efficiency, Plaintiffs agreed to Defendants' demands. On the substance of the allegations, the SCCAC would be Plaintiffs' first substantive amended complaint in this Action. Accordingly, Defendants' citations to cases where the plaintiffs made multiple substantive amendments are inapposite.

1

price reaches that price or better.[3] But there is no contradiction. In consultation with their expert, Dr. Osler, Plaintiffs clarified their original allegation to describe a standard *market* order made by retail FX customers and, thereby, eliminate any confusion that the CCAC's original reference to atypical limit orders may have caused. This is not a case where, as in Defendants' cited cases, the proposed amended complaint repudiates the original complaint for some nefarious purpose.[4] Even if the SCCAC were inconsistent with the CCAC, Defendants' arguments would still fail. "It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect," even where the amended complaint "retreats from [a] position" in the original complaint.[5]

### B. The SCCAC Adequately Alleges Proximate Cause

Dr. Osler's report, which is attached to the Memorandum in Support of Plaintiffs' Motion for Leave to File the SCCAC (ECF No. 139-2) and incorporated in numerous allegations,

---

[3] CCAC ¶¶ 149-50; *see also In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 109 n. 242 (S.D.N.Y. 2009) ("A limit order is an order to buy or sell a security at a specific price. . . . Limit orders are different from market orders, which are orders to buy at the current market price.").

[4] *WestLB AG N.Y. Branch v. TPS McAdams, LLC (In re Enron Corp.)*, 370 B.R. 583, 597-98 (Bankr. S.D.N.Y. 2007), actually supports Plaintiffs' Motion. There, the court noted that parties may "erase" an allegation from their prior complaint where they "present a legitimate explanation for its previous inclusion . . . ." *Id.* Here, the additional facts provided to Plaintiffs by Dr. Osler provide a more than "legitimate explanation" for Plaintiffs' proposed clarifications. The rest of Defendants' cited cases are inapposite. *Dozier v. Deutsche Bank Tr. Co. Ams.*, No. 09-cv-9865, 2011 WL 4058100, at *2 (S.D.N.Y. Sep. 1, 2011) is a motion to dismiss order that does not even involve a motion to amend; in fact, the plaintiff had twice requested leave to amend and the court granted both requests. In *BLD Prods., LLC v. Remote Prods.*, 509 F. App'x 81, 82 (2d Cir. 2013), an unpublished one-page summary opinion affirming the lower court opinion, No. 10-cv-02625 at ECF No. 35 (attached as Ex. A), the lower court found bad faith where the plaintiff initially alleged that it entered into the contract in 2001, then after the court held that the claim was time-barred, the plaintiff tried to amend to say that it actually entered into the contract in 2005. Ex. A at 6-8. And the rest of Defendants' cited cases (*Wallace*, *Colliton*, and *Austin*) all involved *pro se* plaintiffs who blatantly changed their allegations in bad faith.

[5] *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); s*ee also Streit v. Bushnell*, 424 F. Supp. 2d 633, 640 (S.D.N.Y. 2006) ("It would be a harsh rule of law indeed if a litigant were to change a statement in an amended pleading to repair a weakness cited by an adversary or by the Court, only to have the case dismissed because the conforming change in some way may conflict with an allegation in the earlier pleadings."). A rare exception to the general rule that an amended complaint "renders [the original complaint] of no legal effect," *Shields*, 25 F.3d at 1128, occurs where a plaintiff changes their allegations in "bad faith." *Lieb v. Am. Motors Corp.*, 538 F. Supp. 127, 131 (S.D.N.Y. 1982). Bad faith "requires a showing that the party seeking to amend acted with a dilatory and 'wrongful motive,'" such as "forcing unnecessary expenses on the other side." *Hamilton v. Marx*, No. 10-cv-07278, 2012 WL 12882947, at *4 (C.D. Cal. July 24, 2012). Defendants do not claim that this exception applies here.

