UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/25/18

------------------------------------------------------------ X
                                                             :
JAMES CONTANT, et al.,                                       :
                                                             :
                                    Plaintiffs,              :          17 Civ. 3139 (LGS)
                                                             :
             -against-                                       :          **OPINION AND ORDER**
                                                             :
BANK OF AMERICA CORPORATION, et al.,                         :
                                                             :
                                    Defendants. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Plaintiffs,[1] a group of individuals and businesses that purchased foreign exchange ("FX")

instruments from retail foreign exchange dealers ("Retail Dealers"), filed this putative class

action against 18 banks and their affiliates[2] seeking injunctive relief under the Sherman Antitrust

Act, 15 U.S.C. § 1, *et seq.*, and damages under certain state antitrust and consumer protection

laws. Plaintiffs allege that they paid inflated prices for various financial instruments because of

Defendants' alleged conspiracy to fix prices in the FX spot market. Plaintiffs' Consolidated

Class Action Complaint ("CCAC") was dismissed because it failed to plead facts sufficient to

_____

[1] The named plaintiffs are James Contant, Sandra Lavender, Victor Hernandez, Martin-Han
Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry
Jacobson, Tina Porter and Paul Vermillion.
[2] Defendants are Bank of America Corporation, Bank of America, N.A., Merrill Lynch, Pierce,
Fenner & Smith Incorporated, The Bank of Tokyo-Mitsubishi UFJ, Ltd., Barclays Bank PLC,
Barclays Capital Inc., BNP Paribas, BNP Paribas North America, Inc., BNP Paribas Securities
Corp., BNP Paribas Prime Brokerage, Inc., Credit Suisse Group AG, Credit Suisse AG, Credit
Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., The Goldman
Sachs Group, Inc., Goldman, Sachs & Co., HSBC Bank plc, HSBC North America Holdings,
Inc., HSBC Bank USA, N.A., HSBC Securities (USA) Inc., JPMorgan Chase & Co., JPMorgan
Chase Bank, N.A., Morgan Stanley, Morgan Stanley & Co., LLC, Morgan Stanley & Co.
International PLC, RBC Capital Markets, LLC, The Royal Bank of Scotland plc, RBS Securities
Inc., Société Générale S.A., Standard Chartered Bank, UBS AG, UBS Group AG and UBS
Securities, LLC. The Citigroup Defendants have settled.

establish antitrust standing as to Plaintiffs' claims under the Sherman Act and the state antitrust laws of California, Illinois and New York. *Contant v. Bank of Am. Corp.*, No. 17 Civ. 3139, 2018 WL 1353290, at *5 (S.D.N.Y. Mar. 15, 2018) ("*Contant I*"). The CCAC also failed to plead sufficient facts to establish proximate cause, which is required for each of Plaintiffs' claims, and failed to meet due process requirements for bringing state law claims, except those under New York law. *Id.* at *8. Finally, the CCAC failed to establish the availability of injunctive relief for Plaintiffs' Sherman Act claim. *Id.* at *9. Plaintiffs move for leave to file their Proposed Second Consolidated Class Action Complaint (the "Proposed Complaint") pursuant to Federal Rule of Civil Procedure 15(a)(2). For the following reasons, Plaintiffs' motion is granted in substantial part.

## I.    BACKGROUND

Familiarity with the procedural history and the allegations contained in the CCAC is assumed. *See Contant I*, 2018 WL 1353290, at *1-2. The following alleged facts are taken from the Proposed Complaint and documents integral to the complaint, and are assumed to be true only for the purposes of this motion. *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 80 (2d Cir. 2018).

On May 20, 2015, the United States Department of Justice announced that Defendants Citigroup, JPMorgan Chase, Barclays, RBS and UBS were pleading guilty to conspiring to manipulate FX benchmark rates. Those benchmark rates are derived at the same time daily from bids and offers in the FX spot market during short windows of time called "fix periods." The two principal benchmark rates that Defendants manipulated are the European Central Bank rate and the World Markets/Reuters rate. These are the two most widely referenced FX benchmark rates and are used to set FX exchange rates globally. In 2013, Defendants collectively controlled

90.92% of the global FX spot trading market, and 98% of all FX spot trading volume in the United States. Defendants conspired in electronic chatrooms to fix prices, conform FX trade quotes and coordinate the timing and volume of trades, thereby artificially inflating the prices paid by non-Defendant FX purchasers.

Defendants' price fixing scheme operated to Plaintiffs' detriment by causing them to pay more for the FX instruments[3] that they purchased from Retail Dealers than they otherwise would have paid. The Retail Dealers quoted Plaintiffs prices based on the rates in the price-fixed spot market, thereby passing on to Plaintiffs the costs of Defendants' anticompetitive practices. When a Plaintiff placed an order for an FX instrument with a Retail Dealer, the Retail Dealer would then execute a covering trade, purchasing the FX Instrument from a Defendant liquidity provider and reselling it to the Plaintiff for that purchase price plus a retail markup. Depending on the Retail Dealer, the amount of the markup could be fixed based on the currency pair, or it could be calculated as a multiple of the best bid-ask spread quotes that the Retail Dealer receives from liquidity providers.

The Proposed Complaint bases these allegations primarily on analyses conducted by Plaintiffs expert, Dr. Carol L. Osler. According to Dr. Osler, "Each [Retail Dealer] maintains a proprietary algorithm for generating bid and ask quotes that are based on a data feed from the interbank market. Therefore, clients' trading costs are in proportion to the size of the trade and depend on the bid-ask spreads charged to the [Retail Dealers]." Most algorithms set the bid and ask prices for a retail FX instrument via a three step process -- "Step 1: Take in prices from one or more dealer banks as sources of liquidity; Step 2: Identify the highest bid and lowest ask

---

[3] "FX Instrument" is defined in the Proposed Complaint and in the *FOREX* settlements as any FX spot transaction, forward, swap, future, option or any other FX transaction or instrument the trading or settlement value of which is related in any way to FX rates.

prices among those liquidity-provider prices; Step 3: Set the retail ask price by adding a markup to the wholesale ask[] and set the retail bid price by subtracting a markup from the wholesale bid." In the alternative, some Retail Dealers calculate retail prices by "first identifying the wholesale mid-quote and adding (for the ask) or subtracting (for the bid) an appropriate markup." Because of Defendants' dominant market share in the wholesale FX Market, "the Step-1 market prices will almost certainly include streaming quotes from one or more Defendant liquidity providers . . . ."

Dr. Osler's statistical models confirm that the spot FX prices charged by Defendants to Retail Dealers are nearly perfectly correlated with the prices at which Plaintiffs purchased the instruments from the Retail Dealers. "Because the distorted bid and ask quotes from the liquidity providers are incorporated into the [Retail Dealer] bid and ask quotes, any price distortions at the liquidity provider level are passed down to the retail customer at the [Retail Dealer] level," and are "fully incorporated into [Retail Dealer] pricing."

