Ibfdconc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JAMES CONTANT, et al.,

            Plaintiffs,         New York, N.Y.

       v.              17 Civ. 3139(LGS)

BANK OF AMERICA CORPORATION,
et al.,

            Defendants.

------------------------------x

                       November 15, 2018
                       10:43 a.m.

Before:

             HON. LORNA G. SCHOFIELD,

                      District Judge

               APPEARANCES

BERGER MONTAGUE PC
    Attorneys for Plaintiffs
BY:  MICHAEL C. DELL'ANGELO
        - and -
McCULLEY McCLUER PLLC
BY:  R. BRYANT McCULLEY

SHEARMAN & STERLING LLP (NY)
    Attorneys for Defendants Bank of America Corporation
    Bank of America, N.A. and
    Merrill Lynch, Pierce, Fenner & Smith Inc.
BY:  RICHARD FRANKLIN SCHWED

PAUL WEISS (NY)
    Attorneys for Defendant The Bank of Tokyo
    Mitsubishi UFJ Ltd.
BY:  ANAND SITHIAN

Ibfdconc

APPEARANCES CONTINUED

SULLIVAN & CROMWELL, LLP
     Attorneys for Defendants Barclays Bank PLC
     and Barclays Capital Inc.
BY:  MATTHEW ALEXANDER SCHWARTZ

ALLEN & OVERY, LLP
     Attorneys for Defendants BNP Paribas Group, et al.
BY:  ANDREW RHYS DAVIES
     REBECCA ROSE DELFINER

COVINGTON & BURLING, L.L.P.
     Attorneys for Defendants Citigroup Inc., et al.
BY:  ANDREW ARTHUR RUFFINO

CAHILL GORDON & REINDEL LLP
     Attorneys for Defendants Credit Suisse Group AG,
     Credit Suisse AG, Credit Suisse Securities (USA) LLC
BY:  HERBERT SCOTT WASHER

KING & SPALDING LLP (DC)
     Attorneys for Defendants Deutsche Bank AG,
     Deutsche Bank Securities Inc.
BY:  GEORGE PATRICK MONTGOMERY

CLEARY GOTTLIEB
     Attorneys for Defendants
     The Goldman Sachs Group, Inc., et al.
BY:  ROBERT LAWNER

LOCKE LORD LLP
     Attorneys for Defendants HSBC HOLDINGS PLC, et al.
BY:  JAMES MATTHEW GOODIN

SKADDEN, ARPS
     Attorneys for Defendants JPMorgan Chase & Co., et al.
BY:  BORIS BERSHTEYN

WACHTELL, LIPTON, ROSEN & KATZ
     Attorneys for Defendants Morgan Stanley, et al.
BY:  JONATHAN M. MOSES

MOORE & VAN ALLEN, PLLC
     Attorneys for Defendants RBC Capital Markets LLC, et al.
BY:  JAMES P. McLOUGHLIN, JR.

Ibfdconc

1                       APPEARANCES CONTINUED

2   DAVIS POLK & WARDWELL LLP (NYC)
          Attorneys for Defendants Royal Bank of Scotland
3         Group PLC, et al.
    BY:   PAUL STEEL MISHKIN
4
    LINKLATERS, LLP
5         Attorneys for Defendant Societe Generale S.A.
    BY:   PATRICK COBY ASHBY
6
    SIDLEY AUSTIN LLP (NY)
7         Attorneys for Defendant Standard Chartered Bank
    BY:   NICHOLAS PRIMER CROWELL
8
    GIBSON, DUNN & CRUTCHER, LLP
9         Attorneys for Defendants UBS AG, et al.
    BY:   ERIC JONATHAN STOCK
10

11                              oOo

12          THE COURT:  You may be seated.

13          (Speakerphone connection established)

14          THE CLERK:  Hi, counsel on the phone, are you there?

15   Hello?

16          (Pause)

17          Hello.  Can you hear me now, counsel on the phone?

18          SPEAKERPHONE VOICE:  Yes, we can hear you.  Thank you.

19          THE CLERK:  OK.  Great.

20          So we are here in the matter of 17 Civil 3139, and

21   we're here before the Honorable Lorna G. Schofield.

22          Counsel, your appearances are stated on the record.

23          THE COURT:  OK.  Good morning.  We're here really on

24   two separate matters.  One is the preliminary approval hearing

25   for the proposed settlement between plaintiffs and the Citi

Ibfdconc

1    defendants, and the other is an initial Rule 16 conference.  I

2    would like to take the preliminary approval issue first, but

3    everybody can just stay where they are.

4            And through Mr. Ruffino --

5            MR. RUFFINO:  I am counsel for Citibank.

6            THE COURT:  So I will focus on this triangle for the

7    first part of our conference.

8            So I have reviewed the motion papers.  Let me hear

9    from the plaintiffs.

10           MR. DELL'ANGELO:  Good morning, your Honor.

11           THE COURT:  Good morning.  Could you speak into the

12   mic?

13           MR. DELL'ANGELO:  Yes.

14           Good morning, your Honor.  Michael Dell'Angelo, from

15   the law firm of Berger Montague, on behalf of the plaintiffs.

16           We're pleased to present to you today a motion for

17   preliminary approval of a settlement between the plaintiffs and

18   the Citi defendants.  As we've outlined in our papers at docket

19   155, we believe that the settlement is fair, reasonable and

20   adequate and satisfies both the Grinnell factors and the Rule

21   23 factors.

22           A brief overview for your Honor is that the settlement

23   was reached while the initial motion to dismiss in this case

24   was pending.  There was considerable uncertainty about the

25   direction of the case.  After very extensive negotiations with

Ibfdconc

Citi, the parties reached a settlement that provides for a
$9.95 million cash payment for the class from which up to
$100,000 can be used for notice and identification of class
members as part of the development of a plan of allocation,
which is part of the settlement.

At the preliminary approval stage, we've requested to
follow the work that we believe needs to be done to identify
class members and develop a plan of allocation, which is
consistent with what the Court did in the FOREX case and some
other courts in this district have done when there are multiple
parties and settlements are staggered.

An important element of this settlement is that it
also provides for significant cooperation from Citi, including
the production of certain documents that Citi produced in the
FOREX case as well as transactional data, an attorney proffer,
and other cooperation in addition to a process where the
parties would meet and confer about the production of
transactional data to plaintiffs from Citi Pulse, which is a
retail broker that Citi operated.

THE COURT:  And how is the identification of the
retail dealers being handled?

MR. DELL'ANGELO:  So that actually leads into, your
Honor --

THE COURT:  Let's not go into that.  Let's just talk
about what the arrangement is between you and Citi.

Ibfdconc

1          MR. DELL'ANGELO:  OK.  So as I understand the terms

2     and as part of the discussion that we'll have with Citi, but

3     the first component is that Citi will be providing us with

4     transactional data, and that transactional data --

5          THE COURT:  What transactional data?

6          MR. DELL'ANGELO:  The transactional -- the

7     transactions that Citi engaged in with what for purposes of

8     kind of discussion in this case we would call the eligible

9     settlement class members in FOREX.  And as we've laid out in

10    the preliminary approval papers as well as the motion for leave

11    to amend the papers that you decided recently, that there is

12    this flow essentially from the defendant banks to the eligible

13    settlement class members to the plaintiffs in this case.

14    Those, quote, eligible settlement class members include retail

15    brokers.  That is the primary corpus of entities with whom our

16    plaintiffs would have transacted.  So the transactional data

17    that Citi would be providing to the plaintiffs in this case as

18    part of the settlement would include identification of the

19    retail brokers so that we can then kind of match who the

20    plaintiffs would have transacted with --

21         THE COURT:  And how do you identify who those

22    plaintiffs are?

23         MR. DELL'ANGELO:  So the way we structured the class

24    definition is that to be within the scope of the class in our

25    case, you needed -- it is limited to eight states that we have

Ibfdconc

1    specified in the complaint and the papers, and the individuals

2    in those states needed to have transacted with essentially, for

3    simplification of this discussion, a retail broker --

4            THE COURT:  How do you find them?  How do you know who

5    that is?

6            MR. DELL'ANGELO:  Who those individuals are?  So the

7    retail brokers, the easiest way --

8            MR. SCHWARTZ:  Your Honor, I am having a very hard

9    time understanding what he is saying.

10           THE COURT:  OK.  If you could just pull the mic very

11   close, stand it straight up, and pull it right up to the edge

12   of the table so it is under your chin.

13           MR. DELL'ANGELO:  OK.  If I may come around, your

14   Honor, I think it is stuck on the monitors.

15           THE COURT:  OK.

16           MR. DELL'ANGELO:  Thank you.

17           THE COURT:  You can also use the podium, if you

18   prefer, but the mic is just the same.

19           MR. DELL'ANGELO:  This is fine for now.  If it doesn't

20   work, I will move to the podium.

21           THE COURT:  OK.  Is that better.

22           MR. SCHWARTZ:  Yes, it is, your Honor.

23           MR. DELL'ANGELO:  OK.  Thank you.

24           So as we understand it, the transactional data that

25   the retail broker has would identify the individual or entity

Ibfdconc

1      that transacted with the retail broker.  And, you know, there

2      is --

3                  THE COURT:  So the idea is to get the names of the

4      retail brokers who are essentially the class members in FOREX

5      and then to do third-party discovery and get from them -- or

6      some informal discovery -- in any event, get from them in some

7      fashion who they transacted with during the class period?

8                  MR. DELL'ANGELO:  Yes, your Honor, and that's

9      certainly one way to do it.  Another -- by analogy, another way

10     that it could be done is in the securities context, when you

11     have a 10b-5 case under the PSLRA, for example, typically

12     because the individuals or entities who transact in a

13     particular stock, say for purposes of this discussion, will do

14     so in what's called street name, and then so instead of getting

15     the names of every individual that transacted in a particular

16     security, what courts typically do is require the notice to be

17     sent to the broker and the broker then sends the notice to the

18     individuals with whom it was transacting in street name, that

19     is, their customers.  It is another way to approach it.  I

20     think there are a couple of options that we have and that we

21     can kind of when we get to the --

22                 THE COURT:  That is for a later day.

23                 MR. DELL'ANGELO:  When we get to the due process

24     issues, I think we can do a lot of --

25                 THE COURT:  So do you have any idea how many class

Ibfdconc

1    members there are?

2             MR. DELL'ANGELO:  So we have some very rough

3    estimates, but I think at this stage it is difficult to

4    identify with precision the number of class members.  It's

5    certainly -- at the very low end, it's in the thousands, but we

6    think it is really more like in the tens or perhaps approaching

7    the hundred-thousand mark.  What we know is if, for example, we

8    just look at the CFTC data, we can get a pretty clear picture

9    of the amount of FX funds that were being held by retail

10   brokers on behalf of retail customers, and we can also have

11   gathered some data from those retail brokers about the number

12   of accounts that they have, for example.  Now, one individual

13   might have multiple accounts but each account in theory would

14   have a claim.  So it certainly put us into what we think are

15   the tens of thousands, but that's as precise as we have been

16   able to get at this stage.

17            THE COURT:  And do you have any idea what the

18   potential exposure is of the defendants with respect to those

19   tens of thousands or hundreds of thousands?

20            MR. DELL'ANGELO:  You mean the total potential

21   liability of the case, your Honor?

22            So the way we approach that question, understanding

23   the backdrop of the time in which we've reached this settlement

24   was in the very early days, and so what we were really

25   constructing was what we viewed as an ice-breaker settlement,

Ibfdconc

1    is we did some research and dealt with some experts trying to

2    understand the scope of the various markets that may fall

3    within the class definition.  And it is certainly a subset of

4    the FOREX case, and I think it is a relatively small subset.

5            THE COURT:  Why do you think that?

6            MR. DELL'ANGELO:  Well, because the -- based on there

7    is data from a variety of sources that gives some insight into

8    the scope of retail FX transactions relative to the total

9    universe of FX transactions, and so we looked at that data to

10   get a sense of what the relative size of the two is.  But then

11   this case is a little unique in that the plaintiffs haled from

12   eight of the 50 states in the United States.  Some of them,

13   like California, Illinois, Florida, California are very

14   populous states.

15           THE COURT:  And the settlement is limited to those

16   states.

17           MR. DELL'ANGELO:  That is correct, your Honor.

18           THE COURT:  OK.

19           MR. DELL'ANGELO:  So the settlement classes with Citi

20   tracked the settlement classes alleged in the complaint, so it

21   is not nationwide.  So --

22           THE COURT:  But when you struck this deal on the

23   number, you didn't know how many states would be potentially in

24   play?

25           MR. DELL'ANGELO:  I think we did, your Honor, because

Ibfdconc

1    the complaint only alleged classes on behalf of those eight

2    states.  So we knew --

3              THE COURT:  At most it would be eight.

4              MR. DELL'ANGELO:  That is correct.  And the

5    discussions that we had with Citi, as we've indicated in the

6    papers, took place over a considerable amount of time.  And

7    there was a vigorous exchange about, you know, for example, we

8    looked at a variety of ways, you know, what percentage of the

9    U.S. population may be represented by, you know, the residents

10   of those states relative to, you know, other ways of looking at

11   that.

12             THE COURT:  So let me just share my thinking with you.

13             MR. DELL'ANGELO:  Sure.

14             THE COURT:  Everything that you have said in the last,

15   I don't know, ten minutes, five minutes, is critical to my

16   consideration of whether the settlement is fair, reasonable and

17   adequate.  In your papers, you didn't say any of that.  So

18   reading your papers, and even to some extent listening to you

19   now, I have no idea whether this is fair, reasonable and

20   adequate, and so I can't preliminarily approve a settlement

21   without having some of that information.

22             And so that means I need to have at least a sense of

23   the size of the universe of these transactions and what they're

24   worth.  So, I'm going to deny your motion without prejudice and

25   let you proceed however you would like to figure out what you

Ibfdconc

1    need to figure out and you may present it in a -- you can

2    simply renew your motion, if you intend to do that at some

3    point, and file a supplement, and I'm happy to consider it in

4    that way, and you should, I guess, file a new notice of motion

5    just so it appears as a new motion.

6              MR. DELL'ANGELO:  Sure.

7              THE COURT:  And we'll go from there.

8              MR. DELL'ANGELO:  OK.

9              THE COURT:  OK.

10             MR. DELL'ANGELO:  Thank you, your Honor.

11             THE COURT:  Thank you.  All right.

12             So, let's talk now about the case management of the

13    remainder of the case.  And I have your submissions, and I

14    appreciate your trying to present in a clear way what the

15    issues are, what the positions of the plaintiffs and defendants

16    are on the issues.  Even though this is all logistical and

17    planning, there are many, many, many issues and it felt a

18    little bit like Where's Waldo and I was trying to figure it all

19    out.  So what I propose to do is let's walk through the

20    proposed case management plan.  I will address the issues that

21    seem to arise obviously there, and then if there are additional

22    issues, you can bring them to my attention.

23             So it seems to me that the first questions arises on

24    page 2 at the bottom, fact discovery deadline.  And it seems

25    everyone agrees that it shall be completed by a date to be

Ibfdconc

agreed to, but there is no date agreed to.  So I think we need

a control date.  I understand it's difficult at this point to

really have much of a good sense of how long it will take, but

I think we need a control date and we need to try to aim for

that control date.

          So, I would like to set that as May 2nd, which is, of

course, much longer than I normally contemplate.  I know there

are a couple of -- well, more than a couple of wrinkles here

with the DOJ stay, also with the fact that some discovery that

is relevant has already taken place in the other case and that

it is voluminous, but I will set May 2nd as the date.

          So that brings us to the production of documents.  And

as I understand it, the first question is -- and now I'm on

page 3 -- with respect to the documents that everyone agrees

are to be produced, which is I think principally the relevant

FOREX documents, as I understand it, the plaintiffs' position

is that this information would be producible within 30 days

from the entry of a protective order.  Is that right?

          MR. DELL'ANGELO:  That is correct, your Honor.

          I would just note that in the agreement that we have

with Citi, they were able to -- they agreed to do it within 15

days of the entry of a protective order.  Just for your

benefit, I would also note that on Tuesday of this week, we --

the plaintiffs prepared a form of protective order that is

substantially in the form of the protective order that you

Ibfdconc

1   entered in FOREX and circulated that to both Citi and all the

2   nonsettling defendants.

3            THE COURT:  Have you heard back from them?

4            MR. DELL'ANGELO:  We have not.

5            THE COURT:  OK.  As I understand it, the defendants

6   would like it to be the later of that date or January 11th as

7   an outside date.  Is that right?

8            MR. SCHWARTZ:  That is corrects, your Honor.  You

9   know, given the numerous banks that are involved here and, of

10  course, the holidays that are coming up, for some of the banks

11  I think January 11th is a much more realistic timeline for

12  those of us who produce within 30 days.  We will obviously

13  endeavor to do that.

14            I would note there is a slight disagreement for us.

15  We would like to follow the NYPL precedent that your Honor set

16  out where the defendants that are not moving to dismiss under

17  Rule 12 will make the production and the defendants that are

18  moving to dismiss under Rule 12 will hold off until your Honor

19  rules on that motion.  My understanding is that just based off

20  of the structure of the various bank groups that are named in

21  the complaint, that means that there will be a production of

22  documents I think from the majority of the defendants and even

23  from some of the bank group defendants where perhaps a parent

24  entity is moving to dismiss for lack of personal jurisdiction.

25            THE COURT:  OK.  And what is the plaintiffs' position

Ibfdconc

1  on this last issue, the distinction between the moving

2  defendants and the nonmoving defendants?

3       MR. DELL'ANGELO:  So as a practical matter, if the

4  preliminary -- or if the protective order is entered, it seems

5  to us, particularly now that the Court has set at least an

6  initial discovery deadline of May, which is relatively short

7  given the volume of documents and work to be done in this case,

8  that the sooner we could get the materials and start working

9  through them, the better that would be in part because there is

10  this issue, which I'm sure the Court will get to, about our

11  participation at depositions and the need to get up to speed to

12  do that effectively.

13       And I would also just note, your Honor, that I think

14  where we came out on that, even though Citibank has indicated

15  that they could do it in 15 days, I think part of what that

16  30-day deadline was driven by was when the amended complaint

17  was filed and the process for answering or filing a motion to

18  dismiss.  So the absence of one would trigger the fact that the

19  a defendant would be answering.

20       But from our perspective, if the protective order is

21  entered, which seems to me it should be relatively easy to do

22  with the Court's approval, that the defendants who intend to

23  file a Rule 12 motion should produce them nevertheless, because

24  even if they are out of the case, I think there is a process

25  where at least with respect to some them we would be pursuing

Ibfdconc

```
 1     those documents in any event.

 2             THE COURT:  OK.  So it's hard to take first things

 3     first because everything seems to be related.  It sounds like

 4     chronologically the first thing that needs to happen is the

 5     proposed protective order, and plaintiffs have proposed the

 6     22nd, which is Thanksgiving.  So let's not use that as the

 7     date, but I would like the parties to submit to me a proposed

 8     protective order that you all agreed to by let's say the 29th,

 9     so that's two weeks from today.

10             And then in terms of the initial production, what I

11     would like to do is have -- well, so --

12             MR. SCHWARTZ:  Your Honor, if it helps?  If the Court

13     very quickly enters the protective order, that's probably

14     either very late November or early December.  Within 30 days

15     would then put us smack between Christmas and New Year's, which

16     is one of the reasons that we asked for January 11th.  We think

17     it is just a little bit of breathing room throughout the

18     holidays, especially with our clients who are outside of the

19     United States.

20             THE COURT:  OK.  So what I will do is I will use the

21     January 11th date, but I would like to ask for rolling

22     production so that to the extent you can produce earlier or

23     produce in part earlier, I would ask you to do that.

24             So I guess that leaves only the question of the

25     defendants who would be moving to dismiss.  And do we know who
```

Ibfdconc

1    plans on moving to dismiss?

2         MR. SCHWARTZ:  Your Honor, certain of the defendants

3    with non-U.S. parent companies are intending to move to dismiss

4    under Rule 12(b)(2) for lack of personal jurisdiction.  I am

5    not positive exactly which of the defendants, but it will be

6    more than one defendant that does that.  Currently, I am not

7    aware of any defendant that plans to file a Rule 12(b)(6)

8    motion, but I understand that some people may still be

9    considering whether or not to do that.

10        THE COURT:  OK.  So with respect to Rule 12(b)(2)

11   motions, I would like to encourage the parties to talk to the

12   plaintiffs and I would -- I've written a lot about personal

13   jurisdiction in this case over foreign entities, so there is a

14   lot of precedent there and I'm inclined to follow it.  So if

15   you would please consider the arguments that these parties are

16   making in light of my prior rulings and act accordingly, it

17   will save us all a lot of hopefully unnecessary motion

18   practice.

19        MR. DELL'ANGELO:  I appreciate that, your Honor.  And

20   in crafting the proposed amended complaint that was attached to

21   our motion for leave, which you granted, we did take that into

22   consideration, but with the understanding with your comments

23   here today, we will go back and take another look at that and I

24   would be happy to engage with any of the defendants.

25        THE COURT:  Well, my procedure calls for an exchange

Ibfdconc

1    of premotion letters.  So as soon as we get the amended

2    complaint filed, then there will be an exchange of letters.

3    You will be on notice what the arguments are, and that should

4    facilitate a discussion.

5              MR. DELL'ANGELO:  OK.

6              MR. SCHWARTZ:  Thank you, your Honor.

7              THE COURT:  OK.  So that leaves us with a question of

8    whether the moving defendants should have to produce at least

9    the initial production of FOREX material.  And I guess it

10   doesn't make -- I don't know whether those defendants, for

11   example, you know, foreign parents have documents from FOREX

12   that would be producible.

13             MR. SCHWARTZ:  So, your Honor, what we did in the NYPL

14   case, if I recall correctly -- if I don't, I apologize -- but

15   your Honor said you are not inclined to order discovery from

16   parties that are moving to dismiss for lack of personal

17   jurisdiction.

18             THE COURT:  And that would be my inclination here as

19   well.  I don't normally stay discovery for motions to dismiss.

20   On the other hand, if there is a jurisdictional question -- I

21   also wonder how much of those particular entities produced in

22   FOREX anyway.

23             MR. SCHWARTZ:  So, your Honor, I think that is the

24   relevant question here.  Even in the NYPL case, just based off

25   of the productions that were made, for example, we did Barclays

Ibfdconc

1   as a bank group.  Even though the parent company moved to

2   dismiss for lack of personal jurisdiction, there was still

3   production of the FOREX documents from the Barclays entity that

4   did not move to dismiss for lack of personal jurisdiction.  And

5   so in that case the NYPL plaintiffs got effectively the entire

6   FOREX production from Barclays.

7            I can't say that that is going to be the case for each

8   of the defendants in this particular matter.  Some of the

9   defendants were, you know, not named in NYPL, for example.

10  Some of the defendants in the FOREX case made much smaller

11  productions that may have come from the parent company.  My

12  understanding is that there will still be millions of documents

13  produced, and they will get the bulk of the productions from

14  the bank groups.  But I just don't have the roster of exactly

15  which bank entity is going to be producing exactly what for

16  this in part because I don't think every entity has decided

17  whether or not to join in the motion.

18           THE COURT:  So what I will put in the scheduling

19  order, then, is that defendants who are bringing 12(b)(2)

20  motions will be excused from this production at least until a

21  decision on the motion.  Any defendant who brings a 12(b)(6)

22  motion -- and after the opinion that I wrote on leave to amend,

23  I certainly hope that there aren't any such motions, but to the

24  extent there are, I'm not staying discovery for 12(b)(6)

25  motions.

Ibfdconc

1          MR. SCHWARTZ:  Understood.

2          THE COURT:  OK.  All right.

3          So, actually, why don't you all tell me what the next

4   issue is, then.

5          MR. DELL'ANGELO:  Well, I think one of the key

6   issues -- I think there is a lot of agreement here, your Honor.

7   I think one of the key issues from our perspective of

8   disagreement is about the timing in which the parties can

9   undertake their party discovery.  So as understand it, the

10   defendants' position is that they should be allowed to proceed

11   with discovery essentially -- that is, serve discovery requests

12   within 14 days of the entry of the protective order.  But the

13   plaintiffs may receive two categories of documents that the

14   defendants have agreed to produce, which are the FOREX

15   documents and certain transactional data which the parties

16   would meet and confer about.  We couldn't reach an agreement

17   about the timing of the production of the data, so that's one

18   issue.  But I think --

19          THE COURT:  You need to talk about that, though.  I'm

20   not in a position to be very helpful.

21          MR. DELL'ANGELO:  That is correct, and I'm really just

22   framing that.  It's not really an area of disagreement.  So in

23   an effort to reach as much consensus --

24          THE COURT:  Let me just interrupt for a minute.

25          MR. DELL'ANGELO:  Yes.

Ibfdconc

1          THE COURT:  I don't understand why we should wait or

2     impose any deadline before which a request for documents can be

3     served.  I mean, it will take you some time to figure out what

4     you want to ask for.  Perhaps you've figured it out already.

5     The sooner you get the request out there, the better.  Nobody

6     thinks that they're going to be able to produce everything

7     within 30 days anyway.  You will have a discussion and

8     negotiation.  So I don't see why I should set some arbitrary

9     time before which you can't file or send a request for

10    documents.

11         MR. DELL'ANGELO:  I generally share that view, your

12    Honor.  I think the issue from our perspective is the structure

13    that the defendants wanted to create was to make, in our view,

14    discovery both a sword and a shield.  So their proposal, as I

15    understand it, was the plaintiffs can have the nontransactional

16    documents from FOREX.  We'll agree to produce transactional

17    data but we'll meet and confer, no commitment on time.  To the

18    extent plaintiffs would like to serve document requests to get

19    any additional discovery, we first have to review all 1.3

20    million documents --

21         THE COURT:  OK.  I don't agree with that.

22         MR. DELL'ANGELO:  That was really --

23         THE COURT:  But I will hear from the defendants.

24         MR. SCHWARTZ:  Your Honor, I guess we have heard your

25    view on that.  One of the major issues for us is getting the

Ibfdconc

1   information about who these supposed retail FX dealers are.

2           THE COURT:  Well, you think you are getting it from

3   them but they don't have it, so.

4           MR. SCHWARTZ:  Which is a problem if they want to

5   propose a class action.  They certainly have the information as

6   to who their named plaintiffs transacted with, or I hope they

7   do.  They fired a purported expert.  They claim in their

8   complaint to understand how this market works.  They should

9   have the information about who these retail FX dealers are.

10  What they've asked for from us in terms of the data is for us,

11  first of all, to identify who the class members in the FOREX

12  case are.  We can't really do that, your Honor.  That's

13  something that the plaintiffs' counsel in the FOREX case would

14  know, because the way they've determined who those class

15  members are is taking data from us and then taking data from

16  the FOREX class members themselves and figuring it out.  And

17  they weeded out a lot of entities and they probably included

18  some entities that weren't necessarily readily available from

19  the data.

20          So, first, we don't know that.  And then, second of

21  all, then they wanted it to be incumbent upon us to identify

22  who the retail FX dealers are within that.  I mean, normally

23  that would be something that the plaintiffs should do, and from

24  our perspective, we know that your Honor obviously took as true

25  the allegations in the complaint.  We don't think the retail FX

Ibfdconc

1    dealer market works remotely in the way they have describe it.

2    And so from our perspective the real key discovery in this

3    case, both for class certification opposition and for a summary

4    judgment motion, is to get third-party discovery from these

5    purported dealers so we can demonstrate to your Honor that in

6    fact the facts as alleged in the complaint aren't correct.

7         So for us, we at a minimum should be getting from them

8    the names, which they've agreed to do, of the FX dealers with

9    whom the named plaintiffs transacted, but, really, you know,

10   they are the ones who, based on their complaint and based on

11   their experts, should be identifying who these dealers are, and

12   if they do that for us, then we can isolate the data that we --

13        THE COURT:  So let me ask a different question.  I

14   understand your point, but they have raised at least what on

15   the face of the complaint looks like a colorable claim and it

16   looks like a colorable class claim.  Whether it is or not, I

17   have no idea.  But given that, it seems to me that both sides

18   have an obligation to produce documents relevant to the claims

19   and defenses here, but that is limited, of course, by the

20   proportionality rule and just common sense about how do we go

21   about this efficiently.

22        And I understand your point that simply identifying

23   everybody who you viewed as -- and I mean "you" as the

24   defendants broadly -- viewed as potential settlement class

25   members in FOREX, without knowing exactly where it ended up, is

Ibfdconc

overbroad for two reasons.  One is you don't know what the

actual universe is, and, two, it is more than just the retail

brokers.

So the question is -- you will know this better than

I -- what is the most sensible way collaboratively to figure

that out, because I believe both sides have discovery

obligations?

MR. SCHWARTZ:  So, your Honor, what I would suggest is

that the plaintiffs, based on their knowledge of the market,

based on their consultation with the experts, based on the work

that they're going to do in order to give your Honor a sense of

the market and the participants in the market for purposes of

the preliminary approval of the Citi settlement, identify for

the defendants who they believe these retail FX dealers are,

and once they do that, the defendants can then produce the spot

data that is relevant to those particular transactions.

THE COURT:  But they don't know.

MR. DELL'ANGELO:  May I --

THE COURT:  Maybe I'm wrong.  Maybe they do.  Let's

hear from them.

MR. DELL'ANGELO:  May I interject?  Because I think I

can help facilitate this a little bit.

THE COURT:  OK.

MR. DELL'ANGELO:  I think there may be either a

misunderstanding or a presentation of some of the joint

Ibfdconc

1   portions of the letter that are not consistent with at least

2   our understanding of the language.  So looking at docket 170 on

3   page 1, the first paragraph is a joint statement.  The last few

4   lines of that joint statement --

5           THE COURT:  Wait.  170 is the letter?

6           MR. DELL'ANGELO:  Yes, it is, your Honor.

7           THE COURT:  OK.  Go ahead.

8           MR. DELL'ANGELO:  I am looking at the first page, the

9   first paragraph identified as "Joint Statement."

10          THE COURT:  Yes.

11          MR. DELL'ANGELO:  And at the very -- just because it

12  is a very long sentence, what it essentially says, if you look

13  at the last line, is that defendants will produce transactional

14  data from entities identified by plaintiffs as retail foreign

15  exchange dealers.  So I think the notion that we have no idea

16  of who they are or that we have not agreed to identify those

17  whom we know to be retail foreign exchange dealers is not

18  correct.  And I think that's the scope of the agreement, and it

19  is in part how we got there because initially what we had said

20  is please tell us who the settlement class members are.  We

21  understand from defendants why that is not a feasible request

22  so we crafted this solution.  We have a way of identifying what

23  we think constitutes at least most of the universe of those

24  retail FX dealers --

25          THE COURT:  So you know who comprises most of the

Ibfdconc

 1   universe?

 2           MR. DELL'ANGELO:  We do believe that we do, your

 3   Honor.

 4           And so I think that we already have an agreement with

 5   the defendants on that point, but we will identify --

 6           THE COURT:  So what are we arguing about?

 7           MR. DELL'ANGELO:  I don't know your Honor, to be quite

 8   frank.

 9           THE COURT:  Maybe nothing.

10           MR. DELL'ANGELO:  I think there is one small area of

11   disagreement, which is -- just to give a little context, we had

12   initially, as I indicated, asked the defendants to identify the

13   settlement class members in FOREX.  They explained to us why

14   that wasn't feasible.  What we then suggested is if they were

15   to identify the eligible settlement class members, which would

16   just be the universe of entities with whom the defendant

17   transacted in FX during the class period in our case, which --

18           THE COURT:  Is there any way for you to just ask the

19   folks in FOREX who they are?

20           MR. DELL'ANGELO:  We could, but I would expect that

21   the defendants would more readily know who they are, but we can

22   certainly ask the people in FOREX.  What we felt we could do,

23   your Honor, was take the universe of retail FX brokers that we

24   know and then take the eligible settlement class members in FX

25   and compare those two lists and just make sure that we're not

Ibfdconc

1   missing any so that we don't -- both sides don't end up with

2   issues where there is an entity that they're interested in

3   getting discovery on and we've sort of completed what we need

4   to do --

5           THE COURT:  Why don't we take this one step at a time.

6           MR. DELL'ANGELO:  Sure.

7           THE COURT:  You have a big part of this universe.

8   Let's work with that.

9           MR. DELL'ANGELO:  OK.

10          THE COURT:  Talk to the plaintiffs' counsel in FOREX.

11  See if you can reach some understanding about that.  And if

12  there are still issues or cleanup work to be done after that,

13  you can talk to each other.  If you can't reach agreement, then

14  you can come back to me.

15          MR. DELL'ANGELO:  OK.

16          THE COURT:  OK?

17          MR. DELL'ANGELO:  Yes.  Thank you, your Honor.

18          MR. SCHWARTZ:  Thank you, your Honor.

19          THE COURT:  OK.  So, does that take care of the

20  basically document production issue?

21          MR. SCHWARTZ:  I think in general it does, your Honor.

22  I think there will obviously be -- well, not "obviously" but

23  we'll obviously look at their requests and see if we have

24  objections and responses to them and we'll come back to you.

25          One thing that does appear to be on the horizon --

Ibfdconc

1    but, again, we won't know until we see it -- is that they have

2    a request for a much larger set of data than just the data that

3    deals with retail FX dealers, and we'll have some issues with

4    that, but discovery disputes will be handled in the normal

5    process, your Honor.

6            THE COURT:  OK.  That sounds reasonable.

7            So I'm now turning to page 4.  I'm not going to

8    schedule any expert discovery or dispositive motions at this

9    time.

10           And with regard to lifting the stay of discovery,

11   obviously what we've been talking about is proceeding with

12   discovery so I will lift the stay.

13           And then with respect to joint status letters -- I'm

14   in paragraph 13A -- I would like them every 45 days, beginning

15   45 days from today.

16           And then I will schedule a conference for May 16th at

17   11, which is about two weeks after the discovery cutoff I set.

18   And you need to get to me at least two weeks before that any

19   premotion letters or dispositive motions or class certification

20   motions, and we'll set a briefing schedule at that time for any

21   motions that it makes sense to proceed with.

22           And then with respect to the filing of the amended

23   complaint, it sounds like in paragraph 14 on page 6 you all

24   have agreed to a schedule, so I will adopt that schedule.

25           So given all that, what else do we need to talk about,

Ibfdconc

if anything?

MR. SCHWARTZ:  So, your Honor, there are two quick issues that I would raise.

THE COURT:  OK.

MR. SCHWARTZ:  I understand your Honor set May 2nd as sort of the control date.  I would sort of preview for your Honor in advance that that is in our view an aggressive date given that a lot of the discovery is going to be third-party discovery.  Some of the discovery the plaintiffs made for pound will be of deposition deponents who are outside the United States, and of course there is going to be a lot of document production back and forth.  I think your Honor understands that.  I just wanted to sort of state that on the record as point one.

THE COURT:  I do.  I also like to move discovery along.  Part of the purpose of status letters is to let me know what's happening and to show me that everyone is moving as expeditiously as possible.  You are, in essence, making a record in case you need to ask for more time.  So the status letters are actually very important to me.  And my individual rules also say what goes in the status letters, but you now understand, sir, what my orientation is.

MR. SCHWARTZ:  Of course, your Honor.

And the second thing to ask for is the Court now has before it four different FX matters.  It has this matter.  It

Ibfdconc

1   has the NYPL matter.  It has the continuing consolidated class

2   action against the Credit Suisse defendants.  And I don't know

3   if your Honor saw but --

4           THE COURT:  The Allianz.

5           MR. SCHWARTZ:  Yes, there is the Allianz case that was

6   filed.  Defendants are very concerned that if there isn't

7   coordination amongst the plaintiffs' counsel in those cases,

8   that it could subject individuals to potentially multiple

9   depositions, which is not only unfair for those individuals

10  regardless of whether they are party employees or in many cases

11  going to be nonparties at all --

12          THE COURT:  I am sympathetic to that.  What can I do

13  to help you?

14          MR. SCHWARTZ:  Well, your Honor, we talked a little

15  bit in this letter about how the Contant plaintiffs obviously

16  have not participated fully in the FOREX cases going backwards,

17  and so we proposed a standard where, you know, unless they can

18  show prejudice, those deponents could not be deposed again just

19  for this particular action.  And we would also --

20          THE COURT:  Let me just interrupt for a second.

21          As I understood their positions from the letters, they

22  reserved their right, subject to their review of the

23  transcript.  So this is premature.

24          MR. SCHWARTZ:  It is a hypothetical, yes.

25          THE COURT:  But I will just tell you that I am

Ibfdconc

```
1    sympathetic to trying to make this -- have it cause as little
2    burden as necessary for the defendants and business people at
3    the defendants consistent with giving the plaintiffs the right
4    to do the discovery they need to do.
5             So, if you think it would be helpful to have, for
6    example, an order with all four captions on it with my
7    encouraging the parties to coordinate, or ordering the parties
8    to at least confer to coordinate to the extent possible, and if
9    you would like to submit such a proposed order, I would be
10   happy to look at it.
11            MR. SCHWARTZ:  Yes, your Honor.  That would be
12   fantastic from the defendants' point of view.
13            THE COURT:  OK.
14            MR. SCHWARTZ:  The last thing I would ask your Honor
15   is if we were going to try to move discovery along
16   expeditiously, from our perspective the most important
17   information to get from the plaintiffs in this case is their
18   view of who the retail FX dealers are.  It is really very
19   difficult for us to sort of make productive defensive or
20   offensive discovery from our side without those names.  And so
21   just as your Honor has set a date certain for us to start our
22   production, we would ask for a date certain for the plaintiffs
23   to give us those names.  And if the plaintiffs have those
24   names, it shouldn't be difficult to get something that they can
25   produce very quickly.
```

Ibfdconc

1          THE COURT:  I will ask Mr. Dell'Angelo when you would

2     be prepared to produce at least the lion's share of those

3     names?

4          MR. DELL'ANGELO:  Sure.  Understanding that next week

5     is a holiday week, I think we probably could send that list

6     over sometime next week, your Honor.

7          To be quite frank, that joint statement that I

8     identified on page 1 of docket 170 about triggering the

9     defendants' obligation to provide us with the transactional

10    data, we are motivated to get them that information in any

11    event.  So, I expect that we should be able to do that next

12    week.

13         THE COURT:  So let me set a date of Wednesday of next

14    week.  Does that make sense?  Thursday is Thanksgiving.

15         MR. DELL'ANGELO:  That would be fine.

16         If I may, Judge, just, your Honor, with the

17    understanding that to the extent, you know, as we continue to,

18    you know, consult with experts and do discovery, we may

19    identify additional ones --

20         THE COURT:  Of course.

21         MR. DELL'ANGELO:  It is a pretty comprehensive list

22    for now.

23         THE COURT:  OK.

24         MR. DELL'ANGELO:  The one just other caveat I would

25    add, some of the publicly-available data that we have looked at

Ibfdconc

1   that has enabled us to identify those retail FX brokers, some

2   of it only goes back to October of 2010, which would be the

3   middle of the class period.  So there will be some additional

4   work, which is one of the reasons why we're asking for the

5   eligible settlement class members, but there will certainly be

6   some additional work either by us or with the defendants to

7   identify any that we may be missing as of this time.

8                THE COURT:  OK.  Understood.

9                All right.  I will issue an order.  Hopefully, it will

10  reflect what we've talked about today, and we're adjourned.

11               MR. DELL'ANGELO:  Thank you, your Honor.

12               MR. SCHWARTZ:  Thank you, your Honor.

13               (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25