**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X
JAMES CONTANT, *et al*.,             :
                :
          Plaintiffs,    :          17 Civ. 3139 (LGS)
                :
      — against —     :     [Rel. 13 Civ. 7789 (LGS)]
                :
BANK OF AMERICA CORPORATION, *et al*., :    ORAL ARGUMENT REQUESTED
                :
         Defendants.  :
-------------------------------------------------------- X

**FOREIGN DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION**
**TO DISMISS THE SECOND AMENDED COMPLAINT**
**FOR LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................. 1

BACKGROUND ........................................................................... 3

ARGUMENT ............................................................................. 10

I.     SPECIFIC PERSONAL JURISDICTION IS LACKING IN THIS
       FORUM OVER THE NAMED PLAINTIFFS' NON-
       COUNTERPARTY STATE-LAW CLAIMS ................................... 12

       A.     A Purposeful Availment Theory Fails, Because Plaintiffs Do Not Allege
              In-Forum Transactions Or Other Contacts Between Their Intermediaries
              And Foreign Defendants Giving Rise To The Asserted State-Law Claims ........ 13

       B.     The "Effects" Test Fails Because Plaintiffs Do Not Allege That The
              Foreign Defendants Intentionally Targeted This Forum ..................................... 21

II.    THE CONSPIRACY ALLEGED IN *FOREX* CANNOT SUSTAIN
       VICARIOUS SPECIFIC JURISDICTION OVER THE FOREIGN
       DEFENDANTS ....................................................................... 22

III.   GENERAL PERSONAL JURISDICTION IS LACKING IN THIS
       FORUM ................................................................................ 25

CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
   No. 13 Civ. 981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015).................................16

*In re Auto. Refinishing Paint Antitrust Litig.*,
   358 F.3d 288 (3d Cir. 2004).....................................................................................................5, 20

*Beach v. Citigroup Alt. Invs. LLC*,
   No. 12 Civ. 7717 (PKC), 2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) ..............................11, 16

*Bertha Bldg. Corp. v. Nat'l Theatres Corp.*,
   248 F.2d 833 (2d Cir. 1957)..........................................................................................................24

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007)..........................................................................................................12

*BNSF Ry. Co. v. Tyrrell*,
   137 S. Ct. 1549 (2017)...................................................................................................................25

*Bristol-Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*,
   137 S. Ct. 1773 (2017)..............................................................................................3, 12, 18, 19, 21

*Brown v. Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)..........................................................................................................25

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)........................................................................................................................17

*Calder v. Jones*,
   465 U.S. 783 (1984)........................................................................................................................22

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018).........................................1, 3, 11, 12, 13, 15, 16, 18, 19, 21, 23, 24

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014)........................................................................................................................25

*Daniel v. Tootsie Roll Indus., LLC*,
   No. 17 Civ. 7541 (NRB), 2018 WL 3650015 (S.D.N.Y. Aug. 1, 2018) ................................21

*Devlin v. Scardelletti*,
   536 U.S. 1 (2002)............................................................................................................................11

*Famular v. Whirlpool Corp.*,
  No. 16 Civ. 944 (VB), 2017 WL 2470844 (S.D.N.Y. June 6, 2017)......................................21

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13 Civ. 7789 (LGS),
  2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ..............................1, 4, 7, 11, 15, 18, 19, 20, 25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)..............................................................................................................12, 25

*Grunewald v. United States*,
  353 U.S. 391 (1957)......................................................................................................................23

*Hanson v. Denckla*,
  357 U.S. 235 (1958)......................................................................................................................15

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)..........................................................................................................10, 12, 18

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)................................................................................................................11, 18

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
  No. 12 Civ. 3419 (GBD), 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ..............................22

*Leasco Data Processing Equip. Corp. v. Maxwell*,
  468 F.2d 1326 (2d Cir. 1972) (Friendly, J.), *abrogated on other grounds by*
  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) ...................................................24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  No. 11 MD 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)................................16

*Livnat v. Palestinian Auth.*,
  851 F.3d 45 (D.C. Cir. 2017)......................................................................................................21

*In re N. Sea Brent Crude Oil Futures Litig.*,
  No. 13 MD 2475 (ALC), 2017 WL 2535731 (S.D.N.Y. June 8, 2017) ..................................24

*Nypl v. JPMorgan Chase & Co.*,
  No. 15 Civ. 9300 (LGS), 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) ....1, 4, 5, 6, 19, 20, 25

*O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)*,
  714 F.3d 659 (2d Cir. 2013)........................................................................................................12

*Peay v. BellSouth Med. Assistance Plan*,
  205 F.3d 1206 (10th Cir. 2000) ..................................................................................................21

*In re Platinum & Palladium Antitrust Litig.*,
   No. 14 Civ. 9391 (GHW), 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ............................18

*Republic of Panama v. BCCI Holdings (Lux.) S.A.*,
   119 F.3d 935 (11th Cir. 1997) ..........................................................................................21

*Rush v. Savchuk*,
   444 U.S. 320 (1980) .........................................................................................................11

*Selman v. Harvard Med. Sch.*,
   494 F. Supp. 603 (S.D.N.Y. 1980) ..................................................................................11

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ...........................................................................................................11

*Societe Generale v. Fed. Ins. Co.*,
   856 F.2d 461 (2d Cir. 1988)..............................................................................................24

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .....................................................................................................11

*Tarsavage v. Citic Tr. Co.*,
   3 F. Supp. 3d 137 (S.D.N.Y. 2014)..................................................................................14

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ...........................................................................................................18

*Walden v. Fiore*,
   571 U.S. 277 (2014)................................................................................3, 12, 15, 16, 17, 24

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016)........................................12, 14, 16, 17, 19, 21, 22, 25

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980).........................................................................................................17

**Statutes**

Clayton Act § 4, 15 U.S.C. § 15 ...........................................................................................4

Clayton Act § 12, 15 U.S.C. § 22 .......................................................................................20

Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a............................15

## PRELIMINARY STATEMENT

In this so-called "indirect purchaser" action, Plaintiffs allege in the Second Amended Complaint ("Complaint" or "SAC") that they suffered harm under various state laws when purchasing FX spot instruments from unidentified intermediaries known as Retail Foreign Exchange Dealers ("RFEDs"), who in turn allegedly undertook "matching" transactions with Foreign Defendants (or their affiliates).[1] Notably, Plaintiffs do not allege (i) that they purchased any instruments directly from any Foreign Defendants, or (ii) that any Foreign Defendant transacted or communicated with any of the named Plaintiffs' RFEDs in this forum. Plaintiffs therefore fail to provide nonconclusory allegations that their claims "arise from the [Foreign Defendants'] purposeful contacts with the forum." *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 84 (2d Cir. 2018). That is fatal to personal jurisdiction and calls for dismissal of the Foreign Defendants under Rule 12(b)(2).

Given their failure to allege that any Foreign Defendants engaged in transactions with Plaintiffs or their RFEDs in this forum, Plaintiffs fail to establish specific jurisdiction, which must be established for "each claim asserted," and for which the requisite causal nexus must be established for each defendant. *See Schwab*, 883 F.3d at 83–84. Plaintiffs cannot rely on this

---

[1]   This Rule 12(b)(2) motion to dismiss the Complaint is supported by the accompanying declarations of Jason Wright (Barclays Bank PLC), William F. Hennessey, 2nd (BNP Paribas Group), Daniel Kläy (Credit Suisse Group AG), Nicola S. Black and Gavin A. Francis (HSBC Bank plc), Lynne Stoulil and Tony Goulart, III (MUFG Bank, Ltd.), William Gougherty (The Royal Bank of Scotland plc), Dominique Bourrinet (Société Générale), Barbara McAll (Standard Chartered Bank), and John Connors (UBS AG). For ease of reference, those declarations are attached as exhibits to the declaration of Eric J. Stock filed today. Certain Foreign Defendants joining this motion joined the Rule 12(b)(2) motions decided in *In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016), and *Nypl v. JPMorgan Chase & Co.*, 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018). Nothing herein is, or should be construed as, a waiver by any Foreign Defendant of any arguments that they may raise in further proceedings in *FOREX* and *Nypl* or in any other action.

Court's jurisdictional rulings in *FOREX* and *Nypl*, for multiple reasons.  As an initial matter, the plaintiffs in those cases alleged *direct transactions in the forum* between plaintiffs and at least some defendants, whereas here, Plaintiffs do *not* allege that they traded directly with any Defendants (foreign or domestic).  Instead, Plaintiffs describe themselves as "retail FX customers" who transacted from eight different states with intermediaries in unknown locations somewhere around the world; it is the unidentified RFED intermediaries that purportedly transacted with most of the Foreign Defendants.[2]

Moreover, *Nypl* and *FOREX* raised federal antitrust claims, arguably allowing those plaintiffs to premise jurisdiction on defendants' aggregate contacts with the United States as a whole.  Here, Plaintiffs raise only state-law claims without adequately linking those state-law claims to any Foreign Defendant's contacts with the forum State, New York.  That is, Plaintiffs have alleged nothing to indicate that Foreign Defendants transacted in the United States at all (much less New York) with any RFEDs that sold to the named Plaintiffs—for that matter, they have not even alleged the identities, let alone the locations, of their RFEDs.  Indeed, Plaintiffs' location-free theory would, for example, allow a "retail FX customer" in Arizona to sue in this New York forum based on a Nevada RFED's upstream purchase from a Foreign Defendant's desk in London—a scenario in which none of the activity giving rise to the Arizona resident's claim occurred in the forum state.  Moreover, even allegations of a sale by an undisclosed RFED to a Plaintiff in New York would not cure these deficiencies, because personal jurisdiction must be based on *each Foreign Defendant's* contacts with the forum; a Plaintiff's interactions with an RFED in the forum is not enough.

---

[2]   Plaintiffs do not allege that any RFED transacted with Foreign Defendant MUFG Bank, Ltd. ("MUFG Bank").  2d Am. Compl. ¶¶ 10–20 (Nov. 28, 2018) (Dkt. 183) ("SAC").

Plaintiffs' contention that the RFEDs' identities and the locations in which those RFEDs transacted with Foreign Defendants are "irrelevant" flatly contradicts governing law.  Pls.' Pre-Mot. Ltr. 1 n.1, 2 (Dec. 11, 2018) (Dkt. 188).  Despite repeated requests leading up to this motion, Plaintiffs have refused to identify the RFEDs with which the named plaintiffs transacted.  Instead, they urge this Court to defy existing precedent by allowing them to piggyback on the jurisdictional allegations of the *FOREX* and *Nypl* plaintiffs—without examining the relationship between the transactions on which Plaintiffs' injuries in this case are purportedly based, the claims asserted in this action, and the Foreign Defendants' contacts with New York.  *See Schwab*, 883 F.3d at 84–86 (rejecting contention that the "jurisdictional analysis that applies to the direct seller[s] . . . applies equally to the indirect sellers").  As in every other case, "for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State"—here, New York. *See, e.g.*, *Bristol-Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) ("*BMS*").  That affiliation must be created by a defendant's own conduct, and not the act of a third party.  Plaintiffs do not allege the required "affiliation," so the Foreign Defendants' "suit-related conduct" has not "create[d] a substantial connection with the forum State" for purposes of this case.  *See Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Plaintiffs therefore have not met their burden to allege specific jurisdiction.  And general jurisdiction is not at issue here, because the Foreign Defendants are not incorporated or headquartered in this forum.  Accordingly, this Court should dismiss the Foreign Defendants from this case under Rule 12(b)(2).

## **BACKGROUND**

**1.  This Court's Prior Rule 12(b)(2) Rulings.**  In asserting jurisdiction here, Plaintiffs rely heavily on the jurisdictional ruling in *FOREX*, in which this Court denied the Rule 12(b)(2)

motion by two foreign defendants.  SAC ¶¶ 22, 34, 35.  The *FOREX* federal antitrust claims arose from FX transactions that the plaintiffs "entered into . . . directly" with defendants.  74 F. Supp. 3d 581, 586 (S.D.N.Y. 2015) (quoting then-existing *FOREX* putative class definition).  This Court found a *prima facie* basis for specific jurisdiction against two defendants because the complaint and supplemental averments sufficiently connected the *FOREX* plaintiffs' allegations—direct injury to counterparties in the United States under § 4 of the Clayton Act, 15 U.S.C. § 15(a), resulting from an alleged conspiracy in the FX spot market—with the conduct of the two defendants, which allegedly had routinely entered into FX spot trading transactions in New York. 2016 WL 1268267, at \*3–5.  Viewing the United States as the relevant forum because the claim asserted arose under the Clayton Act (*see id.* at \*3 n.2, 4), the Court asserted that "Plaintiffs state," and the Court could "reasonably infer," that the two defendants "each had, *within the United States*, tens of billions of dollars' worth of FX Instruments outstanding each day, *including, undoubtedly, transactions with members of the proposed Classes* during the Class Period" (*id*. at \*6 (internal quotation marks omitted) (emphasis added)).  The *FOREX* plaintiffs were able to "supplement[]" those allegations with federal regulatory filings quantifying the "gross notional outstanding *spot FX* contracts" reported for the New York branches of the banks.  *Id.* at \*6 (emphasis added).  As to the remaining foreign defendant (Standard Chartered plc), plaintiffs had not shown specific jurisdiction because that corporation did not "engage in FX activity in the United States or even operate or maintain offices here."  *Id.* at \*4.

Plaintiffs here also rely on this Court's Rule 12(b)(2) ruling in *Nypl*.  Dkt. 188 at 1–2.  The *Nypl* Plaintiffs "allegedly purchased foreign currency *from Defendants* in the consumer retail market" at defined benchmark rates defendants purportedly manipulated and then applied in pricing those retail transactions.  2018 WL 1472506, at \*1 (emphasis added); *see id.* at \*5, 6 (twice

quoting *Nypl* plaintiffs' allegation that they "purchased price-fixed foreign currency *from Defendants* at the FX Benchmark exchange rates derived from FX spot trading plus a small commission") (emphasis added).   This Court examined certain Foreign Defendants' plea agreements entered in the U.S. District Court for the District of Connecticut, and found that they "add[ed] specificity and plausibility" to the allegations that at least part of the alleged conspiracy either took place in or was directed at the United States as a whole.   *See id.* at *5–6 (assessing nationwide contacts because complaint alleged federal antitrust claims).

This Court focused on portions of the pleas stating that "[a]cts in furtherance of the charged offense were carried out within the *District of Connecticut* and elsewhere," and that those acts involved transactions in the EUR/USD currency pair in interstate commerce within the United States (*id.* (emphasis added)), which, again, was relevant because the federal antitrust claim enabled examination of "aggregate contacts with the United States as a whole" (*id.* at *3 n.4 (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004)).   This Court concluded that the complaint's "allegations of a conspiracy in the FX spot market, combined with its allegations of the linkage between benchmark and retail rates, suffice" to establish a *prima facie* basis for exercising specific jurisdiction over the plaintiffs' claims under § 4 of the Clayton Act.   *Id.* at *6.

2.   **Plaintiffs' Transactions With Unnamed Intermediaries.**   Plaintiffs allegedly currently reside in Arizona, California, Florida, Illinois, Massachusetts, Minnesota, New York, and North Carolina.   SAC ¶¶ 10–20.   They are self-styled "retail FX customers" (SAC ¶¶ 3, 77, 149, 152) who admit that the Foreign Defendants are ***not*** Plaintiffs' counterparties:   "[W]hile both residing in and physically located in" those States, Plaintiffs—including one purported New York resident—allegedly "engaged in FX spot transactions . . . directly with" RFEDs, and the RFEDs

then "transacted those FX Instruments directly with Defendants."  SAC ¶¶ 10–20.  Thus, the unidentified intermediaries allegedly "paid artificially inflated prices for FX Instruments purchased directly from Defendants and Defendants' co-conspirators, and passed on those overcharges" to Plaintiffs.  *Id.*

The Complaint alleges that New York and London are "the two largest FX trading centers (SAC ¶ 64), while acknowledging that the "FX market is the global financial market in which currencies are traded"  (SAC ¶ 59).  The Complaint never alleges where any transactions between any Foreign Defendant and any RFED occurred (and certainly not where a transaction between a Foreign Defendant and a named Plaintiff's RFED occurred).  Moreover, the Complaint does not describe the location of any particular "matching" (SAC ¶ 159) transaction between an RFED and a Defendant corresponding to a  downstream or "indirect" transaction between that RFED and a Plaintiff.  Indeed, the Complaint and the RFED promotional materials it incorporates indicate that many RFEDs operate outside New York, including overseas.  For example, the Complaint cites a promotional website of an RFED called OANDA, and that page lists OANDA's jurisdictions of operation and regulation as Canada, Europe, Singapore, Australia, and Japan—not just the United States.  *See* SAC ¶ 153 & n.8.[3]

The SAC alleges that Defendants functioned as "liquidity providers" (SAC ¶ 157) to the unidentified RFEDs—purportedly, members of the Direct Settlement Class in *FOREX*[4]—and

---

[3]    The unidentified RFEDs of the named Plaintiffs allegedly transacted with most of the Foreign Defendants at unidentified locations, except that no named Plaintiff alleges purchasing FX Instruments from any intermediary who ever purchased an FX instrument from MUFG Bank.  SAC ¶¶ 10–20.

[4]    The preliminarily approved *FOREX* Direct Settlement Class covers "[a]ll Persons who . . . entered into an FX Instrument directly with a Defendant, . . . where such Persons were *either* [(1)] domiciled in the United States *or* . . . [(2)] if domiciled outside the United States . . . transacted FX Instruments in the United States."  SAC ¶ 40 n.5 (emphases added).  Because the two enumerated

avers that Defendants set prices collusively, including through trader-based bid-ask spread manipulation (SAC ¶¶ 115–18), and manipulation of two FX benchmarks set well into the trading day in the United Kingdom and Europe:  (1) the "WM/Reuters Closing Spot Rates (the 'WM/Reuters Fix' or '4:00 p.m. Fix'), which are set at 4:00 p.m. London time (11:00 a.m. New York time)" (SAC ¶¶ 85–88), and the "European Central Bank ('ECB') reference rate," including the ECB rate set at 1:15 p.m. London time (SAC ¶¶ 89–90).[5]

The Complaint does not assert any claim under federal law.  Instead, Plaintiffs seek monetary relief under "state *Illinois Brick* repealer statutes and related state consumer protection statutes" based on the prices "passed on" to them as purported "indirect purchasers" of FX Instruments.  SAC ¶¶ 10–20, 148, 152, 160, 162, 168–69, 179, 184, 251.  That is, Plaintiffs seek under state law "to recover the overcharge damages that were directly passed on to them by" their purportedly overcharged intermediaries.  SAC ¶ 148.  Although Plaintiffs rely on the "same FX manipulation conspiracy" alleged in *FOREX* (SAC ¶ 220), they cite no allegations in *FOREX*—including from any government enforcement actions on which the *FOREX* pleadings depended—that the Foreign Defendants transacted with Plaintiffs' unidentified intermediaries in New York or

---

branches are distinct, an intermediary "domiciled in the United States" that transacted FX Instruments with a Foreign Defendant may assert membership in the Direct Settlement Class *without* having transacted those instruments "in the United States."  (For Plaintiffs' purported definition of an FX Instrument, see SAC ¶ 1 n.2.)

[5]   Plaintiffs omit that the "conspiracy alleged herein," purportedly "facilitated" by "close . . . ties among FX traders," was centered overseas, not in the United States.  *Compare* SAC ¶ 62 (withholding location where FX traders "lived in close proximity") *with FOREX*, 3d Am. Compl. ¶ 118, Dkt. 619 (June 3, 2016)  ("*FOREX* TAC") (alleging that the "small and close-knit group of [FX] traders" lived in Essex County "just northeast of" City of London).  In general, Plaintiffs parrot allegations from *FOREX*—which they say "seek[s] damages for the *same* FX manipulation conspiracy" at issue here (SAC ¶ 220 (emphasis added))—yet omit allegations from *FOREX* whenever convenient for their pleading purposes.  *See* SAC ¶¶ 40–47 (connecting class definitions to "Direct Settlement Class" subject to preliminarily approved settlement agreements in *FOREX*); SAC ¶¶ 220–27 (summarizing "Direct Purchaser Litigation And Settlements" in *FOREX*).

elsewhere in the United States.  Nor do Plaintiffs present nonconclusory allegations that the Foreign Defendants' alleged participation in the "FX manipulation conspiracy" included conduct targeting named Plaintiffs, or their intermediaries, in New York or the United States.

**3. Foreign Defendants' Lack Of Alleged Dealings With Plaintiffs' Intermediaries In This Forum, Or In Any Other State.**  The Foreign Defendants are incorporated and maintain their headquarters overseas:  MUFG Bank is incorporated in Japan and headquartered in Tokyo. SAC ¶ 22; *see* Goulart Decl. ¶ 2; Stoulil Decl. ¶ 2.  Barclays Bank plc, HSBC Bank plc, and Standard Chartered Bank are each incorporated in the United Kingdom and headquartered in London.  SAC ¶¶ 23, 29, 35; *see* Wright Decl. ¶¶ 4–6; Black Decl. ¶¶ 3–4; McAll Decl. ¶¶ 2–3. RBS is incorporated in the United Kingdom and headquartered in Edinburgh.  SAC ¶ 33; *see* Gougherty Decl. ¶ 3.  BNP Paribas Group and Société Générale are incorporated in France and headquartered in Paris.  SAC ¶¶ 24, 34; *see* Bourrinet Decl. ¶ 2; Hennessey Decl. ¶¶ 3–4.  Credit Suisse Group AG and UBS AG are incorporated and headquartered in Switzerland.  SAC ¶¶ 26, 36; *see* Connors Decl. ¶ 3; Kläy Decl. ¶ 2.

The Complaint alleges that four of the Foreign Defendants (BTMU (now MUFG Bank), Credit Suisse, Société Générale, and Standard Chartered Bank) maintain New York branches that conducted FX spot market transactions, but does *not* allege that Plaintiffs' intermediaries engaged in FX spot market transactions with or through those New York branches.  SAC ¶¶ 22, 26, 34, 35. The Complaint also alleges that that regulators, including the New York Department of Financial Services ("NYDFS"), have made assertions about various types of alleged conduct in the FX spot market by certain Foreign Defendants or their affiliates or subsidiaries (*e.g.*, SAC ¶¶ 191, 208,

212), but no named Plaintiff alleges transacting with an RFED harmed in New York by any particular conduct described by that New York regulator or by any other government regulator.[6]

The Complaint also refers to the general banking activities of subsidiaries or affiliates of other Foreign Defendants (Barclays, BNP, HSBC, RBS, and UBS) without alleging a basis for imputing subsidiary or affiliate conduct to the respective Foreign Defendants.  SAC ¶¶ 23, 24, 29, 33, 36.  Additionally, the Complaint defines groups of entities collectively, while largely omitting individual allegations against specific entities.  *See* SAC ¶ 263(c).[7]

Plaintiffs' allegations regarding their purported experts' opinions, certain acts by individual traders, and assertions of regulators provide additional indications that the RFEDs and Foreign Defendants transacted outside New York, if not overseas.  Plaintiffs aver that their purported experts found a relationship between Reuters pricing and prices quoted by a representative RFED, FOREX.com, during *London* business hours, labeled FOREX.com's "most

---

[6]   Plaintiffs do not allege any regulatory proceedings in the United States against Foreign Defendants MUFG Bank, Société Générale, and Standard Chartered Bank.  Moreover, Plaintiffs rely on an NYDFS consent order directed to Credit Suisse AG and Credit Suisse AG, New York Branch—not Credit Suisse Group AG, the foreign entity joining this motion.

[7]   *See also* SAC ¶ 29 (identifying several separate HSBC entities, including the foreign HSBC entity joining this motion, "collectively" as "HSBC"); SAC ¶ 26 (identifying several separate Credit Suisse entities, including the foreign entity Credit Suisse Group AG joining this motion, "collectively" as "Credit Suisse").  The Complaint's allegations as to BTMU reveal a similar failure to distinguish between corporate affiliates and subsidiaries.  The Complaint alleges that New York is the "traditional hub" for MUFG Bank's FX trading.  SAC ¶ 22.  That allegation is copied verbatim from the *FOREX* TAC, which cited in support an article that actually relates to the intention of the Mitsubishi UFJ Financial Group (MUFG Bank's *parent*) to hire "currency and interest-rate derivatives traders globally," and quotes an employee as stating "[o]ur traditional hubs for this trading business"—*i.e.*, currency and interest-rate derivatives trading—"have been in New York, London, Singapore and Hong Kong."  *FOREX* TAC ¶ 48 & n.9; *see* Shigeru Sato & Takako Taniguchi, *MUFJ to hire 200 for derivatives business*, Bloomberg News (Apr. 25, 2012).  Moreover, even if the Complaint *did* allege a basis for imputation of subsidiary or affiliate conduct to Foreign Defendants, Plaintiffs allege no connection between many of these subsidiaries or affiliates and New York.  *See, e.g.,* SAC ¶ 33 (alleging that RBS's subsidiary operates in Connecticut and California), ¶ 36 (alleging that UBS's subsidiary operates in Connecticut).

active hours." SAC ¶ 172. The individual traders employed by Foreign Defendants on whose purported misconduct the Complaint focuses operated primarily in London, Singapore, and Tokyo.[8] Plaintiffs also paraphrase assertions by domestic and foreign regulators about conduct that occurred primarily or wholly outside the United States, such as in London and Zurich.[9]

## ARGUMENT

Due process requires that "in order to subject a defendant to a judgment in personam," the defendant must generally have sufficient "contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation omitted). There is nothing in the Complaint that alleges or limits Plaintiffs' claims to circumstances in which the FX Instrument purchased by Plaintiffs from an RFED was purchased by that RFED from a Foreign Defendant *in New York*. So the Complaint does not meet the minimum requirements of due process by alleging a sufficient causal connection between their claims, the forum, and Foreign Defendants' purported conduct. Plaintiffs fail to meet the fundamental requirements for claim-by-claim and defendant-by-defendant analysis under Rule 12(b)(2). They have simply ignored that they "bear[] the burden"

---

[8]   *See, e.g.,* SAC ¶ 201 (RBS, Barclays, and UBS London traders); ¶ 235 (RBS London traders); ¶ 233 (UBS London and Singapore traders); ¶ 237 (HSBC London traders); ¶ 238 (Barclays London and Tokyo traders).

[9]   *See* SAC ¶ 186 (citing U.S. CFTC 2014 orders); *see also* Order, *In re: HSBC Bank plc*, at 2 (CFTC Dkt. No. 15-07) (Nov. 11, 2014) (underlying conduct primarily took place on the London G10 trading desk); Order, *In re: The Royal Bank of Scotland plc*, at 2 (CFTC Dkt. No. 15-05) (Nov. 11, 2014) (same). Similarly, Plaintiffs rely on orders by the United Kingdom Financial Conduct Authority ("FCA") directed to several Foreign Defendants that explicitly focus on foreign conduct. *See* SAC ¶ 200. The Complaint quotes an FCA press release while omitting the portion that clarifies that the FCA's orders concerned each pertinent institution's "voice trading desk based in London, or in the case of UBS only based in Zurich." *See* FCA, Press Release, *FCA fines five banks £1.1 billion for FX failings and announces industry-wide remediation programme* n.7 (Nov. 12, 2014), *at* https://www.fca.org.uk/news/press-releases/fca-fines-five-banks-%C2%A311-billion-fx-failings-and-announces-industry-wide.

(*FOREX*, 2016 WL 1268267, at \*1) to "establish the court's jurisdiction with respect to each claim asserted" (*Schwab*, 883 F.3d at 83 (internal quotation marks omitted)).

Importantly, in a putative class action, "personal jurisdiction is based on a defendant's contacts with the forum state and actions giving rise to the *named plaintiffs'* causes of action. Contacts with unnamed class members may not be used as a jurisdictional basis, especially before a class has been certified." *Beach v. Citigroup Alt. Invs. LLC*, 2014 WL 904650, at \*6 (S.D.N.Y. Mar. 7, 2014) (emphasis added) (citing *Selman v. Harvard Med. Sch.,* 494 F. Supp. 603, 613 n.6 (S.D.N.Y. 1980)).[10] Moreover, "[e]ach defendant's contacts with the forum State must be assessed *individually*," *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (emphasis added), and allegations against defendants *as a group* are insufficient, *Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980).

Plaintiffs also overlook that even if *other* litigants allegedly injured within this forum by particular conduct may be able to bring "claims similar to those" asserted (namely, the *FOREX* and *Nypl* plaintiffs' federal claims that this Court previously addressed), that does not mean that *all* litigants can do so. For example, in *BMS*, where patients asserted state-law products liability claims in California against a drug company, the Supreme Court concluded that nonresidents not injured in California had not identified "any adequate link between the State and" their claims, even though "*other* plaintiffs" who "allegedly sustained the same injuries as did the nonresidents"

---

[10]  Put another way, Plaintiffs cannot assert injury based on unknown persons not before the Court.  Article III of the U.S. Constitution compels focusing on the named plaintiffs, who lack standing to sue based on the alleged injuries of nonparties—including unnamed members of the putative class.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 n.6 (2016) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)); *see also Devlin v. Scardelletti*, 536 U.S. 1, 9–10 (2002) ("[n]onnamed class members . . . may be parties for some purposes and not for other[]" purposes, and are "not parties" when determining diversity for purposes of subject-matter jurisdiction).

could sue in California (because they "were prescribed, obtained, and ingested" the drug "in California").  137 S. Ct. at 1781.  The *FOREX* and *Nypl* jurisdictional rulings are likewise unavailing here.

## I.     SPECIFIC PERSONAL JURISDICTION IS LACKING IN THIS FORUM OVER THE NAMED PLAINTIFFS' NON-COUNTERPARTY STATE-LAW CLAIMS

For the court to exercise specific jurisdiction over a defendant, the plaintiff must "show some sort of *causal relationship* between a defendant's U.S. contacts and the episode in suit," meaning the claim "arise[s] from the defendants' purposeful contacts with the forum." *Schwab*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)) (internal quotation marks omitted) (emphasis added).  That is, "the defendant's *suit-related* conduct must create *a substantial connection with the forum State*," "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State," and the contacts must be "with the forum State itself, not . . . with persons who reside there." *Walden*, 571 U.S. at 284–85 (first emphasis added) (citation omitted).  Specific jurisdiction thus "depends on in-state activity that '*gave rise to the episode-in-suit*.'" *Waldman*, 835 F.3d at 331 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)) (quoting *Int'l Shoe*, 326 U.S. at 317).

Specific jurisdiction may be valid "where the defendant has purposefully availed itself of the privilege of conducting activities within the forum State . . . such that the defendant should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243–44 (2d Cir. 2007) (internal quotation marks, alterations, and citations omitted).  Alternatively, under the "effects" test, specific jurisdiction may be valid where defendants' allegedly tortious actions outside of the forum were "expressly aimed" at the forum and the claims in suit arose out of those actions. *O'Neill v. Asat Trust Reg. (In re Terrorist Attacks on Sept. 11, 2001)*, 714 F.3d

659, 674 (2d Cir. 2013).   The Complaint does not sufficiently allege either form of specific jurisdiction.

### A.     A Purposeful Availment Theory Fails, Because Plaintiffs Do Not Allege In-Forum Transactions Or Other Contacts Between Their Intermediaries And Foreign Defendants Giving Rise To The Asserted State-Law Claims

As to everything vital for Rule 12(b)(2) purposes, the Complaint lacks nonconclusory allegations that would suffice to support specific jurisdiction.   The Complaint makes clear that the Foreign Defendants are not counterparties to the Plaintiffs, who are self-styled "retail FX customers," meaning that the Foreign Defendants did not transact or even communicate with Plaintiffs in this or any other forum.   SAC ¶¶ 10–20, 77, 148, 152, 160, 162, 168–69, 179, 184, 251.   Indeed, even if the sole New York Plaintiff was injured in New York through retail FX purchases in New York (SAC ¶ 10) from an RFED that may be located out of state, neither his state-law claim, nor the claims of any of the nonresident named Plaintiffs, are shown through nonconclusory allegations to "arise from" Foreign Defendants' "purposeful contacts with th[is] forum."   *Schwab*, 883 F.3d at 84.   The Complaint thus fails to sufficiently allege a "causal relationship between" any Foreign Defendant's contacts with New York (or indeed any other State) "and the episode[s] in suit," which are the unidentified intermediaries' transactions with the named Plaintiffs.   *Id.*

### 1.     Foreign Defendants' in-forum activity lacks the required causal relationship to the asserted claims because no transactions or communications with named Plaintiffs' unidentified intermediaries are shown to have occurred in New York (or any other State)

The Complaint does not allege transactions or communications in this forum between the Foreign Defendants and the named Plaintiffs' unidentified intermediaries, and so the named Plaintiffs—who reside in eight different states and did not transact with any Foreign Defendant—have not shown that their claims seek compensation for conduct in New York, or elsewhere in the

United States, by the Foreign Defendants that "could have subjected" the Foreign Defendants "to liability" here. *See Waldman*, 835 F.3d at 335 ("suit-related conduct," which must create a "substantial connection with the forum State" under *Walden*, means conduct "that could have subjected [the defendant] to liability" in the action).

The Complaint is devoid of nonconclusory allegations that Foreign Defendants transacted or communicated with the named Plaintiffs' intermediaries in New York, as opposed to London, another foreign location, or another State. That is, if the named Plaintiffs' counterparty RFEDs all interacted with Foreign Defendants outside the forum, which is quite possible—perhaps tellingly, Plaintiffs refused to identify the named Plaintiffs' counterparty RFEDs and instead invited this motion—then the alleged link between Foreign Defendants' conduct and the RFEDs' own alleged purchase of FX spot instruments directly from Foreign Defendants would have occurred completely outside this forum. Because the named Plaintiffs have refused to disclose the identities and locations of their counterparty RFEDs—information uniquely in their possession—they have provided no basis from which this Court can reasonably infer that the named Plaintiffs' claims arise from interactions in New York between their counterparty RFEDs and Foreign Defendants. *See Tarsavage v. Citic Tr. Co.*, 3 F. Supp. 3d 137, 148 (S.D.N.Y. 2014) (dismissing under Rule 12(b)(2) where allegations were "equally consistent" with a circumstance in which court lacked personal jurisdiction).

In granting leave to amend following Rule 12(b)(6) dismissal, this Court did *not* uphold the Complaint under Rule 12(b)(2); when it granted leave to amend, no Rule 12(b)(2) motion was pending. And even accepting the allegations that the purported FX spot market conspiracy caused the named Plaintiffs' purported injuries, Plaintiffs' claims only "arise from the [Foreign D]efendants' *purposeful contacts with the forum*" if Foreign Defendants interacted with named

Plaintiffs' RFEDs in New York.  *Schwab*, 883 F.3d at 84 (emphasis added).  So even if Plaintiffs allege that they ultimately transacted in New York—which only a single named Plaintiff does (SAC ¶ 10)—the allegations about the locations of named Plaintiffs' transactions downstream from Foreign Defendants' transactions with RFEDs is inadequate.  Because "mere injury to a forum resident is not a sufficient connection to the forum," the location where the named New York Plaintiff (or any other named Plaintiff) was injured says nothing about the forum contacts of the Foreign Defendants, who are not in a counterparty or any other direct relationship with the named Plaintiffs.  *Walden*, 571 U.S. at 290.

Nor does the Complaint identify a single communication in this forum that facilitated a transaction between one of the named Plaintiff's unidentified intermediaries and a Foreign Defendant.  Indeed, there is no allegation that any RFED transacted with one Foreign Defendant, MUFG Bank, at all.  And the allegations that the unidentified intermediaries are "members of the Direct Settlement Class" preliminarily approved in *FOREX* (SAC ¶¶ 148, 151) also do not establish that the Foreign Defendants transacted or communicated with the intermediaries "within the forum" (*Hanson v. Denckla*, 357 U.S. 235, 253 (1958)), let alone that the Foreign Defendants imposed any "overcharge" on the intermediaries within the forum.  The named Plaintiffs' counterparty RFEDs can be members of the Direct Settlement Class and still be headquartered or incorporated outside New York or outside the United States.[11]

---

[11]   Rule 12(b)(2) dismissal is not averted by the Complaint's proviso that that the putative state-law classes exclude claims based on "all indirect purchases of FX Instruments where the direct purchaser was operating outside of the U.S. at the time the direct purchase was made and the purchase was made with the foreign desk of a Defendant."  SAC ¶ 50.  That averment is evidently designed to avoid the conflict with the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a, that would result were the RFEDs to have transacted with Foreign Defendants in, for example, South Korea or Norway.  *See FOREX*, 74 F. Supp. 3d at 598–600.  But that proviso about the putative classes is of no consequence here because personal jurisdiction

Also deficient are the assertions paraphrasing the NYDFS (*e.g.*, SAC ¶¶ 191, 208, 212) and other regulators concerning the FX spot market conduct of regulated entities in New York, which do not meet Plaintiffs' burden, because they fail to connect the named Plaintiffs' private damages claims to those regulatory assertions. The Complaint fails to allege that any of the named Plaintiffs' (unidentified) RFEDs were affected by Foreign Defendants' alleged FX spot market conduct through a New York-based transaction between a Foreign Defendant and an RFED. So, for example, the events portrayed by NYDFS are not the "episode[s] in suit" that give rise to the asserted claims in this action (*Schwab*, 883 F.3d at 84), and the NYDFS allegations are not sufficiently "suit-related" to create the required forum connection here (*Walden*, 571 U.S. at 284).[12]

Other assertions in the Complaint are notably not entitled the presumption of truth in light of the declarations the Foreign Defendants have filed in support of this motion. For example, the bald allegation that RBS has a "major New York office" and conducts a "substantial portion" of

---

is not based on allegations about the putative classes. *See Beach*, 2014 WL 904650, at *6. Indeed, it is named Plaintiffs' allegations about their own claims that are insufficient to establish personal jurisdiction. Moreover, even with the proviso, the Complaint is fully consistent with a situation where, for example, the RFED "operat[ed]" inside the United States but outside of *New York* and interacted with a Foreign Defendant outside *New York*—which, of course, is the relevant forum for this case under state law. The proviso therefore does not confine the named Plaintiffs' asserted claims to those arising from the Foreign Defendants' "purposeful availment" of this New York forum, as due process requires. *See, e.g., Waldman*, 835 F.3d at 341.

[12] Numerous other regulatory resolutions with Foreign Defendants clarify that the purported misconduct took place primarily or wholly outside the United States. *See* n.9 and accompanying text, *supra*. That bolsters the conclusion that the Complaint is missing the required "connection" between the regulatory assertions about any conduct in New York and "the injury suffered" by the named Plaintiffs before the Court. *See 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *32 (S.D.N.Y. Oct. 20, 2015) (rejecting notion "that a defendant is subject to personal jurisdiction because that defendant was subject to a government investigation, prosecution, or regulatory action or settlement in the United States or a particular state" where "such governmental actions are not the basis of plaintiffs' claims").

its FX trading in New York (SAC ¶ 263(c)) is directly contradicted by the pertinent declaration, which establishes that RBS neither has offices in New York, nor has had any FX trading operations based in New York during the Class Period or subsequently.  *See* Gougherty Decl. ¶¶ 4–5. Similarly, Plaintiffs' allegation that Société Générale's "heads of emerging market FX trading and G10 FX trading are based in New York" (SAC ¶ 34) is simply false.  *See* Bourrinet Decl. ¶ 9. Plaintiffs' allegations that Credit Suisse Group AG has offices in California, Florida, and Illinois, and a corporate center in North Carolina (SAC ¶ 26) are similarly false:  Credit Suisse Group AG is a holding company and engages in no trading of any kind in the United States.  *See* Kläy Decl. ¶ 5.

Plaintiffs' repeated refusal to identify the intermediaries with which the named Plaintiffs transacted cannot be squared with U.S. Supreme Court or Second Circuit precedent.  To the contrary, "[t]he inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among *the defendant, the forum, and the litigation*."  *See, e.g.*, *Waldman*, 835 F.3d at 335 (quoting *Walden*, 571 U.S. at 283–84).  In that regard, even assuming an RFED chose to transact from outside New York—for example, from London—with the sole New York-based named Plaintiff, that would not suffice to establish personal jurisdiction because "unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."  *Walden*, 571 U.S. at 284 (citation omitted).

Indeed, subjecting the Foreign Defendants to liability for independent actions by Plaintiffs' unidentified intermediaries in unknown locations would not provide "fair warning that a particular activity may subject them to the jurisdiction of" a forum in which they are not at home.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (alteration and citation omitted); *see World-*

*Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (requiring jurisdictional rules to afford "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit").  It therefore would "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co*., 326 U.S. at 316 (internal quotation marks omitted).[13]

> ### 2. Plaintiffs cannot derive specific jurisdiction over their indirect claims under state law from *FOREX* and *Nypl*, which involved direct claims based on federal antitrust law

Plaintiffs urge the Court to stretch the specific jurisdiction it discerned in *FOREX* and *Nypl* to encompass specific jurisdiction here. SAC ¶¶ 22, 34–35; Dkt. 188 at 1–2.  But those prior Rule 12(b)(2) decisions addressed (1) inferred direct FX transactions between defendants and counterparty plaintiffs that (2) raised federal antitrust claims.  Those decisions cannot support specific jurisdiction over Plaintiffs' "indirect purchaser" claims under state law here:  A later group of plaintiffs cannot establish personal jurisdiction by relying on the "mere fact that other plaintiffs" (*i.e.*, *FOREX* and *Nypl* plaintiffs) previously have brought claims "similar to those brought by" the later group in the same forum State.  *See BMS*, 137 S. Ct. at 1781; *see also Schwab*, 883 F.3d at 84–86.  The RFED-based claims alleged here are significantly different from the claims asserted in *FOREX* and *Nypl*, and Plaintiffs' allegations here lack an "adequate link" to the forum that would establish personal jurisdiction over Foreign Defendants.  *BMS*, 137 S. Ct. at 1781.  "What

---

[13]  Plaintiffs have not even attempted to allege that personal jurisdiction can be predicated here on interactions between an RFED and a Foreign Defendant's affiliate or subsidiary within this forum, and the Complaint provides no basis for imputing any transaction or communication by an affiliate or subsidiary to a Foreign Defendant for Rule 12(b)(2) purposes here.  *See, e.g.*, *Schwab*, 883 F.3d at 86.  After all, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *FOREX*, 2016 WL 1268267, at *7 (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)); *see Keeton*, 465 U.S. at 781 n.13; *see also, e.g.*, *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *46–48 (S.D.N.Y. Mar. 28, 2017) (rejecting personal jurisdiction allegations seeking to "disregard" defendant's "corporate form").

is needed—and what is missing here—is a connection between the forum and the specific claims at issue." *Id*. In particular:

> *First*, *FOREX* and *Nypl* involved direct claims, asserted by plaintiffs who alleged they were defendants' counterparties in the relevant forum, whereas Plaintiffs here style their claims "indirect." *See FOREX*, 74 F. Supp. 3d at 586; 2016 WL 1268267, at *5–6; *Nypl*, 2018 WL 1472506, at *5–6. There is a clear difference between predicating personal jurisdiction on FX spot-market manipulation claims on FX spot transactions in the forum (as in *FOREX*), or retail purchases of foreign currency directly in the forum from Defendants (as in *Nypl*), and Plaintiffs' bid here to extend personal jurisdiction over their "indirect" claims *without* alleging that any Foreign Defendant engaged in any transaction in this forum with named Plaintiffs' unidentified intermediaries. Such a theory would extend personal jurisdiction to include transactions that never even touched New York nor arose from conduct directed at the forum. Absent an alleged transaction or even communication in New York between each Foreign Defendant and each named Plaintiff's RFED, it cannot be said that the alleged New York connections of the Foreign Defendants have a "causal relationship" to the "episodes in suit" *in this action*. *See Schwab*, 883 F.3d at 84 (quoting *Waldman*, 835 F.3d at 341, 343).[14]

---

[14] The *FOREX* and *Nypl* pleadings identified by name the defendants with which at least a large fraction of named plaintiffs directly transacted. *See FOREX* TAC ¶¶ 18–30; *Nypl* 3d Am. Compl. ¶¶ 21–23 (Dkt. 190) (Aug. 10, 2017).

Again, the Rule 12(b)(2) decision in *FOREX* does not support a finding of personal jurisdiction here. *First*, while that decision relied, in part, on alleged chat communications indicating "participation in the alleged conspiracy (albeit in chatrooms whose participants' locations are presently unknown)" (2016 WL 1268267 at *6), here, named Plaintiffs do not allege occurrence in New York of any chats or other communications between MUFG Bank, Société Générale, or any other Foreign Defendant, and Plaintiffs' intermediaries. *See* SAC ¶¶ 108(d), 108(n). And *second*, no named Plaintiff alleges a purchase of an FX Instrument from *any* intermediary who ever purchased an FX instrument *from MUFG Bank*. *See* SAC ¶¶ 10–20.

**Second**, *FOREX* and *Nypl* involved claims asserted under federal law, activating the Clayton Act's so-called "nationwide service of process" provision (15 U.S.C. § 22), and arguably enabling the Court to consider the entire United States to be the forum. *See FOREX*, 2016 WL 1268267, at *3 n.2, 5 n.3 (citing *Auto. Refinishing Paint*, 358 F.3d at 298); *accord Nypl*, 2018 WL 1472506, at *3 n.4 (same). Because they sue under state law, not the Clayton Act, Plaintiffs cannot use any Foreign Defendant's "aggregate contacts with the United States as a whole" to sustain jurisdiction. *Cf. id.* Thus, for example, unlike the *Nypl* plaintiffs, Plaintiffs cannot rely on plea agreements describing conduct in the District of Connecticut to satisfy their Rule 12(b)(2) burden. *See Nypl*, 2018 WL 1472506, at *5–6. And unlike the *FOREX* plaintiffs, they cannot point to the volume of FX spot market transactions Foreign Defendants undertake "within the United States"— not only because they did not transact directly in the FX spot market, but also because the relevant forum is New York, not the United States. *Cf. FOREX*, 2016 WL 1268267, at *6. Similarly, actions taken by New York regulators and other agencies against FX traders employed by various Defendants do not count as forum contacts supporting specific jurisdiction over Plaintiffs' claims, at least absent allegations that the conduct subject to regulatory intervention imposed concrete harm on a named Plaintiff's unidentified RFED (or even a single named Plaintiff).

The failure to make nonconclusory allegations sufficient for specific jurisdiction, given that the Complaint asserts no federal antitrust claim allowing nationwide service of process, is *particularly* inadequate as to the claims of the nonresident Plaintiffs suing under the laws of their home states other than New York. Even if it were somehow possible to conjure a connection between the New York-based Plaintiff (SAC ¶ 10) and the occurrence of FX spot market conduct by Foreign Defendants in New York as depicted in certain New York regulatory proceedings (SAC ¶¶ 191, 208, 212), that would not suffice to link the nonresident Plaintiffs' state-law claims to

Foreign Defendants' conduct *in this forum*.  The Complaint entirely lacks allegations showing a "connection between the forum and the specific claims at issue" as to the named Plaintiffs based in other States (Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina).  *See BMS*, 137 S. Ct. at 1781.  That is, "[u]nder the circumstances of this case, where each plaintiff's claim is predicated on the law of the particular state where he or she purchased [FX instruments indirectly] and the claims of the other plaintiffs as alleged remain unrelated to anything that transpired in New York, imposing personal jurisdiction for all of the claims because specific jurisdiction may lie as to [the New York Plaintiff's] claim[] would run afoul of the traditional notions of fair play and substantial justice that form the bedrock of any court's personal jurisdiction analysis."  *See Daniel v. Tootsie Roll Indus., LLC*, 2018 WL 3650015, at *8 (S.D.N.Y. Aug. 1, 2018) (quoting *Famular v. Whirlpool Corp.*, 2017 WL 2470844, at *6–7 (S.D.N.Y. June 6, 2017)) (punctuation altered).[15]

### B.   The "Effects" Test Fails Because Plaintiffs Do Not Allege That The Foreign Defendants Intentionally Targeted This Forum

The Complaint also fails to allege adequately specific personal jurisdiction over Plaintiffs' claims through the "effects" test for out-of-forum conduct.  Under this test, "the defendant must 'expressly aim[ ]' his conduct at" the forum.  *Waldman*, 835 F.3d at 337; *see Schwab*, 883 F.3d at 87.

Here, Plaintiffs simply have not asserted that the Foreign Defendants' actions outside the forum were expressly aimed at New York.  The Complaint does not allege that the Foreign

---

[15]   Several courts also have understood that even if a defendant has sufficient "minimum contacts" with the forum that give rise to the claim, the court still must determine that "the plaintiff's choice of forum [is] fair and reasonable."  *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1212 (10th Cir. 2000); *see Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 947 (11th Cir. 1997); *see also Livnat v. Palestinian Auth.*, 851 F.3d 45, 55 n.6 (D.C. Cir. 2017) (noting that issue but declining to express a view).

Defendants acted with the required "calculat[ion] to cause injury" in New York or, for that matter, anywhere else in the United States. *See Calder v. Jones*, 465 U.S. 783, 791 (1984). Indeed, even if any of the RFEDs (the only parties with whom Foreign Defendants purportedly transacted) were located in New York, Plaintiffs expressly allege that the injury the intermediary suffered was at most fleeting: "Because any overcharges paid by the RFED to the Defendant are passed on to the retail FX customer, such as Plaintiffs, it is *impossible* for the RFED to 'absorb' any anticompetitive overcharge caused by the Conspiracy." SAC ¶ 169 (emphasis added). The "focal point" of the alleged misconduct in the FX spot market was the United Kingdom and continental Europe, not New York or anywhere else in the United States. *Calder*, 465 U.S. at 789. Plaintiffs trace their purported injuries, after all, to the "same FX manipulation conspiracy" depicted in the *FOREX* operative pleading, which was centered around traders who resided and socialized in London. *Compare* SAC ¶ 62 *with FOREX* TAC ¶ 118. Thus, allegations of misconduct centered outside New York and outside the United States simply cannot satisfy Plaintiffs' obligation to establish specific jurisdiction *in this forum*.

At most, the Complaint alleges that, when Foreign Defendants endeavored to function as liquidity providers to the RFEDs, they should have been able to foresee downstream harm (SAC ¶¶ 153, 157), but that too falls short, because "mere knowledge" does not meet the "express aim" requirement. *See Waldman*, 835 F.3d at 338; *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *4–6 (S.D.N.Y. Mar. 10, 2017).

## II.     THE CONSPIRACY ALLEGED IN *FOREX* CANNOT SUSTAIN VICARIOUS SPECIFIC JURISDICTION OVER THE FOREIGN DEFENDANTS

Plaintiffs also fail to establish jurisdiction through a conspiracy jurisdiction theory, for two reasons.

*First*, the SAC does not contain the nonconclusory allegations required, at a minimum, for a conspiracy jurisdiction theory—namely, "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's *overt acts in furtherance of the conspiracy* had sufficient contacts with a state to subject that coconspirator to jurisdiction in that state." *Schwab*, 883 F.3d at 87 (emphasis added).  There is no nonconclusory allegation that a transaction in this forum between one of the named Plaintiffs' RFEDs and any Defendant was "in furtherance of" the alleged benchmark and spread manipulation conspiracy.  The SAC thus does not allege that any named Plaintiff is aggrieved by any transactions in New York between any Defendant and Plaintiffs' RFEDs that were "within the scope of" the alleged FX spot market collusion, which, after all, concerns benchmarks centered in the United Kingdom and continental Europe.  *Grunewald v. United States*, 353 U.S. 391, 414 (1957).  And, because a company's promoting its general "financial self-interest is not the same as furthering a conspiracy" through in-forum or forum-directed sales, more is required than to allege simply the bare existence of profitable sales to the RFEDs.  *See Schwab*, 883 F.3d at 87.

Assertions by NYDFS and other agencies about the FX spot market conduct of certain regulated entities, including entities in New York, cannot suffice to show "overt acts in furtherance of the conspiracy" enabling Plaintiffs to invoke the conspiracy jurisdiction theory over their indirect purchaser claims here.  Again, even if it could be inferred that the conduct described by the regulators harmed some unspecified counterparty of the banks at issue in this forum, nothing in the Complaint establishes that *Plaintiffs* or even their intermediaries were injured by that conduct.  And Plaintiffs have disclaimed any need to even identify their RFEDs, let alone to link the RFEDs to the regulatory assertions the Complaint paraphrases.  Dkt. 188 at 1 n.1.

*Second*, for the assertion of conspiracy jurisdiction to satisfy the due process requirement of the U.S. Constitution, Plaintiffs must adequately allege that each Foreign Defendant exercised direction and control over the alleged co-conspirators' in-forum, suit-related acts—and Plaintiffs have not come close to doing so. The "mere presence of one conspirator . . . does not confer personal jurisdiction over another alleged conspirator," at least absent allegations of a partnership with a "general supervision" relationship between them. *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972) (Friendly, J.), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010); *see Schwab*, 883 F.3d at 86–87 (applying *Leasco*). The SAC does not allege that there is any relationship between any Foreign Defendant and any non-Foreign Defendant that amounts to a partnership consistent with that precedent. Without the direction and control inherent in a traditional agency relationship, an alleged co-conspirator's actions in the forum are the mere "unilateral activity of . . . a third person," which are insufficient to confer personal jurisdiction over the foreign defendant. *Walden*, 571 U.S. at 284 (internal quotation marks omitted). Rather, plaintiffs must allege that each Defendant, either personally or through an agent under its control, engaged in substantial suit-related conduct in the forum. *See, e.g.*, *In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017) ("[A]n agency relationship is required to uphold jurisdiction based on a conspiracy theory.").[16]

---

[16]   Plaintiffs appear to incorrectly presuppose that the conspiracy alleged in *FOREX* suffices to establish a conspiracy for jurisdictional purposes. The Second Circuit has been careful to distinguish the tests of liability for a co-conspirator's acts and personal jurisdiction. *See, e.g.*, *Bertha Bldg. Corp. v. Nat'l Theatres Corp.*, 248 F.2d 833, 836 (2d Cir. 1957) (member of conspiracy "to cause injury to the plaintiffs in California" could nevertheless "ha[ve] no agents in California" for personal jurisdiction purposes); *cf. Societe Generale v. Fed. Ins. Co.*, 856 F.2d 461, 465 (2d Cir. 1988) (distinguishing between "co-conspirator liability" and "co-conspirator authority" to act on another's behalf).

## III.   GENERAL PERSONAL JURISDICTION IS LACKING IN THIS FORUM

This Court has already recognized (*FOREX*, 2016 WL 1268267, at \*3–4; *Nypl*, 2018 WL 1472506, at \*3–4) that general jurisdiction is appropriate "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State'" (*Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011))).  "The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business," and in those forums, the corporation is subject to personal jurisdiction for claims arising outside the forums.  *See BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 629 (2d Cir. 2016).

This Complaint is devoid of any allegation that would support such general jurisdiction over the Foreign Defendants in New York or anywhere else in the United States.  None of the Foreign Defendants is incorporated in or has its principal place of business in New York or anywhere else in the United States.  Although the Complaint refers to New York branches of certain Foreign Defendants (*e.g.*, SAC ¶¶ 22, 34, 35), neither New York nor anywhere else in the United States is any Foreign Defendant's principal place of business, and "mere operation of a branch office in [this] forum" does not support general jurisdiction.  *See FOREX*, 2016 WL 1268267, at \*2.  The Foreign Defendants thus are not "at home" or "centered" in—and hence are not subject to jurisdiction in—New York or anywhere else in the United States for claims unrelated to their contacts with the forum.  *See Waldman*, 835 F.3d at 333–34.

## CONCLUSION

The Court should dismiss the Complaint for lack of personal jurisdiction as to the Foreign Defendants.

Dated:   New York, New York                    Respectfully submitted,
         December 20, 2018

SULLIVAN & CROMWELL LLP                GIBSON, DUNN & CRUTCHER LLP

By: /s/ Matthew A. Schwartz           By: /s/ Eric J. Stock
Matthew A. Schwartz                   Eric J. Stock
David H. Braff                        Indraneel Sur
125 Broad Street                      200 Park Avenue
New York, New York  10004             New York, New York  10166
Telephone:  (212) 558-4000            Telephone:  (212) 351-4000
schwartzmatthew@sullcrom.com          estock@gibsondunn.com
braffd@sullcrom.com                   isur@gibsondunn.com

***Attorneys for Foreign Defendant***  D. Jarrett Arp
***Barclays Bank PLC***                 Melanie L. Katsur
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C.  20036
DAVIS POLK & WARDWELL LLP               Telephone:  (202) 955-8500
                                        jarp@gibsondunn.com
By:  /s/ Paul S. Mishkin                mkatsur@gibsondunn.com
Paul S. Mishkin
Melissa C. King                       ***Attorneys for Foreign Defendant***
Maude Paquin                          ***UBS AG***
450 Lexington Avenue
New York, New York  10017
Telephone:  (212) 450-4000            CAHILL GORDON & REINDEL LLP
paul.mishkin@davispolk.com
melissa.king@davispolk.com            By:  /s/ David G. Januszewski
maude.paquin@davispolk.com            David G. Januszewski
                                      Herbert S. Washer
***Attorneys for Foreign Defendant***  Elai Katz
***The Royal Bank of Scotland plc***   Jason M. Hall
                                        80 Pine Street
                                        New York, New York  10005
                                        Telephone:  (212) 701-3000
                                        djanuszewski@cahill.com
                                        hwasher@cahill.com
                                        ekatz@cahill.com
                                        jhall@cahill.com

                                      ***Attorneys for Foreign Defendant***
                                      ***Credit Suisse Group AG***

LINKLATERS LLP

By: /s/ James R. Warnot, Jr.
James R. Warnot, Jr.
Adam S. Lurie
Patrick C. Ashby
1345 Avenue of the Americas
New York, New York  10105
Telephone:  (212) 903-9000
james.warnot@linklaters.com
adam.lurie@linklaters.com
patrick.ashby@linklaters.com

**_Attorneys for Foreign Defendant_**
**_Société Générale_**


PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP

By: /s/ Kenneth A. Gallo
Kenneth A. Gallo
Michael E. Gertzman
Anand Sithian
Maxwell A.H. Kosman
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
kgallo@paulweiss.com
mgertzman@paulweiss.com
asithian@paulweiss.com
mkosman@paulweiss.com

**_Attorneys for Foreign Defendant_**
**_MUFG Bank, Ltd. (f/k/a The Bank of_**
**_Tokyo-Mitsubishi UFJ, Ltd.)_**

LOCKE LORD LLP

By: /s/ Gregory T. Casamento
Gregory T. Casamento
3 World Financial Center
New York, New York  10281
Telephone:  (212) 812-8325
gcasamento@lockelord.com

Roger B. Cowie
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201
Telephone:  (214) 740-8000
rcowie@lockelord.com

J. Matthew Goodin
Julia C. Webb
111 S. Wacker Drive
Chicago, Illinois  60606
Telephone:  (312) 443-0472
jmgoodin@lockelord.com
jwebb@lockelord.com

**_Attorneys for Foreign Defendant_**
**_HSBC Bank plc_**


SIDLEY AUSTIN LLP

By: /s/ Andrew W. Stern
Andrew W. Stern
Alan M. Unger
Nicholas P. Crowell
787 Seventh Avenue
New York, New York  10019
Telephone:  (212) 839-5300
astern@sidley.com
aunger@sidley.com
ncrowell@sidley.com

**_Attorneys for Foreign Defendant_**
**_Standard Chartered Bank_**

ALLEN & OVERY LLP

By: /s/ David C. Esseks
David C. Esseks
Laura R. Hall
Rebecca Delfiner
1221 Avenue of the Americas
New York, New York  10020
Telephone:  (212) 610-6300
david.esseks@allenovery.com
laura.hall@allenovery.com
rebecca.delfiner@allenovery.com

***Attorneys for Foreign Defendant
BNP Paribas Group***