UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONTANT, *et al.*,<br><br>     *Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>     *Defendants*. | No. 17-cv-3139-LGS<br><br>(related to No. 13-cv-7789-LGS) |

**PLAINTIFFS' OPPOSITION TO FOREIGN DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .............................................................................................................. 3

    A.   SCCAC Allegations ................................................................................... 3

    B.   Government Investigations ......................................................................... 4

LEGAL STANDARD ...................................................................................................... 8

ARGUMENT ................................................................................................................. 9

I.    Personal Jurisdiction Is Proper On the Basis of Specific Jurisdiction.................................... 9

    A.   Specific Jurisdiction Exists on the Basis of Foreign Defendants' Participation in the Conspiracy ............................................................................................ 11

    B.   Defendants' Attempts to Distinguish *FOREX* and *Nypl* Fail....................................... 17

II.   Exercising Personal Jurisdiction over the Foreign Defendants is Consistent with Due Process ................................................................................................................ 22

III.  BNP Paribas Group and Credit Suisse Group AG Forfeited Their Rights to Contest Personal Jurisdiction ................................................................................................ 23

CONCLUSION .............................................................................................................. 25

## TABLE OF AUTHORITIES

<u>Cases</u>

*Allgaier v. Peterson*,
  No. 13-cv-5112, 2015 WL 5459808 (S.D.N.Y. Aug. 13, 2015)...............................................24

*Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005).....................................................................................................17

*Asahi Metal Indus. Co., Ltd. v. Superior Court*,
  480 U.S. 102 (1987).........................................................................................................22, 23

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*
  902 F.2d 194 (2d Cir. 1990).......................................................................................................8

*Best Van Lines, Inc. v. Walker*,
  490 F.3d 239 (2d Cir. 2007).....................................................................................................10

*Bristol-Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*,
  137 S. Ct. 1773 (2017)........................................................................................................12, 17

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 ( 1985)................................................................................................................22

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)..............................................................................................passim

*Contant v. Bank of Am. Corp.*,
  No. 17-cv-3139-LGS, 2018 WL 5292126 (S.D.N.Y. Oct. 25, 2018)...................................2, 21

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
  722 F.3d 81 (2d Cir. 2013)..............................................................................................3, 8, 22

*Ford v. United States*,
  273 U.S. 593 (1927).................................................................................................................11

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011).................................................................................................................10

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
  425 F.3d 158 (2d Cir. 2005).......................................................................................................9

*Grunewald v. United States*,
  353 U.S. 391 (1957).................................................................................................................15

*Hawknet, Ltd. v. Overseas Shipping Agencies*,
  590 F.3d 87 (2d Cir.2009).......................................................................................................24

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  74 F. Supp. 3d 581 (S.D.N.Y. 2015) ................................................................... 5, 11

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
  No. 13-cv-7789-LGS, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) .............................. passim

*In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-MD-02,
  475, 2017 WL 2535731 (S.D.N.Y. June 8, 2017) ..................................................... 16

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ......................................................................................... 22

*Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018) ................................................................... 15

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984) ......................................................................................... 17

*Laydon v. Mizuho Bank, Ltd.*,
  No. 12-cv-3419, 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) .................................... 25

*Leasco Data Processing Equip. Corp. v. Maxwell*,
  468 F.2d 1326 (2d Cir. 1972) ............................................................................. 16

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  673 F.3d 50 (2d Cir. 2012) ................................................................................. 9

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ............................................................................... 10

*Marine Midland Bank, N.A. v. Miller*,
  664 F.2d 899 (2d Cir. 1981) ............................................................................... 8

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) ............................................................................. 22, 23

*Nypl v. JPMorgan Chase & Co.*,
  No. 15-cv-9300-LGS, 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) .............................. passim

*Rush v. Savchuk*,
  444 U.S. 320 (1980) ......................................................................................... 17

*Sonera Holding B.V. v. Cukurova Holding A.S.*,
  750 F.3d 221 (2d Cir. 2014) ............................................................................... 9

*Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*,
  No. 01-cv-1574, 2002 WL 719471 (E.D.N.Y. Mar. 1, 2002) ....................................... 9

*United States v. Manuel*,
  371 F. Supp. 2d 404 (S.D.N.Y. 2005).........................................................................11

*Unspam Techs., Inc. v. Chernuk*,
  716 F.3d 322 (4th Cir. 2013) ..............................................................................16, 17

*Walden v. Fiore*,
  571 U.S. 277 (2014)......................................................................................9, 16, 17, 22

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016).................................................................................15

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) ...................................................................23

## <u>Statutes</u>

15 U.S.C. § 22..............................................................................................................17

28 U.S.C. § 1746............................................................................................................1

## <u>Rules</u>

Fed. R. Civ. P. 12..................................................................................................passim

N.Y. C.P.L.R. § 302......................................................................................................9

## PRELIMINARY STATEMENT

The Foreign Defendants' motion to dismiss should be denied. The Court previously rejected arguments substantially similar to those asserted here in holding that it had personal jurisdiction over four of the Foreign Defendants. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13-cv-7789-LGS, 2016 WL 1268267, at *1 (S.D.N.Y. Mar. 31, 2016) (rejecting 12(b)(2) motion filed by The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") and Société Générale ("SocGen"), and granting leave to add Standard Chartered Bank ("Standard Chartered") as a Defendant); *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2018 WL 1472506, at *1 (S.D.N.Y. Mar. 22, 2018) (rejecting 12(b)(2) motion filed by The Royal Bank of Scotland plc ("RBS"), UBS AG ("UBS"), and Barclays PLC). The remaining five Foreign Defendants—Barclays Bank PLC ("Barclays"), BNP Paribas Group ("BNP Paribas"), Credit Suisse Group AG ("Credit Suisse"), HSBC Bank plc ("HSBC"), and Standard Chartered Bank ("Standard Chartered")—did not contest personal jurisdiction in *FOREX* and are not named as defendants in *Nypl*. Guided by the Court's prior personal jurisdiction rulings in *Nypl* and *FOREX*, Plaintiffs did not name foreign entities that this Court dismissed on jurisdictional grounds in those actions. *See* ECF No. 181 (Transcript of November 15, 2018 Conference) at 17:19-22. The Foreign Defendants cannot distinguish the Court's prior rulings denying Defendants' Rule 12(b)(2) motions in *FOREX* and *Nypl*. *See* Foreign Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Second Amended Complaint for Lack Personal Jurisdiction, ECF No. 198 ("D. Br.").

This Court has personal jurisdiction over Foreign Defendants on multiple grounds. First, specific jurisdiction exists over Foreign Defendants under the well-established doctrine of conspiracy jurisdiction. This Court has already held that the Second Consolidated Class Action

1

Complaint ("SCCAC") plausibly alleges that all Defendants engaged in a "conspiracy to fix prices in the FX spot market" and to "manipulate[] the FX benchmark rates, which underlie the pricing of all FX Instruments" (the "Conspiracy"). *See Contant v. Bank of Am. Corp.*, No. 17-cv-3139-LGS, 2018 WL 5292126, at *1 (S.D.N.Y. Oct. 25, 2018). And Foreign Defendants do not dispute that the Court has specific jurisdiction over the non-Foreign Defendants based on the non-Foreign Defendants' acts in furtherance of the Conspiracy that took place in New York and/or were directed at New York. Accordingly, the Court has personal jurisdiction over all Defendants—including Foreign Defendants—pursuant to the doctrine of conspiracy jurisdiction. Second, the Court has specific jurisdiction consistent with due process over the Foreign Defendants for the same reasons the Court announced in *FOREX* and *Nypl*: the Foreign Defendants participated in the Conspiracy within this forum and with the aim to cause harm in the forum. Contrary to Foreign Defendants' suggestions otherwise, The Court's personal jurisdiction rulings in *FOREX* and *Nypl* did not turn on the locations of the direct purchaser plaintiffs at the time of their transactions with Defendants; rather, the Court focused on Defendants' actions in furtherance of the Conspiracy that took place in and were directed at the forum. *See FOREX*, 2016 WL 1268267, at *5; *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, 2018 WL 1472506, at *4–7 (S.D.N.Y. Mar. 22, 2018). Finally, Defendants BNP Paribas Group and Credit Suisse Group AG forfeited their ability to contest personal jurisdiction by declining to join their fellow Foreign Defendants' prior Rule 12(b)(2) motion. Accordingly, the Foreign Defendants' Motion to Dismiss should be denied for the same reasons that the Court previously denied substantially similar motions in *FOREX* and *Nypl*.

## BACKGROUND

The SCCAC and Dell'Angelo Declaration ("Dell'Angelo Decl.") submitted by Plaintiffs

contain the following allegations, which must be assumed as true for purposes of this motion.

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).

### A.    SCCAC Allegations

The SCCAC contains the following allegations, *inter alia,* regarding the Foreign

Defendants' collusive acts and FX activity in New York.

- "Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically and in the United States generally. . . . Each Defendant has continuously and systematically transacted FX in this District and throughout the United States. . . . Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District and throughout the United States. Defendants' conduct was within the flow of, and had substantial effect on, the interstate commerce of the United States, including this District." SCCAC ¶ 8.

- "Defendants all conduct significant business in New York, including business relating to FX trading. . . . Defendants . . . The Bank of Tokyo Mitsubishi UFJ Ltd.; Société Générale S.A.; Standard Chartered Bank; . . . Barclays Bank PLC; . . . and [The] Royal Bank of Scotland PLC all have major New York offices and conduct a substantial portion of their FX trading in New York." *Id*. ¶ 263(c).

- At year-end 2013, BTMU reported for its New York branch gross notional outstanding spot FX contracts of $2.4 billion and FX derivatives of $69.8 billion, for a total of $72.2 billion. *Id*. ¶ 22.

- At year-end 2013, SocGen reported for its New York branch gross notional outstanding spot FX contracts of approximately $13 million and FX derivatives of $21.6 billion. *Id*. ¶ 34.

- At year-end 2013, Standard Chartered reported for its New York branch gross notional outstanding spot FX contracts of $1.9 billion and FX derivatives of $141.4 billion. *Id*. ¶ 35.

- In a December 2011 chat room conversation uncovered by the CFTC, traders at UBS, Citigroup, and JPMorgan discuss inviting another trader from Barclays into their chat group, called the "Cartel," and the Citigroup trader specifically mentions coordinating with Citigroup's New York office to manipulate FX prices. *Id*. ¶ 113.

- The Commodity Futures Trading Commission brought and settled charges against Barclays, Citigroup, HSBC, JPMorgan, RBS, and UBS for violations of the Commodity Exchange Act relating to their involvement in the Conspiracy. *Id*. ¶ 186.

- Defendants Citigroup, JPMorgan, Barclays, and RBS pled guilty to felony charges of conspiring to manipulate the prices of U.S. dollars and euros traded in the FX spot market. *Id*. ¶ 188.

- Defendant UBS pled guilty for illegal FX-related conduct in violation of an earlier Non-Prosecution Agreement related to a conspiracy to manipulate benchmark interest rates. *Id*. ¶ 189.

- The New York Department of Financial Services ("NYDFS") entered into a consent order with Foreign Defendant Barclays Bank PLC" and the "Barclays Bank plc, New York Branch" requiring Barclays to pay $485 million and ordering Barclays to terminate eight employees who engaged in New York Banking Law violations in connection with manipulating FX rates. *Id*. ¶ 191.

- HSBC Bank plc's former global head of FX cash trading, Mark Johnson, was arrested by U.S. authorities at JFK airport on charges of conspiracy and wire fraud. A warrant was also issued for the arrest of Stuart Scott, who was formerly Johnson's deputy and head of HSBC Bank plc's FX cash trading operations for Europe, the Middle East, and Africa. *Id*. ¶ 192.

- Former Barclays trader Jason Katz pled guilty to criminal charges in Manhattan federal court, admitting to participation in a conspiracy with other bankers to manipulate currency prices on electronic trading platforms while working at three different financial institutions from 2007 to 2013. *Id*. ¶ 195. That same day, the Federal Reserve Board announced that it had permanently banned Katz from the banking industry. *Id*. ¶ 196. The Federal Reserve Board has also issued lifetime bans to Matthew Gardiner, a former FX trader at Barclays and UBS, and Christopher Ashton, the former head of spot trading at Barclays. Ashton was also fined $1.2 million by the Board. *Id.*

- Former JPMorgan, Citigroup, and Barclays traders Richard Usher, Rohan Ramchandani, and Chris Ashton were indicted on charges for their alleged roles in a conspiracy to manipulate the price of U.S. dollars and euros. These three former traders were members of the chat group that dubbed themselves the "Cartel." A fourth member of the "Cartel," Matt Gardiner, a former trader at UBS, Barclays, and Standard Chartered, has been cooperating with the DOJ in their ongoing criminal investigation. Usher also worked for RBS during the Class Period. *Id*. ¶ 197.

     **B.**    **Government Investigations**

Several of the Foreign Defendants, as well as other non-Foreign Defendants, have

acknowledged their roles in the Conspiracy in plea agreements and consent decrees with various

governmental authorities. *See, e.g.*, SCCAC ¶¶ 188-89 (Citigroup, JPMorgan, Barclays, UBS,

and RBS pled guilty to "felony charges of conspiring to manipulate the prices of U.S. dollars and euros traded in the FX spot market");[1] Dell'Angelo Decl. Ex. 3 (BNP Paribas pled guilty to participating in a "conspiracy to suppress and eliminate competition by fixing prices for Central and Eastern European, Middle Eastern, and African . . . currencies traded in the United States and elsewhere, from at least as early as September 2011 and continuing until at least July 2013"). Foreign Defendants note that the Citigroup, JPMorgan, Barclays, UBS, and RBS guilty pleas were entered into with federal prosecutors in the District of Connecticut. D. Br. at 5. However, Foreign and non-Foreign Defendants have entered into numerous additional guilty pleas and consent decrees in which they admit to participating in the Conspiracy both within New York and in the United States generally. For example:[2]

- Foreign Defendant Barclays Bank PLC entered into a consent decree with the NYDFS in which it admitted that Barclays Bank PLC and its "New York Branch" engaged in "manipulative conduct and attempted to manipulate benchmark foreign exchange ('FX') rates around the world, during at least 2008 through 2012, to benefit Barclays' own trading positions" and "conspired with other banks in order to coordinate trading, attempt to manipulate exchange rates, or coordinate bid/ask spreads." Dell'Angelo Decl. Ex. 4 at 1. As of the date of the consent decree (May 20, 2015), the Barclays Bank PLC New York branch had "more than 500 employees and total assets exceeding $36 billion." *Id.* at 1. The consent decree cited a chat conversation in which Barclays Bank PLC's "Vice President in the New York Branch" stated: "markup is making sure you make the right decision on price . . . which is whats the worst price i can put on this where the customers decision to trade with me or give me future business doesn't change . . . if you aint cheating, you aint trying." *Id.* at 14. NYDFS also found that "[a] number of Barclays employees [] were involved in the wrongful conduct discussed in this Order, including . . . a director on the FX Spot trading desk in New York, a director on the Emerging Markets desk in New York, a managing director in FX Hedge Fund Sales in New York, [and] a director in FX Real Money Sales in New York . . ." *Id.* at 19. As part of Barclays' penalties set forth in the consent order, the NYDFS ordered Barclays to "take all steps necessary to terminate the following four employees, who played a role in the misconduct

---

[1] The entities that pled guilty "to conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange (FX) spot market" include Foreign Defendants The Royal Bank of Scotland plc and UBS AG. *See* Dell'Angelo Decl. Ex. 1 (UBS Plea Agreement); Dell'Angelo Decl. Ex. 2 (RBS Plea Agreement).

[2] This Court took judicial notice of Defendants' plea agreements in *FOREX*, and may similarly take judicial notice of the plea agreements and consent decrees referenced herein and in the Dell'Angelo Declaration. *See FOREX*, 74 F. Supp. 3d at 588 n.4.

discussed in this Consent Order but who remain employed by the Bank: a vice president on the Emerging Markets trading desk in New York, two directors on the FX Spot trading desk in New York and a director on the FX Sales desk in New York (who previously was Co-Head of UK FX Hedge Fund Sales in London)." *Id.* at 19-20.

- Credit Suisse AG entered into a consent decree with the NYDFS in which it admitted that Credit Suisse AG and its "New York Branch" engaged in "coordinated trading, manipulation of exchange rates, and increased bid/ask spreads offered to customers in Credit Suisse's foreign exchange business" in collusion with "other global banks" and that Credit Suisse's illegal FX manipulation included a Credit Suisse "support staffer" in New York. Dell'Angelo Decl. Ex. 5 at 1-2, 19.

- Foreign Defendant BNP Paribas Group entered into a consent decree with the NYDFS in which it admitted that BNP Paribas Group and its "New York Branch" participated in the Conspiracy through, *inter alia*, "[c]ollusive conduct carried out through on-line chat rooms," "[i]mproperly exchanging information about past and impending customer trades in order to maximize profits at customers' expense," and "[m]anipulation of the price at which daily benchmark rates were set." Dell'Angelo Decl. Ex. 6 at 1-2; SCCAC ¶ 208.[3] BNP Paribas also admitted in the consent decree that its participation in the Conspiracy "involved employees located in both New York and other [BNP Paribas Group] locations across the globe." Dell'Angelo Decl. Ex. 6 at 2.

- Former Barclays and BNP Paribas FX trader Jason Katz entered into a guilty plea in the Southern District of New York in which he admitted that ***while residing in and working for Barclays and BNP Paribas in New York***, he "knowingly enter[ed] into and engag[ed] in a combination and conspiracy to suppress and eliminate competition by fixing prices for Central and Eastern European, Middle Eastern, and African Emerging Markets currencies . . . from at least as early as January 2007 and continuing until at least July 2013." SCCAC ¶ 195; *see also* Dell'Angelo Decl. Ex. 7 (criminal complaint) at 1.

- Former Citigroup FX trader Christopher Cummins entered into a guilty plea in the Southern District of New York in which he admitted that while residing in and working for Citigroup in New York, he "knowingly enter[ed] into and engag[ed] in a combination and conspiracy to suppress and eliminate competition by fixing prices for Central and Eastern European, Middle Eastern, and African Emerging Markets currencies . . . from at least as early as January 2007 and continuing until at least July 2013." Dell'Angelo Decl. Ex. 8 at 1; *see also* SCCAC ¶ 198.

- Defendant BNP Paribas North America Inc., the "intermediate holding company for the U.S. businesses of [Foreign Defendant BNP Paribas Group]," entered into a guilty plea in the Southern District of New York in which it admitted to participating in the Conspiracy and that "[i]n furtherance of the conspiracy, the defendant and its co-conspirators engaged

---

[3] The NYDFS refers to BNP Paribas Group as "BNP Paribas S.A." As set forth in the Declaration of William F. Hennessey, 2nd In Support of Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. 199-2, the entity referred to in the SCCAC as "BNP Paribas Group" is also known as BNP Paribas S.A. *Id.* ¶ 3.

in communications, including near daily conversations, through private chat rooms, phone calls, text messages, other personal cell phone applications, ***and in-person meetings within the Southern District of New York***, among other means of communication," and that "***[a]cts in furtherance of the charged offense were carried out within the Southern District of New York*** and elsewhere." Dell'Angelo Decl. Ex. 3 at 1, 5-6 (emphasis added).

- HSBC Holdings plc entered into a deferred prosecution agreement in the Eastern District of New York in which it agreed to pay more than $100 million in penalties and stipulated to a statement of facts stating that both HSBC Holdings plc ***and Foreign Defendant HSBC Bank plc*** engaged in a conspiracy to "drive up the price of [the GPB/USD currency pair]" and "caused other FX traders at HSBC in both London and New York" to profit from the illegal price manipulation. Dell'Angelo Decl. Ex. 9 at 2, A-7. HSBC also admitted that "***wires sent in furtherance of the scheme were transmitted from the Eastern District of New York***" and that its New York employees profited from the illegal manipulation by communicating via Bloomberg chat with other HSBC employees. *Id.* at A-10 to A-12 (emphasis added).

- Foreign Defendants HSBC Bank plc, The Royal Bank of Scotland plc, Barclays Bank PLC, and UBS AG entered into settlements with the CFTC in which they all admitted that they conspired with other FX dealers to manipulate currency pairs involving the U.S. Dollar. *See* Dell'Angelo Decl. Ex. 10 (HSBC CFTC Settlement), at 2; *id.* Ex. 11 (RBS CFTC Settlement), at 2; *id.* Ex. 12 (Barclays CFTC Settlement), at 2; *id.* Ex. 13 (UBS CFTC Settlement, at 2; *see also* SCCAC ¶ 186 (overviewing the CFTC settlements).

- The Federal Reserve Board announced that it is seeking to permanently ban Peter Little, the former head of the FX spot desk at Barclays Bank PLC in New York, from the banking industry and to impose a $487,500 fine on him for engaging in unsafe and unsound practices by using electronic chat rooms to coordinate with traders at competitor banks to influence FX pricing benchmarks and engage in manipulative trading. *See* SCCAC ¶ 214; Dell'Angelo Decl. Ex. 14 (Federal Reserve Notice of Penalties).

- The Federal Reserve Board banned Michael Weston, a former FX spot desk trader at Barclays Bank PLC in New York, from the banking industry for engaging in unsafe and unsound practices including participating in multibank electronic chatrooms to engage in "disclosures to traders of other institutions of confidential information of Barclays and its customers; and . . . possible coordination of the trading of certain currency pairs in connection with FX currency benchmarks or 'fixes' set by World Markets/Reuters and the European Central Bank with traders of other institutions." Dell'Angelo Decl. Ex. 15 (Federal Reserve Order); *see also* SCCAC ¶ 210.

The Foreign Defendants' Conspiracy-related contacts with this forum are not somehow diminished because the Conspiracy also involved collusive acts in the United Kingdom, Connecticut, or anywhere else. *See FOREX*, 2016 WL 1268267, at *4 (holding that the plaintiffs

made a prima facie showing of specific jurisdiction because the complaint "give[s] rise to the reasonable inference that [the Foreign Defendants] participated in the alleged conspiracy in the United States *or participated elsewhere with the aim to cause harm* in the United States." (emphasis added)). The Court has twice found the contacts alleged here sufficient to establish personal jurisdiction. *See id.*; *Nypl*, 2018 WL 1472506, at *5.

## LEGAL STANDARD

On a "Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction." *Dorchester*, 722 F.3d at 85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Plaintiffs' factual allegations are assumed to be true for purposes of the motion, and "pleadings and affidavits [are construed] in the light most favorable to plaintiffs, resolving all doubts in their favor." *Id.* (internal quotation marks and citation omitted). "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). As this Court held in *FOREX*, Plaintiffs are not required to allege specific transactions that link Foreign Defendants to the forum, as such a requirement would "amount[] to 'a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage.'" *FOREX*, 2016 WL 1268267, at *6.

A prima facie showing of personal jurisdiction requires: (1) procedurally proper service of process, (2) "a statutory basis for personal jurisdiction that renders such service of process effective," and (3) that "the exercise of personal jurisdiction [] comport[s] with constitutional due

process principles." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012). Foreign Defendants do not dispute that the service requirement is satisfied and that New York law provides the statutory basis for personal jurisdiction.[4] Therefore, the key issue is whether the Court's exercise of personal jurisdiction would comport with due process. For the reasons discussed below, Plaintiffs have that established personal jurisdiction exists.

## ARGUMENT

### I.     Personal Jurisdiction is Proper on the Basis of Specific Jurisdiction

"Specific or conduct-linked jurisdiction . . . 'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation.'" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 918 (2011)); *see also Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation.") (citation omitted). Under the "purposeful availment" theory of personal jurisdiction, minimum contacts to support specific jurisdiction "exist where the defendant has purposefully availed itself of the privilege of conducting activities within the forum State . . . such that the defendant should reasonably anticipate being haled into court there." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239,

---

[4] *See, e.g.*, N.Y. C.P.L.R. § 302(a) ("As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent . . . transacts any business within the state . . .; or commits a tortious act within the state . . .; or commits a tortious act without the state causing injury to person or property within the state . . . if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or owns, uses or possesses any real property situated within the state."). "For jurisdictional purposes, anti-trust violations are considered tortious acts" under the New York long-arm statute. *See Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01-cv-1574, 2002 WL 719471, at *3 (E.D.N.Y. Mar. 1, 2002).

242-43 (2d Cir. 2007) (internal quotation marks, alterations, and citations omitted). Under the "effects test," specific jurisdiction may also exist even if none of the relevant conduct took place inside the forum where Defendants' acts outside of the forum were "expressly aimed" at the forum and the claims in suit arose out of those actions. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013); *see also Best Van Lines, Inc.*, 490 F.3d at 243 (describing the two tests as "independent, if conceptually overlapping, methods of demonstrating minimum contacts"). "The effects test is a theory of personal jurisdiction typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. Accordingly, a defendant's business within the forum, their in-forum acts relating to the claims at issue, and their out of forum acts relating to the claims at issue that had the effect of harming the plaintiffs are all probative of specific jurisdiction. *See generally FOREX*, 2016 WL 1268267, at *6 (holding that "[t]aken as a whole, the [complaint] plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to the [Foreign] Defendants' substantial FX businesses here.").

Where plaintiffs plausibly allege that defendants entered into an unlawful conspiracy, the acts of co-conspirators are attributed to all defendants for purposes of specific jurisdiction under the doctrine of "conspiracy jurisdiction." *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018); *Nypl*, 2018 WL 1472506, at *7. "The Supreme Court has specifically upheld the exercise of jurisdiction over conspirators who have never entered the United States, where the conspiracy 'was directed to violation of the United States law within the United States.'" *United States v. Manuel*, 371 F. Supp. 2d 404, 409 (S.D.N.Y. 2005) (quoting *Ford v.*

*United States*, 273 U.S. 593, 620 (1927)).[5] "To allege a conspiracy theory of personal jurisdiction: 'the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state.'" *Nypl*, 2018 WL 1472506, at *7 (quoting *Schwab*, 883 F.3d at 87).

For the reasons described below, Foreign Defendants are subject to specific jurisdiction on the bases of their own acts in furtherance of the Conspiracy that took place in or were directed at New York, as well as the forum-related acts of their co-conspirators in furtherance of the Conspiracy.

### A.     Specific Jurisdiction Exists on the Basis of Foreign Defendants' Participation in the Conspiracy

In *FOREX*, this Court found that the core allegation was that "Defendants conspired to fix [FX] benchmark rates for their own profit." *FOREX*, 2016 WL 1268267, at *5 (citing *FOREX*, 74 F. Supp. 3d at 587). The Court held that *FOREX* plaintiffs had tied Defendants' unlawful conduct to the United States through allegations in their complaint regarding the collusive conduct taking place in or directed at New York and the United States in general and through additional information regarding Defendants' extensive FX activity in the United States:

> Here, Plaintiffs plead collusive conduct within the United States, give examples of each New Defendants' participation in the alleged conspiracy (albeit in chatrooms whose participants' locations are presently unknown), and provide undisputed averments concerning the New Defendants' extensive U.S.-based FX operations. Taken as a whole, the [complaint] plausibly alleges suit-related

---

[5] Foreign Defendants argued in their previous Rule 12(b)(2) brief that "personal jurisdiction consistent with the Due Process Clause cannot be obtained over the Foreign Defendants based on the alleged conduct of other Defendants" because "the conspiracy theory of personal jurisdiction is unsettled in this Circuit." ECF No. 107 at 21 (citations omitted). Following the Second Circuit's ruling in *Schwab* and this Court's ruling in *Nypl* affirming the validity of conspiracy jurisdiction, Defendants now concede that the doctrine of conspiracy jurisdiction is well-established in the Second Circuit. *See* D. Br. at 23.

conduct that either took place in the United States, or had effects expressly aimed
inside the country due to the New Defendants' substantial FX businesses here.

*Id*. at *6. Similarly, in *Nypl*, the Court denied Rule 12(b)(2) motions brought by Barclays PLC,

The Royal Bank of Scotland plc, and UBS AG, holding that the complaint contained allegations

that sufficiently "tied" the alleged Conspiracy to the forum, including allegations that "a

substantial part of the events giving rise to plaintiffs' claims occurred in this District, a

substantial portion of the affected interstate trade and commerce described herein was carried out

in this District," and that "[t]he conspiracy to set, fix and establish foreign currency Benchmark

exchange rates and impose Trade Restraints was implemented in California and New York and

the Defendants have enforced their price-fixing conspiracy and Trade Restraints in California

and New York . . ." *Nypl*, 2018 WL 1472506, at *5.[6]

Here, the SCCAC includes allegations substantially similar to those that the Court found

sufficient for purposes of establishing specific jurisdiction in *FOREX* and *Nypl*. The SCCAC

alleges that the Foreign Defendants acted in furtherance of the Conspiracy in New York and

communicated with co-conspirator Defendants who were in New York. The SCCAC contains

numerous allegations of both Foreign and non-Foreign Defendants participating in the

Conspiracy in New York and through communications with New York-based co-conspirators.

*See, e.g.*, SCCAC ¶ 2 (a Barclays New York-based Vice President discussed Barclays'

---

[6] Defendants cite to *Bristol-Myers Squibb Co. v. Superior Court of Calif., San Francisco Cty.*, 137 S. Ct. 1773, 1781
(2017) ("*BMS*"), for the proposition that "'for a court to exercise specific jurisdiction over a claim, there must be an
affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes
place in the forum State'—here, New York." D. Br. at 3 (quoting *BMS*, 137 S. Ct. at 1780). This Court in *Nypl* cited
that same *BMS* provision in holding that the *Nypl* plaintiffs adequately alleged an affiliation between the Foreign
Defendants and the forum through both Foreign Defendants' acts in furtherance of the Conspiracy that occurred
within the forum as well as the Foreign Defendants' acts that occurred outside of the forum that were aimed at
furthering the Conspiracy in New York and in the United States generally. *See Nypl*, 2018 WL 1472506, at *4
(citing *BMS*, 137 S. Ct. at 1780). As described herein, specific jurisdiction is proper here for the same reasons that
the Court set forth in *Nypl*.

participation in the Conspiracy and stated that "if you aint cheating, you aint trying");[7] ¶ 8 ("Defendants' collusive and manipulative acts took place, in substantial part, in New York"); ¶ 12 (alleging that most Defendants are headquartered in, maintain their principal place of business in, or maintain substantial offices in New York and conduct FX trading activities from those offices and that "Defendant traders located outside of the United States communicated directly with Defendant traders located in New York to carry out and facilitate the conspiracy."); ¶ 113 (three Defendant traders discuss inviting a New York trader into their secret "Cartel" group); ¶ 191 (Barclays Bank PLC's New York Branch admitted to participating in the Conspiracy in a consent decree with the NYDFS);[8] ¶ 192 (HSBC traders were arrested in New York for encouraging New York-based HSBC traders to profit from their illegal FX price manipulation); ¶ 212 (Credit Suisse AG's New York Branch admitted to participating in the Conspiracy in a consent decree with the NYDFS);[9] ¶ 214 (the Federal Reserve sought to permanently ban the former head of the FX spot desk at Barclays Bank PLC in New York from the banking industry for his involvement in the Conspiracy); ¶ 234 (Deutsche Bank fired three of their New York-based FX traders for their involvement in the Conspiracy); ¶ 238 (the NYDFS required Barclays to terminate eight FX traders as a part of Barclays' penalties for its involvement in the Conspiracy). In addition, Plaintiffs allege that "[e]ach Defendant has continuously and systematically transacted FX in this District and throughout the United States," and that "Defendants' conspiracy was directed at, and had the intended effect of, causing injury to

---

[7] *See also* Dell'Angelo Decl. Ex. 4 at 14 (Barclays Bank PLC consent decree with the NYDFS stating that the Barclays trader was "Vice President in the New York Branch" at the time of the statement).

[8] *See also* Dell'Angelo Decl. Ex. 4 at 1 (stating that the Barclays Bank PLC New York Branch "conspired with other banks in order to coordinate trading, attempt to manipulate exchange rates, or coordinate bid/ask spreads").

[9] *See also* Dell'Angelo Decl. Ex. 5 at 2, 19 (Credit Suisse consent decree with the NYDFS finding that the Credit Suisse AG New York Branch engaged in "coordinated trading, manipulation of exchange rates, and increased bid/ask spreads offered to customers in Credit Suisse's foreign exchange business" and that Credit Suisse's illegal FX manipulation included a Credit Suisse "support staffer in New York").

persons residing in, located in, or doing business in this District and throughout the United States [and] Defendants' conduct was within the flow of, and had substantial effect on, the interstate commerce of the United States, including this District." SCCAC ¶ 8.

The SCCAC contains extensive allegations about the Conspiracy, including that each of the Foreign Defendants participated in chat rooms with their co-conspirator Defendants in which they exchanged information regarding FX Instrument pricing and FX benchmark rates. *Id.* at 108. In fact, the SCCAC alleges specific acts undertaken in furtherance of the Conspiracy by every single Foreign Defendant.[10] Moreover, the Foreign Defendants' own admissions in the guilty pleas and consent decrees described above demonstrate their presence in New York and their New York acts in furtherance of the Conspiracy. Foreign Defendants do not dispute that the SCCAC sufficiently alleges that Foreign Defendants' co-conspirators' "overt acts in furtherance of the conspiracy had sufficient contacts with [New York] to subject that co-conspirator to jurisdiction in [New York].'" *Nypl*, 2018 WL 1472506, at *7 (quoting *Schwab*, 883 F.3d at 87); *see* D. Br. at 22-24. Accordingly, because the SCCAC plausibly alleges that (1) there was a Conspiracy, (2) Foreign Defendants participated in the Conspiracy; and (3) the overt acts of both non-Foreign Defendants and Foreign Defendants "had sufficient contacts with [this] state to subject that co-conspirator to jurisdiction in th[is] state," *see Schwab*, 883 F.3d at 87, the

---

[10] *See, e.g.*, SCCAC ¶ 108 (alleging that all Foreign Defendants participated in chat rooms discussing FX Instrument prices with other Defendants); ¶ 109 (FX traders at UBS, Barclays, RBS, BTMU, and Credit Suisse participated in secret chat groups in which traders coordinated trades in furtherance of the Conspiracy); ¶ 110 (FX traders at HSBC and RBS told other traders to participate in their "fixing" of FX Instrument prices); ¶ 117 (a SocGen trader coordinated with a Barclays trader to fix bid-ask spreads in furtherance of the Conspiracy); ¶ 197 (a former FX trader at UBS, Barclays, and Standard Chartered cooperated with the Department of Justice in their criminal investigation into the Conspiracy); ¶ 243 (a Standard Chartered trader invited a Morgan Stanley trader to exploit confidential SocGen customer information in furtherance of the Conspiracy, and "SocGen encouraged traders to gain market intelligence by sharing information with traders at other banks.").

conspiracy jurisdiction doctrine set forth in *Schwab* compels that Foreign Defendants are subject to personal jurisdiction here.[11]

Defendants incorrectly claim that "Plaintiffs must adequately allege that each Foreign Defendant exercised direction and control over the alleged co-conspirators' in-forum, suit-related acts" to establish conspiracy jurisdiction. D. Br. at 24. Under *Schwab*, there is no such requirement. *Schwab*, 883 F.3d at 87; *see also Nypl*, 2018 WL 1472506, at *7 (S.D.N.Y. Mar. 22, 2018) (holding that the second prong of the conspiracy jurisdiction test is met where a foreign defendant "participated in the conspiracy" any engaged in "*any* suit-related conduct in *any* jurisdiction" (emphasis added)). In this Circuit, by entering into an unlawful agreement, a defendant is liable for the acts of their co-conspirator regardless of whether the defendant exerted "control" over each and every act of their co-conspirators. *See, e.g.*, *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285 (S.D.N.Y. 2018) (holding that a defendant is subject to personal jurisdiction on the basis of conspiracy jurisdiction if the complaint plausibly alleges that the defendant "was part of the conspiracy"); *see also Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) (establishing the three-prong test for conspiracy jurisdiction that the Second Circuit adopted in *Schwab*, with no additional "control" requirement).

---

[11] Foreign Defendants suggest that in addition to alleging that Foreign Defendants' co-conspirators engaged in forum-related "overt acts in furtherance of the conspiracy," Plaintiffs must also allege that each and every FX Instrument transaction relevant to Plaintiffs' claims took place within the forum. *See* D. Br. at 23 (arguing that conspiracy jurisdiction cannot apply here because "[t]here is no nonconclusory allegation that a transaction in this forum between one of the named Plaintiffs' RFEDs and any Defendant was 'in furtherance of' the alleged benchmark and spread manipulation conspiracy."). The only authority cited by Foreign Defendants in support of that novel argument is a concurring opinion in *Grunewald v. United States*, 353 U.S. 391, 414 (1957), a criminal tax evasion case that makes no mention of personal jurisdiction or any other issue remotely relevant to Foreign Defendants' Motion. *See* D. Br. at 23 (citing *Grunewald*, 353 U.S. at 414 (Jackson, J., concurring). As Foreign Defendants correctly state elsewhere in their brief, the personal jurisdiction inquiry "focuses on the relationship among *the defendant, the forum, and the litigation*." D. Br. at 17 (emphasis in original) (citing *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 335 (2d Cir. 2016)). Accordingly, Plaintiffs need not allege the physical locations of the transactions of Plaintiffs and the RFEDs with which Plaintiffs transacted in order to establish personal jurisdiction.

The cases cited by Defendants in support of their "control" argument are inapposite. Contrary to Defendants' assertion, *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972), does not impose a "general supervision" requirement for conspiracy jurisdiction. D. Br. at 24. The *Leasco* court's mention of "general supervision" arose in the context of the court's discussion of whether a partnership relationship alone, absent any allegations that the partners participated in a conspiracy together, is sufficient to attribute the acts of one partner to the other for purposes of personal jurisdiction. 468 F.2d at 1343. The *Leasco* court's holding is entirely consistent with the *Schwab* court's recognition that in addition to the defendant's co-conspirator being present in the relevant forum, there must be an allegation that the "co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts" with the forum. *Schwab*, 883 F.3d at 87. *Walden v. Fiore*, 571 U.S. 277 (2014), cited in D. Br. at 24, did not involve allegations of a conspiracy, has no mention whatsoever of conspiracy jurisdiction, and did not alter the three-prong test set forth by the Second Circuit in *Schwab* for conspiracy jurisdiction. *Id. Walden*, 571 U.S. at 281. Finally, Defendants cite *In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-MD-02475, 2017 WL 2535731, at *9 (S.D.N.Y. June 8, 2017), but fail to mention that *Crude Oil* was abrogated by *Schwab* and is currently on appeal. *See id.*, *appeal filed* Jul. 20, 2017, No. 17-2233 (2d Cir.); D. Br. at 24. Although the court in *Crude Oil* held that "there is reason to think that basing specific personal jurisdiction on the acts of a defendant's co-conspirators is questionable" in the Second Circuit, *id.* at *9, the Second Circuit in *Schwab* directly rejected this proposition. *See Schwab*, 883 F.3d at 87 (adopting the conspiracy jurisdiction doctrine as set forth by the Fourth Circuit in *Unspam Techs., Inc.*, 716 F.3d at 329). Because the in-forum acts of all Defendants—including non-Foreign Defendants—are imputed to Foreign Defendants for purposes of personal jurisdiction under the doctrine of conspiracy

jurisdiction, the Court has personal jurisdiction over all Foreign Defendants on the basis of those contacts.[12]

### B.   Defendants' Attempts to Distinguish *FOREX* and *Nypl* Fail

Foreign Defendants' attempts to distinguish the *FOREX* and *Nypl* personal jurisdiction rulings here fail. First, Foreign Defendants note that because Plaintiffs in this action are indirect rather than direct purchasers and raise state-law rather than federal-law antitrust claims, Plaintiffs cannot take advantage of the so-called "nationwide contacts" approach under the federal Clayton Act. D. Br. at 20. Section 12 of the Clayton Act provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. In cases where defendants are served pursuant to that provision, courts assessing personal jurisdiction often look at a defendant's nationwide contacts to determine if the defendant "transacts business" in the relevant forum as required by the Clayton Act. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005). However, the Clayton Act's nationwide service of process provision was not a basis for this Court's holding that specific jurisdiction was established. *See Nypl*, 2018 WL 1472506, at *7 (holding that specific jurisdiction was established without mentioning the Clayton Act's nationwide service provision); *FOREX*, 2016 WL 1268267, at *1 (same).[13] Rather, in both cases, the Court found that specific

---

[12] Defendants also claim that specific jurisdiction must be based on "a defendant's own conduct, and not the act of a third party." D. Br. at 3. The Second Circuit made clear in *Schwab* that in cases where a defendant is alleged to have joined a conspiracy, the forum-related acts of their co-conspirators are attributed to the defendant for purposes of personal jurisdiction. 883 F.3d at 87. The cases cited by Defendants in support of their argument—*Walden*, 571 U.S. at 284; *BMS*, 137 S. Ct. at 1781; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); and *Rush v. Savchuk*, 444 U.S. 320, 331–32 (1980)—did not involve conspiracy allegations and therefore did not address the issue of conspiracy jurisdiction. *See id.*; D. Br. at 3, 11.

[13] Defendants stated in both cases that the relevant forum was New York, not the entire United States. *See Nypl* ECF No. 203 at 10 n.11 (noting that binding authority "compels focusing on the forum state (New York), and necessitates

17

jurisdiction was established based on Foreign Defendants' alleged acts in furtherance of the Conspiracy that occurred within or were directed at New York. *See Nypl*, 2018 WL 1472506, at *5; *FOREX*, 2016 WL 1268267, at *5-6. And in any event, Plaintiffs here specifically allege numerous examples of Foreign Defendants' actions in furtherance of the Conspiracy in New York, collusion with other Defendant traders based in New York, and guilty pleas and consent decrees in which several Foreign Defendants admit to New York-based conduct in furtherance of the Conspiracy. *See, e.g.*, *supra* n.10. Defendants have not identified a single case demonstrating that the Court's analysis should somehow differ for indirect purchaser actions.[14] Accordingly, the fact that *FOREX* and *Nypl* involved federal antitrust claims does not render the Court's Rule 12(b)(2) rulings in those cases any less persuasive here.

    Second, Foreign Defendants argue that in addition to the substantial in-forum acts alleged in the SCCAC, Plaintiffs must also allege "that Foreign Defendants transacted or communicated with the named Plaintiffs' intermediaries in New York." D. Br. at 13. That argument is a red-herring. Plaintiffs must only allege that Defendants participated in a Conspiracy that partially took place in New York or had the effects "expressly aimed inside [New York] due to [] Defendants' substantial FX business here." *FOREX*, 2016 WL 1268267, at *6. Foreign

---

rejection of the 'nationwide contacts' approach"); *FOREX* ECF No. 502 at 9-10 (noting that New York was the relevant forum). These prior concessions highlight Foreign Defendants' inability to distinguish the Court's prior personal jurisdiction rulings here.

[14] Contrary to Foreign Defendants' assertion, the *Schwab* court's discussion of "direct sellers" and "indirect sellers" does not alter the jurisdictional analysis in this indirect purchaser action. D. Br. at 3. The "indirect sellers" in *Schwab* were defendant banks that allegedly sold debt instruments to the plaintiff through those defendants' own "subsidiaries or affiliates," and the plaintiffs argued that the defendants should be subject to jurisdiction on the basis of their subsidiaries' transactions. *See Schwab*, 883 F.3d at 84. The court held that the plaintiffs failed to include allegations sufficient for the court to hold the "indirect seller" banks liable for the acts of their subsidiaries. *Id.* at 85-86. Here, the Foreign Defendants are both the direct sellers and the indirect sellers: they sold FX Instruments directly to members of the Direct Settlement Class in *FOREX*, and indirectly to Plaintiffs here. And Plaintiffs do not claim that Foreign Defendants are subject to specific jurisdiction based solely on the fact that Foreign Defendants had subsidiaries that engaged in the Conspiracy. Rather, Foreign Defendants are subject to specific jurisdiction on the bases of their own acts as well as their participation in the Conspiracy, which both took place in and was directed at this forum.

Defendants concede that "personal jurisdiction must be based on *each Foreign Defendant's* contacts with the forum; [and therefore] a Plaintiff's interactions with [a retail foreign exchange dealer ("RFED")] in the forum is not enough." D. Br. at 2 (emphasis in original). Defendants therefore effectively admit that the physical locations of the RFEDs that transacted with Plaintiffs are irrelevant to Foreign Defendants' Rule 12(b)(2) motion.[15] Again, these are the types of transactional details that this Court found amounts to "a demand for specifics that are not required" in rejecting the Foreign Defendants' argument that *FOREX* plaintiffs had not identified a single transaction relevant to their claims. *FOREX*, 2016 WL 1268267, at *6. Further, all RFEDs from which Plaintiffs purchased FX Instruments are members of the Direct Settlement Class in *FOREX*, SCCAC ¶ 148, and this Court has already found plausible the *FOREX* plaintiffs' allegations that Defendants "each had, within the United States, tens of billions of dollars' worth of FX Instruments outstanding each day, *including, undoubtedly, transactions with members of the proposed [Direct Settlement] Classes during the Class Period*." *FOREX*, 2016 WL 1268267, at *6 (emphasis added).

Foreign Defendants raised a similar argument in *FOREX*. There, the plaintiffs and class members included persons that purchased FX Instruments directly from Defendants (the "OTC Plaintiffs") as well as persons that purchased FX "exchange-based" Instruments on financial exchanges (the "Exchange Plaintiffs"). *See FOREX*, 2016 WL 1268267, at *1; *FOREX* ECF No. 465 (Second Amended Complaint) at 2, 10, 13. Defendants were not parties to the transactions of

---

[15] Foreign Defendants also suggest that Plaintiffs should have informally produced the identities of the RFEDs that transacted with Plaintiffs in advance of the Foreign Defendants' anticipated Rule 12(b)(2) motion. However, Plaintiffs were not required to so under the Civil Case Management Plan ("CMO"). *See* ECF No. 176 at ¶¶ 7-8. All Defendants acknowledged in the parties' November 8, 2018 Joint Letter, ECF No. 170, that the identities of those RFEDs would be produced in the discovery process, *id.* at 3 ("Discovery of Plaintiffs is expected to include, at a minimum, identification of Retail Dealers with whom members of the putative class transacted . . ."), and the CMO provides that discovery is stayed as to all Defendants that file a Rule 12(b)(2) motion. *See* ECF No. 176 at ¶ 8(b). In any event, as described herein, Foreign Defendants' Motion to Dismiss can be resolved without identifying the RFEDs.

the Exchange Plaintiffs; instead, those plaintiffs purchased FX Instruments from unknown

counterparties on financial exchanges. *Id.* at 79, 254. Defendants asserted that the Court did not

have personal jurisdiction because the *FOREX* plaintiffs failed to allege forum-related

transactions between Foreign Defendants and the plaintiffs. *Compare* D. Br. at 13 ("The

Complaint thus fails to sufficiently allege a 'causal relationship between' any Foreign

Defendant's contacts with New York (or indeed any other State) 'and the episode[s] in suit,'

which are the unidentified intermediaries' transactions with the named Plaintiffs."), *with FOREX*

ECF No. 502 at 21-22 (Foreign Defendants argued that the *FOREX* plaintiffs "do not establish

specific jurisdiction because they fail to allege the required causal nexus between the New

Foreign Defendants' alleged exchange trading activities and the basis for Plaintiffs' claims" and

that "[i]ndeed, Plaintiffs do not even allege that they traded FX futures contracts with any of the

New Foreign Defendants."). Significantly, Foreign Defendants in *FOREX* asserted that specific

jurisdiction could not be established because "Plaintiffs have not identified a *single* 'trade at

issue in this litigation' that links any of the [Foreign Defendants] to this forum." *FOREX*, 2016

WL 1268267, at *6 (emphasis in original). The Court rejected that argument, holding that

because the complaint adequately alleged "that Defendants conspired to fix benchmark rates for

their own profit" and that prices for FX "exchange-based" Instruments were based on those

benchmark rates, the plaintiffs were not required to allege specific links between each Defendant

and each relevant transaction. *FOREX*, 2016 WL 1268267, at *6. The Court emphasized that

requiring plaintiffs to allege specific transactions linking each Defendant to the forum would

"amount[] to 'a demand for specifics that are not required, and that Plaintiffs could not be

reasonably expected to know, at the pleading stage.'" *Id.* at *6. That same reasoning applies with

equal force here. Thus, Plaintiffs here have established a "'plausible inference' based on factual

allegations" that Foreign Defendants acted illegally in the forum and intended their out of forum actions to cause injury in the forum. *See id.*

Finally, Foreign Defendants claim that unlike in *FOREX* and *Nypl*, there is no "causal relationship" here between Foreign Defendants' contacts with the forum and Plaintiffs' injuries. D. Br. at 12-13. This argument mirrors Defendants' argument regarding proximate cause that the Court expressly rejected in the October 25, 2018 Order granting Plaintiffs leave to file the SCCAC and should be rejected for the same reasons. *Compare* D. Br. at 19 ("Absent an alleged transaction or even communication in New York between each Foreign Defendant and each named Plaintiff's RFED, it cannot be said that the alleged New York connections of the Foreign Defendants have a 'causal relationship' to the [claims alleged in this action]."), *with Contant*, 2018 WL 5292126, at *5-6 (holding that "the Proposed Complaint alleges that Plaintiffs' losses were proximately caused by, and flowed directly from, Defendants' misconduct" and that "because FX benchmarks constitute the predominant component of FX retail prices, a direct link connects the alleged anticompetitive conduct and Plaintiffs' injury."). The SCCAC's allegations detailing Foreign Defendants' conspiratorial conduct within this forum, with co-conspirators located in this forum, and directed at this forum sufficiently establish specific jurisdiction. The Court should therefore reject Foreign Defendants' "causation" arguments here for the same reasons that it previously rejected Defendants' similar arguments in granting Plaintiffs' motion for leave to amend.

In short, this Court's personal jurisdiction rulings in *FOREX* and *Nypl* compel the same result here. All three actions arise out of the same antitrust Conspiracy. And because Plaintiffs in this action purchased FX Instruments directly from members of the Direct Settlement Class members in *FOREX*, the transactions at issue in *FOREX* include all of the Defendant-to-Direct

Settlement Class Member transactions at issue in this action. This Court has twice held that Defendants' forum-related acts in furtherance of the Conspiracy are sufficient to establish personal jurisdiction, and as detailed above, the SCCAC alleges even more New York-related acts in furtherance of the Conspiracy than the allegations that the Court found sufficient in *FOREX* and *Nypl*. Taken as a whole, the SCCAC plausibly alleges suit-related conduct that took place in New York and had effects expressly aimed at New York. Construing the pleadings and declarations in the light most favorable to Plaintiffs, *Dorchester*, 722 F.3d at 85, the Foreign Defendants' suit-related conduct created a substantial connection with this forum, *Walden*, 571 U.S. at 284. Accordingly, Plaintiffs have made a prima facie showing of specific jurisdiction sufficient to defeat the instant motion.

## II.    Exercising Personal Jurisdiction over the Foreign Defendants is Consistent with Due Process

"Once it has been decided that [respondents] purposefully established minimum contacts within the forum . . . these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 ( 1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945)). "The Supreme Court has held that the court must evaluate the following factors as part of this 'reasonableness' analysis: (1) the burden that the exercise of jurisdiction will impose on the [respondents]; (2) the interests of the forum state in adjudicating the case; (3) the [plaintiff]'s interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) (citing *Asahi*

*Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 113-14 (1987)). All five factors weigh heavily in favor of granting personal jurisdiction here.

The Foreign Defendants do not even attempt to identify *any* burden that would result from litigating Plaintiffs' claims in the same court in which they are already litigating antitrust claims arising out of the same Conspiracy in *FOREX*, *Nypl*, and the recently-filed opt-out action *Allianz Global Investors GmbH v. Bank of America Corporation*, No. 18-cv-10364-LGS. Foreign Defendants have transacted billions of dollars' worth of FX Instruments in New York. They derive substantial income from their New York-based FX operations as well as their FX trading with other Defendants and entities that are based in New York. All Defendants have retained counsel in New York, and it appears that a majority of discovery will take place in New York. Foreign Defendants stipulated that this action should be designated as related to *FOREX* in this District. ECF No. 5. And forcing Plaintiffs to separately litigate their claims in the District of Connecticut, *cf.* D. Br. at 5, or some other forum would impair Plaintiffs' ability to obtain "convenient and effective relief" and burden "the interstate judicial system" with separate actions in separate jurisdictions litigating the same claims. *See Metro. Life Ins. Co.*, 84 F.3d at 568. All reasonable factors weigh in favor of exercising personal jurisdiction over Foreign Defendants.

### III.   BNP Paribas Group and Credit Suisse Group AG Forfeited Their Rights to Contest Personal Jurisdiction

Fed. R. Civ. P. 12(g)(2) provides that with the exception of subject-matter jurisdiction defenses, "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." *Id.* Similarly, Fed. R. Civ. P. 12(h)(1) provides that "[a] party waives any defense listed in Rule 12(b)(2)-(5)" by omitting that defense from a prior Rule 12 motion. *Id.*; *see also Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 273 (E.D.N.Y. 2016) ("Taken together, Rules

12(g)(2) and 12(h)(1) of the Federal Rules of Civil Procedure provide that a party that moves to dismiss an action, but omits an available personal jurisdiction defense, forfeits that defense.").

Although BNP Paribas Group and Credit Suisse Group AG were both named as Defendants in the first Consolidated Class Action Complaint ("CCAC") and joined their co-Defendants' August 11, 2017, Rule 12(b)(6) motion to dismiss, *see* ECF No. 103, they elected not to join their co-Defendants' August 11, 2017, Rule12(b)(2) motion to dismiss. *See* ECF No. 105. BNP Paribas Group and Credit Suisse Group AG do not claim that the personal jurisdiction defense was unavailable to them when it was raised in their co-Defendants' prior motion, or that any recent cases created some new personal jurisdiction argument that was previously unavailable. The SCCAC contains no new jurisdictional allegations that were not contained in the CCAC,[16] and the arguments raised in Defendants' December 20, 2018, Rule 12(b)(2) brief are substantially the same as those that were raised in the August 11, 2017, Rule 12(b)(2) brief. *See generally Allgaier v. Peterson*, No. 13-cv-5112, 2015 WL 5459808, at *3 (S.D.N.Y. Aug. 13, 2015) (holding that defendants forfeited their ability to contest personal jurisdiction with respect to the plaintiffs' second amended complaint by declining to contest personal jurisdiction with respect to the plaintiffs' prior complaints).[17] In fact, the Tables of Contents in the two briefs are virtually identical. *See* ECF No. 107 at i; ECF No. 198 at i. Accordingly, by electing not to challenge the Court's personal jurisdiction when they previously had the opportunity to do so, BNP Paribas Group and Credit Suisse Group AG forfeited their personal jurisdiction defense.

---

[16] The primary difference between the two complaints for purposes for Foreign Defendants' Motion is that the CCAC included a claim for injunctive relief under the federal Sherman Act, while the SCCAC does not. As noted above, the absence of a federal claim in the SCCAC does not alter the personal jurisdiction analysis here.

[17] A narrow exception to the Rule 12(g) waiver rule exists where a defendant contests personal jurisdiction based on new controlling precedent that was not yet issued when the defendant initially declined to contest personal jurisdiction. *See Hawknet, Ltd. v. Overseas Shipping Agencies,* 590 F.3d 87, 92 (2d Cir.2009) ("'[A] party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made.'" (citation omitted)). However, none of Defendants' personal jurisdiction arguments are premised on precedent that was established between the dates of the first 12(b)(2) motion and the motion at issue here.

*See Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1499185, at *5 (S.D.N.Y. Mar. 31, 2015) ("As a general matter, a defense under Rule 12(b)(2) is waived if it is 'not included in a preliminary motion under Rule 12 as required by Rule 12(g).'" (citing Charles Alan Wright & Arthur R. Miller, 5C Fed. Prac. & Proc. Civ. § 1391 (3d ed.)).

## CONCLUSION

For the reasons set forth above, the Foreign Defendants' motion to dismiss for lack of personal jurisdiction should be denied.

Dated:   January 28, 2019                     Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Merrill G. Davidoff
Michael J. Kane (*pro hac vice* forthcoming)
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net
mdavidoff@bm.net
mkane@bm.net
jripley@bm.net

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
8501 North Scottsdale Rd., Ste. 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

Joseph C. Peiffer
**PEIFFER WOLF CARR & KANE, APLC**
201 St. Charles Ave., Ste. 4610
New Orleans, LA 70170
Tel: (504) 523-2434

Fax: (504)523-2464
jpeiffer@pwcklegal.com

R. Bryant McCulley
Stuart H. McCluer
Frank B. Ulmer
**MᴄCᴜʟʟᴇʏ MᴄCʟᴜᴇʀ PLLC**
1022 Carolina Blvd., Ste. 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com
fulmer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*