UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                                               :
UNITED STATES OF AMERICA                                       :      Criminal No.
                                                               :
               v.                                              :      Filed:
                                                               :
BNP PARIBAS USA, INC.,                                         :      Violation: 15 U.S.C. § 1
                                                               :
                              Defendant.                       :
---------------------------------------------------------------x

## PLEA AGREEMENT

The United States of America and BNP Paribas USA, Inc. ("defendant"), a U.S. banking and financial services holding company organized and existing under the laws of Delaware, hereby enter into the following Plea Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."). The defendant was, during the Relevant Period (defined in paragraph 4 below), named Paribas North America, Inc., and was the U.S. holding company for the U.S. Corporate and Investment Banking operations of BNP Paribas S.A., the Paris-based parent company. The defendant was designated as the intermediate holding company for the U.S. businesses of BNP Paribas S.A. as required by the Federal Reserve's Regulation YY in July 2016, after the Relevant Period, and at such time and thereafter elected its current independent directors.

## RIGHTS OF DEFENDANT

1.     The defendant understands its rights:

       (a)     to be represented by an attorney;

       (b)     to be charged by Indictment;

       (c)     as a corporation organized and existing under the laws of Delaware, to decline to accept service of the Summons in this case, and to contest the jurisdiction of the United States to prosecute this case against it in the United States District Court for the Southern District of New York;

       (d)     to plead not guilty to any criminal charge brought against it;

(e) to have a trial by jury, at which it would be presumed not guilty of the charge and the United States would have to prove every essential element of the charged offense beyond a reasonable doubt for it to be found guilty;

(f) to confront and cross-examine witnesses against it and to subpoena witnesses in its defense at trial;

(g) to appeal its conviction if it is found guilty; and

(h) to appeal the imposition of sentence against it.

**AGREEMENT TO PLEAD GUILTY AND WAIVE CERTAIN RIGHTS**

2. The defendant knowingly and voluntarily waives the rights set out in subparagraphs 1(b)-(g) above. The defendant also knowingly and voluntarily waives the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742, that challenges the sentence imposed by the Court if that sentence is consistent with or below the Recommended Sentence in Paragraph 9 of this Plea Agreement, regardless of how the sentence is determined by the Court. For purposes of the waiver of appeal, the sentence imposed is deemed consistent with or below the Recommended Sentence in Paragraph 9 even if the sentence imposed includes a term of probation if it is otherwise consistent with or below the Recommended Sentence in Paragraph 9, unless the term of probation exceeds the length authorized by 18 U.S.C. § 3561(c). This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b)-(c). Nothing in this paragraph, however, will act as a bar to the defendant perfecting any legal remedies it may otherwise have on appeal or collateral attack respecting claims of ineffective assistance of counsel or prosecutorial misconduct. The defendant agrees that there is currently no known evidence of ineffective assistance of counsel or prosecutorial misconduct. Pursuant to Fed. R. Crim. P. 7(b), the defendant will waive indictment and plead guilty to a one-count Information to be filed in the United States District Court for the Southern District of New York. The Information will charge the defendant with entering into and engaging in a combination and

conspiracy to suppress and eliminate competition by fixing prices for Central and Eastern European, Middle Eastern, and African ("CEEMEA") currencies traded in the United States and elsewhere, from at least as early as September 2011 and continuing until at least July 2013, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

3.  The defendant will plead guilty to the criminal charge described in Paragraph 2 above pursuant to the terms of this Plea Agreement and will make a factual admission of guilt to the Court in accordance with Fed. R. Crim. P. 11, as set forth in Paragraph 4 below.

## FACTUAL BASIS FOR OFFENSE CHARGED

4.  Had this case gone to trial, the United States would have presented evidence sufficient to prove the following facts:

   (a)  For purposes of this Plea Agreement, the "Relevant Period" is that period from at least as early as September 2011 and continuing until at least July 2013.

   (b)  The foreign currency exchange ("FX") market is a global market in which participants trade currencies, in pairs. In a currency pair, each currency is valued relative to the other. The ratio that expresses the value of one currency to the other is referred to as the "exchange rate," "rate," or simply "price." Trading in CEEMEA currencies typically involves exchanging one CEEMEA currency, such as the South African Rand ("ZAR"), for a non-CEEMEA currency, such as the U.S. Dollar ("USD"). In the currency pair USD/ZAR, USD is referred to as the "base" currency and ZAR is referred to as the "counter" currency. Prices are quoted in terms of how many units of the counter currency are required in exchange for a stated amount of the base currency.

   (c)  FX transactions include "spot" transactions, in which the exchange of currencies occurs typically within two days of the trade date, and "forward" transactions, in which the exchange of currencies occurs on a more distant, agreed-upon date following the trade date.

3

(d)     FX dealers, also known as FX market makers, are financial institutions that quote prices to buy and sell currencies to customers looking to trade. Customers include corporations, hedge funds, pension funds, and other entities, located in New York, other states, and in foreign countries, that want to exchange large amounts of one currency into an equivalent amount of another currency. Prices for such transactions are typically conveyed to these customers in the form of a "two-way price" quote, comprised of the "bid" (the price at which the FX dealer will buy the base currency) and the "offer" (the price at which the FX dealer will sell the base currency).

(e)     One category of customer order is an order to buy or sell a specific amount of currency at the price quoted by the FX dealer. Another category of customer order is a "fix" order, where the order is to buy or sell a specific amount of currency at a benchmark rate to be determined subsequently. "Fixes" establish such benchmark rates by generating a snapshot of the price of a currency pair based on market activity for that currency pair occurring within a predetermined, and short, window of time. A third category of customer order is known as a "limit" order. In a limit order, a customer places an order to buy or sell a particular currency only if the market price of that currency reaches or exceeds a set price level.

(f)     Once the FX dealer and the customer agree on price for a particular type of customer order, the FX dealer then assumes the risk of an unfavorable movement in price of the quoted currency pair that might occur between the time the FX dealer and the customer enter into their trade and when the FX dealer is able to fill or offset that customer trade in what is known as the "interdealer market." Interdealer trades can be executed directly between competing FX dealers, through brokers, or on electronic FX trading platforms.

(g)     During the Relevant Period, the defendant and certain of its Related Entities, as defined in Paragraph 16 of this Plea Agreement, employing more than 5,000

4

individuals worldwide, acted as an FX dealer, in the United States and elsewhere, for CEEMEA currencies, and for both spot and forward transactions.

(h) During the Relevant Period, the defendant and its corporate co-conspirators, which were also financial institutions acting as competing FX dealers, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices for CEEMEA currencies traded in the United States and elsewhere. The defendant, through one of its CEEMEA traders, participated in the conspiracy from at least as early as September 2011 and continuing until at least July 2013.

(i) In furtherance of the conspiracy, the defendant and its co-conspirators engaged in communications, including near daily conversations, through private chat rooms, phone calls, text messages, other personal cell phone applications, and in-person meetings within the Southern District of New York, among other means of communication.

(j) The defendant and its co-conspirators carried out the conspiracy to suppress and eliminate competition in CEEMEA currencies by various means and methods, including by: (i) agreeing to enter into non-bona fide trades among themselves on an electronic FX trading platform, for the sole purpose of manipulating prices; (ii) agreeing to subsequently cancel these non-bona fide trades, or to offset them by entering into equivalent trades in the opposite direction, in a manner designed to hide such actions from other FX market participants; (iii) coordinating on the price, size, and timing of their bids and offers on an electronic FX trading platform in order to manipulate prices on that and other electronic FX trading platforms; (iv) agreeing to refrain from trading where one or more of the co-conspirators had a stronger need to buy or sell than the others, in order to prevent the co-conspirators from bidding up the price or offering down the price against each other; (v) coordinating their trading prior to and during fixes in a manner

5

intended to manipulate final fix prices; (vi) coordinating their trading in order to move pricing through their customers' limit order levels; (vii) agreeing on pricing to quote to specific customers; and (viii) employing measures to hide their coordinated conduct from customers as well as other FX market participants, including by using code names for specific customers, communicating by personal cell phone applications instead of on recorded business phone lines, and concealing the existence of trades entered into solely to manipulate prices, among other steps.

(k) During the Relevant Period, the business activities of the defendant and its co-conspirators that were the subject of this conspiracy were within the flow of, and substantially affected, interstate and U.S. import trade and commerce. The defendant and its co-conspirators filled substantial quantities of CEEMEA customer orders, and traded substantial quantities of CEEMEA currencies in the interdealer market, with customers and counterparties located in New York, in other states, and in foreign countries, in a continuous and uninterrupted flow of interstate and U.S. import trade and commerce. The defendant and its co-conspirators also caused substantial payments for FX transactions to travel in interstate and U.S. import trade and commerce.

(l) Acts in furtherance of the charged offense were carried out within the Southern District of New York and elsewhere.

### ELEMENTS OF THE OFFENSE

5. The elements of the charged offense are that:

(a) the conspiracy described in the Information existed at or about the time alleged;

(b) the defendant knowingly became a member of the conspiracy; and

(c) the conspiracy described in the Information either substantially affected interstate and U.S. import commerce in goods or services or occurred within the flow of interstate and U.S. import commerce in goods and services.

6

## POSSIBLE MAXIMUM SENTENCE

6. The defendant understands that the statutory maximum penalty which may be imposed against it upon conviction for a violation of Section One of the Sherman Antitrust Act is a fine in an amount equal to the greatest of:

(a) $100 million (15 U.S.C. § 1);

(b) twice the gross pecuniary gain the conspirators derived from the crime (18 U.S.C. § 3571(c) and (d)); or

(c) twice the gross pecuniary loss caused to the victims of the crime by the conspirators (18 U.S.C. § 3571(c) and (d)).

7. In addition, the defendant understands that:

(a) pursuant to §8D1.2(a)(1) of the United States Sentencing Guidelines ("U.S.S.G.," "Sentencing Guidelines," or "Guidelines") or 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years;

(b) pursuant to U.S.S.G. §8B1.1 or 18 U.S.C. § 3563(b)(2) or 3663(a)(3), the Court may order it to pay restitution to the victims of the offense; and

(c) pursuant to 18 U.S.C. § 3013(a)(2)(B), the Court is required to order the defendant to pay a $400 special assessment upon conviction for the charged crime.

## SENTENCING GUIDELINES

8. The defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider, in determining and imposing sentence, the Guidelines Manual in effect on the date of sentencing unless that Manual provides for greater punishment than the Manual in effect on the last date that the offense of conviction was committed, in which case the Court must consider the Guidelines Manual in effect on the last date that the offense of conviction was committed. The parties agree there is no *ex post facto* issue under the November 1, 2016 Guidelines Manual. The Court must also consider the other factors set forth in 18 U.S.C. § 3553(a) in determining and imposing sentence. The defendant

7

understands that the Court will make Guidelines determinations by applying a standard of preponderance of the evidence. The defendant understands that although the Court is not ultimately bound to impose a sentence within the applicable Guidelines range, its sentence must be reasonable based upon consideration of all relevant sentencing factors set forth in 18 U.S.C. § 3553(a).

## SENTENCING AGREEMENT

9.      Pursuant to Fed. R. Crim. P. 11(c)(1)(C) and subject to the full, truthful, and continuing cooperation of the defendant and its Related Entities, the United States and the defendant agree that the appropriate disposition of this case is, and agree to recommend jointly that the Court impose, a sentence within the applicable Guidelines range requiring the defendant to pay to the United States a criminal fine of $90 million, payable in full before the fifteenth (15th) day after the date of judgment, and no order of restitution (the "Recommended Sentence"). The parties agree that there exists no aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the U.S. Sentencing Commission in formulating the Sentencing Guidelines justifying a departure pursuant to U.S.S.G. §5K2.0. The parties agree not to seek at the sentencing hearing any sentence outside of the Guidelines range nor any Guidelines adjustment for any reason that is not set forth in this Plea Agreement. The parties further agree that the Recommended Sentence set forth in this Plea Agreement is reasonable.

(a)     The defendant understands that the Court will order it to pay a $400 special assessment, pursuant to 18 U.S.C. § 3013(a)(2)(B), in addition to any fine imposed.

(b)     In light of the availability of civil causes of action, as evidenced by civil cases already filed against certain of the defendant's Related Entities, including *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789-LGS (S.D.N.Y.), the Recommended Sentence does not include a restitution order for the offense charged

8

Case 1:17-cv-03139-LGS-SDA   Document 220-3   Filed 01/28/19   Page 9 of 10
Case 1:18-cr-90061-JSR   Document 4   Filed 02/02/18   Page 9 of 53

in the Information. If the Court rejects the recommendation for no order of restitution, the United States and the defendant agree that this plea agreement, except for subparagraph 15(b) below, will be rendered void and the defendant will be free to withdraw its guilty plea as provided in subparagraph 15(b).

(c) Both parties will recommend that no term of probation be imposed in this case, in considering, among other factors, the substantial efforts to address the defendant's and its Related Entities' compliance and remediation program to prevent recurrence of the charged offense, and the five-year term of probation imposed upon BNP Paribas S.A. on May 1, 2015 in the unrelated case of *United States v. BNP Paribas S.A.*, 14-cr-460-LGS (S.D.N.Y.). The defendant understands that the Court's denial of this request will not void this Plea Agreement.

(d) The defendant agrees to waive its right to the issuance of a Presentence Investigation Report pursuant to Fed. R. Crim. P. 32 and the defendant and the United States agree that the information contained in this Plea Agreement and the Information may be sufficient to enable the Court to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553, pursuant to Fed. R. Crim. P. 32(c)(1)(A)(ii). Except as set forth in this Plea Agreement, the parties reserve all other rights to make sentencing recommendations and to respond to motions and arguments.

10. The defendant and its Related Entities shall further strengthen their compliance and internal controls as required by the Federal Reserve, the New York Department of Financial Services, and any other regulatory or enforcement agencies that have addressed the conduct set forth in Paragraph 4 (h)-(j) above, and provide a report to the United States one year after execution of this agreement, and thereafter upon the United States' request, regarding their remediation and implementation of any compliance program and internal controls, policies, and procedures that relate to the conduct described in Paragraph 4 (h)-(j) above. Moreover, the defendant agrees that it has no objection to any regulatory agencies providing to the United

States any information or reports generated by such agencies or by the defendant or its Related Entities relating to conduct described in Paragraph 4 (h)-(j) above. Such information and reports will likely include proprietary, financial, confidential, and competitive business information, and public disclosure of the information and reports could discourage cooperation, impede pending or potential government investigations, and thus undermine the objective of the United States in obtaining such reports. For these reasons, among others, the information and reports and the contents thereof are intended to remain and shall remain nonpublic, except as otherwise agreed to by the parties in writing, or except to the extent that the United States determines in its sole discretion that disclosure would be in furtherance of the United States' discharge of its duties and responsibilities or is otherwise required by law.

11.     For a period of three years from the date of execution of this Plea Agreement, the defendant shall report to the Antitrust Division all credible information regarding criminal violations of U.S. antitrust laws by the defendant, its Related Entities, or any of their employees as to which the defendant's or its Related Entities' boards of directors, management (that is, all supervisors within the bank), or legal and compliance personnel are aware.

12.     For a period of three years from the date of execution of this Plea Agreement, the defendant shall bring to the Antitrust Division's attention all federal criminal investigations in which the defendant or any of its Related Entities is identified as a subject or a target, and all administrative or regulatory proceedings or civil actions brought by any federal or state governmental authority in the United States against the defendant, its Related Entities, or their employees, to the extent that such investigations, proceedings, or actions allege facts that could form the basis of a criminal violation of U.S. antitrust laws.

13.     The defendant intends to file an application for a prohibited transaction exemption with the United States Department of Labor ("Department of Labor") requesting that the defendant and its Related Entities be allowed to continue to be qualified as a Qualified Professional Asset Manager pursuant to Prohibited Transactions Exemption 84-14. The

10