NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

In the Matter of

BARCLAYS BANK PLC,
BARCLAYS BANK PLC, NEW YORK BRANCH

**CONSENT ORDER UNDER**
**NEW YORK BANKING LAW §§ 44 and 44-a**

The New York State Department of Financial Services (the "Department"), Barclays Bank PLC, and Barclays Bank PLC, New York Branch (collectively, "the Parties") stipulate that:

**WHEREAS** Barclays Bank PLC is a major international banking institution with more than 132,000 employees and total assets exceeding $2 trillion;

**WHEREAS** Barclays Bank PLC has operated a foreign bank branch in New York State ("the New York Branch"), licensed, supervised and regulated by the Department since 1963;

**WHEREAS** the New York Branch has more than 500 employees and total assets exceeding $36 billion;

**WHEREAS** Barclays Bank PLC and the New York Branch (collectively, "Barclays" or the "Bank") engaged in manipulative conduct and attempted to manipulate benchmark foreign exchange ("FX") rates around the world, during at least 2008 through 2012, to benefit Barclays' own trading positions;

**WHEREAS** in some instances, Barclays conspired with other banks in order to coordinate trading, attempt to manipulate exchange rates, or coordinate bid/ask spreads charged;

**WHEREAS** the coordination and conspiracy to manipulate were intended to benefit Barclays trading results by maximizing profits or minimizing losses to the detriment of counterparties, thereby harming consumers of financial products and services;

**WHEREAS** from at least 2008 to 2014, Barclays engaged in misleading sales practices, including by deceiving clients concerning the application of "mark-ups" to FX trades;

**WHEREAS** the misconduct discussed in this Order involved providing false and misleading information to customers and markets;

**WHEREAS** Barclays PLC has agreed to plead guilty to a violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

**WHEREAS** Barclays is entering into a resolution with the U.S. Commodity Futures Trading Commission ("CFTC") relating to violations of the Commodities Exchange Act (7 U.S.C. §§ 9, 13) and CFTC Regulation 180.2, 17 C.F.R. § 180.2; and

**WHEREAS** Barclays is entering into a resolution with the Board of Governors of the Federal Reserve System relating to violations of the Federal Deposit Insurance Act (12 U.S.C. § 1818);

**WHEREAS** Barclays is entering into a resolution with the U.K. Financial Conduct Authority relating to principles of reasonable care to organize and control its affairs responsibly and effectively with adequate risk management systems, which is FCA Principle for Businesses 3;

**NOW THEREFORE**, to resolve this matter without further proceedings pursuant to the Superintendent's authority under Section 44 and 44-a of the Banking Law, the Department and Barclays agree to the following:

**FACTUAL BACKGROUND**

<u>The FX Market and Fix Manipulation</u>

1. The FX market involves the buying, selling and exchanging of currencies, and is one of the largest, most liquid and most actively traded markets in the world, with an average daily turnover of $5.3 trillion in April 2013.

2

2.      In a typical FX spot transaction, currencies are traded against one another in pairs. As the world's reserve currency, the U.S. Dollar is the most actively traded currency in the FX market. The overwhelming majority of all FX trading is conducted in G10 currency pairs, while the most popular currency pairs are the Euro/U.S. Dollar (EUR/USD), the British Pound Sterling/U.S. Dollar (GBP/USD) and the U.S. Dollar/Japanese Yen (USD/JPY).

3.      FX market participants include banks, investment firms, commercial companies, central banks, hedge funds and retail customers, which trade various types of instruments, including spot, forward, swap, futures and options contracts. The primary FX trading centers are located in New York City and London, although FX trading occurs around the world and continues 24 hours a day, excluding weekends.

4.      A typical FX spot transaction involves the exchange of currencies at an agreed rate for settlement on a spot date—usually two business days from the trade date. In addition to trading directly in the market, clients can also submit "fix" orders to various large international banks, including Barclays, which then shoulder the risk of the trade and agree to deliver the requested currency to the client at the "fix" rate, which is determined at a subsequent time based on trading in the interdealer market. There are numerous such "fix" or benchmark rates, which are set at specific times each day. The most widely referenced benchmark rates include the 4:00 pm (London time) WM/Reuters fix (the "WM/R fix") and the 1:15 pm (London time) European Central Bank fix (the "ECB fix").

5.      For G10 currency trading, the WM/R fix rates are based on actual bids and offers taken from electronic trading systems, which at the relevant times used a one-minute window around the time of the fix. The ECB fix takes into consideration price levels established through trading at the time of the fix, but the precise methodology is not disclosed.

6. For certain less liquid currencies, particularly in emerging markets, benchmark rates, such as the reference rate published by the Chicago Mercantile Exchange ("CME") and Emerging Markets Traders Association ("EMTA") for U.S. dollars and Russian rubles (the "CME/EMTA USD/RUB Reference Rate")  are set based on indicative quotes obtained by a survey of certain market participants.

7. Prior to a fix, clients place orders with banks (including Barclays) to buy or sell a specified amount of currency "at the fix rate"—*i.e.*, the rate that would be determined at the upcoming fix.  Traders with net orders to sell a certain currency at the fix rate make a profit if the average rate at which they buy the currency is lower than the fix rate at which they sell to their clients, while traders with net orders to buy a certain currency at the fix rate make a profit if the average rate at which they sell the currency is higher than the fix rate at which they buy from their clients.

8. By taking these orders to transact at a yet-to-be-determined rate, banks expose themselves to exchange rate movements, and FX traders may buy or sell currency in or around the fix or fix window in order to manage this exposure risk and often to obtain a currency position large enough to complete the order.  Depending on the volume of trading during or around a fix window, transactions to buy or sell currency can affect the fix rate.  For example, a bank that sells, or even simply offers to sell, a large amount of currency just before or during the fix may cause the fix rate to move lower.  The resulting rate movement would benefit the trader, who makes a larger profit due to the increased spread between the fix rate at which the trader committed to buy the currency from the client and the higher rate at which the trader sold the currency to the market.  However, this increased profit comes at the expense of the client, who ends up selling the currency to the market (via the trader) at a lower fix rate.

9.      This dynamic creates a risk that a trader will deliberately engage in trading behavior designed to manipulate the fix rate in order to increase his or her profits by buying or selling large orders, or simply by making bids or offers for large amounts with the intent to move prices rather than engage in actual transactions.  These profits could be increased even further if the trader coordinated his or her trading activity with FX traders at other banks.

10.     By sharing information through multi-bank chats and colluding in their trading, these already influential traders dramatically amplify their ability to manipulate prices.  The fixes use a narrow time window, during which a small number of traders at a few global banks control the majority of the volume, and have leverage to influence prices.

11.     A manipulative trading strategy employed to affect market prices rather than engage in actual transactions is "crossing the spread" and placing an order that unnecessarily reaches "deep into the book" – that is, several levels beyond the market's offered bid/ask spread.  This intentionally shifts the bid/ask levels in the desired direction rather than merely executes orders at the best available price.  The technique is intended to push prices in a direction before a current bid/offer can be renewed by a counterparty at the previously existing price, or close to it.

12.     Knowing that the times around a fix are volatile, other market participants have an incentive to stay out of the way of the banks executing fix orders.  Successful coordination among the fix-executing banks and prior instance of successful manipulation of prices around the time of the fix thus reinforces the lesson that other market participants should stay out of the way at that time.  Only members of the multi-bank chat among large fixing banks have the shared information and the visibility as to the direction of aggregate fix orders, as well as the ability and incentive to cooperate in fix execution.  As one Barclays trader stated on a multi-bank chat: "we

are 3 of the top 4 eur books on the planet . . . if we cant help each other with liquidity . . . who can?"

Barclays' Misconduct

13.     Barclays employs traders who trade FX financial instruments in the inter-bank market and with non-bank counterparties as part of the Bank's Global FX business.  Among others, Barclays' FX traders trade in the following product sectors:  FX spot, FX forwards and non-deliverable forwards ("NDFs") and FX options.

14.     The misconduct described in this Order was not confined to a small group of individuals; it involved more than a dozen employees, who acted with the knowledge and oversight of some senior desk managers, and spanned geographically across numerous countries, including Barclays' offices in New York and London, among others.

Barclays Engaged in Manipulative Conduct Regarding, Attempted to Manipulate and Conspired to Manipulate Trading in Certain G10 Currency Pairs

15.     From approximately 2008 through 2012, certain FX traders at Barclays communicated with FX traders at other banks to coordinate attempts to manipulate prices in certain FX currency pairs and certain FX benchmark rates, including the WM/R and ECB fixes. The majority of these communications took place in multi-bank online chat rooms.

16.     Certain FX traders at Barclays routinely participated in these multi-bank chat rooms and often had multiple chat rooms open at the same time.  In their attempts to manipulate these benchmarks in the chat rooms, Barclays FX traders exchanged information about the size and direction of their orders with FX traders at other banks, as well as coordinated trading, and discussed the spread between bids and offers which the banks were showing to customers.  The

Russian, and Barclays' compliance personnel were not prepared to monitor the full extent of such foreign language interactions in the ordinary course of their compliance supervision.

Sales Practices

41.     On numerous occasions, from at least 2008 to 2014, Barclays employees on the FX Sales team engaged in misleading sales practices with clients.  Sales employees applied "hard mark-ups" to the prices that traders gave them without their clients' knowledge.  A hard mark-up represents the difference between the price the trader gives a salesperson and the price the salesperson shows to the client.

42.     FX Sales employees would determine the appropriate mark-up by calculating the most advantageous rate for Barclays that did not cause the client to question whether executing the transaction with the Bank was a good idea, based on the relationship with the client, recent pricing history, client expectations and other factors.

43.     As one FX Sales employee wrote in a chat to an employee at another bank on December 30, 2009, "hard mark up is key . . . but i was taught early . . . u dont have clients . . . u dont make money .  . . so dont be stupid."

44.     At one point, certain members of the FX Sales team sat right next to the FX G10 traders and only a few rows away from the FX Emerging Markets traders, close enough to communicate verbally.  At some point certain members of the FX Sales team were moved further away from the traders, but still close enough to communicate verbally.  In this seating arrangement, certain FX Sales employees were able to communicate mark-ups to traders verbally and, at times, through the use of hand signals.

45.     The practice of certain FX Sales Employees when a client called for a price quote was to mute the telephone line when asking the trader for a price, which would allow Sales

employees to add mark-up without the client's knowledge. However, some clients demanded to hear the Sales employees' communications with traders, and stayed on an open line while the FX Sales employees communicated with the traders.

46. In such circumstances, at least two Barclays FX Sales employees used hand signals to ask traders to add hard mark-up without the client's knowledge. For example, one finger held sideways would indicate a one-pip markup, while two fingers held sideways would indicate a two-pip mark-up.

47. Mark-ups represented a key revenue source for Barclays and generating mark-ups was a high priority for Sales managers. As the future Co-Head of UK FX Hedge Fund Sales (who was then a Vice President in the New York Branch) wrote in a November 5, 2010 chat: "markup is making sure you make the right decision on price . . . which is whats the worst price i can put on this where the customers decision to trade with me or give me future business doesn't change . . . if you aint cheating, you aint trying."

48. Historically, specific targets were set for mark-ups, and although specific targets are no longer set, most FX Sales employees continued to believe mark-ups remained a significant factor in determining compensation. Almost all FX Sales employees admitted they engaged in marking-up request-for-quotation and at-best orders, when possible. As one FX Sales employee noted, the goal was to "give the rate that was most advantageous to the bank, but would not make the customer go away!"

49. Even though more recent managers of Barclays' FX Sales group stated that they set no hard targets, certain FX Sales employees said they aimed for mark-ups to contribute at least 20% of the total revenue they were credited with. Mark-ups were thus one of three primary

methods for FX Sales to generate revenue (along with sales credits based on volume, and allocations from traders in recognition of receiving profitable orders from Sales).

50. Not only did some Sales managers encourage this practice, but one senior trader on the Hedge Fund FX Sales Desk—who later became the Co-Head of UK FX Hedge Fund Sales—regularly gave presentations to incoming FX Sales employees to teach them, among other things, how to charge mark-ups.

51. The agreements between Barclays and its FX clients did not disclose that Barclays was charging mark-ups to FX trades, and clients were generally not told when mark-ups were being applied to their specific trades.

52. On at least two occasions, FX Sales employees affirmatively represented to a client that no mark-up had been added, when in fact it had been.

53. On June 26, 2009, after one FX Sales employee appeared to admit to another Sales employee that he "came clean" about charging a hard mark-up after a client called him out on it, the second employee stated "i wouldnt normally admit to clients if you pip them. i think saying you rounded is fine." The first employee agreed, and replied that he didn't actually come clean to the client, but rather "said i was rounding."

54. On September 23, 2014, another FX Sales employee applied a mark-up to a client's trade. The client called and asked if had applied a mark-up, and this Sales employee lied and said that he had not.

55. Another misleading sales practice was giving a client the worst (or a worse) rate that was reached during a particular time interval, even if the trader was able to execute the order at a better price. The more favorable fill generated a profit, which Barclays would keep, in whole or in part, without providing disclosure to the client.

15

56.     A similar practice was to tell clients that their orders had been only partially filled, when in fact the FX Sales employees were holding back a portion of the fill as the market moved in Barclays' favor, permitting Barclays to generate an undisclosed profit at the client's expense.

Failures of Controls and Compliance

57.     As discussed within this Order, the misconduct at the Bank was systemic and involved various levels of employees, including a lack of appropriate supervision or intervention by certain managers both of FX trading desks and of FX Sales staff.

58.     The culture within the Bank valued increased profits with little regard to the integrity of the market.  In May 2012, after noting that "Large fixes are the key to making money as we have more chance of moving the market our way," a Barclays senior trader announced an "added incentive" for Sales employees of 50% of profits made for increasing trading volume at certain fix orders.  In response, the head of the FX Spot desk in New York noted that "the ideas put forward in this mail are exactly what we are looking for."

59.     The revenue produced by an FX trader's trading activity impacted the compensation of FX traders, along with other factors.

60.     During the relevant time period, although Barclays had general policies in place regarding trading and sales activity, those policies were not specifically designed for the FX business.  The guidance Barclays did provide focused on insider trading risk and regulations that were not relevant to the foreign exchange market, which effectively left it up to individual traders to determine what kind of conduct was appropriate.

61.     Warning signs alerted the Bank to weaknesses in its controls with respect to the FX business, but the Bank failed to take appropriate action.  Although the Bank took steps,