NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

---

In the Matter of

CREDIT SUISSE AG,
CREDIT SUISSE AG, NEW YORK BRANCH

---

# CONSENT ORDER UNDER
# NEW YORK BANKING LAW §§ 39, 44, and 44-a

The New York State Department of Financial Services ("DFS" or the "Department"), Credit Suisse AG, and Credit Suisse AG, New York Branch (together, "Credit Suisse" or the "Bank"), are willing to resolve the matters described herein without further proceedings.

**WHEREAS,** Credit Suisse AG is a global financial institution headquartered in Zurich, Switzerland, that employs more than 46,000 people worldwide, holds assets of approximately $792 billion, and that is licensed by the Department to operate a foreign bank branch in New York State;

**WHEREAS**, the Department has been investigating Credit Suisse's foreign exchange business.

**WHEREAS**, Credit Suisse has expressed to the Department its commitment to New York and to fully address the Department's investigation findings;

The Department and Credit Suisse are willing to resolve the matters described herein without further proceedings, as follows:

## THE DEPARTMENT'S FINDINGS AFTER INVESTIGATION

**Introduction**

1.  The Department has been investigating Credit Suisse's foreign exchange ("FX") trading business (the "DFS or Department Investigation"), including obtaining thousands of

documents from Credit Suisse, taking testimony from Credit Suisse employees, and obtaining additional information from third-party sources.

2.  The DFS Investigation has determined that, from at least 2008 to 2015, Credit Suisse consistently engaged in improper, unsafe, and unsound conduct, in violation of New York laws and regulations, by failing to implement effective controls over its FX business.

3.  The Bank engaged in the inappropriate sharing of information with other global banks which may have led to coordinated trading, manipulation of exchange rates, and increased bid/ask spreads offered to customers in Credit Suisse's foreign exchange business. These efforts were directed at maximizing profits or minimizing losses in Credit Suisse's trading book, to the detriment of customers and a competitive marketplace.

4.  The DFS Investigation also determined that, from approximately April 2010 to June 2013, Credit Suisse sought to engage in front-running customers' limit and stop-loss orders through application of an algorithm that appears to have been designed to trade ahead of customer's orders and increase profits .

5.  The DFS Investigation further determined that, from at least approximately January 2012 to December 2015, Credit Suisse engaged in improper practices involving the use of its electronic trading platform known as "eFX." Specifically, the DFS Investigation determined that Credit Suisse: (1) improperly employed a delay function when determining whether to fill customer orders, known as "Last Look," on all clients' orders, to increase the Bank's profits at the expense of a transparent, competitive model; (2) failed to adequately disclose to its clients that certain trades were rejected on the basis of a "Last Look" functionality, and instead stated that such rejections were due to an "error," thereby potentially misleading Credit Suisse clients into believing there was a technical error, as opposed to an intentional rejection of an order so the Bank

could avoid losses; and (3) failed to implement adequate controls to ensure its FX trading business and sales practices complied with law.

**The Foreign Exchange ("FX") Market and Credit Suisse's FX Business**

6.   **The FX Market**:  The foreign exchange ("FX") market is one of the largest and most liquid markets in the world.  The FX market is centered on "spot" transactions, the exchange of national currencies between two counterparties typically settled within two business days.  A spot dealer quotes its customer a "bid" (the price at which it will buy a currency) and an "ask" (the price at which it will sell).  Dealers profit on the difference between bid and ask prices, known as the "spread."

7.   The spread quoted plays a central role in a customer's decision whether to place an order with a particular dealer.  Dealers want a wider spread, *i.e.,* buy low and sell high, while customers want a narrower spread.  The narrower the spread, the more competitive the price; if a spread is too wide, a customer may choose to go to a different bank offering tighter spreads.

8.   Large banks such as Credit Suisse serve as dealers or "market-makers," quoting prices to and trading with customers.  Dealers also profit by trading for their own account.

9.   **Credit Suisse's FX Business**:  Credit Suisse does business in the United States through a foreign bank branch in New York State that is licensed and regulated by the Department, as well as through other affiliates.  The New York Branch holds assets of approximately $42 billion.  Credit Suisse is committed to its New York Branch and to cooperating fully with the Department in its continued supervision of the New York Branch.

10.   Credit Suisse conducts FX trading operations in New York, London, and other global FX hubs. During the period 2008 through 2013, Credit Suisse's average share in the global

FX market was approximately two percent (and sometimes reached as much as three percent) – on par with a number of other large global banks.

**Credit Suisse's Unsafe, Unsound and Improper Conduct**

11. For many years, Credit Suisse FX traders participated in multi-party electronic chat rooms, where traders shared information to support coordinated trading activity, and attempts to manipulate currency prices or benchmark rates. By improperly sharing information, some of the traders involved sought to diminish competition among banks, allowing these banks and traders to reap higher profits from the execution of FX trades at customers' expense. Certain Credit Suisse traders also engaged in improper activity by sharing of confidential customer information, again with the aim of enhancing their own profits to the detriment of customers.

12. Credit Suisse traders engaged in this activity despite the fact that both outside guidance and internal Credit Suisse policies counseled against manipulate and abusive practices such as sharing confidential customer information, front-running ahead of customer orders, and trading based on inside or proprietary information.

13. Specific information about customer identity, and the type and size of customer orders, is considered confidential and proprietary to a bank, and is not permitted to be shared outside of the financial institution. As early as 2008, guidance existed from the Federal Reserve emphasizing the need for FX dealers to protect client confidentiality and avoid situations involving (or even appearing to involve) trading on non-public information.[1] Likewise, Credit Suisse policies from 2010 that addressed fixed income trading stated, "***Confidential or Proprietary Information: Employees should assume that all information about customer orders and transactions is confidential and or proprietary.***"

---

[1] *See, e.g.*, Federal Reserve Bank of New York, *Guidelines for Foreign Exchange Trading Activities* (Foreign Exchange Committee, May 2008).

14. Similarly, Credit Suisse policies (again from 2010 pertaining to fixed income trading) stated, "Front-Running of Customer or Firm Transactions":

> ***Employees are prohibited from front-running (trading ahead of customer or Firm transactions)***. Specifically, employees may not buy or sell, or recommend or solicit the purchase or sale of, a security or a derivative thereof (such as options or futures) or another traded product for any account, whether a Firm or personal account, in order to take advantage of non-public information regarding an imminent material transaction by any customer . . . ."

15. Similarly, Credit Suisse policies (again from the 2010 fixed income manual) prohibited trading based on "inside information," which was broadly defined and included, among other things, "merger and acquisition activity."

### Attempts at Front-running Customer Orders

16. One improper use of confidential customer information by Credit Suisse traders may have led to front-running of customer orders. Front running involves using customer order information improperly by trading ahead of the order, with the understanding that the order will have a likely impact on the price of the currency pair in issue.

17. In one instance in February 2013, a Credit Suisse trader, Trader 1, disclosed potentially confidential information obtained from the Credit Suisse sales desk about FX trading associated with a pending merger and acquisition: "I think there's some lhs[2] action today at the fix on the back of tht massive m+a . . . massive caveat, info is from sales desk . . . but 4 o clock. . . . 16 yrds . . . something to do with the equity leg is going thru today . . . that's the reason they saying the spot will be done."

18. In another instance occurring March 1, 2013, Trader 1, referring to a corporate transaction involving a merger or acquisition, stated,"m+a, bmo BOUGHT 5 yards usdcad for it this week." In another instance, on March 4, 2008, Trader 1 told a trader at another large bank,

---

[2] "lhs" generally refers to "left hand side" or an order to sell the first currency listed in a currency pair.

5

Trader 2: "*gve u something to front run . . . I mean strategialcally [sic] position agst*," to which [Trader 2] replied, "*hahahah*."

19.  The desire of Credit Suisse and other traders to front-run corporate transactions based on confidential information was acute. On September 21, 2011, Credit Suisse and other traders in a chat room discussed SABMiller's just-announced intention to acquire Foster's brewery for just over $10 billion.[3] Because the transaction involved a U.K. corporation acquiring an Australian corporation, it was very likely that one or more large currency trades would be necessary to facilitate the acquisition. Understanding the timing of those large trades could provide traders an enormous opportunity to trade ahead of execution, based on a unique understanding about the likelihood the market would move in a particular direction once the orders were placed into the market.

20.  That same date, Trader 1, Trader 2, and two other traders from global banks, Trader 3 and Trader 4, discussed which of their banks might be handling the acquisition's closing -- with the hope the traders would learn ahead of time of the closing, and then trade ahead of it.[4] Trader 1 stated, "if the m+a bird walks thru the dealing room doors im gonna get quite excited." Trader 2 implored the group to share: "*Can whoever does get it make sure they post it immediately on here [this secretive chat room].*"[5]

---

[3] *See* https://dealbook.nytimes.com/2011/09/21/sabmiller-to-buy-fosters-for-10-15-billion/?_r=0.

[4] On or about January 10, 2017, Trader 4, an alleged member of the chat room known as "The Cartel," was charged by indictment in the Southern District of New York with participating in a conspiracy to suppress and eliminate competition for the purchase and sale of euro/U.S. dollar in the United States and elsewhere. The charges are currently pending. *See U.S. v. Richard Usher et al.*, 17-CR-019 (S.D.N.Y.) (https://www.justice.gov/opa/press-release/file/924206/download).

[5] Indeed, even before he joined Credit Suisse and traded for another bank, Trader 1 demonstrated a serious appetite for frontrunning, shamelessly inquiring of his chat room colleagues in October 2008: "*whos got a massive fix I can front run*"; and again in December 2008, "*anyone got a big fix I can front run plse*."

6

### *Improper Sharing of Confidential Customer Information*

21.     Credit Suisse and other banks also improperly shared confidential customer information. Credit Suisse traders potentially harmed FX customers on repeated occasions by exchanging information in chat rooms with traders from other banks to trade advantageously against Credit Suisse customers -- adjusting prices in light of additional information gleaned from putative competitors about the prices they offered such customers, and similarly assisting other traders by providing confidential information.

22.     When participating in certain multi-bank chat rooms, for example, Credit Suisse traders sometimes used code names to discreetly share confidential customer information. For example, Credit Suisse traders disclosed confidential customer information by using code names such as "Tanktop" and "Shoefone" to identify specific customers that traded frequently.

23.     Another example of improper sharing of confidential information involved a customer apparently located at another large bank. Credit Suisse and other traders repeatedly referred to this customer as "Satan," and a particular Credit Suisse trader, Trader 5, would sometimes provide specific information about the customer's orders or positions. In August 2008, for example, Trader 5 broadcasted that "*satan bgt 10 aud*" (indicating the identified customer bought 10 million of Australian dollars against the U.S. dollar). Trader 1 remarked, "n000000000," and after confirmation from Trader 5, Trader 1 replied, "they r still selling[,] a little birdie tells me." In a subsequent chat, Trader 3 told Trader 5, "I remember the old days, *your satan info was legendary*."

24.     In another chat in August 2008 regarding "Satan," Credit Suisse traders goaded Trader 3 into providing current information about Satan, since "[Satan] does all his spot with u [Trader 3] on yr toy now." Trader 3 replied by providing confidential information concerning a

7

63. Despite these concerns, Credit Suisse expanded the application of Last Look by applying a default setting to almost all eFX customers, without regard to whether the customer posed a trading risk to the Bank. This remained the case until approximately mid-2015.

64. Credit Suisse's deployment of Last Look thus grew to be overbroad. As a result, the Bank failed to tailor this mechanism to ensure it was used to defend against toxic flow, and not unfairly profit at customer expense. Moreover, prior to 2015, Credit Suisse never conducted systematic reviews of its application of Last Look, or the extent of its use, with respect to particular customers or categories of customers. As a result, Credit Suisse utilized Last Look to unfairly disadvantage the Bank's customers.

### *Credit Suisse's Inadequate Disclosure to Customers About Last Look*

65. Perhaps even more troubling was Credit Suisse's inadequate and potentially misleading disclosures to customers about the existence and extent of Last Look. While the use of last look in electronic trading may serve as a legitimate tool to defend against toxic flow, it is best employed when adequately disclosed to customers.

66. Here, rather than adopting the "full and frank disclosure policy" counseled by the leader on the eFX Development Team, the Bank did not adequately disclose to customers using the electronic trading platform that they were subject to last look functionality. Instead of indicating that the trade had been rejected by Last Look, Last Look rejection messages stated: **"An Error Occurred – Please Contact Credit Suisse,"** thereby leaving customers in the dark.

67. For example, in an e-mail from April 2013 with a subject heading of "Trade Rejections with Credit Suisse," a customer explicitly complained about the misleading nature of the "error" messages:

> Our FIX Interface received the error "An Error Occurred – Please Contact Credit Suisse", *so there is Zero indication that these rejections are due to last look*, based on the text it

18

could be anything.  Please investigate on your side, is there a delay in your price feed? ***Why is there not a more suitable rejection text if it really is due to Last Look?***

68. Similarly, an eFX support staffer in New York wrote in an April 2013 e-mail:

[The customer] happened to call again regarding these type of rejections . . . . I know this has been an issue since they last brought it to our attention. . . . I know the client receives a general error message "An Error Occurred – Please Contact Credit Suisse" and ***when they do contact us, we are unable to answer straightaway.***

69. Despite repeated customer complaints, certain Credit Suisse employees in the eFX business favored retaining the existing message.  For example, one eFX salesperson counseled against including language like the word "tolerance" that might suggest the Bank was applying Last Look: ***"[s]ome client's [sic] will ask what tolerance means and that could lead to a conversation about last look.  I still think, for some KAM [key accounts], we need to avoid that conversation.***"

70. Similarly, two eFX salespersons discussed how to respond to a customer inquiry concerning a dramatic increase in rejections shortly after Last Look was applied wholesale to eFX. On April 8, 2013, one salesperson asked if the client was aware that the Bank was now applying Last Look and, if not, could the salesperson tell the client, ***"[o]r do I need to be more subtle?"*** His colleague replied: "***I wouldn't use the word LL [Last Look] explicitly*** but explain that we have enhanced the parameters on our side."

71. Evidently to protect against discovery by customers, and others outside of the business of Last Look's application, rejections on this basis were intentionally omitted from internal trading logs.  This helped ensure that eFX salespersons and support staff remained unaware of the true reason for a rejection.  Indeed, at one point, the Head of eFX instructed an eFX trader to "***definitely kill the Last Look text***" in the trading logs.

19

72. Credit Suisse continued to receive complaints regarding the misleading and confusing nature of the error messages well into 2014. In August 2014, for example, the Head of Strategy wrote:

> Anyone object if we change the wording for LL rejects from "An error occurred  - please contact Credit Suisse" to "Trade Rejected"?  The 'error occurred' has caused confusion with [a customer] as they thought it might not be a genuine reject.  ***Don't think we do ourselves any favours by referring to this as an 'error'.***

73. In October 2014, the Head of Strategy again asked her executive colleagues in the business line whether they could update her on the possibility of providing a transparent  rejection message:  "*We are getting queries about our rejects on an almost daily basis now due to the unclear message so would be great to know when it will get changed.*"

74. The effort to resist transparent disclosures concerning  Last Look – even from customers who complained about it – was embraced at senior levels of Credit Suisse's eFX business.  In response to an internal email, the Head of eFX wrote in April 2013, that he would "***rather not discuss our exact settings just like we don't discuss our exact metrics nor pricing algorithms***."

### Following Scrutiny in the Press, Credit Suisse Modifies Last Look

75. In Summer 2014, press reports began to appear concerning customer and regulatory scrutiny of last look functionality.[11]  *See, e.g.,* "Last Look Orders Come Under Scrutiny," *FX Week* (Jul. 10, 2014) (the "FX Week Article").  Due to this press attention, eFX executives began discussing modifications to Last Look.  For example, in a July 24, 2014 e-mail – titled "Last Look coming under fire" – an eFX salesperson wrote to the Head of eFX: "***this topic was discussed in***

---

[11] *See, e.g.*, Michael Watt, *Last Look Orders Come Under Scrutiny*, FX Week, July 11, 2014 (http://www.fxweek.com/fx-week/news/2354579/last-look-orders-come-under-scrutiny).