NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

---

In the Matter of

BNP PARIBAS S.A. and
BNP PARIBAS S.A., NEW YORK BRANCH.

---

# CONSENT ORDER UNDER
# NEW YORK BANKING LAW §§ 39, 44 and 44-a

The New York State Department of Financial Services ("DFS" or the "Department"), BNP Paribas S.A., and BNP Paribas S.A. New York Branch (together, "BNPP" or the "Bank"), are willing to resolve the matters described herein without further proceedings.

WHEREAS, BNPP is a global financial institution headquartered in Paris, France that employs nearly 190,000 people worldwide, with total assets of more than €2.1 trillion, and is licensed by the Department to operate a foreign bank branch in New York State;

WHEREAS, the Department has been investigating BNPP's foreign exchange business. The Department finds as follows:

## THE DEPARTMENT'S FINDINGS

### Introduction

1. The Department has been investigating BNPP's foreign exchange ("FX") trading business (the "DFS or Department Investigation"), including obtaining over 120,000 pages of documents from BNPP; conducting interviews of BNPP employees; and obtaining additional information from third-party sources.

2. The Department's Investigation conclusively determined that BNPP repeatedly engaged in improper, unsafe and unsound conduct, in violation of New York laws and regulations,

The conduct arose from a significant and material failure of BNPP to implement effective controls over its FX trading business.

3. Collusive and manipulative FX trading conduct resulted in market harm by distorting competition and depriving injured customers of the benefit of the bargain they sought when trading with BNPP and other banks involved.

4. The misconduct engaged in by more than a dozen BNPP traders and salespersons was broad; sometimes very deep; involved employees located in both New York and other BNPP locations across the globe; and occurred over an extended period of time.

5. By these illicit efforts, BNPP traders and salespersons intended to benefit the Bank (and themselves) by maximizing profits or minimizing losses, usually to the detriment of BNPP customers and customers of other banks that became involved in the misconduct. Improper activity that was attempted includes:

- Collusive conduct carried out through on-line chat rooms that involved fake trades designed to manipulate prices; and collusion in setting spreads for customers trading in certain currencies, in order to widen the spreads and artificially increase profits.

- Improperly exchanging information about past and impending customer trades in order to maximize profits at customers' expense. Conduct encompassed improper sharing of confidential customer information via personal e-mail – including through use of a sophisticated codebook that helped identify dozens of clients, central banks or other important market participants and specified trading volumes.

- Manipulation of the price at which daily benchmark rates were set – both from collusive market activity, as well via improper submissions to benchmark-fixing bodies.

- Misleading customers by hiding markups on executed trades, including by using secretive hand signals when customers were on the phone; or by deliberately "underfilling" customer trades, in order to keep part of a profitable trade for the Bank's own book.

6. BNPP's failure to effectively police its FX business extended to its electronic trading platforms as well. Its electronic trading offerings were deficient because certain elements,

including a "last look" functionality, operated in a manner that disadvantaged customers, without sufficiently disclosing to them how the Bank's trading was conducted.

### The Foreign Exchange ("FX") Market and BNPP's FX Business

7.  **The FX Market**: The foreign exchange ("FX") market is one of the largest and most liquid markets in the world. The FX market is centered on "spot" transactions, *i.e.*, the exchange of national currencies between two counterparties typically settled within two business days. A spot dealer quotes its customer a "bid" (the price at which it will buy a currency) and an "ask" (the price at which it will sell). Dealers profit on the difference between bid and asking prices, known as the "spread."

8.  The spread quoted plays a central role in the customer's decision whether to place an order with the particular dealer. Dealers want a wider spread, *i.e.*, to buy low and sell high, while customers want a narrower spread. The narrower the spread offered, the more competitive the price; if a spread is too wide, a customer may choose to go to a different bank offering tighter spreads. By quoting narrower spreads than competitors, dealers can gain customers and market share.

9.  Large banks such as BNPP serve as dealers or "market-makers," quoting prices to and trading with customers. Dealers also trade for their own account.

10. **BNPP's FX Business**: BNPP does business in the United States through BNP Paribas S.A., New York Branch ("BNPP New York"), as well as through other affiliates. The Department supervises and regulates BNPP New York as a licensed foreign bank branch in New York State.

11. BNPP conducts FX trading operations in New York, London, and several other global FX hubs. For the relevant period through the present, all FX trades involving U.S. dollars

traded by BNPP clear through BNPP New York. During the approximate period 2008 through 2013, BNPP's average share in the global FX market approximated 2.5 percent – on par with a number of other large global banks.

**BNPP's Improper, Unsafe and Unsound Conduct**

12. For many years, several BNPP FX traders participated in multi-party online chat rooms where participants discussed coordinating trading activity, and attempted to manipulate FX currency prices or benchmark rates. The purpose of this collusive activity was to diminish competition among banks, allowing these institutions and the traders involved to wring higher profits from the execution of FX trades at the expense of customers.

*Collusive Conduct Intended to Manipulate FX Prices – "ZAR Domination"*

13. For example, in 2011 and early 2012, a trader located in BNPP's New York FX desk ("**Trader 1**"), employed a variety of schemes intended to manipulate prices and spreads in several CEEMEA currencies, including the South African rand, Hungarian forint and Turkish lira.

14. As a result of this illegal conduct, on January 4, 2017, **Trader 1** pled guilty in the U.S. District Court for the Southern District of New York (the "Southern District") to a one-count information charging him with conspiracy to restrain trade, in violation of the Sherman Act, 15 U.S.C. § 1.[1] Certain of the manipulative schemes employed or discussed by **Trader 1** and others are described more fully below.

15. Scheme One – "Firepower": In one scheme, **Trader 1** and certain colleagues at other global banks, who also traded in South African Rand (known by its symbol "ZAR"), sought to manipulate FX prices by directly coordinating trading activity. Trader 1, explicitly referring to this group as a "cartel," labeled it "*ZAR Domination.*"

---

[1] *See U.S. v. Jason Katz*, 17-CR-003 (S.D.N.Y.) (https://www.justice.gov/atr/case-document/file/946726/download).

16. This group also included a trader who sat in the New York offices of another global bank that held a large share the FX market ("Trader 2"). On January 11, 2017, Trader 2, who colluded extensively with **Trader 1**, also pled guilty in the Southern District to a nearly identical one-count information charging him with conspiracy to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1.[2]

17. **Trader 1** sought to recruit more members to the ***ZAR Domination*** cartel. In January 2012, for example, Trader 1 sent messages with a former colleague, who then served as Head of FX Spot Trading at a large African bank ("Trader 3"), saying: *"a couple of us here [in New York] are going to probably make a run at zar in this [Eastern] time zone."* Trader 1 sought to enlist Trader 3 to join the group, proposing "some coordination with you guys ... let you know what we are doing and what we have ... do some execution in the overnight hours."

18. Trader 1 explained *"there are about 3 or 4 of us with good size limits here [and] 200 bucks [$200 million] or so in ny time zone can have an effect. . . . [The] "main thing" . . . is just not running into big local orders so between the ones i get plus yours . . .* we should have good idea what is out there." Trader 1 emphasized that this group consisted of traders he trusted based on two years of relationships, "so we could alternate names . . . so no one would get an idea of where the selling or buying is really coming from," and noted, *"thats a lot of firepower i think in ny . . .* [and to] *just keep that quiet."*

19. **Trader 1** sought to recruit another colleague at a global bank that also was a major FX market participant ("Trader 4"), telling him:

> *[W]e got a little cartel really brewing . . . really try and move zar . . . wont take much to push it . . . we will know where all the orders are . . . we got like 200 bucks of firepower . . . occasional blow up but we win . . . make one chat room . . . call it Zar domination*

---

[2] *See U.S. v. Christopher Cummins,* 17-CR-0026 (S.D.N.Y.) (https://www.justice.gov/atr/case-document/file/930521/download).

*. . . i think it is a million dollar plan . . . we have to be proactive on it though. couple times a week for it to pay off.*

20. As noted one of strategies explored by this group involved building up "firepower" in Rand currency during New York trading hours. Because the Rand is a relatively illiquid currency (trading represents approximately 1.1 percent of the global FX market), its price is more susceptible to coordinated manipulation than more liquid currencies.

21. Relatedly, interest in Rand trading is limited to certain regions. A significant percentage of this trading takes place in South Africa during business hours in that time zone. Trading during business hours in New York (off-hours in the South African market) can have an outsized effect.

22. Accumulation of "firepower" would enable the cartel to push the price of the Rand in one direction or another during New York hours, as desired. During a chat with co-conspirators, **Trader 1** stated: It *"just seems to me that zar [is] one of the few ripe mkts out there for people with some stick behind em so why not. not going to make our budgets off flow or nickel and diming euro around."* In other words, when profits from legitimate trading or "flow" would not satisfy these traders, profits from collusive conduct would.

23. <u>Scheme Two – Spread Collusion</u>: Another strategy employed by the *"ZAR Domination"* group involved collusion in setting spreads for trading in Rand. Competition between global banks helps keep spreads tight and prices competitive. Group members, however, repeatedly colluded to widen spreads for orders in Rand to limit competition, thereby boosting the banks' ability to profit at customer expense.

24. In January 2012, for example, Trader No. 2 informed the group that he had received an order to buy $50 million of Rand, asking, "250 pips? 300?" Trader 2 also shared the fact that

6

he had shown his customers a spread of 125 basis points for a $20 million order and 250 basis points for a $50 million order.

25. **Trader 1** responded, "ill match . . . *lets widen this out on people . . . if we all consistent…it becomes standard ahah*." Trader 2 "*agreed*," as did a trader from another global bank with large FX market share ("Trader 5" and "Bank 2"), noting "*tht way 250 is the new 200.*" In other words, members of this group explicitly colluded in an effort to force upon customers an increase in the standard spread for a $50 million order -- from 200 pips to 250 pips.

26. Trader 5 also asked **Trader 1** to solicit Trader 4 to join this illegal arrangement. **Trader 1** agreed, writing to Trader 4 in a different chat room:

> *hey dude we all agreed the new price in 50 bucks ny time is 250 and 125 for 20 we going to try and get this wider … if we all consistent they have to except [sic] it."*

Trader 4 also agreed to the scheme.

27. **Trader 1** returned to the first chat room to inform the other co-conspirators that Trader 4 was on board with this leg of their scheme, bragging: "*i have one word for BNP . . . guarantee.*" Trader 5 congratulated the group, saying "*salute to first coordinated zar effort.*" **Trader 1** responded, "*yep many more to come.*"

28. **Trader 1** also attempted to recruit into the conspiracy a former colleague who traded currency at Bank 4 ("Trader 6"), saying:

> *"a bunch of us have decided to widen spreads a bit in ny afternoon . . . we making 125 in 20 and 250 in 50 . . . going to get custys to except [sic] wider . . . figure if we all consistent they [customers] have to accept it . . . [Bank 2, Bank 1 and Bank 3] all in for it."*

Seeking to extend the reach of the cartel further, **Trader 1** asked Trader 6 to let yet another trader at Bank 4 know about the "new" collusion-based price.

7

29. Subsequently, in March 2012, **Trader 1** complained to the group about other, "*silly*" banks that were undermining the cartel by offering narrower spreads. **Trader 1** encouraged the cartel that, by maintaining solidarity on wider spreads, the group eventually would broadly impact the market: "*my spread is my spread ... if we all in ny keep the same spread that will become the norm ... we set the spreads ... and we stand by them ... 50 in ny is 200 ... 25 in ny is 125 ... you guys agree or am i off.*" Others in the group agreed to adhere to the agreed-upon quotes. Concisely summarizing the deeply pernicious nature of the cartel he helped craft, **Trader 1** stated: "*that is what we show in ny ... custys dont like oh well ... where they going to go?*"

30. <u>Scheme Three – Fake Trades</u>: Another illegal scheme involved **Trader 1** pairing with colleagues at least two other large banks to deploy fake trades directed at improperly moving prices of emerging market currencies. The group focused their illicit efforts on currencies with low liquidity, executing during the off-hours for the primary markets in those currencies when trading activity would be low, in order to maximize the scheme's impact.

31. The co-conspirators first would conduct a currency trade on a public and transparent trading platform, such as "Reuters Matching," so that publicly-available market data showed a completed trade at a certain price. Shortly afterwards, **Trader 1** and a co-conspirator would unwind the same trade on a non-public, non-transparent dealing platform, such as "Reuters Dealing," or cancel the original trade altogether by mutual agreement.

32. In many instances, fake trades between **Trader 1** and a counterparty were unwound or canceled within seconds of placement. Sometimes the fake order was the only trading activity visible on the public trading platform for several minutes. Because the co-conspirators used these tactics during periods of relative market inactivity, prevailing market prices moved upward or downward immediately after publication of the fake trade on repeated occasions.

8

33. **Trader 1** and co-conspirators coordinated tactics in chats and phone calls. In December 2011, for example, Trader 2 stated to **Trader 1** by chat that he was *"trying to stuff it higher"* in the U.S. dollar/rand exchange rate. Minutes later, the two traders executed a publicly-visible U.S. dollar/rand trade, which they immediately canceled privately.

34. The unwinding or canceling of trades served no legitimate economic purpose -- these were fabricated transactions designed to mislead and improperly influence other market participants. The Department's investigation has determined that **Trader 1** engaged in more than two dozen improper canceled trades during 2011 and 2012, involving traders from at least two other major financial institutions.

### *Illegal Coordination to Enhance Profits at Customer's Expense*

35. BNPP traders also engaged in other illegal coordination of their trading to disadvantage customers by maximizing the profits or minimizing the losses to the Bank following a trade. In May 2013, for example, **Trader 1** and Trader 2 expressly discussed coordinating prices offered to a customer to boost Trader 2's profits:

> *I'm going to walk this guy up in the Rand. . . . I want to get him . . . let me cancel my other stuff. Get that out . . . fall back. . . . When it goes 0 . . . let's see, I don't want to get too greedy. Alright, when it goes 050 bid, would you give it the two there?*

36. After Trader 1 agreed to assist, and the customer apparently made a trade, Trader 2 said: "Lets sit back for a sec. Maybe he needs more." **Trader 1** agreed. Trader 2 then instructed **Trader 1**, *"bid four and just pull that for a second . . . Ah, that's fine. So I got one at 78."* Trader 1 and 2 thus appeared to successfully "walk up" the price paid by the customer.

37. In another instance, Trader 5 enlisted **Trader 1** to *"pull ur bids in il,"* apparently referring to publicly-visible bids in Israeli shekels. **Trader 1** responded, *"ok."* Trader 5 then told **Trader 1** he would compensate him for the help in a later trade.

38. **Trader 1's** efforts at manipulation were far-reaching. For example, in January 2012, **Trader 1** and Trader 5 discussed illegally coordinating with other traders to quote specific customers a specific price. **Trader 1** listed two possible price quotes, and Trader 5 responded, *"no, lower."* Five minutes later, after apparently quoting prices to the customer even lower than the coordinated one, **Trader 1** mocked the customer: *"this guy [the customer] is going to sell the bottom."* **Trader 1** subsequently reported to Trader 5 that he succeeded in buying from the customer at several basis points lower.

39. In another example, a BNPP salesperson based in Seoul, South Korea ("**Salesperson 1**"), colluded with a counterpart at another global bank to secretly coordinate bids for a customer's business. Between April 2011 and November 2014, **Salesperson 1** and salespeople at the other bank improperly coordinated when responding to a certain customer's regular requests for competitive bids for a certain U.S. dollar/Korean Won forward transaction. The salespeople at each bank agreed that one or the other of the banks would significantly overbid for the transaction by a certain amount. This permitted the bank that had not overbid to that extent to "win" the bid with a nevertheless higher markup on the price – *i.e.*, the "winning" bank already knew through collusion that its "competitor's" bid would be substantially higher.

40. BNPP and the other global bank rigged at least 44 bids in this manner for the targeted customer, dividing the "wins" evenly and charging the customer margins that were double the typical margins they had been able to charge before they hatched their scheme.

*Improper Sharing of Confidential Customer Information*

41. <u>Explicit Sharing to Customers' Detriment</u>: BNPP traders also harmed FX customers on repeated occasions by exchanging information in chat rooms with traders from other banks to trade advantageously against BNPP customers -- adjusting prices in light of additional