UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA : Criminal No. CRIM 003

v. : Filed:

JASON KATZ, : Violation: 15 U.S.C. § 1

         Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## INFORMATION

The United States of America, acting through its attorneys, charges:

### SHERMAN ACT CONSPIRACY
### (15 U.S.C. § 1)

### DEFENDANT AND CO-CONSPIRATORS

During the period covered by this Information:

1. Jason Katz ("Defendant") resided in New York, New York, and was employed as a foreign currency exchange ("FX") dealer at three successive financial institutions operating in New York, New York.

2. At each of the three financial institutions, Defendant was a dealer of Central and Eastern European, Middle Eastern, and African Emerging Markets currencies ("CEEMEA" currencies).

3. For purposes of this Information, CEEMEA currencies refers to the Hungarian Forint, Polish Zloty, Czech Crown, Romanian Leu, Russian Ruble, Turkish Lira, Israeli Shekel, and South African Rand, when traded against the U.S. Dollar, the Euro, or one another.

1

4. Various financial institutions and individuals, not made defendants in this Information, participated as co-conspirators in the offense charged in this Information and performed acts and made statements in furtherance thereof.

5. Whenever in this Information reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## BACKGROUND

6. The FX market is a global market in which participants trade currency pairs. In a currency pair, each currency is valued relative to the other. The ratio that expresses the value of one currency to the other is referred to as the "exchange rate," "rate," or simply "price." Trading in CEEMEA currencies typically involves exchanging one CEEMEA currency, such as the South African Rand ("ZAR"), for a non-CEEMEA currency, such as the U.S. Dollar ("USD"). In the currency pair USD/ZAR, USD is referred to as the "base" currency and ZAR is referred to as the "counter" currency. Prices are quoted in terms of how many units of the counter currency are required in exchange for one unit of the base currency.

7. FX transactions include "spot" transactions, in which the exchange of currencies occurs typically within two days of the trade date, and "forward" transactions, in which the exchange of currencies occurs on a more distant, agreed-upon date following the trade date.

8. During the period covered by this Information, Defendant and his co-conspirators competed as "market makers" in CEEMEA currencies, meaning they were primarily responsible for quoting prices to buy and sell CEEMEA currencies to customers who contacted their respective financial institutions looking to trade. Defendant and his co-conspirators acted as market makers principally in spot transactions, although on certain occasions, and with respect to certain currencies, they quoted prices for forward transactions as well.

9. Customers of Defendant and his co-conspirators included corporations, hedge funds, pension funds, and other entities, located in New York, other states, and in foreign countries, that wanted to exchange large amounts of one currency into an equivalent amount of another currency. Prices for such transactions were typically conveyed to these customers in the form of a "two-way price," comprised of the "bid" (the price at which the financial institution would buy the base currency) and the "offer" (the price at which the financial institution would sell the base currency) for a stated amount of the base currency.

10. One category of customer order was a simple order to buy or sell a specific amount of currency for a price quoted by the FX dealer. Another category of customer order was a "fix order," where the order was to buy or sell a specific amount of currency at a benchmark rate to be determined subsequently. "Fixes" established such benchmark rates by generating a snapshot of the price of a currency pair based on market activity for that currency pair occurring within a predetermined, and short, window of time.

11. A third category of customer order was known as a "limit" order. In a limit order, a customer would place an order to buy or sell a particular currency only if the market price of that currency reached or exceeded a set price level.

12. Once the FX dealer and the customer agreed on price for a particular type of customer order, the FX dealer then assumed the risk of an unfavorable movement in a currency's price that might occur between the time the FX dealer and the customer entered into their trade and when the FX dealer was able to fill or offset that customer trade in what was known as the "interdealer market." Defendant, his co-conspirators, and other FX CEEMEA dealers competed in the interdealer market. Interdealer trades could be executed directly between competing financial institutions, through brokers, or on electronic FX trading platforms.

## DESCRIPTION OF THE OFFENSE

13. From at least as early as January 2007 and continuing until at least July 2013, the exact dates being unknown to the United States, in the Southern District of New York and elsewhere, Defendant and his co-conspirators, and others known and unknown, knowingly entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing prices for CEEMEA currencies traded in the United States and elsewhere. The combination and conspiracy engaged in by the Defendant and his co-conspirators was in unreasonable restraint of interstate and U.S. import trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

14. The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendant and his co-

conspirators, and others known and unknown, the substantial terms of which were to fix prices for CEEMEA currencies traded in the United States and elsewhere.

### MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT

15. For the purposes of forming and carrying out the charged combination and conspiracy, Defendant and his co-conspirators, and others known and unknown, did those things which they combined and conspired to do, including, among other things:

(a) agreeing to enter into non-bona fide trades among themselves on an electronic FX trading platform, for the sole purpose of manipulating prices;

(b) agreeing to subsequently cancel these non-bona fide trades, or to offset them by entering into equivalent trades in the opposite direction, in a manner designed to hide such actions from other FX market participants;

(c) coordinating on the price, size, and timing of their bids and offers on an electronic FX trading platform in order to manipulate prices on that and other electronic FX trading platforms;

(d) agreeing to refrain from trading where one or more of the co-conspirators had a stronger need to buy or sell than the others, in order to prevent the co-conspirators from bidding up the price or offering down the price against each other;

(e) coordinating their trading prior to and during fixes in a manner intended to manipulate final fix prices;

(f) coordinating their trading in order to move pricing through their customers' limit order levels;

(g) agreeing on pricing to quote to specific customers;

(h) engaging in the above-described behavior by communicating through private chat rooms, phone calls, text messages, other personal cell phone applications, and in-person meetings within the Southern District of New York; and

(i) employing measures to hide their coordinated conduct from customers as well as other FX market participants, including by using code names for specific customers, communicating by personal cell phone applications instead of on recorded business phone lines, and concealing the existence of trades entered into solely to manipulate prices, among other steps.

## TRADE AND COMMERCE

16. During the time period covered by this Information, the business activities of Defendant and his co-conspirators that are the subject of this Information were within the flow of, and substantially affected, interstate and U.S. import trade and commerce. Defendant and his co-conspirators filled substantial quantities of CEEMEA customer orders, and traded substantial quantities of CEEMEA currencies in the interdealer market, with customers and counterparties located in New York, in other states, and in foreign countries, in a continuous and uninterrupted flow of interstate and U.S. import trade and commerce. Defendant and his co-conspirators also caused substantial payments for FX transactions to travel in interstate and U.S. import trade and commerce.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

Dated: 12/29/2016

_____
BRENT SNYDER
Deputy Assistant Attorney General
Antitrust Division
U.S. Department of Justice

_____
MARVIN N. PRICE, Jr.
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

_____
PREET BHARARA
United States Attorney
Southern District of New York

_____
JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division
U.S. Department of Justice

_____
BENJAMIN SIROTA

_____
ERIC HOFFMANN

_____
GRACE PYUN

_____
BRYAN SERINO

_____
DAVID CHU

_____
JOSEPH MUOIO

Trial Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
212-335-8000

7