UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                                    Case No:

HSBC HOLDINGS PLC,


                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DEFERRED PROSECUTION AGREEMENT

Defendant HSBC Holdings plc ("HSBC" or the "Company") pursuant to authority granted by the Company's Board of Directors, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), enters into this deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.    The Company acknowledges and agrees that the Fraud Section will file the attached two-count criminal Information in the United States District Court for the Eastern District of New York charging the Company with wire fraud in violation of 18 U.S.C. § 1343. In so doing, the Company: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York. The Fraud Section agrees

to defer prosecution of the Company and any of its subsidiaries and majority-owned and controlled affiliates pursuant to the terms and conditions described below.

2. The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of the officers, directors, employees, and agents of certain of its subsidiaries and affiliates as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the attached Statement of Facts are true and accurate. Should the Fraud Section pursue the prosecution that is deferred by this Agreement, the Company and HSBC Bank plc ("HBEU") stipulate to the admissibility of the attached Statement of Facts in any proceeding by the Fraud Section, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

## Term of the Agreement

3. This Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company agrees, however, that, in the event the Fraud Section determines, in its sole discretion, that the Company has knowingly violated any provision of this Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's right to proceed as provided in Paragraphs 16 through 20 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the

Agreement may be terminated early. If the Court rejects the Agreement, all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Relevant Considerations

4. The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

    a. the Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts");

    b. despite the Company's intention and commitment to cooperate from the outset of the investigation, the Company's initial cooperation with the government's investigation was deficient in certain respects. After being notified of the government's concerns – including that certain documents were not timely produced when requested and that the Company's internal investigation into the transactions described in the Statement of Facts was not satisfactory, the Company changed course. The Company replaced its lead outside counsel, conducted additional investigation into the transactions described in the Statement of Facts, made additional regular presentations to the Fraud Section, produced additional documents to the Fraud Section from foreign countries in ways that did not implicate foreign data privacy laws, and collected, analyzed and organized voluminous new evidence and information for the Fraud Section. For these reasons, the Company received substantial credit for its cooperation;

    c. the Company, after being alerted to the problems described above, provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

Case 1:17-cv-03139-LGS-SDA Document 620-18 Filed 01/28/19 Page 3 of 10

d. the Company engaged in extensive remedial measures, including dedicating significant resources to improving its systems and controls. For example, the Company implemented algorithmic trading to manage risk around benchmark orders, updated its policies for sales, pricing, order handling, managing confidential client information and conflicts of interest, pre-hedging, and market abuse (including front-running), and engaged outside firms to audit its internal controls and to enhance its trade, voice, and audio surveillance. The Company also terminated the employment of employees involved in wrongdoing.

e. the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

f. accordingly, after considering (a) through (e) above, the Company received an aggregate discount of fifteen percent off of the bottom of the otherwise-applicable U.S. Sentencing Guidelines fine range;

g. based on the Company's remediation and the Company's agreement to report to the Fraud Section as set forth in Attachment D to this Agreement, the Fraud Section determined that an independent compliance monitor was unnecessary;

h. the nature and seriousness of the offense conduct, including the $46.4 million that HSBC gained from the offense conduct from two different victim companies. The Company's Global Markets business also failed to prevent the misuse of confidential client information in these and other instances, which was due in part to a lack of adequate governance, risk management, compliance, and audit policies and procedures to ensure that its conduct complied with U.S. federal law.

20. On that same day, on or about November 28, 2011, in preparation for a call among Cairn, the Advisor and HSBC employees, Salesperson 1 gave advice about ramping the market in a manner that would not raise suspicions of Cairn or the Advisor. Salesperson 1 stated to Stuart Scott during a telephone call that, among other things, Cairn viewed the Advisor "as an agent in between who will be closely monitoring it when we are doing [the Cairn FX Transaction], .... So we don't want ... to push the market too much high[er] ... and at the same time we do want to make money on this."

21. On or about November 30, 2011, Mark Johnson made a purchase of Sterling in exchange for Euros, which was booked in his P-book. Johnson held the Sterling he purchased until the day of the Cairn FX Transaction, when he sold the currency for a profit to HSBC.

22. On or about December 5, 2011, Mark Johnson and Stuart Scott received additional information regarding the timing of the Cairn FX Transaction. Specifically, a news article was circulated to them reporting that the underlying sale by Cairn of its Indian subsidiary had received regulatory approval.

23. On that same day, on or about December 5, 2011, Mark Johnson traveled to New York. While in New York, Johnson directed an FX trader in HSBC's New York office to purchase Sterling in exchange for Dollars, which Johnson later sold for a profit to HSBC on the day of the Cairn FX Transaction. The next day, on or about December 6, 2011, Stuart Scott purchased Sterling in exchange for Euros, which Scott later sold for a profit to HSBC on the day of the Cairn FX Transaction.

C. The Execution of the Cairn FX Transaction

24. On or about December 7, 2011, Cairn contacted HSBC about executing the Cairn FX Transaction on that day. Salesperson 1 arranged for a call at approximately 1:35

A-6

PM London time between Cairn, the Advisor, Salesperson 1 and Mark Johnson and Stuart Scott to discuss whether the Cairn FX Transaction should be executed at the 3 PM fix or the 4 PM fix. HSBC knew that it was advantageous to it, and disadvantageous to Cairn, to execute the Cairn FX Transaction at the 3 PM fix because there was less liquidity at the 3 PM fix and currency prices at that earlier time were easier to manipulate than prices at the 4 PM fix.

25. During the December 7, 2011 call, Stuart Scott falsely and fraudulently suggested to Cairn that the 3 PM fix had more liquidity than the 4 PM fix. When confronted by the Advisor about that assertion, Scott falsely and fraudulently stated that the fixes were the same in terms of liquidity. Scott then stated there was more trading volatility at the 4 PM fix and Mark Johnson stated that he "personally would recommend" the 3 PM fix "so there's an element of surprise." Scott further stated that: "That's an excellent point actually, yeah. Because people do look for that, for the significant flows to happen at 4 o'clock and once they get a smell of that or a smell of significant flow going through, they will try to jump in front and start to muck around in the markets." Cairn followed the HSBC recommendation to execute the Cairn FX Transaction at the 3 PM fix.

26. Mark Johnson and Stuart Scott, anticipating that the execution of the Cairn FX Transaction by HSBC would drive up the price of Sterling/Dollar, quickly orchestrated front-running purchases of Sterling for HSBC. Specifically, within minutes of the December 7, 2011 telephone call with Cairn, Scott directed the purchasing of Sterling/Dollar in his P-book. Johnson and Scott also caused other FX traders at HSBC in both London and New York to purchase Sterling prior to the Cairn FX Transaction in their P-books.

27. On or about December 7, 2011, Cairn placed its order with HSBC to buy approximately 2.25 billion Sterling (equivalent to selling approximately $3.5 billion) in two

A-7

tranches prior to the 3 PM fix—at approximately 1:51 PM and 2:28 PM London time. Johnson and Scott were in communication with each other concerning the execution of the Cairn FX Transaction. For example, during a consensually recorded telephone call at approximately 2:27 PM London time, Johnson commented to Scott, "Seems that they're starting to bite," in reference to Cairn's orders. In response, Scott stated, "full amount" (indicating that Cairn had authorized the full order of 2.25 billion Sterling). Johnson then responded, "No, you're kidding?" Scott then re-confirmed that Cairn had indeed authorized the full purchase, to which Johnson replied: "Ohhhh, f***ing Christmas."

28. During a consensually recorded telephone call at approximately 2:54 PM London time, Mark Johnson and Stuart Scott discussed the Cairn FX Transaction again. During that call, Johnson and Scott discussed how high they could "ramp" the price of Sterling/Dollar before Cairn would "squeal." Scott also provided a trader ("Trader 1") with guidance about how high to push the price of Sterling/Dollar prior to the 3 PM fix, when the Cairn FX Transaction would be priced. HSBC "ramped" the price Sterling/Dollar by aggressively trading before and during the fix in a manner designed to increase the price of Sterling/Dollar. As a result, the price of Sterling/Dollar spiked around the 3 PM fix. Indeed, in the 30 seconds before and 30 seconds after 3:00 PM London time, the price of Sterling/Dollar reached a market high for the day, allowing Johnson, Scott, and other FX traders at HSBC to generate significant profits in their P-books from their prior Sterling purchases by selling that Sterling at the higher prices generated by HSBC. HSBC did not disclose Johnson or Scott's P-book trades or the P-book trades of other FX traders at HSBC in Sterling to Cairn.

29. On or about December 7, 2011, Cairn and the Advisor monitored the price of Sterling in the FX market in anticipation of the Cairn FX Transaction. When Cairn and the

A-8

been exerting upward pressure through its transactions in the Sterling/Dollar market well prior to 2:55 PM London time.

33. In the days immediately following this discussion, Cairn undertook to settle the Cairn FX Transaction with HSBC, during which process wires sent in furtherance of the scheme were transmitted from the Eastern District of New York to outside the State of New York. Specifically, Cairn settled the Cairn FX Transaction by transferring U.S. dollars through a U.S. financial institution ("Financial Institution A"), to HSBC. Financial Institution A only accepted and released these funds to HSBC following customary checks and approvals by personnel in Financial Institution A's offices in Brooklyn, New York. Financial Institution A personnel performed these checks and obtained the requisite approvals from Brooklyn by electronically accessing Financial Institution A's mainframe, which was located outside the State of New York. Each check and approval occurred through an interstate wire communication between Brooklyn, where Financial Institution A personnel were located at the time, and Financial Institution A's mainframe, which was located outside the State of New York.

34. In total, HSBC gained approximately $5,000,000 from its execution of the Cairn FX Transaction and approximately $3,000,000 from the P-book trades of the London and New York FX traders.

## IV. The Victim Company 2 FX Transaction

35. In early 2010, Victim Company 2 planned to acquire the Asian business unit of another financial services company. To satisfy the terms and conditions of the proposed deal, it needed to acquire a significant amount of U.S. Dollars. As Victim Company 2's balance sheet was denominated in British Pounds, it planned to sell British Pounds to purchase the U.S. Dollars.

36. HSBC employees provided recommendations to Victim Company 2 about how to structure and execute its FX transaction, and pitched its FX trading capabilities to Victim Company 2. In connection with those discussions, Victim Company 2 and HSBC employees, on behalf of HSBC, entered into a confidentiality agreement that governed all information relating directly or indirectly to the proposed transaction. Under this agreement, HSBC agreed to keep all such information "secret and confidential," to not disclose such confidential information, and to not use any confidential information "for any purpose (including but not limited to, any competitive or commercial purpose)" other than in connection with the proposed transaction. Accordingly, HSBC and certain of its employees knew that HSBC had an obligation not to misuse Victim Company 2's confidential information.

37. On February 24, 2010, HSBC employees made their initial "pitch" presentation to Victim Company 2 concerning the FX transaction. The following day, an HSBC employee e-mailed Victim Company 2 proposing a call with HSBC's global head of foreign exchange (the "Global FX Head") to provide greater precision on the levels of liquidity and pricing to which HSBC could commit. In that e-mail, the HSBC employee represented that HSBC's Global FX Head "was already an insider on this trade and bound to confidentiality."

38. The next day, Friday, February 26, 2010, the Global FX Head approached the head of HSBC's London FX spot desk (the "London Spot FX Head") for information relevant to the Victim Company 2 FX transaction. The Global FX Head asked him for pricing information and an assessment of liquidity for spot FX transactions in GBP/USD of various large sizes, such as $1B, $3B, and $5B. During this conversation, the Global FX Head further told the London Spot FX Head that HSBC would be selling, rather than buying, cable in this transaction.

A-11

This indicated to the London Spot FX Head that a client had provided information to HSBC in confidence about a large FX transaction that it may execute with HSBC in the near future.

39. The London Spot FX Head, having learned that HSBC would likely be selling a large amount of cable, and despite knowing that this information was confidential, perpetrated a scheme to defraud Victim Company 2 by misappropriating this confidential information for his own benefit and that of the bank in violation of the duty of trust and confidence that HSBC owed to Victim Company 2. Specifically, HSBC's London Spot FX Head, based on the confidential information of Victim Company 2 (that is, based on the fact that Victim Company 2 was to sell cable in the immediate future): (a) traded ahead of, or "frontran," Victim Company 2 by placing proprietary trades in advance of the client with the expectation that HSBC's trading for Victim Company 2 would depress the price of cable in a manner that benefitted any "short" positions taken by HSBC; and (b) executed the Victim Company 2 FX Transaction in a manner designed to cause the price of Sterling to fall, thereby causing Victim Company 2 to transact at less favorable prices and allowing HSBC's London Spot FX Head to cover his short positions and to make money.

40. During the afternoon of February 26, 2010, the London Spot FX Head sent an international wire communication from London, England to the Southern District of New York in the form of a Bloomberg chat message to an HSBC trader in New York requesting that he sell 25M GBP/USD on his behalf and to put it on the "overnight sheet." The London Spot FX Head received this currency in his P-Book on Monday morning, March 1, 2010.

41. Then over the weekend of February 27 and 28, 2010, the media reported the news of Victim Company 2's potential acquisition. Over the course of the weekend, Victim Company 2 decided to move forward with its FX transaction, and it informed HSBC that it

A-12