UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**11:05 pm, Nov 11, 2014**

| | |
|---|---|
| In the Matter of: | ) ) ) |
| The Royal Bank of Scotland plc | ) CFTC Docket No. 15– 05 ) |
| Respondent. | ) ) ) ) |

ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c)(4)(A) AND 6(d) OF THE COMMODITY EXCHANGE ACT,
MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS

**I.**

The Commodity Futures Trading Commission ("Commission" or "CFTC") has reason to believe that The Royal Bank of Scotland plc ("Respondent" or "RBS") has violated the Commodity Exchange Act (the "Act") and Commission Regulations ("Regulations"). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondent engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Respondent has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, Respondent herein consents to the entry and acknowledges service of this Order Instituting Proceedings Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1] Respondent consents to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondent does not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor does Respondent consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding. Neither the Offer nor the Order confers any rights to any part other than the Commission and RBS.

1

## III.

The Commission finds the following:

A.  **Summary**

From 2009 through 2012 ("Relevant Period"), RBS, by and through certain of its foreign exchange ("FX") traders, at times sought to benefit its own trading positions or those of certain FX traders at other banks by attempting to manipulate and aiding and abetting certain traders at other banks in their attempts to manipulate certain foreign exchange benchmark rates.

One of the primary FX benchmark rates that the FX traders attempted to manipulate was the World Markets/Reuters Closing Spot Rates ("WM/R Rates"). The WM/R Rates are the most widely referenced FX benchmark rates in the United States and globally. The WM/R Rates are used to establish the relative values of different currencies, and reflect the rates at which one currency is exchanged for another currency. Most of the WM/R Rates at issue here are set or fixed based on trading activity of market participants, including RBS and other banks, at various times throughout the day. The most widely used WM/R Rate is set or fixed at 4 p.m. London time ("4 p.m. WM/R fix").

FX benchmark rates, including the WM/R Rates, are used to price a variety of transactions including foreign exchange swaps, cross currency swaps, spot transactions, forwards, options, futures, and other financial derivative instruments. The most actively traded currency pairs are the Euro/United States Dollar (EUR/USD), U.S. Dollar/Japanese Yen (USD/JPY), and British Pound Sterling/U.S. Dollar (GBP/USD). Accordingly, the integrity of the WM/R Rates and other FX benchmark rates is critical to the integrity of the markets in the United States and around the world.

At times during the Relevant Period, certain FX traders at RBS and other banks coordinated their trading with certain FX traders at other banks to attempt to manipulate certain FX benchmark rates, including the 4 p.m. WM/R fix, to their benefit. These FX traders at RBS and the other banks used private electronic chat rooms to communicate and plan their attempts to manipulate the FX benchmark rates for certain currency pairs.[2] Certain FX traders at RBS regularly participated in numerous private chat rooms. At times, in certain chat rooms, FX traders at RBS and other banks disclosed confidential customer order information and trading positions, altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates, in some cases downward and in some cases upward.

RBS traders' attempts to manipulate certain FX benchmark rates involved multiple currencies, including the U.S. Dollar, the Euro, and British Pound Sterling. The misconduct occurred primarily, but not exclusively, at RBS's G10 FX trading desk in London, United Kingdom ("U.K.").

---

[2]. Some FX traders involved in certain chat rooms at issue herein were responsible for managing their respective banks' FX desks

2

This conduct occurred at various times over the course of the Relevant Period without detection by RBS in part because of internal controls and supervisory failures at RBS.  RBS failed to adequately assess the risks associated with its participation in the fixing of WM/R benchmark rates and certain other FX benchmark rates.  RBS also lacked adequate internal controls or procedures to detect and deter possible misconduct involving certain FX benchmark rates and failed to adequately supervise its FX traders by, among other shortcomings, failing to have controls and monitoring over the use of electronic chat rooms.

The Commission notes that some of this conduct occurred during the same period that RBS was on notice that the CFTC and other regulators were investigating attempts by certain banks to manipulate the London Interbank Offered Rate ("LIBOR") and other interest rate benchmarks.[3]

***

In accepting RBS's Offer, the Commission recognizes the Respondent's significant cooperation during the CFTC's Division of Enforcement's ("Division") investigation of this matter, which included providing important information and analysis to the Division that helped the Division efficiently and effectively undertake its investigation.  In addition, the Commission acknowledges that RBS initiated its own internal investigation into FX trading prior to the Division's investigation.  The Commission also recognizes that RBS has commenced significant remedial action to strengthen the internal controls and policies relating to foreign exchange benchmarks and internal and external communications by traders.

B.     **Respondent**

**The Royal Bank of Scotland plc** is a British banking and financial services company headquartered in the U.K.  It has operations in over 40 countries and territories including the United States.  It has been provisionally registered as a swaps dealer since December 31, 2012.

C.     **Facts**

   1.     **The FX Market**

The FX market, in which traders are able to buy, sell, exchange and speculate on currencies, is one of the world's largest and most actively traded financial markets.  According to the Bank of International Settlements ("BIS"), trading in global foreign exchange markets averaged $5.3 trillion per day in April 2013.  Currencies are traded in pairs and the transacted rate represents the rate to exchange one currency for another currency.  The U.S. Dollar is the dominant currency in the foreign exchange market.  The exchange of the U.S. Dollar for another currency accounts for an estimated 87% of global FX market activity.  The most actively traded

---

[3] The CFTC issued an order filing and settling charges that RBS and a subsidiary engaged in certain acts of attempted manipulation, completed manipulation and false reporting of the LIBOR for certain currencies and the Euro Interbank Offered Rate ("Euribor"). *In the Matter of the Royal Bank of Scotland plc and RBS Securities Japan Limited*, CFTC Docket 13-14 (February 6, 2013) (the relevant period of this action was from at least mid-2006 to at least late 2010).

3

currency pairs are the Euro/U.S. Dollar (EUR/USD), U.S. Dollar/Japanese Yen (USD/JPY), and British Pound Sterling/U.S. Dollar (GBP/USD). Participants in the FX market include banks, investment firms, commercial companies, central banks, hedge funds and retail customers.

The foreign exchange market is comprised of many instruments including spot, forwards, swaps, futures and option contracts.

### 2. WM/R Rates Overview

The WM/R Rates, one of the leading and most widely referenced foreign exchange benchmark rates, are calculated multiple times daily, including at 4 p.m. London time, which is commonly referred to as the "WM/R 4 p.m. London fix" or the "4 p.m. fix."[4] For twenty-one of the most liquid currencies (the "trade currencies"), the 4p.m. fix is based on actual trades, using bids and offers extracted from a certain electronic trading system during a one-minute window ("fix period"). WM/Reuters determines the bid and offer rates based on the captured transacted rate and the bid-offer spread. WM/Reuters then calculates the median of these bid and offer rates and from these medians determines a "mid trade rate." If there are not enough trades, WM/Reuters calculates a "mid order rate." All orders and transactions are weighted equally, regardless of their notional sizes.

The WM/R Rates for the other 139 less liquid currencies (the "non-trade currencies") are set by similar methodology. Because these currencies are less liquid, WM/Reuters relies on indicative quotes (submissions) derived from a Reuters computer feed that solicits "indications of interest" from market participants as part of its fixing methodology. WM/Reuters captures independent snapshots of indicative quotes for bids and offers, and selects the median rate from these quotes as the "WM/R 4 p.m. London fix."

WM/Reuters also provides fix rates for forward and non-deliverable forward contracts using methodology similar to that used for non-trade currencies. Fix rates for forward and non-deliverable forward contracts are published using a premium or discount to the spot rate for the relevant currency pair.

Other FX benchmark rates are also priced through the use of indicative rates. For instance, the Russian Ruble/U.S. Dollar Emerging Markets Trade Association ("EMTA") benchmark rates are based on indicative rates submitted by market participants to the Chicago Mercantile Exchange ("CME"), which takes the midpoint of submitted bid-offer pairs that it randomly selects, discards the highest and lowest midpoints, and calculates the final benchmark rate using the mean of the remaining midpoints.

Foreign exchange futures contracts are connected to FX benchmark rates. The CME Russian Ruble/U.S. Dollar (RUB/USD) futures contract, for instance, is a cash settled futures contract for which the final settlement rate, a component of the contract's price, is equal to the

---

[4] Another important benchmark is the European Central Bank ("ECB") rate set by the ECB at 1:15 p.m. London time. Though less widely referenced than the WM/R Rate, the ECB Rates are also used by a wide range of participants, specifically non-financial corporates and are important for the non-deliverable forwards market. *See* Financial Stability Board Foreign Exchange Benchmarks Final Report at 1. (September 30, 2014).

4

reciprocal of the EMTA Russian Ruble/U.S. Dollar benchmark rate. Exchange rates in many actively traded CME foreign exchange futures contracts, including the Euro/U.S. Dollar (EUR/USD) futures, the Japanese Yen/U.S. Dollar (JPY/USD) futures, and British Pound Sterling/U.S. Dollar (GBP/USD) futures, track rates in spot foreign exchange markets at near parity after adjusting for the forward differential, or adding or subtracting "forward points." Speculative traders employ strategies that seek to capture short-lived arbitrage opportunities between foreign exchange futures and spot contracts. Since 2012, the CME provides clearing and other services for cash-settled Over the Counter FX Spot, Forward, Swaps, and Non-Deliverable Forward (NDF) contracts. The contracts cover 26 currency pairs, including EUR/USD, JPY/USD, and GBP/USD, and are cash-settled based on the WM/R 4 p.m. London fix.

### 3. RBS Traders' Attempts to Manipulate Foreign Exchange Benchmark Rates

In late 2008, following the financial crisis, liquidity and volume in the FX market increased as many financial institutions and other market participants sought to exchange currencies. The increase in volume and liquidity allowed RBS FX traders and traders at other banks to take advantage of this trading opportunity, specifically during the FX benchmark rate fixing periods.

At the same time, certain FX traders at RBS and other banks had and/or developed relationships with certain FX traders at other banks, and they increasingly utilized private chat rooms to communicate and share information with each other. Certain FX traders at RBS and other banks routinely participated in the chat rooms. Often these FX traders had multiple chat rooms open simultaneously on their trading terminals, and within a chat, the traders often focused on a particular currency pair. Being a member of certain chat rooms was sometimes exclusive and by invitation only.

These chat rooms were the vehicles through which certain RBS FX traders and traders at other banks coordinated attempts to manipulate certain FX benchmark rates, including the WM/R 4 p.m. fix. At times during the Relevant Period, in their attempts to manipulate certain benchmarks (up or down), RBS FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies. The traders at times then used this information to enable one or more traders to attempt to manipulate the FX benchmark rates prior to and during the relevant fixing period.

For example, in one of the chat rooms, if a trader determined that he had fix orders in the opposite direction to the chat room group's overall net fixing position approaching the fixing window, that trader may have transacted before the fix period with traders outside the private chat room, a practice known by market participants as "netting off," rather than transact with other traders within the chat room.[5] In certain cases, the goal of this trading strategy was to maintain the volume of orders in the direction favored by the majority of the private chat room members and limit orders being executed in the opposite direction during the fix window.

---

[5] The Commission does not consider that the netting off of orders (or the decision not to net off) ahead of fixes is inappropriate in all circumstances.

If traders in the chat room had net orders in the same direction as what they desired rate movement at the fix to be, then the traders would at times either (1) match off these orders with traders outside of the chat room in an attempt to reduce the volume of orders in the opposite direction transacted during the fix period; (2) transfer their orders to a single trader within the chat room who could then execute a single order during the fix period; or (3) transact with traders outside of the chat room to increase the volume traded during the fix window in the direction favored by the private chat room traders.  At times, traders also increased the volume traded by them at the fix in the direction favored by the chat room traders in excess of the volume necessary to manage the risk associated with their banks' net buy or sell orders at the fix.   At times, these actions were undertaken in order to attempt to manipulate the benchmark rate set during the fix period.

Examples of RBS FX traders' misconduct include: [6]

In this example, the RBS trader has a client order to sell the GBP/USD currency pair at the WM/R fix.  The RBS trader shares this information with other traders and learns that they also have orders to sell at the fix.  After the fix, the chatroom participants discuss the trading.

| | | |
|---|---|---|
| 15:45:35[7] | RBS Trader: | im getting abt 80 quid now…fixing |
| 15:45:54 | Bank U Trader: | my ny 100 quid… |
| 15:51:19 | RBS Trader: | getting more than u now [Bank U Trader] betty |
| 15:51:26 | Bank U Trader: | ok thx |
| 15:52:23 | Bank W Trader: | nice job gents |
| 15:54:16 | Bank U Trader: | [RBS Trader], just matched with [Bank 1] and [Bank 2] for 100, still lhs in about 140 |
| 15:54:26 | RBS Trader: | cool …. |
| 16:00:58 | Bank Z Trader: | i don my hat …. |
| 16:01:08 | Bank W Trader: | what a job |
| 16:01:23 | Bank Z Trader: | welld one lads |
| 16:01:28 | Bank W Trader: | bravo |
| 16:07:03 | RBS Trader: | 1.6218..nice |
| 16:07:33 | Bank U Trader: | worked ok that one.... |

In another example, at 3:43:32 Bank T's Trader tells the chat room that he is buying Australian and New Zealand dollars but that it's not a big order.  The RBS trader says he is buying 50 million Australian dollars at the fix and he will do Trader T's if he wants.  Bank T's Trader agrees.  Bank P's Trader tells the RBS trader he has an order to buy 25 million and asks the RBS trader if he is interested in taking his order as well because it will give him more "ammo" (a larger position) for the fix.  The RBS trader agrees to do Bank P's Trader order. Bank T's tells the RBS trader that his sales department is also buying New Zealand dollars, offering the RBS trader more "ammo."  Bank P's Trader then tells the RBS trader "all yours" indicating

---

[6] The communications quoted in this Order contain shorthand trader language and many typographical errors.  The shorthand and errors are explained in brackets within the quotations only when deemed necessary to assist with understanding the discussion.

[7] The times in this example have been adjusted to British Summer Time (BST).

the other traders are going to give their orders to the RBS trader to build a larger position.  The RBS Trader tells them he now has built an aggregate 220 buy order.  Bank P's Trader tells him good luck. At 3:53:20 Bank T's Trader tells the RBS trader to "ramp it."  At 4:00:41, after the fix window has closed, Bank T's Trader tells the RBS trader "nice one" and Bank P's Trader says "look at you . . . well done mate."

| | | |
|---|---|---|
| 15:43:32 | Bank T Trader: | buying aud and nzd at the fix |
| 15:43:43 | RBS Trader: | Tkx |
| 15:43:52 | Bank T Trader: | ntg big |
| 15:43:59 | RBS Trader: | Im buying 50 aud can do yours if you want |
| 15:45:13 | Bank T Trader: | ok . . .60 plse . . .**** |
| 15:45:56 | RBS Trader: | Great |
| 15:50:00 | Bank P Trader: | I need to buy 25 aud at the fix too.. any int? more ammo for you…? |
| 15:50:21 | RBS Trader: | Sure [Bank P Trader] |
| 15:51:24 | Bank P Trader: | cool all yours [RBS Trader] |
| 15:51:46 | RBS Trader: | Buying 220 now |
| 15:51:57 | Bank P Trader: | good luck |
| 15:52:20 | Bank T Trader: | load up your 50 offrs . . . |
| 15:53:14 | Bank P Trader: | ill do those ones if you want |
| 15:53:19 | RBS Trader: | haah |
| 15:53:20 | Bank T Trader: | ur fkg [RBS Trader], ramp it |
| 16:00:41 | Bank T Trader: | nice one ***** |
| 16:00:56 | Bank P Trader: | look at you!...-well done mate . . . |

### 4. Respondent Lacked Adequate Internal Controls

During the Relevant Period, RBS failed to adequately assess the risks associated with its FX traders participating in the fixing of certain FX benchmark rates.  RBS also lacked adequate internal controls in order to prevent its FX traders from engaging in improper communications with certain FX traders at other banks. RBS lacked sufficient policies, procedures and training specifically governing participation in trading around the FX benchmarks rates and had inadequate policies pertaining to, or insufficient oversight of, its FX traders' use of chat rooms or other electronic messaging.

RBS received a client complaint in October 2010 relating to the sharing of information about orders, and in November 2011, after attending competition law training, a trader questioned whether it was inappropriate to share information with traders at other firms or with clients.

In August 2012, RBS restricted participation by traders in multi-bank chat rooms.

IV.

**LEGAL DISCUSSION**

A.   **Respondent, Through the Acts of Certain Traders, Attempted to Manipulate Benchmark Rates**

Together, Sections 6(c),[8] 6(d) and 9(a)(2) of the Act prohibit acts of attempted manipulation.  7 U.S.C. §§ 9, 13b and 13(a)(2) (2012).  Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to … attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ."  7 U.S.C. § 13(a)(2) (2012).  Section 6(c) and Section 6(d) of the Act authorize the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person" has manipulated or attempted to manipulate the market price of any commodity, in interstate commerce, or otherwise is violating or has violated any of the provisions of the Act.  7 U.S.C. §§  9 and 13b (2012).

With respect to conduct on or after August 15, 2011, in addition to Sections 6(c), 6(d) and 9(a)(2), Section 6(c)(3) of the Act prohibits attempted manipulation of the price of any commodity in interstate commerce. 7 U.S.C. § 9(3) (2012).  Commission Regulation 180.2, 17 C.F.R. §180.2 (2012), which became effective on August 15, 2011, in relevant part, makes it "unlawful … directly or indirectly to attempt to manipulate, the price of …any commodity in interstate commerce" Regulation 180.2 codifies Section 6(c)(3).

Two elements are required to prove an attempted manipulation: (1) an intent to affect the market price, and (2) an overt act in furtherance of that intent.  *See In re Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220  (N.D. Okla. 2005).  To prove the intent element of attempted manipulation, it must be shown that RBS FX traders "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand."  *In re Indiana Farm Bureau Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, at 27,283 (CFTC Dec. 17, 1982).  "[W]hile knowledge of relevant market conditions is probative of intent, it is not necessary to prove that the accused knew to any particular degree of certainty that his actions would create an artificial price.  It is enough to present evidence from which it may reasonably be inferred that the accused '*consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.*'" *Id*. (quoting *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)).  A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation.  *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).  It is also not

---

[8] Section 6(c) was amended effective August 15, 2011.  For conduct occurring on or after that date, the provision authorizing Commission action is contained in Section 6(c)(4)(A), 7 U.S.C. §9(4)(A).

necessary that there be an actual effect on price. *See CFTC v. Amaranth Advisors, L.L.C.,* 554 F. Supp.2d 523, 533 (S.D.N.Y. 2008).

Here, as evidenced by the foregoing, RBS engaged in acts of attempted manipulation in violation of Sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012). Additionally, with respect to conduct occurring on or after August 15, 2011, RBS engaged in acts of attempted manipulation in violation of Section 6(c)(3), 7 U.S.C. § 9(3) (2012) and Regulation 180.2, 17 C.F.R. § 180.2 (2014).

B.  **Respondent Aided and Abetted the Attempts of Certain Traders at Other Banks to Manipulate FX Benchmark Rates**

Pursuant to Section 13(a) of the Act, liability as an aider and abettor requires proof that: (1) the Act was violated, (2) the aider and abettor had knowledge of the wrongdoing underlying the violation, and (3) the aider and abettor intentionally assisted the primary wrongdoer. *See* 7 U.S.C. § 13c(a) (2012); *In re Shahrokh Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129, at 49,888 n.28 (CFTC May 12, 2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge of the unlawfulness of such conduct is not necessarily required to be demonstrated. *See In re Lincolnwood Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,986, at 28,255 (CFTC Jan. 31, 1984). Knowing assistance can be inferred from the surrounding facts and circumstances. *Id. See also In re Buckwalter*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995, at 37,686 (CFTC Jan. 25, 1991).

Here, as evidenced by the foregoing, FX traders at other banks attempted to manipulate the WM/R and other FX benchmark rates in violation of Sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012). Additionally, with respect to conduct occurring on or after August 15, 2011 FX traders at other banks violated Section 6(c)(3), 7 U.S.C. § 9(3), and Regulation 180.2, 17 C.F.R. § 180.2 (2014). As evidenced above, RBS, through the acts of certain of its FX traders, aided and abetted the attempts of traders at other banks to manipulate the FX benchmark rates in violation of the Act.

C.  **Respondent is Liable for the Acts of its Agents**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014), provide that "[t]he act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation or trust[.]" Pursuant to Section 2(a)(1)(B) of the Act and Commission Regulation 1.2, strict liability is imposed on principals for the actions of their agents. *See, e.g., Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC*, 837 F.2d 847, 857-58 (9th Cir. 1988).

RBS is liable for the acts, omissions and failures of any traders who acted as its employees and/or agents in the conduct described above. Accordingly, RBS violated Sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. §§ 9, 13b and 13(a)(2)(2012) by engaging in attempted manipulation and aiding and abetting attempted manipulation. Additionally, with respect to

conduct occurring on or after August 15, 2011, RBS is liable for violating Section 6(c)(3), 7 U.S.C. § 9(3), 13(a)(2) (2012) and Regulation 180.2, 17 C.F.R. § 180.2 (2012), as set forth above.

V.

**FINDINGS OF VIOLATIONS**

Based on the foregoing, the Commission finds that Respondent violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012), and for conduct occurring on or after August 15. 2011, Section 6(c)(3), 7 U.S.C. § 9(3) and Regulation 180.2, 17 C.F.R. § 180.2 (2014).

VI.

**OFFER OF SETTLEMENT**

Respondent, without admitting or denying the findings or conclusions herein have submitted the Offer in which it:

A.  Acknowledges receipt of service of this Order;

B.  Admits the jurisdiction of the Commission with respect to this Order only and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.  Waives:

    1.  the filing and service of a complaint and notice of hearing;

    2.  a hearing;

    3.  all post-hearing procedures;

    4.  judicial review by any court;

    5.  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

    6.  any and all claims that it may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2014), relating to, or arising from, this proceeding;

    7.  any and all claims that it may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat.