# UNITED STATES OF AMERICA
## Before the
## COMMODITY FUTURES TRADING COMMISSION

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| Barclays Bank PLC, ) | CFTC Docket No. 15 – 24 |
| ) | |
| Respondent. ) | |
| ) | |

**RECEIVED CFTC**

Office of Proceedings
Proceedings Clerk

**8:03 am, May 20, 2015**

## ORDER INSTITUTING PROCEEDINGS PURSUANT TO
## SECTIONS 6(c)(4)(A) AND 6(d) OF THE COMMODITY EXCHANGE ACT,
## MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS

### I.

The Commodity Futures Trading Commission ("Commission" or "CFTC") has reason to believe that Barclays Bank PLC ("Respondent" or "Barclays") has violated the Commodity Exchange Act (the "Act") and Commission Regulations ("Regulations"). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondent engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

### II.

In anticipation of the institution of an administrative proceeding, Respondent has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, except to the extent Barclays admits those findings in any related action against Barclays by, or any agreement with, the Department of Justice or any other governmental agency or office, Barclays consents to the entry and acknowledges service of this Order Instituting Proceedings Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1] Respondent consents to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondent does not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor does Respondent consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding. Neither the Offer nor the Order confers any rights to any party other than the Commission and Barclays.

### III.

The Commission finds the following:

**A.   Summary**

From 2009 through 2012 ("Relevant Period"), Barclays, by and through certain of its foreign exchange ("FX") traders, at times, sought to benefit its own trading positions or those of FX traders at other banks by attempting to manipulate and aiding and abetting certain traders at other banks in their attempts to manipulate certain FX benchmark rates.

One of the primary FX benchmark rates that the FX traders attempted to manipulate was the World Markets/Reuters Closing Spot Rates ("WM/R Rates"). The WM/R Rates are the most widely referenced FX benchmark rates in the United States and globally. The WM/R Rates are used to establish the relative values of different currencies, and reflect the rates at which one currency is exchanged for another currency. Most of the WM/R Rates at issue here are set or fixed based on trading activity of market participants, including Barclays and other banks, at various times throughout the day. The most widely used WM/R Rate is set or fixed at 4 p.m. London time ("WM/R 4 p.m. London fix" or the "4 p.m. fix."). Another FX benchmark rate that a Barclays FX trader attempted to manipulate is the Russian Ruble/U.S. Dollar ("RUB/USD") Chicago Mercantile Exchange ("CME")/EMTA, Inc.[2] benchmark rate ("CME/EMTA Rate")[3] that is based on indicative bids and offers submitted by banks to the CME, who calculates and issues the CME/EMTA Rate as well as publishes the submitted bids and offers of each participant.

FX benchmark rates, including the WM/R Rates and the CME/EMTA Rate, are used to price a variety of transactions including foreign exchange swaps, cross currency swaps, spot transactions, forwards, options, futures, and other financial derivative instruments. For example, the CME/EMTA Rate is the primary rate source for settling Russian Ruble non-deliverable forward transactions and the price used for calculation of the CME Russian Ruble futures final settlement price at termination.[4]

At times during the Relevant Period, certain FX traders at Barclays and other banks coordinated their trading or indicative rate submissions to attempt to manipulate certain FX benchmark rates, including the WM/R 4 p.m. London fix and the CME/EMTA Rate, to their benefit. These FX traders at Barclays and the other banks used private electronic chat rooms to communicate and plan their attempts to manipulate the FX benchmark rates for certain currency pairs.[5] Certain FX traders at Barclays regularly participated in numerous private chat rooms. At times, in certain chat rooms, FX traders at Barclays and other banks disclosed confidential customer order information and trading positions, altered trading positions or CME/EMTA

---

[2] Formerly, the "Emerging Markets Traders Association."
[3] Also known as the CME/EMTA Russian Ruble per USD Reference Rate.
[4] CME Submission 05-50R (April 29, 2005), available at http://www.cftc.gov/files/submissions/rules/selfcertifications/2005/rul042705cme001.pdf
[5] Some FX traders involved in certain chat rooms at issue herein were responsible for managing their respective banks' FX desks.

submissions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates, in some cases downward and in some cases upward.

Barclays traders' attempts to manipulate certain FX benchmark rates involved multiple currencies, including some of the most actively traded currencies like the U.S. Dollar, Euro, and British Pound Sterling. The wrongful conduct involved desks and offices located in at least New York, London and Moscow.

This conduct occurred at various times over the course of the Relevant Period without detection by Barclays in part because of internal controls and supervisory failures at Barclays. Barclays failed to adequately assess the risks associated with its participation in the fixing of certain FX benchmark rates, including the WM/R 4 p.m. London fix and CME/EMTA rates. Barclays also lacked adequate internal controls or procedures to detect and deter possible misconduct involving certain FX benchmark rates and failed to adequately supervise its FX traders by, among other shortcomings, failing to have adequate controls and monitoring over the use of electronic chat rooms.

In fact, some of this conduct occurred during the same period that Barclays was on notice that the CFTC and other regulators were investigating attempts by certain banks to manipulate the London Interbank Offered Rate ("LIBOR") and other interest rate benchmarks.[6]

\*\*\*

In accepting Barclays' Offer, the Commission recognizes Respondent's significant cooperation during the CFTC's Division of Enforcement's ("Division") investigation of this matter, which included self-reporting preliminary findings of questionable conduct by Barclays employees to the CFTC and by providing important information and analysis to the Division that helped the Division efficiently and effectively undertake its investigation. In addition, the Commission acknowledges that Barclays initiated its own internal investigation into FX trading prior to the Division's investigation. The Commission also recognizes that Barclays has commenced significant remedial action to strengthen the internal controls and policies relating to foreign exchange benchmarks and internal and external communications by traders.

The Commission notes, however, the civil monetary penalty imposed reflects, in part, that Barclays did not settle this matter at an earlier stage of the investigation.

B. **Respondent**

**Barclays Bank PLC** is a global banking and financial services company based in the U.K. that is engaged in retail and commercial banking, credit cards, investment banking, wealth

---

[6] The CFTC issued an order filing and settling charges that Barclays engaged in certain acts of attempted manipulation and false reporting of the LIBOR for certain currencies and the Euro Interbank Offered Rate ("Euribor"). *In the Matter of Barclays PLC, Barclays Bank PLC, and Barclays Capital Inc.*, CFTC Docket No. 12-25 (June 27, 2012) (the relevant period of this action was from at least 2005 to at least 2009).

3

management and investment management services. It is wholly owned by Barclays PLC, and has offices in New York, New York. It became provisionally registered with the Commission as a swap dealer on December 31, 2012.

C.  **Facts**

   1.  **The FX Market**

   The FX market, in which traders are able to buy, sell, exchange and speculate on currencies, is one of the world's largest and most actively traded financial markets. According to the Bank of International Settlements, trading in global foreign exchange markets averaged $5.3 trillion per day in April 2013. Currencies are traded in pairs and the transacted rate represents the rate to exchange one currency for another currency. The U.S. Dollar is the dominant currency in the foreign exchange market. The exchange of the U.S. Dollar for another currency accounts for an estimated 87% of global foreign exchange market activity. The most actively traded currency pairs are the Euro/U.S. Dollar (EUR/USD), U.S. Dollar/Japanese Yen (USD/JPY), and British Pound Sterling/U.S. Dollar (GBP/USD). Participants in the FX market include banks, investment firms, commercial companies, central banks, hedge funds and retail customers.

   The foreign exchange market is comprised of many instruments including spot, forwards, swaps, futures and option contracts.

   2.  **WM/R Rates and CME/EMTA Rate Overview**

   The WM/R Rates, some of the leading and most widely referenced foreign exchange benchmark rates, are calculated multiple times daily, including at 4 p.m. London time, which is commonly referred to as the "WM/R 4 p.m. London fix" or the "4 p.m. fix."[7] For twenty-one of the most liquid currencies (the "trade currencies"), the 4 p.m. fix is based on actual trades, using bids and offers extracted from a certain electronic trading system during a one-minute window ("fix period"). WM/Reuters determines the bid and offer rates based on the captured transacted rate and the bid-offer spread. WM/Reuters then calculates the median of these bid and offer rates and from these medians determines a "mid trade rate." If there are not enough trades, WM/Reuters calculates a "mid order rate." All orders and transactions are weighted equally, regardless of their notional sizes.

   The WM/R Rates for the other 139 less liquid currencies (the "non-trade currencies") are set by similar methodology. Because these currencies are less liquid, WM/Reuters relies on indicative quotes (submissions) derived from a Reuters computer feed that solicits "indications of interest" from market participants as part of its fixing methodology. WM/Reuters captures independent snapshots of indicative quotes for bids and offers, and selects the median rate from these quotes as the "WM/R 4 p.m. London fix."

---

[7] Another important benchmark is the European Central Bank ("ECB") rate set by the ECB at 1:15 p.m. London time. Though less widely referenced than the WM/R Rate, the ECB Rates are also used by a wide range of participants, specifically non-financial corporates and are important for the non-deliverable forwards market. See Financial Stability Board Foreign Exchange Benchmarks Final Report at 1. (September 30, 2014).

WM/Reuters also provides fix rates for forward and non-deliverable forward contracts using methodology similar to that used for non-trade currencies. Fix rates for forward and non-deliverable forward contracts are published using a premium or discount to the spot rate for the relevant currency pair.

Other FX benchmark rates are priced through the use of indicative rates. The Russian Ruble/U.S. Dollar CME/EMTA Rate is derived from a daily telephonic survey of participating banks[8] that the CME conducts at a random time between 12:00 p.m. and 12:30 p.m. Moscow time. If a bank responds to the daily survey, it provides the bid and offer at which it could execute a $100,000 RUB/USD spot transaction for next-day value in the Moscow marketplace. Survey participants' responses are then confirmed in writing, recorded telephone message or other secure electronic communication.[9] If more than ten survey responses are received, the CME randomly selects ten responses. The CME then determines the midpoint of each bid-offer pair and eliminates the two lowest and the two highest midpoints.[10] The mean of the remaining six midpoints results in the CME/EMTA Rate for that day. The responding bank names and their indicative responses are published by the CME and EMTA on their respective websites as well as the calculated CME/EMTA Rate. The bids and offers submitted by the survey participants should reflect their honest assessment of the current prevailing market rate. Taking into account the benefit to the survey participants' trading positions is not a legitimate or permissible factor in assessing the currently prevailing market rate.

Foreign exchange futures contracts are connected to FX benchmark rates. The CME Russian Ruble/U.S. Dollar (RUB/USD) futures contract, for instance, is a cash settled futures contract for which the final settlement rate, a component of the contract's price, is equal to the reciprocal of the CME/EMTA Rate. Exchange rates in many actively traded CME foreign exchange futures contracts, including the Euro/U.S. Dollar (EUR/USD) futures, the U.S. Dollar/Japanese Yen (USD/JPY) futures, and British Pound Sterling/U.S. Dollar (GBP/USD) futures, track rates in spot foreign exchange markets at near parity after adjusting for the forward differential, or adding or subtracting "forward points." Speculative traders employ strategies that seek to capture short-lived arbitrage opportunities between foreign exchange futures and spot contracts. Since 2012, the CME provides clearing and other services for cash-settled Over the Counter FX Spot, Forward, Swaps, and Non-Deliverable Forward (NDF) contracts. The contracts cover 26 currency pairs, including EUR/USD, USD/JPY, and GBP/USD, and are cash-settled based on the WM/R 4 p.m. London fix.

### 3. Barclays Traders' Attempts to Manipulate Trading Based FX Benchmark Rates

In late 2008, as the financial crisis began to wane, liquidity and volume in the FX market increased as many financial institutions and other market participants sought to exchange

---

[8] All participating banks are inside the Russian federation and are active participants in the RUB/USD and/or Russian Ruble non-deliverable forward markets.
[9] See CME Rulebook, Chapter 260 (26002 Settlement Procedures).
[10] If fewer than ten responses are received (but more than five) the CME eliminates the high and low midpoint. If fewer than five responses are received no rate will be published for that day.

5

currencies. The increase in volume and liquidity allowed Barclays FX traders and traders at other banks to take advantage of this trading opportunity, specifically during the FX benchmark rate fixing periods.

At the same time, certain FX traders at Barclays and other banks had and/or developed relationships with certain FX traders at other banks, and they increasingly used private chat rooms to communicate and share information with each other. Certain FX traders at Barclays and other banks routinely participated in the chat rooms. Often, these FX traders had multiple chat rooms open simultaneously on their trading terminals, and within a chat, the traders often focused on a particular currency pair. Being a member of certain chat rooms was sometimes exclusive and by invitation only.

For example, when inviting in a new member, traders in one chat room tried to ensure that a new member agreed to put the interests of the group first. In one chat, traders from three other banks discussed[11] whether to invite a Barclays trader into a chat room:

| | | |
|---|---|---|
| Bank Z Trader: | 7:49:55 | are we ok with keeping this as is.. ie the info lvls & risk sharing? |
| Bank X Trader: | 7:50:27 | well… |
| Bank Z Trader: | 7:50:30 | that is the qu[estion] |
| Bank X Trader: | 7:50:32 | you know him best obv… |
| | 7:50:39 | if you think we need to adjust it |
| | 7:50:43 | then he shouldn't be[] in chat |
| Bank Y Trader: | 7:50:54 | yeah that is key |
| | 7:51:00 | simple question [Bank Z Trader] |
| | 7:51:08 | I trust you implicitly [Bank Z Trader] |
| | 7:51:13 | and your judgement |
| | 7:51:16 | you know him |
| | 7:51:21 | will he tell rest of desk stuff |
| | 7:51:26 | or god forbin his nyk… |
| Bank X Trader: | 7:51:46 | yes |
| | 7:51:51 | that's really imp[ortant] q[uestion] |
| | 7:52:01 | dont want other numpty's in mkt to know |
| | 7:52:17 | but not only that |
| | 7:52:21 | is he gonna protect us |
| | 7:52:33 | like we protect each other against our own branches |
| | 7:52:46 | ie if you guys are rhs.. and my nyk is lhs..ill say my nyk lhs in few |
| Bank Z Trader: | 7:53:52 | what concerns me is that i know he'll never tell us when at risk… |

After further discussion of whether the Barclays trader would "add huge value to this cartell," the traders decided to invite the trader into the chat room for a "1 month trial," with the Bank X

---

[11] The communications quoted in this Order contain shorthand trader language and many typographical errors. The shorthand and errors are explained in brackets within the quotations only when deemed necessary to assist with understanding the discussion.

6

Trader warning him, presumably facetiously, "mess this up and sleep with one eye open at night."

These chat rooms were the vehicles through which certain Barclays FX traders and traders at other banks coordinated attempts to manipulate certain FX benchmark rates, including the WM/R 4 p.m. London fix. Certain chat room participants used code words to evade detection by their banks' compliance monitoring systems.

At times during the Relevant Period, in their attempts to manipulate certain benchmarks (up or down), Barclays FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies. The traders at times then used this information to enable one or more traders to attempt to manipulate the FX benchmark rates prior to and during the relevant fixing period.

For example, in one of the chat rooms, if a trader determined that he had fix orders in the opposite direction to the chat room group's overall net fixing position approaching the fixing window, that trader may have transacted before the fix period with traders outside the private chat room, a practice known by market participants as "netting off," rather than transact with other traders within the chat room.[12] In certain cases, the goal of this trading strategy was to maintain the volume of orders held by chat room members in the direction favored by the majority of the private chat room members and limit orders being executed in the opposite direction during the fix window.

If traders in the chat room had net orders in the same direction as what they desired rate movement at the fix to be, then the traders would at times either (1) match off these orders with traders outside of the chat room in an attempt to reduce the volume of orders in the opposite direction transacted during the fix period; (2) transfer their orders to a single trader within the chat room who could then execute a single order during the fix period; or (3) transact with traders outside of the chat room to increase the volume traded by chat room members during the fix window in the direction favored by the private chat room traders. At times, traders also increased the volume traded by them at the fix in the direction favored by the chat room traders in excess of the volume necessary to manage the risk associated with their banks' net buy or sell orders at the fix. At times, these actions were undertaken in order to attempt to manipulate the benchmark rate set during the fix period.

Some examples of Barclays FX traders' misconduct include:

In one chat, a Bank Y Trader and a Barclays trader coordinated their trading in an attempt to manipulate a WM/R 4 p.m. London fix. At 3:43:50, the Barclays trader asked the Bank Y trader whether he needed to buy Euros in the market in the forthcoming fix. The Bank Y trader responded that he had a net buy order for the fix, which he subsequently confirmed as totaling 105 million. At 3:44:04, the Bank Y trader offered to transfer that net buy order to the Barclays trader. The Barclays trader replied "maybe" and then stated that he had a net buy order for 150 million.

---

[12] The Commission does not consider that the netting off of orders (or the decision not to net off) ahead of fixes is inappropriate in all circumstances.

7

The traders had the following exchange:

| | | |
|---|---|---|
| Barclays Trader: | 3:46:53 | i'd prefer we join forces |
| Bank Y Trader: | 3:46:56 | perfick |
| | 3:46:59 | lets do this… |
| Bank Y Trader: | 3:47:11 | lets double team them |
| Barclays Trader: | 3:47:12 | YESsssssssssss |

Immediately after the fixing window, the traders congratulated themselves:

| | | |
|---|---|---|
| Barclays Trader: | 4:03:25 | sml rumour we haven't lost it |
| Bank Y Trader: | 4:03:45 | we |
| | 4:03:46 | do |
| | 4:03:48 | dollarrr |

In another chat, traders for Barclays and three other banks exchanged positions in a chat room leading into the WM/R 4 p.m. fix. The Bank Y trader said "it cant be a good day to be [right hand side]."[13] Once the four traders determined they were all the same direction, the Barclays trader asked if "we gonna be able to get it to 05" to which the Bank Y trader responded "is that the troyal fkn we." After the fixing window closed the Bank X trader said "nice call" and the chat room members gave their "scores" or profits from the fix. The chat room members each claimed they made between $60,000 and $220,000.

### 4. Barclays Traders' Attempts to Manipulate the Submission Based CME/EMTA Rate through False Reports

Barclays provided indicative bids and offers to the CME for the fixing of the CME/EMTA Rate on certain days between August 2009 until August 2011. On at least a few occasions, a Barclays FX trader attempted to manipulate the CME/EMTA Rate by providing false reports concerning his view of the current prevailing bids and offers to the CME in order to move the CME/EMTA Rate up or down in whatever direction would benefit his trading positions or the trading positions of other banks. The Barclays FX trader coordinated, through an electronic chat room, with traders from other banks who also made submissions to skew their indicative bids and offers to try to move the CME/EMTA Rate in the direction they desired.

For example, in one chat including a Barclays FX trader, one RUB/USD trader suggested "we should all lower fix by several kopecks" to which another trader replied "yes."[14] A third trader agreed that "it is a right idea to lower the fix by a few kopecks." The Barclays FX trader responded "so what, 5 kopecks and all/everyone is splendid." After that conversation, the Barclays trader submitted an artificially low indicative bid and offer to the CME, consistent with

---

[13] If an FX trader has orders to sell of the first currency listed in any currency pair, it is often referred to as being on the left-hand side, or "lhs." If an FX trader references right hand side, or "rhs," it indicates that the FX trader is a buyer of the first currency listed in a currency pair.

[14] RUB/USD chatroom language is in Russian and quotations come from an unofficial translation.

8

his conversation with the other traders, that was used by the CME to calculate the final CME/EMTA Rate.

A bank's trading positions are not legitimate or permissible factors on which to base a bank's submission of bids and offers for purposes of determining the CME/EMTA Rate.

### 5. Respondent Lacked Adequate Internal Controls

During the Relevant Period, Barclays failed to adequately assess the risks associated with its FX traders participating in the fixing of certain FX benchmark rates. Barclays also lacked adequate internal controls in order to prevent its FX traders from engaging in improper communications with certain FX traders at other banks. Barclays lacked sufficient policies, procedures and training specifically governing participation in trading around the FX benchmarks rates and had inadequate policies pertaining to, or insufficient oversight of, its FX traders' use of chat rooms or other electronic messaging.

In approximately March 2012, Barclays received a customer complaint regarding potential inappropriate disclosure of customer information in an internal FX chatroom. Barclays then undertook an investigation of FX chatroom usage. Following and as a result of that investigation, in consultation with FX management and Legal and Compliance representatives, beginning in August 2012, Barclays undertook a process of instructing FX traders to cease participation in multi-bank chat rooms, and issued guidance and enhanced training with respect to the sharing of client information. On October, 22, 2012, FX traders at Barclays were formally instructed to cease participation in multi-bank chatrooms.

Furthermore, in June 2013, Barclays commenced an internal investigation of possible misconduct by it FX Traders relating to FX benchmark rates. On October 25, 2013, Barclays reported to the CFTC and other governmental authorities' preliminary findings of questionable conduct.

### IV.

### LEGAL DISCUSSION

### A. Barclays, Through the Acts of Certain Traders, Attempted to Manipulate FX Benchmark Rates

Together, Sections 6(c),[15] 6(d) and 9(a)(2) of the Act prohibit acts of attempted manipulation. 7 U.S.C. §§9, 13b and 13(a)(2) (2012). Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to . . . attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2012). Sections 6(c) and 6(d) of the Act authorize the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person" has attempted

---

[15] Section 6(c) was amended effective August 15, 2011. For conduct occurring on or after that date, the relevant Section of the Act is now Section 6(c)(4)(A), 7 U.S.C. § 9(4)(A) (2012).

9

to manipulate the market price of any commodity, in interstate commerce, or otherwise is violating or has violated any of the provisions of the Act. 7 U.S.C. §§ 9 and 13b (2012).

With respect to conduct on or after August 15, 2011, in addition to Sections 6(c), 6(d) and 9(a)(2), Section 6(c)(3) of the Act prohibits the attempted manipulation of the price of any commodity in interstate commerce. 7 U.S.C. § 9(3) (2012). Commission Regulation 180.2, 17 C.F.R. §180.2 (2014), which became effective on August 15, 2011, in relevant part, makes it "unlawful to . . . directly or indirectly . . . to attempt to manipulate, the price of …any commodity in interstate commerce." Regulation 180.2 codifies Section 6(c)(3).

Two elements are required to prove an attempted manipulation: (1) an intent to affect the market price, and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.,* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005). To prove the intent element of attempted manipulation, it must be shown that Barclays FX traders "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, at 27,283 (CFTC Dec. 17, 1982). "[W]hile knowledge of relevant market conditions is probative of intent, it is not necessary to prove that the accused knew to any particular degree of certainty that his actions would create an artificial price. It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" *Id.* (quoting *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)). A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido,* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009). It is also not necessary that there be an actual effect on price. *See CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp.2d 523, 533 (S.D.N.Y. 2008).

Here, as evidenced by the communications and other facts set forth above, certain Barclays FX traders specifically intended to affect the fixing of certain FX benchmarks, including the WM/R Rates and CME/EMTA Rate. Their intent is also made clear by the evidence that their motive was to benefit Barclays' trading positions or the trading positions of other banks. Barclays, through its traders, took overt acts in furtherance of intent to affect the fixings of certain FX benchmarks, including the WM/R Rates and CME/EMTA Rate. Accordingly, Barclays engaged in acts of attempted manipulation of certain FX benchmarks, commodities in interstate commerce, in violation of Sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012). Additionally, with respect to conduct occurring on or after August 15, 2011, Barclays engaged in acts of attempted manipulation in violation of Section 6(c)(3), 7 U.S.C. § 9(3) (2012), and Regulation 180.2, 17 C.F.R. § 180.2 (2014).