UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**11:22 pm, Nov 11, 2014**

| | |
|---|---|
| In the Matter of: | ) |
| UBS AG, | ) CFTC Docket No. 15 – 06 |
| Respondent. | ) |

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c)(4)(A) AND 6(d) OF THE COMMODITY EXCHANGE ACT,
MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission" or "CFTC") has reason to believe that UBS AG ("Respondent" or "UBS") has violated the Commodity Exchange Act (the "Act") and Commission Regulations ("Regulations"). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondent engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Respondent has submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, Respondent herein consents to the entry and acknowledges service of this Order Instituting Proceedings Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order").[1]

---

[1] Respondent consents to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondent does not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order.  Nor does Respondent consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.  Neither the Offer nor the Order confers any rights to any party other than the Commission and UBS.

**III.**

The Commission finds the following:

**A.     Summary**

From 2009 through 2012 ("Relevant Period"), UBS, by and through certain of its foreign exchange ("FX") traders, at times, sought to benefit its own trading positions or those of certain FX traders at other banks by attempting to manipulate and aiding and abetting certain traders at other banks in their attempts to manipulate certain FX benchmark rates.

One of the primary FX benchmark rates that the FX traders attempted to manipulate was the World Markets/Reuters Closing Spot Rates ("WM/R Rates"). The WM/R Rates are the most widely referenced FX benchmark rates in the United States and globally. The WM/R Rates are used to establish the relative values of different currencies, and reflect the rates at which one currency is exchanged for another currency. Most of the WM/R Rates at issue here are set or fixed based on trading activity of market participants, including UBS and other banks, at various times throughout the day. The most widely used WM/R Rate is set or fixed at 4 p.m. London time ("4 p.m. WM/R fix").

FX benchmark rates, including the WM/R Rates, are used to price a variety of transactions including foreign exchange swaps, cross currency swaps, spot transactions, forwards, options, futures, and other financial derivative instruments. The most actively traded currency pairs are the Euro/U.S. Dollar (EUR/USD), U.S. Dollar/Japanese Yen (USD/JPY), and British Pound Sterling/U.S. Dollar (GBP/USD). Accordingly, the integrity of the WM/R Rates and other FX benchmark rates is critical to the integrity of the markets in the United States and around the world.

At times during the Relevant Period, certain FX traders at UBS and other banks coordinated their trading to attempt to manipulate certain FX benchmark rates, including the 4 p.m. WM/R fix, to their benefit. These FX traders at UBS and the other banks used private electronic chat rooms to communicate and plan their attempts to manipulate the FX benchmark rates for certain currency pairs.[2] Certain FX traders at UBS regularly participated in numerous private chat rooms. At times, in certain chat rooms, FX traders at UBS and other banks disclosed confidential customer order information and trading positions, altered trading positions to accommodate the interests of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates, in some cases downward and in some cases upward.

UBS traders' attempts to manipulate certain FX benchmark rates involved multiple currencies, including the United States Dollar ("U.S. Dollar"), Euro, and British Pound Sterling. The wrongful conduct involved desks and offices located in at least Stamford, Connecticut, and Zurich, Switzerland.

---

[2] Some FX traders involved in certain chat rooms at issue herein were responsible for managing their respective banks' FX desks.

2

This conduct occurred at various times over the course of the Relevant Period without detection by UBS in part because of internal controls and supervisory failures at UBS. UBS failed to adequately assess the risks associated with its participation in the fixing of certain FX benchmark rates, including the 4 p.m. WM/R benchmark rates. UBS also lacked adequate internal controls or procedures to detect and deter possible misconduct involving certain FX benchmark rates and failed to adequately supervise its FX traders by, among other shortcomings, failing to have adequate controls and monitoring over the use of electronic chat rooms.

The Commission notes that some of this conduct occurred during the same period that UBS was on notice that the CFTC and other regulators were investigating attempts by certain banks to manipulate the London Interbank Offered Rate ("LIBOR") and other interest rate benchmarks.[3]

\*\*\*

In accepting UBS's Offer, the Commission recognizes the Respondent's significant cooperation during the CFTC's Division of Enforcement's ("Division") investigation of this matter, which included being the first bank to self-report preliminary findings of questionable conduct by bank employees to the CFTC and by providing important information and analysis to the Division that helped the Division efficiently and effectively undertake its investigation. In addition, the Commission acknowledges that UBS initiated its own internal investigation into FX trading prior to the Division's investigation. The Commission also recognizes that UBS has commenced significant remedial action to strengthen the internal controls and policies relating to foreign exchange benchmarks and internal and external communications by traders.

**B.**     **Respondent**

**UBS AG** is a full service bank and financial services company headquartered in Zurich and Basel, Switzerland, that provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide. It has operations in over 50 countries, including the United States. The Investment Banking division of UBS is responsible for its foreign exchange business serving corporates, institutions, hedge funds, governments and individuals. It became provisionally registered with the Commission as a swap dealer on December 31, 2012.

**C.**     **Facts**

   **1.**     **The FX Market**

The FX market, in which traders are able to buy, sell, exchange and speculate on currencies, is one of the world's largest and most actively traded financial markets. According to

---

[3] The CFTC issued an order filing and settling charges that UBS and a subsidiary engaged in certain acts of attempted manipulation, completed manipulation and false reporting of the LIBOR for certain currencies, the Euro Interbank Offered Rate ("Euribor") and the Euroyen Tokyo Interbank Offered Rate ("Euroyen TIBOR"). *In the Matter of UBS AG and UBS Securities Japan Co., Ltd.*, CFTC Docket No. 13-09 (December 19, 2012) (the relevant period of this action was from at least January 2005 to at least June 2010).

3

the Bank of International Settlements ("BIS"), trading in global foreign exchange markets averaged $5.3 trillion per day in April 2013. Currencies are traded in pairs and the transacted rate represents the rate to exchange one currency for another currency. The U.S. Dollar is the dominant currency in the foreign exchange market. The exchange of the U.S. Dollar for another currency accounts for an estimated 87% of global foreign exchange market activity. The most actively traded currency pairs are the Euro/U.S. Dollar (EUR/USD), U.S. Dollar/Japanese Yen (USD/JPY), and British Pound Sterling/U.S. Dollar (GBP/USD). Participants in the FX market include banks, investment firms, commercial companies, central banks, hedge funds and retail customers.

The foreign exchange market is comprised of many instruments including spot, forwards, swaps, futures and option contracts.

### 2. WM/R Rates Overview

The WM/R Rates, one of the leading and most widely referenced foreign exchange benchmark rates, are calculated multiple times daily, including at 4 p.m. London time, which is commonly referred to as the "WM/R 4 p.m. London fix" or the "4 p.m. fix."[4] For twenty-one of the most liquid currencies (the "trade currencies"), the 4 p.m. fix is based on actual trades, using bids and offers extracted from a certain electronic trading system during a one-minute window ("fix period"). WM/Reuters determines the bid and offer rates based on the captured transacted rate and the bid-offer spread. WM/Reuters then calculates the median of these bid and offer rates and from these medians determines a "mid trade rate." If there are not enough trades, WM/Reuters calculates a "mid order rate." All orders and transactions are weighted equally, regardless of their notional sizes.

The WM/R Rates for the other 139 less liquid currencies (the "non-trade currencies") are set by similar methodology. Because these currencies are less liquid, WM/Reuters relies on indicative quotes (submissions) derived from a Reuters computer feed that solicits "indications of interest" from market participants as part of its fixing methodology. WM/Reuters captures independent snapshots of indicative quotes for bids and offers, and selects the median rate from these quotes as the "WM/R 4 p.m. London fix."

WM/Reuters also provides fix rates for forward and non-deliverable forward contracts using methodology similar to that used for non-trade currencies. Fix rates for forward and non-deliverable forward contracts are published using a premium or discount to the spot rate for the relevant currency pair.

Other FX benchmark rates are also priced through the use of indicative rates. For instance, the Russian Ruble/U.S. Dollar Emerging Markets Trade Association ("EMTA") benchmark rates are based on indicative rates submitted by market participants to the Chicago Mercantile Exchange ("CME"), which takes the midpoint of submitted bid-offer pairs that it

---

[4] Another important benchmark is the European Central Bank ("ECB") rate set by the ECB at 1:15 p.m. London time. Though less widely referenced than the WM/R Rate, the ECB Rates are also used by a wide range of participants, specifically non-financial corporates and are important for the non-deliverable forwards market. See Financial Stability Board Foreign Exchange Benchmarks Final Report at 1. (September 30, 2014).

randomly selects, discards the highest and lowest midpoints, and calculates the final benchmark rate using the mean of the remaining midpoints.

Foreign exchange futures contracts are connected to FX benchmark rates. The CME Russian Ruble/U.S. Dollar (RUB/USD) futures contract, for instance, is a cash settled futures contract for which the final settlement rate, a component of the contract's price, is equal to the reciprocal of the EMTA Russian Ruble/U.S. Dollar benchmark rate. Exchange rates in many actively traded CME foreign exchange futures contracts, including the Euro/U.S. Dollar (EUR/USD) futures, the U.S. Dollar/Japanese Yen (USD/JPY) futures, and British Pound Sterling/U.S. Dollar (GBP/USD) futures, track rates in spot foreign exchange markets at near parity after adjusting for the forward differential, or adding or subtracting "forward points." Speculative traders employ strategies that seek to capture short-lived arbitrage opportunities between foreign exchange futures and spot contracts. Since 2012, the CME provides clearing and other services for cash-settled Over the Counter FX Spot, Forward, Swaps, and Non-Deliverable Forward (NDF) contracts. The contracts cover 26 currency pairs, including EUR/USD, USD/JPY, and GBP/USD, and are cash-settled based on the WM/R 4 p.m. London fix.

### 3. UBS Traders' Attempts to Manipulate FX Benchmark Rates

In late 2008, following the financial crisis, liquidity and volume in the FX market increased as many financial institutions and other market participants sought to exchange currencies. The increase in volume and liquidity allowed UBS FX traders and traders at other banks to take advantage of this trading opportunity, specifically during the FX benchmark rate fixing periods.

At the same time, certain FX traders at UBS and other banks had and/or developed relationships with certain FX traders at other banks, and they increasingly used private chat rooms to communicate and share information with each other. Certain FX traders at UBS and other banks routinely participated in the chat rooms. Often these FX traders had multiple chat rooms open simultaneously on their trading terminals, and within a chat, the traders often focused on a particular currency pair. Being a member of certain chat rooms was sometimes exclusive and by invitation only.

For example, when inviting in a new member, traders in one chat room tried to ensure that a new member agreed to put the interests of the group first. In one chat, a UBS trader and traders from two other banks discussed[5] whether to invite a trader from a fourth bank into a chat room:

| | | |
|---|---|---|
| UBS Trader: | 7:49:55 | are we ok with keeping this as is .. ie the info lvls & risk sharing? |
| Bank X Trader: | 7:50:27 | well… |
| UBS Trader: | 7:50:30 | that is the qu[estion]. |

---

[5] The communications quoted in this Order contain shorthand trader language and many typographical errors. The shorthand and errors are explained in brackets within the quotations only when deemed necessary to assist with understanding the discussion.

| | | | |
|---|---|---|---|
| Bank X Trader: | 7:50:32 | you know him best obv… | |
| | 7:50:39 | if you think we need to adjust it | |
| | 7:50:43 | then he shouldn't be[] in chat | |
| Bank Y Trader: | 7:50:54 | yeah that is key | |
| | 7:51:00 | simple question [UBS Trader] | |
| | 7:51:08 | I trust you implicitly [UBS Trader] | |
| | 7:51:13 | and your judgement | |
| | 7:51:16 | you know him | |
| | 7:51:21 | will he tell rest of desk stuff | |
| | 7:51:26 | or god forbin his nyk… | |
| Bank X Trader: | 7:51:46 | yes | |
| | 7:51:51 | that's really imp[ortant] q[uestion] | |
| | 7:52:01 | dont want other numpty's in mkt to know | |
| | 7:52:17 | but not only that | |
| | 7:52:21 | is he gonna protect us | |
| | 7:52:33 | like we protect each other against our own branches | |
| | 7:52:46 | ie if you guys are rhs.. and my nyk is lhs..ill say my nyk lhs in few | |
| UBS Trader: | 7:53:52 | what concerns me is that i know he'll never tell us when at risk… | |

After further discussion of whether the fourth trader would "add huge value to this cartell," the traders decided to invite the trader into the chat room for a "1 month trial," with the Bank X Trader warning him, presumably facetiously, "mess this up and sleep with one eye open at night."

These chat rooms were the vehicles through which certain UBS FX traders and traders at other banks coordinated attempts to manipulate certain FX benchmark rates, including the WM/R 4 p.m. fix. Certain chat room participants used code words to evade detection by their banks' compliance monitoring systems.

At times during the Relevant Period, in their attempts to manipulate certain benchmarks (up or down), UBS FX traders exchanged the size and direction of the bank's net orders with FX traders at other banks and used this information to attempt to coordinate trading strategies. The traders at times then used this information to enable one or more traders to attempt to manipulate the FX benchmark rates prior to and during the relevant fixing period.

For example, in one of the chat rooms, if a trader determined that he had fix orders in the opposite direction to the chat room group's overall net fixing position approaching the fixing window, that trader may have transacted before the fix period with traders outside the private chat room, a practice known by market participants as "netting off," rather than transact with other traders within the chat room.[6] In certain cases, the goal of this trading strategy was to maintain the volume of orders held by chat room members in the direction favored by the

---

[6] The Commission does not consider that the netting off of orders (or the decision not to net off) ahead of fixes is inappropriate in all circumstances.

majority of the private chat room members and limit orders being executed in the opposite direction during the fix window.

If traders in the chat room had net orders in the same direction as what they desired rate movement at the fix to be, then the traders would at times either (1) match off these orders with traders outside of the chat room in an attempt to reduce the volume of orders in the opposite direction transacted during the fix period; (2) transfer their orders to a single trader within the chat room who could then execute a single order during the fix period; or (3) transact with traders outside of the chat room to increase the volume traded by chat room members during the fix window in the direction favored by the private chat room traders. At times, traders also increased the volume traded by them at the fix in the direction favored by the chat room traders in excess of the volume necessary to manage the risk associated with their banks' net buy or sell orders at the fix. At times, these actions were undertaken in order to attempt to manipulate the benchmark rate set during the fix period.

Some examples of UBS FX traders' misconduct include:

In one chat, a UBS trader and a trader from another bank coordinated their trading to attempt to manipulate the WM/R 4 p.m. fix by exchanging their client fixing orders and information relating to the type of clients buying. As the 4 p.m. fix approached, the following exchange occurred:

| Bank V Trader: | 15:57:45 | come on [UBS Trader] we can do this |
|---|---|---|
|  | 15:57:50 | fix it at 07 |
| UBS Trader: | 15:57:54 | ha |
|  | 15:58:55 | keep seeing citi on the bid |
|  | 16:00:50 | nice work |

In another chat, traders for UBS and three other banks exchanged positions in a chat room leading into the WM/R 4 p.m. fix. The Bank Y trader said "it cant be a good day to be [right hand side]."[7] Once the four traders determined they were all the same direction, the Bank W trader asked if "we gonna be able to get it to 05" to which the Bank Y trader responded "is that the troyal fkn we." After the fixing window closed the Bank X trader said "nice call" and the chat room members gave their "scores" or profits from the fix. The chat room members each claimed they made between $60,000 and $220,000.

### 4. Respondent Lacked Adequate Internal Controls

During the Relevant Period, UBS failed to adequately assess the risks associated with its FX traders participating in the fixing of certain FX benchmark rates. UBS also lacked adequate internal controls in order to prevent its FX traders from engaging in improper communications with certain FX traders at other banks. UBS lacked sufficient policies, procedures and training

---

[7] If an FX trader has orders to sell of the first currency listed in any currency pair, it is often referred to as being on the left-hand side, or "lhs." If an FX trader references right hand side, or "rhs," it indicates that the FX trader is a buyer of the first currency listed in a currency pair.

specifically governing participation in trading around the FX benchmarks rates and had inadequate policies pertaining to, or insufficient oversight of, its FX traders' use of chat rooms or other electronic messaging.

After the Relevant Period, in June 2013, UBS commenced an internal investigation of possible misconduct by its FX traders relating to foreign exchange benchmarks. On September 27, 2013, UBS reported to the CFTC and other governmental authorities preliminary findings of questionable conduct. UBS was the first bank to report such misconduct to the CFTC. UBS has since undertaken certain remedial measures to improve its internal controls and banned nearly all participation by Investment Bank staff in multi-bank chat rooms in November 2013.

IV.

## LEGAL DISCUSSION

A. **Respondent, Through the Acts of Certain Traders, Attempted to Manipulate FX Benchmark Rates**

Together, Sections 6(c),[8] 6(d) and 9(a)(2) of the Act prohibit acts of attempted manipulation. 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012). Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to . . . attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2012). Sections 6(c) and 6(d) of the Act authorize the Commission to serve a complaint and provide for the imposition of, among other things, civil monetary penalties and cease and desist orders if the Commission "has reason to believe that any person" has attempted to manipulate the market price of any commodity, in interstate commerce, or otherwise is violating or has violated any of the provisions of the Act. 7 U.S.C. §§ 9 and 13b (2012).

With respect to conduct on or after August 15, 2011, in addition to Sections 6(c), 6(d) and 9(a)(2), Section 6(c)(3) of the Act prohibits the attempted manipulation of the price of any commodity in interstate commerce. 7 U.S.C. § 9(3) (2012). Commission Regulation 180.2, 17 C.F.R. §180.2 (2014), which became effective on August 15, 2011, in relevant part, makes it "unlawful to . . . directly or indirectly to attempt to manipulate, the price of …any commodity in interstate commerce." Regulation 180.2 codifies Section 6(c)(3).

Two elements are required to prove an attempted manipulation: (1) an intent to affect the market price, and (2) an overt act in furtherance of that intent. *See In re Hohenberg Bros. Co.,* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477 (CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214, 1220 (N.D. Okla. 2005). To prove the intent element of attempted manipulation, it must be shown that UBS FX traders "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, at 27,283 (CFTC Dec. 17, 1982). "[W]hile knowledge of relevant market conditions is probative of

---

[8] Section 6(c) was amended effective August 15, 2011. For conduct occurring on or after that date, the relevant Section of the Act is now Section 6(c)(4)(A), 7 U.S.C. § 9(4)(A) (2012).

intent, it is not necessary to prove that the accused knew to any particular degree of certainty that his actions would create an artificial price. It is enough to present evidence from which it may reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood of that result happening from his conduct.'" *Id*. (quoting *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 445 (1978)). A profit motive may also be evidence of intent, although profit motive is not a necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,478)), *aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009). It is also not necessary that there be an actual effect on price. *See CFTC v. Amaranth Advisors, L.L.C.,* 554 F. Supp.2d 523, 533 (S.D.N.Y. 2008).

Here, as evidenced by the foregoing, UBS engaged in acts of attempted manipulation in violation of Sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. §§ 9,13b and 13(a)(2) (2012). Additionally, with respect to conduct occurring on or after August 15, 2011, UBS engaged in acts of attempted manipulation in violation of Section 6(c)(3), 7 U.S.C. § 9(3) (2012), and Regulation 180.2, 17 C.F.R. § 180.2 (2014).

B. **Respondent Aided and Abetted the Attempts of Certain Traders at Other Banks to Manipulate FX Benchmark Rates**

Pursuant to Section 13(a) of the Act, liability as an aider and abettor requires proof that: (1) the Act was violated, (2) the aider and abettor had knowledge of the wrongdoing underlying the violation, and (3) the aider and abettor intentionally assisted the primary wrongdoer. *See* 7 U.S.C. § 13c(a) (2012); *In re Sharokh Nikkhah*, [1999-2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129, at 49,888 n.28 (CFTC May 12, 2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge of the unlawfulness of such conduct is not necessarily required to be demonstrated. *See In re Lincolnwood Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,986, at 28,255 (CFTC Jan. 31, 1984). Knowing assistance can be inferred from the surrounding facts and circumstances. *Id*. *See also In re Buckwalter*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995, at 37,686 (CFTC Jan. 25, 1991).

Here, as evidenced by the foregoing, FX traders at other banks attempted to manipulate the WM/R and other FX benchmark rates in violation of Sections 6(c), 6(d) and 9(a)(2), 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012). Additionally, with respect to conduct occurring on or after August 15, 2011 FX traders at other banks violated Section 6(c)(3), 7 U.S.C. § 9(3), and Regulation 180.2, 17 C.F.R. § 180.2 (2014). As evidenced above, UBS, through the acts of certain of its FX traders, aided and abetted the attempts of traders at other banks to manipulate the FX benchmark rates in violation of the Act.

C. **Respondent is Liable for the Acts of its Agents**

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2014), provide that "[t]he act, omission, or failure of any official, agent or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual,

association, partnership, corporation or trust[.]" Pursuant to Section 2(a)(1)(B) of the Act and Commission Regulation 1.2, strict liability is imposed on principals for the actions of its agents. *See, e.g., Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v. CFTC*, 837 F.2d 847, 857-58 (9th Cir. 1988).

UBS is liable for the acts, omissions and failures of any traders who acted as its employees and/or agents in relation to the conduct described above. Accordingly, UBS violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2)(2012), by engaging in attempted manipulation and aiding and abetting attempted manipulation. Additionally, with respect to conduct occurring on or after August 15, 2011, UBS is liable for violating Section 6(c)(3), 7 U.S.C. § 9(3), 13(a)(2) (2012), and Regulation 180.2, 17 C.F.R. § 180.2 (2014), as set forth above.

## V.

## **FINDINGS OF VIOLATIONS**

Based on the foregoing, the Commission finds that Respondent violated Sections 6(c), 6(d) and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b and 13(a)(2) (2012), and for conduct occurring on or after August 15, 2011, Section 6(c)(3), 7 U.S.C. § 9(3) and Regulation 180.2, 17 C.F.R. § 180.2 (2014).

## VI.

## **OFFER OF SETTLEMENT**

Respondent, without admitting or denying the findings or conclusions herein has submitted the Offer in which it:

A.  Acknowledges receipt of service of this Order;

B.  Admits the jurisdiction of the Commission with respect to this Order only and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.  Waives:

   1.  the filing and service of a complaint and notice of hearing;

   2.  a hearing;

   3.  all post-hearing procedures;

   4.  judicial review by any court;

   5.  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;