**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>Defendants. | Civil Action No. 17-cv-3139-LGS<br><br>(related to No. 13-cv-7789-LGS) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENTS, FOR CERTIFICATIONS OF THE PROPOSED
SETTLEMENT CLASSES FOR SETTLEMENT PURPOSES, FOR APPOINTMENT OF
SETTLEMENT CLASS REPRESENTATIVES, AND FOR APPOINTMENT OF
SETTLEMENT CLASS COUNSEL**

## TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................................... 1

II.  PROCEDURAL HISTORY............................................................................................ 4

III.  OVERVIEW OF THE SETTLEMENTS ...................................................................... 5

    A.  Overview of the Citigroup Settlement Negotiations and Settlement.....................5

    B.  Overview of the MUFG Settlement Negotiations and Settlement..........................9

IV.  THE SETTLEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT
    TO GRANT PRELIMINARY APPROVAL ................................................................ 11

    A.  Legal Standards for Preliminary Approval ..........................................................11

    B.  The Proposed Settlements Are Entitled to a Presumption of Fairness .................13

        1.  The Complexity, Expense, and Likely Duration of the Litigation ........... 14

        2.  The Reaction of the Class to the Settlements............................................ 15

        3.  The Stage of the Proceedings.................................................................... 15

        4.  The Risks of Establishing Liability and Damages .................................... 16

        5.  The Risks of Maintaining the Class Action Through Trial....................... 18

        6.  The Ability of Defendants to Withstand a Greater Judgment................... 18

        7.  The Reasonableness of the Settlements in Light of the Best Possible
            Recovery and the Attendant Risks of Litigation....................................... 19

V.  CERTIFICATION OF THE SETTLEMENT CLASSES IS APPROPRIATE ............... 24

    A.  Plaintiffs Satisfy the Rule 23(a) Requirements....................................................25

        1.  Numerosity................................................................................................. 25

        2.  Commonality.............................................................................................. 25

        3.  Typicality ................................................................................................... 26

        4.  Adequacy ................................................................................................... 27

|       | B.    | Plaintiffs Satisfy the Rule 23(b)(3) Requirements ................................................. 28 |
|       |       | 1.    Predominance ........................................................................................ 29 |
|       |       | 2.    Superiority ............................................................................................ 30 |
|       | C.    | The Court Should Appoint Class Counsel as Settlement Class Counsel .............. 31 |
| VI.   | ADDITIONAL DETAILS IN SUPPORT OF PRELIMINARY APPROVAL ............... 32 |
|       | A.    | Proposed Plan of Allocation and Notice Forms ................................................... 32 |
|       | B.    | Proposed Forms of Notice to the Settlement Class Members ............................... 37 |
|       | C.    | Fees, Expenses, Service Awards, and Claims Administration Costs ................... 38 |
|       | D.    | Settlement Fund and Anticipated Recovery ........................................................ 39 |
|       | E.    | Appointment of Escrow Agent ........................................................................... 40 |
|       | F.    | Proposed Settlement Schedule ............................................................................ 40 |
| VII.  | CONCLUSION ............................................................................................................ 40 |

# TABLE OF AUTHORITIES

## Cases

*Alaska Elec. Pension Fund v. Bank of Am.*,
No. 14-cv-7126-JMF, 2017 WL 3868461 (S.D.N.Y. Jul. 12, 2017) ................................. 12, 33

*Allen v. Dairy Farmers of Am., Inc.*,
No. 09-cv-230, 2011 WL 1706778 (D. Vt. May 4, 2011) ....................................................... 12

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) ..................................................................................................... *passim*

*Atwood v. Intercept Pharm., Inc.*,
299 F.R.D. 414 (S.D.N.Y. 2014) ............................................................................................ 27

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
No. 07-cv-2207-JGK, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)........................................ 17

*Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*,
No. 85-cv-3048-JMW, 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ........................................... 17

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)................................................................................................... 26

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018).................................................................................................... 16

*Charron v. Pinnacle Grp. N.Y. LLC*,
874 F. Supp. 2d 179 (S.D.N.Y. 2012)..................................................................................... 24

*Cohen v. J.P. Morgan Chase & Co.*,
262 F.R.D. 153 (E.D.N.Y. 2009) ............................................................................................ 25

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) (reversing................................................................................................. 18

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995)..................................................................................................... 25

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)..................................................................................................... 29

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)................................................................................................... 27

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)........................................................................................ *passim*

*Fleisher v. Phoenix Life Ins. Co.*,
  No. 11-cv-8405-CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ....................................... 12

*Hale v. State Farm Mut. Auto. Ins. Co.*,
  No. 12-0660-DRH, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018)............................................. 33

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
  No. 06-md-1775-JG, 2011 WL 2909162 (E.D.N.Y. Jul. 15, 2011) ......................................... 12

*In re American Int'l Group, Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012)..................................................................................... 25, 29, 30

*In re AOL Time Warner, Inc.*,
  No. 02-cv-5575-SWK, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .................................. *passim*

*In re Austrian and German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000)......................................................................................... 13

*In re CitiGroup Inc.*,
  296 F.R.D. 147 (S.D.N.Y. 2013) .............................................................................................. 18

*In re CRT Antitrust Litig., No. 14-cv-2058*,
  2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ................................................................. 8, 9, 10

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) .............................................................................................. 12

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) .................................................................................. 15, 18, 19

*In re IMAX Secs. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010) .............................................................................................. 27

*In re Initial Pub. Offering Sec. Litig.*,
  226 F.R.D. 186 (S.D.N.Y. 2005) .............................................................................................. 11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2016 WL 7625708 ..................................................................................................................... 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  No. 11-md-2262-NRB, 2014 WL 6851096 (S.D.N.Y. Dec. 2, 2014) ....................................... 11

*In re Marsh ERISA Litig.*,
  265 F.R.D. 128 (S.D.N.Y. 2010) .............................................................................................. 13

*In re Michael Milken and Assocs. Sec. Litig.*,
  150 F.R.D. 57 (S.D.N.Y. 1993) ................................................................................................ 13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 17, 19

*In re Packaged Ice Antitrust Litig.*,
    No. 08-md-01952, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011) ........................... 12

*In re PaineWebber Ltd. Pships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................................ 11, 13

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) ........................................................ 26, 27

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ........................................................................ 27

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F. Supp. 2d 697 (M.D. Pa. 2008) ....................................................................... 18

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) .............................................................................. 12

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ................................................................................ 29

*In re Vitamin C Antitrust Litig.*,
    No. 06-md-1738-BMC, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) .................... 14

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ................................................................................. 22

*Johnson v. Nextel Communs Inc.*,
    780 F.3d 128 (2d Cir. 2015)...................................................................................... 26

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991)........................................................................................ 16

*Langan v. Johnson & Johnson Consumer Cos.*,
    No. 13-cv-1470-JAM, 2017 WL 985640 (D. Conn. Mar. 13, 2017)........................ 28

*Larsen v. JBC Legal Grp., P.C.*,
    235 F.R.D. 191 (E.D.N.Y. 2006) ............................................................................. 28

*Newby v. Enron Corp.*,
    394 F.3d 296 (5th Cir. 2004) .................................................................................... 33

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)...................................................................................... 19

*Ortiz v. Chop't Creative Salad Co.*,
No. 13-cv-2541-KNF, 2014 WL 1378922 (S.D.N.Y. Mar. 25, 2014) ..................................... 11

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
237 F.R.D. 26 (E.D.N.Y. 2006) ................................................................................................ 14

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015)..................................................................................................... 29

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003)...................................................................................... 14

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*,
No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ............................................ 21

*Top Tankers, Inc. Sec. Litig., 06-cv-1376-CM*,
2008 WL 2944620 (S.D.N.Y. July 31, 2008) ......................................................................... 16

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S. Ct. 1036 (2016)............................................................................................................. 30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).................................................................................................................. 25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005)............................................................................................ 11, 19, 22

**Rules**

Fed. R. Civ. P. 12 ................................................................................................................... 4, 5

Fed. R. Civ. P. 23............................................................................................................... *passim*

I.       **INTRODUCTION**

Plaintiffs James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry Jacobson, Tina Porter, and Paul Vermillion (collectively, "Plaintiffs," or "proposed Settlement Class Representatives") respectfully submit this memorandum in support of their motion for preliminary approval of (1) a settlement between Plaintiffs and the proposed Classes and Defendants Citigroup Inc., Citibank, N.A., Citicorp, and Citigroup Global Markets Inc. (collectively, "Citigroup") (the "Citigroup Settlement"); and (2) a settlement between Plaintiffs and the proposed Classes and MUFG Bank, Ltd. (formerly known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.) ("MUFG") (the "MUFG Settlement"). If approved, the proposed Settlements[1]—consisting of combined cash payments of $10,935,000[2] (the "Settlement Fund") as well as commitments by both Citigroup and MUFG (together, the "Settling Defendants") to provide significant cooperation to Plaintiffs—offer valuable monetary relief to the Classes and resolve this complex case against the Settling Defendants. The pledged cooperation is particularly valuable at this early stage in the litigation. Plaintiffs' claims against the remaining Defendants (the "Non-Settling Defendants") are being vigorously pursued.[3] Under the doctrine of joint and several liability, all of the damages from proposed Settlement Class Members' transactions can still be recovered from the Non-Settling Defendants.

During the November 15, 2018 hearing regarding Plaintiffs' prior motion for preliminary

---

[1] The Citigroup Settlement and MUFG Settlement are attached, respectively, as Exs. A and B to the accompanying Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Preliminary Approval of Settlements ("Dell'Angelo Decl.").

[2] The Citigroup Settlement provides for a payment of a $9,950,000 by Citigroup, *see id.* § II, ¶ (qq), and the MUFG Settlement provides for a payment of $985,000 by MUFG. *See id.* § II, ¶ (qq).

[3] All Defendants, other than Settling Defendants, are collectively referred to herein as "Non-Settling Defendants." On May 20, 2019, the Court granted dismissal, pursuant to Rule 12(b)(2), of MUFG and Non-Settling Defendants The Royal Bank of Scotland plc, Société Générale, and UBS Group AG for lack of personal jurisdiction. ECF No. 263. However, Plaintiffs believe that they will be able to bring one or more of those Non-Settling Defendants back into the Action through amendment or on appeal.

approval of the Citigroup Settlement, the Court requested information pertaining to the number of class members and total potential classwide damages to determine whether the Citigroup Settlement is fair, reasonable, and adequate. *See* ECF No. 181 (Transcript of Nov. 28, 2018 Hearing). This memorandum, as well as the accompanying Dell'Angelo Declaration, Declaration of Dr. Janet S. Netz ("Netz Decl."), and Declaration of James Bibbings ("Bibbings Decl."), provide the Court with the requested information for both Settlements, and the information required by Rule III.C.5 of the Court's Individual Rules and Procedures for Civil Cases and Rule 23(e).[4]

Pursuant to Fed. R. Civ. P. 23(e), as recently amended on December 1, 2018, in order for the Court to grant preliminary approval of a proposed class settlement, Plaintiffs must show that the Court will likely be able to determine at the final approval stage that: (1) the classes should be certified for purposes of settlement; (2) the class representatives and class counsel have adequately represented the classes; (3) the proposal was negotiated at arm's length; (4) the proposal treats class members equitably relative to each other; and (5) the relief provided for the class is adequate, taking into account: (a) the costs, risks, and delay of trial and appeal, (b) the effectiveness of any proposed method of allocating and distributing relief to the class, (c) the terms of any proposed award of attorney's fees, and (d) the terms of the settlement itself and any other relevant agreements made in connection with the proposed settlement. *Id*. The

---

[4] Settlement negotiations were guided by Plaintiffs' experts' analysis of the scope of the indirect retail FX transactions relevant to this Action relative to the FX market as a whole. *See* Dell'Angelo Decl. ¶ 14. However, because Plaintiffs are continuing to litigate their claims against the Non-Settling Defendants, and such analyses as to the Citigroup Settlement occurred before the discovery stage and were limited to publicly-available information, like class counsel in *FOREX*, Class Counsel here were hesitant to include these analyses in their initial preliminary approval motion. *C.f. In re Foreign Exch. Benchmark Rates Antitrust Litig*., No. 13-cv-07789-LGS ("*FOREX*"), ECF No. 480 (noting, in the motion for preliminary approval of the initial settlements, which was approved by the Court, that "[s]ince Lead Counsel may well have to litigate against the Non-Settling Defendants through trial and appeal, their duties to the Class Plaintiffs and putative classes preclude a full discussion of the potential risks in establishing liability and damages."). Plaintiffs' estimates provided herein are solely for purposes of evaluating the Settlements and may be revised based on additional information obtained in the discovery process.

reasonableness considerations set forth in the amended Fed. R. Civ. P. 23(e) largely overlap with the following factors announced in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), that courts in the Second Circuit often apply at the preliminary approval stage in evaluating a proposed class settlement (the "*Grinnell* factors"):

> (l) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

For the reasons described below, the factors relevant to preliminarily approval of the Settlements support a grant of Plaintiffs' motion. The Settlements were negotiated at arm's-length, and the relief obtained is fair, reasonable, and adequate. The proposed *pro rata* method of allocating the Settlement Fund amongst the Settlement Class members ensures that they will be treated equitably relative to each other. And the $10,935,000 Settlement Fund is well within the range of reasonableness, especially in light of the early stages at which the Settlements were reached, the Settlements' cooperation provisions, the complexity of the litigation, and the risks of establishing liability, aggregate damages, and classwide impact.

Finally, Plaintiffs request a short delay in distributing the proceeds of these Settlements because in the event that additional settlements are reached in the near future, it would be more efficient and cost-effective to distribute all settlements together, thereby limiting administrative costs and preserving settlement funds for distribution to the Settlement Classes. Additionally, Plaintiffs request that their formal Motion for Approval of Notice and Plan of Allocation be temporarily deferred, pursuant to the Settlement Schedule set forth in the Proposed Order

submitted with Plaintiffs' Motion, to allow for additional time for Plaintiffs to obtain Settlement

Class member identifying information and transactional data from third parties whom Plaintiffs

have subpoenaed. However, Plaintiffs are submitting proposed forms of notice and a proposed

plan of allocation for the Court's consideration of this Motion.

## II.    <u>PROCEDURAL HISTORY</u>

Plaintiffs filed this Action on April 28, 2017. ECF No. 1. On June 26, 2017, the parties

filed a stipulation to consolidate the instant action with *Lavender, et al. v. Bank of America*

*Corp., et al.*, No. 17-cv-4392, *see* ECF No. 83, followed by the filing of the First Consolidated

Class Complaint ("CCAC") on June 30, 2017. ECF No. 84.

On August 11, 2017, all Defendants filed a joint motion to dismiss pursuant to Rule

12(b)(6), ECF Nos. 103-104, and certain "Foreign Defendants," including MUFG, filed a motion

to dismiss pursuant to Rule 12(b)(2). ECF Nos. 105-107. On March 15, 2018, the Court granted

Defendants' Rule 12(b)(6) motion and denied the 12(b)(2) Motion as moot. ECF No. 136. The

Court further ordered that Plaintiffs could move for leave to file a proposed amended complaint.

*Id.* Plaintiffs filed a Motion for Leave to File a Second Consolidated Class Action Complaint

("SCCAC") on April 5, 2018, addressing the Court's bases for dismissal. ECF Nos. 138-39.

On October 25, 2018, the Court granted Plaintiffs' motion for leave to file the SCCAC

with respect to Plaintiffs' state-law damages claims, but denied it as to Plaintiffs' injunctive

relief claims under the Sherman Act. ECF No. 166. On May 20, 2019, the Court granted a

motion to dismiss the SCCAC for lack of personal jurisdiction pursuant to Fed. R. Civ. P.

12(b)(2) as to Defendants The Royal Bank of Scotland plc, Société Générale, UBS Group AG,

and MUFG Bank, Ltd., and denied it as to Barclays Bank PLC, BNP Paribas Group, HSBC Bank

plc, Standard Chartered Bank, and UBS AG. *See* ECF No. 263.[5] The Action is being actively litigated against the remaining Non-Settling Defendants. *See* ECF No. 176.

Plaintiffs filed their initial motion for preliminary approval of the Citigroup Settlement on August 21, 2018, after the Court granted Defendants' Rule 12(b)(6) motion but before the Court granted Plaintiffs' motion for leave to file the SCCAC. ECF No. 154. The Court denied the initial motion without prejudice and directed Plaintiffs to file a renewed motion for preliminary approval with additional information. *See* ECF No. 181 at 11:14-12:5. Plaintiffs respectfully submit that this Motion provides the requisite details to support preliminary approval of the Settlements.

## III.   OVERVIEW OF THE SETTLEMENTS

### A.   Overview of the Citigroup Settlement Negotiations and Settlement

During the pendency of Defendants' Rule 12(b)(6) motion, Plaintiffs engaged in numerous settlement discussions with Citigroup. The negotiations led to an agreement in principle in February 2018. The parties then negotiated terms and exchanged drafts of the settlement agreement over the next several months, culminating in a written settlement agreement executed on August 2, 2018. *See* Dell'Angelo Decl. ¶ 14.

The Citigroup negotiations were hard-fought and resulted in a favorable Settlement, especially given that at the time the Settlement was signed, it was uncertain that Plaintiffs' claims would be sustained. Several considerations guided Plaintiffs' negotiations and their demands for the Settlement amount and cooperation provisions.

*First*, in light of the Court's prior holdings that the amount of the settlement between Citigroup and the *FOREX* direct-purchaser plaintiffs in that action was fair, reasonable, and

---

[5] At the time of the Order, Plaintiffs had already reached the MUFG Settlement and were in the process of finalizing an agreement to voluntarily dismiss UBS Group AG.

adequate, *see FOREX* ECF Nos. 536, 1103, Class Counsel and their industry expert Dr. Carol Osler estimated the volume of the retail FX Instrument transactions relevant to the damages claims of the Class members relative to the overall volume of FX Instrument transactions that comprised the claims of the Direct Settlement Class in *FOREX*. Dell'Angelo Decl. ¶ 19.[6] A number of data sources were used to estimate the size of the Classes here as compared to the *FOREX* class, including the Triennial Bank Survey of the Bank for International Settlements ("BIS"),[7] the Federal Reserve Bank of Cleveland,[8] and Dr. Osler's own academic research.[9] Dell'Angelo Decl. ¶ 19. Before adjusting for class size, these sources indicate that the daily average volume of retail FX trading applicable to this case relative to the overall direct purchaser FX Instrument market at issue in *FOREX* (the "retail FX market share") is likely between 10 and 30 percent. *Id.* Dr. Osler's estimate of the overall retail FX market share was then reduced to reflect the likely proportion of Settlement Class Members that reside in New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina (the "Settlement Class States"). *Id.* According to the U.S. Census Bureau's Population Estimates, the populations of those states is 37.7 percent of the overall U.S. population. *Id.*[10]

The *FOREX* plaintiffs settled with Citigroup for $402 million, of which $394 million was allocated to the Direct Settlement Class. *FOREX* ECF No. 481-3 at 6.[11] Applying the more

---

[6] "FX Instrument" and "Direct Settlement Class" are defined in the Settlements as set forth in the Citigroup Settlement § II, ¶ (bb), (s), and the MUFG Settlement § II, ¶ (x), (o).

[7] *See* Triennial Central Bank Survey, *available at* https://www.bis.org/publ/rpfx16fx.pdf (last visited May 15, 2019).

[8] Rawley Z. Heimer & David Simon, *Facebook Finance: How Social Interaction Propagates Active Investing* (Federal Reserve Bank of Cleveland, Working Paper No. 15-22, October 2015), *available at* https://www.clevelandfed.org/en/newsroom-and-events/publications/working-papers/2015-working-papers/wp-1522-facebook-finance-social-interaction-investing.aspx (last visited May 20, 2019)

[9] *See generally* Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, *Price Discrimination and the Cost of Liquidity in OTC Markets* (Nov. 17, 2015), *available at* http://www.fmaconferences.org/Vegas/Papers/CostOfLiquidityInDealershipMarkets_BKO_FMA2016.pdf (last visited May 11, 2019).

[10] *See* U.S. Census Bureau, National and State Population Estimates, *available at* https://www.census.gov/newsroom/press-kits/2018/pop-estimates-national-state.html (last visited May 17, 2019).

[11] The remaining $8 million was allocated to the "Exchange-Only Settlement Class." *Id*. Because the Settlement Class definitions here are limited to persons who indirectly purchased an FX Instrument from a Defendant or co-

conservative retail FX market share estimate of 10 percent to the Citigroup *FOREX* settlement resulted in a *pro-rata* indirect amount of $39.4 million. Dell'Angelo Decl. ¶ 22. That amount was then reduced by 62.3 percent to reflect the percentage of the population represented by the proposed Settlement Class members, leaving an estimate of $14.85 million. *Id.* The $9.95 million Citibank Settlement is on par with that settlement considering the different stages at which the settlements were reached. *See id.*[12]

*Second,* Class Counsel were mindful that unlike the Citigroup settlement in *FOREX*, the Settlement here is the first, a so-called "icebreaker settlement," and obligated Citigroup to provide cooperation despite a discovery stay as to all Non-Settling Defendants. Citibank's assistance has been helpful and will increase if the Settlement is preliminarily approved. The *FOREX* Citigroup settlement was not an "icebreaker" because it was not the first settlement in the case and was reached after this Court's decision on the Defendants' motion to dismiss.

To value this icebreaker Settlement, Class Counsel looked to the $99,000,000 initial *FOREX* settlement with JPMorgan. Dell'Angelo Decl. ¶ 24. Applying the more conservative 10 percent retail FX market share estimate and Settlement Class size population estimate to the *FOREX* JPMorgan settlement, a *pro-rata* icebreaker settlement with Citibank in this case would have been comparatively reasonable at less than $4 million. *Id.*[13] Thus, the $9,950,000 Citigroup

---

conspirator by entering into an FX Instrument with a member of the Direct Settlement Class, the settlement amount allocated to the Exchange-Only Settlement Class is not relevant to Plaintiffs' *pro-rata* comparisons. However, the Court's finding that an $8 million settlement with Citigroup to resolve the Exchange-Only Settlement Class claims is instructive. While Plaintiffs here have not identified publicly available information regarding the size of the Exchange-Only Class's claims, the cash recovery provided by the Citigroup Settlement here is 24.4 percent larger than the Exchange-Only Settlement approved by the Court in *FOREX*. *Id.*

[12] Applying the 30 percent retail FX market share estimate and the 62.3 percent population adjustment to the Citigroup *FOREX* settlement results in an estimate of $44.56 million for the Settlement here. Both estimates support the reasonableness of the Citigroup Settlement.

[13] Specifically, applying the 10 percent retail FX market share estimate to the JPMorgan *FOREX* settlement and the 62.3 percent population adjustment results in an estimate of $3.73 million here, and applying the estimated maximum 30 percent retail FX market share estimate results in an estimate of $11.2 million. Therefore, the Citibank Settlement is at the upper end of the estimated comparative range of reasonableness.

Settlement is more than double the *pro-rata* value of the icebreaker in *FOREX*. *See FOREX* ECF 925 at 3.[14]

*Finally*, Class Counsel and Plaintiffs understood that the entire amount of damages against the Non-Settling Defendants can be recovered under joint and several liability. Accordingly, the proposed Settlement amounts here do not alter the maximum recoverable damages if Plaintiffs prevail at trial. *See, e.g.*, *In re CRT Antitrust Litig.*, No. 14-cv-2058, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) (noting that the right to seek entire damages from non-settling defendants "provides increased value . . . by creating added incentive for the remaining defendants to settle or allowing greater recovery for the Plaintiffs at trial").

The Settlement is on behalf of statewide Classes in each of the Settlement Class States. Each Settlement Class is defined to include persons and entities who, during the period of December 1, 2007, through the date of preliminary approval, indirectly purchased an FX Instrument from a Defendant or co-conspirator in or while residing in the respective Settlement Class State by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class Member entered into the FX Instrument directly with a Defendant or co-conspirator. The entire class definitions are set forth in the Settlements and the Proposed Order.

The Settlement also obligates Citigroup to provide extensive cooperation, both to effectuate the terms of the Settlements and to assist Plaintiffs in the continued litigation against the Non-Settling Defendants. Citigroup Settlement § XIV. The cooperation provisions fall into four categories: attorney proffers, production of documents and data, authentication of documents, and providing witnesses to testify at trial. *Id.*

---

[14] Plaintiffs also considered Citigroup's settlement in the related Canadian action. *See infra* Section IV.B.7; Dell'Angelo Decl. ¶ 24.

First, beginning within 30 days of the entry of this Court's order granting Preliminary Approval (the "Preliminary Approval Order"), Citigroup's Counsel will meet with Class Counsel to provide an attorney proffer concerning the facts and circumstances alleged in Plaintiffs' complaint, including Settling Defendants' understanding of the expected testimony of former or current Settling Defendant employees. Citigroup Settlement § XIV, ¶ (c)(ii). Second, Citigroup must provide Plaintiffs with all documents and transactional data that it produced in *FOREX*, and has meet-and-confer obligations regarding additional reasonably available data relevant to Plaintiffs' claims concerning retail FX transactions. Citigroup Settlement § XIV, ¶ (c)(iii). Third, Citigroup will provide declarations to authenticate documents that Plaintiffs may seek to introduce into evidence in this Action. Citigroup Settlement § XIV, ¶ (c)(vi). Finally, Citigroup is required to make witnesses available to testify at trial. *Id.*

In exchange for Citigroup's consideration, the Released Parties[15] shall be released of any and all manner of claims "arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the Action." Citigroup Settlement § II, ¶ (mm). The full text of the release provisions is set forth in the Settlement Agreement. *See* Citigroup Settlement § II, ¶ (nn).

### B.    Overview of the MUFG Settlement Negotiations and Settlement

Plaintiffs' negotiations with MUFG were guided by the same principles applied in the Citigroup negotiations. Dell'Angelo Decl. ¶ 20. Negotiations between Plaintiffs and MUFG began on December 21, 2018. *Id.* ¶ 16. The parties had serious settlement discussions and communications on approximately nine days during January and early February 2019. *Id.* A

---

[15] "Released Parties" is defined in the Settlements as Citigroup, MUFG Bank, "and each of [their] past, present, and future direct and indirect parents (including holding companies), subsidiaries, affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), divisions, predecessors, successors, and each of their respective officers, directors, employees, agents, attorneys, legal or other representatives, trustees, heirs, executors, administrators, advisors, and assigns. Released Parties do not include any of the other Defendants." Citigroup Settlement § II, ¶ (nn); MUFG Settlement § II, ¶ (mm).

settlement agreement in principle was reached on February 8, 2019, and the parties exchanged draft settlement agreements throughout February culminating in a signed agreement on March 1, 2019. *Id*. During that time period, MUFG's Rule 12(b)(2) motion was pending. *Id*. ¶ 17. The risk presented by MUFG's motion was realized when, on May 20, 2019, the Court granted the Rule 12(b)(2) motion. *See* ECF No. 263. Had Plaintiffs not reached the MUFG Settlement prior to that Order, a settlement with MUFG would likely not have been achieved, and the litigation with respect to MUFG would have been substantially delayed by motion practice and, potentially, an appeal. Also, MUFG was exempt from all discovery productions until the Court reached a decision on the Rule 12(b)(2) motion. *See* ECF No. 176, ¶ 8(b). Further, without the agreed-upon cooperation, obtaining discovery from MUFG, some of which is located in Japan, would have been far more expensive. Dell'Angelo Decl. ¶ 18.

The MUFG settlement in *FOREX* and the Court's orders approving that settlement provided the primary basis for determining a reasonable settlement amount here. Dell'Angelo Decl. ¶ 23. In *FOREX*, the MUFG settlement provided for a payment of $10.5 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-1. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the $10.5 million *FOREX* MUFG settlement is between $395,850 (using the 10 percent estimate) and $1,187,550 (using the 30 percent estimate). *See* Dell'Angelo Decl. ¶ 23. Therefore, the MUFG Settlement amount of $985,000 here is at the upper end of the range of reasonableness when compared to the *FOREX* settlement. *See id*.

Plaintiffs' settlement negotiations with MUFG were also informed by MUFG's settlement in the related Canadian action. *See infra* Section IV.B.7. As detailed below, the MUFG Settlement here far exceeds the estimated reasonable settlement range based on the

10

Canadian MUFG settlement, even after accounting for the fact that the total population of the proposed Settlement Class states is larger than the population of Canada. *Id.*

The MUFG Settlement includes virtually the same cooperation as required by Citigroup, discussed above, and is on behalf of state Settlement Classes with nearly identical class definitions,[16] as fully defined in the MUFG Settlement § III, ¶¶ (a)(i)-(viii). And the same claims are released. MUFG Settlement § II, ¶¶ (ll), (nn).

## IV.   THE SETTLEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT TO GRANT PRELIMINARY APPROVAL

### A.   Legal Standards for Preliminary Approval

Pursuant to Fed. R. Civ. P. 23(e)(2), a proposed class action settlement must be "fair, reasonable, and adequate." To grant preliminary approval, the Court must find it "will be likely" to grant final approval under Rule 23(e)(2) and "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). This analysis entails an initial evaluation of "procedural" fairness, focused on whether the settlement resulted from informed, arm's-length negotiations, *see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005), and "substantive" fairness of the agreement's terms – collectively, the "*Grinnell* factors." *See, e.g., Ortiz v. Chop't Creative Salad Co.*, No. 13-cv-2541-KNF, 2014 WL 1378922, at *12 (S.D.N.Y. Mar. 25, 2014) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The newly amended Rule 23 does not change this fundamental inquiry. *See* Fed. R. Civ. P. 23(e)(2) advisory

---

[16] The Settlement Classes defined in the Citigroup and MUFG Settlements are identical with two minor exceptions. The California and North Carolina Settlement Classes are defined in the Citigroup Settlement as persons who indirectly purchased an FX Instrument from a Defendant or co-conspirator "in [their home state] and/or while domiciled in  [their home state]," Citigroup Settlement § III, ¶¶ (a)(iii), (a)(viii), whereas the MUFG Settlement defines the California and North Carolina Settlement Classes as persons who indirectly purchased an FX Instrument from a Defendant or co-conspirator "and were thereby injured in [their home state]." MUFG Settlement § III, ¶¶ (a)(iii), (a)(viii). Because the Citigroup and MUFG California and North Carolina Settlement Class definitions are functionally identical for purposes of identifying Settlement Class members and administering the Settlements, and because those provisions in the MUFG California and North Carolina Settlement Class definitions mirror the Class definitions set forth in Plaintiffs' Second Consolidated Class Action Complaint ("SCCAC"), Plaintiffs propose that the Settlement Class definitions include the language of the MUFG Settlement for those provisions. Counsel for Citigroup do not object to Plaintiffs' proposal.

committee note ("The goal of this amendment is not to displace any factor"). Substantive factors favoring preliminary approval include whether the settlement provides "intangible benefits, including cooperation against non-settling defendants," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262-NRB, 2014 WL 6851096, at *2 (S.D.N.Y. Dec. 2, 2014), and grants the plaintiffs repose in the face of complex, uncertain litigation. *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 198 (S.D.N.Y. 2005).

Finally, while "[t]he decision to grant or deny such approval lies squarely within the discretion of the trial court," *In re PaineWebber Ltd. Pships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997), courts in this District recognize that "there is an overriding public interest in settling . . . litigation, and this is particularly true in class actions," *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405-CM, 2015 WL 10847814, at *4 (S.D.N.Y. Sept. 9, 2015) (citation omitted). Settlements "advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation." *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2011 WL 1706778, at *2 (D. Vt. May 4, 2011). As demonstrated below, the proposed Settlements merit preliminary approval because they are procedurally and substantively fair. The federal policy favoring settlement of class actions "applies with equal force whether the settlement is partial, involving only some of the defendants, or complete." *In re Packaged Ice Antitrust Litig.*, No. 08-md-01952, 2011 WL 717519, at *7 (E.D. Mich. Feb. 22, 2011); *see In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455-56 (S.D.N.Y. 2004) (acknowledging policy considerations that favor approval of proposed partial class action settlement); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (same). Courts have frequently granted preliminary approval of partial class

action settlements while deferring the notice, plan of allocation, final approval, and claims distribution stages to a later date. *See FOREX*, 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015) (granting preliminary approval and ordering that plaintiffs shall submit a proposed notice, plan of distribution, and schedule "at a later date"); *Alaska Elec. Pension Fund v. Bank of Am.*, No. 14-cv-7126-JMF, 2017 WL 3868461, at *3 (S.D.N.Y. Jul. 12, 2017) (granting preliminary approval and deferring notice and allocation motions to "a later date" to enable the plaintiffs to obtain necessary data). Many of the cooperation provisions are triggered by the Preliminary Approval Order, which further supports approval of the partial Settlements here. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775-JG, 2011 WL 2909162, at *4 (E.D.N.Y. Jul. 15, 2011) (cooperation provisions "may facilitate a more expeditious outcome of the remaining claims").

### B.   The Proposed Settlements Are Entitled to a Presumption of Fairness

A settlement that is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation," is presumptively fair. *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000). In such circumstances, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *PaineWebber*, 171 F.R.D. at 125 (citation omitted).

Here, Class Counsel have the requisite class action and antitrust experience to lead this litigation on behalf of the proposed Settlement Classes, and Settling Defendants are represented by highly experienced and sophisticated counsel. Plaintiffs' negotiations with Citigroup took place over the course of more than seven months, Dell'Angelo Decl. ¶ 14, and Plaintiffs' negotiations with MUFG took place over more than three months. *Id.* ¶ 16. Plaintiffs' negotiations with both Settling Defendants were informed by settlements in *FOREX* and the

Canadian FX action and the expert analyses described above. *Id.* ¶¶ 13-25. Thus, the Settlements are entitled to "a strong initial presumption that the compromise is fair and reasonable." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993).

To determine whether the Court will be likely to grant final approval, the *Grinnell* factors are informative. Not every factor must weigh in favor of settlement; rather, "the court should consider the totality of these factors in light of the particular circumstances." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) (citations and internal quotations omitted). As explained below, these factors weigh in favor of preliminary approval of the Settlements.

### 1.   The Complexity, Expense, and Likely Duration of the Litigation

Numerous courts have recognized that "'[f]ederal antitrust cases are complicated, lengthy, . . . bitterly fought,' as well as costly." *In re Vitamin C Antitrust Litig.*, No. 06-md-1738-BMC, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) (citation omitted). Having overseen the related *FOREX* action over the past five years, this Court is aware of the complexities and potential lengthiness of this case. The parties are in the early stages of the discovery process, and *Daubert* motions, a class certification motion, and summary judgment motions will follow, as well as potential related appeals. *See generally Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) (noting that "the time value of money make[s] future recoveries less valuable than this current recovery").

The costs of continuing to litigate this Action will necessarily be substantial. This factor is less relevant where, as here, Plaintiffs are continuing to litigate their claims with the Non-Settling Defendants. However, the cooperation provisions will meaningfully reduce the time and expenses required to prosecute Plaintiffs' claims. *See, e.g., FOREX* ECF 1100, at 7 (noting the "value of the cooperation agreement" in approving partial settlement with MUFG).

In short, because of the guaranteed cash recovery and reduced litigation expenses, the first *Grinnell* factor weighs in favor of granting preliminary approval.

### 2.      The Reaction of the Class to the Settlements

Because notice has yet to be provided to potential Class Members, courts generally do not consider this *Grinnell* factor at this stage. *See, e.g.*, *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006). However, each of the proposed Settlement Class Representatives supports approval of this Settlements. Dell'Angelo Decl. ¶ 27.

### 3.      The Stage of the Proceedings

"The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02-cv-5575-SWK, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Discovery need not be fully complete, or even underway, before a settlement can be approved. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (to be informed, "formal discovery need not have necessarily been undertaken yet by the parties"). Rather, it is enough for the parties to "have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *AOL Time Warner*, 2006 WL 903236, at *10 (citation omitted). This Court previously granted preliminary approval to class settlements in *FOREX* before the start of merits discovery. *See FOREX* ECF No. 536.

Plaintiffs are sufficiently informed to reach an adequate settlement. The complaints were drafted based on extensive investigation of the alleged conspiracy and its effects, including reviewing publicly available news articles, press releases and other reports, researching the applicable law, and consulting with leading experts on the FX market. Dell'Angelo Decl. ¶ 14. Although discovery is at an early stage, Class Counsel have attended depositions in *FOREX*, and

have received all documents and substantial amounts of transactional data that the Non-Foreign

Defendants produced in *FOREX*. Dell'Angelo Decl. ¶ 12. The information gleaned from this

discovery, as well as from the pleadings, motions, and court orders in *FOREX*, have helped Class

Counsel to assess the potential damages, as well as the risks and likely defenses going forward.

The settlement negotiations included frank discussions of the relative strengths and weaknesses

of the parties' claims and defenses. Dell'Angelo Decl. ¶ 19. Collectively, this information has

provided Plaintiffs with a comprehensive understanding of the relative strengths and weaknesses

of their case that has enabled Plaintiffs to negotiate settlements believed to be an excellent result

for the Settlement Classes. *Id.* Therefore, this factor supports preliminary approval.

### 4.    The Risks of Establishing Liability and Damages

"In assessing the Settlement, the Court should balance the benefits afforded [to] the

Class[es], including the *immediacy* and *certainty* of a recovery, against the continuing risks of

litigation." *In re Top Tankers, Inc. Sec. Litig.*, 06-cv-1376-CM, 2008 WL 2944620, at *4

(S.D.N.Y. July 31, 2008) (emphasis in original). Here, Plaintiffs face significant risks to proving

liability due to, among other things, the complexity of the subject matter of this litigation and the

fact that Defendants are well-financed and can afford to litigate indefinitely.

Two particularly critical components to Plaintiffs' risk analysis were the Rule 12(b)(6)

motion to dismiss that was briefed and pending during the settlement negotiations with Citigroup

and the Rule 12(b)(2) motion that was pending during the settlement negotiations with MUFG.

Significantly, less than a month after the parties entered into a binding Memorandum of

Understanding outlining the terms of the Citigroup Settlement, the Court granted the Defendants'

motion to dismiss the CCAC, while also granting leave for Plaintiffs to file a proposed SCCAC

with an accompanying memorandum in support. ECF No. 136. It was not guaranteed that the

Court would permit the filing of the SCCAC. Similarly, after Plaintiffs and MUFG had finalized

their Settlement agreement, the Court *granted* the Rule 12(b)(2) motion that was pending during the settlement negotiations. *See* ECF No. 263.[17] The 12(b)(2) Order created the risk that the Class Plaintiffs might not recover *anything* at all from MUFG absent the proposed Settlement. In addition, when the MUFG Settlement was signed in March 2019, no government or regulator had fined or sanctioned MUFG for the conduct alleged in the SCCAC, nor had MUFG entered into any voluntary resolution of such claims with any government or regulatory agency, thus complicating proof of MUFG's liability.[18]

Additional risk exists because the Settling and Non-Settling Defendants have significant financial resources to litigate this Action to trial. Defendants are represented by some of the best law firms in the United States, and absent settlement, Settling Defendants are certainly prepared to vigorously contest liability and damages. Even assuming that Plaintiffs can establish the Settling Defendants' liability at trial, "[t]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998)*. In sum, "[t]here is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away." *Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*, No. 85-cv-3048-JMW, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987). This factor therefore supports granting preliminary approval.

---

[17] *See supra* n.6. MUFG's consent to jurisdiction for the purpose of preliminary approval of its settlement agreement with Plaintiffs is limited to this Action only. *See Klinghoffer* v. *S.N.C. Achille Lauro*, 937 F.2d 44, 50 n.5 (2d Cir. 1991); *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68, 88 (2d Cir. 2018).

[18] On May 16, 2019, the European Union announced that it had fined five Defendants a total of 1.07 billion euros for their involvement in the conspiracy, including a 310.8 million euro penalty for Citigroup and a 69.8 million euro penalty for MUFG. *See* Kirstin Ridley, *EU fines Barclays, Citi, JP Morgan, MUFG and RBS $1.2 billion for FX rigging*, BLOOMBERG (May 16, 2019), *available at* https://www.bloomberg.com/news/articles/2019-05-16/citigroup-jpmorgan-among-banks-fined-1-2-billion-in-fx-probe?srnd=markets-vp (last visited May 20, 2019).

### 5.      The Risks of Maintaining the Class Action Through Trial

Plaintiffs will need to overcome numerous hurdles before the Action proceeds to trial. Plaintiffs will be required to succeed in their motion for class certification, and to defeat any *Daubert* motions and motions for summary judgment filed by Defendants. Even if class certification is granted, Defendants may later seek to decertify the Classes or modify the Class definitions prior to trial, and there is always the possibility of changed circumstances, or changes in the governing law, that could threaten class certification in the future. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207-JGK, 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("There is no assurance of obtaining class certification through trial, because a court can re-evaluate the appropriateness of certification at anytime during the proceedings."). Interlocutory appeals at any stage of the litigation would add further uncertainty to the Action. *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 29 (2013) (reversing class certification in an antitrust case at an interlocutory stage). A jury verdict would also likely be followed by appeals. Accordingly, this factor weighs in favor of preliminary approval.

### 6.      The Ability of Defendants to Withstand a Greater Judgment

Settling Defendants could withstand a greater judgment than provided for by the Settlements. However, courts consistently hold that the ability of defendants to pay more than the settlement amount is not a sufficient reason by itself to decline preliminary approval of a settlement. *See In re IMAX Secs. Litig.*, 283 F.R.D. at 191 ("[T]his factor, standing alone, is not sufficient to preclude a finding of substantive fairness where the other factors weigh heavily in favor of approving a settlement."); *In re CitiGroup Inc.*, 296 F.R.D. 147, 157 (S.D.N.Y. 2013) (approving settlement with Citigroup, despite the fact that "Citigroup could likely withstand a greater judgment"). Moreover, "the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to withstand a larger judgment." *In re*

*Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7625708, at *2 (noting "the intangible benefit of cooperation against the non-settling defendants" in granting preliminary approval of an early settlement).

### 7.   The Reasonableness of the Settlements in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors "recognize[] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In applying these factors, "[t]he adequacy of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'" *In re IMAX Secs. Litig.*, 283 F.R.D. at 191 (citation omitted); *see also NASDAQ*, 187 F.R.D. at 478 ("[T]he exact amount of damages need not be adjudicated for purposes of settlement approval."). Consequently, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2, *see also In re IMAX Secs. Litig.*, 283 F.R.D. at 191-192 ("[T]he Second Circuit 'has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought.'" (citation omitted)). Without these Settlements, Plaintiffs have no guarantee of securing any recovery. These risks are arguably dispositive for the final two *Grinnell* factors. *See FOREX* ECF 1100, at 8 ("[S]uccess in antitrust cases such as this one is inherently uncertain, and there is no guarantee that continued litigation would yield a superior result.").

The Settlements provide a $10.935 million Settlement Fund to compensate the Classes, and substantial cooperation, while preserving Plaintiffs' right to recover the entire amount of

damages from the Non-Settling Defendants based on joint and several liability. Citigroup Settlement § X, ¶ (b); *id.* § XIV, ¶¶ (c)(ii)-(vii); MUFG Settlement § X, ¶ (b); *id.* § XIV, ¶¶ (c)(ii)-(vii). The immediacy of a cash payment weighs in favor of approval. *See AOL Time Warner*, 2006 WL 903236, at *13. ("[T]he benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery"). At this early stage, Settling Defendants' cooperation is very valuable to the Classes. *See supra* Section III.A. As this Court recognized in its final approval of the *FOREX* settlements, "this is a partial settlement of the Action in a multi-defendant antitrust case, meaning that if Class Plaintiffs' claims are proven at trial, non-settling defendants will remain liable for all class damages under principles of joint and several liability, and, as such, the Settlement Agreement provides a guaranteed cash recovery and other benefits to the Settlement Classes without substantially diminishing the value of the case going forward." *FOREX* ECF 1100, at 7-8.

In addition to the *FOREX* settlements approved by this Court, the court-approved Citigroup and MUFG settlements in the Canadian action offer further support of the reasonableness of the settlement amounts here. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-000189-152 (Quebec S.C.J.). In the Canadian action, twelve of the same Defendant groups involved in this Action entered into settlements totaling $106,747,205 Canadian Dollars ("CAD") with the plaintiffs and proposed nationwide Canadian classes that included direct *and* indirect purchasers. *See* Dell'Angelo Decl. Ex. I (court-approved notice of the Canadian settlements). The Citigroup and MUFG settlement amounts were, respectively, $21 million CAD and $450,000 CAD. *Id.* The Canadian plaintiffs' settlements allocated 20 percent of the settlement proceeds to the indirect purchaser Canadian class members. *Id.* Therefore, the

Canadian indirect purchasers recovered $4.2 million CAD from the Citigroup settlement (20 percent of $21 million) and $90,000 CAD from the MUFG settlement (20 percent of $450,000). The exchange rate in July 2018 when the Canadian plaintiffs' proposed plan of allocation was approved was 0.768 CAD to 1 U.S. dollar ("USD").[19] Accordingly, the Canadian indirect purchaser settlement amounts are approximately $3,225,600 USD for Citigroup, and $69,160 USD for MUFG. Applying a population adjustment factor of 3.44 to those amounts to account for the larger population of the proposed Settlement Class states relative to the Canadian population,[20] a *pro-rata* estimate of a reasonable settlement amount in this matter based on the Canadian indirect purchaser settlement amounts is approximately $11,096,064 for Citigroup, and $395,850 for MUFG. The $9.95 million Citigroup Settlement here is therefore slightly smaller than a *pro-rata* estimate based on the court-approved Canadian Citigroup settlement, and the $985,000 MUFG Settlement is more than double the *pro-rata* estimate based on the court-approved Canadian MUFG settlement. However, while the Citigroup Settlement here was an "icebreaker," the Canadian settlements were largely reached at approximately the same time. Thus, the Canadian Citigroup and MUFG settlements further confirm the reasonableness of the Settlements here.

The Advisory Committee's comments to the 2018 Fed. R. Civ. P. 23 amendments note that courts often "forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results" in considering the reasonableness of proposed settlements. *Id.*

---

[19] *See* Federal Reserve Bank of St. Louis, US Dollar to National Currency Spot Exchange Rate for Canada, *available at* https://fred.stlouisfed.org/series/CCUSSP01CAM650N#0 (last visited May 27, 2019).

[20] The U.S. Census estimates that in 2013, the total population of Canada was 34.57 million, and the total population of the eight Settlement Class states was 118.98 million. *See* U.S. Census, Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2018, available at https://www.census.gov/data/tables/time-series/demo/popest/ 2010s-state-total.html (last visited May 17, 2019); U.S. Census, Demographic Overview – Canada, *available at* https://www.census.gov/data-tools/demo/idb/ region.php?N=%20Results%20&T=13&A=separate&RT=0&Y=2013&R=-1&C=CA (last visited May 17, 2019). Thus, the total population of the Settlement Class states is approximately 344.2 percent of the population of Canada.

In making this calculation, courts often compare the proposed settlement amount with the damages that would be awarded in the event of a "complete victory" by the plaintiffs, *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-cv-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004), and discount that by the "uncertainties of law and fact" and "the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart*, 396 F.3d at 119. While such a forecast cannot be done with "arithmetic accuracy," it may be useful as "a benchmark for comparison with the settlement figure." Fed. R. Civ. P. 23(e)(2) Adv. Comm. Notes. In *FOREX*, the plaintiffs have settled with all Defendants except for Credit Suisse. *FOREX* ECF No. 925, at 1. The *FOREX* plaintiffs' final settlement papers estimated that their total potential damages ranged from $8 to $10 billion for the period January 1, 2003 to December 15, 2015; and $5.4 to $7.0 billion for the period December 7, 2007 to December 31, 2013. *FOREX* ECF No. 925, at 17.[21]

Applying the state population and retail FX market share estimates (discussed above) to those *FOREX* damages estimates results in an estimated range for total damages in this Action of between $204 million (applying the lower 10 percent retail FX market share estimate and 37.7 percent state population factor to $5.4 billion) and $791 million (applying the 30 percent retail market share estimate and state population factor to $7.0 billion). As alleged in the SCCAC, the Settling Defendants represented 17.3 percent of the total market share of all sixteen Defendant groups as of 2013. *See* SCCAC ¶ 92. Therefore, the Settling Defendants' *pro-rata* estimated share of total damages for the proposed Settlement Classes in this Action is between $35.2 million (applying the lower 10 percent retail FX market share estimate, 37.7 percent state population factor, and 17.3 percent Settling Defendant market share estimate to $5.4 billion) to

---

[21] "The standard for evaluating settlement involves a comparison of single damages, not treble damages." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257-58 (D. Del. 2002) (citations omitted).

$140 million (applying the 30 percent retail market share estimate, state population factor, and 17.3 percent Settling Defendant market share estimate to $7.0 billion). Accordingly, the $10.935 million Settlement Fund here represents between 7.8 and 31.1 percent of the Settling Defendants' *pro-rata* share of potential damages. Compared to the risks facing Plaintiffs at the time of the Settlements, this is an outstanding result for the Settlement Classes.

In considering the reasonableness of Citigroup's settlement amount, Plaintiffs also note that the *FOREX* Citigroup settlement is approximately 7.3 percent of the lower end of the *FOREX* plaintiffs' estimated damages range ($5.4 billion), and the *FOREX* MUFG settlement is approximately 0.19 percent of the $5.4 billion damages estimate in *FOREX*. Here, Citigroup's proposed $9,950,000 Settlement is approximately 4.9 percent of the lower end of the estimated damages range for this Action noted above ($204 million), and the $985,000 MUFG Settlement is 0.48 percent of the $204 million damages estimate here. In other words, without accounting for the very different procedural postures of the cases when the settlements were reached, the proposed Citigroup Settlement here as a portion of estimated damages is only a few percentage points lower on a comparable basis than the Court-approved *FOREX* Citigroup settlement, and the MUFG Settlement amount here as a percentage of potential damages is more than double the comparable percentage in the Court-approved *FOREX* MUFG settlement. The fact that the Citigroup and MUFG Settlements here represent similar portions of estimated potential damages as the Citigroup and MUFG settlements that the Court has already approved in *FOREX* further confirms the reasonableness of the Settlements here.

The litigation risks are real. The Court just granted MUFG's Rule 12(b)(2) motion to dismiss, and shortly after the Settlement was entered with Citigroup, the Court had granted Defendants' Rule 12(b)(6) motion to dismiss without prejudice. Even if litigation continued

23

against Citigroup and MUFG, risks remain. The Settling Defendants would likely have argued that the evidence does not show an overarching price-fixing conspiracy but rather, at most, collusion with respect to individual trades. And even if an overarching conspiracy is established, Citigroup and MUFG would likely have argued they were not participants in that agreement. Plaintiffs believe the evidence will show a price-fixing conspiracy among all Defendants, but there was a risk that the Court or a jury would credit Defendants' arguments, resulting in a narrower case or outright dismissal. The governmental findings and allegations resulting in regulatory fines and guilty pleas are narrower in scope than the allegations in this Action and thus alone would not have sufficed to demonstrate liability with respect to Settling Defendants.

While Class Counsel are confident that they will present sufficient evidence to support a finding of classwide impact and damages, Settling Defendants would have vehemently opposed this argument. They also would likely have moved to exclude Plaintiffs' experts' opinions, arguing that Plaintiffs' proposed methods of estimating aggregate damages and classwide impact are unreliable.[22]

The certainty of the recoveries achieved by the Settlements weighs heavily in support of preliminary approval when weighed against the risks of establishing liability and damages against the Settling Defendants.

## V.   CERTIFICATION OF THE SETTLEMENT CLASSES IS APPROPRIATE

Pursuant to the terms of the Settlements, Plaintiffs respectfully request that the Court certify the Settlement Classes defined in the Proposed Order for settlement purposes. Certification of a settlement class is appropriate where that class meets all of the requirements of

---

[22] Settling Defendants have denied any liability to Class Plaintiffs. "Establishing otherwise [would] require considerable additional pre-trial effort and a lengthy trial, the outcome of which is uncertain." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012), *aff'd sub nom.*, *Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013).

Rule 23(a) as well as one of the requirements of Rule 23(b). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). A court asked to certify a class for settlement purposes only "need not inquire whether the case, if tried, would present intractable management problems." *Id*. at 620. The court's focus instead is "on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id*. at 621; *see also In re American Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012). The Court's analysis must be rigorous to ensure the Rule 23 requirements are met, *id.* at 237-38, but in doing so the court "must take a liberal rather than restrictive approach in determining whether the plaintiff satisfies these requirements and may exercise broad discretion in weighing the propriety of a putative class." *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 158 (E.D.N.Y. 2009).

### A.    Plaintiffs Satisfy the Rule 23(a) Requirements

For the reasons described below, all four Rule 23(a) requirements are satisfied here.

#### 1.    Numerosity

Numerosity is presumed in this Circuit where a class consists of 40 or more members. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs' Counsel estimate that there are at least tens of thousands of Settlement Class Members. Dell'Angelo Decl. ¶ 31; Bibbings Decl. ¶ 19 (providing a preliminary estimate of 99,138 Settlement Class members). The identities of the Settlement Class members are readily identifiable and ascertainable from existing records of RFEDs. Plaintiffs have served subpoenas on RFEDs requesting information sufficient to show the identities and transactions of the Class members. *See* Dell'Angelo Decl. ¶ 28. Accordingly, the numerosity requirement is easily met here.

#### 2.    Commonality

Commonality is established where a common contention "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "'Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *Johnson v. Nextel Communs Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (citation omitted).

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2019 WL 359981, at *37 (E.D.N.Y. Jan. 28, 2019) ("*Payment Card*"). Here, the overarching question is whether Class members were injured by Defendants' price-fixing conspiracy in the FX market. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *Id*. (citation and internal quotation marks omitted). Thus, the commonality requirement is satisfied here on the basis of that common question alone. *Id*. Plaintiffs' claims present numerous other common issues of law and fact, including: the participants of the alleged conspiracy; the duration of the alleged conspiracy and the acts carried out in furtherance of the conspiracy; whether the alleged conduct caused injury to Plaintiffs and the members of the Classes; the effects of the alleged conspiracy on the prices of FX Instruments sold during the Class Period; and the appropriate measure of damages to Plaintiffs and the Classes. Thus, the commonality requirement is satisfied.

### 3.    **Typicality**

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (citation and internal quotations omitted); *Payment Card*, 2019 WL

26

359981, at *38 (same). Small differences do not defeat typicality, "[r]ather, a plaintiff fails to meet Rule 23(a)'s typicality requirement if its claims are 'subject to unique defenses which threaten to become the focus of the litigation.'" *In re IMAX Secs. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (citation omitted). In sum, where "class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions" typicality is satisfied. *Payment Card*, 2019 WL 359981, at *38 (internal quotations and citations omitted).

Plaintiffs' and the Settlement Class Members' claims all arise from the same alleged unlawful conspiracy to artificially widen the spreads on, and otherwise manipulate the prices of, FX Instruments, and the injury resulting from that conduct. For each Settlement Class, the proposed Settlement Class Representatives' claims are the same as the claims of all members of their respective Class. Any differences as to the facts relevant to the claim of each Class Member or the damages suffered by each potential Class Member do not preclude a finding of typicality. *See In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification."). Thus, the typicality requirement is satisfied.

### 4.    Adequacy

"'The adequacy requirement is satisfied where: (l) there is no conflict between the proposed lead plaintiff and the members of the class; (2) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) class counsel is qualified, experienced, and generally able to conduct the litigation.'" *Atwood v. Intercept Pharm., Inc.*, 299 F.R.D. 414, 416-17 (S.D.N.Y. 2014) (citation omitted); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (class representatives "must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to

27

the interests of other class members"). "A conflict 'between named parties and the class they seek to represent' will be sufficient to defeat class certification only if the conflict is 'fundamental.'" *Langan v. Johnson & Johnson Consumer Cos.*, No. 13-cv-1470-JAM, 2017 WL 985640, at *12 (D. Conn. Mar. 13, 2017) (citation omitted).

No fundamental conflict exists between the proposed Settlement Class Representatives and members of their respective Settlement Classes. All seek overcharge damages for violation of substantially similar state antitrust and consumer protection laws under *Illinois Brick* repealer statutes arising out of the same anticompetitive conduct. Plaintiffs have already effectively represented the interests of the proposed Settlement Classes by selecting qualified Class Counsel, producing documents, and by regularly communicating with Class Counsel regarding developments in the litigation and the terms of the Settlements. Neither Plaintiffs nor Class Counsel have any interests antagonistic to those of the proposed Settlement Classes. Finally, proposed Settlement Class Counsel are "qualified, experienced, and generally able to conduct the litigation." *Payment Card*, 2019 WL 359981at *18 (quotation omitted). Class Counsel's adequacy is established by showing that they are experienced "in other similar litigation, and knowledge in the area of complex class actions." *Id*. Therefore, the adequacy of representation requirement is satisfied.

## B.   Plaintiffs Satisfy the Rule 23(b)(3) Requirements

In addition to satisfying all of the criteria of Rule 23(a), a party seeking class certification must also satisfy one of the requirements of Rule 23(b). *See Larsen v. JBC Legal Grp., P.C.*, 235 F.R.D. 191, 196 (E.D.N.Y. 2006). Certification of a class under Rule 23(b)(3) requires that: (i) common issues predominate over individual issues; and (ii) the class action mechanism be superior to other methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). For the reasons described below, both requirements are met here.

### 1.   Predominance

Much like other aspects of the Rule 23 standards for certification, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *AIG*, 689 F.3d at 239. This analysis differs depending on whether the certification is sought for litigation or settlement purposes. In the former, the court must determine whether litigating the class claims will pose "intractable management problems," but in the latter these management concerns "drop out" because with settlement, the "proposal is that there be no trial." *AIG*, 689 F.3d at 240. In the settlement context, the predominance "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem*, 521 U.S. at 623. As the Supreme Court has noted, in a settlement context "the predominance requirement of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that 'claims or defenses' of the named representatives must be 'typical of the claims or defenses of the class.'" *Id*. at n. 18.

Antitrust cases like this one are recognized as well suited for certification under Rule 23(b)(3) because they present issues that are capable of proof by generalized evidence that "are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Courts regularly certify antitrust claims under Rule 23(b)(3), in both litigation and settlement contexts, because issues concerning conspiracy are shared by all class members and these will predominate in any test of liability. *See, e.g.*, *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (finding predominant "all factual and legal questions that must be resolved to decide whether, assuming a plaintiff paid supracompetitive prices, that payment was caused by the defendants' antitrust violation and constitutes the kind of injury with which the antitrust laws are concerned"); *In re*

*Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."); *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." (citation omitted)). Here, all Settlement Class members would have to prove liability for Defendants' anticompetitive conduct through the use of generalized evidence, including the existence of the conspiracy and, for each state Settlement Class, whether that conspiracy violated the laws of each respective state. These issues go to the heart of the case concerning Defendants' conduct and antitrust liability and, therefore, they will predominate over other issues such as individual damages amounts. In sum, the predominance requirement for the Settlement Classes is clearly met here as "[a]ll plaintiffs [] claim injury that by reason of defendants' conduct . . . has caused a common and measurable form of economic damage" because "[a]ll claims arise out of the same course of defendants' conduct; [and] all share a common nucleus of operative fact, supplying the necessary cohesion." *AIG*, 689 F.3d at 240 (citation omitted).

### 2. <u>Superiority</u>

Rule 23(b)(3) identifies four factors to be considered in determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy":

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). Courts considering motions to certify settlement classes need not consider the fourth factor. *See Amchem*, 521 U.S. at 620.

All three of the relevant superiority factors weigh in favor of granting preliminary approval here. The interests of members of the Settlement Classes in individually controlling the prosecution of separate actions are minimal because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.

With respect to the second factor, although *FOREX* concerns the same price-fixing conspiracy as this Action, there are no other suits pending against Defendants that include the claims of the indirect purchaser Settlement Class members. Regarding the third factor, Plaintiffs have shown a desire to focus the litigation in this Court by filing the action in the Southern District of New York and by designating this case as related to *FOREX*, thereby allowing the Court to oversee both related actions. The Court is thoroughly familiar with the facts and legal issues of the case. Accordingly, the superiority requirement is satisfied and Plaintiffs have satisfied the requirements for certification of the proposed Settlement Classes.

### C.    The Court Should Appoint Class Counsel as Settlement Class Counsel

Under Fed. R. Civ. P. 23(g)(l), a court that certifies a class must appoint class counsel who is charged with fairly and adequately representing the interests of the class, considering: (l) the work undertaken by counsel in identifying or investigating the potential claims; (2) counsel's experience in handling class actions, other complex litigation, and similar claims; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. *Id*. Berger Montague PC ("Berger Montague") readily meets these requirements. Berger Montague initiated this litigation along with their co-counsel, McCulley McCluer PLLC, Schneider Wallace Cottrell Konecky Wotkyns LLP, and Peiffer Wolf Carr & Kane APLC, each of which also have extensive experience litigating antitrust class actions. As detailed in their firm

resume (Dell'Angelo Decl. Ex. J), Berger Montague PC is widely recognized as among the country's top antitrust litigation firms, having led numerous complex cases to successful conclusions, including some of the most successful antitrust cases of all time. Accordingly, Plaintiffs respectfully request that Berger Montague PC be appointed as Settlement Class Counsel ("Class Counsel").

## VI.   ADDITIONAL DETAILS IN SUPPORT OF PRELIMINARY APPROVAL

Rule III.C.5 of the Court's Individual Rules and Procedures for Civil Cases require parties moving for preliminary approval to provide additional information, including (a) the total Settlement Fund amount, (b) estimated claims administration fees, costs, and expenses, (c) proposed attorneys' fees, costs, and expenses, (e) the named Plaintiffs' proposed service awards, (f) any other deductions from the Settlement Fund, and (g) the settlement amount as a percentage of estimated potential classwide damages in the aggregate and per class member, *id.*, which Plaintiffs have provided herein and in the chart attached as Exhibit A to this Memorandum. As Plaintiffs receive more detailed data and information through discovery, they can further refine the estimates provided herein. *See generally FOREX*, 2015 WL 9952596, at *3 (deferring approval of notice and a plan of distribution until plaintiffs obtained the data and information necessary to identify and quantify the members of the settlement classes). However, Plaintiffs and their experts believe that these estimates are reliable. *See* Dell'Angelo Decl. ¶¶ 31, 35.

### A.   Proposed Plan of Allocation and Notice Forms

Plaintiffs are committed to distributing the Net Settlement Fund in a reasonable manner that maximizes the amount available for distribution to the proposed Settlement Classes.[23] Like the allocation plan the Court approved in *FOREX*, Plaintiffs propose that the funds be distributed

---

[23] "Net Settlement Fund" is defined in the Settlements as the balance of the Settlement Fund, net of any Court-approved administrative and notice expenses, attorneys' fees and expenses, and tax expenses. Citigroup Settlement § X, ¶ (c); MUFG Settlement § X, ¶ (f).

to members of the Settlement Classes *pro rata* based on each member's transactional volume, with adjustments to account for the dates and currency pairs corresponding to those transactions. *See FOREX* ECF No. 1095 (Order Approving the Plan of Distribution).

Because discovery from RFEDs recently began, Plaintiffs have not yet received all of the data and customer lists necessary to determine the identities and relevant transactions of all members of the Settlement Classes. A consolidated distribution of settlement funds will be more efficient and less costly than distributing funds for each individual settlement in the likely event that Plaintiffs reach settlement agreements with additional Defendants in the near future. Furthermore, because the damages claimed in this Action are a subset of the potential damages in *FOREX*, the Class sizes and potential damages and settlement amounts are more limited here than those in *FOREX*. Therefore, cost efficiency considerations here support delaying the claims and distribution stages to enable the Settlement Administrator to distribute the Citigroup and MUFG Settlement proceeds with funds that may be obtained for the Classes through additional settlements in the upcoming months. Additionally, as noted above, delaying notice several months is necessary to obtain class member identifying information and data from third parties and cost savings will be achieved if any additional settlement is included in the notice. *See generally Alaska Elec. Pension Fund*, 2017 WL 3868461, at *3 (deferring decision on plan of allocation and notice to "a later date" after the plaintiffs obtained the identities of settlement class members); *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *5 (S.D. Ill. Dec. 16, 2018) (plans of allocation should be "efficient, cost-effective, proportional and reasonable under the particular circumstances of this case"); *Newby v. Enron Corp.*, 394 F.3d 296, 310 (5th Cir. 2004) (affirming lower court's order granting preliminary approval of partial settlement and deferring motions for notice and attorneys' fees).

In *FOREX*, the plaintiffs moved for preliminary approval of partial settlements with nine of the sixteen Defendant groups but continued to litigate their claims against the remaining seven Defendant groups. *See FOREX* ECF No. 480 (Motion for Preliminary Approval of Settlements), at ix. The *FOREX* plaintiffs, noting that they had not yet obtained the data necessary to identify the members of their proposed settlement classes, proposed that the Court grant preliminary approval of the nine settlements while deferring the Plaintiffs' submission of proposed notice and allocation plans. *Id.* at 3-4. The Court agreed, granting preliminary approval of the partial settlements and ordering class counsel to submit proposed allocation and notice plans "at a later date." *FOREX*, 2015 WL 9952596, at *3. The *FOREX* plaintiffs subsequently reached settlements with six additional Defendant groups and postponed the scheduling of their motions for final approval, approval of their plan of distribution, and reimbursement of fees and expenses in order to efficiently administer the accrued settlements together. *See FOREX* ECF Nos. 820 (Motion for Preliminary Approval of Settlements with MUFG, Morgan Stanley, RBC, Société Générale, and Standard Chartered); and 875 (Motion for Preliminary Approval of Settlement with Deutsche Bank).

A similar settlement approval process is appropriate here. Plaintiffs are still in the process of obtaining the transactional data and Settlement Class member identifying information necessary to precisely quantify and obtain contact information for the members of the Settlement Classes that can be identified from available records. Accordingly, Plaintiffs propose that Plaintiffs' Motion for Approval of Notice and Plan of Allocation be temporarily deferred until 120 days after the Preliminary Approval Order.

Class Counsel have worked with economist Dr. Janet S. Netz to propose a model to allocate the Net Settlement Fund on a *pro rata* basis to the Settlement Class members who

submit timely and valid claims, as required by Rule III.C.5 of the Court's Individual Rules. *See* Dell'Angelo Decl. ¶¶ 35-37; Netz Decl. at 5-6. Much like the allocation plan that the Court approved in *FOREX*, the allocation methodology proposed here provides that the Net Settlement Fund will be distributed amongst the Class members *pro rata* according to each claimant's trading volume, adjusted for certain factors that potentially affected the amount by which the claimant's transactions were impacted by the Defendants' alleged manipulation of FX prices ("relative damages factors"). Netz Decl. at 2-6.

First, Dr. Netz determined that FX transactions with less liquid currency pairs (i.e., currency pairs that are less frequently traded) were likely more susceptible to the effects of the conspiracy than FX transactions involving more liquid currency pairs. *Id.* at 2-3. Accordingly, Class Counsel and Dr. Netz propose to group the various currency pairs that were traded by Class members during the Settlement Class Period according to their respective liquidity profiles: (1) most liquid, (2) liquid, (3) illiquid, and (4) pegged. *Id.* Each of these categories will be assigned multipliers for purposes of calculating claimant awards based on the liquidity level of each group. Claimant transactions for currency pairs that were relatively less liquid and therefore potentially more susceptible to manipulation receive relatively greater weight for purposes of calculating claim awards than the more liquid currency pairs. *Id.*

Second, it is anticipated that the evidence will show—as noted in the plaintiffs' motion for final approval of the *FOREX* settlements, *see* ECF No. 925—that FX trades occurring between December 1, 2007 (the start date of the Class Period specified in the Settlements) and December 31, 2013 (the end of the Class Period in the SCCAC) were relatively more impacted by the effects of the conspiracy than trades occurring in 2014 and later. *See* Netz. Decl. at 5.

Accordingly, Plaintiffs propose to discount trades occurring between January 1, 2014 and the end of the Settlement Class Period by 90 percent. *Id.*

Plaintiffs anticipate that they will obtain transactional data for many of the Settlement Class members sufficient for the Claims Administrator and Plaintiffs' experts to calculate *pro rata* claim amounts thereby limiting the need for Settlement Class members to submit detailed documentation in conjunction with their claim forms. Plaintiffs have issued third-party subpoenas requesting transactional data from approximately 60 RFEDs, and several RFEDs have already produced or are preparing to produce data responsive to those requests. Dell'Angelo Decl. ¶ 28. However, Plaintiffs also propose to provide claimants with the option to submit transactional records to support their claim in lieu of accepting the Claims Administrator's estimates. This "documented claim option" was also included in the plan of allocation that the Court approved in *FOREX*. The documented claim option will provide claimants with the option of having their claim amount calculated based on their own transactional records, which will be particularly useful for claimants with particularly large transactional volumes and for Settlement Class members for whom detailed transactional records are unavailable.

Finally, Plaintiffs propose that the plan of allocation provide for a minimum payment amount "a *de minimis* award" for claimants whose pro rata claim award would otherwise fall under a certain threshold. The *FOREX* plan of allocation provided that claimants with estimated claim values of $15 or less receive a *de minimis* award of $15. ECF No. 877-7 at 18. Plaintiffs will work with their experts to determine an appropriate *de minimis* award level here and will include additional details regarding that option in conjunction with Plaintiffs' formal Motion for Approval of Notice and Plan of Allocation, to be submitted 120 days after the Preliminary Approval Order, pursuant to the Settlement Schedule proposed below. Dell'Angelo Decl. ¶ 37.

36

**B.** **Proposed Forms of Notice to the Settlement Class Members**

Plaintiffs also respectfully request that the Court approve the same notice procedure that it approved with respect to the preliminary *FOREX* settlements here. *See FOREX*, 2015 WL 9952596, at *3. As noted above, Plaintiffs are currently in the process of obtaining Class member identifying information and transactional data from third parties, and much of that information will be necessary to prepare Plaintiffs' formal Notice Plan and Plan of Allocation. Accordingly, consistent with the Court's preliminary approval order in *FOREX*, *see FOREX*, 2015 WL 9952596, at *3, Plaintiffs propose to submit for the Court's approval a formal notice plan within 120 days of the Preliminary Approval Order. *See infra* § VI.F.

For purposes of the Court's preliminary approval of the Settlements, Plaintiffs have prepared proposed draft Long-Form and Short-Form Notices, attached respectively as Exhibits E and F to the Dell'Angelo Decl., to be disseminated to members of the Settlement Classes. The proposed notice forms each include a description of the case, the terms of the Settlements, and other information sufficient for Settlement Class members to intelligently and meaningfully participate, object, opt out, or otherwise comment on the Settlements. The Short-Form Notice directs Class members to a settlement website where additional details will be provided, and the Long-Form Notice includes numerous additional details, including the plan of allocation and all relevant settlement schedule dates. Plaintiffs seek approval of (1) a postcard Short-Form Notice which provides a cost-effective means of disseminating direct mail notice to the Settlement Class Members;[24] and (2) a Long-Form Notice to be posted on the settlement website and mailed or emailed to Settlement Class Members who request a copy.

---

[24] Plaintiffs' proposed Claims Administrator, Heffler Claims Group, estimates that using postcard notice will result in a cost savings of between $17,600 and $75,500, depending on the total number of Class members. *See* Dell'Angelo Decl. ¶ 32.

C.      **Fees, Costs, Expenses, Service Awards, and Claims Administration Costs**

In order to avoid burdening the Court and confusing the Class members with multiple fee and expense requests in the event that additional settlements are reached in the near future, Plaintiffs propose that motions for awards of attorneys' fees, reimbursement of costs and expenses, service awards, and reimbursement of claims administration costs also be deferred.[25] Plaintiffs do not intend to seek service awards for the proposed Settlement Class Representatives from these Settlements. Rather, Plaintiffs will submit a motion for attorneys' fees (not to exceed 20 percent with respect to the proceeds of the Citigroup and MUFG Settlements), as well as reimbursement of reasonable costs and expenses, in advance of Plaintiffs' motion for final approval of the Settlements, pursuant to the Settlement Schedule proposed below.[26]

Pursuant to Rule III.C.5(b) of the Court's Individual Rules, and based on the information currently available to Class Counsel and their experts, Plaintiffs' experts have prepared preliminary Class size estimates, and Class Counsel obtained preliminary estimates of claims administration costs from five well-respected potential claims administrators based on those estimates. *See* Dell'Angelo Decl. ¶ 32. After carefully comparing bids and notice plan proposals from those administrators, Plaintiffs propose the appointment of Heffler Claims Group ("Heffler") as the proposed Claims Administrator. As detailed in the Dell'Angelo Declaration, Heffler estimates that claims administration costs will range from $136,089 for a total Class size of 50,000 to $355,278 for a Class size of 200,000. *Id.* at 32. Actual costs will vary based on a variety of factors in addition to the total number of Class members, including the claims rate, the methods of publication and internet advertising notices, and other related factors. The estimated

---

[25] Pursuant to subpart (f) of Rule III.C.5(b) of the Court's Individual Rules, Plaintiffs believe that any additional Settlement expenses will be minimal but may include taxes and other escrow costs associated with administering the Settlement Fund.

[26] Plaintiffs reserve the right to seek additional attorneys' fees and service awards from future settlements and/or judgments. Counsel for Plaintiffs do not have any fee-sharing agreements subject to disclosure pursuant to S.D.N.Y. Local Civil Rule 23.1.

total number of Class members is 99,198. Bibbings Decl. ¶ 19. For a total Settlement Class size of 100,000, Heffler estimates that the total costs of publication notice, direct-mail postcard and email notice, internet notice including advertising the Settlements on social media and websites, and administering the claims will be approximately $209,902. Dell'Angelo Decl. ¶ 32. These cost estimates are based on a single consolidated notice and claims administration process, and would be multiplied if the process is repeated. *Id*. ¶ 33.

### D.    Settlement Fund and Anticipated Recovery

The Settlements provide for combined cash payments totaling $10,935,000. For purposes of subpart (e) of Rule III.C.5 of the Court's Individual Rules, and applying the preliminary Class size estimate discussed above of 99,198, Plaintiffs estimate that the average recovery per Class member provided by the gross Settlement Fund is $110.23.[27] As noted in Section VI.A above, the actual amount distributed to each claimant will vary based on the claimant's total volume of transactions, the currency pairs and time periods for those transactions, and the number of Class members who file a claim. Plaintiffs anticipate that they will be able to provide an updated estimate of the total number of Class members upon receipt of additional third-party discovery information from the relevant RFEDs. Applying the estimates detailed above for potential classwide damages in this Action based on the estimates submitted in the *FOREX* plaintiffs' final settlement approval papers, for a total Settlement Class size of 99,198, the per-Class member estimate for actual damages is between $2,056 (using the more conservative $204 million damages estimate) and $7,974 (using the higher $791 million damages estimate). Importantly, the Settlements do not impair Plaintiffs and the Class members from recovering the entirety of

---

[27] Deducting the 20 percent maximum attorneys' fees request and estimated claims administration costs of $209,902 results in a Net Settlement Fund of $8,538,098, not including reimbursement of attorney expenses. Thus, the estimated average recovery per Class member provided by the Net Settlement Fund is $86.07.

their actual damages from the Non-Settling Defendants, including damages arising out of transactions involving FX Instruments that were indirectly purchased from Settling Defendants.

### E.    Appointment of Escrow Agent

The Settlements provide that Settling Defendants shall pay the respective Settlement Amounts in full within fifteen business days of the Preliminary Approval Order. *See* Citigroup Settlement § X, ¶ (b); MUFG Settlement § X, ¶ (b). Pursuant to the Settlements, Plaintiffs respectfully request that the Court approve the settling parties' selection of Huntington National Bank as Escrow Agent. A proposed Escrow Agreement is attached as Exhibit G to the Dell'Angelo Decl.

### F.    Proposed Settlement Schedule

Finally, pursuant to the provision of Rule III.C.5(b) of the Court's Individual Rules, Plaintiffs submit a proposed schedule (the "Settlement Schedule"), set forth in paragraph 34 of the proposed Preliminary Approval Order submitted with this Motion, to establish a schedule for settlement events from Plaintiffs' Motion for Approval of Notice and Plan of Allocation through final approval and the deadline for submitting claims. Consistent with the settlement schedule ordered by the Court in *FOREX*, *see FOREX* ECF Nos. 1114, 1140, the proposed schedule here provides additional time for Plaintiffs to obtain Settlement Class member identifying information and transactional data necessary to file their Motion for Approval of Notice and Plan of Allocation.

## VII.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for preliminary approval of the Settlements.

Dated: May 29, 2019                                  Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Michael J. Kane
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net
mkane@bm.net
jripley@bm.net

*Proposed Settlement Class Counsel*

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL**
**KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Classes*

Joseph C. Peiffer
**PEIFFER WOLF CARR & KANE, APLC**
201 St. Charles Ave. Suite 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504) 523-2464
jpeiffer@pwcklegal.com

*Counsel for Plaintiffs and the Proposed Classes*

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
1022 Carolina Boulevard, Suite 300
Charleston, SC 29451
Tel: (855) 467-0451
Fax: (662) 368-1506
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*