J7P8CONC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JAMES CONTANT, et al.,

              Plaintiffs,              New York, N.Y.

         v.                            17 Civ. 3139 (LGS)

BANK OF AMERICA CORPORATION,
et al.,

              Defendants.
------------------------------x

                                       July 25, 2019
                                       11:05 a.m.
Before:
               HON. LORNA G. SCHOFIELD,

                                       District Judge

                         APPEARANCES

BERGER MONTAGUE PC
     Attorneys for Plaintiffs
BY:  MICHAEL C. DELL'ANGELO

SCOTT & SCOTT, LLP
     Attorneys for Plaintiffs (FX case)
BY:  KRISTEN ANDERSON

SHEARMAN & STERLING LLP
     Attorneys for Bank of America Defendants
BY:  NINA SHETH

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
     Attorneys for Defendant The Bank of Tokyo
     Mitsubishi UFJ Ltd.
BY:  KENNETH A. GALLO
     ANAND SITHIAN
```

APPEARANCES (Cont'd)

SULLIVAN & CROMWELL, LLP
     Attorneys for Barclays Bank Defendants
BY:  NIKOLAI KRYLOV

ALLEN & OVERY, LLP
     Attorneys for BNP Paribas Group Defendants
BY:  LAURA R. HALL

COVINGTON & BURLING, L.L.P.
     Attorneys for Citigroup Defendants
BY:  ANDREW A. RUFFINO

CAHILL GORDON & REINDEL LLP
     Attorneys for Credit Suisse Defendants
BY:  MARGARET A. BARONE
     DAVID G. JANUSZEWSKI

KING & SPALDING LLP
     Attorneys for Deutsche Bank Defendants
BY:  JOSEPH SERINO JR.
     GEORGE P. MONTGOMERY

CLEARY GOTTLIEB STEEN & HAMILTON
     Attorneys for Goldman Sachs Defendants
BY:  RUSSELL A. MAWN

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for JPMorgan Chase Defendants
BY:  TANSY WOAN

MOORE & VAN ALLEN, PLLC
     Attorneys for RBC Capital Markets Defendants
BY:  JOSHUA D. LANNING

LINKLATERS, LLP
     Attorneys for Defendant Societe Generale S.A.
BY:  PATRICK C. ASHBY

1               (Case called)
2               THE DEPUTY CLERK:  Counsel, please state your name for
3       the record.
4               MR. DELL'ANGELO:  Michael Dell'Angelo on behalf of
5       plaintiffs.
6               MR. RUFFINO:  Andrew Ruffino, from Covington &
7       Burling, for the Citi defendants.
8               MR. GALLO:  Ken Gallo, from Paul Weiss, MUFG, Bank of
9       Tokyo.
10              MR. SITHIAN:  Anand Sithian, from Paul Weiss, also for
11      MUFG, Bank of Tokyo.
12              MR. KANE:  Michael Kane, from Berger Montague, on
13      behalf of the Contant plaintiffs.
14              MS. ANDERSON:  Kristen Anderson, from Scott & Scott,
15      on behalf of plaintiffs in the consolidated FX case.
16              THE COURT:  Good morning.
17              So we are here on plaintiffs' motion for preliminary
18      approval of a settlement.  The relief requested is to
19      preliminarily approve the proposed settlement, certify the
20      proposed settlement classes, appoint the named plaintiffs as
21      class representatives, appoint Berger Montague as settlement
22      class counsel, approve the selection of an escrow agent, and
23      stay all proceedings with regard to the two, broadly speaking,
24      settling defendants, except as to the discovery of the settling
25      defendants by the nonsettling defendants, and that's pursuant

1  to a letter I have from the nonsettling defendants dated June
2  24, 2019.
3            So I will be happy to hear from the plaintiff.
4            MR. DELL'ANGELO:  Thank you.  Good morning again, your
5  Honor.  Michael Dell'Angelo, from Berger Montague, on behalf of
6  the plaintiffs.
7            So we are pleased to present to your Honor for
8  preliminary approval two settlements.  One, broadly speaking,
9  with Citibank, and the other with what I will refer to as MUFG,
10 Bank of Tokyo.  The settlement with Citibank is for $9.95
11 million and the settlement with MUFG is for $985,000.
12           For the reasons that we have detailed at some length
13 in our papers -- and I will be happy to go through those, as
14 you wish, your Honor -- we believe that the two proposed
15 settlements are fair, reasonable and adequate.
16           With respect to the timing, generally, an important
17 point I think for consideration with respect to these
18 settlements is that the Citibank settlement was reached while a
19 joint Rule 12(b)(6) motion that included Citibank was pending,
20 so there was considerable uncertainty with respect to whether
21 or not Citibank would remain as a defendant in the case.  As
22 the Court, I am sure, is well aware, that motion was granted.
23 So from the risk-waiting perspective of the plaintiffs, at
24 least as of that time, there was considerable sort of sense in
25 the decision we reached to make that settlement.  Ultimately,

1   the Court granted leave to amend and all of the nonsettling
2   defendants were then brought back into the case.
3           A similar circumstance with respect to MUFG.  That
4   settlement was reached while a Rule 12(b)(2) motion was pending
5   with respect to MUFG and a number of other foreign defendants.
6   Shortly after the parties reached their agreement, the Court
7   rendered a decision on the 12(b)(2) motion.  A number of
8   defendants remained in the case; their 12(b)(2) motion was
9   denied.  However, with respect to a number of defendants, that
10  motion was granted, and included among the defendants as to who
11  the motion was granted was MUFG.
12          THE COURT:  But the settlement remained unchanged; in
13  other words, the parties stuck with the settlement and with the
14  amount of the settlement.
15          MR. DELL'ANGELO:  That is correct, your Honor, it
16  remained unchanged.  The understanding among the parties with
17  respect to the settlement is there was a fairly common term,
18  which is that at the time the MOU, or memorandum of
19  understanding, was entered, subsequent events would not change
20  the terms of the settlement and the parties would agree to go
21  forward.
22          Particularly with respect to Citibank, it is what we
23  generally characterize as an icebreaker settlement, one having
24  been made relatively early in the proceedings and for which, in
25  the calculation of plaintiffs' counsel and the defendants, the

settling defendant in that instance, there is some reduction in the total consideration, on the theory that it's an early settlement, parties are getting out early, it may signal to other defendants the path with respect to how to resolve the larger case, and as the Court is aware, there are many defendants in this case.

There has been no opposition to the proposed preliminary settlements as of this time. As the Court noted, the defendants have requested a modification to the proposed order with respect to any decision the Court may make as it relates to class certification for litigation purposes, not settlement purposes. Plaintiffs have no objection whatsoever to those modifications, having conferred with the defendants in advance.

The negotiations themselves, as we have indicated in our papers, were arm's-length, by experienced attorneys on both sides. They were, I can attest, quite hard-fought and driven by a rather detailed analyses that we have continued to enhance and have, I think, reaffirmed the decisions we made and the numbers that we reached in the course of the settlements. A lot of that is laid out in our papers, and I will touch on that.

THE COURT: Just a question, which really goes back to the underlying claims. What you're settling are state claims, as I understand it, with respect to plaintiffs who reside in, I

1     think, eight states?

2              MR. DELL'ANGELO:  That's correct.

3              THE COURT:  How were those states selected?

4              MR. DELL'ANGELO:  So there are a number of
5     considerations that went into the decision to assert claims on
6     behalf of persons or entities who resided in those states or
7     traded in those states.

8              So just to be clear, the pending complaint has
9     proposed class representatives and asserts claims on behalf of
10    eight proposed state classes, and the settlements track exactly
11    those eight states.

12             So because this is an indirect antitrust class action,
13    we are limited first to the states that have repealer statutes,
14    or have some other path for a plaintiff in those states to
15    bring an indirect claim, because --

16             THE COURT:  It couldn't otherwise.

17             MR. DELL'ANGELO:  Right.  Illinois Brick doesn't
18    permit it unless the state has enacted a repealer statute.

19             Beyond that, there is, of course, an analysis of the
20    underlying state law claims, and really is also driven by a
21    function of the persons or entities that retained us as counsel
22    to bring claims.  There certainly are other states that may
23    have repealer statutes, such that an indirect antitrust
24    purchaser claim could be asserted, but we have not been
25    retained by plaintiffs in those states, and because we don't

1    represent them, we haven't included them in the settlement.

2    THE COURT:  OK.  I am sorry I interrupted you.

3    MR. DELL'ANGELO:  No.  Thank you for the question.

4    In summary, I indicated the amounts of the
5    settlements.  All the terms between the two settlements are
6    nearly identical.  They provide for considerable cooperation,
7    some of which has already begun, as the settlement agreements
8    trigger cooperation, such as the exchange of certain documents
9    and transactional data.  That process is already underway and
10   has been of considerable value to the class.

11   There are additional cooperation provisions that would
12   be triggered under the settlement agreements, when and if the
13   Court were to grant preliminary approval, which we also believe
14   are of considerable value to the plaintiffs in the class, that
15   will facilitate in many ways some of the discovery that we wish
16   to take and help shape the case, as well as give us insight
17   into how we will shape the case going forward that might not
18   otherwise be available at this stage of the proceedings.  And
19   then, of course, there are mutual releases.

20   So in making a determination about whether or not the
21   settlements were fair, reasonable and adequate, we looked at
22   the settlements in a number of different ways, as we have
23   detailed in our papers.  Those include comparing the
24   settlements in this case to those in the consolidated FX case,
25   which I think we generally refer to as the FOREX case.  Also

looking at the settling defendants' pro rata share of the total damages relative to the amounts they agreed to settle for in this case.

          We also looked at the Canadian FX settlements, both Citi and Bank of Tokyo.

          THE COURT:  Tell me a little bit about that action.  I don't really recall any details.

          MR. DELL'ANGELO:  Sure.  There was a class action filed in Canada, and it is my understanding filed in several different provinces because they have a different system than our federal system that brings all the cases.  So there were cases, I believe, in different provinces that were effectively consolidated for settlement purposes.

          THE COURT:  Were you involved in those cases?

          MR. DELL'ANGELO:  I was not.  We have just tracked them.

          THE COURT:  Do you know who the plaintiffs' firm was in those cases?

          MR. DELL'ANGELO:  We certainly know who they are, yes.  But we haven't had any role whatsoever in those cases.

          THE COURT:  Can you tell me who they were?

          MR. DELL'ANGELO:  The best of my recollection -- we do cite the case names in our papers -- there is a firm by the name Siskinds.  Sotos LLP is one of the other firms.

          THE COURT:  So, basically, Canadian firms and not U.S

1    firms with offices in Canada.
2            MR. DELL'ANGELO:  No.  My understanding is these are
3    Canadian firms that brought antitrust claims in Canada against
4    effectively the same group of defendants, save some minor
5    differences.
6            THE COURT:  And both direct and indirect claims, I
7    think you said.
8            MR. DELL'ANGELO:  That's an interesting point, and we
9    tried to detail that in our papers.  In Canada, as we
10   understand it, the way antitrust claims get brought, there is
11   not a distinction at the pleading stage between direct and
12   indirect, and they don't have the Illinois Brick rule that we
13   have.  So when the cases were settled with Citi and MUFG and
14   the other defendants in the Canadian action, the Canadian
15   counsel -- we understand from studying their papers, as well as
16   the notices that they provided, which were very similar to the
17   US style of notices to the class -- they allocated 80 percent
18   of the settlement amount to the direct purchaser plaintiffs and
19   20 percent to the indirect purchaser plaintiffs.  And so that
20   gave us a very clear set of metrics that we could look at, and
21   look at the dollar amount that Citi paid, back out 20 percent
22   for the indirect purchasers; we made some adjustments for
23   population because the population of Canada is larger than the
24   population of the eight states.
25           THE COURT:  Oh, really.  I thought you adjusted the

1  population to the US population and then you adjusted that
2  number down, but it doesn't matter at all.
3          MR. DELL'ANGELO: We went through this formula to try
4  to get as close to a one-to-one comparison to look at the
5  reasonableness. So that is one of the other ways that we
6  looked at it. We tried to look at the settlements from a
7  variety of different perspectives to kind of make sure, no
8  matter how we looked at it, we were within the range of
9  reasonableness for those.
10         THE COURT: So what I understood is that there are
11 basically three perspectives from which you looked at it. One
12 was a comparison to the Citi and MUFG settlements in the FOREX
13 case; and then the Citi and MUFG settlements in the Canadian
14 case; and then there was some further analysis and adjustment
15 for the icebreaker role of Citibank.
16         MR. DELL'ANGELO: That's correct. And there is
17 another way in which we looked at it as well. We looked at the
18 total damages that were estimated in the FOREX case and that
19 were relied on by the parties in this court with respect to
20 what the range of total damages in that case were. We then
21 made an estimate of what percentage the retail market in this
22 case consists of, a subset of those damages in the FX case, and
23 then made the other adjustments we talked about looking at
24 population size. And then we looked at the share of the market
25 that the settling defendants have so we can see what is the

1    total percentage of damages in this case that the settling

2    defendants represent.  So we also took this pro rata share of

3    damages approach as well.

4               THE COURT:  Thank you.

5               I know that this has taken both some time and some

6    money to develop the data, and I know that you are being

7    responsive to my concerns at our prior hearing that there

8    wasn't enough for me to make a determination of reasonableness.

9    So thank you very much for that.

10              A question I am curious about, though, is:  So as you

11   were sitting at the negotiating table, as I understand it, you

12   didn't have all of this data.  How did you know when you

13   arrived at a good number?

14              MR. DELL'ANGELO:  In many ways, we did have most of

15   this data.  I will tell you that -- first of all, we had most

16   of the data.

17              THE COURT:  So what did you have?

18              MR. DELL'ANGELO:  Well, I will say that we -- and I

19   appreciate you recognizing the efforts we have taken to kind of

20   document this for you, in light of your concerns at the prior

21   preliminary approval hearing.  We are exquisitely sensitive to

22   those considerations.

23              I can't think of any data point that we did not have

24   when we were entering into the settlement with Citi.  So just

25   by way of example, we knew what the damages estimate range was

in the FX case.  We know what eight states were dealing with.
We knew what the population of those eight states was and how
to back that out.  We had, in conjunction with Dr. Osler,
already estimated the retail market share, and we have provided
more detail in our papers about that.  We had independently
analyzed what we thought the class size was, and we then went
back with Mr. Bibbings, whose expert report is before you, to
get a more, I guess, robust data-driven perspective from the
expert, but it largely tracked what we already believed about
the size of the market.

         The other thing I will add is, one thing that was
particularly helpful, for as hard-fought as the negotiations
were, the first being with Citibank, Citibank also participates
through a separate entity in the retail market.  So they also
had a lot of perspective that they provided to us to help shape
the negotiation.

         THE COURT:  I didn't understand what you just said.

         MR. DELL'ANGELO:  Citibank also has a unit that
engages in retail foreign exchange dealing.  And if you look at
Mr. Bibbings' declaration, for example, one of the data points
that he relies on to kind of confirm his conclusions is the
Citibank reports about the number of retail FX traders in the
market.  So in the exchange with Citibank, we may not have
ourselves at that time developed as precise a calculation as we
have now, but we were getting the same information that we are

1   presenting to you now from Citi in the course of the
2   negotiations to form the ideas that we had about what the
3   appropriate amounts were.
4           I am happy to say, frankly, that we got it right, and
5   I think we now have the analyses to provide that to you, in
6   light of your questions, that spell that out quite explicitly,
7   and that's what you see in the submission.  I would be happy to
8   walk through those if you like.
9           THE COURT:  I spent some time reading them yesterday.
10  I am not sure it's a useful exercise to go through it again.
11          MR. DELL'ANGELO:  I appreciate that, your Honor.
12          So you having laid out the precise relief that we were
13  requesting, unless your Honor --
14          THE COURT:  Here is the last question.  I know that
15  you have asked to defer approval of the form of notice and the
16  plan of notice in order to get class member identifying
17  information, and I know that you are also wanting to defer the
18  plan of allocation, in part because of the prospect of having
19  additional settlements, and that's obviously something that I
20  did in FOREX and I am not uncomfortable with.
21          You have also given me a proposed schedule, and if I
22  were to follow your schedule, and if I were to issue an order
23  approving the settlement and granting the relief you request
24  here, about when would we have the submission from you of your
25  motion for final approval?

|  |  |
|---|---|
| 1 | MR. DELL'ANGELO:  So that is laid out -- |
| 2 | THE COURT:  I am looking at it, but it's 30 here and |
| 3 | 60 there, and they run off each other's dates.  So I am just |
| 4 | sort of looking for a general bottom line, if that's possible. |
| 5 | MR. DELL'ANGELO:  Right.  I am looking at the |
| 6 | schedule.  So the submission of the motion for final approval |
| 7 | is 90 days after the notice date.  Notice date is the |
| 8 | completion of notice, which is as it's defined.  The notice |
| 9 | date is 60 days after the Court -- |
| 10 | THE COURT:  So that's five months.  90 days plus 60 |
| 11 | days. |
| 12 | MR. DELL'ANGELO:  The motion for approval of the |
| 13 | notice and the plan of allocation is not more than 120 days |
| 14 | after the Court grants preliminary approval. |
| 15 | THE COURT:  Let's just stop there. |
| 16 | You would like to wait to do your plan of allocation |
| 17 | until you have whatever other settlements are likely to occur, |
| 18 | and you're asking for 120 days.  My only question is, how |
| 19 | likely is that to happen, how realistic is that time frame? |
| 20 | MR. DELL'ANGELO:  There are a couple of things.  I |
| 21 | think that there is a reasonable likelihood that we may achieve |
| 22 | at least one additional settlement during that time.  But more |
| 23 | importantly, the other thing that we would like to do during |
| 24 | that time frame is to gather as much detailed data from |
| 25 | third-party retail foreign exchange dealers as we can. |

|   |   |
|---|---|
| 1 | We have issued, I believe, 66 subpoenas to third-party |
| 2 | RFEDs, as they call them, retail foreign exchange dealers, that |
| 3 | we believe the class members transacted with during the class |
| 4 | period.  To the extent that they have the data, and we can get |
| 5 | it through this third-party process, what that would provide us |
| 6 | with are names and addresses for class members.  That process |
| 7 | is excruciating, to say the least, but we are making |
| 8 | significant progress and we are on the cusp of getting data |
| 9 | from several of the largest ones.  Once we get that data and |
| 10 | process it with the names and addresses, what that will allow |
| 11 | us to do is provide direct mail notice to class members. |
| 12 | We would also like to do publication notice, and I |
| 13 | think there are a number of good reasons to do that here.  But |
| 14 | the more data and information we get with specific class member |
| 15 | identities, the better notice that we can provide.  And I think |
| 16 | that we can satisfy Rule 23(c) regardless of how we proceed. |
| 17 | THE COURT:  Just so I am clear, I presume that you're |
| 18 | doing the same thing that was done in FOREX, which is you're |
| 19 | not restricting the class to plaintiffs who demonstrably were |
| 20 | injured by these particular defendants' actions; is that right? |
| 21 | MR. DELL'ANGELO:  Dr. Netz has provided -- we provided |
| 22 | a report by her that talks about the proposed outlines of the |
| 23 | plan of allocation.  So the approach is that there was an |
| 24 | overcharge as a result of the conspiratorial conduct, and that |
| 25 | if you were transacting during the time period that is the |

1  settlement class, you, as we propose now, would have the right
2  to submit a claim. And going back to what we are doing with
3  the RFEDs, for those that we can get detailed trading data for
4  the class members, as well as the names and addresses, we can
5  get quite specific, and for others we anticipate the class
6  members may have that data where we can't get it from the
7  RFEDs.
8       THE COURT: So you're leaving yourself with 120 days.
9  There are many, many, many defendants left. I don't know what
10 the prospect of settling with any of them are, but I presume
11 you don't want to go through the notice process twice, or the
12 claims process twice. So how realistic is the 120 days?
13      MR. DELL'ANGELO: Well, the primary consideration,
14 from our point of view, is using that time -- the real driver
15 here is getting as much data as we can. I think that there are
16 realistic prospects to reach some settlements. Particularly
17 given the fact that some have not settled even in the FOREX
18 case, I think it's unlikely that we would have a global to
19 present to the Court.
20      THE COURT: I understand.
21      MR. DELL'ANGELO: So, yes, we certainly don't want to
22 confuse the class; we don't want to create difficulties for the
23 class, but we were sensitive to what the rules require, and
24 what we were hearing from the Court about moving this process
25 and making sure the class members were aware and receiving

1    notice and understanding the settlements.

2    From our perspective, the most important thing is
3    getting preliminary approval established so that we can
4    provide -- not only can we get the cooperation going, but we
5    also think it's important, and I will certainly let the
6    settling defendants speak to this in greater detail, but from
7    our perspective, part of the deal, of course, is that they have
8    settled, they are out of the case, they essentially function
9    like third parties, and without preliminary approval, ideally
10   pointing toward final approval, that being what the standard
11   and effect is, it puts them in a state of limbo not having some
12   guidance on the preliminary approval, which then makes it more
13   difficult.

14   THE COURT: I understand.

15   MR. DELL'ANGELO: It also makes it more difficult for
16   defendants who may wish to settle to come to the table, on the
17   theory that they don't know where the Court is going with
18   preliminary approval. But I don't think it's essential from
19   our perspective that that notice go out and the plan of
20   allocation go forward. There are efficiencies to be gained by
21   holding off on that, but we were being sensitive to moving the
22   process along on some of the issues that you had raised in the
23   past.

24   THE COURT: The timeline you have presented seems very
25   reasonable to me, but I also presume that if a modest extension

1  would result in more efficiency, you would ask for such an
2  extension, and you shouldn't think that I am precluding that in
3  any way.  I am actually inviting it.
4          MR. DELL'ANGELO:  Thank you, your Honor.
5          THE COURT:  Let me see if I have any other questions.
6          As I understand it, the plan of allocation, at least
7  conceptually, is very similar to the plan of allocation in the
8  FOREX case, in that it's essentially pro rata based on
9  transactional volume, but there are adjustments for currency
10 pairs, also the period of time when the people traded, and I
11 think those are the big drivers.
12         MR. DELL'ANGELO:  Yes.  You're absolutely right, your
13 Honor.  And to be a little more specific, essentially how
14 liquid a currency pair was or whether or not it was pegged will
15 have, and as Dr. Netz demonstrates, could have a significant
16 impact on what the damages are.  So we have taken that into
17 account as well.  So we have tried to track with our own
18 independent work what made sense to do in FOREX and this Court
19 looked to as appropriate.  So that's correct.
20         THE COURT:  All right.  I don't think I have any other
21 questions.  I have a request.
22         MR. DELL'ANGELO:  OK.
23         THE COURT:  And I am not sure if I should make the
24 request of you or some nonsettling defendant, but what I would
25 like is a Word version of your proposed order with the

J7P8CONC

1  additions that the nonsettling defendants have made that you
2  have agreed to.
3          MR. DELL'ANGELO:  OK.
4          THE COURT:  If you could just e-mail that to the
5  chambers inbox as well as file it.  And to avoid complications
6  with the docketing office, if you make an attachment to the
7  letter, there shouldn't be any issues.
8          MR. DELL'ANGELO:  OK.  We would be happy to prepare
9  that, your Honor.  We will pass it by the defendants to get
10 their approval, and we'd be happy to submit that for your
11 consideration.
12         THE COURT:  OK.  The sooner the better.
13         MR. DELL'ANGELO:  We will try to get that done today.
14         THE COURT:  Thank you.
15         Anything else from anyone?
16         MR. RUFFINO:  Nothing to add for Citi, your Honor.
17         MR. GALLO:  No, your Honor.
18         THE COURT:  We are adjourned.  Thank you.
19         (Adjourned)
20
21
22
23
24
25