# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONTANT, *et al.*, | |
| Plaintiffs, | Civil Action No. 17-cv-3139-LGS |
| v. | (related to No. 13-cv-7789-LGS) |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS AND CERTIFICATIONS OF THE PROPOSED SETTLEMENT CLASSES FOR SETTLEMENT PURPOSES

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................... 1

II.     PROCEDURAL HISTORY.................................................................................... 3

III.    OVERVIEW OF THE SETTLEMENT NEGOTIATIONS AND TERMS ...................... 4

        A.    Overview of the SC Settlement Negotiations and Settlement ................................4

        B.    Overview of the SG Settlement Negotiations and Settlement ................................8

IV.     THE SETTLEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT TO
        GRANT PRELIMINARY APPROVAL ........................................................................ 9

        A.    Legal Standards for Preliminary Approval ............................................................9

        B.    The Proposed Settlements Are Entitled to a Presumption of Fairness .................11

              1.    The Complexity, Expense, and Likely Duration of the Litigation .......... 12

              2.    The Reaction of the Classes to the Settlements ....................................... 12

              3.    The Stage of the Proceedings................................................................... 13

              4.    The Risks of Establishing Liability and Damages ................................... 14

              5.    The Risks of Maintaining the Class Action Through Trial...................... 15

              6.    The Ability of Defendants to Withstand a Greater Judgment................... 16

              7.    The Reasonableness of the Settlements in Light of the Best Possible
                    Recovery and the Attendant Risks of Litigation....................................... 17

V.      CERTIFICATION OF THE SETTLEMENT CLASSES IS APPROPRIATE ............... 22

        A.    Plaintiffs Satisfy the Rule 23(a) Requirements....................................................23

              1.    Numerosity................................................................................................ 23

              2.    Commonality............................................................................................. 23

              3.    Typicality.................................................................................................. 24

              4.    Adequacy .................................................................................................. 25

        B.    Plaintiffs Satisfy the Rule 23(b)(3) Requirements...............................................26

              1.    Predominance............................................................................................ 26

i

2.      Superiority...............................................................................28

C.      Settlement Class Counsel.........................................................................29

VI.     ADDITIONAL DETAILS IN SUPPORT OF PRELIMINARY APPROVAL................ 29

A.      Proposed Plan of Allocation and Notice Forms......................................30

B.      Proposed Forms of Notice to the Settlement Class Members..............................33

C.      Fees, Expenses, Service Awards, and Claims Administration Costs ...................35

D.      Settlement Fund and Anticipated Recovery ..........................................36

E.      Appointment of Escrow Agent ...............................................................37

F.      Proposed Settlement Schedule.................................................................37

VII.    CONCLUSION.................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund*,
  2017 WL 3868461 ........................................................................................... 30, 32

*Allen v. Dairy Farmers of Am., Inc.*,
  No. 09-cv-230, 2011 WL 1706778 (D. Vt. May 4, 2011) ...................................... 10

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................................... *passim*

*Atwood v. Intercept Pharm., Inc.*,
  299 F.R.D. 414 (S.D.N.Y. 2014) ......................................................................... 25

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  No. 07-cv-2207-JGK, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) ....................... 15

*Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*,
  No. 85-cv-3048-JMW, 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ......................... 15

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
  504 F.3d 229 (2d Cir. 2007) .............................................................................. 24

*Charron v. Pinnacle Grp. N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012) ................................................................ 22

*Cohen v. J.P. Morgan Chase & Co.*,
  262 F.R.D. 153 (E.D.N.Y. 2009) ....................................................................... 22

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................................... 15

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ................................................................................ 23

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
  502 F.3d 91 (2d Cir. 2007) ................................................................................ 27

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) .............................................................................. 25

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ................................................................... 2, 3, 9, 17

*Fleisher v. Phoenix Life Ins. Co.*,
  No. 11-cv-8405-CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ..................... 10

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   2015 WL 9952596 (S.D.N.Y. Dec. 15, 2015) ...................................................... 10, 29, 30, 33

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   2015 WL 4171032 (S.D.N.Y. Sept. 3, 2019)......................................................................... 16

*In re American Int'l Group, Inc. Sec. Litig.*,
   689 F.3d 229 (2d Cir. 2012)................................................................................ 22, 26, 27, 28

*In re AOL Time Warner, Inc.*,
   No. 02-cv-5575-SWK, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ................................. *passim*

*In re Austrian and German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000).................................................................................... 11

*In re CitiGroup Inc.*,
   296 F.R.D. 147 (S.D.N.Y. 2013) .......................................................................................... 16

*In re Global Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) .......................................................................................... 10

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) .............................................................................. 13, 16, 17

*In re IMAX Secs. Litig.*,
   272 F.R.D. 138 (S.D.N.Y. 2010) .......................................................................................... 24

*In re Initial Pub. Offering Sec. Litig.*,
   226 F.R.D. 186 (S.D.N.Y. 2005) .......................................................................................... 10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2016 WL 7625708 ................................................................................................................ 16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   No. 11-md-2262-NRB, 2014 WL 6851096 (S.D.N.Y. Dec. 2, 2014) ...................................... 9

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................................................... 11

*In re Michael Milken and Assocs. Sec. Litig.*,
   150 F.R.D. 57 (S.D.N.Y. 1993) ............................................................................................ 11

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................................... 15, 17

*In re Packaged Ice Antitrust Litig.*,
   No. 08-MD-01952, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011)......................................... 10

*In re PaineWebber Ltd. Pships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ........................................................................... 10, 11

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
    2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) ........................................................ 23, 24

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) ........................................................................ 25

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    584 F. Supp. 2d 697 (M.D. Pa. 2008) ....................................................................... 16

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ............................................................................. 10

*In re Top Tankers, Inc. Sec. Litig., 06-cv-1376-CM*,
    2008 WL 2944620 (S.D.N.Y. July 31, 2008) ........................................................... 14

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ............................................................................... 27

*In re Vitamin C Antitrust Litig.*,
    No. 06-MD-1738-BMC, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012).................................. 12

*In re Warfarin Sodium Antitrust Litig.*,
    212 F.R.D. 231 (D. Del. 2002) ................................................................................ 20

*Johnson v. Nextel Communs Inc.*,
    780 F.3d 128 (2d Cir. 2015)................................................................................... 23

*Langan v. Johnson & Johnson Consumer Cos.*,
    No. 13-cv-1470-JAM, 2017 WL 985640 (D. Conn. Mar. 13, 2017)................................... 25

*Larsen v. JBC Legal Grp., P.C.*,
    235 F.R.D. 191 (E.D.N.Y. 2006) ............................................................................. 26

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)................................................................................... 17

*Ortiz v. Chop't Creative Salad Co.*,
    No. 13-cv-2541-KNF, 2014 WL 1378922 (S.D.N.Y. Mar. 25, 2014) ..................................... 9

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
    237 F.R.D. 26 (E.D.N.Y. 2006) ............................................................................... 12

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015)................................................................................... 27

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003) ................................................................... 12

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*,
    No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ............................ 19

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................................... 27

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................... 23

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) .......................................................................... 9, 17, 19

**Rules**

Fed. R. Civ. P. 12 ......................................................................................................... 4, 8

Fed. R. Civ. P. 23 ...................................................................................................... *passim*

## I.   **INTRODUCTION**

Plaintiffs James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry Jacobson, Tina Porter, and Paul Vermillion (collectively, "Plaintiffs," or "proposed Settlement Class Representatives") respectfully submit this memorandum in support of their motion for preliminary approval of (1) a settlement between Plaintiffs and the proposed Classes and Defendant Standard Chartered Bank ("SC") (the "SC Settlement"); and (2) a settlement between Plaintiffs and the proposed Classes and Defendant Société Générale ("SG") (the "SG Settlement"). If approved, the proposed Settlements[1]—consisting of combined cash payments of \$2,695,000[2] (the "SC/SG Settlements Amount") as well as commitments by both SC and SG to provide significant cooperation to Plaintiffs—offer valuable monetary relief to the Classes and resolve this complex case against SC and SG. Plaintiffs' claims against the remaining Defendants (the "Non-Settling Defendants") are being vigorously pursued.[3]

Pursuant to Fed. R. Civ. P. 23(e), in order for the Court to grant preliminary approval of a proposed class settlement, Plaintiffs must show that the Court will likely be able to determine at the final approval stage that: (1) the classes should be certified for purposes of settlement; (2) the class representatives and class counsel have adequately represented the classes; (3) the proposal was negotiated at arm's length; (4) the proposal treats class members equitably relative to each other; and (5) the relief provided for the class is adequate, taking into account: (a) the costs, risks, and delay of trial and appeal, (b) the effectiveness of any proposed method of allocating

---

[1] The SC and SG Settlements are attached respectively, as Exs. A and B to the accompanying Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Preliminary Approval of Settlements and Certifications of the Proposed Settlement Classes for Settlement Purposes ("Dell'Angelo Decl.").

[2] The SC Settlement provides for a payment of a \$1,720,000 by SC, *see id.* at Section II, ¶ (qq), and the SG Settlement provides for a payment of \$975,000 by SG. *See id.* at Section II, ¶ (qq).

[3] All Defendants other than SC, SG, the Citigroup Defendants ("Citigroup"), and MUFG Bank ("MUFG") (together, "Settling Defendants") are collectively referred to herein as "Non-Settling Defendants."

and distributing relief to the class, (c) the terms of any proposed award of attorney's fees, and (d) the terms of the settlement itself and any other relevant agreements made in connection with the proposed settlement. *Id*. The reasonableness considerations set forth in the amended Fed. R. Civ. P. 23(e) largely overlap with the following factors announced in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc*., 209 F.3d 43 (2d Cir. 2000), that courts in the Second Circuit often apply at the preliminary approval stage in evaluating a proposed class settlement (the "*Grinnell* factors"):

> (l) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

For the reasons described below, and for substantially the same reasons set forth in the July 29, 2019, Order granting preliminary approval of the Citigroup and MUFG Settlements, ECF No. 297 (the "Citigroup/MUFG Preliminary Approval Order"), the factors relevant to preliminarily approval of the SC and SG Settlements support Plaintiffs' instant motion. The Settlements were negotiated at arm's length, and the relief obtained is fair, reasonable, and adequate. The proposed *pro-rata* method of allocating the Settlement Fund amongst the Settlement Class members ensures that they will be treated equitably relative to each other. The SC/SG Settlements Amount of $2,695,000 is well within the range of reasonableness, especially considering the risks facing Plaintiffs when the Settlements were reached, the Settlements' cooperation provisions, the complexity of the litigation, and the risks of establishing liability, aggregate damages, and classwide impact.

Finally, for the same reasons set forth below and in Plaintiffs' prior motion for preliminary approval of the Citigroup and MUFG settlements, ECF Nos. 272-274 ("Citigroup/MUFG Preliminary Approval Motion"), it will be more efficient and cost-effective to provide settlement notice and allocate and distribute the settlement proceeds in a single coordinated procedure for all settlements, rather than to incur the cost of a separate notice and claims process at this stage. Class Counsel therefore request that dissemination of the proposed notices of the SC and SG Settlements and distribution of those Settlement proceeds be coordinated with notice and distribution of the Citigroup and MUFG Settlements, pursuant to the Settlement Schedule proposed below. Class Counsel filed a separate request to coordinate the Settlement Schedule for the Citigroup and MUFG Settlements with the schedule for the SC and SG Settlements, which the Court granted on November 19, 2019. *See* ECF Nos. 333, 334.

## II. <u>PROCEDURAL HISTORY</u>

Plaintiffs filed this Action on April 28, 2017. ECF No. 1. On June 26, 2017, the parties filed a stipulation to consolidate the instant action with *Lavender, et al. v. Bank of America Corp., et al.*, No. 17-cv-4392, *see* ECF No. 83, followed by the filing of the First Consolidated Class Complaint ("CCAC") on June 30, 2017. ECF No. 84.

On August 11, 2017, all Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6), ECF Nos. 103-104, and certain "Foreign Defendants," including SC and SG, filed a motion to dismiss pursuant to Rule 12(b)(2). ECF Nos. 105-107. On March 15, 2018, the Court granted Defendants' Rule 12(b)(6) motion and denied the 12(b)(2) Motion as moot. ECF No. 136. The Court further ordered that Plaintiffs could move for leave to file a proposed amended complaint. *Id.* Plaintiffs filed a Motion for Leave to File a Second Consolidated Class Action Complaint ("SCCAC") on April 5, 2018, and addressed the issues identified in the Court's March 15, 2018, dismissal Order. ECF Nos. 138-39.

On October 25, 2018, the Court granted Plaintiffs' motion for leave to file the SCCAC with respect to Plaintiffs' state-law damages claims, but denied the motion with respect to Plaintiffs' claim for injunctive relief under the Sherman Act. ECF No. 166. On December 20, 2018, the "Foreign Defendants," including SC and SG, filed a new motion to dismiss the SCCAC for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). ECF No. 197. On May 20, 2019, the Court granted that motion as to Defendants The Royal Bank of Scotland plc ("RBS"), SG, UBS Group AG, and MUFG, and denied it as to Barclays Bank PLC, BNP Paribas Group, HSBC Bank plc, SC, and UBS AG. *See* ECF No. 263.[4] Plaintiffs filed a motion for reconsideration of that dismissal order on May 31, 2019, ECF No. 276, which the Court denied on July 8, 2019. ECF No. 288. On July 25, 2019, Plaintiffs filed a motion for leave to file an amended complaint adding allegations detailing RBS's New York-related conduct in furtherance of the alleged conspiracy to address the issues identified in the Court's May 20, 2019, Order dismissing RBS for lack of personal jurisdiction. Plaintiffs did not seek to add jurisdictional allegations as to SG because Plaintiffs and SG were in the process of finalizing a binding Memorandum of Understanding outlining the terms of the SG Settlement. Plaintiffs' motion to amend to add jurisdictional allegations regarding RBS is pending before the Court. The Action is being actively litigated against the remaining Non-Settling Defendants. *See* ECF No. 176.

III.   **OVERVIEW OF THE SETTLEMENT NEGOTIATIONS AND TERMS**

   A.   **Overview of the SC Settlement Negotiations and Settlement**

Beginning in May 2019, Plaintiffs engaged in numerous settlement discussions with SC. In October 2019, the parties reached an agreement in principle, followed by negotiation of the specific settlement agreement terms over several weeks, culminating in a written settlement

---

[4] At the time of the Order, Plaintiffs had already reached the MUFG Settlement and were in the process of finalizing an agreement to voluntarily dismiss UBS Group AG.

agreement executed as of November 4, 2019. *See* Dell'Angelo Decl. ¶ 8. The SC negotiations were hard-fought and resulted in a favorable Settlement. Several considerations guided Plaintiffs' negotiations and their settlement demands and proposed cooperation provisions. These considerations were largely the same that guided Plaintiffs with respect to the prior preliminarily approved Settlements.[5]

*First*, in light of the Court's prior holdings that the amount of the settlement between SC and the direct-purchaser plaintiffs in *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*") was fair, reasonable, and adequate, *see FOREX* ECF Nos. 866, 1105, and the Citigroup/MUFG Preliminary Approval Order approving of Plaintiffs' settlement analyses based on the Citigroup and MUFG *FOREX* settlement amounts, Class Counsel and their experts estimated the volume of the retail FX Instrument transactions relevant to the damages claims of the Class members relative to the overall volume of FX Instrument transactions that comprised the claims of the Direct Settlement Class in *FOREX*. Dell'Angelo Decl. ¶ 11.[6] Class Counsel and their experts considered a number of sources and data to estimate the size of the Classes here as compared to the *FOREX* class, including the Triennial Bank Survey of the Bank for International Settlements ("BIS"),[7] the Federal Reserve Bank of Cleveland,[8] and the

---

[5] Settlement negotiations were guided by Plaintiffs' experts' analyses of the scope of the indirect retail FX transactions relevant to this Action relative to the entire FX market. *See* Dell'Angelo Decl. ¶ 11. However, because Plaintiffs are continuing to litigate their claims against the Non-Settling Defendants, Plaintiffs' estimates provided herein are solely for purposes of evaluating the Settlements and may be revised as the litigation progresses.

[6] "FX Instrument" and "Direct Settlement Class" are defined in the Settlements as set forth in the SC Settlement § II, ¶ (o); and SG Settlement § II, ¶ (o).

[7] *See* Triennial Central Bank Survey, *available at* https://www.bis.org/publ/rpfx16fx.pdf (last visited Nov. 22, 2019).

[8] Rawley Z. Heimer & David Simon, *Facebook Finance: How Social Interaction Propagates Active Investing* (Federal Reserve Bank of Cleveland, Working Paper No. 15-22, October 2015), *available at* https://www.clevelandfed.org/en/newsroom-and-events/publications/working-papers/2015-working-papers/wp-1522-facebook-finance-social-interaction-investing.aspx (last visited Nov. 22, 2019).

academic research of one of Plaintiffs' experts, Dr. Carol Osler.[9] Dell'Angelo Decl. ¶ 11. Before adjusting for state population, these sources indicate that the daily average volume of nationwide retail FX trading applicable to this case relative to the overall direct purchaser FX Instrument market at issue in *FOREX* (the "retail FX market share") is likely between 10 and 30 percent. *Id.* Dr. Osler's estimate of the overall retail FX market share was then reduced to reflect the likely proportion of settlement Class Members in New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina (the "Settlement Class States"). *Id.* According to the U.S. Census Bureau's Population Estimates, the populations of the Settlement Class States is 37.7 percent of the overall U.S. population. *Id.*[10]

The *FOREX* plaintiffs settled with SC for $17,200,000. *FOREX* ECF No. 822-5. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the SC *FOREX* settlement results in a *pro-rata* indirect amount of $648,440. Dell'Angelo Decl. ¶ 13. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the SC $17.2 million *FOREX* settlement results in a *pro-rata* indirect amount of $1,945,320. *Id.* The $1,720,000 SC Settlement here is therefore 88.4 percent of the high end of the *pro-rata* range of reasonableness based on the Court-approved direct-purchaser settlements in *FOREX. See id.*[11]

The Settlement is on behalf of statewide Classes in each of the Settlement Class States, each of which are defined to include persons and entities who, during the period of December 1,

---

[9] *See generally* Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, *Price Discrimination and the Cost of Liquidity in OTC Markets* (Nov. 17, 2015), *available at* http://www.fmaconferences.org/Vegas/Papers/CostOfLiquidityInDealershipMarkets_BKO_FMA2016.pdf (last visited Nov. 22, 2019).

[10] *See* U.S. Census Bureau, National and State Population Estimates, *available at* https://www.census.gov/newsroom/press-kits/2018/pop-estimates-national-state.html (last visited Nov. 22, 2019).

[11] Plaintiffs' settlement negotiations with SC were also informed by SC's settlement in the related Canadian FX class action. *See infra* Section IV.B.7. As detailed below, the SC Settlement here far exceeds the estimated reasonable settlement range based on the Canadian SC settlement, even after accounting for the fact that the total population of the proposed Settlement Class states is larger than the population of Canada. *Id.*

2007, through the date of preliminary approval, indirectly purchased an FX Instrument from a Defendant or co-conspirator in or while residing in the respective Settlement Class State by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class Member entered into the FX Instrument directly with a Defendant or co-conspirator. The entire class definitions are set forth in the Settlements and the Proposed Order submitted with this motion. *See* SC Settlement § III; SG Settlement § III; Proposed Order ¶ 12.

The Settlement also obligates SC to provide cooperation, both to effectuate the terms of the Settlements and to assist Plaintiffs in the continued litigation against the Non-Settling Defendants. SC Settlement § XIV. The cooperation provisions fall into four categories: attorney proffers, production of documents and data, authentication of documents, and providing witnesses to testify at trial. *Id.*

First, beginning within 30 days of the entry of this court's order granting Preliminary Approval (the "Preliminary Approval Order"), SC's Counsel will meet with Class Counsel to provide an attorney proffer concerning the facts and circumstances alleged in Plaintiffs' complaint, including SC's understanding of the expected testimony of former or current SC employees. SC Settlement § XIV, ¶ (c). Second, SC has meet-and-confer obligations regarding reasonably available documents and data relevant to Plaintiffs' claims concerning retail FX transactions. *Id.* Third, SC will provide declarations to authenticate documents that Plaintiffs may seek to introduce into evidence in this Action. *Id.* Finally, SC is required to make witnesses available to testify at trial. *Id.*

In exchange for SC's consideration, SC shall be released of any and all manner of claims "arising from or relating in any way to any conduct alleged or that could have been alleged in

and arising from the factual predicate of the Action." SC Settlement § II, ¶ (ii). The full text of the release provisions is set forth in the Settlement Agreement. *See id.* § II, ¶¶ (ii)-(kk).

### B.   Overview of the SG Settlement Negotiations and Settlement

Plaintiffs' negotiations with SG were guided by the same principles applied in the SC negotiations. Dell'Angelo Decl. ¶¶ 11, 12, 14-15. Negotiations between Plaintiffs and SG began on May 15, 2019, followed by numerous discussions and communication over the next several weeks. *Id.* ¶ 9. The parties reached a settlement agreement in principle on August 13, 2019, and thereafter exchanged draft settlement agreements culminating in a signed agreement on September 10, 2019. *Id.* Crucially, during the period between the commencement of Plaintiffs' settlement negotiations with SG and the finalization of the SG Settlement, SG was dismissed from the case. The Court granted dismissal of SG for lack of personal jurisdiction on May 20, 2019, ECF No. 263, and denied Plaintiffs' motion for reconsideration of that dismissal order on July 8, 2019. ECF No. 288. Additionally, SG was exempt from all discovery productions until the Court ruled on the Rule 12(b)(2) motion. *See* ECF No. 176, ¶ 8(b). Thus, without the agreed-upon cooperation, there is no guarantee that Plaintiffs would ever have been able to obtain discovery from SG, particularly as SG is based in France. Dell'Angelo Decl. ¶ 10.

As with SC, the SG settlement in *FOREX* and the Court's orders approving that settlement provided the primary basis for determining a reasonable settlement amount here. Dell'Angelo Decl. ¶ 14.[12] In *FOREX*, the SG settlement provided for a payment of $18 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-4. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the of $18 million *FOREX* SG settlement is between $678,600

---

[12] SG's settlement in the related Canadian action also informed Plaintiffs' settlement negotiations with SG. *See infra* Section IV.B.7.

(using the 10% estimate) and $2,035,800 (using the 30% estimate). *See* Dell'Angelo Decl. ¶ 14. Therefore, the SG Settlement amount of $975,000 is well within the *pro-rata* range of reasonableness based on the *FOREX* settlement particularly given that SG was dismissed from the action when the Settlement was reached. *See id*.

The SG Settlement includes virtually the same cooperation as required by SC, discussed above, and is on behalf of state Settlement Classes with identical class definitions, as fully defined in the Section II of the SG Settlement. The SG Settlement cooperation provisions are of considerable value given the Court's dismissal of SG from this Action. And the same claims are released. *Id*.

## IV.   THE SETTLEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT TO GRANT PRELIMINARY APPROVAL

### A.   Legal Standards for Preliminary Approval

Pursuant to Fed. R. Civ. P. 23(e)(2), a proposed class action settlement must be "fair, reasonable, and adequate." To grant preliminary approval, the Court must find it "will be likely" to grant final approval under Rule 23(e)(2) and "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). This analysis entails an initial evaluation of "procedural" fairness, focused on whether the settlement resulted from informed, arm's length negotiations, *see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005), and "substantive" fairness of the agreement's terms – collectively, the "*Grinnell* factors." *See, e.g., Ortiz v. Chop't Creative Salad Co.*, No. 13-cv-2541-KNF, 2014 WL 1378922, at *12 (S.D.N.Y. Mar. 25, 2014) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The recently amended Rule 23 does not change this fundamental inquiry. *See* Fed. R. Civ. P. 23(e)(2) advisory committee note ("The goal of this amendment is not to displace any factor"). Substantive factors favoring preliminary approval include whether the settlement provides

"intangible benefits, including cooperation against non-settling defendants," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262-NRB, 2014 WL 6851096, at *2 (S.D.N.Y. Dec. 2, 2014), and grants the plaintiffs repose in the face of complex, uncertain litigation. *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 198 (S.D.N.Y. 2005).

Finally, while "[t]he decision to grant or deny such approval lies squarely within the discretion of the trial court," *In re PaineWebber Ltd. Pships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997), courts in this District recognize that "there is an overriding public interest in settling . . . litigation, and this is particularly true in class actions," *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405-CM, 2015 WL 10847814, at *4 (S.D.N.Y. Sept. 9, 2015) (citation omitted). Settlements "advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation." *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2011 WL 1706778, at *2 (D. Vt. May 4, 2011). As demonstrated below, the proposed Settlements merit preliminary approval because they are procedurally and substantively fair. The federal policy favoring settlement of class actions "applies with equal force whether the settlement is partial, involving only some of the defendants, or complete." *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *7 (E.D. Mich. Feb. 22, 2011); *see also In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 455-56 (S.D.N.Y. 2004) (acknowledging policy considerations that favor approval of proposed partial class action settlement); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 280 (S.D.N.Y. 1999) (same). In the Citigroup/MUFG Preliminary Approval Order, the Court granted preliminary approval of the partial Settlements while deferring the notice, plan of allocation, final approval, and claims distribution stages pending additional discovery and

settlements. *See id.* ¶¶ 7, 20-25, 33; *see also FOREX*, 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015) (granting preliminary approval and ordering that plaintiffs shall submit a proposed notice, plan of distribution, and schedule "at a later date").

### B.    The Proposed Settlements Are Entitled to a Presumption of Fairness

A settlement that is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation" is presumptively fair. *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000). In such circumstances, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *PaineWebber*, 171 F.R.D. at 125 (citation omitted). Here, Class Counsel have the requisite class action and antitrust experience to lead this litigation on behalf of the proposed Settlement Classes, and SC and SG are represented by highly experienced and sophisticated counsel. Plaintiffs' negotiations with SC took place over the course of six months, and Plaintiffs' negotiations with SG took place over three months. Dell'Angelo Decl. ¶¶ 8-9. Plaintiffs' negotiations with both SC and SG were informed by earlier settlements in this case, the settlements in *FOREX* and the Canadian FX action, and the expert analyses described above. *Id.* ¶ 15. Thus, the Settlements are entitled to "a strong initial presumption that the compromise is fair and reasonable." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993).

To determine whether the Court will be likely to grant final approval, the *Grinnell* factors are informative. Not every factor must weigh in favor of settlement; rather, "the court should consider the totality of these factors in light of the particular circumstances." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) (citations and internal quotations omitted). As explained below, these factors weigh in favor of preliminary approval of the Settlements.

### 1.     The Complexity, Expense, and Likely Duration of the Litigation

Numerous courts have recognized that "'[f]ederal antitrust cases are complicated, lengthy, . . . bitterly fought,' as well as costly." *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738-BMC, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) (citation omitted). Having overseen this case and the related *FOREX* action for years, this Court is aware of the complexities and duration of this case. The parties are currently engaged in the discovery process, and *Daubert* motions, a class certification motion, and summary judgment motions will follow, as well as potential related appeals. *See generally Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) (noting that "the time value of money make[s] future recoveries less valuable than this current recovery").

The costs of continuing to litigate this Action will necessarily be substantial. This factor is less relevant where, as here, Plaintiffs are continuing to litigate their claims with the Non-Settling Defendants. However, the cooperation provisions will meaningfully reduce the time and expenses required to prosecute Plaintiffs' claims. *See, e.g.*, Citigroup/MUFG Preliminary Approval Order ¶ 6 (noting with respect to the Citigroup and MUFG Settlement that "[t]he Cooperation Provisions in the Settlements offer valuable relief to the Classes in their continued litigation with respect to the remaining Defendants."); *FOREX* ECF 1105, ¶ 8 (noting the "value of the cooperation agreement" in approving partial settlement with SC); *FOREX* ECF 1110, ¶ 8 (same, for partial settlement with SG). Because of the guaranteed cash recovery and reduced litigation expenses, the first *Grinnell* factor weighs in favor of granting preliminary approval.

### 2.     The Reaction of the Classes to the Settlements

Courts generally do not consider the second *Grinnell* factor at the preliminary approval stage because notice has not been disseminated to the proposed Settlement Classes. *See, e.g.*, *Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006). However,

12

each of the proposed Settlement Class Representatives supports approval of the Settlements. Dell'Angelo Decl. ¶ 16.

### 3.      The Stage of the Proceedings

"The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02-cv-5575-SWK, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Discovery need not be fully complete, or even underway, before a settlement can be approved. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (to be informed, "formal discovery need not have necessarily been undertaken yet by the parties"). Rather, it is enough for the parties to "have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *AOL Time Warner*, 2006 WL 903236, at *10 (citation omitted). This Court previously granted preliminary approval to class settlements in *FOREX* before the start of merits discovery, *see FOREX* ECF No. 536, and similarly granted preliminary approval of the Citigroup and MUFG Settlements in this Action where the Settlements were reached prior to the start of merits discovery as to Citigroup and MUFG. *See generally* Citigroup/MUFG Preliminary Approval Order.

Plaintiffs are sufficiently informed to reach adequate settlements. The complaints were drafted based on extensive investigation of the alleged conspiracy and its effects, including the review of publicly available news articles, press releases and other reports, research of the applicable law, and consultation with leading experts on the FX market. Discovery, including depositions, is ongoing, and Plaintiffs have received vast amounts of documents and transactional data from Defendants. Dell'Angelo Decl. ¶ 17. The information gleaned from this discovery, as well as from the pleadings, motions, and court orders in *FOREX*, have helped Class

Counsel to assess the potential damages, as well as the risks and likely defenses going forward. The settlement negotiations included frank discussions of the relative strengths and weaknesses of the parties' claims and defenses. Dell'Angelo Decl. ¶ 9. Collectively, this information has provided Plaintiffs with a comprehensive understanding of the relative strengths and weaknesses of their case, enabling Plaintiffs to negotiate settlements believed to be an excellent result for the Settlement Classes. *Id.* Therefore, this factor supports preliminary approval.

### 4. The Risks of Establishing Liability and Damages

"In assessing the Settlement, the Court should balance the benefits afforded [to] the Class[es], including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation." *In re Top Tankers, Inc. Sec. Litig.*, 06-cv-1376-CM, 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008) (emphasis in original). Here, Plaintiffs' ability to prove liability faces significant risk due to, among other things, the complexity of the subject matter of this litigation and the fact that Defendants are well-financed and can afford to litigate indefinitely.

One particularly critical component to Plaintiffs' risk analysis with respect to SG was the Rule 12(b)(2) order dismissing SG from the litigation, and the subsequent order denying Plaintiffs' motion for reconsideration of the dismissal order. For a substantial period of Plaintiffs' settlement negotiations with SG, and critically at the time the SG Settlement was finalized, SG was dismissed from the case. Although Plaintiffs could have sought to appeal that order or filed a motion for leave to file an amended complaint adding jurisdictional allegations regarding SG, the success of such efforts would have been far from certain. Thus, absent the Settlements, there is no guarantee that Plaintiffs would have been able to recover any funds—or obtain any discovery materials—from SG.

Additional risk exists because the Settling and Non-Settling Defendants have significant financial resources to litigate this Action to trial. Defendants are represented by some of the best

law firms in the United States, and absent settlement, SC and SG are prepared to vigorously contest liability and damages. Even assuming Plaintiffs can establish liability at trial with respect to SC and SG, "[t]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Mkt.-Makers Antitrust Litig*., 187 F.R.D. 465, 476 (S.D.N.Y. 1998). In sum, "[t]here is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away." *Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*, No. 85-cv-3048-JMW, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987).

This factor therefore supports preliminary approval of the Settlements.

### 5. The Risks of Maintaining the Class Action Through Trial

Plaintiffs will need to overcome numerous hurdles before the Action proceeds to trial. After the conclusion of fact discovery, Plaintiffs will be required to succeed on their motion for class certification, and to defeat any *Daubert* motions and motions for summary judgment filed by Defendants. Even if class certification is granted, Defendants may later seek to decertify the Classes or modify the Class definitions prior to trial, and there is always the possibility of changed circumstances, or changes in the governing law, that could threaten class certification in the future. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207-JGK, 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("There is no assurance of obtaining class certification through trial, because a court can re-evaluate the appropriateness of certification at anytime during the proceedings."). Interlocutory appeals at any stage of the litigation would add further uncertainty to the Action. *See, e.g., Comcast Corp. v. Behrend*, 569 U.S. 27, 29 (2013) (reversing class certification in an antitrust case at an interlocutory stage).

Significantly, prior to the finalization of the Settlements, on September 3, 2019, the Court in the related direct-purchaser action *FOREX*, issued an order denying the *FOREX* plaintiffs' motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See FOREX*, 2019 WL 4171032, at *1 (S.D.N.Y. Sept. 3, 2019) (the "*FOREX* Class Order"). Although Plaintiffs believe the decision is not dispositive on class certification in this distinct Action, they nevertheless recognize that the *FOREX* Class Order is a potentially complicating factor for class certification in this case. Further, even if Plaintiffs' proposed litigation Classes were certified and prevailed at trial, a jury verdict would likely be followed by appeals. Accordingly, this factor weighs in favor of preliminary approval.

### 6.   The Ability of Defendants to Withstand a Greater Judgment

SC and SG could withstand a greater judgment than provided for by the Settlements. However, courts consistently hold that the ability of Defendants to pay more than the settlement amount is not a sufficient reason by itself to decline preliminary approval of a settlement. *See In re IMAX Secs. Litig.*, 283 F.R.D. at 191 ("[T]his factor, standing alone, is not sufficient to preclude a finding of substantive fairness where the other factors weigh heavily in favor of approving a settlement."); *In re CitiGroup Inc.*, 296 F.R.D. 147, 157 (S.D.N.Y. 2013) (approving settlement with Citigroup, despite the fact that "Citigroup could likely withstand a greater judgment"). Moreover, "the benefit of obtaining the cooperation of the Settling Defendants tends to offset the fact that they would be able to withstand a larger judgment." *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7625708, at *2 (noting "the intangible benefit of cooperation against the non-settling defendants" in granting preliminary approval of a partial settlement).

### 7.   The Reasonableness of the Settlements in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors "recognize[] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In applying these factors, "[t]he adequacy of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'" *In re IMAX Secs. Litig.*, 283 F.R.D. at 191 (citation omitted); *see also NASDAQ*, 187 F.R.D. at 478 ("[T]he exact amount of damages need not be adjudicated for purposes of settlement approval."). Consequently, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2, *see also In re IMAX Secs. Litig.*, 283 F.R.D. at 191-192 ("[T]he Second Circuit 'has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought.'" (citation omitted)). Without these Settlements, Plaintiffs have no guarantee of securing any recovery from SC and SG. These risks are arguably dispositive for the final two *Grinnell* factors. *See FOREX* ECF 1105, ¶ 8 (noting, in granting final approval of SC settlement, that "success in antitrust cases such as this one is inherently uncertain, and there is no guarantee that continued litigation would yield a superior result.").

The SC and SG Settlements provide a combined $2,695,000 million in cash payments to compensate the Classes, for a total Settlement Fund of $13,630,000 including the Citigroup and MUFG Settlements that were previously preliminarily approved by the Court. The Settlements also provide substantial cooperation. SC Settlement § XIV; SG Settlement § XIV. The immediacy of the cash payments weighs in favor of approval. *See AOL Time Warner*, 2006 WL

903236, at *13. ("[T]he benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery"). At this stage in the litigation, the cooperation provided by the SC and SG Settlements is very valuable to the Classes. As this Court recognized in its final approval of the *FOREX* settlements, "the Settlement Agreement provides a guaranteed cash recovery and other benefits to the Settlement Classes without substantially diminishing the value of the case going forward." *FOREX* ECF 1105, ¶ 8.

In addition to the *FOREX* settlements approved by this Court discussed above, the SC and SG settlements approved in the related Canadian action offer further support of the reasonableness of the Settlement amounts here. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-000189-152 (Quebec S.C.J.). In the Canadian action, twelve of the same Defendant groups involved in this Action—including SC and SG—entered into settlements totaling $106,747,206 Canadian Dollars ("CAD") with the plaintiffs and proposed nationwide Canadian classes that included direct *and* indirect purchasers. *See* ECF No. 274-9 (court-approved notice of the Canadian settlements). The Canadian SC and SG settlement amounts were, respectively, $900,000 CAD and $1,800,000 CAD. *Id.* The Canadian plaintiffs' settlements allocated 20 percent of the settlement proceeds to the indirect purchaser Canadian class members. *Id*. Therefore, the Canadian indirect purchasers recovered $180,000 CAD from the SC settlement (20% of $900,000) and $360,000 CAD from the SG settlement (20% of $1,800,000). The exchange rate in July 2018 when the Canadian plaintiffs' proposed plan of allocation was approved was 0.768 CAD to 1 U.S. dollar ("USD").[13] Therefore, the Canadian indirect purchaser settlement amounts are approximately $138,240 USD for SC, and $276,480 USD for SG.

---

[13] *See* Federal Reserve Bank of St. Louis, US Dollar to National Currency Spot Exchange Rate for Canada, *available at* https://fred.stlouisfed.org/series/CCUSSP01CAM650N#0 (last visited Nov. 22, 2019).

Applying a population adjustment factor of 3.44 to those amounts to account for the larger population of the proposed Settlement Class states relative to the Canadian population,[14] a *pro-rata* estimate of a reasonable settlement amount in this matter based on the Canadian indirect purchaser settlement amounts is approximately $475,546 for SC, and $951,091 for SG. Therefore, the $1,720,000 million SC Settlement here is more than three times greater than a *pro-rata* estimate based on the court-approved Canadian SC settlement, and the $975,000 SG Settlement is slightly greater than the *pro-rata* estimate based on the court-approved Canadian SG settlement. Notably, however, SG was dismissed as a Defendant in this Action, but was not dismissed in the Canadian action. Considering this difference, the SG Settlement amount here is superior to the result in the Canadian FX action. The Canadian SC and SG settlements therefore further confirm the reasonableness of the Settlements here.

The Advisory Committee's comments to the 2018 Fed. R. Civ. P. 23 amendments note that courts often "forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results" in considering the reasonableness of proposed settlements. *Id.* In making this calculation, courts often compare the proposed settlement amount with the damages that would be awarded in the event of a "complete victory" by the plaintiffs, *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-cv-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004), and discount that by the "uncertainties of law and fact" and "the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart*, 396 F.3d at 119. While such a forecast cannot be done with "arithmetic accuracy," it may be useful as "a

---

[14] The U.S. Census estimates that in 2013, the total population of Canada was 34.57 million, and the total population of the eight Settlement Class states was 118.98 million. *See* U.S. Census, Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2018, available at https://www.census.gov/data/tables/time-series/demo/popest/ 2010s-state-total.html (last visited Nov. 22, 2019); U.S. Census, Demographic Overview – Canada, *available at* https://www.census.gov/data-tools/demo/idb/ region.php?N=%20Results%20&T=13&A=separate&RT=0&Y=2013&R=-1&C=CA (last visited Nov. 22, 2019). Thus, the total population of the Settlement Class states is approximately 344.2% of the population of Canada.

benchmark for comparison with the settlement figure." Fed. R. Civ. P. 23(e)(2) Adv. Comm. Notes.

In *FOREX*, the plaintiffs have settled with all Defendants except for Credit Suisse, and have estimated that their total potential damages ranged from $5.4 to $7.0 billion for the period December 7, 2007 to December 31, 2013, the Class Period applicable to this Action. *FOREX* ECF No. 925, at 17.[15]

Consistent with the methodology that Plaintiffs applied in evaluating the reasonableness of the Citigroup and MUFG Settlements, *see* Citigroup/MUFG Preliminary Approval Motion, the potential damages analyses set forth herein show the reasonableness of the SC/SG Settlements Amount. Specifically, applying the state population and retail FX market share estimates (discussed above) to those *FOREX* damages estimates results in an estimated range for total damages in this Action of between $204 million (applying the lower 10% retail FX market share estimate and 37.7 percent state population factor to $5.4 billion) and $791 million (applying the 30% retail market share estimate and state population factor to $7.0 billion). Applying the market share estimates alleged in the SCCAC, SC and SG represented a combined 2.82 percent of the total market share of all sixteen Defendant groups as of 2013. *See* SCCAC ¶ 92. Therefore, the SC and SG *pro-rata* estimated share of total damages for the proposed Settlement Classes in this Action is between $5.75 million (2.82% of the low-end $204 million damages estimate) and $22.31 million (2.82% of the high-end $791 million damages estimate). Accordingly, the $2,695,000 in SC and SG Settlement Funds here represents between 12.1 and 46.9 percent of the SC and SG *pro-rata* share of potential damages. For comparison, the SC and SG *pro-rata* estimated share of the *FOREX* plaintiffs' total damages estimates was between

---

[15] "The standard for evaluating settlement involves a comparison of single damages, not treble damages." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257-58 (D. Del. 2002) (citations omitted).

$152.3 million (2.82% of the low-end $5.4 billion damages estimate) to $197.4 million (2.82% of the high-end $7.0 billion damages estimate). Accordingly, the $35.2 million in total *FOREX* SC and SG settlements represented between 18.1 and 23.1 percent of the SC and SG *pro-rata* share of the *FOREX* plaintiffs' potential damages. Without accounting for the very different procedural postures of the cases when the settlements were reached, the proposed SC and SG Settlements here as a portion of estimated damages are in line with, if not greater than, the Court-approved *FOREX* SC and SG settlements as a portion of the *FOREX* estimated damages. These analyses further confirm the reasonableness of the Settlements here.

Moreover, the litigation risks are real. SG was dismissed from the case at the time the SG Settlement was reached. Even if litigation continued against SC and SG, risks remain. SC and SG would undoubtedly have argued that the evidence does not show an overarching price-fixing conspiracy but rather, at most, collusion with respect to individual trades. And even if an overarching conspiracy is established, SC and SG would have argued they were not participants in that agreement. Plaintiffs believe the evidence will show a price-fixing conspiracy among all Defendants, but there was a risk that the Court or a jury would credit Defendants' arguments, resulting in a narrower case or outright dismissal. The governmental findings and allegations resulting in regulatory fines and guilty pleas are narrower in scope than the allegations in this Action (and SG was not the subject of any such governmental fines or pleas), and thus alone would not have sufficed to demonstrate liability with respect to SC and SG. Furthermore, because the Court in the *FOREX* Class Order granted certification of a Rule 23(c)(4) issue class to determine the existence of the Defendants' antitrust conspiracy as well as the involvement of the remaining Defendant Credit Suisse in the conspiracy, *id.* at *10, any orders issued in *FOREX* in favor of Credit Suisse may affect Plaintiffs' claims in this Action.

21

While Class Counsel are confident that they will present sufficient evidence to support a finding of classwide impact and damages, SC and SG would have vehemently opposed this argument, arguing that class certification should be denied here like in the *FOREX* action. They also would likely have moved to exclude Plaintiffs' experts' opinions, arguing that Plaintiffs' proposed methods of estimating aggregate damages and classwide impact are unreliable.[16] The certainty of the recoveries achieved by the Settlements weighs heavily in support of preliminary approval when weighed against the risks of establishing liability and damages against SC and SG.

## V.   **CERTIFICATION OF THE SETTLEMENT CLASSES IS APPROPRIATE**

Pursuant to the terms of the Settlements, Plaintiffs respectfully request that the Court certify the Settlement Classes defined in the Proposed Order for settlement purposes. Certification of a settlement class is appropriate where that class meets all of the requirements of Rule 23(a) as well as one of the requirements of Rule 23(b). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). A court asked to certify a class for settlement purposes "need not inquire whether the case, if tried, would present intractable management problems." *Id*. at 620. The court's focus instead is "on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id*. at 621; *see also In re American Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012). The Court's analysis must be rigorous to ensure the Rule 23 requirements are met, *id.* at 237-38, but in doing so the court "must take a liberal rather than restrictive approach in determining whether the plaintiff satisfies these requirements and may exercise broad discretion in weighing the propriety of a putative class." *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 158 (E.D.N.Y. 2009).

---

[16] SC and SG have denied any liability to Class Plaintiffs. "Establishing otherwise [would] require considerable additional pre-trial effort and a lengthy trial, the outcome of which is uncertain." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012), *aff'd sub nom., Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013).

A.     **Plaintiffs Satisfy the Rule 23(a) Requirements**

For the reasons described below, and as set forth in the Citigroup/MUFG Preliminary

Approval Order certifying the Settlement Classes for purposes of the Citigroup and MUFG

Settlements, all four Rule 23(a) requirements are satisfied here.

1.     **Numerosity**

Numerosity is presumed in this Circuit where a class consists of 40 or more members.

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Plaintiffs' Counsel

estimate that there are at least tens of thousands of Settlement Class Members. Dell'Angelo Decl.

¶ 18; Declaration of James Bibbings, ECF No. 274-4 ("Bibbings Decl."), ¶ 19 (providing a

preliminary estimate of 99,138 Settlement Class members). The identities of the Settlement Class

members are readily identifiable and ascertainable from existing records of retail foreign

exchange dealers ("RFEDs"). Plaintiffs have served subpoenas on RFEDs requesting

information regarding the identities and transactions of the Class members. *See* Dell'Angelo

Decl. ¶ 17. Accordingly, the numerosity requirement is easily met here.

2.     **Commonality**

Commonality is established where a common contention "is capable of classwide

resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011). "'Where the same conduct or practice by the same defendant gives

rise to the same kind of claims from all class members, there is a common question.'" *Johnson v.

Nextel Communs Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (citation omitted).

"Commonality requires the plaintiff to demonstrate that the class members have suffered

the same injury." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,

2019 WL 359981, at *37 (E.D.N.Y. Jan. 28, 2019) ("*Payment Card*"). Here, the overarching

23

question is whether Class members were injured by Defendants' price-fixing conspiracy in the FX market. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (citation and internal quotation marks omitted). Thus, the commonality requirement is satisfied here on the basis of that common question alone. *Id.* Plaintiffs' claims present numerous other common issues of law and fact, including: the participants of the alleged conspiracy; the duration of the alleged conspiracy and the acts carried out in furtherance of the conspiracy; whether the alleged conduct caused injury to Plaintiffs and the members of the Classes; the effects of the alleged conspiracy on the prices of FX Instruments sold during the Class Period; and the appropriate measure of damages to Plaintiffs and the Classes. Thus, the commonality requirement is satisfied.

### 3.    Typicality

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (citation and internal quotations omitted); *Payment Card*, 2019 WL 359981, at *38 (same). Small differences do not defeat typicality, "[r]ather, a plaintiff fails to meet Rule 23(a)'s typicality requirement if its claims are 'subject to unique defenses which threaten to become the focus of the litigation.'" *In re IMAX Secs. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (citation omitted). In sum, where "class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions" typicality is satisfied. *Payment Card*, 2019 WL 359981, at *38 (internal quotations and citations omitted).

Plaintiffs' and the Settlement Class Members' claims all arise from the same alleged unlawful conspiracy to artificially widen the spreads on, and otherwise manipulate the prices of, FX Instruments, and the injury resulting from that conduct. For each Settlement Class, the proposed Settlement Class Representatives' claims are the same as the claims of all members of their respective Class. Any differences as to the facts relevant to the claim of each Class Member or the damages suffered by each potential Class Member do not preclude a finding of typicality. *See In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification."). Thus, the typicality requirement is satisfied.

### 4.   <u>Adequacy</u>

"'The adequacy requirement is satisfied where: (l) there is no conflict between the proposed lead plaintiff and the members of the class; (2) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) class counsel is qualified, experienced, and generally able to conduct the litigation.'" *Atwood v. Intercept Pharm., Inc.*, 299 F.R.D. 414, 416-17 (S.D.N.Y. 2014) (citation omitted); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (class representatives "must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members"). "A conflict 'between named parties and the class they seek to represent' will be sufficient to defeat class certification only if the conflict is 'fundamental.'" *Langan v. Johnson & Johnson Consumer Cos.*, No. 13-cv-1470-JAM, 2017 WL 985640, at *12 (D. Conn. Mar. 13, 2017) (citation omitted).

No fundamental conflict exists between the proposed Settlement Class Representatives and members of their respective Settlement Classes. All seek overcharge damages for violation of substantially similar state antitrust and consumer protection laws under *Illinois Brick* repealer

statutes arising out of the same anticompetitive conduct. Plaintiffs have already effectively represented the interests of the proposed Settlement Classes by selecting qualified Class Counsel, producing documents, and by regularly communicating with Class Counsel regarding developments in the litigation and the terms of the Settlements. Neither Plaintiffs nor Class Counsel have any interests antagonistic to those of the proposed Settlement Classes. Finally, proposed Settlement Class Counsel are "qualified, experienced, and generally able to conduct the litigation." *Payment Card*, 2019 WL 359981at *18 (quotation omitted). The Court has already determined that the proposed Settlement Class Representatives are adequate representatives of the members of their respective Settlement Classes with respect to the Citigroup and MUFG Settlements, and previously designated Berger Montague PC as Settlement Class Counsel finding the firm was qualified, experienced and adequately represented the settlement classes. Citigroup/MUFG Preliminary Approval Order ¶¶ 16, 18. Therefore, the adequacy of representation requirement is satisfied.

### B.      Plaintiffs Satisfy the Rule 23(b)(3) Requirements

In addition to satisfying Rule 23(a), a party seeking class certification must also satisfy one of the requirements of Rule 23(b). *See Larsen v. JBC Legal Grp., P.C.*, 235 F.R.D. 191, 196 (E.D.N.Y. 2006). Certification of a class under Rule 23(b)(3) requires that: (i) common issues predominate over individual issues; and (ii) the class action mechanism be superior to other methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). For the reasons described below, both requirements are met here.

### 1.      Predominance

Much like other aspects of the Rule 23 standards for certification, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *AIG*, 689 F.3d at 239. This analysis differs depending

on whether the certification is sought for litigation or settlement purposes. In the former, the court must determine whether litigating the class claims will pose "intractable management problems," but in the latter these management concerns "drop out" because with settlement, the "proposal is that there be no trial." *AIG*, 689 F.3d at 240. In the settlement context, the predominance "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem*, 521 U.S. at 623. As the Supreme Court has noted, in a settlement context "the predominance requirement of Rule 23(b)(3) is similar to the requirement of Rule 23(a)(3) that 'claims or defenses' of the named representatives must be 'typical of the claims or defenses of the class.'" *Id.* at n. 18.

Antitrust cases like this one are recognized as well suited for certification under Rule 23(b)(3) because they present issues that are capable of proof by generalized evidence "more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Courts regularly certify antitrust claims under Rule 23(b)(3), in both litigation and settlement contexts, because issues concerning conspiracy are shared by all class members and these will predominate in any test of liability. *See, e.g.*, *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (finding predominant "all factual and legal questions that must be resolved to decide whether, assuming a plaintiff paid supracompetitive prices, that payment was caused by the defendants' antitrust violation and constitutes the kind of injury with which the antitrust laws are concerned"); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."); *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the

class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." (citation omitted)). Here, all Settlement Class members would have to prove liability for Defendants' anticompetitive conduct using generalized evidence, including the existence of the conspiracy and, for each state Settlement Class, whether that conspiracy violated the laws of each respective state. These issues go to the heart of the case concerning Defendants' conduct and antitrust liability and, therefore, they will predominate over other issues such as individual damages amounts. In sum, the predominance requirement for the Settlement Classes is clearly met here as "[a]ll plaintiffs [] claim injury that by reason of defendants' conduct . . . has caused a common and measurable form of economic damage" because "[a]ll claims arise out of the same course of defendants' conduct; [and] all share a common nucleus of operative fact, supplying the necessary cohesion." *AIG*, 689 F.3d at 240 (citation omitted).

### 2.     Superiority

To determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Rule 23(b)(3) identifies four factors to be considered:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). Courts need not consider the fourth factor. *See Amchem*, 521 U.S. at 620.

All three of the relevant superiority factors weigh in favor of granting preliminary approval here. The interests of members of the Settlement Classes in individually controlling the prosecution of separate actions are minimal because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.

As to the second factor, although *FOREX* concerns the same price-fixing conspiracy as this Action, there are no other suits pending against Defendants that include the claims of the indirect purchaser Settlement Class members. Regarding the third factor, Plaintiffs have shown a desire to focus the litigation in this Court by filing the action in the Southern District of New York and by designating this case as related to *FOREX*, thereby allowing the Court to oversee both related actions. The Court is thoroughly familiar with the facts and legal issues of the case. Accordingly, the superiority requirement is satisfied and Plaintiffs have satisfied the requirements for certification of the proposed Settlement Classes.

### C.    Settlement Class Counsel

The Court appointed Berger Montague PC ("Berger Montague") as Settlement Class Counsel for purposes of the Citigroup and MUFG Settlements, Citigroup/MUFG Preliminary Approval Order ¶ 18, and Plaintiffs respectfully request that Berger Montague retain that designation for purposes of the SC and SG Settlements.

## VI.    ADDITIONAL DETAILS IN SUPPORT OF PRELIMINARY APPROVAL

Rule III.C.5 of the Court's Individual Rules and Procedures for Civil Cases require parties moving for preliminary approval to provide additional information, including (a) the total Settlement Fund amount, (b) estimated claims administration fees, costs, and expenses, (c) proposed attorneys' fees, costs, and expenses, (d) the named Plaintiffs' proposed service awards, (e) any other deductions from the Settlement Fund, and (f) the settlement amount as a percentage of estimated potential classwide damages in the aggregate and per class member, *id.*, which Plaintiffs have provided herein and in the chart attached as Exhibit A to this Memorandum. As Plaintiffs receive more detailed data and information through discovery, they can further refine the estimates provided herein. *See generally FOREX*, 2015 WL 9952596, at *3 (deferring approval of notice and a plan of distribution until plaintiffs obtained the data and information

necessary to identify and quantify the members of the proposed settlement classes). However, Plaintiffs and their experts continue to believe that these estimates are reliable. *See* Dell'Angelo Decl. ¶ 18.

### A.      Proposed Plan of Allocation and Notice Forms

Plaintiffs are committed to distribute the Net Settlement Fund in a reasonable manner that maximizes the amount available for distribution to the proposed Settlement Classes.[17] Like the allocation plan the Court approved in *FOREX*, Plaintiffs propose that the funds be distributed to members of the Settlement Classes *pro rata* based on each member's transactional volume, with adjustments to account for the dates and currency pairs corresponding to those transactions. *See FOREX* ECF No. 925 (Memorandum in Support of Motion for Final Approval of Plan of Distribution); *id.* ECF No. 1095 (Order Approving the Plan of Distribution).

In the Citigroup/MUFG Preliminary Approval Motion, Plaintiffs summarized their proposed allocation methodology, but requested that formal Motion for Approval of Notice and Plan of Allocation for the Citigroup and MUFG Settlements be deferred. Plaintiffs argued that it would be more efficient to administer the Citigroup and MUFG Settlement funds along with the proceeds of any additional settlements that were obtained in the future. Plaintiffs also noted that certain information yet to be obtained from third-party RFEDs was necessary to prepare Plaintiffs' notice plan.

With these additional settlements, cost efficiency considerations strongly support consolidating notice, fee and expense requests, and distribution of the SC and SG Settlement Funds together with the Citigroup and MUFG Settlement Funds. *See generally Alaska Elec. Pension Fund*, 2017 WL 3868461, at *3 (deferring decision on plan of allocation and notice to a

---

[17] "Net Settlement Fund" is defined in the Settlements as the balance of the Settlement Fund, net of any Court-approved administrative and notice expenses, attorneys' fees and expenses, and tax expenses. SC Settlement § X, ¶ (f); SG Settlement § X, ¶ (f).

later date to allow the plaintiffs obtain the identities of settlement class members); Citigroup/MUFG Preliminary Approval Order ¶ 34 (same). Additionally, although Plaintiffs have received document and data productions from certain RFEDs in the months since the Citigroup/MUFG Preliminary Approval Order, and are negotiating the scope and manner of responsive productions with others, much of the RFED documents and data necessary to identify the Settlement Class members and determine the Settlement Fund allocation has yet to be produced. *See* Letter Requesting Stay of Settlement Deadlines, ECF No. 333. Plaintiffs obtained a Court order compelling production of their FXDirectDealer, LLC subpoena on April 18, 2019, ECF No. 254, and filed a motion to compel as to their Forex Capital Markets subpoena on November 12, 2019. ECF No. 325. Plaintiffs will similarly move to compel any additional noncompliant RFEDs.

   In order to effectuate the consolidation of the allocation and notice procedures for the SC and SG Settlements with allocation and notice for the Citigroup and MUFG Settlements, Plaintiffs filed a separate request to stay the deadline for the submission of their Motion for Approval of Notice and Plan of Allocation for the Citigroup and MUFG Settlements so that they could match the deadlines proposed herein for the SC and SG Settlements, *see* ECF No. 333, which the Court granted on November 19, 2019. *See* ECF No. 334.

   Class Counsel rely on Dr. Janet S. Netz's proposed model to allocate the Net Settlement Fund on a *pro-rata* basis to the Settlement Class members who submit timely and valid claims, as required by Rule III.C.5 of the Court's Individual Rules, which was submitted in connection with the Citigroup/MUFG Preliminary Approval Motion. *See* ECF No. 274-3 (Declaration of Janet S. Netz). The allocation methodology proposed provides for the Net Settlement Fund to be distributed amongst the Class members *pro-rata* according to each claimant's trading volume,

adjusted for certain factors that potentially affected the amount by which the claimant's transactions were affected by the Defendants' alleged manipulation of FX prices ("relative damages factors"). ECF No. 274-3, at 2-6.

First, Dr. Netz determined that FX transactions with less liquid currency pairs (*i.e.*, currency pairs that are less frequently traded) were likely more susceptible to the effects of the conspiracy than FX transactions involving more liquid currency pairs. *Id.* at 2-3. Therefore, Class Counsel and Dr. Netz propose to group the various currency pairs that were traded by Class members during the Settlement Class Period according to their respective liquidity profiles: (1) most liquid, (2) liquid, (3) illiquid, and (4) pegged. *Id.* Each of these categories will be assigned multipliers for purposes of calculating claimant awards based on the liquidity level of each group. Claimant transactions for currency pairs that were relatively less liquid and therefore potentially more susceptible to manipulation receive relatively greater weight for purposes of calculating claim awards than the more liquid currency pairs. *Id.*

Second, it is anticipated that the evidence will show that FX trades occurring between December 1, 2007 (the start date of the Class Period specified in the Settlements) and December 31, 2013 (the end of the Class Period in the SCCAC) were relatively more impacted by the effects of the conspiracy than trades occurring in 2014 and later. *See* Netz. Decl. at 5. Accordingly, Plaintiffs propose to discount trades occurring between January 1, 2014 and the end of the Settlement Class Period by 90 percent. *Id.*

Plaintiffs anticipate that they will obtain transactional data for many of the Settlement Class members sufficient for the Claims Administrator and Plaintiffs' experts to calculate *pro-rata* claim amounts, thereby limiting the need for Settlement Class members to submit detailed documentation in conjunction with their claim forms. Plaintiffs have issued third-party

subpoenas requesting transactional data from approximately 60 RFEDs, and several RFEDs have already produced or are preparing to produce data responsive to those requests. Dell'Angelo Decl. ¶ 17. However, Plaintiffs also propose to provide claimants with the option to submit transactional records to support their claim in lieu of accepting the Claims Administrator's estimates.[18] The documented claim option will allow claimants to have their claim amount calculated based on their own transactional records, which will be particularly useful for claimants with large transactional volumes and for Class members for which detailed transactional records are unavailable.

Finally, Plaintiffs propose that the plan of allocation provide for a minimum payment amount "a *de minimis* award" for claimants whose *pro rata* claim award would otherwise fall under a certain threshold.[19] Plaintiffs will work with their experts to determine an appropriate *de minimis* award level here and will include additional details regarding that option in conjunction with Plaintiffs' formal Motion for Approval of Notice and Plan of Allocation, to be submitted 150 days after the Court's Preliminary Approval Order, pursuant to the Settlement Schedule proposed below.

**B.   Proposed Forms of Notice to the Settlement Class Members**

Plaintiffs also respectfully request that the Court approve the same notice procedure that it approved with respect to the Citigroup and MUFG Settlements here and the preliminary settlements in *FOREX. See* Citigroup/MUFG Preliminary Approval Order ¶¶ 20-25; *FOREX*, 2015 WL 9952596, at *3. Multiple notices spread out over the course of the litigation that describe different settlements and amounts with different Defendants may create confusion for

---

[18] This "documented claim option" was also included in the plan of allocation that the Court approved in *FOREX. See* ECF No. 877-7.

[19] The *FOREX* plan of allocation provided that claimants with estimated claim values of $15 or less receive a *de minimis* award of $15. ECF No. 877-7 at 18.

many Class members, which in turn would increase claims administration costs associated with responding to Class member inquiries. Accordingly, with the Court's permission, Class Counsel will submit for the Court's approval a formal notice plan within 150 days of the Preliminary Approval Order (pursuant to the Settlement Schedule proposed below). Class Counsel will submit proposed revisions to the notice plan as additional settlements, if any, are reached.

For purposes of the Court's Preliminary Approval Order, Plaintiffs prepared proposed draft Short-Form and Long-Form Notices to be disseminated to members of the Settlement Classes, in substantially similar forms as the Notices that the Court preliminarily approved in the Citigroup/MUFG Preliminary Approval Order. *See* ECF No. 274-5 (proposed Short-Form Notice); 274-6 (proposed Long-Form Notice). The updated proposed notice forms, attached as Exhibits C and D to the Dell'Angelo Declaration, each include a description of the case, the terms of the Settlements, and other information to allow Settlement Class Members to intelligently and meaningfully participate, object, opt out, or otherwise comment on the Settlements. The Short-Form Notice directs Class members to a settlement website where additional details will be provided, and the Long-Form Notice includes numerous additional details, including the plan of allocation and all relevant settlement schedule dates. In Plaintiffs' formal Motion for Approval of Notice and Plan of Allocation, Plaintiffs will seek approval of (1) a postcard Short-Form Notice which provides a cost-effective means of disseminating direct mail notice to the Settlement Class Members;[20] and (2) a Long-Form Notice to be posted on the settlement website and mailed or emailed to Settlement Class Members who request a copy. Plaintiffs intend to propose notice forms substantially similar to the draft Long-Form and Short-

---

[20] Plaintiffs' proposed Claims Administrator, Heffler Claims Group, estimates that using postcard notice will result in a cost savings of between $17,600 and $75,500, depending on the total number of Class members. *See* Dell'Angelo Decl. ¶ 19.

Form Notices attached as Exhibits C and D to the Dell'Angelo Declaration in their anticipated formal Motion for Approval of Notice and Plan of Allocation.

C. **Fees, Expenses, Service Awards, and Claims Administration Costs**

To avoid burdening the Court and confusing the Class members with multiple fee and expense requests, Plaintiffs propose that awards of attorneys' fees, reimbursement of expenses, service awards, and reimbursement of claims administration costs also be deferred.[21] Plaintiffs will submit a motion for attorneys' fees, reimbursement of reasonable costs and expenses, and service awards for the Settlement Class Representatives in advance of Plaintiffs' motion for final approval of the Settlements, pursuant to the Settlement Schedule proposed below.[22] Plaintiffs' fee request will not exceed 20% of the Citigroup and MUFG Settlement Funds and 25% of SC and SG Settlement Funds ($2,860,750 total), and their service awards request will not exceed $5,000 for each of the 11 Settlement Class Representatives ($55,000 total). As of November 22, 2019, Plaintiffs' litigation costs and expenses total $1,256,183. Dell'Angelo Decl. ¶ 20.

Pursuant to Rule III.C.5(b) of the Court's Individual Rules, and based on the information currently available to Class Counsel and their experts, Plaintiffs' experts have prepared preliminary Class size estimates. After carefully comparing bids and notice plan proposals from five well-respected administrators in conjunction with the Citigroup/MUFG Preliminary Approval Motion, Plaintiffs selected Heffler Claims Group ("Heffler") as the proposed Claims Administrator. The Court approved that selection in the Citigroup/MUFG Preliminary Approval Order. *Id.* ¶ 27. As detailed in the Dell'Angelo Declaration, Heffler estimates that for a total Settlement Class size of 100,000, the total costs of publication notice, direct-mail postcard and

---

[21] Pursuant to subpart (f) of Rule III.C.5(b) of the Court's Individual Rules, Plaintiffs believe that any additional Settlement expenses will be minimal but may include taxes and other escrow costs associated with administering the Settlement Fund.

[22] Plaintiffs reserve the right to seek additional attorneys' fees and service awards from future settlements and/or judgments. Counsel for Plaintiffs do not have any fee-sharing agreements subject to disclosure pursuant to S.D.N.Y. Local Civil Rule 23.1. Dell'Angelo Decl. ¶ 21.

email notice, internet notice including advertising the Settlements on social media and websites, and administering the claims will be approximately $209,902. Dell'Angelo Decl. ¶ 19. These cost estimates are based on a single consolidated notice and claims administration process for all Settlements to date, but would be multiplied if the process is done multiple times. *Id.*

### D. <u>Settlement Fund and Anticipated Recovery</u>

The SC and SG Settlements provide for combined cash payments totaling $2,695,000, for a total of $13,630,000 including the Citigroup and MUFG Settlements that are already preliminarily approved by the Court. For purposes of subpart (e) of Rule III.C.5 of the Court's Individual Rules, and applying the Class member estimate discussed above of 99,198, Plaintiffs estimate that the average recovery per Class member provided by the Citigroup, MUFG, SC, and SG Settlements combined is $137.49.[23] As noted in Section VI.A above, the actual amount distributed to each claimant will vary based on the claimant's total volume of transactions, the currency pairs and time periods for those transactions, and the number of Class members who file a claim. Plaintiffs anticipate that they will be able to provide a more precise estimate of the total number of Class members upon receipt of additional third-party discovery information from the relevant RFEDs. Applying the estimates detailed above for potential classwide damages in this Action based on the estimates submitted in the *FOREX* plaintiffs' final settlement approval papers, for a total Settlement Class size of 99,198, the per-Class member estimate for actual damages is between $2,058 (using the more conservative $204 million damages estimate) and $7,979 (using the higher $791 million damages estimate). Importantly, Plaintiffs and the Class members can still pursue their damages claims against the Non-Settling Defendants.

---

[23] Deducting the 20 percent maximum attorneys' fees request from the Citigroup and MUFG Settlements Amount, the 25 percent maximum attorneys' fees request from the SC and SG Settlements Amount, costs and expenses of $1,256,183 (as of November 22, 2019), estimated claims administration costs of $209,902, and maximum total service awards of $55,000 results in a Net Settlement Fund of $9,248,165. Thus, the estimated average recovery per Class member provided by the Net Settlement Fund is $93.29.

### E.   Appointment of Escrow Agent

The SC Settlement provides that SC shall pay the SC Settlement Amount in full within twenty business days of the Preliminary Approval Order, *see* SC Settlement § X, ¶ (b), and the SG Settlement provides that SG shall pay their Settlement Amount in full within fifteen business days of the Order. *See* SG Settlement § X, ¶ (b). In the Citigroup/MUFG Preliminary Approval Order, the Court approved Plaintiffs' for appointment of Huntington National Bank as Escrow Agent. *Id.* ¶ 29. Plaintiffs respectfully request that Huntington National Bank be similarly appointed as Escrow Agent for the SC and SG Settlements.

### F.   Proposed Settlement Schedule

Finally, pursuant to the provision of Rule III.C.5(b) of the Court's Individual Rules, and the Court's November 19, 2019, Order staying the settlement schedule set forth in the Citigroup/MUFG Preliminary Approval Order and directing Plaintiffs to submit a proposed revised settlement schedule by November 22, 2019, Plaintiffs submit a proposed schedule (the "Settlement Schedule"), set forth in paragraph 32 of the Proposed Order submitted with this motion, to establish a schedule for settlement events from Plaintiffs' Motion for Approval of Notice and Plan of Allocation through final approval and the deadline for submitting claims. The proposed schedule for the four Settlements is set to commence within 150 days of the Court's Order granting preliminary approval, and will ensure that classwide notice, claims administration, and distribution of claimant awards are carried out efficiently and in a manner that is not unduly duplicative or costly at the expense of the Settlement Class members.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for preliminary approval of the Settlements.

Dated: November 22, 2019              Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Michael J. Kane
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net
mkane@bm.net
jripley@bm.net

*Proposed Settlement Class Counsel*

Garrett W. Wotkyns
**SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP**
8501 North Scottsdale Road, Suite 270
Scottsdale, AZ 85253
Tel: (480) 428-0142
Fax: (866) 505-8036
gwotkyns@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Classes*

Joseph C. Peiffer
**PEIFFER WOLF CARR & KANE, APLC**
201 St. Charles Ave. Suite 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504) 523-2464
jpeiffer@pwcklegal.com

*Counsel for Plaintiffs and the Proposed Classes*

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
701 East Bay Street
Suite 411
Charleston, SC 29403
Tel: (843) 444-5404
Fax: (843) 444-5408

bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*