# Exhibit 5

# Jodi Tesser

| | |
|---|---|
| **From:** | Webb, Julie <JWebb@lockelord.com> |
| **Sent:** | Monday, October 07, 2019 9:49 PM |
| **To:** | Jodi Tesser |
| **Cc:** | Finger, Anna K.; Barry Temkin |
| **Subject:** | RE: FXCM/ CONFIDENTIAL |

Jodi,

Thanks for the productive discussion last week. As promised, please find below the questions we had to follow up on the draft declaration. Please let us know if it works best for you to respond to these by email, or if you'd like to schedule a call to talk through them.

- General follow-up questions:
    - Is the information provided in the draft declaration true for the entire relevant time period, or did things shift over time?
    - Did the CFTC investigation affect FXCM's execution, hedging, or pricing practices during the relevant time period? If so, how did things change?
    - What is the relationship between FXCM and FXCM Ltd.?
- Follow-up questions regarding trade execution models (Dealing Desk v. Non-Dealing Desk) (Paragraphs 10-14):
    - How does FXCM determine whether a particular retail trade will be executed using the dealing desk or non-dealing desk model?
    - At a high level, approximately what percentage of trades were executed using the dealing desk model vs. the non-dealing desk model?
    - Were there any written policies or procedures in place during the relevant time period governing whether trades would be executed using the dealing desk or non-dealing desk model, and/or how retail trades would be hedged?
    - What types of products were available through the dealing desk vs. the non-dealing desk? Were there any products only available through one model?
- Follow-up questions regarding liquidity providers (Paragraphs 15-19):
    - For non-dealing desk trades, are we understanding correctly that each of those trades was hedged before the client order was filled by either a Previously Quoted or Limit trade with a liquidity provider? In other words, no Market At Best, Stop, or Stop-Limit orders were used to hedge non-dealing desk trades with liquidity providers?
    - At a high level, approximately what percentage of non-dealing desk trades with liquidity providers were done via a Previously Quoted order vs. a Limit order?
    - Roughly what percentage of FXCM's non-dealing desk hedge trades during the relevant time frame were done with one of the Defendants as opposed to other liquidity providers?
    - Is it possible to determine, in FXCM's data, which liquidity provider was used to hedge individual retail non-dealing desk trades during the relevant time period?
    - Were prime brokers used for non-dealing desk trades, or only dealing desk trades? Did any Defendant serve as a broker for FXCM during the relevant time period?
- Follow-up questions regarding pricing and markups (Paragraphs 20-22, 88-90):
    - How were markups generally applied during the relevant time frame – was it on a customer-by-customer basis, or a standard markup applied to all trades? Paragraph 20 says that it is possible for markups to be applied to all clients on a universal basis, but does not indicate whether that is something that FXCM actually did during the relevant time frame.
    - Please describe the client-specific markups alluded to in the second sentence of Paragraph 20. We need to understand more about how FXCM took any prices they might have been quoted by Defendants and

1

- turned them into prices for FXCM's retail customers. Were there any written policies or procedures in place during the relevant time period governing pricing and/or markups?
    - How were commissions, fees, or other costs, if any, charged to customers?
    - Is there any way to determine, in FXCM's data, which liquidity provider(s) were used to calculate the "Best Bid/Offer" shown to any particular customer for any particular trade?
    - What is the "Bank Adapter" referred to in the declaration – is that a human or a computer? On what did it base its markup decisions and/or its decisions whether quotes were tradeable?
    - Did the CFTC investigation in 2011 cause any changes to FXCM's handling of asymmetrical price slippage? How did this affect prices charged to customers?
- Follow-up questions regarding anticipated document production:
    - FXCM indicates in its letter to Plaintiffs that it will produce transaction data "for the defendant banks only, for the eight states involved in this case." We'd like to understand more about what this means. How is FXCM able to identify which transaction data is somehow tied to the Defendants? What data is FXCM using to effectuate the geographical limiter?
    - FXCM also indicates in the letter to Plaintiffs that it will produce a general form for customer contracts. Did those agreements ever vary between customers?
    - Do you have a sense of the other categories or types of documents that you will be producing to Plaintiffs? We understand that your letter indicates which Requests you will be responding to via a document production, but a list of high-level categories would be extremely helpful to us.

We look forward to hearing from you when you've had a chance to connect with your client.

Best,

Julie C. Webb
Locke Lord LLP
312.443.0404 Direct

-----Original Message-----
From: Webb, Julie
Sent: Thursday, October 3, 2019 9:28 AM
To: 'Jodi Tesser' <JTesser@moundcotton.com>; Finger, Anna K. <Anna.K.Finger@lockelord.com>; Barry Temkin <BTemkin@moundcotton.com>
Subject: RE: FXCM/ CONFIDENTIAL

Sounds good, Jodi -- Talk to you later today.

If you need to move the call to tomorrow afternoon, just let us know.

Julie C. Webb
Locke Lord LLP
312.443.0404 Direct

2