```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                        Docket #1:17-cv-03139-
 CONTANT et al.,                    : LGS-SDA

                    Plaintiffs,     :

  - against -                       :

 BANK OF AMERICA CORPORATION et al., : New York, New York
                                       December 16, 2019
                    Defendants.     :

                                       TELEPHONE CONFERENCE
----------------------------------- : ON MOTIONS

                    PROCEEDINGS BEFORE
            THE HONORABLE JUDGE STEWART D. AARON,
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:          BERGER MONTAGUE PC
                         BY:  MICHAEL C. DELL'ANGELO, ESQ.
                              MICHAEL J. KANE, ESQ.
                              JOSHUA RIPLEY, ESQ.
                         1818 Market Street - Suite 3600
                         Philadelphia, Pennsylvania 19103
                         215-875-3000


For the Defendant,       LOCKE LORD LLP
HSBC Bank USA, N.A.:     BY:  JULIA C. WEBB, ESQ.
                         111 South Wacker Drive
                         Chicago, Illinois 60606
                         312-443-0404


Transcription Service:   Carole Ludwig, Transcription Services
                         155 East Fourth Street, #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service
```

APPEARANCES - CONTINUED:

```
For the Defendant,        MOUND COTTON WOLLAN & GREENGRASS
FXCM:                     BY:  JODI S. TESSER, ESQ.
                               BARRY TEMKIN, ESQ.
                          One New York Plaza - 44th Floor
                          New York, New York 10004
                          212-809-4200


For the Defendant,        KING & SPALDING LLP
Deutsche Bank:            BY:  GEORGE PATRICK MONTGOMERY, ESQ.
                          1700 Pennsylvania Avenue, N.W.
                          Washington, D.C.  20006-4706
                          202-737-0500


For the Defendant,        SHEARMAN & STERLING LLP
Bank of America:         BY:  JEFFREY JASON RESETARITS, ESQ.
                          599 Lexington Avenue
                          New York, New York 10022
                          212-848-7116


For the Defendant,        SHEARMAN & STERLING LLP
JP Morgan Chase & Co.:       FLOM LLP
                          By:  Tansy Woan, Esq.
                          One Manhattan West
                          New York, New York 10001-8602
                          212-735-2472


For the Defendant,        GIBSON, DUNN & CRUTCHER, LLP
UBS AG:                   BY:  PHILIP O. SHAPIRO, ESQ.
                          200 Park Avenue
                          New York, New York 10166
                          212-351-5323


For the Defendant,        MOORE & VAN ALLEN, PLLC
RBC Capital Markets LLC:  BY:  WILLIAM M. BUTLER, ESQ.
                          100 North Tryon Street - Suite 4700
                          Charlotte, North Carolina 28202
                          704-331-2455
```

**INDEX**


**E X A M I N A T I O N S**


| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|

None

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|

None

```
 1                        PROCEEDINGS                    4

 2              HONORABLE STEWART D. AARON (THE COURT):   Good

 3   morning.  This is Magistrate Judge Aaron.  This is the

 4   matter of Contant against Bank of America, 17-cv-3139.

 5   This line is being recorded.  If I could have the parties

 6   identify themselves, please, starting with the plaintiff.

 7              MR. MICHAEL DELL'ANGELO:  Good morning, Michael

 8   Dell'Angelo from the law firm of Berger Montague on behalf of

 9   the plaintiffs.  Accompanying me in the room are Michael Kane

10   and Josh Ripley.

11              THE COURT:  All right.  Good morning.

12              MR. DELL'ANGELO:  Good morning.  Thank you.

13              MS. JULIA WEBB:  Good morning, your Honor.  This is

14   Julia Webb from Locke Lord on behalf of HSBC.

15              THE COURT:  Good morning.

16              Do we have counsel for FXCM on the line?

17              MS. JODI TESSER:  Yes, your Honor.  This is Jodi

18   Tesser and Barry Temkin from Mound Cotton Wollan & Greengrass,

19   counsel for FXCM.

20              THE COURT:  Good morning.

21              MR. BARRY TEMKIN:  Good morning, your Honor.  This

22   is Barry Temkin.

23              THE COURT:  Good morning.

24              Do we have anyone else that is going to be joining

25   on the line?
```

```
 1                        PROCEEDINGS                    5
 2          MR. PATRICK MONTGOMERY:  Good morning, your Honor.
 3  This is Patrick Montgomery from King & Spalding on behalf of
 4  Deutsche Bank.
 5          THE COURT:  Good morning.
 6          MR. JEFFREY RESETARITS:  Good morning, your Honor.
 7  Jeffrey Resetarits of Shearman & Sterling for the Bank of
 8  America defendants.
 9          THE COURT:  Good morning.
10          MS. TANZY WOAN:  Good morning, your Honor.  This is
11  Tansy Woan from Skadden, Arps on behalf of the JPMorgan
12  defendants.
13          THE COURT:  Good morning.
14          MR. PHILIP SHAPIRO:  Good morning, your Honor.  This
15  is Philip Shapiro of Gibson, Dunn & Crutcher on behalf of the
16  UBS defendants.
17          THE COURT:  Good morning.
18          Is that everyone?
19          MR. WILLIAM BUTLER:  Good morning, your Honor.  This
20  is Bill Butler from Moore & Van Allen on behalf of RBC Capital
21  Markets.
22          THE COURT:  Good morning.
23          Anyone else?
24          All right.  The purpose of this call is to discuss
25  the two pending letter motions filed at ECF 325 and ECF 335.
```

```
 1                        PROCEEDINGS                    6

 2    The way I'd like to proceed, please, is I'll hear from the

 3    plaintiffs with respect to ECF 325; and then I'll hear from

 4    FXCM and then I'll hear from HSBC with respect to ECF 335 and

 5    I'll hear again from FXCM.  And I may have a few questions

 6    along the way.

 7             I've obviously read everything that's been

 8    submitted.  Please feel free to just rest on your papers or

 9    just to refer me to specific things rather than rehashing

10    what's in the correspondence.  But I did want to give the

11    parties an opportunity to address any issues that they thought

12    were particularly relevant for me to consider as I rule on

13    these two letter motions.

14             MR. DELL'ANGELO:  Thank you, your Honor.  Again,

15    this is Michael Dell'Angelo on behalf of the plaintiffs.  In

16    light of how narrow the dispute is and your statements

17    introducing the dispute, I will attempt to be very brief and

18    just respectfully reserve the opportunity to respond as

19    needed.

20             From the plaintiffs' perspective the dispute is

21    really very limited.  You know, we have requested and through

22    the meet-and-confer process narrowed down the scope of

23    material from FXCM that we believe is really necessary and

24    relevant to our case, both to (indiscernible) impact of

25    damages as well as to provide notice for four settlements that
```

1                              PROCEEDINGS                      7

2  we made with defendants in the case.  And, you know, there

3  are a number of additional defendants against whom we're

4  still litigating.  And so the dispute is really narrowed to

5  the question of whether and to what extent legal fees should

6  be paid.  And in that regard I think we have set it out, you

7  know, fairly clearly in our papers.  It's really a question of

8  compliance, which is not reimbursable, and we have to this day

9  not had any substantiation as to what, if any, fees have

10  actually been incurred, as to whether they're compliance- or

11  noncompliance-related.

12          And just to briefly overview the dispute with

13  respect to expenses, initially because a lot of the material

14  that we understood HSBC's subpoena was seeking would overlap

15  with what plaintiffs were seeking, we had thought that it made

16  sense, to the extent that FXCM was insisting upon some

17  extended contribution from the parties, that each of the

18  parties just share that expense equally.  You know, again,

19  FXCM didn't substantiate which expenses, and the basis for its

20  estimate was set forth in a letter to the Court of, I believe,

21  December 6.  That said, because an agreement apparently

22  couldn't be reached with HSBC with respect to the scope of its

23  subpoena to FXCM, plaintiffs suggested that we just pay half

24  of what FXCM was proposing, even though it's not really clear

25  in our view that any contribution is required.  Because of how

1                              PROCEEDINGS                    8

2   important this information is both to the prosecution as well

3   as providing notice to the class for the settlements, we

4   wanted to facilitate that and, you know, effectively took on

5   word what FXCM was representing about the expenses.   And

6   beyond that, I'm happy to answer any questions that the Court

7   has; but, otherwise, the interests of (indiscernible) and the

8   narrowness of the dispute, just rest on our papers.

9             THE COURT:  All right, so with respect to the data

10  that the plaintiffs are going to be receiving under the

11  plaintiffs' subpoena, I saw what's Exhibit 3 to the letter

12  that was submitted by Mr. Temkin of December 12, which is an

13  email from Jodi Tesser to Julie Webb that has -- it says,

14  "Please find attached the exemplar we provided to plaintiffs'

15  counsel."  So this appear to the Court -- and I'd like just

16  confirmation as to -- are you receiving, for lack of a better

17  term, FX trading data in response to plaintiffs' subpoena?

18            MR. DELL'ANGELO:  Yes, your Honor, that was -- yes.

19            THE COURT:  And what else are you receiving in

20  addition to what I refer to as the trading data?

21            MR. DELL'ANGELO:  So there are a number of things

22  that relate to data how FXCM interacts with its customers and

23  processes transactions, which are really central to the

24  determination in our case, as well as customer-specific

25  information about addresses.  We have an indirect-purchaser

```
 1                         PROCEEDINGS                    9
 2   case on behalf of plaintiffs in eight states, so we're seeking
 3   contact information for plaintiffs in those eight states so
 4   that we can issue notice and do a damage analysis that's
 5   limited to the plaintiffs who have brought claims in this
 6   case.  So broadly those are the categories of what we've
 7   narrowed the subpoena to.
 8              THE COURT:  Okay.  And I'm obviously going to be
 9   asking this question of HSBC, but I'll ask it of you, as well.
10   What's the overlap between your subpoena and the HSBC
11   subpoena, from your perspective?
12              MR. DELL'ANGELO:  I would say, your Honor, the
13   overlap of what we have requested -- let me put it this way.
14   I think everything that we have requested is within, broadly
15   within the scope of the HSBC subpoena, although the HSBC
16   subpoena is somewhat broader.  I'm a little hesitant to kind
17   of define the parameters of the HSBC subpoena in part because
18   I don't -- you know, I'm not the driver that's been thinking
19   about subpoena, and there may have been some, you know,
20   narrowing or discussions between HSBC and FXCM.
21              THE COURT:  Okay.  Very well.  So those are the
22   only questions I had.
23              Who's going to speak on behalf of FXCM?
24              MR. TEMKIN:  Good morning, your Honor.  This is
25   Barry Temkin.  I'm going to speak on behalf of the
```

```
 1                          PROCEEDINGS                 10

 2   negotiations with the plaintiffs.  And my colleague, Jodi

 3   Tesser, will speak on behalf of negotiations with defendants.

 4           THE COURT:  Okay.  Yes, Mr. Temkin, so what I'd

 5   like to do, as I mentioned, I'd like to speak strictly about

 6   the plaintiffs' subpoena for now.  So let me hear from you.

 7   And then I'd like to give HSBC an opportunity to speak before

 8   your colleague speaks.

 9           MR. TEMKIN:  Yes.  You got it.  That's fine.

10           Judge, I just want to make it clear that,  you know,

11   pursuant to the Court's rules and chambers individual rules,

12   that what we're doing now is really just a conference on the

13   Rule 45 potential motion.

14           THE COURT:  Let me stop you.  Let me stop you.  I'm

15   deciding this motion today.  You'll be getting a written

16   order, so say whatever you want to say.  I've gotten a lot of

17   materials.  So this is your chance.

18           MR. TEMKIN:  Okay, but, your Honor -- I'm going to

19   proceed -- but my concern is, you know, we haven't had an

20   opportunity to submit a declaration or any documents other

21   than the three pages required by the Court's rule.  So, in

22   other words, I've just heard from plaintiffs' lawyer, with

23   whom we have a substantive agreement in principle about the

24   scope of what to produce; but I just heard him say, well, you

25   know, Mound Cotton hasn't produced its billing records.  But
```

```
 1                         PROCEEDINGS                    11
 2  under this Court's rules I would not have had an opposition to
 3  produce, for example, our billing records or a declaration
 4  from our clients because the Court's rules only permit us to
 5  file a three-page letter.
 6          So I'm just asking that we be allowed to continue
 7  discussions, and then if it's germane to the Court's rulings,
 8  we be permitted at a future time to submit billing records,
 9  because our billing records for six months of meet-and-confer
10  and reviewing documents and drafting a declaration are, you
11  know, substantially more than three pages, your Honor.
12          THE COURT:  Okay.
13          MR. TEMKIN:  And it's just not fair to limit us to
14  three pages and then say we won't have an opportunity to put
15  in any declaration.
16          THE COURT:  Okay.  So, again, let me stop you.  You
17  submitted more than three pages because I asked you for
18  additional briefing, and you submitted another letter.  In
19  fact, you submitted three letters to the Court with
20  attachments.  Having said that, to the extent that the Court
21  believes that your billing records are germane to this
22  dispute, you are certainly going to have the opposition to
23  submit billing records at the appropriate time.  Don't get me
24  wrong.  I'm not going to be prejudicing you in any way from
25  putting in the proof that you need to establish what you're
```

```
 1                        PROCEEDINGS                    12
 2   trying to establish.
 3            MR. TEMKIN:  That's fine, your Honor.  I
 4   appreciate -- I just wanted to clarify that.  And the same
 5   thing, we may ask the Court -- and we may not need to -- but
 6   we may ask the Court for an opportunity to put in a
 7   declaration from our client on the level of burden.
 8            But for the plaintiffs I don't think we need to do
 9   that, your Honor, because, you know, I'm happy to say that
10   we've met and conferred with the plaintiffs for months, many,
11   many meetings.  We have reached an agreement, we confirmed it
12   in a letter.  And we also, as counsel correctly points out,
13   the only real legal issue as to the plaintiffs is who pays
14   what.  And we're happy to continue cooperating.
15            Both sides agree that we think all the case law
16   cited by both sides provides that a non-party served with a
17   subpoena under Rule 45 is entitled to some compensation for
18   legal expenses.  I've seen no case that awarded 100% of the
19   non-party's legal fees.  I've seen it range from a third in
20   the case of First American against Price Waterhouse to as high
21   as 80% in Kahn against GM.  And, obviously, the Court is
22   looking at all the factors.  Neither side has cited a case in
23   which zero in legal fees was paid.  Here we're in a situation
24   where the plaintiffs, as Ms. Tesser will get into later, the
25   defendant have not agreed to pay dollar one.  As we said in
```

```
 1                         PROCEEDINGS                    13
 2    our letters to the Court, we've incurred over $50,000 in legal
 3    fees doing what the court rules require us to do; we're
 4    meeting and conferring, we're attempting in good faith to
 5    produce the records, and we've -- you know, we've reviewed --
 6    we've been back and forth with our client.  We've prepared a
 7    detailed declaration from our client, which we've shared with
 8    everyone on the phone, with both sides.  And we're actually
 9    happy to go back and continue this discussion, but no one's
10    agreeing to pay our legal fees, and so we think we're entitled
11    to at least, you know, to have our legal fees paid.  Whether
12    it's 100% or 0% or some number in between, we think we're
13    entitled to that, and certainly we shouldn't be penalized for
14    doing what the court rules tell us to do, which is meet and
15    confer in good faith.
16              THE COURT:  Okay.  Anything else to add vis-à-vis
17    the plaintiffs?
18              MS. TESSER:  Your Honor, hi, this is Jodi Tesser for
19    FXCM.  I just wanted to point out one additional piece of
20    information.  The plaintiffs' counsel is taking issue with
21    the fact that we're looking for what they term as pre-
22    production legal fees.  And they've cited cases in support of
23    that where the counsel for the subpoenaed entity is incurring
24    fees in resisting the subpoena as opposed to attempting to
25    comply with the subpoena.  And what we've been doing, as
```

```
 1                        PROCEEDINGS                    14
 2   Mr. Temkin has just, you know, provided to the Court in terms
 3   of recitation of our back-and-forth, we've been doing meet-
 4   and-confers for months.  We have discussed the scope of the
 5   subpoena with plaintiffs' counsel on numerous occasions.  We
 6   have agreed to produce documents in response to certain
 7   demands.  We have -- plaintiffs have agreed to withdraw
 8   certain demands, and for other more sensitive proprietary and
 9   confidential information we have agreed to produce and we have
10   produced to everyone, as Mr. Temkin said, a 17-page draft
11   declaration that touches upon those proprietary and
12   confidential demands in both subpoenas.
13             So it's our position that this back-and-forth with
14   plaintiffs' counsel is not in attempting to resist the
15   subpoena and is in fact an attempt to comply with the
16   subpoena.  The cases that discuss resisting subpoenas talk
17   about fees incurred in connection with doing research on
18   attorney-client privilege and other confidential privileges to
19   attempt to hide documentation behind those privileges and/or
20   research about clock-shifting.  That's not what we're seeking
21   attorneys' fees for.  We are seeking attorneys' fees for the
22   meet-and-confers concerning the narrowing of the scope of the
23   subpoena in order to comply with it and also in drafting that
24   17-page declaration with our clients.
25             THE COURT:  Okay.  Anything else?
```

```
 1                        PROCEEDINGS                    15

 2            All right, let me hear, then, from HSBC.

 3            MS. WEBB:  Good morning, your Honor.  This is Julie

 4   Webb from Locke Lord on behalf of HSBC.  Given your comments

 5   about how thoroughly you've read the papers, I'm not going to

 6   take too much of your time, but I'm happy to answer questions

 7   you may have.  I do just want to say that it's clear to us

 8   from plaintiffs' filings that a substantial portion of the

 9   data that it will be receiving from FXCM is for the purpose of

10   administrating some settlements.  We certainly don't think

11   that HSBC should be required to pay for data plans they're

12   receiving to administer settlements.  I also --

13            THE COURT:  All right, so let's -- stop, please.

14   Let's go better on that.  I have your subpoena.  You're asking

15   for trading data, aren't you?

16            MS. WEBB:  I am asking for trader data, you're

17   right.

18            THE COURT:  Okay.  So tell me what parts of what

19   plaintiff is getting is different from that which you need and

20   which you've requested.

21            MS. WEBB:  We don't have enough information

22   about -- I'm sorry, I didn't mean to interrupt, your Honor.

23            THE COURT:  Okay.  It --

24            MS. WEBB:  We don't have enough -- we don't --

25            THE COURT:  Go ahead.
```

```
 1                         PROCEEDINGS                    16
 2              MS. WEBB:  From HSBC's perspective, we do not have
 3    enough information about the data that FXCM is going to be
 4    producing to plaintiffs in order to say either way whether it
 5    would be appropriate for us to pay for it.  We have received
 6    that one exemplar.  We can't tell from the exemplar whether
 7    it's retail-side data, liquidity-side data, what the scope of
 8    the data pull might be.  We've asked the follow-up questions,
 9    and we've not received answers.  So --
10              THE COURT:  Okay.  So let's stop --
11              MS. WEBB:  -- we are not --
12              THE COURT:  Let's stop.  Let's stop.  Let's stop.
13    Let's go one at a time.  And I want plaintiff to answer the
14    questions as to what's there.  So go with your first category
15    that you don't know.  You listed a bunch of things you don't
16    know --
17              MS. WEBB:  We don't have anything --
18              THE COURT:  You gave a bunch --
19              MS. WEBB:  And so I guess --
20              THE COURT:  You gave a bunch of examples.  I want
21    to go one by one, and I'm going to have the plaintiff tell you
22    whether or not it's there.  So go ahead.
23              MS. WEBB:  Okay, my first question is will the data
24    include both retail side and liquidity side or only one or
25    only the other or something I'm not even thinking of?
```

PROCEEDINGS                    17

 1

 2            MR. DELL'ANGELO:  This is Michael Dell'Angelo

 3   speaking for the plaintiffs.  My understanding is that it's

 4   both.

 5            THE COURT:  And counsel for FXCM, is that right?

 6            MS. TESSER:  Yes, I believe so, your Honor.

 7            THE COURT:  Okay, what's your next question?

 8            MS. WEBB:  What is the time frame for which data is

 9   being pulled?

10            MR. DELL'ANGELO:  My understanding is it's the

11   beginning of 2007 through 2015, December 2015; so two years

12   after the flat period.

13            MS. WEBB:  And for what -- what customers, what

14   types of transactions are being pulled?  Like, you must be

15   doing some sort of limiting searching, right?  So unless it's

16   all of FXCM's data for that time period --

17            MR. DELL'ANGELO:  As I indicated before, the

18   transactions are for those in the eight states that are the

19   subject of the complaint and that they're spot transactions.

20            MS. WEBB:  Okay, so it's only spot transactions,

21   correct?

22            MR. DELL'ANGELO:  Well, yes, it's my -- yes.

23            MS. WEBB:  And it's only spot transactions that are

24   somehow connected to the eight states identified in the

25   complaint?

```
 1                        PROCEEDINGS               18

 2            MR. DELL'ANGELO:  Correct.

 3            MS. WEBB:  Do we know how the location is being

 4  determined?  Is there actually a location field that's pulled?

 5            MR. DELL'ANGELO:  Um --

 6            MS. WEBB:  I didn't see one on the exemplar; that's

 7  why I'm asking.

 8            MR. DELL'ANGELO:  Yeah, we had some discussions

 9  with FXCM about this.  Just in the interest of making sure we

10  get the answer right, I would ask if counsel for FXCM could

11  specify?  Perhaps you could add some color here?

12            MR. TEMKIN:  Okay.  This is Temkin.  What

13  specifically is the question?

14            MR. DELL'ANGELO:  My understanding is counsel for

15  HSBC is trying to confirm how it is that FXCM is determining

16  the location of those making the spot transactions from 2007

17  to 2015 for which you would be producing in response to

18  plaintiffs' subpoena.

19            MR. TEMKIN:  Right.  I mean, we -- this is

20  Temkin -- we have a database where we can search by, yeah, by

21  address, by state.  But we have -- but it's not, especially if

22  you want to go back eight years, you know, we're going to have

23  to do some work and do some scanning to reconstruct it.  And

24  for different time periods it's kept in different statuses.

25  So, in other words, it's going to take a lot of legwork to, or
```

```
 1                          PROCEEDINGS                    19

 2   finger work, to get to the point.  But we can isolate this;

 3   it's just going to take time.

 4          MS. WEBB:  This is Julie Webb.  Mr. Temkin, is there

 5   a location field you're able to include in the production?

 6          MR. TEMKIN:  We would have to do a search to locate

 7   that; but the answer is yeah, we can search by location, but

 8   it will take -- you know, it will take effort and time.  And

 9   going back eight years will take a lot longer than going back

10   five years because my -- what I'm told from FXCM is that, you

11   know, it's databases have changed over time and, you know,

12   over the last -- especially going back that long, five years,

13   it's kept, I think, on backup tapes that needs to be restored,

14   and there's other data mixed in with it.  So we can't just

15   pull addresses with the push of a button the way -- you know,

16   that easily.

17          MS. WEBB:  Okay, so it's my understanding that when

18   you say you're going to search by location or state, what you

19   would be searching for is the customer's address information

20   in your systems, correct?

21          MR. TEMKIN:  Correct.

22          MS. WEBB:  Okay, and this is something you're

23   already planning to do for the production to plaintiffs; it's

24   not something extra that I'm identifying for you because I'm

25   being told you're already planning to pull for just eight
```

1                          PROCEEDINGS                    20

2  states, correct?

3          MS. TESSER:  Yeah, so -- yeah, so Julie and your

4  Honor, I find multiple conversations with, I believe,

5  Ms. Webb about this.  I sent to her a June 17, 2019, letter

6  which identifies the requests in the plaintiffs' subpoena,

7  which is exactly what we're doing now, telling her -- advising

8  her what categories of documents FXCM is going to be

9  responding to.  For example, in the June 17, 2019, letter, you

10 say, "Requests 3 and 4, we agree to produce this information

11 for the defendant banks only for the eight states involved in

12 the case."  So if Ms. Webb was asked to look at the

13 subpoena -- since the subpoena, she would know that we agreed

14 to produce all of the items listed in the Request No. 4 in

15 accordance with the letter.  This is exactly what I've been

16 trying to say during our meet-and-confers.  This

17 documentation, you know, the questions that I think

18 defendants' counsel has have already been addressed numerous

19 times during our meet-and-confers.

20         MS. WEBB:  May I respond, your Honor?

21         THE COURT:  Yes.

22         MS. WEBB:  Respectfully, Ms. Tesser, I've asked many

23 times some follow-up questions, and today is the first time

24 I'm getting answers, and they're from plaintiffs' counsel.

25 So, you know, I didn't know it was both liquidity side and

```
 1                        PROCEEDINGS                    21
 2   retail side that you'd be producing, and I didn't -- I've been
 3   asking how you were going to be limited it by location.  And I
 4   was told by you that was an improper interrogatory, so I
 5   couldn't have that information.  So I need information about
 6   what is in this production in order to determine whether or
 7   not it's something that my client is willing to pay for.  So
 8   we're not saying no, we'll never pay; we're saying please tell
 9   us more.  And today I'm getting some more information.  That's
10   very helpful.
11            THE COURT:  Yes, so just to be clear -- this is the
12   judge -- I'm going to be ordering you to make some payments.
13   So you don't need to worry about making an agreement, okay?
14   But whatever categories you have so far, everything that
15   you're -- as I understand it -- you'll correct me if I'm
16   wrong -- but this is all overlap with your subpoena?
17            MS. WEBB:  Yes, your Honor, this is all overlap with
18   our subpoena.
19            THE COURT:  Okay.
20            MS. TESSER:  It's my understanding that --
21   regardless, okay.
22            THE COURT:  Okay?
23            MS. TESSER:  I also have -- I have a few more
24   questions about the damages if this is the time for me to ask
25   them.
```

```
 1                          PROCEEDINGS              22
 2              THE COURT:  Yes.  I mean, obviously, this should
 3   have happened before, but now is as good a time as any.
 4              MS. TESSER:  Oh, I've been asking them, your Honor;
 5   I just haven't received answers, but I'm receiving answers
 6   today so I'd like to keep asking them, if that's okay.
 7              THE COURT:  Yes.  And I take -- the Court takes no
 8   position because the Court doesn't know, aside from the
 9   letters it's been given, as to who said what to who.  But go
10   ahead.
11              MS. TESSER:  Okay.  For the liquidity-side data, the
12   letter says that, "FXCM will be producing it for the
13   defendant banks only."  And I'm not able to determine what
14   that means.  Is that meaning that FXCM will only be producing
15   liquidity-side data that involves a transaction between FXCM
16   and a defendant?
17              MS. WEBB:  Yes, that's exactly what it means.  For
18   the defendants that are involved in the underlying
19   litigation, yes, that's exactly what that means.
20              MS. TESSER:  Okay.  And it's only -- okay.  That
21   helps.  Thank you.
22              Okay.  If any other defendants' counsel on the
23   phone have additional questions about the data; that's what I
24   have in my list right now.
25              MR. RESETARITS:  Yeah, this is Jeffrey Resetarits
```

```
 1                         PROCEEDINGS                    23
 2   with Shearman & Sterling for Bank of America.  I frankly don't
 3   understand the last interaction that just occurred.  The way
 4   these transactions work is the retail customers trade with
 5   FXCM, and FXCM then goes into the market and does a
 6   corresponding trade with potentially the defendant banks,
 7   potentially other entities.  And so the limitation to just the
 8   defendant banks doesn't make any sense in this context.
 9             MR. TEMKIN:  This is Barry Temkin.  I'm not sure I
10   understand the question, actually.
11             MR. RESETARITS:  It's straightforward.  The retail
12   customers that trade with your client, they enter into a
13   transaction.  Your client then goes into the market and trains
14   with other liquidity providers.  Sometimes those liquidity
15   providers are the defendant banks, and sometimes they are
16   not.  And so it's critically important for this case to get
17   both the transactions with the defendant banks and the non-
18   defendant banks.  They're central to this case.  I don't know
19   how you can limit it to that.
20             MR. TEMKIN:  This is Barry Temkin.  So I agree that
21   sometimes FXCM transacts with the defendant banks and
22   sometimes it transacts with other non-defendant parties.  But
23   it would be substantially more burdensome on FXCM to produce
24   additional documents and search for additional documents with
25   parties that are not -- with banks that are not parties to
```

```
 1                        PROCEEDINGS                     24
 2   this case.  And I'm not sure -- no one's explained to me why
 3   documents of banks that are not parties in this case would be
 4   relevant to this case, and no one's offered to pay us to do
 5   that search.
 6             MR. RESETARITS:  It's no -- there's no additional
 7   burden.  This is a collection of data; this is not a search
 8   for paper documents and files.  This is -- when you search on
 9   the liquidity side, you either gather it all or you gather
10   part of it.  It's actually more work to limit it to the
11   defendant banks.  That takes effort.
12             MR. TEMKIN:  Your Honor, this is Barry Temkin.  I
13   haven't really heard anything from Bank of America.  We've
14   been meeting and conferring with the defendants and the
15   plaintiffs for about six months now, and this is the first
16   I've heard that -- you know, of this request.  But all I can
17   tell you is, you know, Ms. Tesser and I have been speaking to
18   our client, meeting with our client and emailing with our
19   client for six months now.  And they're representing to us,
20   and we'll be happy to put it in a declaration, that it would
21   be significantly more burdensome and expensive for FXCM to
22   produce databases, which have to be -- you know, they have to
23   be retrieved, most of them, from backup tapes and other
24   storage.  And our client's data, according to what they've
25   told us, is intermingled with other data.  Like, it's mixed up
```

```
 1                          PROCEEDINGS                    25

 2    with other documents, so it has to be untangled from the other

 3    documents.  And so my client's challenge could be very, very

 4    burdensome.  And as your Honor just heard with your own ears,

 5    when I just asked counsel for Bank of America what relevance

 6    does it have, he just said, "Well, it's not going to cost you

 7    any more money to find it."  And my client says it will.

 8              MR. RESETARITS:  With all due respect, I'm happy to

 9    explain to you what the relevance is.  The relevance is that

10    the transaction -- the plaintiffs allege that the defendants

11    engaged in back-to-back transactions.  So the retail customer

12    traded with FXCM and then did a back-to-back transaction with

13    the defendant bank at the exact same rates.  The defendants

14    have a whole host of arguments, one of which is that the back-

15    to-back transaction was not with the defendant bank; it was

16    with a third party who had nothing to do with any anti-trust

17    conspiracy.  So getting the data for those non-parties is

18    critical.  We -- there's no way that the defendants want any

19    part of paying for data that doesn't have the complete picture

20    of the back-to-back transactions.  It's really that simple.

21              MS. TESSER:  Well, with all due respect, the

22    representation that it should be pretty easy for our clients

23    to gather the additional liquidity provider information for

24    non-party defendants is not accurate.  We discussed this.  As

25    Barry said, we discussed it with our clients, with multiple
```

1                          PROCEEDINGS                      26

2   preparation of multiple queries, as the data is stored

3   differently for different years over the eight-year time

4   period, restoration of backup tapes, isolation of relevant

5   data, cleaning of the data to ensure that a single query will

6   produce the desired results across the entire database,

7   linking the data together from FXCM's various databases in

8   order to produce the requested information and searching the

9   voluminous documents.  So, I mean, that's directly from our

10  client as to a summation as to the process that it would take

11  just to get the information related to the eight defendant

12  banks.

13          MR. TEMKIN:  As William F. Buckley famously said,

14  counsel's argument reminds me of calling 17 witnesses who did

15  not see the defendant shoot the victim.  In other words, you

16  know, defendants are accused, and some of them have pleaded

17  guilty to, or agree with regulators that they were engaged in

18  anti-competitive price fixing, forcing a non-party, at great

19  additional expense, to produce records about non-

20  conspiratorial trades with people who haven't been accused of

21  price fixing seems an unwarranted burden, particularly where

22  here Bank of America has not been part of this party for the

23  six months that we've been incurring over $50,000 in legal

24  fees, meeting and conferring with everyone else.

25          MR. RESETARITS:  I frankly don't understand that

```
 1                          PROCEEDINGS                    27

 2   argument at all.  I have no doubt that it is difficult for you

 3   to gather this information.  That burden exists regardless of

 4   whether you limit it to the defendant banks or you include

 5   the other liquidity providers.  And in fact anybody who has

 6   searched through a detailed spreadsheet knows it's actually

 7   harder to exclude and to limit certain categories rather than

 8   just to produce the whole thing.

 9           THE COURT:  Yes.  What the Court is having

10   difficulty understanding from FXCM is it seems to the Court

11   that there's trading data that relates to these FX

12   instruments, and it would seem to the Court that what counsel

13   for Bank of America is saying makes sense, right, that in

14   order to pinpoint that which related to the defendants in

15   this case would require more work than just giving all of the

16   data.  Tell me what I'm missing.

17           MR. TEMKIN:  Your Honor, since -- this is Temkin --

18   since this is just raised for the first time in this call, I

19   would ask an opportunity to go back to my client to, you know,

20   who has a unique system, to explain carefully to the Court

21   what I'm just hearing for the first time today.  And, you

22   know, we reached an agreement with the plaintiff in June --

23   okay, that's six months ago.  We sent that over to counsel for

24   HSBC, whom I assume shared with the other defendants.  And

25   now six months later, you know, counsel for Bank of America is
```

PROCEEDINGS                    28

1
2    saying, Hey, it's not going to cost you anything more.  So
3    rather than, you know, cause FXCM to be blindsided by the
4    surprise last-minute argument, all I'm asking for is an
5    opportunity for me to go back to my client and explain to the
6    Court in writing exactly why, as he's told me many times, it's
7    much, much more burdensome because of the way we keep the
8    data.  And, you know, restricting it to these defendants is
9    very beneficial and cheaper to my client.  I'm just a lawyer;
10   I'm not an IT professional, but that's what the IT
11   professionals are telling me.
12          And, you know, maybe counsel for Bank of America has
13   dealt with different spreadsheets for different clients; maybe
14   that's the way Bank of America keeps its records.  But, your
15   Honor, it's been represented to me that ain't the way that
16   FXCM keeps its records.  And, you know, if you don't accept my
17   representation, then give me a chance to put in a declaration
18   for my client, and I'm pretty sure we'll satisfy the Court
19   because, you know, all the information they've been giving us
20   so far and that we've shared with both sides has been accurate
21   in good faith.
22          THE COURT:  All right, let me ask plaintiffs'
23   counsel, why is it that you don't want transaction data
24   relating to parties other than the defendants?  I'm having
25   difficulty understanding.

```
 1                         PROCEEDINGS                    29
 2              MR. DELL'ANGELO:  Well, your Honor -- this is
 3  Michael Dell'Angelo speaking -- we don't believe that we need
 4  it.  The allegations in the case are that the defendants
 5  conspired to, for example, widen the spread on FX
 6  transactions that they made with retail foreign exchange
 7  dealers, such as FXCM, and then FXCM then passed on that
 8  illegal overcharge to our clients.  And we believe that by
 9  getting that narrower set of defendant transactional data
10  between FXM and the defendants and between FXCM and our
11  clients we can trace what we need to trace.  The defendants
12  have a different view, as I understand it, of the scope of the
13  data that they want.  That really goes to how they, you know,
14  intend to defend the case; it doesn't go to how, you know, we
15  intend to prosecute the case.
16              THE COURT:  All right, so here's what I'm going to
17  do.  I don't want additional submissions to the Court with the
18  back-and-forth and the back-and-forth that happened here.  I
19  believe that HSBC -- well, let me ask you this:  Since we had
20  all these other defendants join the call -- and this is the
21  question I had earlier -- am I correct that this data is going
22  to inure to the benefit of all of the defendants in the case?
23              MR. DELL'ANGELO:  Yes, your Honor.
24              THE COURT:  And am I also correct that whatever
25  cost sharing the Court's going to allocate here -- and there
```

1
2  will be some, because I agree with Mr. Temkin that under the
3  case law and under the rules, that some cost sharing is
4  appropriate -- that whatever share goes to HSBC is going to be
5  shared among the various defendants?
6          MS. WEBB:  That's our hope, your Honor.
7          THE COURT:  Well, is it -- it's something more than
8  hope, isn't it?  I mean, you folks have a joint defense
9  arrangement, I imagine, such that it's not only going to fall
10 on one of you, unless you've divvied it up, and HSBC takes the
11 expense on this one, and then Bank of America takes the
12 expense on the next one.  There is going to be sharing, isn't
13 there?
14         MS. WEBB:  We expect there to be sharing, yes.
15         THE COURT:  Okay.  So I think this meeting-and-
16 conferring already should have happened, and I know people
17 point fingers as to whose responsibility it was that it didn't
18 happen, but that's all water under the bridge.  I am going to
19 direct that defense counsel (indiscernible) meet and confer
20 with FXCM with respect to this issue of what I'll refer to as
21 the additional trading data.  And what I want to understand in
22 a joint letter -- and hopefully you're going to work it out --
23 is whether there is incremental costs associated with this
24 trading data that captures all of the trades, not just the
25 trades where the defendants, you know, provided the

```
 1                       PROCEEDINGS                    31
 2   liquidity, but rather, the trades (indiscernible).  And I'd
 3   like to understand what the scope of that incremental expense
 4   is so I can figure out how to divvy it up between plaintiffs
 5   and defendants.  I understand what plaintiffs are saying, in
 6   order to prove our case we only want this.  But that's not
 7   fair to the defendants because they obviously need the
 8   broader data pull in order to prove their defense.  But I'd
 9   like to understand what the incremental cost is so I can
10   figure out how to properly allocate it.  How long do you folks
11   need, given that we're approaching Christmas week, to
12   accomplish that meeting-and-conferring and reporting back to
13   the Court?
14             MR. TEMKIN:  Your Honor, I'm going to be out of the
15   office for about two weeks, so I would ask for a date in
16   January.
17             THE COURT:  I take it Ms. Tesser is similarly
18   unavailable?
19             MS. TESSER:  Yes, your Honor, I'm here this week,
20   but I am gone from next week through the new year.  And,
21   again, we have to speak to our client.  You know, I don't know
22   what they're going to do, what their vacation schedule looks
23   like at this point.  We did not talk to them about that before
24   this call.
25             THE COURT:  And tell me what the deadlines you have
```

```
 1                    PROCEEDINGS                 32

 2   in the case are.

 3            MR. DELL'ANGELO:  Your Honor, this is Michael

 4   Dell'Angelo.  May I speak to that?  I wasn't quite clear who

 5   you were directing that to, but --

 6            THE COURT:  I was directing it to whoever could

 7   answer the question.

 8            MR. DELL'ANGELO:  Thank you.  So by consent,

 9   plaintiffs and defendants just recently asked Judge Schofield

10   for an extension of the dispositive motion and class

11   certification deadlines as well as the fact discovery

12   deadlines.  So they're now pushed out to the end of the first

13   quarter of this year.  So we are kind of approaching what is

14   already an extended deadline.

15            But the thing that I would like to just draw to the

16   Court's attention and one area where I would ask some

17   indulgence to the extent that it's feasible within the scope

18   of what your Honor has in mind about how to manage this

19   process is that we have had preliminary approval pending on

20   two settlements.  On January 6, I believe it is, we have a

21   preliminary approval hearing on two more settlements.  Now, in

22   the interest of full disclosure, we told the Court that we

23   would like to combine notice for those two settlements because

24   we need to get address data from the various RFED's, such as

25   FXCM.  There are others on whom we're waiting, so I don't mean
```

1

2 to suggest that this is a problem that FXCM has created.  But

3 the more quickly we can get at least the address information,

4 the more quickly we, you know, fulfill our obligations to

5 issue notice.  So I would just -- I just wanted to raise

6 that issue because this is one of several pieces, certainly

7 not the only one, that is holding up our ability to, you

8 know, issue notice and fulfill our obligations with respect

9 to the preliminary approval process.  So from our

10 perspective, the sooner we can at least get that contact

11 information, the better.

12          But the other thing I would say is this larger

13 transactional data the parties are trying to get is

14 absolutely critical to plaintiffs' ability to brief class

15 certification.  That deadline was coming up in December, was

16 effectively, you know, impossible to meet in light of not

17 having this data from FXCM as well as others.  So, again,

18 I'm not putting it at their feet alone.  And this was

19 obviously a complicated, you know, three-way negotiation.

20 But, you know, what I would prefer not to do is have to go

21 back into court and ask for yet another extension on the

22 class certification deadline, although depending on when the

23 parties get the deadline -- get the data, we may be forced

24 to do that.

25          THE COURT:  All right, and so --

```
 1                      PROCEEDINGS                34
 2              MR. TEMKIN:  This is Temkin --
 3              THE COURT:  Yes, let me -- Mr. Temkin, let me
 4      speak, please.
 5              Thank you for adding additional issues for me to
 6      address.  So we're going to break them down.  So the list of
 7      names, is that list of names and addresses, is that of use
 8      to the bank defendants here?
 9              That question's addressed to HSBC or any other of
10      the banks on the call.
11              MS. WEBB:  I think the only interest to defendants
12      would be to the extent that plaintiffs are trying to prove
13      that a customer or a trade occurred in a certain state.  You
14      know, that's the only use of the address that I can think
15      of.  So I don't know that defendants would be independently
16      inclined to pay for that.
17              MR. TEMKIN:  Well, I just would -- well, your
18      Honor, if I may, a significant issue in the case that the
19      defendants have raised is that the plaintiffs have to be --
20      first of all, they have to be from a particular state to
21      even have standing to bring a claim.  And with respect to
22      some of the states, I think it's the defendants' position
23      that they actually had to transact from that state.  So, for
24      example, in the five or six plaintiff depositions that we've
25      had thus far, I mean, a theme of the questioning has been do
```

```
 1                        PROCEEDINGS                    35
 2   you go on vacation, do you travel for work, do you transact
 3   FX when you're outside of your home state.  So I tend to
 4   think that that location data, while the defendants may not
 5   have an interest in it for purposes of class certification
 6   notice under Rule 23, they will have a significant interest
 7   in it from a defense of a class certification motion as well
 8   as potential standing issues.
 9            MS. WEBB:  So maybe I misunderstood.  I thought we
10   were talking about the addresses, not a location field.  I'm
11   not sure we need the full address.  And it sounds to me like
12   plaintiffs would like full address information.  To the
13   extent pulling complete address information for FXCM's
14   customers is a different process than just pulling a field,
15   a location field in the database, that's what I was saying
16   we probably wouldn't be interested in.
17            MR. DELL'ANGELO:  I understand.  I guess only --
18   this is Mr. Dell'Angelo speaking -- I can only -- I think
19   only FXCM can speak to that question.  It wasn't clear to me
20   from the discussion earlier as to whether or not there's
21   really a distinction, but we've got --
22            MS. WEBB:  Understood.
23            THE COURT:  All right.  So FXCM, how -- can you
24   get the address and location data separately and on a
25   different, for lack of a better term, on a different
```

```
 1                        PROCEEDINGS                36
 2   schedule than the trading data?
 3           MR. TEMKIN:  Your Honor, this is Barry Temkin.  My
 4   understanding is no; it's all intertwined, and it would take
 5   at least a month and probably more.
 6           THE COURT:  Okay.
 7           MR. DELL'ANGELO:  Your Honor, this is Michael
 8   Dell'Angelo.  May I just ask a related question that may
 9   sort of cut through some of this?  I'm not trying to sort of
10   create a complication, but to the extent that there are
11   ongoing issues for data pulls, for scoping issues for the
12   defendants and FXCM, I'm wondering if it would be -- since
13   the plaintiffs had an agreement on the scope of the
14   subpoena, and I think the only question is, you know, the
15   question of fees and costs -- we'll be bound by, you know,
16   whatever the Court decides on that -- as to whether or not
17   it would be possible to at least, you know, move the scope
18   of the plaintiffs' agreement forward just to keep the
19   timeline moving?
20           THE COURT:  Yes.  I mean, the problem that I see
21   with that -- and, obviously, I'm (indiscernible) from FXCM
22   is you do the data pull once.  It's far more expensive to do
23   it twice.  And unless the plaintiff is willing to pay, for
24   lack of a better term, on its own for its data pull and then
25   the defendants pay on their own for their data pull whatever
```

```
 1                         PROCEEDINGS                    37
 2    share it is that I determine in my discretion, if you're
 3    willing to do that, then I don't see an issue.  But FXCM is
 4    going to be put to a greater burden if they have to do two
 5    data pulls.
 6              MR. DELL'ANGELO:  I understand, your Honor.  I
 7    appreciate that.  We would prefer to be more efficient,
 8    certainly don't want to incur costs that are unnecessary to
 9    incur.  What I had had in mind is, from what I understand what
10    Mr. Temkin was saying, is that pulling the non-defendant
11    transactional data that Mr. Resetarits was speaking to on
12    behalf of Bank of America, that that was as separate pull, so
13    there might not be an additional burden.  But if that is the
14    case, then so be it, we will not -- don't want to duplicate or
15    add to costs.
16              THE COURT:  Mr. Temkin, I assume you can't answer
17    that question on this call, can you?
18              MR. TEMKIN:  Correct, your Honor, but we'll be happy
19    to, you know, get back to counsel.
20              THE COURT:  Right.  So here's the way we're going
21    to proceed.  So, Mr. Temkin, to the extent you can get back to
22    plaintiffs' counsel promptly on that question, you should
23    please do so because, as I indicated, if plaintiff can get a
24    separate data pull from you without any additional incremental
25    costs and then you can do the, for lack of a better term, the
```

```
 1                        PROCEEDINGS                    38

 2   broader data pull, then, you know, feel free to negotiate with

 3   the plaintiffs about doing that.  But, otherwise, I'm going to

 4   proceed under the assumption that there's going to be one

 5   grand data pull from which this data is going to be culled.

 6              And the parties are to meet and confer, like we did

 7   on this call, with all interested parties on the call and seek

 8   to resolve the scope, what I'll refer to as the scope issue,

 9   and report -- and advise the Court whether they've been able

10   to come to agreement by -- does January 15 give you enough

11   time?

12              (interposing - indiscernible)

13              MR. DELL'ANGELO:  Well --

14              THE COURT:  Mr.  Dell'Angelo, it sounded like you

15   wanted to say something.

16              MR. DELL'ANGELO:  I did, your Honor.  Thank you.

17   And as I was speaking, I realized it's probably largely driven

18   by the schedules of counsel for FXCM.  What I was thinking is

19   that we do have this preliminary approval hearing -- and I

20   apologize, I can't remember if it's -- January 9.  So I was

21   thinking it would be helpful if we had a conclusion before

22   that so we can report to Judge Schofield.  But --

23              THE COURT:  Well, counsel for FXCM, can you do it

24   sooner?

25              MR. TEMKIN:  No, your Honor.  Well, what I mean,
```

```
 1                           PROCEEDINGS                    39
 2   we'll be as expeditious as we can, but I don't think we can do
 3   it.
 4           I'm going to be on vacation for actually ten days,
 5   not that I deserve it.
 6           THE COURT:  All right, and I'm going to wait to do
 7   the allocation.  From what I heard, it sounds to me like --
 8   and, obviously, FXCM should determine this -- it would seem to
 9   me that to get the address is just another field in addition
10   to the state, where the customer was, and therefore, that the
11   defendants should share in the expense of getting the
12   location data, as well, unless there's incremental costs
13   involved in getting the specific address as opposed to the
14   state.  That seems to me that it should be a shared cost.
15           So what the Court envisions here is there's going to
16   be a certain amount that falls within the plaintiffs'
17   subpoena, that is, trading data and location data and anything
18   else that the plaintiff is getting that will insure to the
19   benefit of the defendants, the defendants are going to share
20   in that.  If there's any plaintiffs-specific data or
21   documents, the plaintiff will only share in that; and any
22   defendants-specific documents or data, only the defendants
23   will share in that.  And that's what I want to hear back from
24   the parties in a joint letter on January 15, how that plays
25   out.  If you all can work it out among yourselves, so be it.
```

```
 1                          PROCEEDINGS                    40
```

I mean by that, the plaintiffs and the defendants.  And the

Court will come up with how much will be allocated between --

how much FXCM will pay and how much the parties requesting the

documents, the data will pay.  And I am, as I think

Ms. Tesser -- I think it was Ms. Tesser contemplated -- there

will be no legal fees that will be allocated in any way for

resisting the subpoena, for objecting to the subpoena or

anything like that; rather, any attorneys' fees which will

have to be supported by contemporaneous billing records that

I'll review for reasonableness both in terms of number of

hours and hourly rates, unless the parties again can work it

out among themselves.  It will only be for complying with the

subpoena.  I think that's what the case law dictates.

          MR. TEMKIN:  Your Honor, this is Barry Temkin.  May

I be heard on that point?

          THE COURT:  I'm not sure there's anything to be

heard on, but go ahead.

          MR. TEMKIN:  Thank you, your Honor.  Your Honor, I

think that there is no such limitation that I've seen, either

in Rule 45 and in the case, and, you know, my firm has -- my

client's incurred significant expenses in avoiding bringing

this to the attention of the Court.  And the plaintiff has

dropped, you know, many of his requests which we put in our

letter.  And if we had made a motion to quash and perhaps got

```
 1                         PROCEEDINGS                   41
 2   the plaintiff to drop half of their requests, I think under
 3   Rule 45 the Court would have awarded FXCM its attorneys' fees.
 4   Instead of burdening the Court with a motion to quash, what we
 5   did is we spent a lot of time and incurred a lot of expenses
 6   negotiating that they drop half their expenses.  Your Honor,
 7   we've been on the phone with the defendants for an hour, and
 8   all we've been talking about is trading data.  So it seems
 9   they've abandoned, you know, most of their other requests.  So
10   under these circumstances, I think FXCM, having complied with
11   the Court's rules and met and conferred the way we're supposed
12   to do, shouldn't have to pay more money for being good and
13   complying with the Court's rules.  If we had wanted a motion
14   to quash or gotten an order from the Court modifying the
15   subpoena to the extent we've agreed on today, I think you
16   would have awarded us our attorneys' fees.
17             THE COURT:  Are you and Ms. Tesser with the same
18   law firm?
19             MR. TEMKIN:  We are.
20             THE COURT:  You're on the same side, right?
21             MR. TEMKIN:  Affirmative.
22             THE COURT:  Yes, so Ms. Tesser eloquently stated
23   earlier why she believed the efforts that your firm undertook
24   were in complying with the subpoena.   And those type of
25   efforts, to the extent I determined that they were in an
```

```
 1                              PROCEEDINGS                    42
 2   effort to comply with the subpoena, I was saying would be
 3   compensable.  So I was agreeing with your colleague.  And to
 4   the extent you want to talk me out of that, I'm happy to hear
 5   you further.
 6              MR. TEMKIN:  I think I agree with your Honor and
 7   Ms. Tesser.
 8              THE COURT:  Okay.  Is there anything else?
 9              MR. TEMKIN:  Your Honor, I have one more question --
10   yes, there's one more question I have.  And I apologize to the
11   Court because counsel for Bank of America has explained this,
12   but I just want to make sure I understand it.  So I apologize
13   for, you know, asking him to repeat himself.  I just want to
14   understand -- and, again, my apologies -- the reasons why --
15   so I can explain to my client -- why the trading data for non-
16   defendant liquidity providers is essential to the defendants'
17   case.
18              MR. RESETARITS:  Again, the plaintiffs' allegations
19   in this case are that the defendants colluded with each other
20   and impacted the price of FX rates.  The way that the Retail
21   Foreign Exchange Markets works is the retail trader trades
22   with an entity like FXCM.  The allegation is that FXCM then
23   does as back-to-back trade with a liquidity provider.  If, for
24   example, FXCM did a back-to-back trade with a non-defendant,
25   there's at least one argument -- there's likely many
```

```
 1                        PROCEEDINGS                    43
 2    arguments -- as to why that particular retail customer could
 3    not have been injured by the defendants.
 4              There's also additional issues, which I'm sure
 5    you're aware of, where a retail foreign exchange individual
 6    trades with FXCM and FXCM does not do a back-to-back trade
 7    because, for example, the size of the trade from the retail
 8    customer is so small, that they can't go into the interbank
 9    market and trade a $500 or a $1,000 trade with an entity like
10    the defendant banks because it's too small.  So what FXCM and
11    other entities like it do is they warehouse it until it builds
12    to a particular size and then they trade with a liquidity
13    provider that could be a defendant or a non-defendant.  And
14    in that situation it's not a back-to-back trade, and any
15    prices they received were not passed onto the retail customer.
16              So I could go on and on.  There's a whole host of
17    reasons why the full complement of FX trading data from your
18    client is important to our defense.
19              THE COURT:  And this is Judge Aaron.  This is the
20    type of conversation that I am ordering you to have with one
21    another.  And I've been on the phone now for, I guess, a
22    little over an hour, but I don't need to be part of it.  This
23    is the type of conversation I want you to have with one
24    another to try to work this out.  And, by the way, having
25    heard what I heard, the Court has no doubt that the trading
```

```
 1                         PROCEEDINGS                    44

 2  data the defendant is seeking is relevant to this

 3  controversy.  It is something that needs to be produced.  It's

 4  another question as to who's going to pay for it and in what

 5  shares.  That's going to be something I'll determine.  But

 6  this is data that's relevant to the defense of the case.

 7             Anything else the parties would like to raise?

 8             I'm sorry, I didn't --

 9             MR. DELL'ANGELO:  Nothing for the plaintiffs, your

10  Honor.  Thank you.

11             THE COURT:  Okay.  Anything else from FXCM?

12             MR. TEMKIN:  Yes, your Honor, Barry Temkin.  I just

13  want it clear that counsel for the defendants

14  was -- accidentally, inadvertently left out from their initial

15  letter to the Court that we did have an agreement that was

16  confirmed in writing that we had an extension of time in which

17  to file objections or move.  I think counsel inadvertently

18  omitted that from their initial submission to the Court.  And

19  I just want that clear as your Honor read the records.

20             MS. WEBB:  I'm happy to respond to that, if you'd

21  like.

22             THE COURT:  Okay.

23             MS. WEBB:  I will say that I was unaware of that

24  email at the time we filed our letter.  And so I apologize for

25  not including it.  I also do not believe that we ever agreed
```

```
 1                        PROCEEDINGS                 45

 2   to an infinite extension of time.  But it seems a moot point

 3   at this point.  We're willing to work with FXCM and figure out

 4   what is appropriate to be produced based on burden.

 5              THE COURT:  Yes.  And the draft opinion that I

 6   prepared that I will not be issuing today has in a footnote

 7   that I do not find there's been a waiver of FXCM's objection.

 8   And that will -- that footnote will carry over to whatever I

 9   ultimately issue.  There's been no waiver in the circumstances

10   and on the record before me.

11              All right --

12              MS. WEBB:  Sounds good, your Honor.

13              THE COURT:  All right, so by January 15 I expect to

14   see a joint letter hopefully that all of you have worked out

15   the scope issues and advising the Court as to -- and this will

16   be in the written order that my law clerk and I will work

17   on -- but trying to get across the point of, you know, how

18   much is for the plaintiffs' benefit only, how much is overlap

19   and how much is for the defendants' benefit only.  And in

20   that way I can properly allocate the burden here.

21              All right, with that, this matter is adjourned.

22   And, as I said, expect to see an order probably sometime this

23   afternoon, if not tomorrow morning.

24              MR. TEMKIN:  Thank you, your Honor.

25              THE COURT:  All right, very well.  This matter is
```

1                              PROCEEDINGS                        46

2    adjourned.   Thank you.

3              (Whereupon, the matter is adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                            47

2

3                    C E R T I F I C A T E

4

5          I, Carole Ludwig, certify that the foregoing

6  transcript of proceedings in the case of Contant et al v.

7  Bank of America Corporation et al, Docket #17-cv-03139-LGS-

8  SDA, was prepared using digital transcription software and

9  is a true and accurate record of the proceedings.

10

11

12

13  Signature_____

14                     Carole Ludwig

15  Date:    March 5, 2020

16

17

18

19

20

21

22

23

24

25