**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al.*, | |
| Plaintiffs, | Civil Action No. 17-cv-3139-LGS |
| v. | (related to No. 13-cv-7789-LGS) |
| BANK OF AMERICA CORPORATION, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
APPROVAL OF SETTLEMENTS AND CERTIFICATIONS OF THE PROPOSED
SETTLEMENT CLASSES FOR SETTLEMENT PURPOSES**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     PROCEDURAL HISTORY.................................................................................. 3

III.    OVERVIEW OF THE SETTLEMENT NEGOTIATIONS AND TERMS ...................... 5

        A.      Overview of the SC and SG Settlement Negotiations and Settlements..................5

        B.      Overview of the Group Negotiations and Settlement ...............................................9

IV.     THE SETTLEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT
        TO GRANT PRELIMINARY APPROVAL .................................................................. 10

        A.      Legal Standards for Preliminary Approval ............................................................10

        B.      The Proposed Settlements Are Entitled to a Presumption of Fairness .................11

                1.      The Complexity, Expense, and Likely Duration of the Litigation .......... 12

                2.      The Reaction of the Classes to the Settlements ...................................... 12

                3.      The Stage of the Proceedings................................................................... 13

                4.      The Risks of Establishing Liability and Damages .................................. 14

                5.      The Risks of Maintaining the Class Action Through Trial..................... 16

                6.      The Ability of Defendants to Withstand a Greater Judgment.................. 17

                7.      The Reasonableness of the Settlements in Light of the Best Possible
                        Recovery and the Attendant Risks of Litigation...................................... 17

V.      CERTIFICATION OF THE SETTLEMENT CLASSES IS APPROPRIATE ............... 23

        A.      Plaintiffs Satisfy the Rule 23(a) Requirements.....................................................24

                1.      Numerosity............................................................................................... 24

                2.      Commonality............................................................................................ 25

                3.      Typicality.................................................................................................. 26

                4.      Adequacy.................................................................................................. 27

                5.      Ascertainability ....................................................................................... 28

        B.      Plaintiffs Satisfy the Rule 23(b)(3) Requirements.................................................29

                1.      Predominance........................................................................................... 29

                2.      Superiority................................................................................................ 31

        C.      Settlement Class Counsel......................................................................................32

VI.     ADDITIONAL DETAILS IN SUPPORT OF PRELIMINARY APPROVAL................. 32

        A.      Proposed Plan of Allocation and Notice Forms.....................................................32

B.      The Notice Plan..............................................................................37

C.      Fees, Expenses, Service Awards, and Claims Administration Costs ...................39

D.      Settlement Fund and Anticipated Recovery ...........................................41

E.      Appointment of Escrow Agent .........................................................42

F.      Proposed Settlement Schedule...........................................................42

VII.    CONCLUSION...................................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Allen v. Dairy Farmers of Am., Inc.*,
No. 09-cv-230, 2011 WL 1706778 (D. Vt. May 4, 2011) ........................................................ 11

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)................................................................................................... 23, 29, 31

*Atwood v. Intercept Pharm., Inc.*,
299 F.R.D. 414 (S.D.N.Y. 2014) ........................................................................................... 26

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
No. 07-cv-2207-JGK, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010) ....................................... 16

*Bowes v. Melito*,
140 S. Ct. 677, 205 L. Ed. 2d 440 (2019) ............................................................................... 39

*Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*,
No. 85-cv-3048-JMW, 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) .......................................... 15

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
504 F.3d 229 (2d Cir. 2007)................................................................................................... 25

*Charron v. Pinnacle Grp. N.Y. LLC*,
874 F. Supp. 2d 179 (S.D.N.Y. 2012)..................................................................................... 21

*Cohen v. J.P. Morgan Chase & Co.*,
262 F.R.D. 153 (E.D.N.Y. 2009) ........................................................................................... 23

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)................................................................................................................. 16

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)..................................................................................................... 30

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)................................................................................................... 26

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)............................................................................................*passim*

*Fleisher v. Phoenix Life Ins. Co.*,
No. 11-cv-8405-CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)...................................... 11

*Gruber v. Gilbertson*,
No. 16-CV-9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019)............................................ 25

*Hall v. ProSource Techs., LLC*,
No. 14-CV-2502-SIL, 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016) ...................................... 38

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) ........................................................................................... 38

*In re Agent Orange Prod. Liab. Litig.*,
818 F.2d 145 (2d Cir. 1987)................................................................................................... 39

*In re American Int'l Group, Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012)..................................................................................... 23, 29, 30

*In re AOL Time Warner, Inc.*,
No. 02-cv-5575-SWK, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) .................................. *passim*

*In re Austrian and German Bank Holocaust Litig.*,
80 F. Supp. 2d 164 (S.D.N.Y. 2000)...................................................................................... 11

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17-cv-1580-LGS, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).............................. passim

*In re CitiGroup Inc.*,
296 F.R.D. 147 (S.D.N.Y. 2013) ........................................................................................... 17

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009)..................................................................................................... 27

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
No. 13-cv-7789-LGS, 2019 WL 4171032 (S.D.N.Y. Sept. 3, 2019) .................................. 9, 16

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ...................................................................................... *passim*

*In re IMAX Secs. Litig.*,
272 F.R.D. 138 (S.D.N.Y. 2010) ........................................................................................... 26

*In re Initial Pub. Offering Sec. Litig.*,
226 F.R.D. 186 (S.D.N.Y. 2005) ........................................................................................... 10

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................................................... 12

*In re Michael Milken and Assocs. Sec. Litig.*,
150 F.R.D. 57 (S.D.N.Y. 1993) ............................................................................................. 11

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................................... 15, 17

*In re PaineWebber Ltd. Pships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997) ............................................................... 10, 11

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
  2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) ............................................... 25, 26

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ............................................................................ 28

*In re Playmobil Antitrust Litig.*,
  35 F. Supp. 2d 231 (E.D.N.Y. 1998) .............................................................. 26

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019) ........................................................ 31, 32, 34

*In re Top Tankers, Inc. Sec. Litig.*,
  No. 06-cv-1376-CM, 2008 WL 2944620 (S.D.N.Y. July 31, 2008) ................ 14

*In re Urethane Antitrust Litig.*,
  768 F.3d 1245 (10th Cir. 2014) ....................................................................... 30

*In re Vitamin C Antitrust Litig.*,
  No. 06-MD-1738-BMC, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ........ 12, 39, 40

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. Del. 2002) ........................................................................ 20

*Johnson v. Nextel Communs Inc.*,
  780 F.3d 128 (2d Cir. 2015) ............................................................................ 24

*Langan v. Johnson & Johnson Consumer Cos.*,
  No. 13-cv-1470-JAM, 2017 WL 985640 (D. Conn. Mar. 13, 2017) ................ 27

*Larsen v. JBC Legal Grp., P.C.*,
  235 F.R.D. 191 (E.D.N.Y. 2006) .................................................................... 29

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir.) ...................................................................................... 38

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972) ........................................................................... 17

*Ortiz v. Chop't Creative Salad Co.*,
  No. 13-cv-2541-KNF, 2014 WL 1378922 (S.D.N.Y. Mar. 25, 2014) .............. 10

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*,
  237 F.R.D. 26 (E.D.N.Y. 2006) ...................................................................... 12

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015) ................................................................... 29

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
  659 F.3d 234 (2d Cir. 2011) ................................................................... 24

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003) ..................................................... 12

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*,
  No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) .......................... 20

*Thompson v. Metro. Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) ............................................................... 37

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) ......................................................................... 30

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................ 24

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................. 10, 17, 20, 38

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982) ................................................................... 37

## **Rules**

Fed. R. Civ. P. 12 ............................................................................... 4, 6

Fed. R. Civ. P. 23 ....................................................................... *passim*

## I.    <u>INTRODUCTION</u>

Plaintiffs James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry Jacobson, Tina Porter, and Paul Vermillion (collectively, "Plaintiffs," or "proposed Settlement Class Representatives") respectfully submit this memorandum in support of their motion for preliminary approval of (1) a settlement between Plaintiffs and the proposed Classes and Defendant Standard Chartered Bank ("SC") (the "SC Settlement"); (2) a settlement between Plaintiffs and the proposed Classes and Defendant Société Générale ("SG") (the "SG Settlement"); and (3) a group settlement between Plaintiffs and the proposed Classes and Defendants Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Bank of America"); Barclays Bank PLC and Barclays Capital Inc. ("Barclays"); BNP Paribas (identified in the Complaint as BNP Paribas Group), BNP Paribas US Wholesale Holdings Corp., previously known as BNP Paribas North America, Inc., and BNP Paribas Securities Corp., which now includes BNP Paribas Prime Brokerage, Inc. ("BNP Paribas"); Credit Suisse AG and Credit Suisse Securities (USA) LLC ("Credit Suisse"); Deutsche Bank AG ("Deutsche Bank"); The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (now known as Goldman Sachs & Co. LLC) ("Goldman Sachs"); HSBC Bank plc, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. ("HSBC"); JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("JPMorgan"); Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley & Co. International plc ("Morgan Stanley"); RBC Capital Markets, LLC ("RBC"); The Royal Bank of Scotland plc (now known as NatWest Markets Plc) and RBS Securities Inc. (now known as NatWest Markets Securities Inc.) ("RBS"); UBS AG, UBS Group AG, and UBS Securities LLC ("UBS") (collectively, ("Group

Settling Defendants") (the "Group Settlement").[1] If approved, the proposed Settlements[2]—consisting of combined cash payments of $12,695,000[3] (the "New Settlements Amount")—will offer valuable monetary relief to the Classes and resolve this complex case in full against all Defendants.

Pursuant to Fed. R. Civ. P. 23(e), preliminary approval of a proposed class settlement requires Plaintiffs to show that the Court will likely be able to determine at the final approval stage that: (1) the classes should be certified for purposes of settlement; (2) the class representatives and class counsel have adequately represented the classes; (3) the proposal was negotiated at arm's length; (4) the proposal treats class members equitably relative to each other; and (5) the relief provided for the class is adequate, taking into account: (a) the costs, risks, and delay of trial and appeal, (b) the effectiveness of any proposed method of allocating and distributing relief to the class, (c) the terms of any proposed award of attorneys' fees, and (d) the terms of the settlement itself and any other relevant agreements made in connection with the proposed settlement. *Id*. The reasonableness considerations set forth in the amended Fed. R. Civ. P. 23(e) largely overlap with the following factors announced in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), that courts in the Second Circuit often apply at the preliminary approval stage in evaluating a proposed class settlement (the "*Grinnell* factors"):

> (l) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6)

---

[1] SC, SG, and Group Settling Defendants are collectively referred to herein as "New Settling Defendants."

[2] The SC, SG, and Group Settlements (referred to collectively herein as the "New Settlements") are attached, respectively, as Exs. A, B, and C to the accompanying Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Preliminary Approval of Settlements and Certifications of the Proposed Settlement Classes for Settlement Purposes ("Dell'Angelo Decl.").

[3] The SC Settlement provides for a payment of a $1,720,000, *see id.* at Section II, ¶ (qq); the SG Settlement provides for a payment of $975,000, *see id.* at Section II, ¶ (qq); and the Group Settlement provides for a payment of $10,000,000. *See id.* at Section II, ¶ (mm).

the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

As explained below, and for many of the same reasons set forth in the July 29, 2019, Order granting preliminary approval of the Citigroup and MUFG Bank ("MUFG") Settlements, ECF No. 297 (the "Citigroup/MUFG Preliminary Approval Order"), the factors relevant to preliminary approval of the New Settlements support Plaintiffs' instant motion. The New Settlements were negotiated at arm's length, and the relief obtained is fair, reasonable, and adequate. The proposed *pro rata* method of allocating the Settlement Fund amongst the members of the Settlement Classes ensures that they will be treated equitably relative to each other. The $12,695,000 to paid under the New Settlements is well within the range of reasonableness, especially considering the complexity of the litigation, and the risks of establishing liability, aggregate damages, and classwide impact.

Finally, prior to the settlement with Group Settling Defendants, counsel for Plaintiffs and the Settlement Classes ("Class Counsel") filed a separate request to coordinate the Settlement Schedule for the Citigroup and MUFG Settlements with the schedule for the SC and SG Settlements, which the Court granted on November 19, 2019. *See* ECF Nos. 333, 334. Class Counsel propose to consolidate the notice, allocation, and distribution of funds from all Settlements, pursuant to the settlement schedule set forth in the Proposed Order submitted with this motion.

## II.   <u>PROCEDURAL HISTORY</u>

Plaintiffs filed this action on April 28, 2017. ECF No. 1. On June 26, 2017, the parties filed a stipulation to consolidate the instant action with *Lavender, et al. v. Bank of America*

*Corp., et al.*, No. 17-cv-4392, *see* ECF No. 83, followed by the filing of the First Consolidated Class Complaint ("CCAC") on June 30, 2017. ECF No. 84.

On August 11, 2017, all Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6), ECF Nos. 103-104, and certain "Foreign Defendants," including SC and SG, filed a motion to dismiss pursuant to Rule 12(b)(2). ECF Nos. 105-107. On March 15, 2018, the Court granted Defendants' Rule 12(b)(6) motion and denied the 12(b)(2) Motion as moot. ECF No. 136. With the Court's permission, Plaintiffs filed a Motion for Leave to File a Second Consolidated Class Action Complaint ("SCCAC") on April 5, 2018, and addressed the issues identified in the Court's March 15, 2018, dismissal Order. ECF Nos. 138-39.

On October 25, 2018, the Court granted Plaintiffs' motion for leave to file the SCCAC with respect to Plaintiffs' state-law damages claims, but denied the motion with respect to Plaintiffs' claim for injunctive relief under the Sherman Act. ECF No. 166. Plaintiffs filed the SCCAC on November 28, 2018. ECF No. 183. On December 20, 2018, the "Foreign Defendants," including SC and SG, filed a new motion to dismiss the SCCAC for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). ECF No. 197. On May 20, 2019, the Court granted that motion as to Defendants The Royal Bank of Scotland plc, SG, UBS Group AG, and MUFG, and denied it as to Barclays Bank PLC, BNP Paribas Group, HSBC Bank plc, SC, and UBS AG. *See* ECF No. 263.[4] Plaintiffs filed a motion for reconsideration, ECF No. 276, which the Court denied on July 8, 2019. ECF No. 288. On July 25, 2019, Plaintiffs filed a motion for leave to file an amended complaint adding allegations detailing RBS's New York-related conduct in furtherance of the alleged conspiracy to address the issues identified in the Court's May 20, 2019, Order dismissing RBS for lack of personal jurisdiction. Plaintiffs did not seek to

---

[4] At the time of the Order, Plaintiffs had already reached the MUFG Settlement and were in the process of finalizing an agreement to voluntarily dismiss UBS Group AG.

add jurisdictional allegations as to SG because Plaintiffs and SG were in the process of finalizing a binding Memorandum of Understanding outlining the terms of the SG Settlement. The Court granted Plaintiffs' motion to amend on December 9, 2019. ECF No. 355.

On May 29, 2019, Plaintiffs filed a motion for preliminary approval of the Citigroup and MUFG Settlements, ECF No. 272, which the Court granted on July 29, 2019. ECF No. 297. On November 22, 2019, Plaintiffs filed a separate motion for preliminary approval of the SC and SG Settlements. ECF No. 337. The Court scheduled a hearing on the SC and SG preliminary approval motion for January 9, 2020. ECF No. 341. Plaintiffs and Group Settling Defendants reached an agreement in principle to settle this action in full shortly prior to the date of that hearing. Therefore, in order to avoid burdening the Court with two separate preliminary approval motions, the parties requested that the Court adjourn the January 9, 2020, hearing so that Plaintiffs could file this consolidated motion for preliminary approval of the SC, SG, and Group Settlements. *See* ECF No. 371.

## III.    OVERVIEW OF THE SETTLEMENT NEGOTIATIONS AND TERMS

### A.    Overview of the SC and SG Settlement Negotiations and Settlements

Beginning in May 2019, Plaintiffs engaged in numerous settlement discussions with SC. In October 2019, the parties reached an agreement in principle, followed by negotiation of the specific settlement agreement terms over several weeks, culminating in a written settlement agreement executed as of November 4, 2019. *See* Dell'Angelo Decl. ¶ 13.

Negotiations between Plaintiffs and SG began on May 15, 2019, followed by numerous discussions and communication over the next several weeks. *Id.* ¶ 14. The parties reached an agreement in principle on August 13, 2019, and thereafter exchanged draft settlement agreements culminating in a signed agreement on September 10, 2019. *Id.*

Negotiations for the SC and SG Settlements were hard-fought and resulted in favorable Settlements. Several considerations guided Plaintiffs' negotiations and their settlement demands and proposed cooperation provisions. These considerations were largely the same that guided Plaintiffs with respect to the prior preliminarily approved Citigroup and MUFG Settlements. Crucially, during the period between the commencement of Plaintiffs' settlement negotiations with SG and the finalization of the SG Settlement, SG was dismissed from the case. The Court granted dismissal of SG for lack of personal jurisdiction on May 20, 2019, ECF No. 263, and denied Plaintiffs' motion for reconsideration of that dismissal order on July 8, 2019. ECF No. 288. Additionally, SG was exempt from all discovery productions until the Court ruled on the Rule 12(b)(2) motion. *See* ECF No. 176, ¶ 8(b). The agreed-upon cooperation guaranteed that Plaintiffs would obtain discovery from SG, which is based in France, at a time when litigation was ongoing. Dell'Angelo Decl. ¶ 14.

Class Counsel utilized a methodology to estimate potential damages premised on the Court's finding that the settlement amounts in the direct purchaser plaintiffs' action in *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*"), was fair, reasonable and accurate.[5] Class Counsel and their experts estimated the volume of the retail FX Instrument transactions relevant to the damages claims of the members of the Settlement Classes relative to the overall volume of FX Instrument transactions that comprised the claims of the Direct Settlement Class in *FOREX*. Dell'Angelo Decl. ¶ 17.[6] Class Counsel and their experts studied a number of sources and data to estimate the size of the Classes here as compared to the *FOREX* class, including the Triennial Bank Survey of the Bank for International Settlements

---

[5] The Court previously granted preliminary approval of the Citicorp and MUFG Settlements, which utilized the same methodology for determining reasonableness of those settlement amounts.

[6] "FX Instrument" and "Direct Settlement Class" are defined in the Settlements as set forth in the SC Settlement § II, ¶ (o); and SG Settlement § II, ¶ (o).

("BIS"),[7] the Federal Reserve Bank of Cleveland,[8] and the academic research of one of Plaintiffs' experts, Dr. Carol Osler.[9] Dell'Angelo Decl. ¶ 17. Before adjusting for state population, these sources indicate that the daily average volume of nationwide retail FX trading applicable to this case relative to the overall direct purchaser FX Instrument market at issue in *FOREX* (the "retail FX market share") is likely between 10 and 30 percent. *Id.* Dr. Osler's estimate of the overall retail FX market share was then reduced to reflect the likely proportion of members of the Settlement Classes in New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina (the "Settlement Class States"). *Id.* According to the U.S. Census Bureau's Population Estimates, the populations of the Settlement Class States is 37.7 percent of the overall U.S. population. *Id.*[10]

The *FOREX* plaintiffs settled with SC for $17,200,000. *FOREX* ECF No. 822-5. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the SC *FOREX* settlement results in a *pro rata* indirect purchaser settlement amount of $648,440. Dell'Angelo Decl. ¶ 19. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the SC $17.2 million *FOREX* settlement results in a *pro rata* indirect amount of $1,945,320. *Id.* The $1,720,000 SC

---

[7] *See* Triennial Central Bank Survey, *available at* https://www.bis.org/publ/rpfx16fx.pdf (last visited May 22, 2020).
[8] Rawley Z. Heimer & David Simon, *Facebook Finance: How Social Interaction Propagates Active Investing* (Federal Reserve Bank of Cleveland, Working Paper No. 15-22, October 2015), *available at* https://www.clevelandfed.org/en/newsroom-and-events/publications/working-papers/2015-working-papers/wp-1522-facebook-finance-social-interaction-investing.aspx (last visited May 22, 2020).
[9] *See generally* Geir Bjønnes, Neophytos Kathitziotis, & Carol Osler, *Price Discrimination and the Cost of Liquidity in OTC Markets* (Nov. 17, 2015), *available at* http://www.fmaconferences.org/Vegas/Papers/CostOfLiquidityInDealershipMarkets_BKO_FMA2016.pdf (last visited May 22, 2020).
[10] *See* U.S. Census Bureau, National and State Population Estimates, *available at* https://www.census.gov/newsroom/press-kits/2018/pop-estimates-national-state.html (last visited May 22, 2020).

Settlement here is therefore 88.4 percent of the high end of the *pro rata* range of reasonableness based on the Court-approved direct-purchaser settlements in *FOREX*. *See id*.[11]

The SG settlement in *FOREX* provided for a payment of $18 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-4. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the$18 million *FOREX* SG settlement is between $678,600 (using the 10% estimate) and $2,035,800 (using the 30% estimate). *See* Dell'Angelo Decl. ¶ 20. Therefore, the SG Settlement amount of $975,000 is well within the *pro rata* range of reasonableness based on the *FOREX* settlement, particularly given that SG was dismissed from the action when the Settlement was reached. *See id*.

Both the SC and SG Settlements required the Settling Defendants to provide cooperation to Plaintiffs in their ongoing litigation against the non-settling Defendants. Because the SC and SG Settlements were reached prior to the Group Settlement, the cooperation provisions further support the reasonableness of those settlements.

The settlements provide that SC and SG shall be released of any and all manner of claims arising from or relating in any way to any conduct alleged or that could have been alleged in and arising from the factual predicate of the Action. SC Settlement § II, ¶ (ii); SC Settlement § II, ¶ (ii).[12]

---

[11] Plaintiffs' settlement negotiations with SC were also informed by SC's settlement in the Canadian FX class action. *See infra* Section IV.B.7. As detailed below, the SC Settlement exceeds the estimated reasonable settlement range based on the Canadian SC settlement, even after accounting for the fact that the total population of the eight states included in the proposed Settlement Classes is larger than the population of Canada. *Id.*

[12] The Citigroup, MUFG, SG, and SC Settlements each contained a provision providing that under certain circumstances, the release and termination provisions applied to each of these Defendants will be harmonized with the corresponding provisions applicable to one or more subsequent settlements. Citigroup Settlement § VIII(f); MUFG Settlement § VIII(f); SG Settlement § VIII(f); SC Settlement § VIII(f). Pursuant to that provision, Plaintiffs and these Settling Defendants have agreed to harmonize the release and termination provisions of the Citigroup, MUFG, SG, and SC Settlements with the corresponding provisions in the Group Settlement. Dell'Angelo Decl. ¶ 32. Harmonizing the release provisions does not change the substance of the releases in the Citigroup, MUFG, SG,

**B.**     **Overview of the Group Negotiations and Settlement**

Plaintiffs' negotiations with the Group Settling Defendants began in November 2019. The parties reached an agreement in principle on February 19, 2020, and thereafter exchanged draft settlement agreements culminating in a signed agreement on April 24, 2020. *Id.*

The negotiations were informed and guided by the litigation status. Shortly prior to the commencement of the parties' Group Settlement negotiations, on September 3, 2019, the Court in the related direct-purchaser action *FOREX* issued an order denying the *FOREX* plaintiffs' motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS, 2019 WL 4171032, at *1 (S.D.N.Y. Sept. 3, 2019) (the "*FOREX* Class Order"). In addition, the deadline for fact discovery and for the parties to file pre-motion letters regarding summary judgment and class certification motions was imminent. The impending risks and expenses associated with these motions, which were amplified by the *FOREX* Class Order, were significant factors in determining a reasonable Group Settlement amount.

The SC, SG, and Group Settlements are on behalf of statewide Classes in each of the Settlement Class States, each of which are defined to include persons and entities who, during the Class Period for each settlement, indirectly purchased an FX Instrument from a Defendant or co-conspirator in or while residing in the respective Settlement Class State by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class Member entered into the FX Instrument directly with a Defendant or co-conspirator. *See* SC Settlement § III; SG Settlement § III; Group Settlement § III. The SC and SG Settlements

---

and SC Settlements. However, doing so will avoid Class members potentially being confused by the different release language in the Settlements. The termination of any of the Settlements will also now be governed by the same provision so as to eliminate inconsistencies and avoid potential confusion.

provide for a class period of December 1, 2007 through preliminary approval; while the class period for the Group Settlement is December 1, 2007 through December 15, 2015. *See* SC Settlement § III; SG Settlement § III; Group Settlement § III.

The entire class definitions are set forth in the Settlements and the Proposed Order submitted with this motion. *See* SC Settlement § III; SG Settlement § III; Group Settlement § III; Proposed Order ¶ 11.

## IV.   THE SETTLEMENTS MEET THE CRITERIA NECESSARY FOR THIS COURT TO GRANT PRELIMINARY APPROVAL

### A.   Legal Standards for Preliminary Approval

Pursuant to Fed. R. Civ. P. 23(e)(2), a proposed class action settlement must be "fair, reasonable, and adequate." To grant preliminary approval, the Court must find it "will be likely" grant final approval under Rule 23(e)(2) and "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). This analysis entails an initial evaluation of "procedural" fairness, focused on whether the settlement resulted from informed, arm's length negotiations, *see Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005), and "substantive" fairness of the agreement's terms – collectively, the "*Grinnell* factors." *See, e.g.*, *Ortiz v. Chop't Creative Salad Co.*, No. 13-cv-2541-KNF, 2014 WL 1378922, at \*12 (S.D.N.Y. Mar. 25, 2014) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The recently amended Rule 23 does not change this fundamental inquiry. *See* Fed. R. Civ. P. 23(e)(2) advisory committee note ("The goal of this amendment is not to displace any factor . . ."). Substantive factors favoring preliminary approval include whether the settlement grants the plaintiffs repose in the face of complex, uncertain litigation. *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 198 (S.D.N.Y. 2005).

Finally, while "[t]he decision to grant or deny such approval lies squarely within the discretion of the trial court," *In re PaineWebber Ltd. Pships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997), courts in this District recognize that "there is an overriding public interest in settling . . . litigation, and this is particularly true in class actions," *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405-CM, 2015 WL 10847814, at *4 (S.D.N.Y. Sept. 9, 2015) (citation omitted). Settlements "advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation." *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2011 WL 1706778, at *2 (D. Vt. May 4, 2011). As demonstrated below, the New Settlements merit preliminary approval because they are procedurally and substantively fair.

### B.      The Proposed Settlements Are Entitled to a Presumption of Fairness

A settlement that is the "product of arm's length negotiations conducted by experienced counsel knowledgeable in complex class litigation" is presumptively fair. *In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000). In such circumstances, "'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *PaineWebber*, 171 F.R.D. at 125 (citation omitted). Here, Class Counsel have the requisite class action and antitrust experience to lead this litigation on behalf of the proposed Settlement Classes, and New Settling Defendants are represented by highly experienced and sophisticated counsel. Negotiations with SC took place over the course of six months, and negotiations with SG and Group Settling Defendants each took place over more than three months. Dell'Angelo Decl. ¶¶ 13-15. Negotiations with New Settling Defendants were informed by Class Counsel's knowledge of the facts and the Court's decisions in this and related actions, earlier settlements in this case, the settlements in

11

*FOREX* and the Canadian FX action, and the expert analyses described herein. *Id.* ¶ 22-24. Thus, the New Settlements are entitled to "a strong initial presumption that the compromise is fair and reasonable." *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993).

To determine whether the Court will be likely to grant final approval, the *Grinnell* factors are informative. Not every factor must weigh in favor of settlement; rather, "the court should consider the totality of these factors in light of the particular circumstances." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) (citations and internal quotations omitted). As explained below, these factors weigh in favor of preliminary approval of the Settlements.

### 1.     The Complexity, Expense, and Likely Duration of the Litigation

Courts recognize that "'[f]ederal antitrust cases are complicated, lengthy, . . . bitterly fought,' as well as costly." *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738-BMC, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) (citation omitted). Having overseen this case and the related *FOREX* action for years, this Court is aware of the complexities and duration of this case. The Group Settlement was reached shortly prior to the deadline for fact discovery, and *Daubert*, class certification, and summary judgment motions would have followed, as well as a potential trial and appeals. *See generally Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) (noting that "the time value of money make[s] future recoveries less valuable than this current recovery").

The costs of continuing to litigate this action, absent the New Settlements proposed herein, would be substantial. Because of the guaranteed cash recovery and reduced litigation expenses, the first *Grinnell* factor weighs in favor of granting preliminary approval.

### 2.     The Reaction of the Classes to the Settlements

Courts generally do not consider the second *Grinnell* factor at the preliminary approval stage because notice has not been disseminated to the proposed Settlement Classes. *See, e.g.*,

*Reade-Alvarez v. Eltman, Eltman & Cooper, P.C.*, 237 F.R.D. 26, 34 (E.D.N.Y. 2006). However, each of the proposed Settlement Class Representatives supports approval of the New Settlements. Dell'Angelo Decl. ¶ 25.

### 3.    The Stage of the Proceedings

"The relevant inquiry for this factor is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re AOL Time Warner, Inc.*, No. 02-cv-5575-SWK, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006). Discovery need not be fully complete, or even underway, before a settlement can be approved. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (to be informed, "formal discovery need not have necessarily been undertaken yet by the parties"). Rather, it is enough for the parties to "have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *AOL Time Warner*, 2006 WL 903236, at *10 (citation omitted). This Court previously granted preliminary approval to class settlements in *FOREX* before the start of merits discovery, *see FOREX* ECF No. 536, and similarly granted preliminary approval of the Citigroup and MUFG Settlements in this Action where the settlements were reached prior to the start of merits discovery as to Citigroup and MUFG. *See generally* Citigroup/MUFG Preliminary Approval Order.

Plaintiffs are sufficiently informed to reach adequate settlements. The complaints were drafted based on extensive investigation of the alleged conspiracy and its effects, including the review of publicly available news articles, press releases and other reports, research of the applicable law, and consultation with leading experts on the FX market. Discovery was far-along when the SC and SG settlements were reached and the Court-ordered discovery period was nearly completed when the Group Settlement was reached. Dell'Angelo Decl. ¶¶ 13-15. The

information gleaned from this discovery—including vast amounts of documents and transactional data from Defendants—as well as from the pleadings, motions, and court orders in *FOREX* helped Class Counsel to assess the potential damages, as well as the risks and likely defenses going forward. The settlement negotiations included frank discussions of the relative strengths and weaknesses of the parties' claims and defenses. Dell'Angelo Decl. ¶¶ 13-15. Collectively, this information provided Plaintiffs with a comprehensive understanding of the relative strengths and weaknesses of their case, enabling Plaintiffs to negotiate settlements believed to be an excellent result for the Settlement Classes. *Id.* Therefore, this factor supports preliminary approval.

### 4.   The Risks of Establishing Liability and Damages

"In assessing the Settlement, the Court should balance the benefits afforded [to] the Class[es], including the *immediacy* and *certainty* of a recovery, against the continuing risks of litigation." *In re Top Tankers, Inc. Sec. Litig.*, No. 06-cv-1376-CM, 2008 WL 2944620, at *4 (S.D.N.Y. July 31, 2008) (emphasis in original). Here, Plaintiffs' ability to prove liability faces significant risk due to, among other things, the complexity of the subject matter of this litigation and the fact that Defendants are well-financed and can afford to litigate indefinitely.

Critical to Plaintiffs' risk analysis for SG was the Rule 12(b)(2) order dismissing SG from the litigation, and the subsequent order denying Plaintiffs' motion for reconsideration of the dismissal order. Although Plaintiffs could have sought to appeal that order or filed a motion for leave to file an amended complaint adding jurisdictional allegations regarding SG, the success of such efforts would have been far from certain. Thus, absent the settlement, there is no guarantee that Plaintiffs would have been able to recover any funds—or obtain any discovery materials—from SG.

Significantly, on October 26, 2018, prior to Plaintiffs' settlement negotiations with New Settling Defendants, a jury in the U.S. District Court for the Southern District of New York acquitted three foreign exchange traders of price-fixing charges brought by the Antitrust Division of the Department of Justice ("DOJ"). *See* Dell'Angelo Decl. Ex. H (Oct. 26, 2018, Trial Transcript (Jury Verdict), *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), ECF No. 240, at 2481:9-2482:4). The DOJ argued that the Defendant traders conspired to coordinate their trading to manipulate FX Instrument prices. However, the three traders, who were previously employed by Barclays, RBS, JPMorgan, and Citigroup, successfully argued that their chatroom discussions regarding FX trades reflected lawful parallel conduct rather than coordination. *See* Dell'Angelo Decl. Ex. I (Oct. 25, 2018, Trial Transcript (Closing Arguments), *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), ECF No. 239, at 2369:17-22). If a jury in this action similarly found that the evidence does not support Plaintiffs' antitrust conspiracy allegations, Plaintiffs and the members of the Settlement Classes would likely be unable to recover any damages.

Additional risk exists because the New Settling Defendants have significant financial resources to litigate this action to trial. New Settling Defendants are represented by some of the best law firms in the United States, and absent settlement, they are prepared to vigorously contest liability and damages. Even assuming Plaintiffs can establish liability at trial with respect to New Settling Defendants, "[t]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). In sum, "[t]here is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and

appealed, any recovery would be years away." *Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*, No. 85-cv-3048-JMW, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987).

This factor therefore supports preliminary approval of the Settlements.

### 5. The Risks of Maintaining the Class Action Through Trial

Plaintiffs will need to overcome numerous hurdles before the action proceeds to trial. After the conclusion of fact discovery, Plaintiffs will be required to succeed on their motion for class certification, and to defeat any *Daubert* summary judgment motions filed by New Settling Defendants. Even if class certification is granted, New Settling Defendants may later seek to decertify the Settlement Classes or modify the definitions of the classes prior to trial, and there is always the possibility of changed circumstances, or changes in the governing law, that could threaten class certification in the future. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207-JGK, 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("There is no assurance of obtaining class certification through trial, because a court can re-evaluate the appropriateness of certification at anytime during the proceedings."). Interlocutory appeals at any stage of the litigation would add further uncertainty to the Action. *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 29 (2013) (reversing class certification in an antitrust case at an interlocutory stage).

Significantly, on September 3, 2019, the Court in the related direct-purchaser action *FOREX*, issued the *FOREX* Class Order, denying the motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS, 2019 WL 4171032, at *1 (S.D.N.Y. Sept. 3, 2019). Although the decision *FOREX* Class Order is not dispositive of class certification in this distinct action, Class Counsel nevertheless recognize that the *FOREX* Class Order is a potentially complicating factor for obtaining certification of litigation classes in this case. Further, even if Plaintiffs' proposed

litigation classes were certified and prevailed at trial, a jury verdict would likely be followed by appeals. Accordingly, this factor weighs in favor of preliminary approval.

### 6.     The Ability of Defendants to Withstand a Greater Judgment

New Settling Defendants could withstand a greater judgment than provided for by the New Settlements. However, courts consistently hold that the defendants' ability to pay more than the settlement amount is insufficient reason by itself to decline preliminary approval of a settlement. *See In re IMAX Secs. Litig.*, 283 F.R.D. at 191 ("[T]his factor, standing alone, is not sufficient to preclude a finding of substantive fairness where the other factors weigh heavily in favor of approving a settlement."); *In re CitiGroup Inc.*, 296 F.R.D. 147, 157 (S.D.N.Y. 2013) (approving settlement with Citigroup, despite the fact that "Citigroup could likely withstand a greater judgment").

### 7.     The Reasonableness of the Settlements in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors "recognize[] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In applying these factors, "[t]he adequacy of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'" *In re IMAX Secs. Litig.*, 283 F.R.D. at 191 (citation omitted); *see also NASDAQ*, 187 F.R.D. at 478 ("[T]he exact amount of damages need not be adjudicated for purposes of settlement approval."). Consequently, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2, *see also In re IMAX Secs. Litig.*, 283 F.R.D. at 191-192 ("[T]he Second Circuit 'has held

that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought.'" (citation omitted)). Without the New Settlements, Plaintiffs have no guarantee of securing any recovery from the New Settling Defendants given the risks, among others, of class certification not being granted or failing to establish liability and damages. These risks are arguably dispositive for the final two *Grinnell* factors. *See FOREX* ECF 1105, ¶ 8 (noting, in granting final approval of SC settlement, that "success in antitrust cases such as this one is inherently uncertain, and there is no guarantee that continued litigation would yield a superior result.").

The New Settlements provide a combined $12,695,000 million in cash payments to compensate the Settlement Classes, for a total Settlement Fund of $23,630,000 including the Citigroup and MUFG Settlements that were previously preliminarily approved by the Court. The immediacy of the cash payments weighs in favor of approval. *See AOL Time Warner*, 2006 WL 903236, at *13. ("[T]he benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery").

As described in Section III above, Class Counsel utilized a methodology to estimate reasonable settlement ranges in this Action premised on the settlement amounts in the *FOREX* direct purchaser action. Class Counsel's methodologies described in Section III—together with the Court's orders in *FOREX* finding that those direct purchaser settlements were fair, reasonable and adequate—support the reasonableness of the settlement amounts proposed here.

In addition to the *FOREX* settlements approved by this Court, the New Settling Defendants' settlements approved in the Canadian action offer further support of the reasonableness of the Settlement amounts here. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-

18

000189-152 (Quebec S.C.J.). In the Canadian action, twelve of the same Defendant groups involved in this Action—SC, SG, UBS, BNP Paribas, Bank of America, Goldman Sachs, JPMorgan, Citigroup, Barclays, HSBC, RBS, and MUFG—entered into settlements totaling $106,747,206 Canadian Dollars ("CAD") with the plaintiffs and proposed nationwide Canadian classes that included direct *and* indirect purchasers. *See* ECF No. 274-9 (court-approved notice of the Canadian settlements). The Canadian settlements with the ten New Settling Defendants listed immediately above totaled $85,297,205 CAD.[13] The Canadian plaintiffs' settlements allocated 20 percent of the settlement proceeds to the indirect purchaser Canadian class members. *Id*. Therefore, the Canadian indirect purchasers recovered $17,059,441 CAD from the New Settling Defendants' Canadian settlements (20% of $85,297,205 CAD). The exchange rate as of March 27, 2020, was approximately 0.71 CAD to 1 U.S. dollar ("USD").[14] Therefore, the Canadian indirect purchaser settlement amounts are approximately $12,112,203.11 USD for New Settling Defendants. Applying a population adjustment factor of 3.44 to those amounts to account for the larger population of the proposed Settlement Class states relative to the Canadian population,[15] a *pro rata* estimate of a reasonable settlement amount in this matter based on the Canadian indirect purchaser settlement amounts is approximately $41.7 million for New Settling

---

[13] Specifically, the settlement amounts for the ten New Settling Defendants involved in the Canadian action were $4,950,000 CAD for UBS, $4,500,000 CAD for BNP Paribas, $6,500,000 CAD for Bank of America, $6,750,000 CAD for Goldman Sachs, $11,500,000 CAD for JPMorgan, $19,677,205 CAD for Barclays, $15,500,000 CAD for HSBC, $13,220,000 CAD for RBS, $900,000 CAD for SC, and $1,800,000 CAD for SG. The Citigroup and MUFG Canadian settlements, which the Court considered in granting preliminary approval of the Citigroup and MUFG Settlements in this Action, were, respectively, $21,000,000 CAD and $450,000 CAD. *See* ECF No. 274-9 (Canadian Settlement Notice).

[14] *See* Federal Reserve Bank of St. Louis, US Dollar to National Currency Spot Exchange Rate for Canada, *available at* https://fred.stlouisfed.org/series/CCUSSP01CAM650N#0 (last visited May 22, 2020).

[15] The U.S. Census estimates that in 2013, the total population of Canada was 34.57 million, and the total population of the eight Settlement Class states was 118.98 million. *See* U.S. Census, Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2018, available at https://www.census.gov/data/tables/time-series/demo/popest/ 2010s-state-total.html (last visited May 22, 2020); U.S. Census, Demographic Overview – Canada, *available at* https://www.census.gov/data-tools/demo/idb/ region.php?N=%20Results%20&T=13&A=separate&RT=0&Y=2013&R=-1&C=CA (last visited May 22, 2020). Thus, the total population of the Settlement Class states is approximately 344.2% of the population of Canada.

Defendants. Therefore, the $12,695,000 under New Settlements is approximately 24 percent of a *pro rata* estimate based on the court-approved Canadian New Settling Defendants settlements. Notably, however, SG was dismissed as a Defendant in this action, but was not dismissed in the Canadian action. In addition, the increased risks presented by the *FOREX* Class Order was not present in the Canadian action as the question of class certification had not been addressed in the Canadian action when the Canadian New Settling Defendant settlements were reached. The Canadian New Settling Defendant settlements further confirm the reasonableness of the Settlements here.

The Advisory Committee's comments to the 2018 Fed. R. Civ. P. 23 amendments note that courts often "forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results" in considering the reasonableness of proposed settlements. *Id.* In making this calculation, courts often compare the proposed settlement amount with the damages that would be awarded in the event of a "complete victory" by the plaintiffs, *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-cv-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004), and discount that by the "uncertainties of law and fact" and "the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart*, 396 F.3d at 119. While such a forecast cannot be done with "arithmetic accuracy," it may be useful as "a benchmark for comparison with the settlement figure." Fed. R. Civ. P. 23(e)(2) Adv. Comm. Notes.

In *FOREX*, the plaintiffs have settled with all Defendants except for Credit Suisse and have estimated that their total potential damages ranged from $5.4 to $7.0 billion for the period

December 7, 2007 to December 31, 2013, the same litigation Class Period applicable to this Action. *See* SCCAC ¶ 40; *FOREX* ECF No. 925, at 17.[16]

Consistent with the methodology that Plaintiffs applied in evaluating the reasonableness of the Citigroup and MUFG Settlements, *see* Citigroup/MUFG Preliminary Approval Motion, the potential damages analyses set forth herein confirm the reasonableness of the SC, SG, and Group Settlement Amounts here.

Specifically, applying the state population and retail FX market share estimates (discussed above) to those *FOREX* damages estimates results in an estimated range for total damages in this Action of between $204 million (applying the lower 10% retail FX market share estimate and 37.7 percent state population factor to $5.4 billion) and $791 million (applying the 30% retail market share estimate and state population factor to $7.0 billion). Collectively, New Settling Defendants account for 82.7% of all Defendants' market share. *See* SCCAC ¶ 92. Accordingly, the estimated range for total damages in this Action attributable to New Settling Defendants is between $168.7 million (82.7% of $204 million) and $654.2 million (82.7% of $791 million). The $12,695,000 under the New Settlements therefore represents between 1.9 and 7.5 percent of the estimated potential damages range allocable to New Settling Defendants. Including the Citigroup and MUFG Settlements that were preliminarily approved by the Court, the $23,630,000 total Settlement Fund here represents between 3.4 and 13.3 percent of the $204 million to $791 million potential damages range allocable to all Defendants. Given the significant litigation risks facing Plaintiffs at the times the New Settlements were reached, these analyses further confirm the reasonableness of the New Settlements.

---

[16] "The standard for evaluating settlement involves a comparison of single damages, not treble damages." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257-58 (D. Del. 2002) (citations omitted).

Moreover, the litigation risks are real. SG was dismissed from the case at the time the SG Settlement was reached. The *FOREX* Class Order significantly increased the risks that Plaintiffs would be unable to certify their proposed classes, which would have effectively eliminated the possibility of obtaining additional settlements or a favorable judgment with respect to any non-settling Defendants. New Settling Defendants made clear their position that class certification should be denied here like in the *FOREX* action and would have argued that in opposition to a litigation class certification motion. They also would likely have moved to exclude Plaintiffs' experts' opinions, arguing that Plaintiffs' proposed methods of estimating aggregate damages and classwide impact are unreliable.[17] Litigating class certification and related *Daubert* motions would have required Plaintiffs to expend hundreds of thousands—if not millions—of dollars in expert expenses alone, and if the Court ruled in favor of Defendants on any of those motions, Plaintiffs may have been unable to recover those unreimbursed expenses.

Further, even if Plaintiffs successfully obtained class certification, substantial risks would still remain. New Settling Defendants would undoubtedly have argued that the evidence does not show an overarching price-fixing conspiracy but rather, at most, collusion with respect to individual trades. This argument finds support in a recent class certification opinion issued in the Canadian FX class action involving many of the same allegations and same defendants. The court noted that the conspiracy alleged was an "episodic conspiracy of price fixing" and not an overarching conspiracy. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174-00CP (Ontario S.C.J. Apr. 14, 2020). And even if Plaintiffs established the alleged overarching conspiracy, each of the New Settling Defendants would have argued they were not participants in that agreement. If a jury were to credit Defendants' arguments, the action would

---

[17] New Settling Defendants have denied liability here. "Establishing otherwise [would] require considerable additional pre-trial effort and a lengthy trial, the outcome of which is uncertain." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012), *aff'd sub nom., Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013).

be significantly narrowed or dismissed. The governmental findings and allegations resulting in regulatory fines and guilty pleas are narrower in scope than the allegations in this action (and several New Settling Defendants were not the subject of any such governmental fines or pleas), and thus alone would not have sufficed to demonstrate liability with respect to New Settling Defendants. And, even if liability is established, a jury could reject Plaintiffs' expert's opinion on damages finding much lower or even no damages. Furthermore, because the Court in the *FOREX* Class Order granted certification of a Rule 23(c)(4) issue class to determine the existence of the Defendants' antitrust conspiracy as well as the involvement of the remaining Defendant Credit Suisse in the conspiracy, *id.* at *10, any orders issued in *FOREX* in favor of Credit Suisse may have adversely affected Plaintiffs' claims in this action.

In short, the certainty of the recoveries achieved by the New Settlements weighs heavily in support of preliminary approval when weighed against the risks of establishing liability and damages against New Settling Defendants.

## V.   CERTIFICATION OF THE SETTLEMENT CLASSES IS APPROPRIATE

Pursuant to the terms of the Settlements, Plaintiffs respectfully request that the Court certify the Settlement Classes defined in the Proposed Order for settlement purposes only. Certification of a settlement class is appropriate where that class meets all of the requirements of Rule 23(a) as well as one of the requirements of Rule 23(b). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). A court asked to certify a class for settlement purposes "need not inquire whether the case, if tried, would present intractable management problems." *Id.* at 620. The court's focus instead is "on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 621; *see also In re American Int'l Group, Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012). The Court's analysis must be rigorous to ensure the Rule 23 requirements are met, *id.* at 237-38, but in doing so the court

23

"must take a liberal rather than restrictive approach in determining whether the plaintiff satisfies these requirements and may exercise broad discretion in weighing the propriety of a putative class." *Cohen v. J.P. Morgan Chase & Co.*, 262 F.R.D. 153, 158 (E.D.N.Y. 2009). For the same reasons the Court previously preliminary found that the requirements for class certification were met for purposes of the Citicorp and MUFG Settlements, the Court should preliminarily find that the requirements for class certification are met for purposes of the New Settlements. *See* Citigroup/MUFG Preliminary Approval Order at 2-6 (certifying Settlement Classes and finding that numerosity, typicality, commonality, adequacy, and ascertainability requirements of Fed. R. Civ. P. 23(a) are satisfied).

### A.   Plaintiffs Satisfy the Rule 23(a) Requirements

"Before granting a class certification motion, a court must ensure that the requirements of Federal Rule of Civil Procedure 23(a) and (b) have been met." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580-LGS, 2020 WL 1329354, at *1 (S.D.N.Y. Mar. 23, 2020) ("Chicago Bridge"). Rule 23(a) has four prerequisites: numerosity, commonality, typicality and adequacy of representation. *Id.* "An additional implied requirement of Rule 23 is ascertainability, which requires that members of the proposed class be identifiable." *Id.* For the reasons described below, and as set forth in the Citigroup/MUFG Preliminary Approval Order certifying the Settlement Classes for purposes of the Citigroup and MUFG Settlements, all four Rule 23(a) requirements are satisfied here.

### 1.   Numerosity

"In the Second Circuit, numerosity is presumed for a class of forty or more plaintiffs." *Chicago Bridge*, 2020 WL 1329354, at *10 (citing *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011)). Class Counsel estimate that there are at least tens of thousands of members of the Settlement Classes. Dell'Angelo Decl. ¶ 27; Declaration of James

Bibbings, ECF No. 274-4 ("Bibbings Decl."), ¶ 19 (estimating of 99,138 members). Accordingly, the numerosity requirement is easily met here.

### 2. **Commonality**

Commonality is established where a common contention "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "'Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'" *Johnson v. Nextel Communs Inc.*, 780 F.3d 128, 137-38 (2d Cir. 2015) (citation omitted).

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 2019 WL 359981, at *37 (E.D.N.Y. Jan. 28, 2019) ("*Payment Card*"). Here, the overarching question is whether members of the Settlement Classes were injured by Defendants' price-fixing conspiracy in the FX market. "Numerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (citation and internal quotation marks omitted). Thus, the commonality requirement is satisfied here on the basis of that common question alone. *Id.* Plaintiffs' claims present numerous other common issues of law and fact, including: the participants of the alleged conspiracy; the duration and acts carried out in furtherance of the alleged conspiracy; whether the alleged conduct caused injury to Plaintiffs and the members of the Classes; the effects of the alleged conspiracy on the prices of FX Instruments sold during the Class Period; and the appropriate measure of damages to Plaintiffs and the Classes. Thus, the commonality requirement is satisfied.

### 3. __Typicality__

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (citation and internal quotations omitted); *Payment Card*, 2019 WL 359981, at *38 (same). "This standard is 'not demanding,' as 'the claims only need to share the same essential characteristics, and need not be identical.'" *Chicago Bridge*, 2020 WL 1329354, at *11 (quoting *Gruber v. Gilbertson*, No. 16-CV-9727, 2019 WL 4439415, at *2 (S.D.N.Y. Sept. 17, 2019). Accordingly, small differences do not defeat typicality; "[r]ather, a plaintiff fails to meet Rule 23(a)'s typicality requirement if its claims are 'subject to unique defenses which threaten to become the focus of the litigation.'" *In re IMAX Secs. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (citation omitted). In sum, where "class representatives have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions" typicality is satisfied. *Payment Card*, 2019 WL 359981, at *38 (internal quotations and citations omitted).

The claims of Plaintiffs and the members of the Settlement Classes all arise from the same alleged unlawful conspiracy to artificially widen the spreads on, and otherwise manipulate the prices of, FX Instruments, and the injury resulting from that conduct. For each Settlement Class, the proposed Settlement Class Representative's claims are the same as the claims of all members of their respective Class. Any differences as to the facts relevant to the claim of each potential member of the Settlement Classes or the damages suffered by the Settlement Classes do not preclude a finding of typicality. *See In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Differences in the damages sustained by individual class members does not

preclude a showing of typicality, nor defeat class certification."). The typicality requirement is therefore satisfied here.

### 4.   <u>Adequacy</u>

"'The adequacy requirement is satisfied where: (l) there is no conflict between the proposed lead plaintiff and the members of the class; (2) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) class counsel is qualified, experienced, and generally able to conduct the litigation.'" *Atwood v. Intercept Pharm., Inc.*, 299 F.R.D. 414, 416-17 (S.D.N.Y. 2014) (citation omitted); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (class representatives "must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members"). "A conflict 'between named parties and the class they seek to represent' will be sufficient to defeat class certification only if the conflict is 'fundamental.'" *Langan v. Johnson & Johnson Consumer Cos.*, No. 13-cv-1470-JAM, 2017 WL 985640, at *12 (D. Conn. Mar. 13, 2017) (citation omitted). "Regarding the appointment of class counsel, the inquiry is whether they 'are qualified, experienced[,] and able to conduct the litigation.'" *Chicago Bridge*, 2020 WL 1329354, at *10 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

No fundamental conflict exists between the proposed Settlement Class Representatives and members of their respective Settlement Classes. All seek overcharge damages for violation of substantially similar state antitrust and consumer protection laws under *Illinois Brick* repealer statutes arising out of the same anticompetitive conduct. Plaintiffs have already effectively represented the interests of the proposed Settlement Classes by selecting qualified Class Counsel, producing documents, and by regularly communicating with Class Counsel regarding developments in the litigation and the terms of the New Settlements. Neither Plaintiffs nor Class

Counsel have any interests antagonistic to those of the proposed Settlement Classes. Finally, proposed Settlement Class Counsel are "qualified, experienced, and generally able to conduct the litigation." *Payment Card*, 2019 WL 359981at *18 (quotation omitted). The Court has already determined that the proposed Settlement Class Representatives are adequate representatives of the members of their respective Settlement Classes with respect to the Citigroup and MUFG Settlements, and previously designated Berger Montague PC as Settlement Class Counsel, finding that the firm was qualified, experienced and adequately represented the Settlement Classes. Citigroup/MUFG Preliminary Approval Order ¶¶ 16, 18. Therefore, the adequacy of representation requirement is satisfied.

### 5.    Ascertainability

"The 'touchstone' of ascertainability is whether the class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member. A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case.'" *Chicago Bridge*, 2020 WL 1329354, at *11 (quoting *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

Here, membership in the Settlement Classes is based on objective criteria: people and entities who purchased an FX Instrument from an individual or entity in or while residing in New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, or North Carolina, during the Class Period, and that party in turn transacted in the FX Instrument with a Defendant or an alleged co-conspirator. In addition, the identities of the members of the Settlement Classes are readily identifiable and ascertainable from existing records of retail foreign exchange dealers ("RFEDs"). As detailed below, Plaintiffs have successfully obtained customer contact information and transactional data from the four largest RFEDs that operated during the Class

Period for which records exist. Dell'Angelo Decl. ¶ 29. Collectively, the former customers of

these four RFEDs represent a majority of all Settlement Class members. *Id*. Additionally, as

noted below, Plaintiffs' proposed notice plan is designed to reach members of the Settlement

Classes that transacted FX instruments other than through the four major RFEDs. Accordingly,

the ascertainability requirement is satisfied here.

### B.        Plaintiffs Satisfy the Rule 23(b)(3) Requirements

In addition to satisfying Rule 23(a), a party seeking class certification must also satisfy

one of the requirements of Rule 23(b). *See Larsen v. JBC Legal Grp., P.C.*, 235 F.R.D. 191, 196

(E.D.N.Y. 2006). Certification of a class under Rule 23(b)(3) requires that: (i) common issues

predominate over individual issues; and (ii) the class action mechanism be superior to other

methods of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). For the reasons described

below, both requirements are met here.

### 1.        Predominance

Much like other aspects of the Rule 23 standards for certification, the "predominance

inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." *Amchem*, 521 U.S. at 623; *AIG*, 689 F.3d at 239. This analysis differs depending

on whether the certification is sought for litigation or settlement purposes. In the former, the

court must determine whether litigating the class claims will pose "intractable management

problems," but in the latter these management concerns "drop out" because with settlement, the

"proposal is that there be no trial." *AIG*, 689 F.3d at 240. In the settlement context, the

predominance "inquiry trains on the legal or factual questions that qualify each class member's

case as a genuine controversy, questions that preexist any settlement." *Amchem*, 521 U.S. at 623.

As the Supreme Court has noted, in a settlement context "the predominance requirement of Rule

23(b)(3) is similar to the requirement of Rule 23(a)(3) that 'claims or defenses' of the named

representatives must be 'typical of the claims or defenses of the class.'" *Id*. at n. 18.

Antitrust cases like this one are recognized as well suited for certification under Rule 23(b)(3) because they present issues that are capable of proof by generalized evidence "more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). Courts regularly certify antitrust claims under Rule 23(b)(3), in both litigation and settlement contexts, because issues concerning conspiracy are shared by all class members and these will predominate in any test of liability. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately." (citation omitted)); *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007) (finding predominant "all factual and legal questions that must be resolved to decide whether, assuming a plaintiff paid supracompetitive prices, that payment was caused by the defendants' antitrust violation and constitutes the kind of injury with which the antitrust laws are concerned"); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("In price-fixing cases, courts have regarded the existence of a conspiracy as the overriding issue even when the market involves diversity in products, marketing, and prices."). Here, all members of the Settlement Classes would have to prove liability for Defendants' anticompetitive conduct using generalized evidence, including the existence of the conspiracy and, for each state Settlement Class, whether that conspiracy violated the laws of each respective state. These issues go to the heart of the case concerning Defendants' conduct and antitrust liability and, therefore, they will predominate over other issues such as individual damages amounts. In sum, the predominance requirement for the Settlement Classes is clearly met here as "[a]ll plaintiffs []

claim injury that by reason of defendants' conduct . . . has caused a common and measurable form of economic damage" because "[a]ll claims arise out of the same course of defendants' conduct; [and] all share a common nucleus of operative fact, supplying the necessary cohesion." *AIG*, 689 F.3d at 240 (citation omitted).

## 2. **Superiority**

To determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Rule 23(b)(3) identifies four factors to be considered:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D). Courts need not consider the fourth factor. *See Amchem*, 521 U.S. at 620.

All three of the relevant superiority factors weigh in favor of granting preliminary approval here. The interests of members of the Settlement Classes in individually controlling the prosecution of separate actions are minimal because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.

As to the second factor, although *FOREX* concerns the same price-fixing conspiracy as this action, there are no other suits pending against Defendants that include indirect purchaser claims of the members of the Settlement Classes. Regarding the third factor, Plaintiffs have shown a desire to focus the litigation in this Court by filing the action in the Southern District of New York and by designating this case as related to *FOREX*, thereby allowing the Court to oversee both related actions. Given the size of the class, "certification will promote judicial efficiency by permitting claims common to all Plaintiffs to be resolved just once, rather than

having individual lawsuits regarding the same alleged wrongdoing." *Chicago Bridge*, 2020 WL 1329354, at *12 (citing *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 144 (S.D.N.Y. 2019)).

The Court is thoroughly familiar with the facts and legal issues of the case. Accordingly, the superiority requirement is satisfied and Plaintiffs have satisfied the requirements for certification of the proposed Settlement Classes.

### C.      Settlement Class Counsel

The Court appointed Berger Montague PC ("Berger Montague") as Settlement Class Counsel for purposes of the Citigroup and MUFG Settlements, Citigroup/MUFG Preliminary Approval Order ¶ 18, and Plaintiffs respectfully request that Berger Montague retain that designation for purposes of the New Settlements.

## VI.      ADDITIONAL DETAILS IN SUPPORT OF PRELIMINARY APPROVAL

Rule III.C.5 of the Court's Individual Rules and Procedures for Civil Cases require parties moving for preliminary approval to provide additional information, including (a) the total settlement amount, (b) estimated claims administration fees, costs, and expenses, (c) proposed attorneys' fees, costs, and expenses, (d) the named Plaintiffs' proposed service awards, (e) any other deductions from the Settlement Fund, and (f) the settlement amount as a percentage of estimated potential classwide damages in the aggregate and per class member, which Plaintiffs have provided herein and in the chart attached as Exhibit A to this Memorandum.

### A.      Proposed Plan of Allocation and Notice Forms

Plaintiffs are committed to distribute the Net Settlement Fund in a reasonable manner that maximizes the amount available for distribution to the proposed Settlement Classes.[18] Like the allocation plan the Court approved in *FOREX*, Plaintiffs propose that the funds be distributed to

---

[18] "Net Settlement Fund" is defined in the Settlements as the balance of the Settlement Fund, net of any Court-approved administrative and notice expenses, attorneys' fees and expenses, and tax expenses. SC Settlement § X, ¶ (f); SG Settlement § X, ¶ (f); Group Settlement § X, ¶ (f).

members of the Settlement Classes *pro rata* based on each member's transactional volume, with adjustments to account for the dates and currency pairs corresponding to those transactions. *See FOREX* ECF No. 925 (Memorandum in Support of Motion for Final Approval of Plan of Distribution); *id.* ECF No. 1095 (Order Approving the Plan of Distribution).

In the Citigroup/MUFG Preliminary Approval Motion, Plaintiffs summarized their proposed allocation methodology, but requested that formal Motion for Approval of Notice and Plan of Allocation for the Citigroup and MUFG Settlements be deferred. Plaintiffs explained that it would be more efficient and cost effective to administer the Citigroup and MUFG Settlement funds along with the proceeds of any additional settlements that were obtained in the future. Plaintiffs also noted that certain information yet to be obtained from third-party RFEDs was necessary to prepare Plaintiffs' notice plan. After Plaintiffs reached the SC and SG Settlements, Plaintiffs filed a separate request to stay the deadline for the submission of their Motion for Approval of Notice and Plan of Allocation for the Citigroup and MUFG Settlements so that they could match the deadlines proposed in Plaintiffs' motion for preliminary approval of the SC and SG, *see* ECF No. 333, which the Court granted on November 19, 2019. *See* ECF No. 334. Now that Plaintiffs have reached the Group Settlement with all remaining Defendants, Plaintiffs propose to consolidate the notice, allocation, and distribution of funds from all Settlements, pursuant to the settlement schedule set forth in the Proposed Order submitted with this motion.

Plaintiffs have received customer contact information and transactional data from four RFEDs that purchased FX Instruments from Defendants and resold those FX Instruments during the Class Period to members of the Settlement Classes proposed here. Specifically, (1) Plaintiffs obtained a Court order compelling production of their FXDirectDealer, LLC ("FXDD") subpoena on April 18, 2019, ECF No. 254, and FXDD completed their production to Plaintiffs

on December 2, 2019; (2) GAIN Capital, which operates the RFED website FOREX.com, produced their customer contact information and transactional data to Plaintiffs on March 11, 2020; (3) Forex Capital Markets ("FXCM"), completed its production to Plaintiffs on May 7, 2020; and (4) Oanda Corporation produced customer contact information and transactional data to Plaintiffs on May 19, 2020.[19] Dell'Angelo Decl. ¶ 29.

Collectively, the former customers of these four RFEDs represent a substantial majority of all members of the Settlement Classes. *Id*. This will allow notice to mailed and emailed to reach members of the Settlement Classes that transacted with these RFEDs. Having the data from these RFEDs will also provide valuable information for the proposed Plan of Allocation and determining claimant awards from the Settlement Fund.

Class Counsel rely on Dr. Janet S. Netz's proposed model to allocate the Net Settlement Fund on a *pro rata* basis to the Settlement Class members who submit timely and valid claims, as required by Rule III.C.5 of the Court's Individual Rules, which was submitted in connection with the Citigroup/MUFG Preliminary Approval Motion. *See* Declaration of Janet S. Netz (attached as Ex. F to the Dell'Angelo Decl.) (the "Netz Decl."). The allocation methodology proposed provides for the Net Settlement Fund to be distributed *pro rata* according to each claimant's trading volume, adjusted for certain factors that potentially affected the amount by which the claimant's transactions were affected by the Defendants' alleged manipulation of FX prices. *Id.* § III.

First, Dr. Netz determined that FX transactions with less liquid currency pairs (*i.e.*, currency pairs with greater spreads between the bid and ask prices) were likely more susceptible to the effects of the conspiracy than FX transactions involving more liquid currency pairs. *Id.* §

---

[19] Plaintiffs and FXCM are currently negotiating the amount of FXCM's attorneys' fees to paid by Plaintiffs associated with that production. *See* Apr. 6, 2020, FXCM Letter, ECF No. 408.

III(B). Therefore, the proposed plan of allocation calculates claimant awards based on the volume of each claimant trade adjusted for the spread of the currency pair at the time of the trade. *Id.* at § IV.A. This ensures that claimant transactions for currency pairs with greater spreads, and therefore potentially more susceptible to manipulation, receive relatively greater weight for purposes of calculating claim awards than the more liquid currency pairs. *Id.*

Second, FX purchases occurring between December 1, 2007 (the start date of the Class Period specified in the Settlements) and December 31, 2013 (the end of the Class Period in the SCCAC) were relatively more impacted by the effects of the conspiracy than purchases occurring in 2014 and later. *See* Netz. Decl. § IV.G. Accordingly, Plaintiffs propose to discount purchases occurring between January 1, 2014 and the end of the Settlement Class Period by 90 percent. *Id.*

The transactional data obtained from the four RFEDs is sufficient for the Claims Administrator and Plaintiffs' experts to calculate *pro rata* claim amounts for the majority of members of the Settlement Classes, thereby limiting the need for many claimants to submit detailed documentation in conjunction with their claim forms. Plaintiffs also propose to provide claimants with the option to submit transactional records to support their claim or in lieu of accepting the Claims Administrator's estimates.[20] The documented claim option will allow claimants to have their claim amount calculated based on their own transactional records, which will be particularly useful for claimants with large transactional volumes and those for which detailed transactional records are unavailable in the data by the RFEDs.

Finally, Plaintiffs propose that the plan of allocation provide for a minimum payment amount "a *de minimis* award" for claimants whose *pro rata* claim award would otherwise fall

---

[20] This "documented claim option" was also included in the plan of allocation that the Court approved in *FOREX*. *See* ECF No. 877-7.

under a certain threshold.[21] As set forth in the Netz Declaration, there will be two *de minimis* payment amounts: a high-end amount for members of the Settlement Class eligible for a *de minimis* award who traded FX Instruments during the period of December 1, 2007, and December 31, 2013; and a low-end amount for those who only traded on or after January 1, 2014. *Id.* § IV.A.[22] The high-end a *de minimis* award will be set between $12.50 and $25, and the low-end award will be between $5 and $10. Netz Decl. § IV.C. The exact amounts within those ranges depend on the total number of claimants who file a claim for a *de minimis* award. *Id.*

The *de minimis* award will apply to two categories of claimants. First, claimants who provide documentation sufficient to demonstrate that they purchased FX Instruments and are a member of any Settlement Class during the Class Period but do not have transactional data sufficient for the Claims Administrator to calculate a *pro rata* award will be eligible to receive a *de minimis* award. For example, if a Settlement Class member provides documentation sufficient to demonstrate that they transacted FX Instruments with an individual or entity that in turn transacted in the FX instrument with a Defendant or one of Defendants' alleged co-conspirators during the Class Period but who do not have transactional data sufficient for the Claims Administrator to calculate a *pro rata* award will receive a *de minimis* award. Second, claimants who do have transactional data sufficient for the Claims Administrator to calculate a *pro rata* award will be eligible to receive a *de minimis* award if the claimant's *pro rata* award as calculated by the Claims Administrator falls below the *de minimis* award amounts. Therefore, all claimants will receive the greater of (a) their *pro rata* award based on their transactional volume calculated by the Claims Administrator; or (b) the *de minimis* award amounts.

---

[21] The *FOREX* plan of allocation allowed claimants with estimated claim values of $15 or less receive a *de minimis* award of $15. ECF No. 877-7 at 18.

[22] The proposed *pro rata* award calculation methodology similarly applies a discount to trades that took place on or after January 1, 2014. *See supra* p. 35; Netz Decl. § IV(G).

B.       **The Notice Plan**

Class Counsel, together with the proposed Claims Administrator, Heffler Claims Group
(the "Claims Administrator"), have devised a notice program and prepared mail and publication
notices that fully satisfy the Rule 23(c)(2)(B) notice standards, which govern classes certified
pursuant to Rule 23(b)(3). *In re IMAX Securities Litig.*, 283 F.R.D. at 185 (describing notice
requirements for Rule 23(b)(3) classes). Rule 23(c)(2)(B) requires the court to "direct to class
members the best notice that is practicable under the circumstances, including individual notice
to all members who can be identified through reasonable effort." *Id.*; *see also Thompson v.
Metro. Life Ins. Co.*, 216 F.R.D. 55, 67 (S.D.N.Y. 2003) ("Although no rigid standards govern
the contents of notice to class members, the notice must fairly apprise the prospective members
of the class of the terms of the proposed settlement and of the options that are open to them in
connection with [the] proceedings." (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir.
1982) (internal quotation marks omitted)).

Plaintiffs' proposed postcard and Long-Form Notices to be disseminated to members of
the Settlement Classes are attached, respectively, as Exhibits D and E to the Dell'Angelo Decl.
These notice forms are substantially similar to the proposed notices that the Court preliminarily
approved in the Citigroup/MUFG Preliminary Approval Order. *See* ECF No. 274-5 (proposed
postcard Notice); 274-6 (proposed Long-Form Notice). As required by Rule 23(c)(2)(B), the
updated postcard and Long-Form Notices proposed here each include a description of the case,
the terms of the Settlements, and other information to allow members of the Settlement Classes
to intelligently and meaningfully participate, object, opt out, or otherwise comment on the
Settlements. *See* Dell'Angelo Decl. Exs. D, E. Both notice forms direct members of the
Settlement Classes to a settlement website where additional details will be provided, and the

Long-Form Notice includes numerous additional details, including information regarding the plan of allocation and all relevant settlement schedule dates. *Id.*

Notice regarding a proposed settlement is adequate under both Rule 23 and due process standards if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," *Hall v. ProSource Techs., LLC*, No. 14-CV-2502-SIL, 2016 WL 1555128, at *4 (E.D.N.Y. Apr. 11, 2016) (citation omitted), and it can "be understood by the average class member," *Wal-Mart Stores, Inc.*, 396 F.3d at 114 (citation omitted).

In this case, the Notice Plan was prepared with the aid of an experienced Claims Administrator and provides for widespread direct mailed notice and published notice, robust media coverage, and a comprehensive settlement website. As noted above, Plaintiffs already have the names, contact information, and transactional data for most of the members of the Settlement Classes from the data produced by RFEDs. Plaintiffs also obtained contact information (but not comprehensive transactional data) for former customers of a fifth RFED that operated during the Class Period, Peregrine Financial Group. These databases will enable the Claims Administrator to mail postcard Notice to the majority of members of the Settlement Classes.

For purposes of efficiency and to limit expenses associated with administering the Notice Plan, Plaintiffs propose to disseminate the postcard Notice via direct mail to all members of the Settlement Classes for which Plaintiffs obtain mailing addresses. *See generally In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 183 (S.D.N.Y. 2014) ("The use of a combination of a mailed post card directing class members to a more detailed online notice has been approved by courts."). Additionally, for all members of the Settlement Classes for which Class Counsel

have obtained email addresses, the Claims Administrator will disseminate Notice via email which directs Settlement Class members to the Settlement website. The Settlement website will include the Long-Form Notice as well as other relevant information and Court documents. *See generally Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 89 (2d Cir.) (affirming lower court's approval of notice plan that provided for "class notice via email or postcard to those members for whom [plaintiff] had addresses and posted notice regarding the class settlement on a website"), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677, 205 L. Ed. 2d 440 (2019).

The Claims Administrator estimates that using postcard notice will result in a cost savings of between $17,600 and $75,500, depending on the total number of Class members. *See* Dell'Angelo Decl. ¶ 28.

The proposed Long-Form Notice will be posted on the Settlement website and mailed or emailed to anyone who requests a copy. The Notice Plan also provides for robust media coverage, including press releases and internet and social media advertising designed to reach members of the Settlement Classes and direct them to the Settlement website for more information regarding the Settlements. Courts have routinely approved similar notice plans involving both direct mail and publication notice through various media. *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 167–69 (2d Cir. 1987) (approving letter notice to reasonably identifiable class members, supplemented by "various forms of substitute notice," including publication in various media); *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *2 (approving notice plan that included direct mail, publication in periodicals, internet and social media advertisements, and a settlement website).

C.  **Fees, Expenses, Service Awards, and Claims Administration Costs**

Pursuant to the Settlement Schedule proposed below, Plaintiffs will submit a motion for attorneys' fees, reimbursement of reasonable costs and expenses, and service awards for the

Settlement Class Representatives in advance of Plaintiffs' motion for final approval of the Settlements. Plaintiffs' fee request will not exceed 26.21% of all Settlement Funds in total, as follows: 20% of the Citigroup and MUFG Settlement Funds; 25% of the SC and SG Settlement Funds, and one-third (33.33%) of the New Settlement Funds, totaling $6,194,083.33; and their service awards request will not exceed $5,000 for each of the eleven Settlement Class Representatives ($55,000 total). As of May 22, 2020, Plaintiffs' litigation costs and expenses total $1,634,659.21. Dell'Angelo Decl. ¶ 30. Class Counsel anticipate incurring certain additional costs and expenses including data hosting charges and attorney expenses related to claims administration and the final approval process. The proposed postcard and Long-Form Notice forms both provide that Class Counsel's cost and expense request will not exceed $1,825,000. *See* Dell'Angelo Decl. Exs. D, E.

Pursuant to Rule III.C.5(b) of the Court's Individual Rules, and based on the information currently available to Class Counsel and their experts, Plaintiffs' experts have prepared an estimated total Settlement Class size of 99,198.[23] After carefully comparing bids and notice plan proposals from five well-respected administrators in conjunction with the Citigroup/MUFG Preliminary Approval Motion, Plaintiffs selected Heffler Claims Group ("Heffler") as the proposed Claims Administrator. The Court approved that selection in the Citigroup/MUFG Preliminary Approval Order. *Id.* ¶ 27. As detailed in the Dell'Angelo Declaration, Heffler estimates that for a total Settlement Class size of 100,000, the total costs of publication notice, direct-mail postcard and email notice, internet notice including advertising the Settlements on social media and websites, and administering the claims will be approximately $229,794. Dell'Angelo Decl. ¶ 28. The Claims Administrator may incur additional fees and expenses

---

[23] The transactional data and Settlement Class member contact information that Plaintiffs have received from the RFEDs described above are consistent with and support this Settlement Class size estimate. *See* Dell'Angelo Decl. ¶ 27.

related to the claims administration process if the total number of claimants and/or the volume of work involved in the claims administration exceeds their current expectations.

Finally, the total amount of all invoices for claims administration work performed by Plaintiffs' expert econometrician Dr. Netz (and her consulting firm, applEcon, LLC), is $51,500.20 as of May 22, 2020. These invoices include work by Dr. Netz and her associates on the plan of allocation and the Declaration Of Janet S. Netz, Ph.D., attached as Exhibit F to the Dell'Angelo Decl. Class Counsel anticipate additional expert costs related to claims administration, including the verification of claimant transactional volumes, determination of claim amounts, and related work for the claims process.

### D.    Settlement Fund and Anticipated Recovery

The New Settlements provide for combined cash payments of $12,695,000, for a total of $23,630,000 including the Citigroup and MUFG Settlements that are already preliminarily approved by the Court. For purposes of subpart (e) of Rule III.C.5 of the Court's Individual Rules, and applying the Class member estimate discussed above of 99,198, Plaintiffs estimate that the average recovery per Class member provided by the Citigroup, MUFG, SC, SG, and Group Settlements combined—after deducting fees, costs, expenses, and service awards as set forth above—is $155.99. As noted in Section VI.A above, the actual amount distributed to each claimant will vary based on the claimant's total volume of transactions, the currency pairs and time periods for those transactions, and the number of Class members who file a claim. Applying the estimates detailed above for potential classwide damages in this Action based on the estimates submitted in the *FOREX* plaintiffs' final settlement approval papers, for a total Settlement Class size of 99,198, the per-Class member estimate for actual damages is between $2,058 (using the more conservative $204 million damages estimate) and $7,979 (using the higher $791 million damages estimate).

E.     **Appointment of Escrow Agent**

The Settlements provides that New Settling Defendants shall pay their respective Settlement Amounts in full within fifteen to twenty business days of the Preliminary Approval Order. *See* SC Settlement § X, ¶ (b); SG Settlement § X, ¶ (b); Group Settlement § X, ¶ (b). In the Citigroup/MUFG Preliminary Approval Order, the Court approved Plaintiffs' for appointment of Huntington National Bank as Escrow Agent. *Id.* ¶ 29. Plaintiffs respectfully request that Huntington National Bank be similarly appointed as Escrow Agent for the New Settlements.

F.     **Proposed Settlement Schedule**

Finally, pursuant to the provision of Rule III.C.5(b) of the Court's Individual Rules, Plaintiffs submit a proposed schedule (the "Settlement Schedule"), set forth in paragraph 27 of the Proposed Order submitted with this motion, to establish a schedule for settlement events from Plaintiffs' Motion for Approval of Notice and Plan of Allocation through final approval and the deadline for submitting claims. The Settlement Schedule is set to commence with Notice to be distributed within 45 days of the Court's Order granting preliminary approval, and will ensure that classwide notice, claims administration, and distribution of claimant awards are carried out efficiently and in a manner that is not unduly duplicative or costly at the expense of the Settlement Class members.

## VII.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for preliminary approval of the New Settlements.

Dated: May 26, 2020                                Respectfully submitted,

                                                    /s/ Michael Dell'Angelo
                                                    Michael Dell'Angelo

Michael J. Kane
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net
mkane@bm.net
jripley@bm.net

*Proposed Settlement Class Counsel*

Todd M. Schneider
**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
tschneider@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Classes*

Joseph C. Peiffer
**PEIFFER WOLF CARR & KANE, APLC**
201 St. Charles Ave. Suite 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504) 523-2464
jpeiffer@pwcklegal.com

*Counsel for Plaintiffs and the Proposed Classes*

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
701 East Bay Street
Suite 411
Charleston, SC 29403
Tel: (843) 444-5404
Fax: (843) 444-5408
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*

43