UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONTANT, *et al.*,<br><br>   *Plaintiffs*,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, *et al.*,<br><br>   *Defendants*. | No. 17-cv-3139-LGS<br><br>(related to No. 13-cv-7789-LGS) |

**DECLARATION OF MICHAEL DELL'ANGELO IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS AND
CERTIFICATIONS OF THE PROPOSED SETTLEMENT CLASSES FOR
SETTLEMENT PURPOSES**

Pursuant to 28 U.S.C. § 1746, I, Michael Dell'Angelo, declare as follows:

1. I am a Managing Shareholder in the law firm of Berger Montague PC. My firm serves as attorneys of record for Plaintiffs in this matter and was previously designated as Settlement Class Counsel with respect to the Citigroup and MUFG Settlements. *See* ECF No. 297 (the "Citigroup/MUFG Preliminary Approval Order").

2. I have been actively involved in prosecuting this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein. If called upon and sworn as a witness, I could competently testify thereto.

3. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Approval of the Standard Chartered Bank ("SC") Settlement (the "SC Settlement"), the Société Générale ("SG") Settlement (the "SG Settlement"), and the "Group Settlement" with Defendants Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Bank of America"); Barclays Bank PLC and Barclays Capital Inc. ("Barclays"); BNP Paribas (identified in the Complaint as BNP Paribas Group), BNP Paribas US Wholesale Holdings Corp., previously known as BNP Paribas North America, Inc., and BNP Paribas Securities Corp., which now includes BNP Paribas Prime Brokerage, Inc. ("BNP Paribas"); Credit Suisse AG and Credit Suisse Securities (USA) LLC ("Credit Suisse"); Deutsche Bank AG ("Deutsche Bank"); The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (now known as Goldman Sachs & Co. LLC) ("Goldman Sachs"); HSBC Bank PLC, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. ("HSBC"); JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("JPMorgan"); Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley & Co. International plc ("Morgan Stanley"); RBC Capital Markets, LLC ("RBC"); The Royal Bank of Scotland PLC (now known as NatWest Markets PLC) and RBS Securities Inc.

(now known as NatWest Markets Securities Inc.) ("RBS"); UBS AG, UBS Group AG, and UBS Securities LLC ("UBS") (collectively, ("Group Settling Defendants") (together with SC and SG, "New Settling Defendants").

4. Attached as Exhibit A is a true and correct copy of the proposed Stipulation and Agreement of Settlement with SC.

5. Attached as Exhibit B is a true and correct copy of the proposed Stipulation and Agreement of Settlement with SG.

6. Attached as Exhibit C is a true and correct copy of the proposed Stipulation and Agreement of Settlement with Group Settling Defendants.

7. Attached as Exhibit D is a proposed postcard Notice to be disseminated to the members of the Settlement Classes.

8. Attached as Exhibit E is a proposed Long-Form Notice to be disseminated to the members of the Settlement Classes.

9. Attached as Exhibit F is a true and correct copy of the Declaration of Dr. Janet S. Netz ("Netz Decl.") concerning Plaintiffs' proposed method of allocating the Net Settlement Fund.

10. Attached as Exhibit G is a true and correct copy of the Declaration of Jeanne C. Finegan, Apr, Concerning Ability to Provide Adequate Notice to Settlement Class Members Through Direct Notice Methods and Proposed Multi-Media Notice Program (the "Notice Plan").

11. Attached as Exhibit H is a true and correct excerpt of the October 26, 2018, Trial Transcript in the criminal action *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), ECF No. 240, in which the jury renders its not guilty verdict.

12. Attached as Exhibit I is a true and correct excerpt of the October 25, 2018, Trial Transcript in the criminal action *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), ECF No. 239, in which the Department of Justice and defendants present their closing arguments.

13. As attorney of record for the Plaintiffs, and with additional counsel representing Plaintiffs in this action (collectively, "Class Counsel"), we have undertaken extensive settlement negotiations with counsel for SC. Those settlement discussions began in May 2019, and culminated in the SC Settlement signed on November 4, 2019, after six months of vigorous, arm's-length negotiations by the parties that included frank discussions of the relative strengths and weaknesses of the parties' claims and defenses. Plaintiffs were informed throughout the settlement negotiations by the expert analyses described below, as well as Class Counsel's investigation of the alleged conspiracy and its effects, including discovery obtained from Defendants, publicly available news articles, press releases and other reports, and researching the applicable law.

14. I, along with Class Counsel, also undertook extensive settlement negotiations with counsel for Defendant SG. Those negotiations began on May 15, 2019, and spanned three months of arm's-length negotiations and exchanges of draft settlement agreements. The parties reached a settlement agreement in principle on August 13, 2019, but continued to exchange draft settlement agreements throughout the following weeks before culminating in a signed settlement agreement on September 10, 2019. The agreed-upon cooperation guaranteed that Plaintiffs would obtain discovery from SG, which is particularly valuable as SG is based in France.

15. For a substantial period of Plaintiffs' settlement negotiations with SG, and at the time the SG Settlement was finalized, SG was dismissed from the case. Although Plaintiffs could have sought to appeal that order or filed a motion for leave to file an amended complaint adding jurisdictional allegations regarding SG, the success of such efforts would have been far from

4

certain. Thus, absent the SG Settlement, there is no guarantee that Plaintiffs would have been able to recover any funds—or obtain any discovery materials—from SG.

16. Finally, I, along with Class Counsel, also undertook extensive settlement negotiations with counsel for the Group Settling Defendants beginning in November 2019. The parties reached an agreement in principle on February 19, 2020, and thereafter exchanged draft settlement agreements culminating in a signed settlement agreement on April 24, 2020. *Id*. Critically, shortly prior to the commencement of the parties' Group Settlement negotiations, on September 3, 2019, the Court in the related direct-purchaser action *FOREX* issued an order denying the *FOREX* plaintiffs' motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See FOREX*, 2019 WL 4171032, at *1 (S.D.N.Y. Sept. 3, 2019) (the "*FOREX* Class Order"). In addition, the deadline for fact discovery and for the parties to file pre-motion letters regarding summary judgment and class certification motions was imminent. The impending risks and expenses associated with class certification, which were heightened in light of the Court's *FOREX* Class Order, and potential summary judgment motion(s) were significant factors that Class Counsel and I considered in determining a reasonable settlement amount with the Group Settling Defendants.

17. During the settlement negotiations with New Settling Defendants, Class Counsel considered the analyses of industry expert Dr. Carol Osler to evaluate the volume of retail FX transactions relative to the volume of spot FX transactions as a whole. I, along with Class Counsel and the Plaintiffs, took into consideration the substance of Dr. Osler's analyses, the complexities of this Action, and the relative strengths and weaknesses of each side's litigation position in reaching the terms of the Settlements proposed here. Class Counsel and Dr. Osler considered a number of sources in estimating the size of the Classes at issue here as compared to the direct

purchaser class in the related action *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*"), including retail estimates from the Triennial Bank Survey of the Bank for International Settlements ("BIS"), the Federal Reserve Bank of Cleveland, Dr. Osler's own academic research, and other industry data and sources. These sources indicated that the daily average volume of retail FX trading relative to the overall direct purchaser FX Instrument market at issue in *FOREX* is likely between 10 and 30 percent. Additionally, because the proposed Settlement Classes at issue here are limited to the eight states of New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina, the estimate was further reduced to account for the total size of these Classes. According to the U.S. Census Bureau's Population Estimates, the populations of the eight states at issue in this Action account for 37.7 percent of the overall U.S. population.

18. Applying the market share estimates prepared by Dr. Osler, Class Counsel took into consideration the settlement amounts with SC, SG, and Group Settling Defendants approved by the Court in *FOREX*.

19. The *FOREX* plaintiffs settled with SC for $17,200,000. *FOREX* ECF No. 822-5. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the SC *FOREX* settlement results in a *pro-rata* indirect amount of $648,440. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the SC $17.2 million *FOREX* settlement results in a *pro-rata* indirect amount of $1,945,320. The $1,720,000 SC Settlement here is therefore at the high end of the *pro-rata* range of reasonableness based on the Court-approved direct-purchaser settlements in *FOREX*.

20. In *FOREX*, the SG settlement provided for a payment of $18 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-4. Applying the same

6

state population and retail FX market share estimates described above, the retail FX market share portion of the of $18 million *FOREX* SG settlement is between $678,600 (using the 10% estimate) and $2,035,800 (using the 30% estimate). Therefore, even though SG was dismissed from the action when the settlement was reached here, the SG Settlement amount of $975,000 is still well within the *pro-rata* range of reasonableness based on the *FOREX* settlement where SG was not dismissed when it settled with the plaintiffs in that action.

21. The *FOREX* litigation is ongoing as to Credit Suisse, but all eleven other Group Settling Defendants entered into settlements with the *FOREX* plaintiffs totaling $1,862,575,000. *See FOREX* ECF Nos. 481, 822, 877. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the Group Settling Defendants' *FOREX* total settlement amount results in a *pro-rata* indirect amount of $70,219,078. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the Group Settling Defendants' $1,862,575,000 *FOREX* settlement total results in a *pro-rata* indirect amount of $210,657,233. *Id*. The $10,000,000 Group Settlement here is therefore 14.2 percent of the low end of the *pro-rata* range of reasonableness based on the Court-approved direct-purchaser settlements in *FOREX*, and 4.8 percent of the high-end estimate. *See id*. However, the *FOREX* settlements were reached before the Court denied class certification. The denial of class certification in *FOREX*, in the judgement of Class Counsel, significantly increased the risks that Plaintiffs would not be able to certify a class in the instant case. Therefore, in the judgment of Class Counsel, the settlements in *FOREX* are a less valuable basis for comparison against the settlements in the instant case reached after the entry of the *FOREX* Class Order.

22. Plaintiffs' settlement negotiations with New Settling Defendants were also informed by the New Settling Defendants' settlements in the related Canadian action. *See*

7

*Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-000189-152 (Quebec S.C.J.). The Canadian SC and SG settlement amounts were, respectively, $900,000 CAD and $1,800,000 CAD. The Canadian plaintiffs' settlements allocated 20 percent of the settlement proceeds to the indirect purchaser Canadian class members. Therefore, the Canadian indirect purchasers recovered $180,000 CAD from the SC settlement (20% of $900,000) and $360,000 CAD from the SG settlement (20% of $1,800,000). The exchange rate in July 2018 when the Canadian plaintiffs' proposed plan of allocation was approved was 0.768 CAD to 1 U.S. dollar ("USD").[1] Therefore, the Canadian indirect purchaser settlement amounts are approximately $138,240 USD for SC, and $276,480 USD for SG. Applying a population adjustment factor of 3.44 to those amounts to account for the larger population of the proposed Settlement Class states relative to the Canadian population,[2] a *pro-rata* estimate of a reasonable settlement amount in this matter based on the Canadian indirect purchaser settlement amounts is approximately $475,546 for SC, and $951,091 for SG. Therefore, the $1,720,000 million SC Settlement here is more than three times greater than a *pro-rata* estimate based on the court-approved Canadian SC settlement, and the $975,000 SG Settlement is slightly greater than the *pro-rata* estimate based on the court-approved Canadian SG settlement where SG was not dismissed when it settled with the plaintiffs in that action. Thus, the Canadian SC and SG settlements further confirm the reasonableness of the SC and SG Settlements here.

---

[1] *See* Federal Reserve Bank of St. Louis, US Dollar to National Currency Spot Exchange Rate for Canada, *available at* https://fred.stlouisfed.org/series/CCUSSP01CAM650N#0 (last visited May 22, 2020).

[2] The U.S. Census estimates that in 2013, the total population of Canada was 34.57 million, and the total population of the eight Settlement Class states was 118.98 million. *See* U.S. Census, Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2018, available at https://www.census.gov/data/tables/time-series/demo/popest/ 2010s-state-total.html (last visited May 22, 2020); U.S. Census, Demographic Overview – Canada, *available at* https://www.census.gov/data-tools/demo/idb/ region.php?N=%20Results%20&T=13&A=separate&RT=0&Y=2013&R=-1&C=CA (last visited May 22, 2020). Thus, the total population of the Settlement Class states is approximately 344.2% of the population of Canada.

23. The Canadian settlements with the ten Group Settling Defendants that were involved in the Canadian action totaled $85,297,205 CAD. The Canadian plaintiffs' settlements allocated 20 percent of the settlement proceeds to the indirect purchaser Canadian class members. *Id*. Therefore, the Canadian indirect purchasers recovered $17,059,441 CAD from the Group Settling Defendants' Canadian settlements (20% of $85,297,205). Applying the 0.71 CAD to 1 USD exchange rate, the Canadian indirect purchaser settlement amounts are approximately $12,112,203.11 USD for Group Settling Defendants. Applying a population adjustment factor of 3.44 to those amounts to account for the larger population of the proposed Settlement Class states relative to the Canadian population, a *pro-rata* estimate of a reasonable settlement amount in this matter based on the Canadian indirect purchaser settlement amounts is approximately $41.7 million for New Settling Defendants. Therefore, the $12,695,000 under the New Settlements here is approximately 24 percent of a *pro-rata* estimate based on the court-approved Canadian New Settling Defendants' settlements.

24. Notably, SG was dismissed as a Defendant in this action, but was not dismissed in the Canadian action. In addition, the increased risks presented by the *FOREX* Class Order was not present in the Canadian action. The Canadian New Settling Defendant settlements therefore further confirm the reasonableness of the Group Settlement here.

25. After diligent investigation and careful consideration of all relevant circumstances, I, along with Class Counsel, recommended to the Plaintiffs that it was in the best interests of the proposed Classes to enter into the proposed Settlements. Plaintiffs concurred with the recommendations of counsel, allowing for the finalization of the proposed SC, SG, and Group Settlements. Each of the proposed Settlement Class Representatives supports approval of the Settlements.

26. At the times the Settlements were reached, Plaintiffs had received all documents and substantial amounts of transactional data that a majority of the Defendants produced in *FOREX*, and had issued third-party subpoenas requesting transactional data from a number of retail foreign exchange dealers ("RFEDs"). The information gleaned from this discovery, as well as from the pleadings, motions, and court orders in *FOREX*, and the trial in the criminal action *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), helped Class Counsel to assess the potential damages, as well as the risks and likely defenses going forward. Class Counsel also attended depositions conducted in the related *FOREX* action, and had reviewed all public and governmental reports related to or exchanged during the *FOREX* litigation as part of our extensive factual and legal analysis of this Action.

27. Plaintiffs' expert James Bibbings prepared an analysis estimating the total number of members of the Settlement Classes is 99,138. *See* Declaration of James Bibbings, ECF No. 274-4, ¶ 19. Class Counsel and Mr. Bibbings believe that these estimates are reliable. The transactional data and Settlement Class member contact information that Plaintiffs have received from the RFEDs described in Paragraph 29 below are consistent with and support this estimate of the size of the Settlement Classes. Therefore, the numerosity requirements are easily met.

28. In connection with the Citigroup/MUFG Preliminary Approval Motion, Class Counsel obtained preliminary estimates of claims administration costs from five well-respected potential claims administrators based on the Class size estimates set forth in the Bibbings Declaration. After carefully comparing bids and notice plan proposals from those five claims administrators, Plaintiffs selected Heffler Claims Group ("Heffler") as the proposed Claims Administrator. The Court approved that selection in the Citigroup/MUFG Preliminary Approval Order. *Id.* ¶ 27. For a total Class size of 100,000, Heffler estimates that the total costs of publication

notice, direct-mail postcard and email notice, internet notice including advertising the Settlements on social media and websites, and administering the claims, will be $229,794. Heffler's estimates reflect that using postcard notice results in a cost savings of between $17,600 and $75,500, depending on the total number of Class members.

29. As of the date of this Declaration, Plaintiffs have successfully obtained customer contact information and transactional data from the four largest RFEDs that purchased FX Instruments from Defendants and resold those FX Instruments during the Class Period to members of the Settlement Classes proposed here. Specifically, (1) Plaintiffs obtained a Court order compelling production of their FXDirectDealer, LLC ("FXDD") subpoena on April 18, 2019, ECF No. 254, and FXDD completed their production to Plaintiffs on December 2, 2019; (2) GAIN Capital, which operates the RFED website FOREX.com, produced their customer contact information and transactional data to Plaintiffs on March 11, 2020; (3) counsel for Oanda Corporation produced customer contact information and transactional data to Plaintiffs on May 19, 2020; and (4) Forex Capital Markets ("FXCM"), completed its production to Plaintiffs on May 7, 2020. Collectively, the former customers of these four RFEDs represent a substantial majority of all Settlement Class members.

30. As of May 22, 2020, Plaintiffs' litigation costs and expenses total $1,634,659.21. Class Counsel anticipate incurring certain additional costs and expenses including data hosting charges, costs of shutting down Plaintiffs' document database, and attorney expenses related to claims administration and the final approval process.

31. The total amount of all invoices for claims administration work performed by Plaintiffs' expert econometrician Dr. Netz (and her consulting firm, applEcon, LLC), is $51,500.20 as of May 22, 2020. These invoices include work by Dr. Netz and her associates on the plan of

allocation and the Declaration of Janet S. Netz, Ph.D., attached as Exhibit F to this Declaration. Class Counsel anticipate additional expert costs related to claims administration, including the verification of claimant transactional volumes, determination of claim amounts, and related work for the claims process.

33. The Citigroup, MUFG Bank, SG, and SC Settlements each contained a provision providing that under certain circumstances, the release and termination provisions applied to each of these Defendants will be harmonized with the corresponding provisions applicable to one or more subsequent settlements. Citigroup Settlement § VIII(f); MUFG Bank Settlement § VIII(f); SG Settlement § VIII(f); SC Settlement § VIII(f). Pursuant to that provision, Plaintiffs and these Settling Defendants have agreed to harmonize the release and termination provisions of the Citigroup, MUFG Bank, SG, and SC Settlements with the corresponding provisions in the Group Settlement. Harmonizing the release provisions does not change the substance of the releases in the Citigroup, MUFG Bank, SG, and SC Settlements. However, doing so will avoid Class members potentially being confused by the different release language in the Settlements. The termination of any of the Settlements will also now be governed by the same provision so as to eliminate inconsistencies and avoid potential confusion.

33. Class Counsel and Kehoe Law Firm, P.C. entered into a fee sharing agreement that provides the Kehoe Law Firm, P.C. shall be entitled to receive 10 percent of the portion of attorneys' fees, as awarded by the Court, attributable to the Florida Class only. The portion of attorneys' fees attributable to the Florida Class will be calculated based on the total volume of Settlement funds awarded to Florida Class member claimants relative to the total claimant awards for all Classes. For example, if Florida Class members are awarded 20 percent of the claimant awards for all Classes, then the Kehoe Law Firm shall be entitled to 10 percent of 20 percent of

12

the total attorneys' fees awarded by the Court. Other than that agreement and the Settlement Agreements themselves, there are no additional agreements required to be identified under Rule 23(e)(3), as counsel of record have agreed to allocate the remaining attorneys' fees awarded based on their pro rata share of lodestar, and there no additional fee-sharing agreements subject to disclosure pursuant to S.D.N.Y. Local Civil Rule 23.1.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 26, 2020, in Philadelphia, PA.

/s/ Michael Dell'Angelo
Michael Dell'Angelo
**BERGER MONTAGUE PC**
1818 Market St, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net