**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al*., | |
| Plaintiffs, | Civil Action No. 17-cv-3139-LGS |
| v. | (related to No. 13-cv-7789-LGS) |
| BANK OF AMERICA CORPORATION, *et al*., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AWARD OF
ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND
SERVICE AWARDS FOR CLASS REPRESENTATIVES**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ..................................................................................................... 1

II.    PROCEDURAL HISTORY ...................................................................................... 3

III.   SUMMARY OF WORK BY COUNSEL ................................................................ 5

 A. Pre-Complaint Investigation ....................................................................... 5

 B. Motion Practice ............................................................................................ 6

 C. Discovery .................................................................................................... 10

 D. Settlement Negotiations and Agreements .................................................. 12

IV.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE ................................. 15

 A. The Common Fund Doctrine and *Goldberger* .......................................... 15

 B. Comparison to Court-Approved Fees in Other Class Action Settlements ............ 17

 C. Consideration of Risk, Result and Policy Considerations ......................... 23

  1. Litigation Risk ............................................................................... 24

  2. Quality of Representation ............................................................... 27

  3. Public Policy Considerations ......................................................... 28

 D. The Lodestar Cross-Check Further Supports the Requested Fee ............... 29

V.     LITIGATION EXPENSES ...................................................................................... 32

VI.    NAMED PLAINTIFF SERVICE AWARDS ......................................................... 33

VII.   CONCLUSION ........................................................................................................ 34

# TABLE OF AUTHORITIES

Page(s)

<u>**Cases**</u>

*Alaska Elec. Pension Fund,*
   No. 14-cv-7126, 2018 WL 6250657 (S.D.N.Y. Nov. 29, 2018)................................ 26

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
   421 U.S. 240 (1975)................................................................................................ 15

*Associated Gen. Contractors of Cal., Inc. v. Cal State Council of Carpenters,*
   459 U.S. 519 (1983).................................................................................................. 6

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.,*
   No. 96-cv-0583, 2002 WL 1315603 (S.D.N.Y. June 17, 2002) ............................... 31

*Blum v. Stenson,*
   465 U.S. 886 (1984)................................................................................................ 29

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.,*
   137 S. Ct. 1773 (2017).............................................................................................. 6

*Bryant v. Potbelly Sandwich Works, LLC,*
   No. 17-cv-07638, 2020 WL 563804 (S.D.N.Y. Feb. 4, 2020) ................................. 30

*City of Detroit v. Grinnell Corp.,*
   495 F.2d 448 (2d Cir. 1974)............................................................................... 23, 27

*Cohan v. Columbia Sussex Mgmt., LLC,*
   No. 12-cv-3203, 2018 WL 4861391 (E.D.N.Y. Sept. 28, 2018) ............................. 27

*Dial Corp. v. News Corp.,*
   317 F.R.D. 426 (S.D.N.Y. 2016) .......................................................... 20, 26, 27, 32

*Dornberger v. Metro. Life Ins. Co.,*
   203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................................ 32

*F.T.C. v. Phoebe Putney Health Sys., Inc.,*
   568 U.S. 216 (2013)................................................................................................ 28

*Farbotko v. Clinton Cty. of N.Y.,*
   433 F.3d 204 (2d Cir. 2005)..................................................................................... 29

*Fleisher v. Phoenix Life Ins. Co.,*
   No. 11-cv-8405, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ............................. 32

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13-cv-7789-LGS, 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ............................... *passim*

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) .................................................................... 14, 25

*Fresno Cty. Emps.'s Ret. Ass'n v. Isaacson/Weaver Family Tr.*,
    925 F.3d 63 (2d Cir. 2019) ........................................................................ 14, 16, 23

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000) ...................................................................................... *passim*

*Grice v. Pepsi Beverages Co.*,
    363 F. Supp. 3d 401 (S.D.N.Y. 2019) ..................................................................... 27

*Guevoura Fund Ltd. v. Sillerman*,
    No. 15-cv-07192, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ............................ 31

*In re BioScrip, Inc. Sec. Litig.*,
    273 F. Supp. 3d 474 (S.D.N.Y. 2017) ............................................................ 24, 25, 29

*In re Buspirone Antitrust Litig.*,
    No. 01-md-1413, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. Apr. 11, 2003) ............................ 20

*In re Colgate-Palmolive Co. ERISA Litig.*,
    36 F. Supp. 3d 344 (S.D.N.Y. 2014) ............................................... 16, 17, 23, 27, 32

*In re Credit Default Swaps Antitrust Litig.*,
    No. 13-md-2476, 2016 WL 2731524 (S.D.N.Y. April 26, 2016) ...................... 16, 28

*In re Currency Conversion Fee Antitrust Litig.*,
    263 F.R.D. 110 (S.D.N.Y. 2009) .............................................................................. 20

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    No. 05-cv-2237, 2011 WL 12627961 (S.D.N.Y. Nov. 28, 2011) ............................ 20

*In re Domestic Drywall Antitrust Litig.*,
    No. 13-md-2437, 2019 WL 1258832 (E.D. Pa. Mar. 19, 2019) .............................. 24

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    No. 12-md-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ............................... 29

*In re GSE Bonds Antitrust Litig.*,
    No. 19-cv-1704, 2020 WL 3250593 (S.D.N.Y. Jun. 16, 2020) .................... 26, 27, 29

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...................................................................... 30

*In re Lloyd's Am. Tr. Fund Litig.*,
No. 96-cv-1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)......................................15, 20

*In re Marsh ERISA Litig.*,
265 F.R.D. 128 (S.D.N.Y. 2010) ...............................................................................30, 33

*In re Med. X-Ray Film Antitrust Litig.*,
No. 93-cv-5904, 1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) .................................21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
246 F.R.D. 156 (S.D.N.Y. 2007) ................................................................................27

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ................................................................................26

*In re Municipal Derivatives Antitrust Litig.*,
No. 08-cv-02516, 2016 WL 11543257 (S.D.N.Y. July 8, 2016)...............................20

*In re NTL, Inc. Sec. Litig.*,
No. 02-cv-3013, 2007 WL 1294377 (S.D.N.Y. May 2, 2007) .................................30

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-md-1720, 2019 WL 6888488 (E.D.N.Y. Dec. 16, 2019) .......................24, 31

*In re Platinum and Palladium Commodities Litig.*,
No. 10-cv-3617, 2015 WL 4560206 (S.D.N.Y. July 7, 2015).................................29

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
724 F. Supp. 160 (S.D.N.Y. 1989) .............................................................................16

*James v. China Grill Mgmt.*,
No. 18-cv-455, 2019 WL 1915298 (S.D.N.Y. April 30, 2019) ...............................17

*Levitt v. Bear Stearns & Co. (In re Sterling Foster, & Co. Sec. Litig.)*,
MDL No. 1208, 2006 WL 3193744 (E.D.N.Y. Oct. 31, 2006) ...............................31

*McGreevy v. Life Alert Emergency Response, Inc.*,
258 F. Supp. 3d 380 (S.D.N.Y. 2017)...................................................................16, 32

*Meredith Corp. v. SESAC, LLC*,
87 F. Supp. 3d 650 (S.D.N.Y. 2015)...............................................................20, 26, 31

*Miltland Raleigh-Durham v. Myers*,
840 F. Supp. 235 (S.D.N.Y. 1993) .............................................................................31

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
No. 15-cv-9936, 2019 U.S. Dist. LEXIS 36942 (S.D.N.Y. March 7, 2019) ..........15, 17, 20, 22

*Pillsbury Co. v. Conboy,*
   459 U.S. 248 (1983) ......................................................................................... 27

*Strougo v. Bassini,*
   258 F. Supp. 2d 254 (S.D.N.Y. 2003) ........................................................... 33

*Tawfilis v. Allergan, Inc.,*
   No. 15-cv-00307, 2018 WL 4849716 (C.D. Cal. Aug. 27, 2018) ........................... 24

*Themis Capital v. Democratic Republic of Congo,*
   No. 09-cv-1652, 2014 WL 4379100 (S.D.N.Y. Sept. 4, 2014) ............................... 30

*Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank,*
   No. 09-cv-686, 2012 WL 2064907 (S.D.N.Y. June 7, 2012) ................................. 33

*U.S., ex rel Fox Rx, Inc. v. Omnicare, Inc.,*
   No. 12-cv-275, 2015 WL 1726474 (S.D.N.Y. April 15, 2015) ............................... 30

*Wal-Mart Stores Inc. v. Visa U.S.A. Inc.,*
   396 F.3d 96 (2d Cir. 2005) ............................................................................. 15

*Weiss v. Blech (In re Blech Sec. Litig.),*
   No. 94-cv-7696, 2000 WL 661680 (S.D.N.Y. May 19, 2000) ............................... 31

*Weseley v. Spear, Leeds & Kellogg,*
   711 F. Supp. 713 (E.D.N.Y.1989) ................................................................... 23

## **Federal Rules**

Fed. R. Civ. P. 12(b)(2) ........................................................................................ 4, 6, 9

Fed. R. Civ. P. 23(b)(3) ........................................................................................ 14

Fed. R. Civ. P. 23(h) ........................................................................................... 14, 15

Rule 12(b)(6) ...................................................................................................... 6

Rule 23 .............................................................................................................. 14

## **Other Sources**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,*
   7 J. EMPIRICAL LEGAL STUD. 811 (2010) ................................................ 18, 20, 23, 29

Theodore Eisenberg et. al., *Attorneys' Fees in Class Actions: 2009-2013,*
   92 N.Y.U. L. REV. 937 (2017) ........................................................................ 18, 19, 21

## I.      **INTRODUCTION**

Class Counsel[1] for Plaintiffs James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry Jacobson, Tina Porter, and Paul Vermillion respectfully submit this memorandum in support of their motion for an award of attorneys' fees, reimbursement of litigation expenses, and service awards for the Class Representatives.

Although this case followed government investigations and the direct purchaser plaintiffs' action *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*"), recovery in this complex indirect purchaser antitrust class action was uncertain from the outset. Defendants raised persuasive legal arguments regarding antitrust standing, proximate cause and personal jurisdiction—and were initially successful in getting this case dismissed (wholly or in part) by this Court on Rule 12(b)(6) and Rule 12(b)(2) motions. ECF Nos. 136, 263. Plaintiffs' indirect purchaser claims were novel under the circumstances of this case. Despite numerous direct purchaser financial instrument manipulation antitrust actions having been brought in recent years, Class Counsel were first to assert indirect purchaser claims in this context. Class Counsel developed proximate cause and standing theories and identified supporting facts while being unable to rely on case law from similar indirect purchaser financial benchmark price-fixing cases.

Exemplifying the obstacles Plaintiffs faced from the outset in this novel litigation was this Court's initial dismissal of this case on standing grounds. Class Counsel ultimately prevailed by crafting viable causation and damages theories with the assistance of their experts. Plaintiffs then obtained terabytes of data and hundreds of thousands of pages of documents to develop

---

[1] The Court has previously appointed Berger Montague PC as Class Counsel for the Settlement Classes. ECF No. 297, ¶18; ECF No. 441, ¶16. Class Counsel's motion for attorneys' fees includes the other supporting counsel who represented Plaintiffs in this case and references to "Class Counsel" herein refer to all Plaintiffs' counsel.

their case. Class Counsel analyzed the documents and data, participated in and defended numerous depositions, worked with experts on causation and damages, and studied the records in *FOREX* and related governmental investigations evincing the anticompetitive conduct alleged here. Fully understanding the complexity and risks of litigating this case through trial, and possibly appeal, as well as with class certification, Class Counsel were able to negotiate a non-revertible total settlement fund of $23,630,000 (the "Total Settlement Fund") with all Defendants providing significant relief for the Classes.[2] Critically, these settlements are the only ones that will return money to the individual victims who were the lowest on the distribution chain and suffered injury by FX-related misconduct.

Class Counsel have litigated this case for nearly four years without compensation while investing substantial time, resources and money. For taking on this risk and achieving a successful result for the Settlement Classes, Class Counsel request a fair and reasonable fee that equates to 26.2%[3] of the Total Settlement Fund (or $6,194,083.33) and reimbursement of $1,628,320.51 in litigation expenses. These expenses were reasonably and necessarily incurred in the prosecution of this case. Class Counsel also respectfully request service awards in the amount of $5,000 for each of the eleven class representatives ($55,000 total).

Class Counsel's fee and expense request is well within the standards governing awards in this Circuit. Further, as discussed below and in the accompanying declaration of Professor Brian T. Fitzpatrick, the requested award is reasonable and consistent with fees awarded in other

---

[2] The Total Settlement Fund is $23,630,000 and results from five Settlements: a $9,950,000 settlement with Citigroup and a $985,000 settlement reached with MUFG, both of which were preliminarily approved by the Court on July 29, 2019 (ECF No. 272); a $1,720,000 settlement with Standard Chartered ("SC"), a $975,000 settlement with Societe Generale ("SG"), and a $10,000,000 Group Settlement reached with the remaining Defendants Bank of America, Barclays, BNP Paribas, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JPMorgan, Morgan Stanley, RBC, RBS, and UBS (collectively, "Group Settling Defendants"). The SC, SG, and Group Settlements were preliminarily approved on July 17, 2020. ECF No. 441.

[3] Specifically, Class Counsel request 20 percent of the proceeds of the Citigroup and MUFG Settlements ($2,187,000 from those Settlements), 25 percent of the proceeds of the SC and SG Settlements ($673,750 from those Settlements), and one-third of the proceeds of the Group Settlement ($3,333,333.33 from the Group Settlement).

similarly sized antitrust settlements.

## II.   <u>PROCEDURAL HISTORY</u>

On September 26, 2016, Class Counsel filed *Baker, et al. v. Bank of America Corp., et al.*, No. 16-cv-7512 ("*Baker*"), seeking injunctive relief under the Sherman Act and damages under New York and California law on behalf of proposed classes of indirect purchasers of FX Instruments. *Id.* ECF No. 1. On March 24, 2017, Plaintiffs filed an amended complaint in the *Baker* action that was substantially similar to the *Baker* complaint, but substituted new plaintiffs and, separately, added proposed classes under Florida, Illinois, Minnesota, and North Carolina law. *Id.* at ECF No. 176. In response, Defendants insisted that the amended complaint should be filed as a new action. Rather than delaying the litigation, Plaintiffs voluntarily dismissed *Baker* and filed a new action.

Plaintiffs filed the first complaint in this action on April 28, 2017 (ECF No. 1) and subsequently filed an additional complaint captioned *Lavender, et al. v. Bank of America Corporation, et al.*, 17-cv-4392 ("*Lavender*") asserting similar allegations but also including claims under Massachusetts and Arizona law. On June 26, 2017, the parties filed a stipulation to consolidate the *Contant* and *Lavender* actions (ECF No. 83), followed by the filing of the First Consolidated Class Complaint ("CCAC") on June 30, 2017 (ECF No. 84).

On August 11, 2017, all Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6) (ECF Nos. 103-104), and certain "Foreign Defendants" filed a motion to dismiss pursuant to Rule 12(b)(2) (ECF Nos. 105-107). After the parties fully briefed both motions, on March 15, 2018, the Court granted Defendants' Rule 12(b)(6) motion and denied the 12(b)(2) Motion as moot. ECF No. 136. With the Court's permission, Plaintiffs filed a Motion for Leave to File a Second Consolidated Class Action Complaint ("SCCAC") on April 5, 2018, to address the issues identified in the Court's March 15, 2018, dismissal Order. ECF Nos. 138-39.

On October 25, 2018, the Court granted Plaintiffs' motion for leave to file the SCCAC as to Plaintiffs' state-law damages claims, but denied the motion as to Plaintiffs' claim for injunctive relief under the Sherman Act. ECF No. 166. Plaintiffs filed the SCCAC on November 28, 2018. ECF No. 183. On December 20, 2018, the "Foreign Defendants" filed a new motion to dismiss the SCCAC for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). ECF No. 197. On May 20, 2019, the Court granted that motion as to Defendants The Royal Bank of Scotland plc ("RBS"), Societe Generale ("SG"), UBS Group AG, and MUFG, and denied it as to Barclays Bank PLC, BNP Paribas Group, HSBC Bank plc, Standard Chartered Bank ("SC"), and UBS AG. *See* ECF No. 263.[4] Plaintiffs filed a motion for reconsideration (ECF No. 276), which the Court denied on July 8, 2019. ECF No. 288. On July 25, 2019, Plaintiffs filed a motion for leave to file an amended complaint adding allegations detailing RBS's New York-related conduct in furtherance of the alleged conspiracy to address the issues identified in the Court's May 20, 2019 Order dismissing RBS for lack of personal jurisdiction. Plaintiffs did not seek to add jurisdictional allegations as to SG because Plaintiffs and SG were in the process of finalizing a binding Memorandum of Understanding outlining the terms of the SG Settlement. The Court granted Plaintiffs' motion to amend on December 9, 2019.

On May 29, 2019, Plaintiffs filed a motion for preliminary approval of the Citigroup and MUFG Settlements (ECF No. 272), which the Court granted on July 29, 2019. ECF No. 297. On November 22, 2019, Plaintiffs filed a motion for preliminary approval of the SC and SG Settlements (ECF No. 337), which was scheduled for a hearing on January 9, 2020. ECF No. 341. Plaintiffs and Group Settling Defendants reached an agreement in principle to settle shortly prior to the date of that hearing. To avoid burdening the Court with two separate preliminary

---

[4] At the time of the Order, Plaintiffs had already reached the MUFG Settlement and were in the process of finalizing an agreement to voluntarily dismiss UBS Group AG.

approval motions, the Parties sought adjournment of the January 9, 2020, hearing to file a consolidated motion for preliminary approval of the SC, SG, and Group Settlements. *See* ECF No. 371. The Court granted preliminary approval of these latest Settlements on July 17, 2020. ECF No. 441.

III.   **SUMMARY OF WORK BY COUNSEL**

Class Counsel have invested significant time and resources prosecuting this case, including pre-filing investigation, interviewing industry participants and working with experts, drafting complaints and motions and other pleadings, conducting discovery, reviewing and analyzing documents and data, preparing for and defending depositions, negotiating and consummating settlements, and creating a plan of distribution and implementation, among other tasks. *See generally* Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives ("Dell'Angelo Decl."). This work is described in detail below.

A.   **Pre-Complaint Investigation**

Because Plaintiffs' indirect purchaser claims were novel, there was no similar indirect purchaser financial benchmark price-fixing case law to rely on. Therefore, prior to the filing of the original complaint and the amended complaints that bolstered Plaintiffs' allegations, Class Counsel engaged in extensive investigatory efforts.

Prior to the initiation of the *Baker* action, Class Counsel spent hundreds of hours reviewing relevant academic literature on the retail FX market and the FX market as a whole; monitoring and reviewing documents from the numerous related governmental investigations and the *FOREX* action; and speaking with industry experts regarding Plaintiffs' allegations, claims, and proposed Class definitions. Dell'Angelo Decl. ¶ 29. These efforts were crucial to developing the consolidated complaints which successfully resulted in the proposed settlements.

### B.    <u>Motion Practice</u>

Class Counsel overcame Defendants' efforts to dismiss this case. Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6) (ECF Nos. 103-104) raising complex issues related to proximate causation, antitrust standing under *Associated Gen. Contractors of Cal., Inc. v. Cal State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 545 (1983), as well as Plaintiffs' state-law claims. Foreign Defendants also filed a motion to dismiss pursuant to Rule 12(b)(2) (ECF Nos. 105-107) asserting personal jurisdiction issues related to proper application of key and relatively untested Supreme Court cases, including the then-recent *Bristol-Myers Squibb* opinion.[5] Despite Plaintiffs' significant efforts, the Court granted Defendants' Rule 12(b)(6) motion. The Court found that Plaintiffs did not allege a "sufficiently direct connection" between the prices at which Defendants sell spot FX instruments to RFEDs (the "direct purchaser prices") and the prices at which RFEDs resell those same spot FX instruments to retail customers (the "retail prices") including members of the indirect purchaser Classes proposed here. ECF No. 136, at 11. The Court held the complaint did not sufficiently "explain the RFEDs' presumably independent and various pricing and execution strategies, which may well have broken the chain of causation," and thus it was unclear "whether and to what extent the RFEDs absorbed the alleged price increases or passed them on to Plaintiffs." *Id.* at 11-12. The Court denied the 12(b)(2) Motion as moot. ECF No. 136.

Addressing the issues identified in the Court's dismissal Order was arduous. Dell'Angelo Decl. ¶ 34. Plaintiffs worked diligently with their experts to substantially bolster allegations supporting proximate cause and address the Court's *AGC* concerns. To adequately explain the pass-through mechanism in this case for purposes of amending the complaint, Plaintiffs consulted with Carol L. Osler, Ph.D., a professor of international economics and finance whose

---

[5] *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773 (2017).

curriculum vitae includes extensive academic publications on and work related to the FX market. The new allegations, as well as the Report of Carol L. Osler, Ph.D. ("Osler Report") submitted with Plaintiffs' motion for leave to amend their complaint, detailed how the pricing of FX Instruments sold by RFEDs to their retail FX customers (such as Plaintiffs) pass-on to Plaintiffs the Defendants' anticompetitive overcharges resulting from the conspiracy. Dr. Osler's correlation and regression analyses confirmed the tight link between the conspiratorial manipulated direct purchaser prices and the retail prices paid by Plaintiffs and members of the Classes, and did so without the transactional data that could only be obtained through discovery. Dell'Angelo Decl. ¶¶ 35-37.

Specifically, Dr. Osler determined that (a) the spot FX Instrument prices paid by retail FX customers, including Plaintiffs and members of the proposed Classes, are nearly perfectly correlated with the prices quoted by Defendants and paid by RFEDs; (b) any distortions in the spot FX Instrument prices quoted by Defendants directly caused equivalent distortions in the prices paid by Plaintiffs and members of the proposed Classes to RFEDs for those same spot FX Instruments; and (c) the spot FX Instrument prices paid by retail FX customers, such as Plaintiffs and members of the proposed Classes, are nearly perfectly correlated with the European Central Bank ("ECB") Fix rates which were manipulated by the conspiracy. Dr. Osler then explained that to avoid incurring losses, RFEDs must update their prices frequently based on Defendants' quotes and therefore it would be impossible for an RFED to "absorb" an overcharge incurred in the direct transaction. In every instance where an RFED paid an anticompetitive overcharge in purchasing an FX Instrument from a Defendant, that overcharge was necessarily passed on to the indirect purchaser, such as Plaintiffs, when the RFED resold that same FX Instrument. The anticompetitive overcharge incurred by the Class member could be calculated by subtracting the

RFED's markup and the competitive price that the RFED would have paid to the Defendant bank but-for the conspiracy from the price paid by the customer to the RFED. The detailed allegations of the tight and direct connection between the spot and benchmark rates manipulated by the conspiracy and the prices paid by Plaintiffs and members of the Classes, confirmed by Dr. Osler's statistical analysis of pricing data during the Class Period, more than sufficed to allege proximate cause at the pleading stage. Dell'Angelo Decl. ¶ 37. In addition, Dr. Osler's work helped Plaintiffs sufficiently allege the *ACG* factors to the extent that those factors were applicable to their respective state law claims. *See id.* With the Court's permission (ECF No. 166), Plaintiffs filed the SCCAC (ECF No. 183).

Foreign Defendants then filed a new motion to dismiss the SCCAC for lack of personal jurisdiction. ECF No. 197. Class Counsel extensively researched and responded to the jurisdictional arguments, including that Plaintiffs, as indirect purchasers, "cannot take advantage of the so-called 'nationwide contacts' approach under the federal Clayton Act" to establish personal jurisdiction. Class Counsel argued that specific jurisdiction applied, as a matter of law and fact, based on Defendants' conspiratorial conduct in New York, the forum state. Plaintiffs found and alleged numerous examples of Foreign Defendants' actions in furtherance of the conspiracy in New York, collusion with other Defendant traders based in New York, and guilty pleas and consent decrees in which several Foreign Defendants admitted to New York-based conduct in furtherance of the Conspiracy. Class Counsel argued that the Court's specific jurisdiction analysis is the same for indirect purchaser actions as it was for direct purchaser actions in which the Court had found jurisdiction. Having established the necessary minimum contacts, Class Counsel also persuasively argued that the SCCAC sufficiently alleged that New York was a reasonable forum for this action to satisfy due process requirements.

The Court denied the Rule 12(b)(2) motion as to Barclays Bank PLC, BNP Paribas Group, HSBC Bank plc, SC, and UBS AG, but granted it as to Defendants The Royal Bank of Scotland plc, SG, UBS Group AG, and MUFG. ECF No. 263.[6] Plaintiffs filed a motion for reconsideration (ECF No. 276), which the Court denied (ECF No. 288). Undeterred, Plaintiffs requested leave to file an amended complaint adding allegations detailing RBS's New York-related conduct in furtherance of the alleged conspiracy to establish personal jurisdiction. Before the Foreign Defendants filed their Rule 12(b)(2) motion, Defendants produced documents to Plaintiffs including chat transcripts of interbank communications between Defendant traders. Working with an industry expert to help interpret the jargon and code words that dealer bank traders used to conceal their unlawful conduct, Class Counsel meticulously searched and reviewed hundreds of thousands of pages of transcripts and identified numerous instances of foreign Defendant traders colluding with New York-based Defendant traders for each of the Defendants seeking dismissal on personal jurisdiction grounds. Plaintiffs did not add jurisdictional allegations as to SG because Plaintiffs and SG were in the process of finalizing a binding Memorandum of Understanding outlining the terms of the SG Settlement. Plaintiffs' efforts proved fruitful. The Court granted Plaintiffs' motion to amend, holding that the proposed amended complaint adequately alleged that RBS was aware of their coconspirators' in-forum overt acts to establish personal jurisdiction. ECF No. 355. RBS joined the other Group Settling Defendants in settlement negotiations and eventually the Group Settlement. Dell'Angelo Decl. ¶ 43.

---

[6] At the time of the Order, Plaintiffs had already reached the MUFG Settlement and were in the process of finalizing an agreement to voluntarily dismiss UBS Group AG.

C.      **Discovery**

Plaintiffs obtained terabytes of transactional data and hundreds of thousands of pages of interbank chat transcripts from Defendants that they produced in the *FOREX* action. Dell'Angelo Decl. ¶ 44. Plaintiffs' expert economist, Dr. Janet S. Netz, analyzed the contents of the data for each Defendant transactional data production and prepared questions to Defendants to ensure that all required data fields were included in the productions and standardized across all Defendant productions. *Id.* Class Counsel also consulted with industry expert and a former FX trader to analyze and identify deficiencies in Defendants' data productions. *Id.* He also assisted Class Counsel with interpreting the jargon and code words that bank traders used to conceal their unlawful conduct in the produced interbank chat transcripts. *Id.*

Plaintiffs' discovery of Defendants in this action overlapped with the discovery of Defendants in *FOREX* as well as in the related direct purchaser class action *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, and the direct purchaser action filed on November 7, 2018, by former *FOREX* class members who opted out of the *FOREX* settlements, *Allianz et al. v. Bank of America Corp. et al.*, No. 18-cv-10364. Class Counsel negotiated with counsel for Defendants and the Plaintiffs in the other actions for a proposed order regarding deposition protocols for all actions, which the Court approved on March 22, 2019. ECF No. 186.

To prove damages, Plaintiffs would need to show that any anticompetitive overcharge incurred at the direct purchaser level (here, in the Defendant-to-RFED FX Instrument transaction) was passed down to the indirect purchasers at the retail level (in the subsequent RFED-to-indirect purchaser transaction). Therefore, Plaintiffs needed transactional data both from Defendants (for the direct purchaser transactions) and RFEDs (for the retail transactions). Class Counsel and their experts identified 64 RFEDs that operated during the Class Period and

requested Defendants' transactional data and documents related to transactions with those RFEDs. Dell'Angelo Decl. ¶ 46.

In addition to drafting and serving written discovery on Defendants, Plaintiffs also drafted and served subpoenas on more than 60 RFEDs. *Id.* ¶ 47. These subpoenas sought transactional data and other information pertaining to Class-member retail FX transactions, including RFED pricing data. *Id.* The data and information were central to the case and necessary for Plaintiffs to show impact, estimate damages, and identify Class members. *Id.* Plaintiffs' negotiations with many of these RFEDs were protracted and arduous. RFEDs resisted Plaintiffs' subpoenas, arguing they were unduly burdensome and that much of the requested information was subject to privilege and other protections. *Id.* ¶¶ 47-48. Although Plaintiffs served the majority of their RFED subpoenas in March 2019, the final production was not received until more than a year later on May 19, 2020, seven days before Plaintiffs filed their motion for preliminary approval of the Settlements. *Id.* ¶ 48.

Certain RFEDs' objections required motion practice to compel production. Third-party RFED FXDirectDealer, LLC filed a motion to quash Plaintiffs' subpoena, claiming it was unduly burdensome and improperly requested trade secret and confidential information. ECF No. 251. Two days after Plaintiffs filed their memorandum in opposition to FXDD's motion to quash (ECF No. 253), the Court denied FXDD's motion in full. *See* ECF No. 254 (denying FXDD's motion to quash "[f]or substantially the reasons stated in Plaintiffs' letter"). Plaintiffs also defended against another RFED's efforts to extract exorbitant cost-sharing fees for responding to a subpoena. ECF No. 424. Consequently, Class Counsel minimized the expense to the Classes. *See* ECF No. 433 (awarding RFED only $17,500 as reimbursement for attorneys' fees despite initial request of over $51,000).

Class Counsel's extensive efforts pursuing and litigating their RFED subpoenas resulted in productions of customer contact information and transactional data from the four largest RFEDs: FXDD, Gain Capital, Forex Capital Markets ("FXCM"), and Oanda Corporation. Dell'Angelo Decl. ¶ 48. The former customers of these four RFEDs represent a substantial majority of all Settlement Class members. *Id*. The transactional data and identifying information is crucial to Plaintiffs' Plan of Allocation, which proposes to allocate Settlement funds to claimants on a pro rata basis. *Id.* As with Defendants' data productions, Class Counsel worked closely with Dr. Netz to analyze the contents of the data for each RFED and submit questions to the RFEDs to ensure that all required data fields and information were included in the productions. *Id.* This information also provided Settlement Class member names, mailing addresses, and email addresses necessary to mail notice to the Settlement Class members that transacted with these RFEDs.

Finally, Defendants noticed the depositions of all eleven named Plaintiffs in this action. Seven of the named Plaintiffs eventually sat for depositions. Dell'Angelo Decl. ¶ 51. Class Counsel prepared for and defended these depositions—and worked with Plaintiffs FX Primus, Carlos Gonzalez, Ugnius Matkus, and Jerry Jacobson to prepare for their depositions which were cancelled due to pending settlement discussions—in various locations around the country. *Id.* Class Counsel also took part in sixteen depositions of current and former Defendant FX traders. *Id.*

### D. <u>Settlement Negotiations and Agreements</u>

During the pendency of Defendants' Rule 12(b)(6) motion, a settlement was reached with Citigroup following numerous settlement discussions. Throughout those discussions, Class Counsel consulted with an industry expert, Dr. Carol Osler, to help evaluate the volume of retail FX transactions at issue relative to the volume of FX transactions as a whole. A series of

negotiating sessions and counterproposals resulted in an agreement in principle in February 2018, followed by negotiation of terms and exchange of draft agreements over the next several months. This culminated in a written settlement agreement executed on August 2, 2018. *See id.* ¶ 53. The hard-fought negotiations resulted in a favorable Settlement given the uncertainty that Plaintiffs' claims would be sustained. The Court granted dismissal of Plaintiffs' complaint shortly after the settlement with Citigroup was reached. *Id.* ¶ 54.

Plaintiffs' negotiations with MUFG were guided by the same principles applied in the Citigroup negotiations. *Id.* ¶ 60. Negotiations with MUFG began on December 21, 2018. *Id.* ¶ 58. The Parties had serious settlement discussions and communications on approximately nine days during January and early February 2019. *Id.* A settlement agreement in principle was reached on February 6, 2019, and the parties exchanged draft settlement agreements throughout February culminating in a signed agreement on March 1, 2019. *Id.* The risk presented by MUFG's Rule 12(b)(2) motion was realized as the Court subsequently granted the motion. *See* ECF No. 263. Had Plaintiffs not settled prior to that Order, a settlement would likely not have been achieved, and the litigation with MUFG would have been substantially delayed by motion practice and, potentially, an appeal. Also, MUFG was exempt from all discovery productions until the Court ruled on the Rule 12(b)(2) motion. *See* ECF No. 176, ¶ 8(b). Further, without the agreed-upon cooperation, obtaining discovery from MUFG, much of which is in Japan, would have been far more expensive.

Beginning in May 2019, Plaintiffs engaged in numerous settlement discussions with SC. In October 2019, the parties reached an agreement in principle, followed by negotiation of the specific settlement agreement terms over several weeks, culminating in a written settlement agreement executed as of November 4, 2019. *See* Dell'Angelo Decl. ¶ 61.

Negotiations between with SG began on May 15, 2019, followed by numerous discussions and communication over the next several weeks. *Id.* ¶ 62. The parties reached a settlement agreement in principle on August 13, 2019, and thereafter exchanged draft settlement agreements culminating in a signed agreement on September 10, 2019. *Id.*

The SC and SG negotiations were hard-fought and resulted in favorable settlements. Plaintiffs' negotiations and their settlement demands and proposed cooperation provisions were guided by similar considerations as those that supported the prior preliminarily approved Citigroup and MUFG Settlements. Crucially, prior to finalizing the SG Settlement, SG was dismissed from the case for lack of personal jurisdiction (ECF No. 263), and the Court denied Plaintiffs' motion for reconsideration (ECF No. 288). Additionally, SG was exempt from all discovery productions until the Court ruled on the motion. *See* ECF No. 176, ¶ 8(b). The agreed-upon cooperation guaranteed that Plaintiffs would obtain discovery from SG, particularly as SG is based in France, at a time when litigation was ongoing. Dell'Angelo Decl. ¶ 62.

Finally, Plaintiffs' negotiations with the Group Settling Defendants began in November 2019. *Id.* 63. The parties reached a settlement agreement in principle on February 19, 2020, and thereafter exchanged draft settlement agreements culminating in a signed agreement on April 24, 2020. *Id.* The negotiations were informed and guided by the litigation status. Shortly prior to the commencement of the parties' Group Settlement negotiations, on September 3, 2019, the Court in the related direct-purchaser action *FOREX* issued an order denying the *FOREX* plaintiffs' motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See FOREX*, 2019 WL 4171032, at *1 (the "*FOREX* Class Order"). In addition, the deadlines for fact discovery and filing pre-motion letters regarding summary judgment and class certification motions were

14

imminent. Dell'Angelo Decl. ¶ 64. The impending risks and expenses associated with these motions were significant factors in determining a reasonable Group Settlement amount.

## IV.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE

### A.   The Common Fund Doctrine and *Goldberger*

In Rule 23 class actions, the "attorneys whose efforts created the [common] fund are entitled to a reasonable fee—set by the court—to be taken from the fund." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *see also* Fed. R. Civ. P. 23(h); *Fresno Cty. Emps.'s Ret. Ass'n v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 68 (2d Cir. 2019) ("The common-fund doctrine is . . . rooted in the courts' 'historic power of equity to permit' a person who secures a fund for the benefit of others to collect a fee directly from the fund." (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975)). The Second Circuit permits attorneys' fees to be calculated under either the lodestar or the percentage of the fund methods. *See Goldberger*, 209 F.3d at 47. Under the lodestar method, the reasonable hours billed are multiplied by a reasonable hourly rate, then the court may adjust the award based on factors such as the risk of the litigation and the performance of the attorneys. *Id.* Under the percentage of the fund method, class counsel is awarded a reasonable percentage of the total value of the settlement fund created for the class. *Id.* Courts in this Circuit tend to apply the percentage method, which, unlike the lodestar method, "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (quoting *In re Lloyd's Am. Tr. Fund Litig.*, No. 96-cv-1262, 2002 WL 31663577, at *25 (S.D.N.Y. Nov. 26, 2002)). However, even when the percentage of the fund method is used, "the lodestar remains useful as 'a cross check on the reasonableness of the requested percentage.'" *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-cv-9936, 2019 U.S. Dist. LEXIS 36942,

at *4 (S.D.N.Y. March 7, 2019) (quoting *Goldberger*, 209 F.3d at 50) (no Westlaw citation available); *see also* Dell'Angelo Decl. Ex. A (Declaration of Professor Brian T. Fitzpatrick ("Fitzpatrick Decl.")), ¶ 9 (noting that the percentage method is preferred as it "aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers").

A fee award should be reasonable under the circumstances. *Goldberger*, 209 F.3d at 47. *See also* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees. . . .); *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2016 WL 2731524, at *16 (S.D.N.Y. April 26, 2016). A reasonable fee is determined from the "plaintiff's perspective" and "can account for contingency risk where such risk exists." *Fresno Cty. Emps.*, 2019 WL 2219680, at *4. As the Second Circuit explained in *Fresno County*:

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases. That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited by the risk she has assumed that the class's cause will be unsuccessful. The class, having been enriched by counsel's acceptance of its cause at the expense of other clients' causes, may be charged for counsel's assumption of risk on its behalf.

*Id*. at *5. Affirming a 25 percent fee from a $10.9 million settlement, the Second Circuit concluded that "Lead Counsel is entitled to compensation not only for skillfully negotiating that settlement fund but for bearing the risk that the suit would not generate any recovery." *Id*. at *6.

In evaluating the reasonableness of a fee, courts consider the *Goldberger* factors: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50 (omission in

original) (quoting *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989)).

Applying the *Goldberger* factors, this Court in prior cases has followed the three-step approach set forth in *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. 2014); *see also McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 384-90 (S.D.N.Y. 2017); *FOREX*, 2018 WL 5839691, at *1. First, a baseline or benchmark for a reasonable fee is determined by reference to other common fund settlements of a similar size, complexity and subject matter. *Colgate-Palmolive*, 36 F. Supp. 3d at 348. This analysis accounts for three of the *Goldberger* factors: the requested fee in relation to the settlement, the magnitude and complexity of the case, and the policy consideration of using a sliding scale based on the amount of the settlement to avoid a windfall to class counsel. *Id.* Second, the *Goldberger* factors of the risk to Class Counsel, the quality of representation, and other public policy concerns are analyzed to adjust the baseline fee, as appropriate. *Id.* Finally, the lodestar cross check is applied, which involves the *Goldberger* factor of the time and labor expended by Class Counsel. *Id.*

### B.  Comparison to Court-Approved Fees in Other Class Action Settlements

Under the percentage of the fund method, the size of the requested fee in relation to the settlement is the critical *Goldberger* factor. *See FOREX,* 2018 WL 5839691, at *1. Accordingly, as the Court has previously noted, "the first step is to determine a baseline reasonable fee by looking to other common fund settlements of a similar size, complexity and subject matter." *Id.* "In conducting this assessment, a 'sliding scale' approach—awarding a smaller percentage for fees as the size of the settlement fund increases—is appropriate." *Id.* (citations omitted).

This Court has found that "[h]istorical data of fees awarded in common fund cases provide an unbiased and useful reference for comparing fees cases of similar magnitude as a

17

starting point for the sliding scale." *Moreno*, 2019 U.S. Dist. LEXIS 36942, at *6 (citing 2010 empirical study of Professor Brian T. Fitzpatrick in finding that baseline fee for a $21.9 million ERISA settlement was 27%); *In re Colgate-Palmolive*, 36 F. Supp. 3d at 349-50 (citing empirical studies in finding that baseline fee for a $45.9 million ERISA settlement was 25%). The "overwhelming determinant of fee is the amount of recovery for the class," and "courts typically decrease the percentage of the fee as the size of the fund increases." *In re Colgate-Palmolive*, 36 F. Supp. 3d at 359 (internal quotations and citations omitted); *see also James v. China Grill Mgmt.*, No. 18-cv-455, 2019 WL 1915298, at *1 (S.D.N.Y. April 30, 2019) (Schofield, J.) (finding reasonable fee for a $1.22 million FLSA settlement was 30%).

In its *FOREX* fee opinion, the Court cited both Professor Fitzpatrick and a NYU Law Review article by Professor Geoffrey P. Miller and Professor Theodore Eisenberg in awarding class counsel over $300 million in attorneys' fees, or 13% of the $2.3 billion settlement fund. In selecting that baseline fee, the Court found that six megafund antitrust settlements analyzed by Professor Fitzpatrick provided the relevant basis for comparison. *FOREX,* 2018 WL 5839691, at *5; Theodore Eisenberg et. al., *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. REV. 937 (2017) (the "Eisenberg/Miller Study"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) ("Fitzpatrick Study"). Thus, here, the data related to non-mega fund settlements should provide "an adequate basis for comparison." *See FOREX,* 2018 WL 5839691, at *2.

Professor Fitzpatrick, a leading scholar on class actions and attorneys' fees, has submitted a declaration explaining that Plaintiffs' requested fee is reasonable for several reasons. *See* Fitzpatrick Decl., ¶¶ 12, 17-29. Professor Fitzpatrick explains that whether Class Counsel's fee request is considered for each Settlement individually or for the $23,630,000 Total Settlement

Fund, empirical analyses of percentage fee awards in prior settlements with similar dollar amounts as the Settlements proposed here confirm the reasonableness of the requested fees. *Id.* ¶ 16. Professor Fitzpatrick also notes that a percentage fee award is generally favored over a lodestar approach, particularly in the Second Circuit, *id.* ¶ 9, and that public policy considerations strongly support percentage fee awards that incentivize future litigants to bring similar private antitrust enforcement actions. *Id.* ¶ 13.

In his December 2010 article, Professor Fitzpatrick analyzed *every* class action settlement approved by federal courts over a two-year period (688 settlements, including 109 in the Second Circuit, between 2006 and 2007). Fitzpatrick Decl. ¶ 3. Professor Fitzpatrick found that most common percentage of fund fees awarded by federal courts nationwide were 25%, 30%, and 33%, with a mean award of 25.4% and a median award of 25%. *Id.* ¶ 17.

The recent study by Professors Miller and Eisenberg also supports the reasonableness of Plaintiffs' fee request. As Professor Fitzpatrick explains, the Eisenberg/Miller Study found that in the Southern District of New York, the mean fee in reported class action settlements was 27% and the median fee was 31%. Fitzpatrick Decl. ¶ 19; Eisenberg/Miller Study at 950. The study also found that S.D.N.Y. fee awards were in line with awards in other districts: the nationwide mean fee for antitrust settlements was 27% and the nationwide median fee was 30%. *Id.* at 952. The 26.2% fee requested in this case is below each of these figures. Moreover, in the antitrust cases included in the study, the mean recovery was $501.09 million, and the median recovery was $37.3 million; therefore, the mean and median fee awards were far greater than the $6,194,083.33 fee requested here. *Id.* Accordingly, as the Court has previously noted, "the first step is to determine a baseline reasonable fee by looking to other common fund settlements of a similar size, complexity and subject matter." *FOREX,* 2018 WL 5839691, at *2. "In conducting

19

this assessment, a 'sliding scale' approach—awarding a smaller percentage for fees as the size of the settlement fund increases—is appropriate." *Id.*

Plaintiffs' requested fee falls squarely within, and even below, the band of percentage fees cited in the studies and confirmed by Professor Fitzpatrick. Fitzpatrick Study at 17. The 26.2% fee award requested here is below the range of the 27% mean and 30% median for antitrust settlements in Table 4 of the Eisenberg/Miller Study and, because the data shows a sliding scale as settlement amounts get higher, Plaintiffs' requested percentage fee is reasonable because the total settlement amount is much lower than the median. *See* Eisenberg/Miller Study at 952 (listing $37,300,000 as median in antitrust settlement amounts, which is higher the Total Settlement Fund of $23,630,000 in this case).

Courts analyze the magnitude and complexity of the litigation in determining the reasonableness of a fee percentage. For example, this Court awarded a 30% fee in an ERISA class action that settled for a similar amount ($21.9 million), after first finding that a baseline reasonable fee was 27% based on data from the 2010 Fitzpatrick Study:

> Historical data of fees awarded in common fund cases provide an unbiased and useful reference for comparing fees cases of similar magnitude as a starting point for the sliding scale. Professor Brian T. Fitzpatrick's 2010 empirical study examined data from 688 class action settlements in 2006 and 2007. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,* 7 J. Empirical Legal Stud. 811, 839 (2010) ("Fitzpatrick"). Fitzpatrick divided the cases into ten ranges of recovery (deciles) based on the amount of the settlement, and then calculated the mean and median fee percent, as well as the standard deviation. *See id.* at 839. The $21.9 million settlement in this case is in the eighth decile of cases; in that decile, the median fee was 25% with a standard deviation of 7.5%. *See id.* . . . Accordingly, a reasonable baseline fee for an ERISA case of this size is 27%.

*Moreno*, 2019 U.S. Dist. LEXIS 36942, at *6-7. Like ERISA cases, antitrust class actions are complicated and involve a highly specialized area of law. *See Dial Corp. v. News Corp.*, 317 F.R.D. 426, 435 (S.D.N.Y. 2016) (finding that this *Goldberger* factor weighed in favor of the fee

request and noting that "[f]ederal antitrust cases are complicated, lengthy, and bitterly fought"); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 669 (S.D.N.Y. 2015) (same); *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) (same). Comparable percentage awards are routinely granted in antitrust cases by courts in the Second Circuit. See, e.g., *In re Municipal Derivatives Antitrust Litig.*, No. 08-cv-02516-VM, 2016 WL 11543257, at *1 (S.D.N.Y. July 8, 2016) (one-third fee from $101 million settlement fund); *In re DDAVP Direct Purchaser Antitrust Litig.*, No. 05-cv-2237-CS, 2011 WL 12627961, at *4 (S.D.N.Y. Nov. 28, 2011) (one-third fee from $20.25 million settlement fund); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-md-1894, ECF No. 521 (D. Conn. Dec. 9, 2014) (one-third fee from $297 million settlement fund in a case that settled before summary judgment) (attached hereto as Ex. A); *In re Buspirone Antitrust Litig.*, No. 01-md-1413, 2003 U.S. Dist. LEXIS 26538, at *11 (S.D.N.Y. Apr. 11, 2003) (one-third fee from $220 million settlement) (no Westlaw citation available); *In re Lloyd's Am. Trust Fund Litig.*, No 96-cv-1262, 2002 WL 31663577, at *26–27 (S.D.N.Y. Nov.26, 2001) (noting that "[i]n this district alone, there are scores of common fund cases where fees alone . . . were awarded in the range of 33–1/3% of the settlement fund" and that lodestar multiples of between 3 and 4.5 had "become common"); *In re Med. X-Ray Film Antitrust Litig.*, No. 93-cv-5904-CPS, 1998 WL 661515, at *7 (E.D.N.Y. Aug. 7, 1998) (awarding one-third of an approximately $40 million settlement fund as "well within the range accepted by courts in this circuit").

Class Counsel secured a Total Settlement Fund of $23,630,000 and respectfully request fees totaling 20% of the Citigroup and MUFG Settlement Funds, 25% of the SC and SG Settlement Funds, and 33.33% of the Group Settlement Funds. *See* ECF No. 419. Accordingly, Class Counsel respectfully request attorneys' fees of $2,187,000.00 from the Citigroup and

MUFG Settlement Funds (20% of $10,935,000), $673,750.00 from the SC and SG Settlement Funds (25% of $2,695,000), and $3,333,333.33 from the Group Settlement Funds (one-third of $10,000,000). This results in a total fee award of $6,194,083.33 and a blended fee percentage of 26.2% of the Total Settlement Fund ($23,630,000).

According to Professor Fitzpatrick, whether the settlements are considered individually or collectively, fees awarded in prior settlements with comparable settlements amounts support the reasonableness of Class Counsel's fee request here. Fitzpatrick Decl. ¶ 17. Specifically, Fitzpatrick's 2010 survey found that (1) fee awards for settlements between $750,000 and $1.75 million averaged 28.7% with a median of 30.0% and standard deviation of 6.2%; (2) fee awards for settlements between $7 million and $10 million averaged 26.4% with a median of 28.0% and standard deviation of 6.6%; and (3) fee awards for settlements between $15.2 million and $30 million averaged 24.4% with a median of 25% and standard deviation of 6.6%. *Id.* ¶ 21.[7] Therefore, under the analysis considered by this Court in *Moreno*, 2019 U.S. Dist. LEXIS 36942, at *6-7, applying Professor Fitzpatrick's decile ranges to the individual settlements, the MUFG ($985,000 fund) 20% requested fee, SG ($975,000 fund) 25% requested fee, and SC ($1,720,000 fund) 25% requested fee, fall below the average and median fee awards in the under $1.75 million settlement range. *See* Fitzpatrick Decl. ¶ 21. Class Counsel's requested 20% fee from the $9.95 million Citigroup Settlement is below the average and median fee awards in the $7-$10 million range. *See id.* These four settlements fall well within a reasonable baseline range, particularly given the legal complexities and risks that Plaintiffs had to overcome to obtain the proposed settlements. And although Class Counsel's request for one-third of the proceeds of the

---

[7] The Eisenberg/Miller Study similarly grouped settlement amounts into deciles and found that the average fee percentage is approximately 29 percent for settlements ranging from $750,000 to $1.4 million; 26 percent for settlements ranging from $1.4 million to $2.65 million; 26 percent for settlements ranging from $6.5 million to $12 million; 25 percent for settlements ranging from $12 million to $23.4 million; and 24 percent for settlements ranging from $23.5 million to $67.5 million. *Id.* at 948.

Group Settlement ($10 million fund) is greater than the average and median fee awards in the $7-$10 million range, *see id.*, the risks facing Plaintiffs at the time the Group Settlement was reached—including the Court's Order denying class certification in *FOREX*—makes the requested amount reasonable, particularly because the total requested fee is less than Class Counsel's lodestar.

Likewise, the requested aggregate 26.2% fee of the $23.6 million Total Settlement Fund is consistent with fees awarded in settlements between $15 million and $30 million: in this range, the average fee is 24.4%, with a median of 25% and standard deviation of 6.6%. *See* Fitzpatrick Decl. ¶ 21. As the Court has noted, a reasonable enhancement from the baseline average is warranted for cases that involve more complex areas of law. *Moreno*, 2019 U.S. Dist. LEXIS 36942, at *7 (holding that a reasonable baseline fee for a $21.9 million settlement in an ERISA case was 27 percent, an increase of 2 percent from the 25 percent median set forth in the Fitzpatrick Study, and granting a 30 percent fee award). Antitrust cases are recognized to be difficult and complex. *See, e.g.*, *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 719 (E.D.N.Y.1989) (antitrust class actions "are notoriously complex, protracted, and bitterly fought"). This case is no different. The requested blended fee percentage here of 26.2% of the Total Settlement Fund is therefore well within a reasonable baseline range, particularly given the legal complexities and risks that Plaintiffs to overcome achieve the settlements.

### C.   Consideration of Risk, Result and Policy Considerations

Step two of the *Colgate-Palmolive* analysis considers three additional *Goldberger* factors: the risk of the litigation, the quality of the representation, and any remaining policy considerations. *FOREX*, 2018 WL 5839691, at *1. "If this case were demonstrably exceptional in any of these areas compared to cases of a similar size, complexity, and subject matter, then an increase or decrease of the baseline percentage would be warranted." *Id.* (citing *Colgate-*

*Palmolive*, 36 F. Supp. 3d at 551). Each of these factors supports the reasonableness of the requested aggregate 26.2% fee.

### 1.    **Litigation Risk**

Litigation risks should first be considered "as of when the case is filed." *Goldberger*, 209 F.3d at 55. Significant risks warrant a substantial fee because "[n]o one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success[.]" *FOREX*, 2018 WL 5839691, at *2 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974)). "The plaintiff class is . . . appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases." *Fresno Cty. Emps.'s Ret. Ass'n*, 925 F.3d at 70. Essentially, "the risk analysis asks . . . whether certain claims and cases, although potentially meritorious, might face factual and legal hurdles that create a material risk that the case may fail." *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 500 (S.D.N.Y. 2017).

From the outset, Plaintiffs faced several difficult legal issues that could have ended the case entirely or against at least some of the Defendants. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2019 WL 6888488, at *14 (E.D.N.Y. Dec. 16, 2019) (noting that the litigation was substantively risky from the outset due in part to antitrust standing challenges faces by plaintiffs); *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437, 2019 WL 1258832, at *3 (E.D. Pa. Mar. 19, 2019) (noting obstacles faced by indirect purchaser plaintiffs and the "major risk that a class action of indirect purchasers would not be certified"); *Tawfilis v. Allergan, Inc.*, No. 15-cv-00307, 2018 WL 4849716, at *5 (C.D. Cal. Aug. 27, 2018) (noting that complex antitrust standing issues represented "enormous risk").

24

These risks included (1) the lack of precedent from any indirect purchaser financial products cases of this nature; (2) Defendants' initially successful proximate cause and *AGC* antitrust standing arguments; and (3) the Foreign Defendants' personal jurisdiction arguments.

Plaintiffs also faced significant risks because Defendants denied the existence of an overarching conspiracy to fix prices, and if such a conspiracy had been established, each Defendant would have argued they were not a participant in that conspiratorial agreement. The government investigations and actions relating to this matter did not yield any broad-based admissions of conspiratorial conduct that could have been used to establish an overarching conspiracy in this action. This argument finds support the Canadian FX class certification opinion involving many of the same allegations and same defendants. The court noted that the conspiracy alleged was an "episodic conspiracy of price fixing" and not an overarching conspiracy. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174-00CP (Ontario S.C.J. Apr. 14, 2020).

Additionally, the criminal prosecutions of FX traders allegedly involved in the conspiracy have not been entirely successful. A jury in the U.S. District Court for the Southern District of New York acquitted three foreign exchange traders of price-fixing charges brought by the Antitrust Division of the Department of Justice ("DOJ"). *See* ECF No. 420-8 (Transcript, *USA v. Usher et al.*, No. 17-cr-00019 (S.D.N.Y.), ECF No. 240), at 2481:9-2482:4. The DOJ argued that the Defendant traders conspired to coordinate their trading to manipulate FX Instrument prices. However, the three traders, who were previously employed by Barclays, RBS, JPMorgan, and Citigroup, successfully argued that their chatroom discussions regarding FX trades reflected lawful parallel conduct rather than coordination. *See* ECF No. 420-9 (Transcript, *USA v. Usher et al.*, No. 17-cr-00019 (S.D.N.Y.), ECF No. 239), at 2369:17-22. If a jury in this case found that

the evidence does not support Plaintiffs' antitrust conspiracy allegations, Plaintiffs and the Class members would likely be unable to recover any damages.[8] Thus, Plaintiffs had much heavy-lifting to do beyond the government investigations.

Further, Plaintiffs faced the arduous and complex tasks of proving class-wide impact and establishing that damages could be computed on a common, formulaic basis. On September 3, 2019, the Court denied the motion to certify the proposed Rule 23(b)(3) classes in *FOREX*. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, at 423 (S.D.N.Y. 2019). Class Counsel also incurred a significant risk of non-payment of fees due here to their working on a contingency basis. *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d at 501 (noting that the contingency risk analysis "weigh[ed] in favor of a large award" where lead counsel "worked for two years without compensation on a contingency fee basis, and in that time billed almost 4,000 hours without a guarantee of recovery," and "would reasonably have been aware, in accepting this representation, that it could be involved in protracted motion practice for years prior to receiving any fee"). All this was in the face of litigating against some of the best defense counsel and largest banks in the world. *See Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126, 2018 WL 6250657, at *1 (S.D.N.Y. Nov. 29, 2018) (noting that this factor weighed in favor of approving requested fee of 28.5% of the gross settlement fund of a $504.5 million antitrust settlement where the risk was "considerable," and "exacerbated" in part because of the number of defendants and size of their resources); *Dial Corp.*, 317 F.R.D. at 435 (finding that this *Goldberger* factor weighed in favor of the requested fee and noting that "counsel prosecuted this case largely on contingency and assumed the risk of recovering nothing" and "[b]oth [c]ounsel and their clients waged a battle against one of the largest corporations in the world").

---

[8] The DOJ did obtain a guilty verdict for a fourth former Defendant trader on November 20, 2019. *USA v. Akshay Aiyer*, No. 18-cr-00333 (S.D.N.Y.). However, the disparate results from the DOJ's criminal trials still created uncertainty and increased risks for Plaintiffs' claims here.

2. **Quality of Representation**

Class Counsel are well-known as superbly qualified antitrust litigators and provided top-notch representation in this difficult litigation. *See* Dell'Angelo Decl. ¶ 83, Exs. M to P (Class Counsel firm resumes). One means of assessing the quality of representation is assessing "the recovery obtained." *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704, 2020 WL 3250593, at *5 (S.D.N.Y. Jun. 16, 2020) (quoting *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008)); *Goldberger*, 209 F.3d at 55 (stating that "the quality of representation is best measured by results"). The Total Settlement Fund represents an excellent result given the significant headwinds Plaintiffs were fighting against. As previously noted, Defendants still have many arguments to defeat liability and damages in this case, including that they did not engage in an overarching conspiracy, an argument credited by the court in the Canadian action. Moreover, Plaintiffs faced an uphill battle with class certification after the Court declined to certify a damages class in the *FOREX* action.

Given the "caliber and vigor" of Defendants' counsel in this case, the valuable relief obtained for the Classes signifies a significant achievement. *See id.* (quoting *Meredith Corp.*, 87 F. Supp. 3d at 670); *Dial Corp.*, 317 F.R.D. at 435 (finding that this *Goldberger* factor weighed in favor of the fee request where "[p]laintiffs were represented by some of the finest antitrust lawyers in the nation," and defendants' lawyers "were of equally high caliber"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 174 (S.D.N.Y. 2007) ("The quality of opposing counsel is also important in evaluating the quality of Class Counsels' work."); *Cohan v. Columbia Sussex Mgmt., LLC*, No. 12-cv-3203, 2018 WL 4861391, at *4 (E.D.N.Y. Sept. 28, 2018) ("[C]ourts review, among other things, the backgrounds of

the lawyers involved in the lawsuit and the recovery obtained."). Thus, this factor weighs in favor of the reasonableness of the requested fee.[9]

### 3.  Public Policy Considerations

"Attorneys' fees should reflect the important public policy goal of 'providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.'" *FOREX*, 2018 WL 5839691, at *5 (quoting *Goldberger*, 209 F.3d at 51). "If attorneys' fees are routinely set too low, it may create poor incentives to bringing large class action cases." *Id.* (citing *Colgate-Palmolive*, 36 F. Supp. 3d at 352). And, in the antitrust context, "ever since the enactment of the Sherman Act in 1890, Congress has encouraged enforcement of the antitrust laws through private civil suits to deter infringing conduct in the future." *In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at *5; *see Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) ("This Court has emphasized the importance of the private action as a means of furthering the policy goals of . . . the federal antitrust laws.").

As this Court has explicitly recognized, "[a]ntitrust class actions serve the public interest by protecting consumers from exploitation," and "it is important to encourage top-tier litigators to pursue challenging antitrust cases." *FOREX*, 2018 WL 5839691, at *24; *see In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *18 (noting that public policy considerations weighed in approval of the fee request and that "[i]t is important to encourage top-tier litigators to pursue challenging antitrust cases" and that "[o]ur antitrust laws address issues that go to the heart of our economy. Our economic health, and indeed our stability as a

---

[9] Though the class recovery is a relatively small percentage of Plaintiffs' maximum estimated damages, given the significant obstacles Plaintiffs' faced, the result is nevertheless excellent. *See Grinnell Corp.*, 495 F.2d at 455 & n. 2 (in theory, even a recovery of only a fraction of one percent of the overall damages could be a reasonable and fair settlement); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 409 (S.D.N.Y. 2019) ("[T]he class members are receiving only approximately 5% of their maximum potential recovery. But considering the factual and legal hurdles that the class would have had to overcome before securing a favorable judgment, the current settlement represents a good result for the class members.").

nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and transparency of our marketplace." (citing *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225, 133 S. Ct. 1003, 185 L. Ed. 2d 43 (2013))). Professor Fitzpatrick similarly notes that public policy considerations strongly support percentage fee awards that incentivize class action lawyers to bring similar meritorious private antitrust enforcement actions in the future to compensate injured parties and deter future wrongdoing. Fitzpatrick Decl. ¶ 13.

Public policy concerns weigh in favor of the requested fee here. This case presents a first. Due to Class Counsel's efforts, Classes of indirect purchasers of FX instruments will receive significant funds at a time when indirect purchasers have not received any money in other financial instrument manipulation antitrust actions filed in recent years. Attorneys should be encouraged to bring such cases in the future.

**D.    The Lodestar Cross-Check Further Supports the Requested Fee**

The last step of the analysis is to cross-check the fee award against the lodestar multiplier. The lodestar multiplier is calculated by dividing the fee award by the lodestar, which itself is calculated by multiplying the reasonable hours by a reasonable hourly rate. *FOREX*, 2018 WL 5839691, at *5. The 2010 Fitzpatrick Study found that lodestar multipliers averaged 1.65 with a median of 1.34. Fitzpatrick Decl. ¶ 29. The 2017 Eisenberg/Miller Study found that the mean multiplier for antitrust cases is 1.61 and the mean multiplier for all class action cases is 1.48. Eisenberg/Miller Study at 965. Class Counsel's requested fee represents a negative lodestar multiplier, exceedingly lower than these averages.

Class Counsel have spent more than 11,400 hours on this case, with billing rates ranging from $190 per hour for paralegals to $925 per hour for senior partners.[10] The number of hours

---

[10] Class Counsel have not included the hours spent on this fee application in their lodestar amount. In addition, Class Counsel will not be seeking fees for work done on final approval of the settlements after this fee petition is filed and

spent represents a reasonable amount given the work required to litigate and resolve this case. This case has required extensive legal work against many of the world's largest banks.

A reasonable hourly rate is determined by the "prevailing market rate," that is, the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984). "The relevant community, in turn, is the district in which the court sits." *Farbotko v. Clinton Cty. of N.Y.*, 433 F.3d 204, 208 (2d Cir. 2005) (citation omitted). The billing rates used by Class Counsel are reasonable and within the range routinely approved by Courts in this district. *See, e.g.*, *In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at *5 (approving fee based on billing rates ranging from $350 to $1,150 per hour); *In re Platinum and Palladium Commodities Litig.*, No. 10-cv-3617, 2015 WL 4560206, at *3 (S.D.N.Y. July 7, 2015) (approving partner rate of $950 per hour); *U.S., ex rel Fox Rx, Inc. v. Omnicare, Inc.*, No. 12-cv-275, 2015 WL 1726474, at *2 (S.D.N.Y. April 15, 2015) (approving a partner rate of $836 per hour); *Themis Capital v. Democratic Republic of Congo*, No. 09-cv-1652, 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) (approving a partner rate of $871 per hour).

The cross-checks show the lodestar amount is $6,573,412.50. A fee award of 26.2% of the Total Settlement Fund, or $6,194,083.33, represents a negative lodestar multiplier of 0.94. This negative multiplier weighs in favor of the reasonableness of the fee request as it shows "that an otherwise reasonable percentage fee would not lead to a windfall for class counsel." *See*

---

for expected work on the claims process. This fact further supports the reasonableness of Class Counsel's fee request. *See In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 497 (S.D.N.Y. 2017) ("This multiplier is especially reasonable given the fact that the lodestar does not reflect any work Lead Counsel has done since December 18, 2015 or will do subsequent to the date of the publication of this order."); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, MDL No. 12-2389, 2015 WL 6971424, at *10 (S.D.N.Y. Nov. 9, 2015) (finding, in awarding a fee of 33% of a $26.5 million settlement fund, amounting to a lodestar multiplier of 1.02, that the fact that "the work in [the] matter [was] not yet concluded for [p]laintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof of Claims" supported the reasonableness of the award), *aff'd sub nom. In re Facebook, Inc.*, 674 F. App'x 37 (2d Cir. 2016) (summary order).

*FOREX*, 2018 WL 5839691, at *5 (awarding 13% fee amounting to a lodestar multiplier of 1.72); Fitzpatrick Decl. ¶ 29.

"Where a percentage fee is on the higher end of the range of reasonable fees but still represents a negative multiplier to the total lodestar, there is 'no real danger of overcompensation.'" *Bryant v. Potbelly Sandwich Works, LLC*, No. 17-cv-07638, 2020 WL 563804 (S.D.N.Y. Feb. 4, 2020) (citing *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009)). Here, the requested fee is well within the range of reasonable fees based on empirical data *and* that fee represents a negative multiplier to the total lodestar. *See supra* Section IV.B (discussing Professor Fitzpatrick's empirical analyses of the requested fee); Fitzpatrick Decl. ¶¶ 16-25 (empirical analyses); *id.* ¶ 29 (noting that negative multipliers are rare and indicate that Class Counsel "assumed a great deal of risk and worked for many years and ended up making less money in this litigation than they would have had they taken risk-free hourly work instead"). Courts typically cite a negative loadstar multiplier as an indication of reasonableness of the requested percentage fee. *See In re Marsh ERISA Litig.*, 265 F.R.D. 128, 151 (S.D.N.Y. 2010) (noting that 33.3% fee requested was substantially less than the lodestar, "which strongly suggests the requested fee is reasonable"); *In re NTL, Inc. Sec. Litig.*, No. 02-cv-3013, 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007) (negative lodestar multiplier indicates the fee was "reasonable because it will not bring a windfall to co-lead plaintiffs' counsel"); *Levitt v. Bear Stearns & Co. (In re Sterling Foster & Co. Sec. Litig.)*, MDL No. 1208, 2006 WL 3193744, at *8 (E.D.N.Y. Oct. 31, 2006) (noting that the 25% requested fee was "less than half [the] lodestar, or a negative multiplier"); *Baffa* v. *Donaldson Lufkin & Jenrette Secs. Corp.*, No. 96-cv-0583, 2002 WL 1315603 at *2 (S.D.N.Y. June 17, 2002) (in securities class action resulting in $3 million settlement fund, fee award based on a negative lodestar multiplier was fair

31

and reasonable); *Weiss v. Blech (In re Blech Sec. Litig.)*, No. 94-cv-7696, 2000 WL 661680, at

*5 (S.D.N.Y. May 19, 2000) (awarding lead counsel 30% of the settlement, and confirming that

the award was reasonable because it represented a negative multiplier of lead counsel's lodestar).

The lodestar cross-check therefore confirms the reasonableness of the requested fee.

## V.   <u>LITIGATION EXPENSES</u>

Class Counsel respectfully request $1,628,320.51 in reimbursement for out-of-pocket

expenses incurred in connection with prosecution of this action on behalf of the Class. "It is well

established that counsel who create a common fund are entitled to the reimbursement

of expenses that they advanced to a class." *Meredith Corp.*, 87 F. Supp. at 671; *see also*

*Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019). "Courts in the

Second Circuit normally grant expense requests in common fund cases as a matter of course." *In*

*re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-md-1720, 2019 WL

6888488, at *14 (E.D.N.Y. Dec. 16, 2019) (citation omitted). Costs are compensable if they are

of the type normally billed by attorneys to paying clients. *Miltland Raleigh-Durham v. Myers*,

840 F. Supp. 235, 239 (S.D.N.Y. 1993).

Class Counsel's largest expense was expert compensation, which totaled $1,063,118.68.

*See* Dell'Angelo Decl. ¶ 88. These expenses were crucial in Plaintiffs' prosecution and

settlement of this action. Plaintiffs also incurred expenses related to document processing,

deposition transcripts and court reporting, wholesale market pricing database subscriptions, data

storage and organization, cost sharing payments for certain RFED subpoenas, computer research,

printing, travel, and accommodations. *See id.* ¶ 89. These expenses were reasonable and

necessary to litigate this action. *See, e.g., McGreevy v. Life Alert Emergency Response, Inc.*, 258

F. Supp. 3d 380, 390 (S.D.N.Y. 2017) (finding similar expenses to be reasonable); *Fleisher v.*

*Phoenix Life Ins. Co.*, No. 11-cv-8405, 2015 WL 10847814, at *23 (S.D.N.Y. Sept. 9, 2015) (same).

## VI.     CLASS REPRESENTATIVE SERVICE AWARDS

Class Counsel respectfully request service awards of $5,000 each, for a total of $55,000, to compensate Settlement Class Representatives James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry Jacobson, Tina Porter, and Paul Vermillion (collectively, the "Class Representatives") for their efforts and personal time spent advancing the litigation on behalf of the Class. A service award may be given to compensate named plaintiffs for efforts expended "for the benefit of the lawsuit." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 354 (S.D.N.Y. 2014) (citing *Dornberger v. Metro. Life Ins. Co*., 203 F.R.D. 118, 124 (S.D.N.Y. 2001)). Service awards can be given to individuals as well as corporate plaintiffs. *See Dial Corp. v. News Corp.*, 317 F.R.D. 426, 439 (S.D.N.Y. 2016).

Here, the Class Representatives consistently worked to support the prosecution of this case. *See* Dell'Angelo Decl. ¶ 94. They regularly communicated with Class Counsel, reviewed the multiple complaints and other litigation documents, searched for and provided discovery requested by Defendants, reviewed and approved the Settlement Agreements, and seven Class Representatives (Contant, Lavender, Vermillion, Hitchcock, Hernandez, Tran, and Porter) sat for depositions that generally lasted all day and the remainder were preparing to do so when the final settlements were reached. *Id.* Moreover, the depositions required extensive preparation both telephonically and in-person at the deposition location. *Id.* Some of Plaintiffs were required to travel away from home and/or stay overnight in a different city to be deposed. *Id.* As set forth in the individual Class Representative declarations attached as Exhibits B to L to the Dell'Angelo Declaration, the Class Representatives devoted 997 combined hours of work towards the

33

prosecution of this action. Without their efforts, the Settlements would not have been achieved for the Settlement Class members.

The requested amount of $5,000 for each Class Representative is less than those awarded in other complex class actions. *See, e.g., In re Marsh ERISA Litig.*, 265 F.R.D. 128, 151 (S.D.N.Y. 2010) (awarding case contribution awards in the amount of $15,000 to each of the three named plaintiffs); *Strougo v. Bassini*, 258 F. Supp. 2d 254, 264 (S.D.N.Y. 2003) (collecting cases and granting an award of $15,000 to class representative); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-cv-686, 2012 WL 2064907, at *3 (S.D.N.Y. June 7, 2012) (awarding $50,000 to each of the three named class representatives). Class Counsel therefore respectfully request that the Court approve payments of $5,000 to each of the Class Representatives to compensate them for their efforts in the litigation.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion.

Dated: September 21, 2020                  Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Michael J. Kane
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net
mkane@bm.net
jripley@bm.net

*Proposed Settlement Class Counsel*

Todd M. Schneider
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**

2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
tschneider@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Classes*

Joseph C. Peiffer
**PEIFFER WOLF CARR & KANE, APLC**
201 St. Charles Ave. Suite 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504) 523-2464
jpeiffer@pwcklegal.com

*Counsel for Plaintiffs and the Proposed Classes*

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
701 East Bay Street
Suite 411
Charleston, SC 29403
Tel: (843) 444-5404
Fax: (843) 444-5408
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*