**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al*., <br><br> *Defendants*. | No. 17-cv-3139-LGS <br><br> (related to No. 13-cv-7789-LGS) |

**DECLARATION OF MICHAEL DELL'ANGELO IN SUPPORT OF PLAINTIFFS'
MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND SERVICE AWARDS FOR CLASS
REPRESENTATIVES**

I, Michael Dell'Angelo, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge, information and belief:

1.      I am a Managing Shareholder in the law firm of Berger Montague PC. My firm serves as attorneys of record for Plaintiffs in this matter and was previously designated as Lead Class Counsel with respect to the Settlements. *See* ECF Nos. 297, 441 (the "Preliminary Approval Orders").

2.      I have been actively involved in prosecuting this action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein. If called upon and sworn as a witness, I could competently testify thereto.

3.      I submit this Declaration in support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives.

4.      Attached as Exhibit A is a true and correct copy of the Declaration of Professor Brian Fitzpatrick ("Fitzpatrick Decl.") concerning Plaintiffs' requested attorneys' fees.

5.      Attached as Exhibit B is a true and correct copy of the Declaration of James Contant ("Contant Decl.") concerning Mr. Contant's time and effort expended on behalf of the Settlement Classes.

6.      Attached as Exhibit C is a true and correct copy of the Declaration of Sandra Lavender ("Lavender Decl.") concerning Ms. Lavender's time and effort expended on behalf of the Settlement Classes.

7.      Attached as Exhibit D is a true and correct copy of the Declaration of Victor Hernandez ("Hernandez Decl.") concerning Mr. Hernandez's time and effort expended on behalf of the Settlement Classes.

8.      Attached as Exhibit E is a true and correct copy of the Declaration of Martin-Han Tran ("Tran Decl.") concerning Mr. Tran's time and effort expended on behalf of the Settlement Classes.

9.      Attached as Exhibit F is a true and correct copy of the Declaration of FX Primus Ltd. ("FX Primus Decl.") concerning FX Primus's time and effort expended on behalf of the Settlement Classes.

10.      Attached as Exhibit G is a true and correct copy of the Declaration of Carlos Gonzalez ("Gonzalez Decl.") concerning Mr. Gonzalez's time and effort expended on behalf of the Settlement Classes.

11.      Attached as Exhibit H is a true and correct copy of the Declaration of Ugnius Matkus ("Matkus Decl.") concerning Mr. Matkus's time and effort expended on behalf of the Settlement Classes.

12.      Attached as Exhibit I is a true and correct copy of the Declaration of Charles G. Hitchcock III ("Hitchcock Decl.") concerning Mr. Hitchcock's time and effort expended on behalf of the Settlement Classes.

13.      Attached as Exhibit J is a true and correct copy of the Declaration of Jerry Jacobson ("Jacobson Decl.") concerning Mr. Jacobson's time and effort expended on behalf of the Settlement Classes.

14.      Attached as Exhibit K is a true and correct copy of the Declaration of Tina Porter ("Porter Decl.") concerning Ms. Porter's time and effort expended on behalf of the Settlement Classes.

15.     Attached as Exhibit L is a true and correct copy of the Declaration of Paul Vermillion ("Vermillion Decl.") concerning Mr. Vermillion's time and effort expended on behalf of the Settlement Classes.

16.     Attached as Exhibit M is a true and correct copy of the firm resume of Berger Montague PC.

17.     Attached as Exhibit N is a true and correct copy of the firm resume of Schneider Wallace Cottrell Konecky LLP.

18.     Attached as Exhibit O is a true and correct copy of the firm resume of McCulley McCluer PLLC.

19.     Attached as Exhibit P is a true and correct copy of the firm resume of Peiffer Wolf Carr Kane & Conway, APLC.

20.     Attached as Exhibit Q is a true and correct copy of the Declaration of Michael Dell'Angelo on Behalf of Berger Montague PC in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives.

21.     Attached as Exhibit R is a true and correct copy of the Declaration of Kyle G. Bates on Behalf of Schneider Wallace Cottrell Konecky LLP in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives.

22.     Attached as Exhibit S is a true and correct copy of the Declaration of R. Bryant McCulley on Behalf of McCulley McCluer in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives.

23.    Attached as Exhibit T is a true and correct copy of the Declaration of Joseph C. Peiffer on Behalf of Peiffer Wolf Carr Kane & Conway, APLC, in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards for Class Representatives.

24.    Unless otherwise specified "Class Counsel" as used herein includes my firm, Berger Montague PC, as well as the other firms who assisted in the prosecution of this action. These firms are McCulley McCluer PLLC; Peiffer Wolf Carr Kane & Conway, APLC; and Schneider Wallace Cottrell Konecky LLP. Attached hereto as Exhibits Q through T are Declarations from each Class Counsel firm, attesting to the hours spent and litigation expenses incurred in the prosecution of this action.

25.    For the reasons set forth below and in the accompanying memorandum of law, we respectfully submit the fee, expense, and service award application is reasonable, supported by the record and the law, and should be granted.

26.    Class Counsel spent 11,427.90 hours prosecuting this action from its inception through September 11, 2020, for a total lodestar of $6,573,412.50. As explained more fully below, the time Class Counsel spent prosecuting this action included:

- investigating the facts and legal theories that formed the basis for the allegations, including reviewing publicly available information and news articles, and consulting with economic and financial experts to identify economic and statistical evidence of collusion and manipulation in the FX indirect purchaser market;

- drafting the original complaints and two detailed consolidated amended complaints;

- prosecuting and defending numerous motions, including successfully opposing in large part Defendants' motion to dismiss pursuant to Rules 12(b)(2) and 12(b)(6);

- engaging in extensive discovery negotiations, as well as numerous meet-and-confer discussions, with Defendants and RFEDs;

- reviewing and analyzing hundreds of thousands of pages of documents produced;

- attended depositions conducted in the related *FOREX* action;

- obtaining and analyzing terabytes of transaction data from Defendants and RFEDs;

- collecting, reviewing and then producing documents on behalf of Plaintiffs;

- defending seven Plaintiffs' depositions;

- negotiating and drafting the Settlement Agreements and exhibits thereto, including resolution of various issues, including the extent of the cooperation provisions and scope of the release;

- briefing and arguing the preliminary approval motions after execution of the Settlement Agreements; and

- consulting extensively with experts on numerous aspects of the action, including the complaints, class certification, merits issues, damages issues, and notice and plan of distribution

27.    Although this case followed government investigations and the direct purchaser plaintiffs' action *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*"), recovery in this complex indirect purchaser antitrust class action was uncertain from the outset. Defendants raised persuasive legal arguments regarding antitrust standing and personal jurisdiction—and were successful in getting this case dismissed (wholly or in part) by this Court on Rule 12(b)(6) and Rule 12(b)(2) motions. ECF Nos. 136, 263. Plaintiffs' indirect purchaser claims were novel under the circumstances of this case. Notwithstanding numerous direct purchaser financial instrument manipulation antitrust actions in recent years, Class Counsel were the first to assert indirect purchaser claims in this context. Thus, while Class Counsel were confident that their indirect purchaser theory applied to the facts of this case, there was no case law from similar indirect purchaser financial benchmark price-fixing cases to rely on.

28.     Without the benefit of case law from similar indirect purchaser financial benchmark price-fixing cases to guide them, Class Counsel engaged in extensive investigatory efforts prior to the filing of the *Baker, et al. v. Bank of America Corp., et al.*, No. 16-cv-7512 ("*Baker*") complaint in September 2016, and prior to each of the subsequent and amended complaints that bolstered Plaintiffs' allegations.

29.     Specifically, prior to the initiation of the *Baker* action in September 2016, Class Counsel worked hundreds of hours reviewing relevant academic literature on the retail FX market and the FX market as a whole; monitoring and reviewing documents from the numerous governmental investigations and the related *FOREX* action; and speaking with industry experts regarding Plaintiffs' allegations, claims, and proposed Class definitions. These efforts were crucial to developing the consolidated complaints which successfully resulted in the Settlements pending the Court's final approval here.

30.     After working with industry experts to identify several potential categories of FX indirect purchaser classes, Class Counsel determined the largest and most directly impacted group of indirect purchasers to be purchasers of retail FX instruments from retail foreign exchange dealers ("RFEDs"). RFEDs offer individual and small businesses the opportunity to participate in the FX market by purchasing FX instruments from dealer banks—primarily the Defendants in this case—and then reselling those FX instruments to the RFEDs' customers. RFEDs are direct purchasers from Defendants and therefore members of the settlement classes in the related direct-purchaser action *FOREX*, but customers of the RFEDs (the Plaintiffs and Class members in *Contant*) are indirect purchasers ineligible to participate in the direct purchaser settlements. Retail customer purchases account for a significant portion of the overall FX dealer

market, and because RFEDs pass along dealer bank prices to their customers, the retail purchasers incurred the full extent of the Defendants' alleged unlawful price manipulation.

31.    Class Counsel also attended depositions conducted in the related *FOREX* action, and reviewed all public and governmental reports related to or exchanged during the *FOREX* litigation as part of our extensive factual and legal analysis of this Action.

32.    Plaintiffs filed this action on April 28, 2017. ECF No. 1. On June 26, 2017, the parties filed a stipulation to consolidate the instant action with *Lavender, et al. v. Bank of America Corp., et al.*, No. 17-cv-4392, *see* ECF No. 83, followed by the filing of the First Consolidated Class Complaint ("CCAC") on June 30, 2017. ECF No. 84.

33.    On August 11, 2017, all Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6), ECF Nos. 103-104, and "Foreign Defendants" filed a motion to dismiss pursuant to Rule 12(b)(2). ECF Nos. 105-107. On March 15, 2018, the Court granted Defendants' Rule 12(b)(6) motion and denied the 12(b)(2) Motion as moot. ECF No. 136. Specifically, the Court found that Plaintiffs did not allege a "sufficiently direct connection" between the prices at which Defendants sell spot FX instruments to RFEDs (the "direct purchaser prices") and the prices at which RFEDs resell those same spot FX instruments to retail customers (the "retail prices")—the indirect purchasers. ECF No. 136 at 11. The Court held the complaint did not adequately "explain the RFEDs' presumably independent and various pricing and execution strategies, which may well have broken the chain of causation," and thus it was unclear "whether and to what extent the RFEDs absorbed the alleged price increases or passed them on to Plaintiffs." *Id.* at 11-12.

34.    Addressing the issues identified in the Court's March 15, 2018, dismissal Order required extensive labor. To adequately explain the pass-through mechanism in this case for

purposes of amending the complaint, Plaintiffs consulted with Carol L. Osler, Ph.D., a professor of international economics and finance whose curriculum vitae includes extensive academic publications on and work related to the FX market. The new allegations, as well as the Report of Carol L. Osler, Ph.D. ("Osler Report"), set forth in detail how the pricing of FX Instruments sold by RFEDs to their retail FX customers (such as Plaintiffs) pass-on to Plaintiffs the Defendants' anticompetitive overcharges arising from the conspiracy. Dr. Osler's correlation and regression analyses confirmed the tight link between the prices manipulated by the conspiracy and the prices paid by Plaintiffs and members of the proposed Classes and did so without the transactional data that could only be obtained through discovery.

35.     Specifically, Dr. Osler determined that (a) the spot FX Instrument prices paid by retail FX customers, including Plaintiffs and members of the proposed Classes, are nearly perfectly correlated with the prices quoted by Defendants and paid by RFEDs; (b) any distortions in the spot FX Instrument prices quoted by Defendants directly caused equivalent distortions in the prices paid by Plaintiffs and members of the proposed Classes to RFEDs for those same spot FX Instruments; and (c) the spot FX Instrument prices paid by retail FX customers, such as Plaintiffs and members of the proposed Classes, are nearly perfectly correlated with the European Central Bank ("ECB") Fix rates which were manipulated by the conspiracy. Dr. Osler then explained that to avoid incurring losses, RFEDs must update their prices frequently based on the quotes that they receive from Defendants and therefore it would be impossible for an RFED to "absorb" an overcharge incurred in the direct transaction. Therefore, in every instance where an RFED incurred an anticompetitive overcharge in purchasing an FX Instrument from a Defendant, that overcharge was necessarily passed on to the indirect purchaser, such as Plaintiffs, when the RFED resold that same FX Instrument to a Plaintiff or other Class member.

36.     The detailed allegations of the tight and direct connection between the spot and benchmark rates manipulated by the conspiracy and the prices paid by Plaintiffs and members of the Classes, confirmed by Dr. Osler's statistical analysis of actual pricing data during the Class Period, more than sufficed to allege proximate cause at the pleading stage. In addition, Dr. Osler's work helped Plaintiffs sufficiently allege the *ACG* factors to the extent that those factors were applicable to their respective state law claims.

37.     Plaintiffs filed a motion for leave to file an amended complaint adding allegations based on Dr. Osler's correlation and regression analyses demonstrating that the only two inputs affecting the prices paid by Class members are the prices that the RFED paid to purchase the FX instrument from the dealer bank, and the markups charged by the RFED. Plaintiffs showed a direct connection between the conspiratorial manipulated rates and the prices paid by Plaintiffs and members of the Classes, confirmed by Dr. Osler's statistical analysis of actual pricing data. Therefore, the anticompetitive overcharge incurred by the Class member could be calculated by subtracting the RFED's markup and the competitive price that the RFED would have paid to the Defendant bank but-for the conspiracy from the price paid by the customer to the RFED.

38.     On October 25, 2018, the Court granted Plaintiffs' motion for leave to file the Second Consolidated Class Action Complaint ("SCCAC") with respect to Plaintiffs' state-law damages claims, but denied the motion with respect to Plaintiffs' claim for injunctive relief under the Sherman Act. ECF No. 166.

39.     Plaintiffs filed the SCCAC on November 28, 2018. ECF No. 183. On December 20, 2018, the Foreign Defendants filed a new motion to dismiss the SCCAC for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), arguing that jurisdiction cannot be established on the basis of a foreign Defendant's alleged participation in a conspiracy where the Defendant

did not engage in any acts within the forum, and that the foreign Defendants' alleged conduct was insufficiently connected to the forum. ECF No. 197.

40.     Class Counsel extensively researched and responded to the jurisdictional issues raised by Foreign Defendants, including that Plaintiffs, as indirect purchasers, could not "take advantage of the so-called 'nationwide contacts' approach under the federal Clayton Act" to establish personal jurisdiction. Class Counsel persuasively argued that specific jurisdiction applied, as a matter of law and fact, based on Defendants' conspiratorial conduct in New York the forum state. Plaintiffs found and alleged numerous examples of foreign Defendants' actions in furtherance of the conspiracy in New York, collusion with other Defendant traders based in New York, and guilty pleas and consent decrees in which several foreign Defendants admitted to New York-based conduct in furtherance of the conspiracy. Class Counsel successfully argued that the Court's specific jurisdiction analysis is the same for indirect purchaser actions as it is for direct purchaser actions. Having established the necessary minimum contacts, Class Counsel also persuasively argued that the SCCAC sufficiently alleged that New York was a reasonable forum for this action to satisfy due process requirements.

41.     On May 20, 2019, the Court granted that motion as to Defendants The Royal Bank of Scotland plc, SG, UBS Group AG, and MUFG, and denied it as to Barclays Bank PLC, BNP Paribas Group, HSBC Bank plc, SC, and UBS AG. *See* ECF No. 263. At the time of the Order, Plaintiffs had already reached the MUFG Settlement and were in the process of finalizing an agreement to voluntarily dismiss UBS Group AG.

42.     Plaintiffs filed a motion for reconsideration, ECF No. 276, which the Court denied on July 8, 2019. ECF No. 288. On July 25, 2019, Plaintiffs filed a motion for leave to file an amended complaint adding allegations detailing RBS's New York-related conduct in furtherance

of the alleged conspiracy to address the issues identified in the Court's May 20, 2019, Order dismissing RBS for lack of personal jurisdiction.

43.　　Before the Foreign Defendants filed their Rule 12(b)(2) motion, Plaintiffs received Defendants' document productions including chat transcripts of interbank communications between Defendant traders. Working with an industry expert to help interpret the jargon and code words that dealer bank traders used to conceal their unlawful conduct, Class Counsel meticulously searched and reviewed hundreds of thousands of pages of transcripts and identified numerous instances of foreign Defendant traders colluding with New York based Defendant traders for each of the Defendants seeking dismissal on personal jurisdiction grounds. Plaintiffs did not add jurisdictional allegations as to SG because Plaintiffs and SG were in the process of finalizing a binding Memorandum of Understanding outlining the terms of the SG Settlement. Plaintiffs' efforts proved fruitful. The Court granted Plaintiffs' motion to amend on December 9, 2019, holding that the proposed amended complaint adequately alleged that RBS was aware of their coconspirators' in-forum overt acts, sufficient to establish personal jurisdiction with respect to RBS. ECF No. 355. RBS joined the other Group Settling Defendants in settlement negotiations and entered into the Group Settlement on April 24, 2020.

44.　　Discovery in this case was extensive. Plaintiffs obtained terabytes of transactional data and hundreds of thousands of pages of interbank chat transcripts from Defendants that they produced in the *FOREX* action. Managing and organizing this data required working with Plaintiffs' expert economist, Dr. Janet S. Netz, to analyze the contents of the data for each Defendant transactional data production and prepare questions to Defendants to ensure that all required data fields were included in the productions and standardized across all Defendant productions. Class Counsel also consulted with an industry expert and former FX trader to

analyze and identify deficiencies in Defendants' data productions and to prepare questions to Defendants. He also assisted Class Counsel with interpreting the jargon and code words that dealer bank traders used to conceal their unlawful conduct in the voluminous interbank dealer chat transcripts produced by Defendants.

45.    Plaintiffs' discovery of Defendants in this action overlapped with the discovery of Defendants in *FOREX* as well as in the related direct purchaser class action *Nypl v. JPMorgan Chase & Co.*, No. 15-cv-9300-LGS, and the direct purchaser action filed on November 7, 2018, by former *FOREX* class members who opted out of the *FOREX* settlements, *Allianz et al. v. Bank of America Corp. et. al.*, No. 18-cv-10364. Class Counsel negotiated with counsel for Defendants and other Plaintiffs for a proposed order regarding deposition protocols for the three actions, which the Court approved on March 22, 2019. ECF No. 186.

46.    Proving damages in an indirect purchaser antitrust action such as this one requires Plaintiffs to show that any anticompetitive overcharge incurred at the direct purchaser level (here, in the Defendant-to-RFED FX Instrument transaction) was passed down to the indirect purchasers at the retail level (in the subsequent RFED-to-indirect purchaser transaction). Therefore, Plaintiffs required transactional data both from Defendants (for the direct purchaser transactions) and from RFEDs (for the retail transactions). Class Counsel and their experts identified a list of 64 RFEDs that operated during the Class Period and requested Defendants' transactional data and documents related to transactions with those RFEDs.

47.    In addition to drafting and serving written discovery on Defendants, Plaintiffs also drafted and served subpoenas on more than 60 RFEDs. These subpoenas sought transactional data and other information pertaining to Class-member retail FX transactions, including RFED pricing data. The data and information were central to the case and necessary for Plaintiffs to

show impact, estimate damages, and identify Class members. Plaintiffs' negotiations with many of these RFEDs were protracted and arduous. Many of the subpoenaed RFEDs—including the four largest RFEDs that operated during the Class Period and therefore possessed transactional data and related information for a substantial majority of the Settlement Class members— vigorously resisted Plaintiffs' subpoenas, arguing they were unduly burdensome and that much of the information requested by Plaintiffs was subject to various privilege and other protections. Although Plaintiffs served the majority of their RFED subpoenas in March 2019, the last of the productions was not received until May 19, 2020, seven days before Plaintiffs filed their motion for preliminary approval of the Settlements.

48.     Plaintiffs also engaged in substantial motion practice related to their RFED subpoenas. On April 11, 2019, third-party RFED FXDirectDealer, LLC—one of the largest RFEDs that operated during the Class Period—filed a motion to quash Plaintiffs' subpoena, arguing that the subpoena was unduly burdensome and improperly requested trade secret and confidential information. ECF No. 251. Plaintiffs filed their memorandum in opposition to FXDD's motion to quash on April 16, 2019, ECF No. 253, and on April 18, 2019, the Court denied FXDD's motion in full. *See* ECF No. 254 (denying FXDD's motion to quash "[f]or substantially the reasons stated in Plaintiffs' letter"). Plaintiffs also defended against Forex Capital Markets' ("FXCM") attempt to extract exorbitant cost-sharing fees for responding to a subpoena. ECF No. 424. The Court ruled on this issue in a way favorable to Plaintiffs that minimized the expense to the Class. *See* ECF No. 433 (awarding RFED only $17,500 as reimbursement for attorneys' fees despite initial request of over $51,000). FXCM completed its production to Plaintiffs on May 7, 2020. Class Counsel also entered into a favorable cost sharing agreement with GAIN Capital, another one of the largest RFEDs during the class period that

14

operated the RFED website FOREX.com. GAIN Capital produced their customer contact information and transactional data to Plaintiffs on March 11, 2020. Finally, RFED Oanda Corporation produced customer contact information and transactional data to Plaintiffs on May 19, 2020.

49.     As a result of Class Counsel's extensive efforts pursuing and litigating their RFED subpoenas, Plaintiffs received customer contact information and transactional data from the four largest RFEDs that purchased FX Instruments from Defendants and resold those FX Instruments during the Class Period to members of the Settlement Classes. Specifically, (1) Plaintiffs obtained a Court order compelling production of their FXDD subpoena on April 18, 2019, ECF No. 254, and FXDD completed their production to Plaintiffs on December 2, 2019; (2) GAIN Capital, which operates the RFED website FOREX.com, produced their customer contact information and transactional data to Plaintiffs on March 11, 2020; (3) Forex Capital Markets ("FXCM"), completed its production to Plaintiffs on May 7, 2020; and (4) Oanda Corporation produced customer contact information and transactional data to Plaintiffs on May 19, 2020. The former customers of these four RFEDs represent a substantial majority of all Settlement Class members. *Id.* These subpoenas resulted in Plaintiffs' obtaining relevant FX transactions and identifying information for most class members. This was used to send mail notice to Settlement Class members that transacted with these RFEDs.

50.     That information is also crucial to Plaintiffs' proposed Plan of Allocation of the Settlement funds, which proposes to allocate funds to claimants on a pro rata basis based largely on the transactional data and Class member identifying information obtained by Plaintiffs' counsel from the RFEDs. As with Defendants' data productions, Plaintiffs' Counsel worked closely with Dr. Netz to analyze the contents of the data for each RFED data production and

prepare questions to the RFEDs to ensure that all required data fields and information were included in the productions.

51.     Finally, Defendants noticed the depositions of all eleven named Plaintiffs in this action. Seven of the named Plaintiffs (Contant, Lavender, Vermillion, Hitchcock, Hernandez, Tran, and Porter) eventually sat for depositions. Plaintiffs' Counsel prepared for and defended these depositions—and worked with Plaintiffs Carlos Gonzalez and Ugnius Matkus to prepare for their depositions which were cancelled at the last minute due to pending settlement discussions—in various locations around the country. Plaintiffs' Counsel was also working with FX Primus to prepare for its deposition the date for which was being finalized when the final settlements were reached. Plaintiffs' Counsel also took part in sixteen depositions of current and former Defendant FX traders that were noticed in the related *FOREX* action.

52.     Class Counsel engaged in extensive settlement discussions, culminating in Settlements with all Defendants for a Total Settlement Fund of $23,630,000.

53.     The Citigroup settlement discussions began on December 22, 2017, and culminated in the proposed settlement signed on August 2, 2018, after more than seven months of vigorous, arm's-length negotiations by the parties that included frank discussions of the relative strengths and weaknesses of the parties' claims and defenses.

54.     During settlement negotiations with Citigroup, Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) was pending before the Court. On March 15, 2018, less than a month after Plaintiffs and Citigroup entered into a binding Memorandum of Understanding, the Court granted the motion to dismiss the CCAC, while also granting leave for Plaintiffs to file a motion for leave to amend accompanied by a proposed SCCAC with an accompanying memorandum in support. ECF No. 136. Although the Court ultimately granted Plaintiffs leave to

file the SCCAC, that result was not certain when Plaintiffs were negotiating the Citigroup settlement.

55.    During the settlement discussions with Citigroup, Class Counsel consulted with Dr. Osler to evaluate the volume of retail FX transactions relative to the volume of spot FX transactions as a whole. I, along with other Class Counsel, took into consideration the substance of the consultations with Dr. Osler, the complexities of this action, and the relative strengths and weaknesses of each side's litigation position in reaching to the terms of the proposed settlement. Class Counsel and Dr. Osler considered a number of sources in estimating the size of the Classes at issue here as compared to the *FOREX* class, including retail estimates from the Triennial Bank Survey of the Bank for International Settlements ("BIS"), the Federal Reserve Bank of Cleveland, Dr. Osler's own academic research, and other industry data and sources. These sources indicated that the daily average volume of retail FX trading relative to the overall direct purchaser FX Instrument market at issue in *FOREX* is likely between 10 and 30 percent. Subsequent information provided to Plaintiffs by Citigroup corroborated this estimate. Additionally, because the proposed Settlement Classes at issue here are limited to the eight States of New York, Arizona, California, Florida, Illinois, Massachusetts, Minnesota, and North Carolina, the estimate was further reduced to account for the size of these Classes. According to the U.S. Census Bureau's Population Estimates, the populations of the eight states at issue in this Action account for 37.7 percent of the overall U.S. population. These settlement negotiations with the other Defendants were guided by largely the same considerations.

56.    The *FOREX* plaintiffs settled with Citigroup for $402 million, of which $394 million was allocated to the Direct Settlement Class. *FOREX* ECF No. 481-3 at 6.[1] Applying the

---

[1] The remaining $8 million was allocated to the "Exchange-Only Settlement Class." *Id*. Because the Settlement Class definitions here are limited to persons who indirectly purchased an FX Instrument from a Defendant or co-

more conservative retail FX market share estimate of 10 percent to the Citigroup *FOREX* settlement resulted in a *pro-rata* indirect amount of $39.4 million. That amount was then reduced by 62.3 percent to reflect the percentage of the population represented by the proposed Settlement Class members, leaving an estimate of $14.85 million. The $9.95 million Citibank Settlement is on par with that settlement considering the different stages at which the settlements were reached.

57.    During the November 15, 2018 hearing regarding Plaintiffs' prior motion for preliminary approval of the Citigroup settlement, the Court requested information pertaining to the number of class members and total potential damages to determine whether the Citigroup settlement is fair, reasonable, and adequate. *See* ECF No. 181 (Transcript of Nov. 28, 2018 Hearing). Class Counsel worked diligently to provide the Court with the requested information pertaining to the settlement, as well as additional information supporting preliminary approval as required by Rule III.C.5 of the Court's Individual Rules and Procedures for Civil Cases and recent amendments to Fed. R. Civ. P. 23(e). That work has included retaining multiple experts to analyze the volume of retail FX transactions relative to the volume of spot FX transactions as a whole; estimate the total size of the Settlement Classes; and propose a methodology of allocating the Net Settlement Fund to the Settlement Class members here, consistent with the Court's approval of the *FOREX* plaintiffs' plan for allocating settlement funds to the direct-purchaser settlement class members in that action.

---

conspirator by entering into an FX Instrument with a member of the Direct Settlement Class, the settlement amount allocated to the Exchange-Only Settlement Class is not relevant to Plaintiffs' pro-rata comparisons. However, the Court's finding that an $8 million settlement with Citigroup to resolve the Exchange-Only Settlement Class claims is instructive. While Plaintiffs here have not identified publicly available information regarding the size of the Exchange-Only Class's claims, the cash recovery provided by the Citigroup Settlement here is 24.4% larger than the Exchange-Only Settlement approved by the Court in *FOREX*. *Id.*

58.     Beginning on December 21, 2018, Class Counsel had extensive settlement discussions with counsel for MUFG. The discussions spanned more than three months of arm's-length negotiations and exchanges of draft settlement agreements. An agreement in principle to settle the claims against MUFG was reached on February 6, 2019, but the parties continued to exchange draft settlement agreements throughout the following weeks before culminating in a signed settlement agreement on March 1, 2019. During Plaintiffs' settlement negotiations with MUFG, the motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) filed by MUFG and certain other Defendants was pending before the Court and on May 20, 2019, the Court granted the Rule 12(b)(2) motion in an order that would have dismissed MUFG from the Action absent the Settlement proposed here. Thus, if Plaintiffs had not reached the MUFG Settlement prior to the Court's Rule 12(b)(2) Order, the possibility of any recovery from MUFG may have been significantly diminished if not impossible, and the litigation with respect to MUFG would be delayed by months if not years pending Plaintiffs' motion for leave to amend the SCCAC and possible appeals.

59.     Similarly, although discovery had commenced with respect to many of the non-settling Defendants at the time when the MUFG negotiations began, MUFG was exempt from all discovery productions until the date on which the Court issued a decision on the Rule 12(b)(2) motion. *See* ECF No. 176 (Civil Case Management Plan and Scheduling Order), ¶ 8(b). Accordingly, many of the same risks that were present during Plaintiffs' Citigroup settlement negotiations—during which Citigroup's Rule 12(b)(6) motion to dismiss was pending before the Court—were also present throughout the MUFG Settlement discussions. Further, because MUFG is located in Japan, if MUFG had been dismissed, without the cooperation afforded by

the MUFG Settlement, Plaintiffs' counsel may have been unable to obtain discovery from MUFG or, otherwise, would have incurred substantial expense and delay to do so.

60.     Class Counsel used the same analysis for the MUFG settlement as it did to assess the Citigroup Settlement concerning the reasonableness of the settlement consideration offered by MUFG. In *FOREX*, the MUFG settlement provided for a payment of $10.5 million for both the Direct and the Exchange-Only Settlement Classes. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the $10.5 million *FOREX* MUFG settlement is between $395,850 (using the 10% estimate) and $1,187,550 (using the 30% estimate). Therefore, the MUFG Settlement amount of $985,000 here is at the upper end of the range of reasonableness when compared to the *FOREX* settlement. The MUFG Settlement was also reached at a relatively early stage in the case, rendering the cooperation provisions of both Settlements particularly valuable to the Settlement Classes.

61.     The SC settlement discussions began in May 2019, the parties reached an agreement in principle in October 2019, and the parties signed the SC Settlement on November 4, 2019, after six months of vigorous, arm's-length negotiations by the parties that included frank discussions of the relative strengths and weaknesses of the parties' claims and defenses. Plaintiffs were informed throughout the settlement discussions by the expert analyses, as well as Class Counsel's investigation of the alleged conspiracy and its effects, including discovery obtained from Defendants, publicly available news articles, press releases and other reports, and researching the applicable law. The *FOREX* plaintiffs settled with SC for $17,200,000. *FOREX* ECF No. 822-5. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the SC *FOREX* settlement results in a *pro-rata* indirect amount of $648,440. Applying the high-end 30 percent retail FX market share estimate

and the 37.7 percent population estimate to the SC $17.2 million *FOREX* settlement results in a *pro-rata* indirect amount of $1,945,320. The $1,720,000 SC Settlement here is therefore at the high end of the *pro-rata* range of reasonableness based on the Court-approved direct-purchaser settlements in *FOREX*.

62.     I, along with other Class Counsel, also undertook extensive settlement discussions with counsel for Defendant SG. Those settlement discussions began on May 15, 2019, and spanned three months of arm's-length negotiations and exchanges of draft settlement agreements. The parties reached a settlement agreement in principle on August 13, 2019, but continued to exchange draft settlement agreements throughout the following weeks before culminating in a signed settlement agreement on September 10, 2019. The agreed-upon cooperation guaranteed that Plaintiffs would obtain discovery from SG, particularly as SG is based in France, at a time when litigation was ongoing. For a substantial period of Plaintiffs' settlement negotiations with SG, and at the time the SG Settlement was finalized, SG was dismissed from the case. Although Plaintiffs could have sought to appeal that order or filed a motion for leave to file an amended complaint adding jurisdictional allegations regarding SG, the success of such efforts would have been far from certain. Thus, absent the SG Settlement, there is no guarantee that Plaintiffs would have been able to recover any funds—or obtain any discovery materials—from SG. In *FOREX*, the SG settlement provided for a payment of $18 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-4. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the of $18 million *FOREX* SG settlement is between $678,600 (using the 10% estimate) and $2,035,800 (using the 30% estimate). Therefore, even though SG was dismissed from the action when the Settlement was reached here, the SG

Settlement amount of $975,000 is still well within the *pro-rata* range of reasonableness based on the *FOREX* settlement where SG was not dismissed when it settled with the plaintiffs in that action.

63.     Finally, I, along with other Class Counsel, also undertook extensive settlement discussions with counsel for the Group Settling Defendants beginning in November 2019. The parties reached a settlement agreement in principle on February 19, 2020, and thereafter exchanged draft settlement agreements culminating in a signed agreement on April 24, 2020. *Id.*

64.     Critically, shortly prior to the commencement of the parties' Group Settlement negotiations, on September 3, 2019, the Court in the related direct-purchaser action *FOREX*, issued an order denying the *FOREX* plaintiffs' motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See FOREX*, 2019 WL 4171032, at *1 (S.D.N.Y. Sept. 3, 2019) (the "*FOREX* Class Order"). In addition, the deadline for fact discovery and for the parties to file pre-motion letters regarding summary judgment and class certification motions as imminent. The impending risks and expenses associated with class certification and potential summary judgment motion(s) were significant factors Class Counsel and I considered in determining a reasonable Group Settlement amount.

65.     Prior to the settlement discussions with Group Settling Defendants, a jury in the U.S. District Court for the Southern District of New York acquitted three foreign exchange traders of price-fixing charges brought by the Antitrust Division of the Department of Justice ("DOJ"). *See USA v. Usher et al.*, No. 17-cr-00019 (S.D.N.Y.), ECF No. 240, at 2481:9-2482:4). The DOJ argued that the Defendant traders conspired to coordinate their trading to manipulate FX Instrument prices. However, the three traders, who were previously employed by Barclays, RBS, JPMorgan, and Citigroup, successfully argued that their chatroom discussions regarding

FX trades reflected lawful parallel conduct rather than coordination. *See USA v. Usher et al.*, No. 17-cr-00019 (S.D.N.Y.), ECF No. 239, at 2369:17-22). If a jury in this action found that the evidence does not support Plaintiffs' antitrust conspiracy allegations, Plaintiffs and the Class members would likely be unable to recover any damages. The DOJ did obtain a guilty verdict for a fourth former Defendant trader on November 20, 2019. *USA v. Akshay Aiyer*, No. 18-cr-00333 (S.D.N.Y.). However, the disparate results from the DOJ's criminal trials still created uncertainty and increased risks for Plaintiffs' claims here.

66.      During the settlement discussions with Group Settling Defendants, Class Counsel considered the analyses of industry expert Dr. Carol Osler to evaluate the volume of retail FX transactions relative to the volume of spot FX transactions as a whole. I, along with other Class Counsel and the Plaintiffs, took into consideration the substance of Dr. Osler's analyses, the complexities of this Action, and the relative strengths and weaknesses of each side's litigation position in reaching the terms of both Settlements proposed here.

67.      The *FOREX* litigation is ongoing with respect to Credit Suisse, but all eleven other Group Settling Defendants entered into settlements with the *FOREX* plaintiffs totaling $1,862,575,000. *See FOREX* ECF Nos. 481, 822, 877. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the Group Settling Defendants *FOREX* total settlement amount results in a *pro-rata* indirect amount of $70,219,078. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the Group Settling Defendants $1,862,575,000 *FOREX* settlement total results in a *pro-rata* indirect amount of $210,657,233. *Id.* The $10,000,000 Group Settlement here is therefore 14.2 percent of the low end of the *pro-rata* range of reasonableness

based on the Court-approved direct-purchaser settlements in *FOREX*, and 4.8 percent of the high end estimate. *See id.*

68.     Plaintiffs' settlement negotiations with Defendants were also informed by the settlements in the related Canadian action. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-000189-152 (Quebec S.C.J.).

69.     After diligent investigation and careful consideration of all relevant circumstances, I, along with Class Counsel, recommended to the Plaintiffs that it was in the best interests of the Classes to enter into the proposed Settlements. Plaintiffs concurred with the recommendations of counsel, allowing for the finalization of the proposed Settlements. Each of the proposed Class Representatives supports approval of the settlements.

70.     At the times the settlements were reached, Plaintiffs had received Defendants' document productions and transactional data, and had issued third-party subpoenas requesting transactional data from a number of retail foreign exchange dealers ("RFEDs"). The information gleaned from this discovery, as well as from the pleadings, motions, and court orders in *FOREX*, and the trial in the criminal action *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), have helped Class Counsel to assess the potential damages, as well as the risks and likely defenses going forward. Class Counsel have also attended depositions conducted in the related *FOREX* action, and had reviewed all public and governmental reports related to or exchanged during the *FOREX* litigation as part of our extensive factual and legal analysis of this Action.

71.     On May 29, 2019, Plaintiffs filed a motion for preliminary approval of the Citigroup and MUFG Settlements, ECF No. 272, which the Court granted on July 29, 2019. ECF No. 297. On November 22, 2019, Plaintiffs filed a separate motion for preliminary approval of

the SC and SG Settlements. ECF No. 337. The Court scheduled a hearing on the SC and SG preliminary approval motion for January 9, 2020. ECF No. 341. Plaintiffs and Group Settling Defendants reached an agreement in principle to settle this action in full shortly prior to the date of that hearing. Therefore, in order to avoid burdening the Court with two separate preliminary approval motions, the Parties requested that the Court adjourn the January 9, 2020, hearing so that Plaintiffs could file this consolidated motion for preliminary approval of the SC, SG, and Group Settlements. *See* ECF No. 371.

72.     On May 26, 2020, Plaintiffs filed a motion for preliminary approval of the SC, SG, and Group Settlements, ECF No. 418, which, after a hearing on July 9, 2020, the Court granted on July 17, 2020. ECF No. 441.

73.     In connection with the Citigroup/MUFG Preliminary Approval Motion, Class Counsel obtained preliminary estimates of claims administration costs from five well-respected potential claims administrators based on the Class size estimates provided by another consultant. After carefully comparing bids and notice plan proposals from those five claims administrators, Plaintiffs selected Heffler Claims Group ("Heffler") as the proposed Claims Administrator. The Court approved that selection in the Citigroup/MUFG Preliminary Approval Order. *Id.* ¶ 27. For a total Class size of 100,000, Heffler estimated that the total costs of publication notice, direct-mail postcard and email notice, internet notice including advertising the Settlements on social media and websites, and administering the claims, will be $229,794.

74.     The Preliminary Approval Order required that notice be provided to members of the Settlement Classes in the form and manner set forth in Plaintiffs' Memorandum in Support of Preliminary Approval and the accompanying Declaration of Jeanne C. Finegan (the "Notice Plan").

75.     Pursuant to the Preliminary Approval Order, the Settlement Administrator completed the mailing of Direct Notice to the Class on August 12, 2020. On August 10, 2020, the Settlement Administrator also commenced Publication Notice through various media outlets—including a press release, social media advertising, and internet search advertising, and posted the Long-Form Notice along with other pertinent information and documents on a website devoted to this case (fxindirectantitrustsettlement.com). The Notices inform all Class members of, *inter alia*: (1) the nature of the action; (2) the definition of the Settlement Classes that are being certified; (3) the class claims, issues, or defenses; (4) the basic terms of the Settlements; (5) that a Settlement Class member may enter an appearance through an attorney if the member so desires; (6) that the Court will exclude from the class any Settlement Class member who requests exclusion; (7) the time and manner for objecting to the Settlement sand/or requesting exclusion; (8) the binding effect of a class judgment on members and the terms of the releases; (9) the claims filing process and a description of the Plan of Allocation; (10) that Class Counsel would be seeking a fee award in the amount set forth in Paragraph 78 below; and (11) the date on which Plaintiffs will file a motion requesting an award of attorneys' fees, reimbursement of costs, and service awards to the Class Representatives.

76.     The Settlement Administrator completed the mailing and emailing of Direct Notice to the Class members on August 12, 2020. The Settlement Administrator commenced publication and internet advertising notice on August 10, 2020. Internet advertising notice ran through August 31, 2020.

77.     Although Class members have until October 15, 2020, to object to the Settlements or opt out of the Settlement Classes, there have not been any objections or opt-outs as of the date of this Declaration.

78.    In the Notice disseminated, Class Counsel indicated they would not seek attorneys'

fees in excess of 20% of the Citigroup and MUFG Settlement Funds; 25% of the Standard

Chartered ("SC") and Societe Generale ("SG") Settlement Funds; and 33.33% of the Group

Settlement Funds (resulting in a blended fee percentage of 26.2% of the total $23,630,000

Settlement Fund). Class Counsel have now requested 26.2% ($6,194,083.33) of the Total

Settlement Fund as attorneys' fees.

79.    Class Counsel's total requested fee of $6,194,083.33 divided by Class Counsel's

total lodestar of $6,573,412.50 equals 0.94. This figure is commonly referred to as the "lodestar

multiplier."

80.    In the Notice disseminated, Class Counsel indicated they would not seek

reimbursement of expenses in excess of $1,825,000. Class Counsel have now requested

reimbursement of expenses totaling $1,628,320.51.

81.    Declarations in support of each firm's lodestar, as well as expenses incurred, are

attached hereto as Exhibits Q through T. These Declarations provide the names of the attorneys

and professional support staff who worked on the Action, their hourly rates and number of hours

billed, the lodestar value, the expenses incurred by the firms, and the background and experience

of the firms and attorneys. Class Counsel are not seeking fees for work done in connection with

preparing the fee and expense application. Class Counsel also are not seeking fees for work done

after the date of September 11, 2020.

82.    Experienced attorneys at Class Counsel's respective firms undertook particular

tasks appropriate for their levels of expertise, skill and experience. Throughout the prosecution

of this Action, work assignments were allocated among Class Counsel in a manner that was

intended to promote efficiency and avoid unnecessary duplication of effort. Class Counsel did not employ contract attorneys for work on this case.

83.     Class Counsel's firm resumes are attached hereto as Exhibits M to P. As these resumes and bios demonstrate, Class Counsel are among the most experienced and skilled firms in the complex class action litigation field and have successful track records in some of the largest class actions throughout the country.

84.     In addition to the numerous risks discussed in the accompanying memorandum, Class Counsel bore the risk of litigation this action entirely on a contingent basis. Class Counsel undertook that risk with full awareness that success in contingent litigation such as this action is never certain.

85.     Throughout the pendency of this Action, Class Counsel have ensured that sufficient attorney resources were allocated to prosecuting the action effectively. Moreover, Class Counsel have also advanced the expenses required to litigate such a complex action. From the outset, Class Counsel were aware that they might not recover any of the expenses they incurred in prosecuting this action.

86.     Class Counsel's total litigation expenses, including paid and unpaid expenses, are $1,628,320.51. Class Counsel has advanced $1,225,183.92 in unreimbursed expenses in the prosecution and settling of this Action, including $1,057,672.24 of contributions to the litigation fund.

87.      The majority of the expenses incurred were paid out of a litigation fund created and maintained by Berger Montague PC. Class Counsel collectively contributed $1,057,672.24 to the litigation fund. Class Counsel have incurred an additional $403,136.59 in unpaid expenses. The total amount of litigation funds contributed by each firm are shown in this chart:

| Breakdown of Litigation Fund Contributions by Firm | |
|---|---|
| **Firm** | **Amount** |
| Berger Montague PC | $619,642.93 |
| Schneider Wallace Cottrell Konecky LLP | $181,753.71 |
| McCulley McCluer PLLC | $198,775.60 |
| Pfiefer Robca Wolf Abdullah Carr & Kane | $57,500.00 |
| TOTAL | $1,057,672.24 |

88.     Most of Class Counsel's litigation expenses incurred were for expert work. Class Counsel successfully engaged specialized and highly skilled economic experts with extensive knowledge of the FX market. Plaintiffs' expert expenses totaled $1,063,118.68, including $1,029,841.58 paid from the Litigation Fund, $20,194.10 paid by McCulley McCluer PLLC, and $13,083.00 paid by Berger Montague PC. The total amounts expended by each firm are shown in the individual firm declarations attached hereto as Exhibits Q to T.

89.     Class Counsel incurred other reasonable expenses, including filing fees, document processing, deposition transcripts and court reporting, wholesale market pricing database subscriptions, data storage and organization, cost sharing payments for certain RFED subpoenas, computer research, printing, travel, and accommodations.

90.     Class Counsel has reasonably incurred, and seeks reimbursement of, expenses in the amount of $1,628,320.51 (from inception through September 11, 2020). All of the time and funds advanced by Class Counsel were fully contingent on a successful outcome. During the case, Class Counsel, at the direction of Lead Counsel, contributed to a Litigation Fund managed by my firm for common expenses. Class Counsel also individually advanced and documented additional expenses over the course of the litigation. Finally, the Litigation Fund has unpaid bills owed for database hosting services. The table below provides a summary of the total expenses:

| Summary of Total Expenses | |
|---|---|
| **Paid Expenses** | |
| Litigation Fund Paid Out | $1,055,307.79 |
| Additional Expenses Advanced by Class Counsel for Individual Firm Expenses | $169,876.13 |
| Unpaid Expenses | |
| Outstanding Bills for Database Services Owed from Litigation Fund | $403,136.59 |
| **TOTAL EXPENSES** | **$1,628,320.51** |

91.    As demonstrated by the tables in Exhibits Q to T summarizing each firm's expenses by category, the largest expense of each firm is its contribution to the Litigation Fund. From the inception of the litigation, the books and records of the Litigation Fund were maintained by the accounting department of Berger Montague PC. The current balance of the Litigation Fund is $2,364.45. This balance is not included in Class Counsel's total requested expenses of $1,628,320.51. The total expenses incurred by the Litigation Fund by category are as follows:

| Summary of Litigation Fund Expenses | |
|---|---|
| *Paid Expenses* | |
| Expert and Consulting Costs | $1,029,841.58 |
| Legal Research | $5,464.80 |
| Court Fees and Transcripts | $7,605.69 |
| Witness/Service Costs | $125.00 |
| Commercial Copies | $12.40 |
| Reimbursement of Third-Party Production Costs | $6,000.00 |
| Travel Costs for Class Representatives | $2,888.52 |
| Miscellaneous | $3,369.80 |
| *Unpaid (Incurred) Expenses* | |
| Database Hosting Services | $403,136.59 |
| **TOTAL PAID AND UNPAID LITIGATION FUND EXPENSES** | $1,458,444.38 |

92.     Class Counsel carefully reviewed the materials submitted by all Plaintiffs' Counsel firms to ensure that: (1) any time for work not authorized by Class Counsel and non-litigation related time be removed; (2) all firms complied with Class Counsel's instructions to prohibit contract attorneys from billing to the case; and (3) unreasonable or unapproved costs and expenses be removed. Settlement Class Counsel also instructed each Plaintiffs' Counsel firm to carefully review its records to confirm that all billings are reasonable, including confirming that the hourly rates charged commensurate with the biller's experience level, and the time reported is commensurate with the work assigned.

93.     Class Counsel will continue to expend many additional hours—which are not included in the lodestar cross-check calculations set forth above—in connection with the Settlement administration process, responding to Class member inquiries, working to secure final approval of the Settlement, preparing for the final approval hearing scheduled for November 19, 2020, and dealing with logistical matters involving Settlement administration.

94.     Class Counsel have requested service awards for the eleven Class Representatives in in the amount of $5,000 each, $55,000 in total. The Class Representatives consistently worked to support the prosecution of this case. They regularly communicated with Class Counsel, reviewed the multiple complaints and other litigation documents, searched for and provided discovery requested by Defendants, and reviewed and approved the Settlement Agreements. Class Representatives James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, Charles G. Hitchcock III, Tina Porter, and Paul Vermillion sat for depositions that lasted close to a full day each. Moreover, the depositions required extensive preparation by the Class Representatives with Class Counsel, both telephonically and in-person at the deposition location. Some of the Class Representatives were required to travel away from home and/or stay overnight

in a different city to be deposed. As set forth in the individual Class Representative declarations attached hereto, the Class Representatives devoted at least 997 combined hours of work towards the prosecution of this action. Without their efforts, the Settlements would not have been achieved for the Class members.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 21, 2020, in Philadelphia, PA.

/s/ Michael Dell'Angelo
Michael Dell'Angelo
**BERGER MONTAGUE PC**
1818 Market St, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net