**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES CONTANT, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br><br> Defendants. | Civil Action No. 17-cv-3139-LGS <br><br> (related to No. 13-cv-7789-LGS) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
OF SETTLEMENTS, PLAN OF ALLOCATION, AND CERTIFICATIONS OF THE
PROPOSED SETTLEMENT CLASSES FOR SETTLEMENT PURPOSES**

## TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................... 1

II.    BACKGROUND ........................................................................................... 4

       A.    Procedural Posture ............................................................................4

       B.    The Dissemination of Notice to the Settlement Classes .........................5

       C.    The Settlement Classes' Response to the Settlement ...............................7

III.   THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE...................... 7

       A.    Public Policy Favors Settlement .........................................................7

       B.    Courts Approve "Fair, Reasonable, and Adequate" Class Action Settlements ......8

       C.    The Settlements Are Procedurally Fair.................................................8

             1.    The Settlements Were Negotiated At Arm's Length................................. 8

             2.    The Class Representatives and Class Counsel Have Adequately
                   Represented the Class ................................................................. 9

       D.    The Settlements Are Substantively Fair ...............................................10

             1.    The *Grinnell* Factors Support Final Approval ......................................... 10

                   a.    The Complexity, Expense, and Likely Duration of the Litigation 10

                   b.    The Positive Reaction of the Classes to the Settlements Further
                         Supports Approval ........................................................................ 11

                   c.    The Stages of Proceedings When the Settlements Were Reached
                         Supports Approval ........................................................................ 12

                   d.    The Classes Faced Significant Risks in Establishing Liability and
                         Damages................................................................................... 13

                   e.    The Classes Faced Significant Hurdles in Certifying the Classes
                         and Maintaining them On Appeal................................................. 16

                   f.    The Fact That Defendants May Be Able to Sustain a Larger
                         Judgment Does Not Undercut the Reasonableness of the
                         Settlement .................................................................................. 17

                   g.    The Settlement Fund is Reasonable in Light of the Best Possible
                         Recovery and the Attendant Risks of Litigation............................ 17

                         i.     The *FOREX* Settlement Amounts Support Final
                                Approval ......................................................................... 19

                         ii.    Plaintiffs' Damages Analyses Support Final Approval .... 21

                         iii.   Defendants' Settlements in the Canadian Action Support
                                Final Approval ................................................................. 23

      2.     Proposed Attorneys' Fees .......................................................................... 26

IV.    THE NOTICE CAMPAIGN ADEQUATELY APPRISED CLASS MEMBERS OF THEIR RIGHTS ............................................................................................... 27

V.    THE PLAN OF ALLOCATION SHOULD BE FINALLY APPROVED ...................... 30

VI.    THE PROPOSED SETTLEMENT CLASSES SHOULD BE FINALLY APPROVED ................................................................................................... 34

VII.    CONCLUSION ...................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                    Page(s)

*Allen v. Dairy Farmers of Am., Inc.*,
  No. 09-cv-230, 2011 WL 1706778 (D. Vt. May 4, 2011) ............................................... 7

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997)................................................................................................... 35

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
  No. 07-cv-2207-JGK, 2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)...................................... 16

*Bowes v. Melito*,
  140 S. Ct. 677 (2019)................................................................................................. 29

*Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*,
  No. 85-cv-3048-JMW, 1987 WL 7030 (S.D.N.Y. Feb. 13, 1987) ........................................ 16

*Charron v. Pinnacle Grp. N.Y. LLC*,
  874 F. Supp. 2d 179 (S.D.N.Y. 2012)............................................................................ 25

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013).................................................................................................... 17

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)................................................................................. *passim*

*Fleisher v. Phoenix Life Ins. Co.*,
  No. 11-cv-8405-CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)..................................... 7

*Guevoura Fund Ltd. v. Sillerman*,
  No. 15-cv-07192-CM, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ................................... 8

*Hall v. ProSource Techs., LLC*,
  No. 14-cv-2502-SIL, 2016 WL 1555128 (E.D.N.Y. Apr. 11, 2016)..................................... 28

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
  298 F.R.D. 171 (S.D.N.Y. 2014) ................................................................................. 29

*In re Agent Orange Prod. Liab. Litig.*,
  818 F.2d 145 (2d Cir. 1987)........................................................................................ 30

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001)........................................................... 31, 32, 33, 34

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012)........................................................................................ 34

*In re AOL Time Warner, Inc.*,
   No. 02-cv-5575-SWK, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ...................... 12, 18, 19, 21

*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
   909 F. Supp. 2d 259 (S.D.N.Y. 2012) ..................................................................................... 11

*In re Citigroup Inc. Sec. Litig.*,
   965 F. Supp. 2d 369 (S.D.N.Y. 2013) ..................................................................................... 11

*In re CitiGroup Inc.*,
   296 F.R.D. 147 (S.D.N.Y. 2013) ............................................................................................. 17

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13-md-2476-DLC, 2016 WL 2731524, (S.D.N.Y. Apr. 26, 2016) .................................. 34

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   343 F. Supp. 3d 394 (S.D.N.Y. 2018) ..................................................................................... 12

*In re Facebook, Inc., No.*,
   No. 18-cv-3845, 2020 WL 5652448 (2d Cir. Sept. 23, 2020) ................................................ 12

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   No. 13-cv-7789-LGS, 2019 WL 4171032 (S.D.N.Y. Sept. 3, 2019) ...................................... 17

*In re GSE Bonds Antitrust Litig.*,
   414 F. Supp. 3d 686 (S.D.N.Y. 2019) ..................................................................................... 10

*In re GSE Bonds Antitrust Litig.*,
   No. 19-cv-1704-JSR, 2020 WL 3250593 (S.D.N.Y. June 16, 2020) ...................................... 11

*In re GSE Bonds Antitrust Litig.*,
   No. 19-cv-1704-JSR, 2019 WL 6842332 (S.D.N.Y. Dec. 16, 2019) ...................................... 13

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12-cv-8557-CM, 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ...................................... 13

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ..................................................................................... *passim*

*In re Initial Pub. Offering Sec. Litig.*,
   226 F.R.D. 186 (S.D.N.Y. 2005) ............................................................................................... 8

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ............................................................................................. 10

*In re Michael Milken & Assocs. Sec. Litig.*,
   150 F.R.D. 57 (S.D.N.Y. 1993) ................................................................................................. 8

*In re Namenda Direct Purchaser Antitrust Litig.*,
  No. 15-cv-7488-CM, 2020 WL 2749223 (S.D.N.Y. May 27, 2020)........................................ 8

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................... 16, 18

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997) ....................................................................... 31

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
  30 F.R.D. 11 (E.D.N.Y. 2019)..................................................................... 10, 18

*In re Polyurethane Foam Antitrust Litig.*,
  135 F. Supp. 3d 679 (N.D. Ohio 2015).................................................................. 30

*In re Vitamin C Antitrust Litig.*,
  No. 06-md-1738, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ....................................... 11, 30

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. Del. 2002) .................................................................... 22, 24

*Lane v. Facebook*,
  696 F.3d 811 (9th Cir. 2012) ......................................................................... 34

*Melito v. Experian Mktg. Sols., Inc.*,
  923 F.3d 85 (2d Cir. 2019).......................................................................... 29

*Newman v. Stein*,
  464 F.2d 689 (2d Cir. 1972).......................................................................... 18

*Ortiz v. Chop't Creative Salad Co.*,
  No. 13-cv-2541-KNF, 2014 WL 1378922 (S.D.N.Y. Mar. 25, 2014) ....................................... 8

*Rodriquez v. It's Just Lunch Int'l*,
  No. 07-cv-09227-SN, 2020 WL 1030983 (S.D.N.Y. Mar. 2, 2020) ........................................ 8

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
  258 F. Supp. 2d 254 (S.D.N.Y. 2003).................................................................. 11

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011).......................................................................... 34

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*,
  No. 01-cv-11814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ....................................... 21, 26

*Thompson v. Metro. Life Ins. Co.*,
  216 F.R.D. 55 (S.D.N.Y. 2003) ...................................................................... 28

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
   226 F.R.D. 207 (D.N.J. 2005) ................................................................................. 30

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) .......................................................................... *passim*

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982) ...................................................................................... 28

**Rules**

Fed. R. Civ. P. 23 .................................................................................................. *passim*

**Other Authorities**

Manual for Complex Litigation, Third, § 30.42 (1995) ................................................. 9

## I.   __INTRODUCTION__

Plaintiffs[1] respectfully submit this memorandum in support of their motion for final approval of (1) a settlement between Plaintiffs and the proposed Classes and Defendant Citigroup ("Citigroup") (the "Citigroup Settlement"); (2) a settlement between Plaintiffs and the proposed Classes and Defendant MUFG Bank (the "MUFG Bank Settlement"); (3) a settlement between Plaintiffs and the proposed Classes and Defendant Standard Chartered Bank ("SC") (the "SC Settlement"); (4) a settlement between Plaintiffs and the proposed Classes and Defendant Société Générale ("SG") (the "SG Settlement"); and (5) a group settlement between Plaintiffs and the proposed Classes and Defendants Bank of America Corporation, Bank of America, N.A., and Merrill Lynch, Pierce, Fenner & Smith Inc. ("Bank of America"); Barclays Bank PLC and Barclays Capital Inc. ("Barclays"); BNP Paribas (identified in the Complaint as BNP Paribas Group), BNP Paribas US Wholesale Holdings Corp., previously known as BNP Paribas North America, Inc., and BNP Paribas Securities Corp., which now includes BNP Paribas Prime Brokerage, Inc. ("BNP Paribas"); Credit Suisse AG and Credit Suisse Securities (USA) LLC ("Credit Suisse"); Deutsche Bank AG ("Deutsche Bank"); The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (now known as Goldman Sachs & Co. LLC) ("Goldman Sachs"); HSBC Bank plc, HSBC North America Holdings Inc., HSBC Bank USA, N.A., and HSBC Securities (USA) Inc. ("HSBC"); JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. ("JPMorgan"); Morgan Stanley, Morgan Stanley & Co. LLC, and Morgan Stanley & Co. International plc ("Morgan Stanley"); RBC Capital Markets, LLC ("RBC"); The Royal Bank of Scotland plc (now known as NatWest Markets Plc) and RBS Securities Inc. (now known as NatWest Markets

---

[1] James Contant, Sandra Lavender, Victor Hernandez, Martin-Han Tran, FX Primus Ltd., Carlos Gonzalez, Ugnius Matkus, Charles G. Hitchcock III, Jerry Jacobson, Tina Porter, and Paul Vermillion (collectively, "Plaintiffs," or "proposed Settlement Class Representatives").

Securities Inc.) ("RBS"); UBS AG, UBS Group AG, and UBS Securities LLC ("UBS") (the "Group Settlement") ("Group Settling Defendants") (collectively with Citigroup, MUFG Bank, SC, and SG, "Settling Defendants" or "Defendants"). If finally approved, the proposed Settlements[2]—consisting of combined cash payments of $23,630,000[3] (the "Total Settlement Amount")—will offer valuable monetary relief to the Classes and resolve this complex case in full against all Defendants.

Pursuant to Fed. R. Civ. P. 23(e), final approval of a proposed class settlement requires Plaintiffs to show that: (1) the classes should be certified for purposes of settlement; (2) the class representatives and class counsel have adequately represented the classes; (3) the proposal was negotiated at arm's length; (4) the proposal treats members of the settlement classes equitably relative to each other; and (5) the relief provided for the classes is adequate, taking into account: (a) the costs, risks, and delay of trial and appeal, (b) the effectiveness of any proposed method of allocating and distributing relief to the classes, (c) the terms of any proposed award of attorney's fees, and (d) the terms of the settlement itself and any other relevant agreements made in connection with the proposed settlement. *Id.* These requirements largely overlap with the following factors announced in *Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974),

---

[2] The Citigroup and MUFG Bank Settlements are attached, respectively, as Exs. A and B to the Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Preliminary Approval of Settlements and Certifications of the Proposed Settlement Classes for Settlement Purposes that Plaintiffs filed in connection with their motion for preliminary approval of the Citigroup and MUFG Bank Settlements, ECF No. 274 ("Dell'Angelo Citigroup and MUFG Bank Settlement Decl."). The SC, SG, and Group Settlements are attached, respectively, as Exs. A, B, and C to the Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Preliminary Approval of Settlements and Certifications of the Proposed Settlement Classes for Settlement Purposes that Plaintiffs filed in connection with their motion for preliminary approval of the SC, SG, and Group Settlements, ECF No. 418 ("Dell'Angelo SC, SG, and Group Settlement Decl."). The Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Final Approval of Settlements, Plan of Allocation, and Certifications of the Proposed Settlement Classes for Settlement Purposes, submitted in support of this motion, is referred to herein as the "Dell'Angelo Decl."

[3] The Citigroup Settlement provides for a payment of a $9,950,00 by Citigroup, *see id.* at Section II, ¶ (qq); the MUFG Bank Settlement provides for a payment of a $985,000 by MUFG Bank, *see id.* at Section II, ¶ (qq); the SC Settlement provides for a payment of a $1,720,000 by SC, *see id.* at Section II, ¶ (qq); the SG Settlement provides for a payment of $975,000 by SG, *see id.* at Section II, ¶ (qq); and the Group Settlement provides for a payment of $10,000,000. *Id.* at Section II, ¶ (qq).

*abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000), that courts in the Second Circuit apply in evaluating a proposed class settlement (the "*Grinnell* factors"):

> (l) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

As explained below, and for many of the same reasons set forth in the Court's prior Orders granting preliminary approval of the Settlements,[4] these factors support final approval of the Settlements. The Settlements were negotiated at arm's length, and the relief obtained is fair, reasonable, and adequate. *See* Declaration of Michael Dell'Angelo in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards for Class Representatives, ECF No. 449 ("Dell'Angelo Fee Decl."), ¶¶ 53, 58, 61-64. The proposed *pro rata* method of allocating the Settlement Fund amongst the members of the Settlement Classes ensures that they will be treated equitably relative to each other. *See* Dell'Angelo SC, SG, and Group Settlement Decl. Ex. F (May 22, 2020, Declaration of Janet S. Netz, Ph.D.), ECF No. 420-6 ("Netz Decl."), § IV. The Total Settlement Amount of $23,630,000 is well within the range of reasonableness, especially considering the complexity of the litigation, and the risks of establishing liability, aggregate damages, and classwide impact. The overwhelmingly positive reaction of the members of the Settlement Classes confirms that the Settlements amply satisfy the *Grinnell* factors. Of the approximately 100,000 members of the Settlement Classes, none have opted out or

---

[4] *See* Jul. 29, 2019, Order granting preliminary approval of the Citigroup and MUFG Bank ("MUFG Bank") Settlements, ECF No. 297 (the "Citigroup/MUFG Bank Preliminary Approval Order"); Jul. 17, 2019, Order granting preliminary approval of the SC, SG, and Group Settlements, ECF No. 441 (the "Preliminary Approval Order").

objected to the Settlements. *See* Declaration of Jeanne C. Finegan Concerning Notice to Settlement Class Members and Plan of Allocation ("Finegan Decl.") (attached as Ex. A to the Dell'Angelo Decl.), ¶ 33. The lack of objections and exclusions is remarkable for the size of the Settlement Classes and highlights the overwhelmingly positive reaction of the Settlement Classes to the Settlements.

The Settlements also satisfy additional factors for final approval. The Claims Administrator estimates that Notice reached approximately 95 percent of the Settlement Classes. *Id.* ¶ 34. And as this Court recognized in preliminarily approving the Plan of Allocation, it is a "straightforward and equitable method of allocating the Net Settlement Fund to the members of the Settlement Classes" and "fairly accounts for the relative strengths and weaknesses of the claims of different categories of the members of the Settlement Classes." Preliminary Approval Order ¶ 21. Finally, for the reasons set forth in Plaintiffs' preliminary approval papers and those adopted by the Court in preliminarily certifying the Classes for Settlement purposes, the Settlement Classes' conditional certification should be finalized for purposes of effectuating the Settlements.

Plaintiffs' Motion should be granted.

## II.   **BACKGROUND**

### A.   **Procedural Posture**

On July 17, 2020, this Court: (1) granted preliminary approval of the Settlements with SC, SG, and Group Settling Defendants, finding the requirements of Rules 23(a) and Rule 23(b)(3) satisfied (ECF No. 441, Order Preliminarily Approving Settlements and Certifying the Proposed Settlement Classes for Settlement Purposes ("Preliminary Approval Order"), ¶¶ 3-7); (2) preliminarily certified the Settlement Classes for settlement purposes, *id.*; (3) appointed Berger Montague PC ("Class Counsel") as counsel for the Settlement Classes, *id.* ¶ 16; (4) appointed Plaintiffs as class representatives of the Settlement Classes, *id.* ¶ 17; (5) appointed the Huntington

4

National Bank as the Escrow Agent and Heffler Claims Group (the "Claims Administrator") as the Claims Administrator, *id.* ¶¶ 19, 24; (6) approved Plaintiffs' plan to disseminate notice to the Settlement Classes as the "best notice that is practicable under the circumstances" and "reasonably calculated" to apprise the Classes of their rights and options, meeting "the requirements of Federal Rule of Civil Procedure 23 and due process," *id.* ¶ 20; and (7) preliminarily approved Plaintiffs' plan to allocate the net settlement fund to the Classes, finding Dr. Netz's proposed methodology to be "a straight forward and equitable method of allocat[ion]" that "fairly accounts for the relative strengths and weaknesses of the claims of different categories of Settlement Class Members." *Id.* ¶ 21. The Court had previously preliminarily approved the Citigroup and MUFG Bank Settlements. ECF No. 297.

Class Counsel and the Claims Administrator completed direct notice and publication notice by August 31, 2020. Finegan Decl. ¶ 3. Class Counsel and Plaintiffs submitted their request for attorneys' fees, expenses, and service awards for the Settlement Class Representatives on September 21, 2020. ECF No. 447. On October 22, 2020, Class Counsel notified the Court that no members of the Settlement Classes objected to or opted out of the Settlements. ECF No. 450. Plaintiffs respectfully submit this Motion for final approval in advance of the Fairness Hearing scheduled for November 19, 2020. Preliminary Approval Order ¶ 28.

### B. The Dissemination of Notice to the Settlement Classes

The Court-approved Notice included direct postcard and email notice to all known members of the Settlement Classes; publication notice through a specifically targeted press release; internet notice through investment websites including Morningstar, Investopedia, MarketWatch and Motley Fool; targeted social media advertising through Facebook and Instagram; and the maintenance of a settlement website containing important information and court documents. Finegan Decl. ¶¶ 10-13, 20-27; *see also* Preliminary Approval Order ¶ 20.

In July and August 2020, the Claims Administrator processed email addresses and direct mailing addresses contained in transactional data produced to Plaintiffs by third-party retail foreign exchange dealers ("RFEDs"), utilizing skip-tracing services for the physical addresses to ensure that the most current mailing information would be used. Finegan Decl. ¶¶ 11-12. On August 12, 2020, Notice was mailed to approximately 94,867 physical addresses and emailed to an additional 43,309 addresses. *Id*. ¶¶ 12-13. The Claims Administrator estimates that a substantial majority of the members of the Settlement Classes were reached through direct mail. *Id.* ¶ 8.

Publication notice was disseminated on August 10, 2020, through a press release on PR Newswire's National Newsline with additional targeting to 1,777 financial news websites and personalities. *Id.* ¶ 26; Finegan Decl. Ex. C (copy of press release). Media publication notice started on August 10, 2020. *Id.* ¶ 26. Notice was also delivered through financial news websites, Google search engine advertising, and social media advertising on Facebook and Instagram. *Id.* ¶ 23; Finegan Decl. Ex. A (exemplar copies of Google and social media advertisements). For the Google search engine advertising, the Claims Administrator targeted keywords and topics within the Settlement Classes states related to this action and the Settlements specifically as well as FX investments in general. The Claims Administrator used email addresses and phone numbers to directly target members of the Settlement Classes through Facebook and Instagram. *Id*. ¶ 23. The Claims Administrator also targeted Facebook and Instagram users who liked or followed pages such as The Motley Fool, Investing.com, MarketWatch, Morningstar, Seeking Alpha, TheStreet, The Wall Street Journal, Yahoo Finance, Bloomberg, Financial Times, and others. *Id*. Users who visited the Settlement website were re-targeted through the internet advertising campaign. *Id*.

Finally, the Claims Administrator (a) caused a settlement website to go live on August 8, 2020, which, through October 27, 2020, had more than 15,400 page views by over 6,500 unique

visitors, *id.* ¶ 27-28; (b) established a 24-hour toll free telephone line on August 10, 2020, where callers can obtain automated and interactive information, *id.* ¶ 29; and (c) established a dedicated post office box for written inquiries and correspondence. *Id.* ¶ 30.

C.    <strong><u>The Settlement Classes' Response to the Settlement</u></strong>

The Settlement Classes' responses to the Settlements has been overwhelmingly positive. There are approximately 100,000 members in the Classes. *See* Dell'Angelo Fee Decl. ¶ 73. The period for members of the Settlement Classes to request exclusion from the Settlement Classes or object to the Settlements, Plan of Allocation, or Class Counsel's requests for attorneys' fees, reimbursement of litigation expenses, and service awards for the Settlement Class representatives ended on October 15, 2020. Preliminary Approval Order ¶ 28. No members of the Settlement Classes requested exclusion from the Classes or submitted an objection. Dell'Angelo Decl. ¶ 18.

**III.**    <strong><u>THE SETTLEMENTS ARE FAIR, REASONABLE, AND ADEQUATE</u></strong>

A.    <strong><u>Public Policy Favors Settlement</u></strong>

"The compromise of complex litigation is encouraged by the courts and favored by public policy." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005). It is well-established that "there is an overriding public interest in settling . . . litigation, and this is particularly true in class actions," *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405-CM, 2015 WL 10847814, at *4 (S.D.N.Y. Sept. 9, 2015) (citation omitted). Settlements "advance the public interest because they minimize the expense of litigation, avoid the expenditure of judicial resources, and ensure injured parties' recoveries without the time, expense, and inconvenience of litigation." *Allen v. Dairy Farmers of Am., Inc.*, No. 09-cv-230, 2011 WL 1706778, at *2 (D. Vt. May 4, 2011). The proposed Settlements are both procedurally and substantively fair and therefore merit final approval.

7

### B.   Courts Approve "Fair, Reasonable, and Adequate" Class Action Settlements

Pursuant to Fed. R. Civ. P. 23(e)(2), a proposed class action settlement must be "fair, reasonable, and adequate." This analysis entails an initial evaluation of "procedural" fairness, focused on whether the settlement resulted from informed, arm's length negotiations, *see Wal-Mart Stores, Inc.*, 396 F.3d at 117, and "substantive" fairness of the agreement's terms – collectively, the "*Grinnell* factors." *See, e.g.*, *Ortiz v. Chop't Creative Salad Co.*, No. 13-cv-2541-KNF, 2014 WL 1378922, at *12 (S.D.N.Y. Mar. 25, 2014) (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). The recently amended Rule 23 does not change this fundamental inquiry. *See* Fed. R. Civ. P. 23(e)(2) advisory committee note ("The goal of this amendment is not to displace any factor . . ."). Substantive factors favoring final approval include whether the settlement grants the plaintiffs repose in the face of complex, uncertain litigation. *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 198 (S.D.N.Y. 2005).

### C.   The Settlements Are Procedurally Fair

#### 1.   The Settlements Were Negotiated At Arm's Length

"A strong initial presumption of [procedural] fairness attaches to a proposed settlement if it is reached by experienced counsel after arm's-length negotiations, and great weight is accorded to counsel's recommendation." *In re Namenda Direct Purchaser Antitrust Litig.*, No. 15-cv-7488-CM, 2020 WL 2749223, at *3 (S.D.N.Y. May 27, 2020) (quoting *Guevoura Fund Ltd. v. Sillerman*, No. 15-cv-07192-CM, 2019 WL 6889901, at *6 (S.D.N.Y. Dec. 18, 2019)); *see also Rodriquez v. It's Just Lunch Int'l*, No. 07-cv-09227-SN, 2020 WL 1030983, at *3 (S.D.N.Y. Mar. 2, 2020) ("Where '[c]ounsel for plaintiff[s] is able and experienced, particularly in the specific area with which these actions are concerned,' counsel's 'judgment is entitled to great weight.'" (quoting *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 68 (S.D.N.Y. 1993)). Here, Class Counsel have the requisite class action and antitrust experience to lead this litigation on

behalf of the proposed Settlement Classes, and Defendants are represented by highly experienced and sophisticated counsel. Plaintiffs' negotiations with Citigroup took place over the course of more than seven months. Dell'Angelo Fee Decl. ¶ 53. The arm's length negotiations with MUFG Bank took place over more than three months. *Id.* ¶ 58. Negotiations with SC took place over the course of six months, and negotiations with SG and Group Settling Defendants each took place over more than three months. *Id.* ¶¶ 61-62. Negotiations with Defendants were informed by counsel's knowledge of the facts and the Court's decisions in this and related actions, the settlements in *FOREX* and the Canadian FX action, and the expert analyses, including the volume of retail FX trading relative to the overall direct purchaser FX Instrument market at issue in the related direct purchaser antitrust action *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*") and using that analysis as a basis to estimate damages claims of the members of the Settlement Classes. *See* Dell'Angelo Fee Decl. ¶¶ 58, 61-62, 67. As detailed below in Section V, the Plan of Allocation allocates funds among class members on a *pro rata* basis and accounts for the relative strengths and weaknesses of Class member claims, consistent with the Plan of Allocation that this Court approved in *FOREX*.

Thus, the Settlements are entitled to a "presumption of fairness, adequacy, and reasonableness." *Wal-Mart Stores, Inc.*, 396 F.3d at 116 (quoting Manual for Complex Litigation, Third, § 30.42 (1995)).

## 2.   The Proposed Settlement Class Representatives and Class Counsel Have Adequately Represented the Classes

Rule 23(e)(2)(A) requires the Court to consider whether the proposed Settlement Class Representatives and Class Counsel have adequately represented the Classes. For the same reasons that the Court held that "Plaintiffs and Class Counsel have fairly and adequately represented and

protected the interests of the Settlement Classes" in the Preliminary Approval Order, this factor supports final approval of the Settlements. *Id.* ¶ 16.

No fundamental conflict exists between the proposed Settlement Class Representatives and members of their respective Settlement Classes. All seek overcharge damages for violation of substantially similar state antitrust and consumer protection laws under *Illinois Brick* repealer statutes arising out of the same anticompetitive conduct. They have already effectively represented the interests of the proposed Settlement Classes by selecting qualified Class Counsel, producing documents, sitting for depositions, and regularly communicating with Class Counsel regarding developments in the litigation and the terms of the Settlements. Neither proposed Settlement Class Representatives nor Class Counsel have any interests antagonistic to those of the proposed Settlement Classes. Finally, proposed Settlement Class Counsel are "qualified, experienced, and generally able to conduct the litigation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 30 F.R.D. 11, 30 (E.D.N.Y. 2019) (quotation omitted). Proposed Settlement Class Representatives and Class Counsel have adequately represented the Settlement Classes.

     **D.**    **The Settlements Are Substantively Fair**

        **1.**    **The *Grinnell* Factors Support Final Approval**

Whether proposed settlements are substantively fair are determined by analysis of the *Grinnell* factors. Not every factor must weigh in favor of settlement; rather, "the court should consider the totality of these factors in light of the particular circumstances." *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 138 (S.D.N.Y. 2010) (citations and internal quotations omitted). These factors weigh in favor of final approval of the Settlements.

          **a.**  **The Complexity, Expense, and Likely Duration of the Litigation**

Numerous federal courts have recognized that "'[f]ederal antitrust cases are complicated, lengthy, and bitterly fought,' 'as well as costly.'" *In re GSE Bonds Antitrust Litig.*, 414 F. Supp.

3d 686, 693 (S.D.N.Y. 2019) (quoting *Wal-Mart Stores Inc.*, 396 F.3d at 118; *In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 5289514, at \*4 (E.D.N.Y. Oct. 23, 2012)). Having overseen this case and the related *FOREX* action for years, this Court is aware of the complexities and duration of this case. The Group Settlement was reached shortly before the fact discovery deadline, and *Daubert* motions, a class certification motion, and summary judgment motions would have followed, as well as a potential trial and appeals. *See generally Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) (noting that "the time value of money make[s] future recoveries less valuable than this current recovery").

The costs of continuing to litigate this action, absent the Settlements proposed herein, would have been substantial. Because of the guaranteed cash recovery and reduced litigation expenses, the first *Grinnell* factor weighs in favor of granting final approval.

### b.   The Positive Reaction of the Classes to the Settlements Further Supports Approval

The Settlement Classes' overwhelmingly positive response supports final approval of the Settlements. A favorable reception by the classes constitutes 'strong evidence' that a proposed settlement is fair." *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704-JSR, 2020 WL 3250593, at \*2 (S.D.N.Y. June 16, 2020) (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013)). The fact that no members of the Settlement Classes requested exclusion from the Classes or objected to the Settlements highlights the exceptionally positive response. *See, e.g.*, *Wal-Mart,* 396 F.3d at 118 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."); *In re GSE Bonds Antitrust Litig.*, No. 2020 WL 3250593, at \*2 (holding that de minimis exclusion requests and "no formal objection to any of the proposed settlements . . . also favors approval"); *In re Bear Stearns Cos., Inc. Sec.,*

*Deriv., & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012) (finding that a rate of exclusion of 5.1% weighed strongly in favor of approval).

Moreover, each of the proposed Settlement Class Representatives supports approval of the Settlements. Dell'Angelo Fee Decl. ¶ 69.

### c. The Stages of Proceedings When the Settlements Were Reached Supports Approval

The relevant inquiry for this factor is whether the plaintiffs have obtained a "'sufficient understanding of the case to gauge the strengths and weaknesses of their claims' as well as 'the adequacy of the settlement.'" *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 412 (S.D.N.Y. 2018) (quoting *In re AOL Time Warner, Inc.*, No. 02-cv-5575-SWK, 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006)), *aff'd*, *In re Facebook, Inc.*, No. 18-3845, 2020 WL 5652448 (2d Cir. Sept. 23, 2020). Discovery need not be fully complete, or even underway, before a settlement can be approved. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 190 (S.D.N.Y. 2012) (to be informed, "formal discovery need not have necessarily been undertaken yet by the parties"). Rather, it is enough for the parties to "have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the settlement." *AOL Time Warner*, 2006 WL 903236, at *10 (citation omitted).

Plaintiffs are sufficiently informed to reach adequate settlements. The complaints were drafted based on extensive investigation of the alleged conspiracy and its effects, including the review of publicly available news articles, press releases and other reports, research of the applicable law, and consultation with leading experts on the FX market. When the Settlements were reached with Citigroup and MUFG, Class Counsel had attended depositions in *FOREX*, and had received all documents and substantial amounts of transactional data that Defendants produced in *FOREX*. Discovery was far-along when the SC and SG settlements were reached, and the Court-

ordered discovery period was nearly completed at the time the Group Settlement was reached. Dell'Angelo Fee Decl. ¶¶ 61-64, 70; *see, e.g., In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704-JSR, 2019 WL 6842332, at *4 (S.D.N.Y. Dec. 16, 2019) (finding that this factor supported approval where, as here, "plaintiffs' counsel has already gone through . . . [multiple] rounds of briefing at the motion to dismiss stage, making it aware of the strengths and weaknesses of plaintiffs' position . . ." and "significant discovery has taken place, including the substantial completion of data and document production"). The information gleaned from this discovery—including vast amounts of documents and transactional data from Defendants—as well as from the pleadings, motions, and Court orders in this action and in *FOREX* helped Class Counsel to assess the potential damages, as well as the risks and likely defenses going forward. Plaintiffs' consultation with their experts—including expert review of the FX trader chat transcripts produced by Defendants, statistical analyses of transactional data produced by Defendants and third-party RFEDs, and damages and class size calculations—further informed Plaintiffs of the strengths, weaknesses, risks, and potential value of their claims. The settlement negotiations included frank discussions of the relative strengths and weaknesses of the parties' claims and defenses. Dell'Angelo Fee Decl. ¶¶ 53, 61-62, 66. Collectively, this information provided Plaintiffs with a comprehensive understanding of the relative strengths and weaknesses of their case, enabling Plaintiffs to negotiate settlements believed to be an excellent result for the Settlement Classes. Therefore, this factor supports final approval.

### d.   The Classes Faced Significant Risks in Establishing Liability and Damages

"In assessing the Settlement[s], the Court should balance the benefits afforded the Class[es], including the immediacy and certainty of a recovery, against the continuing risks of litigation." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-cv-8557-CM, 2014 WL 7323417, at

*8 (S.D.N.Y. Dec. 19, 2014) (citing *Grinnell*, 495 F.2d at 463). Here, Plaintiffs' ability to prove

liability faces significant risk due to, among other things, the complexity of the subject matter of

this litigation and the fact that Defendants are well-financed and can afford to litigate indefinitely.

A particularly critical component to Plaintiffs' risk analysis were the Rule 12(b) motions

to dismiss that were briefed and pending during Plaintiffs' Citigroup and MUFG Bank settlement

negotiations. Significantly, less than a month after entering into a binding Memorandum of

Understanding outlining the terms of the Citigroup Settlement, the Court *granted* the Defendants'

motion to dismiss the CCAC, while also granting leave for Plaintiffs to file a proposed SCCAC

with an accompanying memorandum in support. ECF No. 136. It was not guaranteed that the Court

would permit the filing of the SCCAC. Similarly, after Plaintiffs and MUFG Bank had finalized

their Settlement agreement, the Court *granted* the Rule 12(b)(2) motion that was pending during

the settlement negotiations. *See* ECF No. 263.[5] In addition, when the MUFG Bank Settlement was

reached in February 2019, no government or regulator had fined or sanctioned MUFG Bank for

the conduct alleged in the SCCAC, nor had MUFG Bank entered into any voluntary resolution of

such claims with any government or regulatory agency, thus complicating the proof that MUFG

Bank had participated in the alleged conspiracy.[6]

Critical to Plaintiffs' risk analysis for SG was the Rule 12(b)(2) order dismissing SG from

the litigation, and the subsequent order denying Plaintiffs' motion for reconsideration of the

dismissal order. Although Plaintiffs could have appealed that order or filed a motion for leave to

file an amended complaint adding jurisdictional allegations regarding SG, the success of such

---

[5] *See supra* n.6.

[6] On May 16, 2019, the European Union announced that it had fined five Defendants a total of 1.07 billion euros for their involvement in the conspiracy, including a 310.8 million Euro penalty for Citigroup and a 69.8 million euro penalty for MUFG Bank. *See* Kirstin Ridley, *EU fines Barclays, Citi, JP Morgan, MUFG and RBS $1.2 billion for FX rigging*, REUTERS (May 16, 2019), available at https://www.bloomberg.com/news/articles/2019-05-16/citigroup-jpmorgan-among-banks-fined-1-2-billion-in-fx-probe?srnd=markets-vp (last visited Oct. 28, 2020).

efforts would have been far from certain. Thus, absent the Settlements, there is no guarantee that Plaintiffs would have been able to recover any funds—or obtain any discovery materials—from SG.

On October 26, 2018, prior to Plaintiffs' settlement negotiations with Group Settling Defendants, a jury in the U.S. District Court for the Southern District of New York acquitted three foreign exchange traders of price-fixing charges brought by the Antitrust Division of the Department of Justice ("DOJ"). *See* ECF No. 420-8 (Oct. 26, 2018, Trial Transcript (Jury Verdict), *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), ECF No. 240, at 2481:9-2482:4). The DOJ argued that the Defendant traders conspired to coordinate their trading to manipulate FX Instrument prices. However, the three traders, who were previously employed by Barclays, RBS, JPMorgan, and Citigroup, successfully argued that their chatroom discussions regarding FX trades reflected lawful parallel conduct rather than coordination. *See* ECF No. 420-9 (Oct. 25, 2018, Trial Transcript (Closing Arguments), *USA v. Usher et al.*, No. 1:17-cr-00019 (S.D.N.Y.), ECF No. 239, at 2369:17-22). If a jury in this action similarly found that the evidence does not support Plaintiffs' antitrust conspiracy allegations, Plaintiffs and the Class members would likely be unable to recover any damages.

Plaintiffs' risks were further evinced by a recent class certification opinion issued in the Canadian FX class action involving many of the same allegations and same defendants. The Canadian court noted that the conspiracy alleged was an "episodic conspiracy of price fixing" and not an overarching conspiracy. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174-00CP (Ontario S.C.J. Apr. 14, 2020). Such a finding in this case could decrease Plaintiffs' chances of certifying their proposed classes and proving Defendants' liability for the alleged price manipulation.

Additional risk exists because the Defendants have significant financial resources to litigate this action to trial. Defendants are represented by some of the best law firms in the United States, and absent settlement, Defendants are prepared to vigorously contest liability and damages. Even assuming Plaintiffs can establish liability at trial with respect to Defendants, "[t]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal." *In re NASDAQ Mkt.- Makers Antitrust Litig.*, 187 F.R.D. 465, 476 (S.D.N.Y. 1998). In sum, "[t]here is a substantial risk that the plaintiff might not be able to establish liability at all and, even assuming a favorable jury verdict, if the matter is fully litigated and appealed, any recovery would be years away." *Cardiology Assocs., P.C. Pension Plan v. Nat'l Intergroup, Inc.*, No. 85-cv-3048-JMW, 1987 WL 7030, at *3 (S.D.N.Y. Feb. 13, 1987).

This factor therefore supports final approval.

### e.   The Classes Faced Significant Hurdles in Certifying the Classes and Maintaining Them on Appeal

Absent settlement, Plaintiffs would have been required to overcome numerous hurdles before the action proceeded to trial. After the conclusion of fact discovery, Plaintiffs would have had to succeed on their motion for class certification, and defeat any *Daubert* motions and motions for summary judgment filed by Defendants. Even if class certification is granted, Defendants could later seek to decertify the Classes or modify the Class definitions prior to trial, and there is always the possibility of changed circumstances, or changes in the governing law, that could threaten class certification in the future. *See Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07-cv-2207-JGK, 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("There is no assurance of obtaining class certification through trial, because a court can re-evaluate the appropriateness of certification at anytime during the proceedings."). Interlocutory appeals at any stage of the litigation would add further

uncertainty and expense to the action. *See, e.g.*, *Comcast Corp. v. Behrend*, 569 U.S. 27, 29 (2013) (reversing class certification in an antitrust case at an interlocutory stage).

Significantly, prior to finalizing the last Settlements, on September 3, 2019, the Court in the related direct-purchaser action *FOREX*, issued the *FOREX* Class Order, denying the motion to certify their proposed classes pursuant to Fed. R. Civ. P. 23(b)(3). *See In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS, 2019 WL 4171032, at *1 (S.D.N.Y. Sept. 3, 2019). Although Plaintiffs believe the decision is not dispositive on class certification in this distinct action, they nevertheless recognize that the *FOREX* Class Order is a potentially complicating factor for obtaining certification of litigation classes in this case. Further, even if Plaintiffs' proposed litigation classes were certified and prevailed at trial, a jury verdict would likely be followed by appeals. Accordingly, this factor weighs in favor of final approval.

### f. The Fact That Defendants May Be Able to Sustain a Larger Judgment Does Not Undercut the Reasonableness of the Settlement

Defendants could withstand a greater judgment than provided for by the Settlements. However, courts consistently hold that Defendants' ability to pay more than the settlement amount is not a sufficient reason by itself to decline approval of a settlement. *See In re IMAX Secs. Litig.*, 283 F.R.D. at 191 ("[T]his factor, standing alone, is not sufficient to preclude a finding of substantive fairness where the other factors weigh heavily in favor of approving a settlement."); *In re CitiGroup Inc.*, 296 F.R.D. 147, 157 (S.D.N.Y. 2013) (approving settlement with Citigroup, despite the fact that "Citigroup could likely withstand a greater judgment").

### g. The Settlement Fund is Reasonable in Light of the Best Possible Recovery and the Attendant Risks of Litigation

The last two *Grinnell* factors "recognize[] the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to

completion." *Wal-Mart Stores*, 396 F.3d at 119 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). In applying these factors, "[t]he adequacy of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case.'" *In re IMAX Secs. Litig.*, 283 F.R.D. at 191 (citation omitted); *see also NASDAQ*, 187 F.R.D. at 478 ("[T]he exact amount of damages need not be adjudicated for purposes of settlement approval."). Consequently, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Grinnell*, 495 F.2d at 455 n.2, *see also In re IMAX Secs. Litig.*, 283 F.R.D. at 191-192 ("[T]he Second Circuit 'has held that a settlement can be approved even though the benefits amount to a small percentage of the recovery sought.'" (citation omitted)); *Payment Card*, 330 F.R.D. at 48-49 (stating that the Second Circuit did not take issue with original settlement recovery of "2.5% of the largest possible estimate of actual damage to merchants"). Without these Settlements, Plaintiffs have no guarantee of securing any recovery from Defendants given the risks, among others, of class certification not being granted or failing to establish liability and damages. These risks are arguably dispositive for the final two *Grinnell* factors. *See FOREX*, ECF 1105, ¶ 8 (noting, in granting final approval of the SC settlement, that "success in antitrust cases such as this one is inherently uncertain, and there is no guarantee that continued litigation would yield a superior result.").

The Settlements provide a combined $23,630,000 million in cash payments to compensate the Settlement Classes. The immediacy of the cash payments weighs in favor of approval. *See AOL Time Warner*, 2006 WL 903236, at *13. ("[T]he benefit of the Settlement will . . . be realized far earlier than a hypothetical post-trial recovery").

### i.   The *FOREX* Settlement Amounts Support Final Approval

Class Counsel utilized a methodology to estimate reasonable settlement ranges in this action premised on the Court-approved settlement amounts in the *FOREX* direct purchaser action. Class Counsel's methodologies described herein—together with the Court's orders in *FOREX* finding that those direct purchaser settlements were fair, reasonable and adequate—support the reasonableness of the settlement amounts proposed here.

The *FOREX* plaintiffs settled with Citigroup for $402 million, of which $394 million was allocated to the Direct Settlement Class. *FOREX* ECF No. 481-3 at 6.[7] Applying the more conservative retail FX market share estimate of 10 percent to the Citigroup *FOREX* settlement resulted in a *pro rata* indirect amount of $39.4 million. That amount was then reduced by 62.3 percent to reflect the percentage of the total U.S. population represented by the proposed members of the Settlement Classes, leaving an estimate of $14.85 million. The $9.95 million Citigroup Settlement here is therefore on par with the Citigroup *FOREX* settlement considering the different stages at which the settlements were reached.

In *FOREX*, the MUFG Bank settlement provided for a payment of $10.5 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-1. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the $10.5 million *FOREX* MUFG settlement is between $395,850 (using the 10% estimate) and $1,187,550 (using the 30% estimate). Therefore, the MUFG Settlement amount of

---

[7] The remaining $8 million was allocated to the "Exchange-Only Settlement Class." *Id*. Because the Settlement Class definitions here are limited to persons who indirectly purchased an FX Instrument from a Defendant or co-conspirator by entering into an FX Instrument with a member of the Direct Settlement Class, the settlement amount allocated to the Exchange-Only Settlement Class is not relevant to Plaintiffs' *pro rata* comparisons. However, the Court's finding that an $8 million settlement with Citigroup to resolve the Exchange-Only Settlement Class claims is instructive. While Plaintiffs here have not identified publicly available information regarding the size of the Exchange-Only Class's claims, the cash recovery provided by the Citigroup Settlement here is 24.4% larger than the Exchange-Only Settlement approved by the Court in *FOREX*. *Id.*

$985,000 here is at the upper end of the range of reasonableness when compared to the *FOREX* settlement.

The *FOREX* plaintiffs settled with SC for $17,200,000. *FOREX* ECF No. 822-5. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the SC *FOREX* settlement results in a *pro rata* indirect amount of $648,440. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the SC $17.2 million *FOREX* settlement results in a *pro rata* indirect amount of $1,945,320. The $1,720,000 SC Settlement here is therefore at the high end of the *pro rata* range of reasonableness based on the Court-approved SC settlement in *FOREX*.

In *FOREX*, the SG settlement provided for a payment of $18 million for both the Direct and the Exchange-Only Settlement Classes. *See FOREX* ECF No. 822-4. Applying the same state population and retail FX market share estimates described above, the retail FX market share portion of the of $18 million *FOREX* SG settlement is between $678,600 (using the 10% estimate) and $2,035,800 (using the 30% estimate). Therefore, even though SG was dismissed from the action when the settlement was reached here, the SG Settlement amount of $975,000 is still well within the *pro rata* range of reasonableness based on the *FOREX* settlement where SG was not dismissed when it settled with the plaintiffs in that action.

The *FOREX* litigation is ongoing as to Credit Suisse, but all eleven other Group Settling Defendants entered into settlements with the *FOREX* plaintiffs totaling $1,862,575,000. *See FOREX*, ECF Nos. 481, 822, 877. Applying the more conservative retail FX market share estimate of 10 percent and the 37.7 percent population estimate to the Group Settling Defendants' *FOREX* total settlement amount results in a *pro rata* indirect amount of $70,219,078. Applying the high-end 30 percent retail FX market share estimate and the 37.7 percent population estimate to the

Group Settling Defendants' $1,862,575,000 *FOREX* settlements total results in a *pro rata* indirect amount of $210,657,233. *Id*. The $10,000,000 Group Settlement here is therefore 14.2 percent of the low end of the *pro rata* range of reasonableness based on the Court-approved direct-purchaser settlements in *FOREX*, and 4.8 percent of the high-end estimate. *See id*. However, the *FOREX* settlements were reached before the Court denied class certification. The denial of class certification in *FOREX*, in the judgement of Class Counsel, significantly increased the risks that Plaintiffs would not be able to certify their proposed classes in the instant case. Therefore, in the judgment of Class Counsel, the Group Settling Defendants' settlements in *FOREX* are a less valuable basis for comparison against the settlements in the instant case reached after the entry of the *FOREX* Class Order.

### ii.  Plaintiffs' Damages Analyses Support Final Approval

The Advisory Committee's comments to the 2018 Fed. R. Civ. P. 23 amendments note that courts often "forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results" in considering the reasonableness of proposed settlements. *Id*. In making this calculation, courts often compare the proposed settlement amount with the damages that would be awarded in the event of a "complete victory" by the plaintiffs, *Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-cv-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004), and discount that by the "uncertainties of law and fact" and "the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart*, 396 F.3d at 119. While such a forecast cannot be done with "arithmetic accuracy," it may be useful as "a benchmark for comparison with the settlement figure." Fed. R. Civ. P. 23(e)(2) Adv. Comm. Notes.

In *FOREX*, the plaintiffs have settled with all Defendants except for Credit Suisse and have estimated that their total potential damages ranged from $5.4 to $7.0 billion for the period December 7, 2007 to December 31, 2013, the same litigation Class Period applicable to this action.

*See* SCCAC ¶ 40; *FOREX* ECF No. 925, at 17.[8] Applying the state population and retail FX market share estimates (discussed above) to those *FOREX* damages estimates results in an estimated range for total damages in this action of between $203.6 million (applying the lower 10% retail FX market share estimate and 37.7 percent state population factor to $5.4 billion) and $791.7 million (applying the 30% retail market share estimate and state population factor to $7.0 billion). The $23,630,000 total Settlement Fund here represents between 2.98 and 11.61 percent of the $203.6 million to $791.7 million potential damages range allocable to all Defendants. The following chart shows the *pro rata* (based on the respective market shares of Settling Defendants) low-end and high-end potential damages estimate, as well as the Settlement amount as a percentage of low-end and high-end potential damages, for each of the five Settlements:

| Settling Defendants | Contant Settlement | Market Share | *Pro rata* Low End Potential Damages | *Pro rata* High End Potential Damages | Settlement as % of Low End Damages | Settlement as % of High End Damages |
|---|---|---|---|---|---|---|
| MUFG Bank | $985,000 | 0.35% | $717,809 | $2,791,481 | 137.2% | 35.3% |
| Citigroup | $9,950,000 | 16.95% | $34,501,160 | $134,171,178 | 28.8% | 7.4% |
| Soc Gen | $975,000 | 1.79% | $3,635,357 | $14,137,500 | 26.8% | 6.9% |
| Standard Chartered | $1,720,000 | 1.04% | $2,107,118 | $8,194,347 | 81.6% | 21.0% |
| Group Defendants | $10,000,000 | 79.88% | $162,618,556 | $632,405,494 | 6.2% | 1.6% |
| **Total** | **$23,630,000** | **100.00%** | **$203,580,000** | **$791,700,000** | **11.6%** | **3.0%** |

Notably, the $1,720,000 SC Settlement amount here is close to Plaintiffs' estimated low-end potential damages attributable to SC ($2,107,118); and the $985,000 MUFG Bank Settlement amount is significantly greater than MUFG Bank's respective low-end damages estimate. The

---

[8] "The standard for evaluating settlement involves a comparison of single damages, not treble damages." *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 257-58 (D. Del. 2002) (citations omitted).

Citigroup Settlement amount is similarly noteworthy given that the Court granted Citigroup's motion to dismiss Plaintiffs' complaint less than a month after the parties entered into a binding Memorandum of Understanding outlining the terms of the Settlement. *See* Dell'Angelo Citigroup and MUFG Bank Settlement Decl. ¶ 15. And although the SG Settlement and Group Settlement are on the lower end of the five Settlements in terms of percentages of *pro rata* potential damages, these Settlement amounts are impressive given the increased litigation risks facing Plaintiffs at the times the Settlements were reached. During the period between the commencement of Plaintiffs' settlement negotiations with SG and the finalization of the SG Settlement, SG was dismissed from the case on personal jurisdiction grounds. *See* Dell'Angelo SC, SG, and Group Settlement Decl. ¶ 15. The Group Settlement was reached after the Court issued the *FOREX* Class Order, which significantly increased the risks that Plaintiffs would be unable to certify their proposed Classes here. *Id.* ¶ 16. Thus, these analyses further confirm the reasonableness of the Settlements here.

### iii. <u>Defendants' Settlements in the Canadian Action Support Final Approval</u>

In addition to the *FOREX* settlements approved by this Court discussed above, Settling Defendants' settlements approved in the related Canadian action offer further support of the reasonableness of the Settlement amounts here. *See Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-000189-152 (Quebec S.C.J.). In the Canadian action, twelve of the same Defendant groups involved in this action—SC, SG, UBS, BNP Paribas, Bank of America, Goldman Sachs, JPMorgan, Citigroup, Barclays, HSBC, RBS, and MUFG Bank—entered into settlements totaling $106,747,206 Canadian Dollars ("CAD") with the plaintiffs and proposed nationwide Canadian classes that included direct *and* indirect purchasers. *See* ECF No. 274-9 (court-approved notice of

the Canadian settlements).[9] The Canadian plaintiffs' settlements allocated 20 percent of the settlement proceeds to the indirect purchaser Canadian class members. *Id*. The Canadian indirect purchasers thus recovered $21,349,441.20 CAD from the Settling Defendants' Canadian settlements (20% of $106,747,206). The exchange rate as of October 28, 2020, was approximately 0.75 CAD to 1 U.S. dollar ("USD").[10] Therefore, the Canadian indirect purchaser settlement amounts are $16,012,080.75 USD for Settling Defendants. Applying a population adjustment factor of 3.44 to those amounts to account for the larger population of the proposed Settlement Classes states relative to the Canadian population,[11] a *pro rata* estimate of a total reasonable settlement amount in this matter for Settling Defendants based on the Canadian indirect purchaser settlement amounts is approximately $55.1 million. Thus, the $23.6 million Settlement Fund here is approximately 42.9 percent of a *pro rata* estimate based on the court-approved Canadian Settling Defendants settlements. Notably, SG was dismissed as a Defendant in this action when the SG Settlement was reached but was not dismissed in the Canadian action. Also, the increased risks presented by the *FOREX* Class Order was not present in the Canadian action at the time the Canadian settlements were reached. The Canadian Settling Defendant settlements further confirm the reasonableness of the Settlements here.

---

[9] Specifically, the settlement amounts for Settling Defendants in the Canadian action were $21,000,000 CAD for Citigroup; $450,000 CAD for MUFG Bank; $4,950,000 CAD for UBS; $4,500,000 CAD for BNP Paribas; $6,500,000 CAD for Bank of America; $6,750,000 CAD for Goldman Sachs; $11,500,000 CAD for JPMorgan; $19,677,205 for Barclays; $15,500,000 for HSBC; $13,220,000 for RBS; $900,000 for SC; and $1,800,000 for SG. *See* Dell'Angelo Decl. ¶ 16 (citing *Mancinelli et al. v. Royal Bank of Canada et al.*, No. CV-15-536174 (Ontario S.C.J.); *Béland v. Banque Royale du Canada et al.*, No. 200-06-000189-152 (Quebec S.C.J.).

[10] *See* Federal Reserve Bank of St. Louis, US Dollar to National Currency Spot Exchange Rate for Canada, *available at* https://fred.stlouisfed.org/series/CCUSSP01CAM650N#0 (last visited Oct. 28, 2020).

[11] The U.S. Census estimates that in 2013, the total population of Canada was 34.57 million, and the total population of the eight Settlement Class states was 118.98 million. *See* U.S. Census, Annual Estimates of the Resident Population for the United States, Regions, States, and Puerto Rico: April 1, 2010 to July 1, 2018, available at https://www.census.gov/data/tables/time-series/demo/popest/ 2010s-state-total.html (last visited Oct. 28, 2020); U.S. Census, Demographic Overview – Canada, *available at* https://www.census.gov/data-tools/demo/idb/ region.php?N=%20Results%20&T=13&A=separate&RT=0&Y=2013&R=-1&C=CA (last visited Oct. 28, 2020). Thus, the total population of the Settlement Class states is approximately 344.2% of the population of Canada.

Moreover, the litigation risks are real. Shortly after the Settlement was entered with Citigroup, the Court granted Defendants' Rule 12(b)(6) Motion to Dismiss without prejudice. After the MUFG Bank Settlement was finalized, the Court granted MUFG Bank's Rule 12(b)(2) Motion to Dismiss. And SG was dismissed from the case when the SG Settlement was reached. The *FOREX* Class Order significantly increased the risks that Plaintiffs would be unable to certify their proposed Classes here, which would have effectively eliminated the possibility of obtaining additional settlements or a favorable judgment with respect to any non-settling Defendants. Settling Defendants made clear their position that class certification should be denied here as in the *FOREX* action and would have argued that in opposition to a litigation class certification motion. They also would likely have moved to exclude Plaintiffs' experts' opinions, arguing that Plaintiffs' proposed methods of estimating aggregate damages and classwide impact are unreliable.[12] Litigating class certification and related *Daubert* motions would have required Plaintiffs to expend hundreds of thousands—if not millions—of dollars in expert expenses alone, and if the Court ruled in favor of Defendants on any of those motions, Plaintiffs may have been unable to recover those unreimbursed expenses.

Further, even if Plaintiffs successfully obtained class certification, substantial risks would remain. Defendants would undoubtedly have argued that the evidence does not show an overarching price-fixing conspiracy but rather, at most, collusion with respect to individual trades. And even if Plaintiffs established the alleged overarching conspiracy, each of the Defendants would have argued they were not participants in that agreement. If a jury were to credit Defendants' arguments, the action would be significantly narrowed or dismissed. The

---

[12] Defendants have denied any liability to Class Plaintiffs. "Establishing otherwise [would] require considerable additional pre-trial effort and a lengthy trial, the outcome of which is uncertain." *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 199 (S.D.N.Y. 2012), *aff'd sub nom., Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013).

governmental findings and allegations resulting in regulatory fines and guilty pleas are narrower in scope than the allegations in this action (and several Defendants were not the subject of any such governmental fines or pleas), and thus alone would not have sufficed to demonstrate liability with respect to Defendants. And, even if liability is established, a jury could reject Plaintiffs' expert's opinion on damages, finding much lower or even no damages. Furthermore, because the Court in the *FOREX* Class Order granted certification of a Rule 23(c)(4) issue class to determine the existence of the Defendants' antitrust conspiracy as well as the involvement of the remaining Defendant Credit Suisse in the conspiracy, *id.* at *10, any orders issued in *FOREX* in favor of Credit Suisse may have adversely affected Plaintiffs' claims in this action.

In short, the certainty of the recoveries achieved by the Settlements weighs heavily in support of final approval when weighed against the risks of establishing liability and damages against Defendants.

### 2.    Proposed Attorneys' Fees

Rule 23(e)(2)(C)(iii) requires the Court to consider the "terms of any proposed award of attorney's fees, including timing of payment" when deciding whether to approve the settlement of a class action. Fed. R. Civ. P. 23(e)(2)(C)(iii). Class Counsel has submitted a motion and supporting papers requesting fees totaling 20% of the Citigroup and MUFG Settlement Funds, 25% of the SC and SG Settlement Funds, and 33.33% of the Group Settlement Funds. *See* ECF No. 419. Accordingly, Class Counsel respectfully request attorneys' fees of $2,187,000.00 from the Citigroup and MUFG Settlement Funds (20% of $10,935,000), $673,750.00 from the SC and SG Settlement Funds (25% of $2,695,000), and $3,333,333.33 from the Group Settlement Funds (one-third of $10,000,000). This results in a total fee award of $6,194,083.33 and a blended fee percentage of 26.2% of the Total Settlement Fund ($23,630,000), representing a negative lodestar multiplier of 0.94. ECF Nos. 447-49 (Plaintiffs' Motion for Award of Attorneys' Fees,

Reimbursement of Litigation Expenses, and Service Awards for Class Representatives, and supporting papers) (the "Fee Motion"). As explained in the Fee Motion papers (incorporated herein by reference) Class Counsel's fee request is reasonable and meets the standards for approval in this Circuit. The proposed award of attorneys' fees therefore supports final approval.

The timing of the attorney-fee payment also supports final approval. Class Counsel is not seeking a "quick pay" and will receive fees only when the Settlements are final. The timing is fair to the Settlement Classes, as Class Counsel funded this case over the course of this litigation.[13]

## IV.    THE NOTICE CAMPAIGN ADEQUATELY APPRISED CLASS MEMBERS OF THEIR RIGHTS

Class Counsel, together with the Claims Administrator, devised a notice program and prepared direct mail and publication notices that fully satisfy the Rule 23(c)(2)(B) notice standards, which govern classes certified pursuant to Rule 23(b)(3). *In re IMAX Securities Litig.*, 283 F.R.D. at 185 (describing notice requirements for Rule 23(b)(3) classes). Rule 23(c)(2)(B) requires the court to "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Id.*; *see also Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 67 (S.D.N.Y. 2003) ("Although no rigid standards govern the contents of notice to class members, the notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that

---

[13] Rule 23(e)(2)(C)(iv) provides that "any agreement required to be identified under Rule 23(e)(3)" may be considered in evaluating a motion for final approval. Rule 23(e)(3) provides that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the [settlement] proposal." As set forth in Plaintiffs' Preliminary Approval Motion and Fee Motion, Class Counsel and Kehoe Law Firm, P.C. entered into a fee sharing agreement that provides the Kehoe Law Firm, P.C. shall be entitled to receive 10 percent of the portion of attorneys' fees, as awarded by the Court, attributable to the Florida Class only. The portion of attorneys' fees attributable to the Florida Class will be calculated based on the total volume of Settlement funds awarded to Florida Class member claimants relative to the total claimant awards for all Classes. Other than that agreement and the Settlement Agreements themselves, there are no additional agreements required to be identified under Rule 23(e)(3) or S.D.N.Y. Local Civil Rule 23.1.

are open to them in connection with [the] proceedings." (quoting *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982) (internal quotation marks omitted)).

Plaintiffs' postcard and Long-Form Notices were disseminated to members of the Settlement Classes. As required by Rule 23(c)(2)(B), the postcard and Long-Form Notices each included a description of the case, the terms of the Settlements, and other information to allow members of the Settlement Classes to intelligently and meaningfully participate, object, opt out, or otherwise comment on the Settlements. *See* Finegan Decl. Ex. D. Both Notice forms directed members of the Settlement Classes to a settlement website where additional details were provided, and the Long-Form Notice included numerous additional details, including the plan of allocation and all relevant settlement schedule dates. *Id.*

Notice regarding a proposed settlement is adequate under both Rule 23 and due process standards if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings," *Hall v. ProSource Techs., LLC*, No. 14-cv-2502-SIL, 2016 WL 1555128, at *4 (E.D.N.Y. Apr. 11, 2016) (citation omitted), and it can "be understood by the average class member," *Wal-Mart Stores, Inc.*, 396 F.3d at 114 (citation omitted).

Here, the Notice Plan was prepared with the aid of an experienced Claims Administrator and provided for widespread direct mailed notice and published notice, robust media coverage, and a comprehensive settlement website. Plaintiffs obtained the names, contact information, and transactional data for most the members of the Settlement Classes from the data produced by RFEDs, the brokers through whom members of the Classes transacted. Plaintiffs also obtained contact information (but not comprehensive transactional data) for former customers of a fifth

28

RFED that operated during the Class Period, Peregrine Financial Group. These databases enabled the Claims Administrator to mail postcard Notice to most members of the Settlement Classes.

For purposes of efficiency and to limit expenses associated with administering the Notice Plan, Plaintiffs disseminated the postcard Notice via direct mail postcard, which were distributed to all members of the Settlement Classes for which Class Counsel obtained mailing addresses. *See generally In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 183 (S.D.N.Y. 2014) ("The use of a combination of a mailed post card directing class members to a more detailed online notice has been approved by courts."). Additionally, for all members of the Settlement Classes for which Class Counsel obtained email addresses, the Claims Administrator disseminated postcard Notice via email. The postcard Notice directed Settlement Class members to the Settlement website for further information. The Settlement website included the Long-Form Notice as well as other relevant information and Court documents. *See generally Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 89 (2d Cir. 2019) (affirming lower court's approval of notice plan that provided for "class notice via email or postcard to those members for whom [plaintiff] had addresses and posted notice regarding the class settlement on a website"), *cert. denied sub nom. Bowes v. Melito*, 140 S. Ct. 677, 205 L. Ed. 2d 440 (2019).

The Long-Form Notice was posted on the Settlement website and mailed or emailed to anyone who requested a copy. The Notice Plan also provided for robust media coverage, including press releases and internet and social media advertising designed to reach members of the Settlement Classes and direct them to the Settlement website for more information regarding the Settlements. For example, members of the Settlement Classes were targeted with advertisements through Facebook, Instagram, and Google search with keywords and topics relevant to the Settlements. Finegan Decl. ¶ 25. Courts have routinely approved similar notice plans involving

both direct mail and publication notice through various media. *See, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 167–69 (2d Cir. 1987) (approving letter notice to reasonably identifiable class members, supplemented by "various forms of substitute notice," including publication in various media); *In re Vitamin C Antitrust Litig.*, 2012 WL 5289514, at *2 (approving notice plan that included direct mail, publication in periodicals, internet and social media advertisements, and a settlement website). The total number of impressions served across the website, social media, and Google search advertising campaigns was more than 17,755,000, as of October 27, 2020. Finegan Decl. ¶ 21. The Claims Administrator estimates that more than 95 percent of the Settlement Classes were reached through the Notice campaign, and that those Settlement Class members were reached an average of 3.9 times each. *Id.* ¶ 20; *see generally Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 226 (D.N.J. 2005) (finding that notice program administered by Heffler was adequate and supported final approval where notice "reached an estimated 92.48 percent of the Class, with an estimated average frequency of exposure of 3.09 times"); *In re Polyurethane Foam Antitrust Litig.*, 135 F. Supp. 3d 679, 684 (N.D. Ohio 2015) (notice program supported final approval where notice reached "almost 65 percent" of the class members). The Notice Plan therefore satisfies Rule 23(c)(2)(B)'s requirements.

## V.   THE PLAN OF ALLOCATION SHOULD BE FINALLY APPROVED

Rule 23(e)(2)(C)(ii) provides that the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," in evaluating the fairness, reasonableness, and adequacy of proposed settlements. As this Court recognized in preliminarily approving the Plan of Allocation—to which no one has

objected—it "is a straightforward and equitable method of allocating the Net Settlement Fund[14] to the Settlement Class, and . . . it fairly accounts for the relative strengths and weaknesses of the claims of different categories of Settlement Class Members." Preliminary Approval Order ¶ 21. Plaintiffs' Plan of Allocation proposes to distribute the Settlement Funds to Claimants largely *pro rata* based on their FX Instrument transactional volumes. *See generally* Netz Decl. The Plan of Allocation therefore supports final approval.

"As a general rule, the adequacy of an allocation plan turns on . . . whether the proposed apportionment is fair and reasonable" under the circumstances of the case. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). "An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 429-30 (S.D.N.Y. 2001) (quotation marks omitted).

Much like the allocation plan the Court approved in *FOREX*, Plaintiffs propose that the funds be distributed to members of the Settlement Classes *pro rata* based on each member's transactional volume, with adjustments to account for the dates and currency pairs corresponding to those transactions. *See FOREX* ECF No. 925 (Memorandum in Support of Motion for Final Approval of Plan of Distribution); *id.* ECF No. 1095 (Order Approving the Plan of Distribution).

As set forth in the Netz Declaration, Dr. Netz determined that certain factors that affected the amount by which members of the Settlement Classes' transactions were affected by the Defendants' alleged manipulation of FX prices. *Id.* § III. First, Dr. Netz determined that FX transactions with less liquid currency pairs (*i.e.*, currency pairs with greater spreads between the

---

[14] "Net Settlement Fund" is defined in the Settlements as the balance of the Settlement Fund, net of any Court-approved administrative and notice expenses, attorneys' fees and expenses, and tax expenses. Citigroup Settlement § X, ¶ (f); MUFG Bank Settlement § X, ¶ (f); SC Settlement § X, ¶ (f); SG Settlement § X, ¶ (f); Group Settlement § X, ¶ (f).

bid and ask prices) were likely more susceptible to the effects of the alleged conspiracy than FX transactions involving more liquid currency pairs. *Id.* § III(B). Therefore, the Plan of Allocation calculates claimant awards based on the volume of each claimant trade adjusted for the spread of the currency pair at the time of the trade. *Id.* at § IV.A. This ensures that claimant transactions for currency pairs with greater spreads, and therefore potentially more susceptible to manipulation, receive relatively greater weight for purposes of calculating claim awards than the more liquid currency pairs. *Id.*

Second, FX purchases occurring between December 1, 2007 (the start date of the Class Period specified in the Settlements) and December 31, 2013 (the end of the Class Period in the SCCAC) were relatively more impacted by the effects of the alleged conspiracy than purchases occurring in 2014 and later. *See* Netz. Decl. § IV.G. Accordingly, Plaintiffs propose to discount purchases occurring between January 1, 2014, and the end of the Settlement Class Period by 90 percent. *Id.*

Finally, Plaintiffs propose that the plan of allocation provide for a minimum payment amount a "*de minimis* award" for claimants whose *pro rata* claim award would otherwise fall under a certain threshold.[15] As set forth in the Netz Declaration, there will be two *de minimis* payment amounts: a high-end amount for members of the Settlement Class eligible for a *de minimis* award who traded FX Instruments during the period of December 1, 2007, and December 31, 2013; and a low-end amount for those who only traded on or after January 1, 2014. *Id.* § IV.A.[16] The high-end *de minimis* award will be set between $12.50 and $25, and the low-end award will be

---

[15] The *FOREX* plan of allocation allowed claimants with estimated claim values of $15 or less receive a *de minimis* award of $15. ECF No. 877-7 at 18.

[16] The proposed *pro rata* award calculation methodology similarly applies a discount to trades that took place on or after January 1, 2014. *See* Netz Decl. § IV(G).

between $5 and $10. Netz Decl. § IV.C. The exact amounts within those ranges depend on the total number of claimants who file a claim for a *de minimis* award. *Id.*

The *de minimis* award will apply to two categories of claimants. First, claimants who provide documentation sufficient to demonstrate that they purchased FX Instruments during the Class Period and are a member of any Settlement Class but do not have transactional data sufficient for the Claims Administrator to calculate a *pro rata* award will be eligible to receive a *de minimis* award. For example, if a member of the Settlement Classes provides documentation sufficient to demonstrate that she, he, or it transacted FX Instruments with an individual or entity that in turn transacted in the FX instrument with a Defendant or one of Defendants' alleged co-conspirators during the Class Period, but the Class member does not have transactional data sufficient for the Claims Administrator to calculate a *pro rata* award, the Class member will receive a *de minimis* award. Second, claimants who do have transactional data sufficient for the Claims Administrator to calculate a *pro rata* award will be eligible to receive a *de minimis* award if the claimant's *pro rata* award as calculated by the Claims Administrator falls below the *de minimis* award amounts. Therefore, all claimants will receive the greater of (a) their *pro rata* award based on their transactional volume calculated by the Claims Administrator; or (b) the *de minimis* award amount applicable to their claims.

Accordingly, as the Court recognized in the Preliminary Approval Order, the Plan of Allocation "fairly accounts for the relative strengths and weaknesses of the claims of different categories of the members of the Settlement Classes, while ensuring that all valid claimants for which transactional data is available receive a *pro rata* share of the Net Settlement Fund, and that claimants for which transactional data is unavailable or whose *pro rata* share is below the *de minimis* payment threshold will be entitled to a reasonable *de minimis* award." *Id.* ¶ 21. As Judge

Cote has observed, "the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision," and the "principal goal of a plan of distribution must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund." *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476-DLC, 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (finding this principle "often magnified in antitrust cases"). Here, Class Counsel and their experts have tailored the Plan of Allocation to the different categories of claimants using Dr. Netz's econometric analyses, exceeding the minimal requirement that the Plan be supported by a reasonable and rational basis.[17] That the Plan of Allocation is recommended by Class Counsel underscores the conclusion that it is fair and adequate to the members of the Settlement Classes. *See In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001) ("As with other aspects of the settlement, the opinion of experienced and informed counsel is entitled to considerable weight."). The Plan of Allocation should be finally approved.

## VI.     THE PROPOSED SETTLEMENT CLASSES SHOULD BE FINALLY APPROVED

The Court granted preliminary certification of the Settlement Classes in the Preliminary Approval Orders, holding that "the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) have been satisfied for settlement purposes" because:

> (a) the members of the Settlement Classes are so numerous that joinder of all Class members in the Action is impracticable; (b) there are questions of law and fact common to the Settlement Classes and these common questions predominate over any individual questions; (c) the claims of Plaintiffs are typical of the claims of

---

[17] *See, e.g.*, *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 293, 301-03, 305-08 (3d Cir. 2011) (criticisms of a class settlement based upon a distribution plan that fails to consider "the legal strengths and weaknesses of [individual] class members' claims misconstrue[] the requirements of Rule 23," as it is not the court's role to impose a Rule 12(b)(6) or 56-like standard on a Rule 23 motion to "differentiate within a [settlement] class based on the strength or weakness of the theories of recovery"); *Lane v. Facebook*, 696 F.3d 811, 823-24 (9th Cir. 2012) (rejecting the argument that "the district court was required to find a specific monetary value corresponding to each of the plaintiff class's [] claims and compare the value of those claims" to approve a class settlement); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 239, 244 (2d Cir. 2012) (rejecting criticisms of settlement, citing *Sullivan* with approval).

their respective Settlement Classes; (d) Plaintiffs and Class Counsel have fairly and adequately represented and protected the interests of the Settlement Classes; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering (i) the interests of the members of the Settlement Classes in individually controlling the prosecution of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by members of the Settlement Classes; (iii) the desirability or undesirability of concentrating the litigation of these claims in this particular forum; and (iv) the likely difficulties in managing this Action as a class action.

*Id.* ¶ 15. Certification of the Settlement Classes remains appropriate because, as set forth in Plaintiffs' Preliminary Approval papers[18] and reflected in the Court's Preliminary Approval Orders, these Classes meet all the requirements of Rule 23(a) and Rule 23(b)(3). *See Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997). Therefore, Plaintiffs respectfully request that the Settlement Classes be finally certified for Settlement purposes.

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant their motion for final approval of the Settlements.

Dated: October 30, 2020                Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
Michael J. Kane
Joshua T. Ripley
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdellangelo@bm.net
mkane@bm.net
jripley@bm.net

*Settlement Class Counsel*

Todd M. Schneider

---

[18] ECF Nos. 272-274; 418-420.

**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
Fax: (415) 421-7105
tschneider@schneiderwallace.com

*Counsel for Plaintiffs and the Proposed Classes*

Joseph C. Peiffer
**PEIFFER WOLF CARR & KANE, APLC**
201 St. Charles Avenue, Suite 4610
New Orleans, LA 70170
Tel: (504) 523-2434
Fax: (504) 523-2464
jpeiffer@pwcklegal.com

*Counsel for Plaintiffs and the Proposed Classes*

R. Bryant McCulley
Stuart McCluer
**MCCULLEY MCCLUER PLLC**
701 East Bay Street, Suite 411
Charleston, SC 29403
Tel: (843) 444-5404
Fax: (843) 444-5408
bmcculley@mcculleymccluer.com
smccluer@mcculleymccluer.com

*Counsel for Plaintiffs and the Proposed Classes*