

**MICHAEL C. DELL'ANGELO**  *MANAGING SHAREHOLDER*
d 215.875.3080  m 610.608.8766  mdellangelo@bm.net

September 23, 2021

**VIA ECF**                                                                                              **REDACTED VERSION**
Honorable Lorna G. Schofield
United States District Judge
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

                            RE: *Contant, et al. v. Bank of America Corp., et al.*, No. 17-cv-3139

Dear Judge Schofield:

      Pursuant to Class Counsel's September 15, letter to the Court, (ECF 485), we respectfully request review of the unresolved dispute regarding AMA Capital LLC's ("AMA") late Option Two claim. AMA contests the Claims Administrator's August 13, 2021 assessment ("Claim Assessment") (Ex. A) denying transactions with ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. As discussed, AMA's late claim should be denied in full or the disputed denials should be upheld because it was months late, and, despite several revisions, AMA did not submit the required documentation to validate the denied transactions which, regardless, do not meet the Settlement Class Definitions and the late claim materially delayed distribution of the Settlement Proceeds to valid claimants. Of the 11,311 claims received, the only dispute is as to AMA's late claim which is the only impediment to distribution of the settlement funds.

      **Background of AMA's Late Claim**
      After missing the March 19, 2021 claim submission deadline, on May 12, 2021, AMA asked to submit a late claim because it did not receive direct notice of the Settlement. AMA did not receive direct notice because its transactions do not appear in the transactional data that Class Counsel obtained from retail foreign exchange dealers ("RFEDs") in the litigation. Given AMA's representations and because timely claims were still being processed and it was not apparent that the settlement distribution would be materially delayed, on May 14, 2021, Class Counsel exercised their discretion to allow AMA to submit a late claim offering no "guarantee that [AMA] can participate in the distribution" and required the submission within seven (7) days. (Ex. B).

      On May 20, AMA submitted an Option Two Claim Spreadsheet with millions of transactions but no "detailed transactional records (e.g., account statements and transaction confirmations)" as required by the Court-approved Claim Form. (ECF 467 at 3). On May 24, Class Counsel informed AMA that supporting documentation was required and requested it by May 28. (Ex. C). On May 26, AMA responded, but did not supply supporting documentation. (Ex. D).

      On June 2, Class Counsel asked AMA to identify transactions on its spreadsheet for which it had also made a claim in *FOREX* and reiterated that the Claim Form stated AMA "must submit detailed transactional records (e.g., account statements and transaction confirmations) *and* fill out and submit the 'Option Two Claim Form Spreadsheet.'" (Ex. E emphasis added). On June 4, in response to AMA's request to accept exemplar trading records in lieu of a complete set of the required transactional records, Class Counsel's experts randomly selected 300 transactions in AMA's spreadsheet and requested supporting detailed transactional records. AMA was told this

was needed to decide if "the submission of complete transaction data supporting all approximately ▊▊▊▊ submitted trades is needed" and that "submission of additional (or potentially complete) data supporting AMA's claim" may still be required. On June 6, AMA was asked again to submit the detailed transactional records to consider whether the "claim could be validated without all detailed transactional data" and informed "no decision has been made about whether less than all transactional data will suffice to support a claim." (Ex. F). AMA did not do so. On June 7, AMA submitted "cut and paste" copies of Fix messages that it created for three transactions. (Ex. G). On June 9, stated that this was insufficient to validate the late claim and lacked counterparty and location information and requested the required documentation. (Ex. H). AMA never produced it.

On June 11, AMA's counsel and Class Counsel engaged in a telephonic discussion. AMA's counsel stated that he had reviewed the Court's Orders regarding the award of attorneys' fees and understood Class Counsel should be "motivated" to resolve AMA's late claim because Class Counsel would not receive 75% of their attorneys' fee award until all claims were resolved. Class Counsel took considerable exception to that statement and told AMA's counsel that it was their obligation to recommend the payment of valid claims and the denial of invalid claims.

On June 25, AMA provided original copies of some Fix messages and a few account statements but not a complete set of detailed transactional records that correspond to its spreadsheet or even the requested exemplars. On July 1, Class Counsel responded that those materials were still insufficient to validate the submitted transactions and that detailed transactional records must correspond to the transactions on its Option Two Spreadsheet. (Ex. I).

On July 4, AMA responded that it lacked detailed transactional records to validate every transaction on its spreadsheet and proposed an audit of "probably a few random months" and proof that a trading relationship existed. (Ex. J). On July 8, the proposal was rejected because it is inconsistent with the Court approved Claim Form and Class Counsel and their experts had identified inconsistencies in the limited documentation that AMA had submitted such that they did not believe that an "audit" would be a reliable method of validation of AMA's claim. (Ex. K).

On July 16, AMA further revised its late claim stating: "The total number of trades is somewhat under one half and the volume is approximately one third the original submission." (Ex. L at 1). It consisted of "Category A" transactions with "certain FIX messages and statements [that] specifically disclose that the intermediary traded with a Defendant" and "Category B" transactions that "do not have documentation specifically identifying the Defendant at the other end of the trade." (*Id*. at 4). Without specification, AMA also acknowledged it was seeking compensation for duplicate transactions in *Contant*, an indirect purchaser action, and *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13-cv-7789-LGS ("*FOREX*"), a direct purchaser action. (*Id*. at 2). To date, despite repeated requests, AMA has not identified the duplicate transactions.

AMA's submitted materials were extensively analyzed by Class Counsel's subject matter experts to assess the completeness and accuracy of submitted materials, attempt to link transactions in statements and Fix messages to transactions in AMA's spreadsheet and to determine the mechanics of and parties to the transactions, and whether each identified transaction was directly with one of the ▊▊▊▊ in the spreadsheets and in turn that venue was trading with a *FOREX* Defendant. They also provided insights and explanations as to information contained in the Fix messages and statements and the purpose and role of primary brokers and electronic trading platforms in FX transactions and who are the parties to FX transactions when using prime brokers and/or electronic trading platforms. The Claim Assessment was based, in part, upon extensive analysis by Class Counsel and its subject matter experts, and approved in part and denied in part

the millions of transactions with ▮▮▮▮ identified in AMA's Option Two Spreadsheet, as follows: ▮▮▮▮▮▮.



On August 26, AMA sent "several additional documents" and requested an audit in lieu of compliance with the requirement to submit detailed transactional records. Class Counsel did not agree to an audit, supplementation of the late claim or to a further extension of time. (Ex. M)

On September 2, AMA sent a lengthy response to the Claim Assessment with additional materials. ("Assessment Response") (Ex. N). AMA stated it was not contesting the denial of its transactions through "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." (*Id*. at 11). AMA also stated: "the FOREX claim administrator has preliminarily accepted ▮▮▮▮ claims in that case." (*Id*. at 2). Despite that, AMA contests the denial of ▮▮▮▮ transactions here but has not identified any duplicate transactions. Later that day, AMA's counsel called Class Counsel stating AMA was "determined to take [AMA's claim assessment] to the Court" but acknowledged the Settlement Agreement provided for this resolution process. (ECF 483). Class Counsel later wrote to AMA's counsel to address the truth of certain representations AMA's counsel made to the Claims Administrator regarding the claims process. (Ex. O).

On September 13, Class Counsel, its experts, and the Claims Administrator, had a lengthy call with AMA and its counsel to attempt to resolve the dispute. The discussion focused on the role prime brokers played in AMA's transactions. Among other things, AMA stated (i) AMA does not have prime brokerage statements for a significant number of the transactions on its Claim Two Spreadsheet; (ii) the statements it does have lack details about the underlying FX transactions; and (iii) it did not submit those it has because it "didn't think they would be helpful."

On September 15, Class Counsel and AMA's counsel again discussed why AMA's prime broker transactions do not satisfy the Settlement Class Definitions. AMA's counsel disagreed and referenced unspecified CFTC materials without elaboration. Class Counsel advised that AMA had not articulated a basis to reverse the Claim Assessment and AMA had not provided detailed transactional records with its late claim for most denied transactions. Class Counsel later requested the CFTC materials AMA referenced on the call, but AMA has not supplied it or a citation.

**The Court Should Exercise Its Discretion to Deny AMA's Late Claim**

This Court may deny AMA's claim *in full* for failure to meet the filing deadline. *In re Oxford Health Plans, Inc.*, 383 Fed. Appx. 43, 45 (2d Cir. 2010). "Excusable neglect" sufficient to submit a late-filed claim, is based on: "(1) the danger of prejudice to the non-movant; (2) whether the movant acted in good faith; (3) the length of the delay and its potential effect on

judicial proceedings; and (4) the reason for the delay." *In re VISA Check/Mastermoney Litig.*, No. 96-cv-2538, 2009 U.S. Dist. LEXIS 130182 *7 (E.D.N.Y. Nov. 19, 2009) (citing *Pioneer Investment Serv. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 391 (1993)). The Second Circuit "take[s] a 'hard line' when applying the *Pioneer* factors" because "the legal system relies on deadlines to function, and [] 'every missed deadline' should not become 'the occasion for the embarkation on extensive trial and appellate litigation to determine the equities of enforcing the bar.'" *In re Oxford Health Plans, Inc.*, 383 Fed. Appx. At 45 (quoting *Silivanich v. Celebrity Cruises, Inc.*, 333 F.3d 355, 367-68 (2d Cir. 2003)).

Courts assess whether accepting the late-filed claim will materially reduce recoveries to other timely claimants or otherwise impair the timely administration of the settlement. *Id.* at 46 (affirming exclusion of late-filed claims where "at least some prejudice to claimants who had timely filed [would result] by diminishing those claimants' pro rata share of the settlement funds); *Black v. Diamond*, 163 Fed. Appx. 58, 61(2d. Cir. 2006). AMA's late claim would prejudice other claimants because it would substantially reduce their pro-rata recoveries. Thus, AMA's claim is not the "ordinary case" where there is "little prejudice or disruption caused by allowing a late-submitted claim." *Id.* at 45. Compare *Zients v. La Morte*, 459 F.2d 628, 630-31 (2d Cir. 1972) (accepting late-filed claims "would result in only a miniscule reduction in recovery by timely claimants"); *Cassese v. Wash. Mut., Inc.*, No. 05-cv-2724, 2013 U.S. Dist. LEXIS 142120, *5 (E.D.N.Y. Oct. 1, 2013) (accepting certain late claims resulting in less than a 5% difference in payouts to timely claims). AMA cannot justify missing the deadline given the extensive publication notice, failure to submit the required documentation for months and refusal to identify potentially duplicative transactions in *FOREX* – all of which indicate AMA has not acted in good faith. The timing of AMA's submission and the manner in which it was made unnecessarily delayed the final distribution motion thereby delaying payments to settlement class members.

### AMA Did Not Timely Submit the Required Detailed Transactional Records

AMA did not submit the required "detailed transactional records" to corroborate the denied transactions self-identified on its Option Two Spreadsheet for ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Those records enable verification of the transactions claimants self-identify on the spreadsheet were, in fact, made and meet the Settlement Class Definitions. Accordingly, the denial of AMA's undocumented transactions should be upheld regardless of whether they meet the Settlement Class Definition; however, most, if not all, do not.

### The Transactions AMA Disputes Do Not Meet the Settlement Class Definition

AMA's denied transactions made with a prime broker do not meet the Court-approved Settlement Class Definitions which state valid claimants are those who:

> indirectly purchased an FX Instrument from a Defendant or co-conspirator and were thereby injured in California by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator. Excluded from the California Class are Defendants and their co-conspirators….

(ECF 460, ¶10). A "Direct Settlement Class" member is as a member of the *FOREX* class of direct purchasers. (*Id.* ¶13). A valid claimant must *enter into* an FX transaction directly with a member of the *FOREX* Class who, in turn, entered into an FX Instrument with a Defendant.

As the Complaint alleges:

When retail FX customers … purchase an FX Instrument from a Direct Settlement Class member, such as an RFED, where the RFED is their counterparty for purposes of the

> transaction, *no other person or entity stands between the retail FX customer, such as Plaintiffs, and the RFED*. For each retail FX Instrument purchase, for which Plaintiffs alleges damages, there is a principal-to-principal transaction between the retail FX customer (Plaintiff) and the RFED, and a matching principal-to-principal transaction between the RFED and the liquidity provider-Defendant.

(ECF 183, ¶159) (emphasis added). When AMA instructed a prime broker to facilitate an FX Transaction, the prime broker (not AMA) entered into it on AMA's behalf. Sophisticated entities such as AMA use a prime broker's name and credit to instruct and conduct FX transactions.[1] Thus, AMA agrees with its prime broker that the "prime broker, rather than [AMA], will become the party to these transactions" when the prime broker accepts the transaction and likewise the prime broker has a written agreement with the dealer in which they agree that the prime broker will be "the counterparty to each transaction executed by the client [AMA]" and the dealer. *Id*. at 39.[2]

AMA did not provide prime broker agreements but its agreement with ▓▓▓▓ *requires* that AMA is *not* a party to the FX Transaction. (Ex. Q, at Section 1.2) (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"). AMA's instructions to its prime broker resulted in a two-step process: 1) FX transaction entered between the prime broker (which, in some instances, was a Defendant or co-conspirator) and an unidentified counterparty (that *may or may not* be member of the *FOREX* class); and 2) the financial reconciliation of the FX transaction between the prime broker and AMA. *See* Ex. R (FTC Staff Letter No. 13-11, April 30, 2013).[3]

AMA *may* be the ultimate *economic beneficiary* of the FX transaction that it instructed its prime broker to enter into, but AMA itself did not *enter into* nor is it a party to an FX Transaction and undertakes no credit risk to that transaction. (Ex. P at 39). AMA is neither buyer nor seller in these transactions. Thus, all FX transactions AMA conducted through a prime broker do not satisfy the Settlement Class Definitions and cannot be compensated from the Settlement Funds. Regardless, because documents AMA supplied suggest its prime brokers include Defendants, despite who "entered into" those transactions they cannot meet the Settlement Class Definition. And, absent the required documentation, it is impossible to verify that an entity in the prime broker transactions was a Settlement Class Member in *FOREX*, as required.

### **AMA's Failed to Identify Duplicate Transactions Submitted in *FOREX***

Denial of AMA's ▓▓▓▓▓▓ denied transactions should be upheld because they may be duplicative of direct transactions for which payment has been approved in *FOREX* and they are not supported with the required records and do not meet the Settlement Class Definition.

---

[1] Ex. P (Foreign Exchange Prime Brokerage: Product Overview and Best Practice Recommendations, published December 19, 2005 at 36-37 (available at
https://www.newyorkfed.org/medialibrary/microsites/fxc/files/annualreports/ar2005/fxar05PB.pdf).
[2] *See also* Foreign Exchange Prime Brokerage Reverse Give-Up Relationships: Overview of Key Issues and Analysis of Legal Framework published November 20, 2009, at 11 (available at
https://www.newyorkfed.org/medialibrary/microsites/fxc/files/annualreports/ar2009/11-20_fx09.pdf) ("…the prime broker—rather than the client—becomes the party to the transaction.").
[3] http://www.cftc.gov/ucm/groups/public/@lrlettergeneral/documents/letter/13-11.pdf. at 4 (recognizing use of prime broker to conduct FX transaction results in two transactions, one between the client and prime broker and a second between the prime broker and the dealer).

Respectfully submitted,

/s/ Michael Dell'Angelo
Michael Dell'Angelo
**BERGER MONTAGUE PC**
1818 Market St, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net

AMA's application to seal the documents at Dkt. No 490 is GRANTED for substantially the reasons stated in AMA's letter at Dkt. No. 500.

The Clerk of Court is respectfully directed to (1) maintain all of the documents at Dkt. Nos. 490 and 507 under seal with access limited to the parties listed in the appendix at Dkt. No 496 and (2) close the motion at Dkt. No. 489.

Dated: October 25, 2021
New York, New York

LORNA G. SCHOFIELD
**UNITED STATES DISTRICT JUDGE**

# Exhibits A-R

*Filed under Seal*