UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONTANT, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BANK OF AMERICA CORPORATION, *et al.*, <br><br> Defendants. | Case No. 17-CV-3139-LGS <br><br> **Judge Lorna G. Schofield** |

# CLAIMANT AMA CAPITAL, LLC'S, OPPOSITION TO PLAINTIFFS' MOTION FOR DISBURSEMENT OF INTEREST INCOME

**Table of Contents**

                                                    **Page**

Introduction ............................................................................................................................ 1

Argument ............................................................................................................................... 2

      A.      The Requested Release Is Not Encompassed by the Settlement ............................ 2

      B.      Critical Issues Remain That Would Be Improperly Released if the Motion
                Is Granted ................................................................................................................ 4

            1.      Apparent Mishandling of Dealing Desk Claims ......................................... 5

            2.      FX Primus's Inclusion in the Class Appears to Improperly Harm AMA
                   and Other Class Members ........................................................................... 8

Conclusion ........................................................................................................................... 10

## Table of Authorities

Page(s)

**Cases**

*Appel v. Ford Motor Co.*,
   111 A.D.2d 731 (1985) ................................................................................................2, 4

*Contant v. AMA Cap., LLC*,
   66 F.4th 59 (2d Cir. 2023) .................................................................................................5

*Green v. Lake Placid 1980 Olympic Games, Inc.*,
   147 A.D.2d 860 (1989) ................................................................................................2, 4

*Lefrak SBN Assocs. V. Kennedy Galleries, Inc.*,
   203 A.D.2d 256 (N.Y. App. 1994) .....................................................................................3

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   842 F.Supp.2d 587 (S.D.N.Y. 2012) ..................................................................................1

*Lucent Techs., Inc. v. Gateway, Inc.*,
   470 F. Supp. 2d 1195 (S.D. Cal. 2007) (N.Y. law) ............................................................2

*Richardson v. Island Harvest, Ltd.*,
   166 A.D.3d 827 (2018) ......................................................................................................4

*Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*,
   423 F.3d 145 (2d Cir. 2005) ..............................................................................................2

*Wyly v. Milberg Weiss Bershad & Schulman, LLP*,
   12 N.Y.3d 400 (2009) ........................................................................................................8

*Wyly v. Weiss*,
   697 F.3d 131 (2d Cir. 2012) ..............................................................................................4

**Statutes**

Fed. R. Civ. P. 23 .....................................................................................................................4

Fed. R. Civ. P. 60 .....................................................................................................................4

**Introduction**

AMA Capital opposes Class Counsel's most recent motion solely with regard to the requested release and discharge for Class Counsel, the Claims Administrator, applEcon, and all persons involved in the claim review for claims by AMA arising out of the administration of Settlement Funds. Class Counsel identifies no support for this request. The releases in the settlements, final approval order, and claim form do not extend to these activities. Class Counsel should be entitled only to the limited release in the settlements regarding claims that could have been brought by Defendants, not a general release by AMA.

AMA seeks to retain its rights to claims against these parties in future litigation on several grounds. First, the requested release is not encompassed by the settlement and a broad release of all possible claims would not be appropriate in a venue in which AMA has not had discovery power, the right to confront its likely opponents, or the ability to make actual claims against the parties seeking a release. Second, granting Class Counsel's motion would mean improperly releasing critical unsettled issues. For illustrative purposes only, and to demonstrate to the court that AMA is not merely positing entirely hypothetical issues, two recent examples of unresolved critical issues highlight AMA's concerns.

First, after the Second Circuit finalized which claims are eligible for payment, AMA noticed that a significant majority of Option 1 claims likely did not meet the class definition and should have been removed from the proposed distribution.[1] These claims, which include dealing desk trades that are not back-to-backed with banks, appear to make up most of the RFEDs' trading volume. AMA raised this issue with Class Counsel and Class Counsel's expert Dr. Janet

---

[1] If the Court questions whether the settlement distribution should proceed as previously ordered, it has the inherent power to reconsider and modify its prior order on the motion to distribute. *Liberty Media Corp. v. Vivendi Universal, S.A.*, 842 F.Supp.2d 587, 592-93 (S.D.N.Y. 2012).

1

Netz. Dr. Netz did not respond. Class Counsel met with AMA, but Class Counsel did not rebut AMA's analysis or state that they intended to remedy the issue. Second, even without discovery, AMA found publicly available records showing that it is highly unlikely that FX Primus, a named plaintiff for the Florida class, was validly making trades from that state. Instead FX Primus is a foreign entity trading offshore. For both of these unresolved issues, because the distributions are pro rata, a payment to ineligible class members damages the balance of the class, including AMA. AMA should retain its right to bring claims against liable parties for post-settlement conduct in a venue in which it has discovery powers.

With no cited legal support for the request for a broad release of what would amount to all AMA's claims, including claims never considered or resolved by this Court, the motion should be denied with respect to the release of AMA's claims.

## Argument

**A.     The Requested Release Is Not Encompassed by the Settlement**

For a party to validly release another, there must be a knowing and voluntary relinquishing of claims. *Appel v. Ford Motor Co.*, 111 A.D.2d 731, 732, 490 N.Y.S.2d 228, 229 (1985). A release, in a settlement, like other contracts, should be interpreted to give effect to the intent of the parties. *See Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*, 423 F.3d 145, 148 (2d Cir. 2005). Under New York law, which applies here, courts interpret releases according to their terms. *Green v. Lake Placid 1980 Olympic Games, Inc.*, 147 A.D.2d 860, 862, 538 N.Y.S.2d 82, 84 (1989). But even releases "containing standardized and ritualistic language" are often limited to the circumstances in the underlying matter. *Id*. at 84-85; *see also Lucent Techs., Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1195, 1199 (S.D. Cal. 2007) (N.Y. law).

Here Class Counsel identifies nowhere in the motion or the brief support for releasing all AMA's claims regarding claims handling. The motion should be denied on that ground alone.

There are several specific releases and covenants not to sue in the settlements, the final approval order, and the claim form, but none cover the overly broad scope of the issues Class Counsel requests to be released here. The settlement agreements in pertinent part release all claims "against the Released Parties that arise from or relate to a factual predicate of the Action, including any conduct alleged or that could have been alleged in any amended complaint or pleading therein, from the beginning of time through the Effective Date." (*E.g.*, Dkt. 420-3 § II.(gg); VIII.(b).) Claims against Class Counsel, the Claim Administrator, and the experts are not covered by the substance of the release. Regardless, the "Released Parties" include the Defendants and their related entities—they do not include Class Counsel, the Claim Administrator or the experts. (*Id*. § II.(hh).)

"The Released Claims do not include: ***(i) any claims relating to the enforcement of the settlement.***" (Dkt. 420-3 § II.(gg) [emphasis added].) And it appears Class Counsel specifically negotiated a limited release in the settlement—only for claims by the Defendants—not class members like AMA. (Dkt. 420-3 § VIII.(c).)

Without a specifically contemplated release for Class Counsel and claims administration, there is nothing in the settlements, therefore, permitting Class Counsel to seek the relief requested by the motion. *Lefrak SBN Assocs. V. Kennedy Galleries, Inc.*, 203 A.D.2d 256, 257 (N.Y. App. 1994). The final judgment has basically the same terms (Dkt. 460 ¶¶ 19-24) and the claim form (Dkt. 467) merely incorporates the releases from the judgment and settlements. Indeed, the judgment confirms that "This Final Approval Order shall not affect, in any way, the

3

right of Class Plaintiffs or the Releasing Parties to pursue claims, if any, outside the scope of the Released Claims." (Dkt. 460 ¶ 25.)[2]

There is also no release merely by operation of law. Nothing in Rule 23 itself supports a blanket release for Class Counsel, the Claim Administrator, or the experts' potentially improper actions in handling claims. Indeed, the Second Circuit requires parties to have an opportunity to fully and fairly litigate issues against class counsel, including the "reasonableness of counsel's representation" and issues like fiduciary duty, fraud, and deceit, before rejecting claims. *Wyly v. Weiss*, 697 F.3d 131, 144 (2d Cir. 2012). The Circuit explained that in a case where the class settlement is not challenged, there is no overlap between the initial case and a subsequent proceeding against class counsel for malpractice. *Id.* at 139. And there should be no preclusive effect on any claims by AMA for deceit or the like because AMA has not had a full and fair opportunity to take discovery and litigate potential claims here or in any other forum. *Id.* at 143 (enjoining malpractice claims against class counsel only because class members had ***three years of discovery*** to prove fraud as part of a Rule 60 motion).

As such, Class Counsel's broad request for release of all claims is not supported by the law or by the settlement, and should be denied on this basis.

### B. Critical Issues Remain That Would Be Improperly Released if the Motion Is Granted

As explained above, a broad release of claims should not be granted without a knowing and voluntary release from AMA. Several examples below, for illustrative purposes, highlight issues that would arise from releasing un-litigated claims. It is important that AMA have an

---

[2] Even if there were a release for Class Counsel in the settlements and final judgment, it should still be limited to claims occurring before they were entered. These documents specifically bar claims only up to the "Effective Date," which likely occurred when the Court approved the class notice. (Dkt. 420-3 § VI (making the effective date when six conditions are completed.)) By their terms, improprieties occurring thereafter would not be barred. *Green*, 147 A.D.2d at 862; *Appel*, 111 A.D.2d at 733. Plus, releasing future claims may be against public policy. *See Richardson v. Island Harvest, Ltd.*, 166 A.D.3d 827, 828, 89 N.Y.S.3d 92, 93 (2018).

opportunity to pursue these questions in an appropriate venue where AMA can take discovery and obtain further evidence directly from those withholding information. AMA's claims cannot be released without the opportunity to test the veracity of the parties' statements and the reasonableness of their representations. Due process requires a full and fair opportunity to litigate any issues AMA may have.

### 1. Apparent Mishandling of Dealing Desk Claims

After the Second Circuit finally determined through review of AMA's transactions what types of claims were acceptable, AMA found publicly available information indicating that a material number of Option 1 class member claims may have been improperly deemed valid. Based on the information available to AMA in the absence of discovery powers, it appears the trade information received from the RFEDs was not properly filtered to include only claims within the class definition. (Schwartz Decl. ¶¶ 3-4; Cavaleri Decl. Ex. B.)

The class definition here includes only those in several states "who, during the Class Period, indirectly purchased an FX Instrument from a Defendant or co-conspirator … by entering into an FX Instrument with a member of the Direct Settlement Class, where the Direct Settlement Class member entered into the FX Instrument directly with a Defendant or co-conspirator." (Dkts. 1, 84, 183, *etc*.)

In finally determining AMA's claim, Class Counsel, this Court, and the Second Circuit ultimately interpreted this class definition language to mean that eligible trades include only those where a class member traded with an RFED and the RFED immediately back-to-backed an off-setting trade with a bank. *Contant v. AMA Cap., LLC*, 66 F.4th 59, 68 (2d Cir. 2023).

As the Second Consolidated Class Action Complaint says:

When retail FX customers, such as Plaintiffs, purchase an FX Instrument from an RFED, two matching transactions are **concurrently executed**: (1) the RFED purchases the FX Instrument from the liquidity provider, such as Defendants, paying the best "Ask" price

5

quoted by the liquidity provider at the time of purchase, and (2) the retail FX customer purchases the FX Instrument from the RFED, paying that exact same price, plus an additional retail spread charged by the RFED. The entire liquidity provider (Defendant) to RFED (Direct Settlement Class Member) to retail FX customer (Plaintiff) transaction **takes less than a second to complete**. (Dtk. 183 at 161 [emphasis added].)

But not all trades with RFEDs meet this class definition. As Class Counsel is aware, RFEDs handle customer orders in two ways. (Schwartz Decl. ¶ 8.) The first is referred to as "Non-Dealing-Desk", "back-to-back" or "Offset Flow." (*Id.*) When a customer places a retail order on this basis, the dealer will simultaneously place an identical order with a liquidity provider. (*Id.*) If the liquidity provider is a Defendant, then these trades meet the class definition. The second is referred to as "Dealing-Desk", "warehousing" or "Managed Flow." (*Id.*) When a customer places a retail order on this basis, the dealer will take the opposite side of that order without concurrently offsetting the corresponding trade with a liquidity provider. (*Id.*) These trades do not meet the class definition.

GAIN, one of the Option 1 RFEDs, publicly discloses a total retail volume for the eligible states of between $1-2 trillion from 2007-2015, including both dealing desk trades that are not eligible for payment and non-dealing desk trades that were back-to-backed with liquidity providers. (Schwartz Decl. ¶ 4; Cavaleri Decl. Ex. B.) The publicly available information shows that *only a little more than 10%* of GAIN's total retail volume was actually back-to-backed with liquidity providers. (*Id.*) This means that less than $200 billion in volume was eligible here. (*Id.*) Yet Class Counsel's expert identified roughly $1.1 trillion in GAIN volume as eligible for Option 1 claim payments. (Dkt. 420-6.) This strongly suggests that ineligible claims were included. The expert report does not claim that the expert filtered these data to select only the eligible non-dealing desk trades. (*Id.*)

The Netz declaration (Dkt. 420-6) discusses the data obtained from GAIN. It also lists the files received from the RFED. The files appear to relate only to customers and their trades –

there is no mention of files that would contain transactions between the RFEDs and the Defendants. The discussion of the fields in the files from GAIN does not include any field that would indicate which bank, if any, the RFED back-to-backed the trade with. While the declaration discusses many types of filtering and data cleaning Netz performed (e.g. "dropping trades of products not at issue, such as metals and oil," dropping trades outside the class period, and handling various forms of incorrect or invalid data in the customer information files), it makes no mention of any methodology for filtering out dealing-desk trades. (Dkt. 420-6.)

Missing from the complex analysis described by Netz (Dkt. 420-6) and the Report of James Bibbings (Dkt. 274-4) is any mention of the term "dealing-desk", "non-dealing-desk" or any similar term. It appears that Class Counsel's experts analyzed the retail market as a whole, when they should have been analyzing only the non-dealing-desk portion. This error carried over to the claim administration process. Indeed, Kroll, the Claim Administrator, worked closely with Class Counsel and the experts to determine which claims were valid. (Dkt 541 ¶ 16.) But there is no mentioning of filtering the claims in Kroll's testimony either. (*Id.*)[3] While the other Option 1 RFEDs do not appear to have publicly disclosed the same information as GAIN, the error is likely the same for those venues.[4]

---

[3] Kroll's representative Lori Castaneda vaguely asserts without explanation only that "Kroll also worked with Class Counsel and their subject matter experts and consultants to ensure that submitted claims satisfied the Definitions of the Settlement Classes and were substantiated as such." (Dkt 541 ¶ 16.) But AMA should not be forced to take Kroll's word for it without the benefit of discovery or the ability to see what, if anything, was actually done to make sure claims met the definition.

[4] This issue came up in the course of discovery disputes surrounding subpoenas to the RFEDs. In proceedings before the honorable Judge Stewart D. Aaron, it was explained that:
"There's also additional issues, which I'm sure you're aware of, where a retail foreign exchange individual trades with FXCM and FXCM does not do a back-to-back trade because, for example, the size of the trade from the retail customer is so small, that they can't go into the interbank market and trade a $500 or a $1,000 trade with an entity like the defendant banks because it's too small. So what FXCM and other entities like it do is they warehouse it until it builds to a particular size and then they trade with a liquidity provider that could be a defendant or a non-defendant. And in that situation it's not a back-to-back trade, and any prices they received were not passed onto the retail customer." (Dkt. 394, p. 43 at 4; *see also* Dkt. 351.)

7

AMA made both Class Counsel and the experts aware of this issue prior to Class Counsel requesting a release of all claims. (Schwartz Decl. Ex. 1.) Dr. Netz ignored the information. (*Id.* ¶ 5.) Class Counsel did not have a real response—neither giving substantive information showing that AMA was wrong nor that they had any information this was somehow not a problem. (*Id.* ¶¶ 7-10.)[5] Instead Class Counsel only inferred that the issue should be dropped because there may not be enough money at stake for AMA to continue a challenge. (*Id.*) Nothing changed even after AMA sent its written analysis. (Cavaleri Decl. Ex. C.) Proper filtering to exclude the ineligible trades would drastically change the pro-rata payments to properly eligible class members including, not limited to AMA. AMA's claims should not be released without a full and fair opportunity to take discovery and actually litigate issues, especially non-responses and unsupported representations.[6]

### 2. FX Primus's Inclusion in the Class Appears to Improperly Harm AMA and Other Class Members

In addition to the identified Option 1 claimant issues, it also appears based on publicly available data that one particular named plaintiff, FX Primus Ltd., is not a valid member of the class. The operative Second Consolidated Class Action Complaint represents that "Plaintiff FX Primus Ltd. ("FX Primus") is a limited liability company doing business in the state of Florida" and "...while both residing in and physically located in Florida, Plaintiff FX Primus engaged in FX spot transactions…" (Dkt. 183 ¶ 14.)

---

[5] Class Counsel suggested that due to the acquisition of Gain Capital by FC Stone, FC Stone trades might have been included in Gain Capital's production. (Schwartz Decl. ¶ 8.) The history does not support this. Dr. Netz's declaration was dated May 22, 2020, and FC Stone's acquisition of Gain was not completed until July 31, 2020. https://www.sec.gov/Archives/edgar/data/913760/000091376020000196/earningsrelease2020qtr.htm.

[6] Because AMA never received a substantive response or access to any specific information concerning how claims were actually analyzed, it should be entitled to obtain these documents in discovery or otherwise. Indeed, class members are able to obtain class counsel's file as long as they have a substantial interest in the settlement and are not engaging in a fishing expedition. *Wyly v. Milberg Weiss Bershad & Schulman, LLP*, 12 N.Y.3d 400, 413, 908 N.E.2d 888 (2009) (CPLR article 4 special proceeding to obtain class counsel documents).

But FX Primus is not a limited liability company: it appears to be a foreign "Ltd." Interrogatory responses explain that FX Primus transacted with RFEDs FXCM and Alpari from 2009 through 2015. (Dkt. 253-1). During that period, FX Primus, on its website, claimed to have an office in Ebene, Mauritius, and no office in the United States whatsoever, much less Florida, in 2009-2015.[7] FX Primus's home page today gives a "registered address" in Vanuatu.

There is also no indication that any corporate entity with a name like "FX Primus" is listed on the Florida Division of Corporations website, even though any corporation in Florida as well as any foreign corporation doing business in Florida would be expected to be registered there. AMA obtained a formal statement certificate of no record from the Florida Secretary of State stating "I certify that the records of this office do not disclose a Florida corporation by the name of FX PRIMUS LTD, either active or dissolved." (Schwartz Decl. Ex. 3.)

FX Primus Ltd.'s Australian IPO filing also shows that it was not transacting business in Florida. The prospectus states that "The principal operating business of FXPRIMUS is its retail FX brokerage business incorporated in Mauritius and Cyprus servicing clients mainly in South East Asia. FXPRIMUS, through an acquisition in CY2014 of CMS UK, also operates an institutional FX brokerage firm incorporated in the United Kingdom." (Schwartz Decl. Ex. 2 at 43). And further: "Key operating subsidiaries FX Primus Limited (Mauritius), FX1 Academy Pie Ltd (Singapore) and OPC Business Support Sdn Bhd (Malaysia) were subject to audits during CY2013 according to local financial reporting requirements" (*id*.) and "Income tax expense represents income tax in the jurisdictions in which FXPRIMUS operates. Effective

---

7  2009: https://web.archive.org/web/20091027181159/www.fxprimus.com/contactus.php
2010: https://web.archive.org/web/20100208213444/www.fxprimus.com/contactus.php
2011: https://web.archive.org/web/20110928204921/https://www.fxprimus.com/new-forex-traders/contact-us
2012: https://web.archive.org/web/20120305124842/https://www.fxprimus.com/new-forex-traders/contact-us
2013: https://web.archive.org/web/20130402002128/http://www.fxprimus.com/en/support/contact-us
2014: https://web.archive.org/web/20140209215416/www.fxprimus.com/support/contact-us/
2015: https://web.archive.org/web/20150407180042/http://www.fxprimus.com/en/about-us

income tax rates assumed for key jurisdictions include Mauritius 3%, Cyprus 12.5% and United Kingdom 28.0%." (*Id.* at 55.) In FX Primus Ltd.'s 141 page IPO Prospectus, the word "Florida" does not appear a single time. (*Id.*)

There should be little doubt that the named plaintiff here and the FX Primus in the IPO are the same companies because they both identify Terry Thompson as representative. (Dkt. 449-6; Schwartz Decl. Ex. 2 at 70.) Thompson's 2020 declaration stated he was a resident of Pennsylvania. (Dkt. 449-6.)

This issue has also been raised directly with class counsel through emails and during telephonic conferences. (Cavaleri Decl. ¶¶ 2-8.) Class Counsel did not provide any explanation or evidence that FX Primus was engaging in spot transactions from Florida during the class period. Class Counsel couldn't even guarantee that this issue actually was checked after AMA raised concerns. Rather, Class Counsel baldly dismissed AMA's concerns, saying "I think you will find that what you are aiming at is not going to bear fruit." (Schwartz Decl. ¶ 7.) But based only on publicly available information there is good reason to believe that AMA (and other class members) would be damaged by a distribution to FX Primus. Because it did not knowingly and voluntarily release any claims related to this claim-handling issue, AMA's claim should be preserved. Indeed, it should not be waived without giving AMA a full and fair opportunity to litigate it through the use of discovery.

## Conclusion

For the foregoing reasons, the motion should be denied solely with regard to Class Counsel's attempt to obtain a what would basically be a general release from AMA from all possible claims for Class Counsel, the Claim Administrator, and applEcon.

10

DATED:   June 5, 2023                    Respectfully Submitted,

_____
Damian R. Cavaleri
Hoguet Newman Regal & Kenney, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Phone: 212-689-8808
Fax: 212-689-5101
Email: dcavaleri@hnrklaw.com

Scott O. Luskin
Payne & Fears LLP
200 N. Pacific Coast Highway, Suite 825
El Segundo, CA 90245
Phone: 310-689-1764
Fax: 310-689-1755
Email: SOL@paynefears.com
Attorneys for Claimant AMA Capital LLC

4882-6761-8150.3