explains in detail how for every instance where a Defendant sold an FX Instrument to a RFED at an artificially inflated price and the RFED resold that FX Instrument directly to a member of the proposed Classes, the illegal overcharge incurred in the Defendant-to-RFED transaction was directly passed to the Class member in the RFED-to-Class member transaction. Dr. Osler also performed a robust correlation and regression analysis to examine that corroborate Plaintiff's causation allegations, and found that (a) the spot FX Instrument prices paid by retail FX customers (*i.e.* Plaintiffs and the Class members) are nearly perfectly correlated with the prices quoted by Defendants and paid by RFEDs; (b) distortions in the spot FX Instrument prices quoted by Defendants directly caused equivalent distortions in the prices paid by retail customers for those same spot FX Instruments; and (c) the spot FX Instrument prices paid by retail customers are nearly perfectly correlated with the European Central Bank Fix rates which were manipulated by the Conspiracy.[6] That analysis—reflected in the SCCAC's new allegations—rises far above what Plaintiffs are required to allege to satisfy proximate cause at the pleading stage. *See In re Tronox, Inc. Sec. Litig.*, No. 09 CIV. 6220 (SAS), 2010 WL 2835545, at *13 (S.D.N.Y. June 28, 2010) ("The Second Circuit does not require plaintiffs, at the motion to dismiss phase, to hire expert witnesses to perform complex regression analysis."). Notably, Defendants do not challenge Dr. Osler's analysis. However, should Defendants choose to do so at a later stage in this litigation, that question is one for the jury.[7]

---

[6] *See* P. Br. 2-3. Defendants' correlation versus causation argument is not well founded. Plaintiffs do not base their causal allegations solely on Dr. Osler's correlation analysis. *C.f.* D. Br. 12 (noting that "[c]orrelation is not the same as causation" (citing *In re North Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 313 (S.D.N.Y. 2017)). Rather, Dr. Osler conducted correlation analyses to *confirm* her detailed explanation—reflected in the SCCAC—showing that the conspiracy proximately caused Class members to incur anticompetitive overcharges. Further, as the Court held in rejecting Defendants' same argument in *Nypl*, "Plaintiffs allege not only that a correlation exists between FX benchmark rates and [the prices paid by Plaintiffs], but also that the FX benchmark rates are the principal component of consumer retail prices." *Nypl II* at *5.

[7] *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[T]he chain of causation . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss.").

3

Ignoring Dr. Osler's analysis, Defendants attempt to misdirect the Court into drawing inferences that are wholly unsupported by the SCCAC. First, Defendants conflate spot FX Instruments—the financial instruments at issue in *FOREX* and this Action—with "fungible currency,"—the U.S. dollars, euros, and other currencies at issue in *Nypl*. Defendants then claim that the purported "fungibility of currency" renders Plaintiffs unable to trace FX Instrument transactions from Defendants to RFEDs to Class members. D. Br. 9. Second, Defendants speculate that RFEDs might somehow "comingle" their transactions in a way that makes it impossible to trace a FX Instrument from a Defendant to a RFED to a Class member. *Id.* at 10-11. Finally, Defendants assert that RFED "liquidity providers" may include non-Defendants and Defendants, and speculate that this may somehow impair Plaintiffs' ability to show proximate cause for the Defendant-to-RFED-to-Class member transactions at issue in the SCCAC. All three arguments fail.

### 1. Plaintiffs' Claims Do Not Involve "Fungible Currency"

The SCCAC expressly limits the Classes to persons who purchased a FX Instrument directly from a member of the Direct Settlement Class (as defined in *FOREX*) where the Direct Settlement Class member purchased that FX Instrument from a Defendant or co-conspirator. The *FOREX* Direct Settlement Class is limited to direct purchasers of spot FX Instruments, and this Court has specifically held that the Direct Settlement Class does not include direct purchasers of "fungible currency." *See Nypl v. JP Morgan Chase & Co.*, No. 15-cv-9300-LGS, 2016 WL 3211440, at *4 (S.D.N.Y. June 8, 2016). Therefore, under the SCCAC's Class definitions, fungible currency transactions are excluded from this Action, just as they are excluded in *FOREX*. As the largest FX dealers in the market, and as parties to *Nypl* where the Court distinguished between spot FX Instruments and fungible currency, Defendants clearly know the

difference. Yet, in another attempt at misdirection, Defendants conflate the two and claim that the problems inherent in showing proximate cause in cases involving fungible currency (*i.e.* the difficulty in tracing physical currency bills) apply here.

In *Nypl*, Defendants unsuccessfully argued that the case should either be stayed or consolidated with *FOREX* because the *Nypl* plaintiffs—direct purchasers of fungible currency from Defendants—fell under the *FOREX* Direct Settlement Class. *Nypl*, 2016 WL 3211440, at *3. The Court rejected that argument, holding that the "foreign currency for purchasing goods and services [at issue in *Nypl*] are completely different from the computer generated [electronic communication network] *FX* spot trading in the *FX* market [at issue in *FOREX*]." *Id.* (Emphasis in original). That holding directly refutes Defendants' suggestion that this Action involves fungible currency. If this were a case involving physical currency notes—like *Nypl*—Defendants' arguments might have some relevance. But, it is not. The SCCAC is narrowly defined to include only spot FX Instruments, and Defendants have not argued here or in *FOREX* that spot FX Instruments are somehow impossible to trace.[8]

---

[8] The primary case that Defendants cite in support of their proximate cause arguments is remarkably inapposite. D. Br. 11 (citing *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013)). In *Rothstein*, federal authorities had found that UBS illegally transferred millions in physical U.S. currency to Iran, and the plaintiffs alleged that the UBS transfer enabled Iran to subsequently transfer funds to the terrorist organizations Hizbollah and Hamas, which subsequently carried out attacks in Israel that injured the plaintiffs and their families. *Id.* at 87. The court held that the plaintiffs failed to plausibly allege proximate cause, noting that the plaintiffs did not even attempt to allege that the funds transferred from UBS to Iran could be traced to the funds transferred from Iran to the terrorist organizations, nor did they allege that the funds transferred from Iran to the terrorist organizations could be traced to the attacks. *Id.* at 93-96. *Rothstein* is distinguishable on numerous grounds. Whereas the SCCAC involves the prototypical indirect purchaser defendant-to-intermediary-to-plaintiff framework, *Rothstein* involved numerous other parties in the chain of causation, most notably a foreign state and terrorist organizations that undoubtedly would have refused to produce the transactional records required to determine whether the funds transferred by UBS were actually used to carry out the terrorist attacks. Furthermore, the problems inherent in tracing millions of dollars in cash that the court identified in *Rothstein, id.* at 95, do not apply to spot FX Instruments. The SCCAC alleges that each FX Instrument at issue here can be easily traced from Defendant to RFED to Class member with existing records from both Defendants and RFEDs. *See* P. Br. 18 (the anticompetitive overcharges incurred by Class members "are readily traceable under the methodology explained by Dr. Osler"). In fact, CFTC regulations expressly require RFEDs to "prepare, and keep current, ledgers or other similar records which show or summarize, with appropriate references to supporting documents," which includes both customer transactions (RFED-to-Class member) and liquidity provider transactions (Defendant-to-RFED). 17 C.F.R. 5.7(c). The spot FX Instruments purchased by Plaintiffs and members

### 2. RFEDs Do Not "Comingle" FX Instruments

Defendants also incorrectly argue that "RFEDs comingle currency" in a way that makes it impossible to determine whether a FX Instrument purchased by a RFED and resold to a Class member was purchased from a Defendant or some non-Defendant liquidity provider. D. Br. 5, 10-11. Defendants' unsupported assertions, however, directly contradict both the SCCAC and Dr. Osler's analyses, which the Court must accept as correct on a motion to amend. P. Br. 3. RFEDs are required to maintain detailed records of all purchases and sales of FX Instruments, including their purchases from Defendants and sales to Plaintiffs and members of the Classes.[9] Therefore, even assuming the validity of Defendants' hypothetical—where one customer makes a Defendant-to-RFED-to-customer transaction and the other makes a non-Defendant-to-RFED-to-customer transaction, D. Br. 10,—Plaintiffs and their experts will easily be able to distinguish those transactions and thereby determine which customer is a Class member. Defendants' suggestions otherwise are both factually wrong and inappropriate for consideration at this stage.

### 3. Plaintiffs' Classes and Claims are Limited to Defendant-to-RFED-to-Class Member Transactions

Finally, Defendants claim that because RFED "liquidity providers" *may* include non-Defendants as well as Defendants, Plaintiffs cannot establish proximate cause for the Defendant-to-RFED-to-Class member transactions at issue in the SCCAC. This argument is a red herring. As detailed above, the SCCAC's proposed Classes and claims exclude any transactions where a Defendant or co-conspirator was not the liquidity provider. Defendants do not dispute that

---

of the Classes from RFEDs are distinct, traceable financial instruments with a specific price, specific currency pair, specific quantity, and matching transactions from Defendants to RFEDs in the same currency pair and quantity.
[9]*Supreme Auto Transp. LLC v. Arcelor Mittal*, 238 F. Supp. 3d 1032, 1042 (N.D. Ill. 2017) is inapposite. There, the plaintiffs alleged that the defendants manipulated prices on "raw steel," but the products purchased by the plaintiffs were merely products *containing* steel, "including refrigerators, dishwashers, ovens, automobiles, air conditioner units, lawn mowers, and farm and construction equipment." *Id.* at 1037. Here, the SCCAC expressly limits Plaintiffs' claims to transactions where the FX Instrument sold by the Defendant to the RFED is the *exact same* FX Instrument as the one that is resold by the RFED to the Class member. SCCAC ¶ 156.

Defendant-to-RFED-to-Class member transactions occurred. And because Defendants collectively dominate more than 90% of the market, SCCAC ¶ 93, it defies logic to suggest that every single spot FX transaction by Plaintiffs and Class members—most of whom transacted hundreds if not thousands of spot FX Instruments during the Class Period—involved a non-Defendant liquidity provider. The SCCAC does not claim damages for any transactions that did not follow the Defendant-to-RFED-to-Class member chain of causation. P. Br. 19-20. If there exists some retail FX customer who only transacted spot FX Instruments with RFEDs that only purchased those FX Instruments from non-Defendants, that customer is not a member of the Classes defined in the SCCAC. *Id.*

Defendants falsely claim that "plaintiffs and their expert assert [that] the bid and ask quotes of . . . non-conspirator liquidity providers were more competitive," and nonsensically assert that because Defendants' pricing was anticompetitive, the RFED algorithms which select the "best-available" liquidity provider quotes would always select non-Defendant liquidity providers. Nowhere do Plaintiffs or Dr. Osler assert that non-conspirator dealer pricing was "more competitive" than Defendants' pricing. To the contrary, the SCCAC alleges that Defendants manipulated the FX benchmark rates which underlie the pricing of *all* FX Instruments, including those sold by non-conspirators. The plausible inference to be drawn is that non-Defendants' bid-ask-quotes were impacted by Defendants' manipulation of the benchmark on which the non-Defendants relied to set their own prices. *See FOREX II* at *5, (finding plausible that Defendants' manipulation of benchmark rates impacted prices on exchange-traded FX Instruments); *Nypl II* at *5-6 (finding plausible that Defendants' manipulation of benchmark rates impacted prices on consumer currencies).[10]

---

[10] It is well-established that non-conspirators operating in a cartelized market typically raise their prices to take advantage of the "umbrella" of the cartel's pricing. In *In re Platinum & Palladium Antitrust Litig.*, No. 14 Civ. 9391

## III. THE SCCAC ADEQUATELY ALLEGES ANTITRUST STANDING

Defendants do not dispute Plaintiffs' argument that under the modified version of the federal-law "efficient enforcer" factors that some states have applied to state-law indirect purchaser claims, Plaintiffs satisfy the second *AGC* factor because there are no "other indirect purchasers in the distribution chain who are more directly impacted." P. Br. 19. Nor do they dispute that the second and third *AGC* factors also favor granting Plaintiffs' Motion because the SCCAC, supported by Dr. Osler's analyses, shows that damages will not be speculative, and because there are no other indirect purchaser cases that would create a risk of duplicative recovery. *Id.* at 20-21. And in claiming that the SCCAC fails to meet the first *AGC* factor, Defendants simply refer back to their proximate cause arguments. As Plaintiffs argued in P. Br., if Plaintiffs have plausibly alleged proximate cause, they have also plausibly alleged antitrust standing for their state-law claims to the extent that those states would apply some version of the *AGC* factors. Therefore, for the same reasons that the SCCAC plausibly alleges proximate cause, and for the reasons set forth in P. Br., Plaintiffs' Motion should be granted.[11]

## IV. THE SCCAC SATISFIES DUE PROCESS

In the MTD Order, the Court held that Plaintiffs failed to allege that due process was satisfied under the *Shutts* factors for Plaintiffs' non-New York state-law claims because the CCAC failed to include allegations "that Plaintiffs transacted and thus were injured in their home

---

(GHW), 2017 WL 1169626, at *22 (S.D.N.Y. Mar. 28, 2017), cited at D. Br. 11, the plaintiffs were neither direct nor indirect purchasers; instead, they were so-called "umbrella purchasers" who purchased from non-conspiring sellers at prices that were allegedly inflated due to the "pricing umbrella" created by the conspiracy. *Id.* at 21-22 (internal quotation marks omitted). Because the Classes are limited to Defendant-to-RFED-to-Class member transactions, Plaintiffs do not claim damages for transactions involving non-Defendant liquidity providers; therefore *Platinum* is inapposite. But the mere existence of non-Defendant transactions does nothing to affect Plaintiffs' allegations showing proximate cause for the Defendant-to-RFED-to-Class member transactions in this Action.
[11] Notably, Defendants abandoned many of the arguments they raised in support of their motion to dismiss the CCAC. *See generally* D. MTD Br. Defendants no longer argue: that "retail FX Instruments" are in a different market from "FX Instruments," *c.f. id.* at 5; the existence of a direct purchaser action involving federal antitrust damages claims somehow merits dismissing a related indirect purchaser action involving state-law damages claims, *c.f. id.* at 19-21; or that RFEDs charge a markup on FX Instruments which somehow disrupts the chain of causation in a Defendant-to-RFED-to-Class member transaction. *C.f. id.* at 12-13.

8

states." *Contant*, 2018 WL 1353290, at *8. The SCCAC adds those allegations, as well as allegations detailing Defendants' physical presences in the non-New York states,[12] which further weighs in favor of applying the laws of non-New York Plaintiffs' respective states.

Defendants now raise the novel claim that Plaintiffs must also specifically allege that "title to the traded currency was transferred" in their home states. D. Br. 15. Neither of Defendants' cited cases supports the notion that a plaintiff who resides and executes the relevant transactions in his home state is somehow injured in a state other than his home state.[13]

More importantly, the *Shutts* inquiry is relevant to the question of which state's laws should apply to a particular Plaintiff, not the question of whether Plaintiffs should be outright dismissed from the case.[14] Defendants claim that the *Shutts* factors warrant against choosing the laws of Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina for Plaintiffs' claims, but do not suggest which state's laws should be chosen instead. D. Br. 15-16. Presumably that state would be New York. Therefore, even if the Court accepts Defendants' arguments that Plaintiffs other than the New York Plaintiff are not entitled to bring claims under

---

[12] Defendants point out that not all of those locations conduct FX trading operations. D. Br. 14. However, the SCCAC's allegations establish that Defendants have a physical presence in the non-New York states, which supports applying the laws of those respective states under the third *Shutts* factor. *See Phillips Petroleum v. Shutts*, 472 U.S. 797, 819 (1985) (noting that the defendant "owns property and conducts substantial business in the State, so Kansas certainly has an interest in regulating petitioner's conduct in Kansas").

[13] Neither case even mentions *Shutts*. Both involved the determination of whether securities transactions are "domestic" and therefore subject to U.S. securities laws. *In re Petrobras Securities Litig.*, 862 F.3d 250 (2d Cir. 2017); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d. Cir. 2012). Both courts held that the "domestic" requirement is satisfied if either the "location where irrevocable liability was incurred *or* legal title transferred" was in the U.S. *Petrobras*, 862 F.3d at 262 (emphasis added); *accord Absolute*, 677 F.3d at 68 *Petrobras*. "Irrevocable liability" is incurred at the location of the purchaser at the time of the sale. *Id.* Therefore, even if that securities law test applied here (it does not) or if the location where "legal title transferred" for Plaintiffs' purchases was somehow different from the location where they made their purchases (it is not), Defendants' argument would still fail. The court in *In re TFT-LCD Antitrust Litig.*, No. 09-cv-4997, 2012 WL 3727221, at *3 (N.D. Cal. Aug. 27, 2012), expressly rejected an argument similar to the one Defendants raise here, holding that "for purposes of state law indirect purchaser claims, plaintiffs are deemed to be injured in the states where they agreed to pay inflated prices for products," not "where they 'took title' to the products." *Id.*

[14] In their Motion to Dismiss for Lack of Personal Jurisdiction, Defendants separately argued that the exercise of personal jurisdiction would not comport with due process. ECF No. 107. For the reasons described in Plaintiffs' opposition brief, that argument also fails. But "[t]he issue of personal jurisdiction over plaintiffs in a class action is entirely distinct from the question of the constitutional limitations on choice of law." *Shutts*, 472 U.S. at 817.

the laws of their respective states, it necessarily follows that those Plaintiffs would still be entitled to bring their claims under the laws of New York.[15] However, for the reasons stated above, *Shutts* actually compels rejecting Defendants' arguments.

## V. THE SCCAC ADEQUATELY ALLEGES A CLAIM FOR INJUNCTIVE RELIEF

As described in P. Br., the SCCAC adds allegations showing that the same market conditions that facilitated the Conspiracy continue today, as well as allegations that Defendants engaged in FX-related misconduct as recently as last year.[16] P. Br. 23-24. Those allegations are more than sufficient to sustain Plaintiffs' injunctive relief claim.

## VI. DEFENDANTS' STATE-LAW ARGUMENTS FAIL

Although the MTD Order did not address Defendants' state-law arguments, Defendants rehashed them here.[17] For the reasons stated in P. MTD Br. those arguments are still without merit. Finally, because Defendants insist that New York law applies to the claims of the non-New York Plaintiffs they should have no objection to substituting New York-law claims for any other state-law claims if the Court were to find that any Plaintiff cannot bring claims under the laws of their respective state. Therefore, even if Defendants' state-law arguments succeed, that would not warrant the outright dismissal of any Plaintiffs from this Action.

## VII. CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' Opening Brief, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Leave to File the SCCAC.

---

[15] *See Shutts,* 472 U.S. at 843 (analyzing whether Kansas, Texas, or Oklahoma law applied); *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 307 (1981) (analyzing whether Minnesota or Wisconsin law applied).
[16] On May 29, 2018, Bloomberg reported that "routine misbehavior in the $5.1 trillion-a-day FX market persists even after banks paid $10 billion in penalties and a trader was sent to prison." *See* https://www.bloomberg.com/news/articles/2018-05-29/fx-abuses-persist-even-after-10-billion-in-fines-traders-say.
[17] The SCCAC adds an allegation to clarify that Massachusetts Plaintiff Charles G. Hitchcock III is a person who purchased FX Instruments for personal use, and not a business that purchased FX Instruments for a business purpose. *Id.* ¶ 41. Defendants also make the bizarre claim that the SCCAC fails to comply with Arizona's requirement that plaintiffs must "simultaneously with the filing of the pleading . . . serve a copy of the complaint . . . on the [Arizona] attorney general," D. Br. 18-19. Plaintiffs have not yet filed the SCCAC, hence their Motion here.

Dated:   May 30, 2018                              Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Merrill G. Davidoff
Joshua T. Ripley
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
mdellangelo@bm.net
jripley@bm.net

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 North Scottsdale Rd., Ste. 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

Joseph C. Peiffer
**PEIFFER ROSCA WOLF ABDULLAH CARR& KANE LLP**
201 St. Charles Ave., Ste. 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504)523-2464
jpeiffer@prwlegal.com

R. Bryant McCulley
Stuart H. McCluer
Frank B. Ulmer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Blvd., Ste. 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com
fulmer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*