## II.   STANDARD

"Leave to amend should be 'freely give[n] . . . when justice so requires,' Fed. R. Civ. P. 15(a)(2), but should generally be denied in instances of futility [or] undue delay . . . ." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (some internal quotation marks omitted). "A proposed amendment to a complaint is futile when it could not withstand a motion to dismiss." *F5 Capital v. Pappas*, 856 F.3d 61, 89 (2d Cir. 2017). To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *accord Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 65 (2d Cir. 2018).

In reviewing a motion for leave to amend, a court accepts as true all factual allegations and draws all reasonable inferences in the plaintiff's favor.  *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  In adjudicating a motion for leave to amend, "A complaint is also deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint."  *Cohen*, 897 F.3d at 80.

## III.   DISCUSSION

The Proposed Complaint claims that Defendants' price-fixing agreements violated § 1 of the Sherman Antitrust Act; the state antitrust statutes of Arizona, California, Illinois, Minnesota, New York and North Carolina and the consumer protection statutes of California, Florida and Massachusetts.  For the reasons below, Plaintiffs' motion for leave to file the Proposed Complaint is granted in substantial part.  The Proposed Complaint adequately pleads (at least as to some Defendants) all of Plaintiffs' claims, except for the Sherman Act claim, which still fails for lack of Article III standing.

### A.   Contradictions between the CCAC and Proposed Complaint

Defendants argue that it is inappropriate even to assess the sufficiency of the facts pleaded in the Proposed Complaint, because "Plaintiffs may not delete previously pleaded factual allegations and replace them with contradictory allegations."  This argument fails, because Plaintiffs inserted the challenged amendments and corrections to their pleading with the help of an expert to address the CCAC's deficiencies identified in *Contant I*.

Pursuant to Rule 15(a), "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15.  "Leave to amend, though liberally granted, may properly be denied for: undue delay, bad faith or dilatory motive on the part of the movant . . . ."  *Ruotolo v. City of New*

*York*, 514 F.3d 184, 191 (2d Cir. 2008) (citations omitted); *accord Melendez v. POP Displays USA*, No. 18 Civ. 2323, 2018 WL 3611934, at *3 (S.D.N.Y. July 27, 2018). It is "well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *accord Elliott v. City of Hartford*, 649 F. App'x 31, 32 (2d Cir. 2016) (summary order).

This is not a case where Plaintiffs have blatantly changed their version of facts known personally to them, suggesting bad faith. Here, the Proposed Complaint corrects and clarifies a description of a complex business transaction outside the ken of Plaintiffs and their lawyers. *See, e.g.*, *Bernadotte v. New York Hosp. Med. Ctr. of Queens*, No. 13 Civ. 965, 2014 WL 808013, at *6 (E.D.N.Y. Feb. 28, 2014) ("Taken as a whole, while not congruous, Plaintiff's allegations are not in such direct contradiction that the Court is moved to abandon the usual deference afforded to an Amended Complaint."); *Streit v. Bushnell*, 424 F. Supp. 2d 633, 640 (S.D.N.Y. 2006) ("It would be a harsh rule of law indeed if a litigant were to change a statement in an amended pleading to repair a weakness cited by an adversary or by the Court, only to have the case dismissed because the conforming change in some way may conflict with an allegation in the earlier pleadings"). Assessing the Proposed Complaint's sufficiency is appropriate.

### B. Sherman Act Claim

The Proposed Complaint's Sherman Act claim once again fails for lack of Article III standing. "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v Robins*, 136 S. Ct. 1540, 1547 (2016) (citation omitted).

Plaintiffs seek only injunctive relief with respect to their Sherman Act Claim, presumably because they may not seek damages as indirect purchasers. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977) (holding the treble damage actions under § 4 of the Clayton Act are limited to "direct purchaser[s]"); *see also Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 n.7 (2d Cir. 2014) ("The indirect purchaser doctrine . . . does not apply to claims for equitable relief."). However, injunctive relief is not available because Plaintiffs fail to allege any ongoing misconduct. *See* 15 U.S.C. § 26. Past injuries "do not confer standing . . . unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (affirming dismissal of injunctive claim).

Like the CCAC, the Proposed Complaint pleads no plausible threat of ongoing or recurring violations. The Proposed Complaint asserts a Class Period ending on December 31, 2013, suggesting the alleged violations ended in 2013. The Proposed Complaint alleges that, following investigations, guilty pleas and fines, "Defendants terminated and suspended traders, forced traders to resign and implemented internal safeguards. . . ." -- suggesting that Defendants have reformed their FX operations.

Plaintiffs assert three arguments why the Proposed Complaint pleads a sufficient threat of future harm; none are persuasive. First, Plaintiffs point to "recent developments in government investigations" into the price fixing conspiracy. This argument fails, because the Government's uncovering of further details with respect to Defendants' past misconduct does not imply that the misconduct is continuing or likely to recur. Second, Plaintiffs argue that allegations "that the same market conditions that facilitated the Conspiracy continue today" are sufficient, because "[i]f Defendants continue to be able to manipulate FX prices, those Plaintiffs will continue to be harmed." This argument assumes without reason that, despite being caught and punished for

manipulating the market, Defendants will continue to manipulate the market simply because they allegedly still can. *See, e.g.*, *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (denying injunctive relief where an "accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief"); *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 296 F. Supp. 3d 614, 625 (S.D.N.Y. 2017) (denying an injunction where the "alleged harm [was] far too speculative to justify injunctive relief").

Third, as evidence of an ongoing threat, Plaintiffs point to a paragraph in the Proposed Complaint that alleges ongoing regulatory violations "that included failing to segregate client funds, failing to report FX transactions, failure to report Credit Suisse's short positions, selling risky investment products to clients, and the charging of incorrect rates and commissions to FX clients." But this allegation does not describe an ongoing threat from the *same* FX-related misconduct that catalyzed the present lawsuit -- i.e., collusion amongst Defendants to rig FX benchmarks. Because Plaintiffs cannot obtain damages or injunctive relief under the Sherman Act, their alleged injury is not "likely to be redressed by a favorable judicial decision," *Spokeo*, 136 S.Ct. at 1547, and leave to amend is denied.

### C.      State Law Claims -- Proximate Cause

As discussed in detail in *Contant I*, proximate cause is required for all of the Plaintiffs' state law claims, which are unchanged in the Proposed Complaint. 2018 WL 1353290, at *7. Proximate cause -- under the rubric of "directness" -- is also in effect a requirement for antitrust standing for at least the California, Illinois and New York antitrust claims. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) (noting that "directness" is in essence a proximate cause requirement); *see also Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018) ("The overall [antitrust standing] inquiry is akin to proximate cause

in tort law . . . ."); *see generally Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540-45 (1983) ("*AGC*") (discussing the "efficient enforcer" doctrine and the four factors used to measure the link between a defendant's conduct and the plaintiff's injury in an antitrust action); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) ("the 'directness or indirectness of the asserted injury' [] requires evaluation of the 'chain of causation' linking appellants' asserted injury and the Banks' alleged price-fixing").

"A proximate cause determination does not require a jury to identify the liable party as the sole cause of harm; it only asks that the identified cause be a substantial factor in bringing about the injury." *Hydro Inv'rs, Inc. v. Trafalgar Power Inc*., 227 F.3d 8, 15 (2d Cir. 2000); *accord Scentsational Techs., LLC v. Pepsico, Inc.*, No. 13 Civ. 8645, 2018 WL 2465370, at *7 (S.D.N.Y. May 23, 2018). The harm alleged need have only "a sufficiently close connection to the conduct the statute prohibits," *Lexmark*, 572 U.S. at 133 -- proximate causation does not demand total causation.

Accepting the Proposed Complaint's allegation that retail FX prices "move in near-perfect correlation" with FX benchmarks, because FX benchmarks constitute the predominant component of FX retail prices, a direct link connects the alleged anticompetitive conduct and Plaintiffs' injury; any engineered increase in FX benchmark rates galvanized an equivalent increase in the price paid by retail consumers. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016) ("*FOREX*") (directness factor satisfied where rates in the market in which plaintiffs participated allegedly "track" and "move in virtual lockstep" with rates in the manipulated market).

Defendants argue that the Proposed Complaint does not sufficiently plead proximate cause or "directness" because Plaintiffs' purchases cannot be traced to Defendants: "Plaintiffs

here allege that they purchased currency from an unidentified [Retail Dealer] that dealt with a defendant, but they cannot plausibly allege a direct and proximate connection between their completely fungible currency transactions in the retail foreign currency market and any antecedent transaction between their [Retail Dealer] and one of the defendants."  This argument fails for two reasons.  First, the Proposed Complaint alleges that Defendants manipulated the FX benchmark rates, which underlie the pricing of all FX Instruments, including those sold by non-conspirators.  *See Gelboim*, 823 F.3d at 779 (stating that, where defendants allegedly manipulated the LIBOR benchmark, "there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks").

Second, this argument mischaracterizes the Proposed Complaint, which limits the putative class to those who purchased indirectly from a Defendant through a Retail Dealer:

> All persons and entities who . . . indirectly purchased an FX Instrument *from a Defendant or co-conspirator* in the United States and/or while domiciled in the United States, by entering into an FX Instrument with a member of the Direct Settlement Class [i.e., the Retail Dealers who were plaintiffs and class members in *FOREX*], where the Direct Settlement Class member entered into the FX Instrument *directly with a Defendant or co-conspirator* [emphasis added].

The "Direct Settlement Class" in *FOREX* is defined to include participants in the FX spot market, who traded "FX Instruments" and "FX Exchange-Traded Instruments" with Defendants, but does not include consumers "who purchased supracompetitive foreign currency exchange rates from Defendants and their co-conspirators *for their own end use* . . . ."  *Nypl v. JP Morgan Chase & Co.*, No. 15 Civ. 9300, 2016 WL 3211440, at *2 (S.D.N.Y. June 8, 2016).

Contrary to Defendants' argument, these transactions are not impossible to identify because of the fungible nature of currency.  By mirroring the "Direct Settlement Class" in *FOREX*, the putative class in this case does not include Plaintiffs who purchased fungible

currency notes from a Retail Dealer to use in buying goods and services. It includes only Plaintiffs who purchased a traceable FX instrument from a Retail Dealer. The Proposed Complaint alleges that every FX instrument Plaintiffs purchased from a Retail Dealer is traceable back to a Defendant liquidity provider, which is plausible given the recordkeeping requirements imposed on Retail Dealers by the Commodity Futures Trading Commission. *See* 17 C.F.R. § 5.14 ("No person shall be registered as a retail foreign exchange dealer under the Act unless . . . he prepares and keeps current ledgers or other similar records which show or summarize, with appropriate references to supporting documents, *each transaction* affecting his asset, liability, income, expense and capital accounts . . . .") (emphasis added). Accordingly, the Proposed Complaint alleges that Plaintiffs' losses were proximately caused by, and flowed directly from, Defendants' misconduct.[4]

Defendants argue that "because the bid and ask quotes of defendants and other non-defendant liquidity providers are comingled in the [Retail Dealers'] algorithms, plaintiffs cannot rely on those algorithms -- and their purported self-imposed absence of pricing discretion -- to show that defendants' alleged conduct directly or proximately caused plaintiffs' claimed injury." This argument is inapposite.

First, Plaintiffs are not required to provide expert analysis at the pleading stage, much less rebut anticipated counterarguments. *See Elkind v. Revlon Consumer Prod. Corp.*, No. 14

---

[4] Defendants argue in a summary fashion that Plaintiffs' inability to trace the foreign currency they purchased in the retail market to defendants' conduct undermines Plaintiff's ability to meet the other *AGC* antitrust standing requirements, as it does the "directness" requirement. *See AGC*, 459 U.S. at 540-45; *Gelboim*, 823 F.3d 778. This argument fails for the same reasons as explained in the text; the Proposed Complaint plausibly alleges Plaintiffs' ability to trace the transactions at issue to the Defendants' wrongful conduct.

Civ. 2484, 2015 WL 2344134, at *11 n.7 (E.D.N.Y. May 14, 2015) (stating that plaintiffs are generally not required to provide expert analysis at the pleading stage).

Second, the Proposed Complaint alleges that the conspiring Defendant liquidity providers controlled 90% of trading in the global FX spot market and 98% of trading in the United States FX spot market. Given this market share and the likelihood that streaming quotes would include those from Defendants, the Proposed Complaint plausibly alleges that Defendants' misconduct was the "substantial factor in bringing about the injury." *Hydro Inv'rs*, 227 F.3d at 15.

### D. State Law Claims -- Due Process Requirements

The Proposed Complaint also pleads facts sufficient to satisfy due process. The Proposed Complaint pleads consumer and antitrust claims under the law of 8 different states (New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, North Carolina), in each case on behalf of one or more named Plaintiffs who both reside in that state and purchased FX instruments in that state, and on behalf of a putative class of those who "purchased an FX Instrument from a Defendant or co-conspirator in [that state] and/or while domiciled in [that state] . . . ."

Under the Fourteenth Amendment Due Process Clause, a state law may not be applied unless that state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985) (citing *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). Application of a state's law is invalid where the state has "no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction." *Allstate*, 449 U.S. at 308. This places "modest restrictions on the application of forum law." *Shutts*, 472 U.S. at 818.

Courts treat antitrust claims as torts for purposes of due process analyses. *See In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003) (stating that the "effects" test, which is used to analyze whether the exercise of specific personal jurisdiction comports with due process in the tort context, applies to antitrust claims).[5] For tort claims, the factors relevant to determining a state's interest are: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 142 (2d Cir. 2015) (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)).

The Proposed Complaint satisfies these due process requirements by alleging facts relevant to the first three factors. Factor (d) is inapplicable because, as alleged, Plaintiffs did not transact with Defendants and had no relationship with them. The Proposed Complaint alleges that at least one Plaintiff lives in each of the states in question, and that Plaintiff purchased an FX instrument while physically located in their respective states of residence. Plaintiffs were therefore injured in their home states. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 09 Civ. 4997, 2012 WL 3727221, at *3 (N.D. Cal. Aug. 27, 2012) ("for purposes of state law indirect purchaser claims, plaintiffs are deemed to be injured in the states where they agreed to pay inflated prices for products."). The Proposed Complaint alleges that the Defendants each maintain a significant corporate presence in each of the states. Accordingly, application of the laws of each Plaintiff's home state to that Plaintiff's claims comports with due process. *See, e.g.*,

---

[5] *See also Fashion Two Twenty, Inc. v. Steinberg*, 339 F. Supp. 836, 841 (E.D.N.Y. 1971) ("[A]n action alleging violations of the antitrust laws is a claim for injuries sustained, and therefore in the nature of a tort."); *accord Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 231–32 (W.D.N.Y. 1997) (analyzing antitrust actions for purposes of the New York long-arm statute); *Saratoga Harness Racing Inc. v. Veneglia*, 897 F. Supp. 38, 44 n.8 (N.D.N.Y. 1995) (same).

*Falise v. Am. Tobacco Co*., 94 F. Supp. 2d 316, 354 (E.D.N.Y. 2000) (holding that application of New York law satisfied due process where plaintiffs suffered injury in New York).

Defendants argue that the Proposed Complaint does not satisfy the requirements of due process because Plaintiffs must plead facts to show that title passed in their home states. Defendants cite no authority for the proposition that, for the *Nextel* state interest analysis, the place of injury is where title passes. The two securities cases upon which Defendants rely have nothing to do with application of state law under the Due Process Clause and are inapposite.

### E.    State-Specific Arguments

Defendants raise arguments specific to the antitrust laws of six of the states. For the reasons below, leave to replead the Florida and Illinois claims is denied with respect to Bank of America, N.A., HSBC Bank USA, N.A. and JPMorgan Chase Bank, N.A. Leave to amend is otherwise granted.

### 1.    Arizona

The Proposed Complaint asserts a claim under Arizona's Uniform State Antitrust Act (the "AUSAA"), Ariz. Rev. Stat. Ann. § 44-1401, *et seq*., on behalf of an Arizona resident and an Arizona putative class. Defendants argue that the Proposed Complaint fails to state a claim under the AUSAA, because Plaintiffs did not serve Arizona's Attorney General with a copy of the CCAC contemporaneously with its filing, as required by the statute. *See* Ariz. Rev. Stat. Ann. § 44-1415 ("A person filing a complaint, counterclaim or answer for any violation of the provisions of this article shall simultaneously with the filing of the pleading . . . in the federal court, serve a copy of the complaint, counterclaim or answer on the attorney general."). Plaintiffs argue that because the provision is procedural, not substantive, under *Shady Grove*

*Orthopedic Associates, P.A. v. Allstate Insurance Co*., 559 U.S. 393 (2010), it is inapplicable in federal proceedings.

Deciding the *Shady Grove* issue, on which various district courts have split, is unnecessary. *Compare In re Asacol Antitrust Litig.*, No. 15 Civ. 12730, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016) (dismissing without prejudice claims under Arizona antitrust law for a failure to serve the Arizona Attorney General), *with In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 254 (D. Conn. 2015) (declining to dismiss for failure to serve the state attorney general under an analogous Hawaii statute). Even those courts that have held that service requirements are substantive, and hence enforceable in federal court, have dismissed without prejudice to renewal after proper service. *See, e.g., Asacol*, 2016 WL 4083333; *In re Chocolate Confectionary Antitrust Litig*., 749 F. Supp. 2d 224, 232 (M.D. Pa. 2010), *In re Flash Memory Antitrust Litig*., 643 F. Supp. 2d 1133, 1158 (N.D. Cal. 2009) (same). Plaintiffs have already served the Arizona Attorney General the CCAC, which in any event was dismissed, and presumably they will timely serve the new complaint filed pursuant to this Opinion. No reason exists to deny leave to file an amended complaint that includes the AUSAA claim.

### 2.  California

The Proposed Complaint asserts two claims for violation of the Cartwright Act and California's Unfair Competition Law (the "UCL"), respectively, on behalf of the California Plaintiffs and a California putative class. California Business and Professions Code § 16720, *et seq*.; 1720, *et seq*. Defendants argue that the Proposed Complaint is deficient as to these claims because it "pleads no specific intrastate conduct within California."

This argument fails because it misstates the law. To state a valid Cartwright Act or UCL claim, a plaintiff must allege either (1) that the antitrust misconduct occurred within California

*or* (2) that the plaintiff suffered antitrust injury in California. *See RLH Indus., Inc. v. SBC Communications, Inc.,* 133 Cal. App. 4th 1277, 1281-82 (2005) (recognizing that the Cartwright Act is meant to protect against "anticompetitive conduct that causes injury in California"); *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 226 (1st Div. 1999) (holding that the UCL applies where anticompetitive conduct occurred in California or when the plaintiff was injured there); *see also McKinnon v. Dollar Thrifty Auto. Grp., Inc.*, No. 12 Civ. 4457, 2013 WL 791457, at *4 (N.D. Cal. Mar. 4, 2013) (stating that UCL claims are inadequate "where none of the alleged misconduct or injuries occurred in California"). Even the case cited by Defendants illustrates the point; *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005), states, "California's UCL does not support claims by non-California residents where none of the alleged misconduct *or injuries* occurred in California." 404 F. Supp. 2d at 1225 (emphasis added).

Here, the Proposed Complaint alleges that the California Plaintiffs were injured in California when they purchased overpriced FX instruments while in California. Accordingly, the Proposed Complaint's California claims are adequately pleaded.[6]

### 3. Florida

The Proposed Complaint pleads a cause of action under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Fl. Stat. § 501.201, *et seq*., on behalf of the Florida residents in the purported class. Defendants argue that the Proposed Complaint fails to state a claim under the FDUTPA because (1) Plaintiffs are not "consumers" within the meaning of the

---

[6] In this regard, Plaintiffs should limit the definition of the California Class to those who purchased an FX Instrument in California, and not include those who were merely domiciled there. *See In re TFT-LCD*, 2012 WL 3727221, at *3 ("for purposes of state law indirect purchaser claims, plaintiffs are deemed to be injured in the states where they agreed to pay inflated prices for products.").

statute and (2) the FDUTPA does not apply to federally regulated banks.  Neither argument

merits denial of leave to amend.

### a.  "Consumers"

Defendants argue that, for purposes of FDUTPA, "[c]onsumers are those who purchased

goods and services for personal, family or household use . . . ."  This argument misstates the law.

In 2003, the FDUTPA was amended to apply to a broader category than just consumers.  *See* Fla.

Stat. Ann. § 501.202 ("The provisions of this part shall be construed liberally . . . . To protect the

consuming public *and legitimate enterprises* from those who engage in unfair methods of

competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade

or commerce." (emphasis added)).  Furthermore, the FDUTPA defines the terms "consumer" and

"trade or commerce" as:

> "Consumer" means an individual; child, by and through its parent or legal guardian;
> business; firm; association; joint venture; partnership; estate; trust; business trust;
> syndicate; fiduciary; corporation; any commercial entity, however denominated; or any
> other group or combination.

> "Trade or commerce" means the advertising, soliciting, providing, offering, or
> distributing, whether by sale, rental, or otherwise, of any good or service, or any property,
> whether tangible or intangible, or any other article, commodity, or thing of value,
> wherever situated. "Trade or commerce" shall include the conduct of any trade or
> commerce, however denominated, including any nonprofit or not-for-profit person or
> activity.

Fla. Stat. Ann. § 501.203(7-8).  Given these broad definitions, Florida courts have clarified that

the FDUTPA "is not limited to contracts for 'personal, family or household purposes' as defined

in the Uniform Commercial Code."  *State v. Commerce Commercial Leasing, LLC*, 946 So. 2d

1253, 1258 (Fla. Dist. Ct. App. 2007).  Plaintiffs' purchase of FX instruments falls within these

definitions because Plaintiffs are individuals, businesses or associations; and Plaintiffs purchased

FX instruments, which are, at minimum, a "thing of value."  Fla. Stat. Ann. § 501.203(8).

In arguing to the contrary, Defendants cite two types of cases, neither of which is persuasive. First, Defendants cite cases involving claims brought by sellers -- rather than the buyers -- of goods and services, who do not qualify as "consumers" because they have not purchased anything. *See Burger King Corp. v. Ashland Equities, Inc.*, 161 F.Supp.2d 1331, 1338 (S.D. Fla. 2001) (holding that plaintiffs, who owned Burger King franchises and claimed that Burger King interfered with their attempt to sell those franchises, were not "consumers" under FDUTPA); *N.G.L. Travel Assoc. v. Celebrity Cruises, Inc.,* 764 So.2d 672, 674 (Fla. 3d DCA 2000) (holding that travel agencies that sold services to cruise lines, rather than purchasing services from them, were not "consumers" entitled to protection under FDUTPA). These cases are inapplicable because Plaintiffs are the buyers, rather than the sellers, of FX instruments.[7]

Second, Defendants cite cases that have defined the term "unfair trade practices" and held that "deceptive conduct" relating to securities is not covered by the FDUTPA, because (1) federal securities "laws provide plaintiffs with an appropriate civil remedy" and (2) the FDUTPA is modeled after the Federal Trade Commission Act, which does not apply to securities transactions. *Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1315-16 (N.D. Fla. 2003); *see also Minshall v. TD Evergreen*, No. 05 Civ. 1232, 2005 WL 8145046, at *1 (M.D. Fla. Aug. 4, 2005). These cases are inapplicable, first, because they do not shed light on the definition of "consumer." Also, although FX instruments are analogous to securities in some respects,

---

[7] Defendants cite other cases in which the plaintiff also had not purchased anything, but that are less applicable to the facts at hand. *See, e.g.*, *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1350 (S.D. Fla. 2009) (holding that a college student, whose photograph appeared in advertising on a pornographic website, was not a "consumer" who can sue under FDUTPA); *Cannova v. Breckenridge Pharm., Inc.*, No. 08 Civ. 81145, 2009 WL 64337, at *3 (S.D. Fla. Jan. 9, 2009) (dismissing an FDUTPA claim premised on wrongful termination of employment).

Plaintiffs do not have recourse under federal securities or antitrust laws. Defendants cite nothing to suggest that the Florida legislature meant to exempt the conduct in question from FDUTPA.

### b. Banking Exception

Leave to amend is denied with respect to three of the Defendants. The FDUTPA explicitly "does not apply to . . . . Banks, credit unions, and savings and loan associations regulated by federal agencies." Fla. Stat. Ann. § 501.212(4)(c); *see also Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 778 (Fla. 5th DCA 2007) ("FDUTPA does not apply to banks and savings and loan associations regulated by the state or the federal government."). Plaintiffs argue that this statutory exception to FDUTPA "only applies where the specific activities at issue were subject to federal banking laws." "A review of the governing case law reveals some ambiguity as to whether being regulated by a federal agency is sufficient in and of itself to exempt an entity under Fla. Stat. § 501.212(4)(c) or if, in addition to being federally regulated, the activity at issue must be subject to the federal regulatory authority." *Regions Bank v. Legal Outsource PA*, No. 214 Civ. 476, 2015 WL 7777516, at *5 (M.D. Fla. Dec. 3, 2015) (collecting cases that reached conflicting conclusions regarding whether the FDUTPA can ever apply to banks).

"The majority of Florida courts" have held that a federally regulated bank cannot be held liable under the FDUTPA, regardless of whether the anticompetitive activity at issue is itself federally regulated. *Id. See, e.g., Bankers Tr.*, 960 So. 2d at 779 ("the statute unambiguously excludes banks."); *see also Wing Kei Ho v. Bank of Am., N.A.*, No. 16 Civ. 80538, 2016 WL 8679174, at *4 (S.D. Fla. Sept. 19, 2016); *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1221 (S.D. Fla. 2015); *Sovereign Bonds Exch. LLC v. Fed. Republic of Germany*, 899 F. Supp. 2d 1304, 1315 (S.D. Fla. 2010).

This majority position is most likely to be found correct if considered by the Supreme Court of Florida. "When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning." *Bank of New York Mellon v. Glenville*, -- So.3d --, 2018 WL 4327881, at *5 (Fla. Sept. 6, 2018). Here, the FDUTPA exception is explicit; the FDUTPA cannot be applied to a "bank" "regulated by federal agencies" -- regardless of what activities are regulated. Fla. Stat. Ann. § 501.212(4)(c). Plaintiffs' additional argument that Defendant's FX activities are not "federally regulated" is unpersuasive in light of the Proposed Complaint's protracted discussion of the various federal entities that levied civil and criminal penalties against Defendants for the precise FX benchmark rigging at issue here, including, for example, the Commodity Futures Trading Commission and Federal Reserve.

The Parties dispute which Defendants are "banks" within the meaning of the exemption. Defendants fall into three categories: (1) three Defendants are federally chartered national associations (the "NAs"); (2) twenty-four Defendants are bank holding companies (the "BHCs") or their subsidiaries and (3) twenty-four Defendants are foreign banks, foreign banking organizations or subsidiaries thereof (the "Foreign Defendants").

All of the NAs are "banks" within the meaning of the FDUTPA, and Plaintiffs concede as much.[8] *See George v. Wells Fargo Bank*, N.A., No. 13 Civ. 80776, 2014 WL 61487, at *5 (S.D. Fla. Jan. 8, 2014) ("There can be no dispute that 'N.A.' stands for 'National Bank.' As a National Bank, Defendant is exempt from FDUTPA."). But ambiguity exists with respect to

---

[8] Only three NAs are left from the original four because Citibank, N.A., is no longer a party to the action.

what non-NA entities constitute "banks" for the purposes of the FDUTPA exemption. *See Brown v. Capital One Bank (USA), N.A.*, No. 15 Civ. 60590, 2015 WL 12712062, at *2 (S.D. Fla. June 19, 2015) (stating that "there is no express definition of 'bank' or 'federal agency' within the meaning of [FDUTPA]").[9]

In the absence of guidance from the Florida courts, *see Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011) ("To determine questions of state law, we look principally to the opinions of that state's courts."), this Opinion refers to the definition of "bank" from the "Taxation and Finance" portion of the Florida Annotated Statutes:

> The term "bank" means a bank holding company registered under the Bank Holding Company Act of 1956 of the United States, 12 U.S.C. ss. 1841-1849, as amended, or a bank or trust company incorporated and doing business under the laws of the United States (including laws relating to the District of Columbia), of any state, or of any territory, a substantial part of the business of which consists of receiving deposits and making loans and discounts or of exercising fiduciary powers similar to those permitted to national banks under authority of the Comptroller of the Currency and which is subject by law to supervision and examination by state, territorial, or federal authority having supervision over banking institutions. The term "bank" also includes any banking association, corporation, or other similar organization organized and operated under the laws of any foreign country, which banking association, corporation, or other organization is also operating in this state pursuant to chapter 663.

Fla. Stat. Ann. § 220.62.

---

[9] The BHCs and Foreign Defendants are not necessarily "banks." *See Bankers Tr. Co. v. Basciano*, 960 So. 2d 773, 779 (Fla. Dist. Ct. App. 2007) ("Nothing in FDUTPA suggests that bank subsidiaries, affiliates or agents are necessarily exempt from FDUTPA."); *see also State v. Commerce Commercial Leasing, LLC*, 946 So. 2d 1253, 1258 (Fla. Dist. Ct. App. 2007) ("It is quite a leap, however, to suggest that, just because an entity is a subsidiary of a bank, it is necessarily exempt from the Act."); *but see Sovereign Bonds Exch. LLC v. Fed. Republic of Germany*, 899 F. Supp. 2d 1304, 1316 (S.D. Fla. 2010) (holding that German Banks cannot be sued under the FDUTPA because they "are subject to federal regulation under the International Banking Act of 1978, the Foreign Bank Supervision Enhancement Act of 1991, and the Gramm-Leach-Bliley Act of 1999 . . . ."); *Caban v. J.P. Morgan Chase & Co.*, 606 F. Supp. 2d 1361, 1371 (S.D. Fla. 2009) (dismissing FDUTPA claims against J.P. Morgan Chase & Co., a BHC "because the statute does not apply to federally regulated banks such as Chase.").

In light of this definition, and lacking any other, leave to amend is granted with respect to both the BHCs and the Foreign Defendants. Accepting the facts pleaded in the Proposed Complaint, and drawing all inferences in Plaintiffs' favor, it is plausible that the BHCs do not qualify as banks under this definition because a "a substantial part of the[ir] business" does not consist of "receiving deposits and making loans and discounts or of exercising fiduciary powers similar to those permitted to national banks." *Id.* Likewise, it is plausible to infer that some of the Foreign Defendants will not qualify as banks because they do not operate in Florida "pursuant to chapter 663." *Id.* Determining which, if any, of the BHCs and Foreign Defendants qualify as banks will require discovery and need to be resolved at a later stage. *See Christie v. Bank of Am.*, N.A., No. 13 Civ. 1371, 2014 WL 5285987, at *4 (M.D. Fla. Oct. 15, 2014) (denying a motion to dismiss a FDUTPA claim because the issue of whether the defendant qualified as a "bank" was "better addressed on a more fully developed record"); *Renfrow v. First Mortg. Am., Inc.*, No. 08 Civ. 80233, 2011 WL 2416247, at *3 (S.D. Fla. June 13, 2011) (same). Leave to amend is therefore granted in substantial part with respect to the FDUTPA claim, except that the Proposed Complaint shall not include the NAs as defendants in the Florida cause of action.

### 4. Illinois

The Proposed Complaint asserts violations of the Illinois Antitrust Act ("IAA"), 740 Ill. Comp. Stat. 10/1, *et seq.*, on behalf of the Illinois Plaintiff and an Illinois putative class. Defendants argue that the Proposed Complaint fails to state a claim under the IAA because (1)

the IAA does not allow for class actions and (2) the IAA does not apply to banks.  Neither argument merits denial of leave to amend.

### a. Class Actions

The IAA states, "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae as provided in this subsection."  740 Ill. Comp. Stat. Ann. 10/7(2).  If, as Defendants argue, this provision is "substantive" under the doctrine of *Shady Grove*, 599 U.S. at 397-406, then it must be applied in federal court.  But if, as Plaintiffs argue, the provision is "procedural" under the doctrine of *Shady Grove*, 599 U.S. at 397-406, then only the dictates of Rule 23 would apply.  District courts have reached conflicting conclusions about whether indirect purchasers' class action claims raised under the IAA in federal court can proceed.  *Compare In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 728 (S.D.N.Y. 2017) (holding that the IAA provision is a "state procedural rule [that] does not control in federal court, where Rule 23 sets the only relevant requirements to file a class action."), *with In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011) (concluding, by following the analysis outlined in Justice Stevens's *Shady Grove* concurrence, that "[b]ecause the indirect purchaser restrictions of the IAA are 'intertwined' with the underlying substantive right, application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights, and therefore Illinois' restrictions on indirect purchaser actions must be applied in federal court.").

For two reasons, the IAA allows for class actions in federal court.  First, it is unnecessary to reach the *Shady Grove* question, because the statute, by its terms, does not apply in federal court; the statute states, "no person shall be authorized to maintain a class action *in any court of*

*this State* for indirect purchasers asserting claims under this Act." 740 Ill. Comp. Stat. Ann. 10/7(2). The proscription has no effect on indirect purchaser class claims brought outside of Illinois courts. *Id.*; *see also In re Aggrenox Antitrust Litig.*, No. 14 Md. 2516, 2016 WL 4204478, at *5 (D. Conn. Aug. 9, 2016) (holding that an IAA class action could proceed in federal court).

Second, even if it is necessary to reach the *Shady Grove* analysis, the statute is procedural, not substantive, and does not apply in federal court. In *Shady Grove*, the New York statute, which the Supreme Court held to be procedural, stated that "an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action." N.Y. C.P.L.R. 901*; see Shady Grove*, 559 U.S. at 397. If that New York statute, which foreclosed a wide range of potential class actions, did not "abridge, enlarge or modify any substantive right," then the IAA, which applies exclusively to antitrust class actions, must also be procedural. In short, although some courts have reached a conflicting conclusion by following the reasoning of one justice's concurrence, the holding of *Shady Grove,* which was approved by five justices, is controlling.

### b. Banking Exemption

Defendants next argue that they are exempt under the IAA's banking exemption, which states, "No provisions of this Act shall be construed to make illegal . . . . the activities of any state or national bank to the extent that such activities are regulated or supervised by officers of the state or federal government under the banking laws of this State or the United States." 740

Ill. Comp. Stat. Ann. 10/5(11).  It appears that no court has ever applied the IAA banking exemption as the parties have not cited any case, nor has the Court found one.

For purposes of interpreting the IAA's banking exemption, this Opinion uses the definition of "national bank" from the Illinois Banking Act ("IBA"), 205 Ill. Comp. Stat. Ann. 5/2, which is specifically referenced in the IAA exemption -- i.e., "the banking laws of this State."  740 Ill. Comp. Stat. Ann. 10/5(11).  Under the IBA, "'National bank' means . . . a national banking association without regard to its location."  205 Ill. Comp. Stat. Ann. 5/2.  "'State bank' means any banking corporation that has a banking charter issued by the [Banking] Commissioner [of Illinois] under this Act."  205 Ill. Comp. Stat. Ann. 5/2.

This reading of the IAA comports with the Illinois Bar Committee's 1967 comments to the IAA exemptions, which state, "It is assumed that all of the provisions of Section 5 will be strictly construed and narrowly applied."  740 Ill. Comp. Stat. Ann. 10/5.  Furthermore, unlike the FDUTPA, which exempts "banks," the IAA exempts "any state or national bank."  The modifiers "state or national" are presumed to carry significance and limit the definition of "bank."  *See, e.g.*, *Maimonides Med. Ctr. v. United States*, 809 F.3d 85, 89 (2d Cir. 2015) ("we must give effect to every word of a statute wherever possible.") (quotation marks omitted).  Leave to amend is denied with respect to the NAs, which clearly are within the definition of "national bank," but granted with respect to the BHCs and the Foreign Defendants.

### 5.  Massachusetts

Plaintiffs assert a claim under Chapter 9 of the Massachusetts Consumer Protection Act (the "MCPA"), Mass. Gen. Laws ch. 93A, §1 *et seq.*, on behalf of the Massachusetts Plaintiff and a putative Massachusetts class.  Defendants argue that Plaintiffs are not "consumers" entitled to bring a claim under Chapter 9 of the MCPA, because "trading in foreign currency instruments

is not a consumer-oriented activity."  In support of this argument, Defendants rely principally on *Axiom Inv. Advisors, LLC by & through Gildor Mgmt., LLC v. Deutsche Bank AG*, 234 F. Supp. 3d 526, 537 (S.D.N.Y. 2017), which held that trading on the FX spot market between Deutsche Bank and a large hedge fund was not "consumer oriented" for purposes of the New York's Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349, 350.  This argument fails for two reasons.

First, *Axiom*'s analysis under New York law does not shed light on the MCPA, which expressly contemplates that the purchase of investment instruments can be a consumer activity. In 1988, the Massachusetts legislature passed "An Act Providing Increased Protection for Consumers in Securities and Commodities Transactions," which amended the definition of "trade" and "commerce" in the MCPA to include the term "any security."  *See Barron v. Fid. Magellan Fund*, 57 Mass. App. Ct. 507, 513 (2003) (describing the evolution of consumer securities actions under the MCPA).  As a result of that amendment, the "definitions" chapter of MCPA states in broad terms:

> "Trade" and "commerce" shall include the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and *any property*, tangible or *intangible*, real, personal or mixed, *any security* . . . and any contract of sale of a *commodity for future delivery*, and any other article, commodity, *or thing of value wherever situate*, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

Mass. Gen. Laws Ann. ch. 93A, § 1(b) (emphasis added).  Beyond merely incorporating the MCPA's general definitions of "trade" and "commerce," Section 9 expressly contemplates that individual consumers can bring claims for anticompetitive conduct that negatively affects their investments.  *See* Mass. Gen. Laws Ann. ch. 93A, § 9(3) ("if the court finds any method, act or practice unlawful with regard to any security or any contract of sale of a commodity for future

delivery as defined in section two, and if the court finds for the petitioner, recovery shall be in the amount of actual damages.").

Accordingly, the purchase of FX instruments is not automatically outside of Chapter 9 of the MCPA simply because it is an investment. *See Barron v. Fid. Magellan Fund*, 57 Mass. App. Ct. 507 (2003) (holding that anticompetitive conduct affecting plaintiff's shares in a mutual fund fell within Chapter 9); *Bergeron v. Ridgewood Sec. Corp.*, 610 F. Supp. 2d 113, 147 (D. Mass. 2009) ("It is beyond question that chapter 93A applies to the sale of securities."). If Plaintiffs purchased investment instruments for their personal portfolios, then FX instruments are, at minimum, "a thing of value" within the ambit of Chapter 9.

Second, Defendants' reliance on *Axiom*, 234 F. Supp. 3d at 537, is misplaced, because the factual circumstances of that case are distinguishable from this case. *Axiom* held that FX trading in the spot market between Deutsche Bank and Axiom, a large hedge fund, was not "consumer oriented" within the meaning of New York's Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349, 350, because it did not have "a broader impact on consumers at large." *Id.* (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, (1995)). *Axiom* noted that "[t]ransactions between businesses or sophisticated parties that do not affect average consumers do not constitute consumer-oriented conduct." *Id.* (citations omitted). In contrast to *Axiom*, Plaintiffs here are not billion dollar hedge funds that trade directly with liquidity providers on the FX spot market. They are individuals who purchased FX instruments from a Retail Dealer. Plaintiffs use FX instruments "for a variety of purposes, including long and short-term investing, portfolio diversification, and to hedge their foreign investments against

risks of foreign currency fluctuations."  This small-scale purchasing of FX instruments in the retail market qualifies as a consumer activity.[10]

### 6.  North Carolina

The Proposed Complaint asserts a claim under the North Carolina Unfair Trade Practice Act (the "NCUTPA"), N.C. Gen. Stat. § 75-1, *et seq*., on behalf of the North Carolina Plaintiff and a putative North Carolina Class.  Defendants seek dismissal of the NCUTPA claim on the grounds that (1) application of the NCUTPA is precluded by the statute's regulatory scheme exception and (2) the Proposed Complaint does not plead a sufficient effect on North Carolina in state business.  Both arguments fail.

#### a.  Regulatory Scheme Exception

Defendants invoke the NCUTPA's regulatory scheme exception, which they assert "bars such claims when application of the statute would create unnecessary and overlapping supervision, enforcement, and liability in the face of existing state or federal laws and regulatory schemes.  A concurrent state regulatory scheme is not required, an overlapping federal scheme is sufficient . . . ."  This argument mischaracterizes the law.

An overlapping state or federal regulatory regime is not alone sufficient to preclude application of the NCUTPA.  *See Walker v. Fleetwood Homes of N. Carolina, Inc.*, 362 N.C. 63, 70 (2007) ("[A] violation of a regulatory statute which governs business activities 'may also be a

---

[10] Because the Proposed Complaint asserts a consumer claim under Chapter 9 of the MCPA, it is unnecessary to address whether the alleged misconduct occurred "primarily and substantially" in Massachusetts, as that test applies only to business claims under Chapter 11 of the MCPA.  *See* Mass. Gen. Laws Ann. ch. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth."); *see also Pare v. Northborough Capital Partners, LLC*, 89 F. Supp. 3d 192, 193 (D. Mass. 2015) ("Unlike actions under § 9, an action brought under § 11 must allege unfair practices that occur primarily and substantially within the Commonwealth.").

violation of N.C. Gen. Stat. § 75-1.1.'"). Absent a showing that the overlapping regulatory

regime provides plaintiffs an adequate remedy, courts have held NCUTPA to apply. *See Ellis v.*

*Smith-Broadhurst, Inc.*, 48 N.C. App. 180, 182 (1980) (holding that NCUTPA provides a cause

of action to plaintiff suing an insurance company where state statutes regulating insurance

companies did not provide for civil damage actions); *see also Ray v. United Family Life Ins. Co.*,

430 F. Supp. 1353, 1356 (W.D.N.C. 1977) (same). The cases cited by Defendants are

distinguishable because, in each of them, the plaintiff could bring a cause of action and seek

relief under a different statute. *See, e.g., Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162,

167 (4th Cir. 1985) (holding that NCUTPA did not apply where the plaintiff could recover under

North Carolina Securities Act, as well as the Securities Act of 1933 and the Securities Exchange

Act of 1934); *Hagy v. Advance Auto Parts, Inc.*, No. 15 Civ. 509, 2016 WL 5661530, at *2

(W.D.N.C. Sept. 28, 2016) (holding that NCUTPA did not apply where there was a private cause

of action available under the Medicare Secondary Payer Act, 42 U.S.C.A. § 1395y(b)); *Skinner*

*v. E.F. Hutton & Co.*, 314 N.C. 267, 275 (1985) (confirming *Linder*'s holding that the NCUTPA

does not apply to securities claims).[11]

### b. In State Effects

Defendants also argue that the proposed NCUTPA claim does not plead an adequate

effect on in state business. This argument fails because the Proposed Complaint alleges that the

Plaintiffs, who are North Carolina residents, were injured in North Carolina when they purchased

---

[11] Defendants also cite *Bache Halsey Stuart, Inc. v. Hunsucker*, 38 N.C. App. 414, 420 (1978),
which held that the NCUTPA could not be applied to claims for misconduct relating to futures
contracts because any state regulation of commodities brokers was pre-empted by the
Commodity Futures Trading Act. That case is inapplicable here, because the Sherman Act does
not preempt NCUTPA. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101(1989) ("the Court of
Appeals erred in holding that the state indirect purchaser statutes are pre-empted").

FX instruments at inflated prices while located in North Carolina.[12]  This in state injury is sufficient to state a claim under the NCUTPA.  *Compare In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1174 n. 16 (N.D. Cal. 2015) ("Here, GEHA has alleged in-state injury and that defendants' products were being sold in North Carolina.  That is sufficient at this juncture to state a claim under the NCUDTPA.") (internal citations omitted), *with Duke Energy Int'l, L.L.C. v. Napoli*, 748 F.Supp.2d 656, 677 (S.D. Tex. 2010) (dismissing NCUTPA where plaintiff failed to explain how it "experienced harm in North Carolina as a the result of the alleged wrongful conduct"); *In re Parmalat*, 383 F. Supp. 2d 587, 603 (S.D.N.Y.2005) (dismissing NCUTPA claim where plaintiff failed to allege any in state injury).

Both of the cases cited by Defendants illustrate that an injury that occurs in North Carolina is sufficient to sustain a NCUTPA claim.  *See Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 93 Civ. 301, 1994 WL 910955, at *2 (W.D.N.C. July 12, 1994) (dismissing an NCUTPA claim where "[i]t is not at all clear that Defendants injury occurred when it received the goods free on board in North Carolina."); *In Porters, S.A. v. Hanes Printables, Inc*., 663 F. Supp. 494, 501 (M.D.N.C. 1987) (holding that NCUTPA claims are not available "to a foreign plaintiff suing a resident defendant over alleged foreign injuries having a negligible effect, if any, on North Carolina trade or commerce.").  Leave to amend the NCUTPA claim is granted.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to amend is DENIED with respect to the Sherman Act claim.  Plaintiffs' motion for leave to amend is GRANTED with respect to all state

---

[12] Plaintiffs should consider whether the definition of the North Carolina putative class should be revised.

law claims, except to the extent that the Proposed Complaint raises claims against the NAs under Florida and Illinois law.

The Clerk of Court is respectfully directed to close the motion at Docket Nos. 103, 105 and 120.

Dated: October 25, 2018
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE