# EXHIBIT 1

*Contant v. Bank of America* – **Analysis of Dealing Desk Volume Issues**

AMA has analyzed publicly available information regarding the trade volume for one of the Option 1 RFEDs, and it appears to show that the analysis of Class Counsel's experts to determine valid class member claims and allocate payments was flawed. The main issue appears to be that dealing desk trades were deemed valid for Option 1 class members (without analysis) even though they do not meet the class definition requiring the specific trade with an RFED be individually backed-to-back to a trade with a Defendant Bank. This likely applies to the other Option 1 RFEDs as well.

As discussed below, GAIN, one of the Option 1 RFEDs, publicly discloses a total retail volume of somewhat over $1 trillion, including both dealing desk trades that are not eligible for payment and non-dealing desk trades that were back-to-backed with liquidity providers. Yet Class Counsel's expert also identified a bit over $1 trillion in volume as eligible for Option 1 claim payments. This would seem to show that ineligible claims were included. This problem could be massive because the publicly available information shows that only a little more than 10% of GAIN's total retail volume was actually back-to-backed with liquidity providers. There is no mention that the expert filtered these data to select only the eligible non-dealing desk trades This means that the expert should have allocated payment to eligible trades totaling less than $200 billion, which would drastically change the pro-rata payments to properly eligible class members.

**Analysis of GAIN Volume**

We first calculated GAIN's total US retail volume. We extracted and in some cases extrapolated each year's volume from the relevant SEC filings as detailed in the footnotes.

Table 1

| Time period | GAIN US Retail Volume (billions) |
|---|---|
| Dec 2007 | $ 51.4[1] |
| 2008 | $ 878.9[2] |
| 2009 | $ 679.2[3] |

---

[1] Gain doesn't disclose monthly volumes to the SEC, so we average Gain's 2007 and 2008 annual volumes and divide by 12.
https://www.sec.gov/Archives/edgar/data/1444363/000119312511082584/d10k.htm "Selected Geographic Data" table

[2] https://www.sec.gov/Archives/edgar/data/1444363/000095012310001290/y75376a4sv1za.htm "Selected Geographic Data" table

[3] https://www.sec.gov/Archives/edgar/data/1444363/000119312511082584/d10k.htm "Selected Geographic Data" table

| 2010 | $ | 658.4[4] |
|------|---|----------|
| 2011 | $ | 371.5[5] |
| 2012 | $ | 268.5 [6] |
| 2013 | $ | 377.3 [7] |
| 2014 | $ | 386.4 [8] |
| 2015 | $ | 524.1 [9] |

The sum of these numbers is $4195.8 billion.  James Bibbings (ECF 274-4) expects 37.59% of this to be from the states included in the settlement; Janet Netz uses 37.7% (ECF 274 at 19). Either way, this gives about $1.58 trillion of total retail volume in the relevant states between December 1, 2007 and December 15, 2015, including both dealing desk and non-dealing desk volume.

The Netz Declaration states that the total *Contant*-eligible trading volume from Gain Capital "in the relevant states during the Class Period was roughly $1.1 trillion." (ECF 420-6 page 10)

This analysis of the publicly available information is generally consistent with Netz's analysis of the transactional data from GAIN ***assuming all GAIN transactions meet the class definition without filtering any ineligible trades***.

However, it is widely known that GAIN Capital operates a dealing desk.  In their 2010 10-K, they write:

> "Our retail forex trading revenue is generated from our managed flow portfolio, in which trades are either naturally hedged or become part of our net exposure to be managed pursuant to our risk-management policies, and our offset flow portfolio, in which we

---

[4] In 2010, the total retail volume was 1,324.8 billion.  The non-US percentage was 50.3%.
https://www.sec.gov/Archives/edgar/data/1444363/000119312511082584/d10k.htm
https://www.sec.gov/Archives/edgar/data/1444363/000119312512117644/d278852d10k.htm
[5] In 2011, the total retail volume was 1,574.0 billion.  The non-US percentage was 76.4%
https://www.sec.gov/Archives/edgar/data/1444363/000119312512117644/d278852d10k.htm
[6] In 2012, the total retail volume was 1,303.4 billion.  The non-US percentage was 79.4%
https://www.sec.gov/Archives/edgar/data/1444363/000119312513112866/d440569d10k.htm
[7] In 2013, the total retail volume was 1,796.7 billion.  The non-US percentage was 79%
https://www.sec.gov/Archives/edgar/data/1444363/000144436314000048/gcap2013123110-k.htm
[8] In 2014, the total retail volume was 2,430.5 billion.  The non-US percentage was 84.1%
https://www.sec.gov/Archives/edgar/data/1444363/000144436315000054/gcap2014123110-k.htm
[9] In 2015, the total retail volume was 3,985.8  billion.  The non-US percentage was 86.3%
https://www.sec.gov/Archives/edgar/data/1444363/000144436316000218/gcap2015123110-ka.htm

We reduce this by 1/24 of the average between 2015 and 2016 to account for the fact that the period ended on December 15, 2015 and not December 31, 2015.
In 2016, the total retail volume was 2,822.0 billion.  The non-US percentage was 82.0%
https://www.sec.gov/Archives/edgar/data/1444363/000144436317000016/gcap2016123110-k.htm

> immediately offset trades with one of our wholesale forex trading partners" (https://www.sec.gov/Archives/edgar/data/1444363/000119312511082584/d10k.htm)

These dealing desk trades from the "managed flow portfolio" are not back-to-backed with liquidity providers.  Therefore, they are ineligible trades based on the class definition.  GAIN further explains that most of its retail trading is this ineligible managed flow portfolio, while only a small fraction are "offset flow portfolio."

The 2010 10-K continues:

> As discussed below, in our retail forex business, trading revenue is generated from our managed flow portfolio, which accounted for 76.7% of our customer trading volume for the year ended December 31, 2010, and our offset flow portfolio, which accounted for 8.0% of our customer trading volume for the year ended December 31, 2010.

This gives approximately 9.4% of their 2010 retail volume being "offset" or non-dealing-desk, which are the only trades meeting the class definition.[10]

GAIN's Amendment No. 10 to their S-1 says:

> For the year ended December 31, 2009, 88.7% of our customer trade volume was directed into our managed flow portfolio and we immediately offset the remaining 11.3%.[11]

GAIN's Amendment No. 4 to their S-1 says:

> For the year ended December 31, 2008, 87.0% of our customer trade volume was directed into our managed flow portfolio and we immediately offset the remaining 13.0%.[12]

Summarizing, we have:

Table 2

| Year | Percentage of GAIN flow that was non-dealing-desk and likely eligible for payment |
| --- | --- |
| 2008 | 13.0% |
| 2009 | 11.3% |

---

[10] GAIN's retail volume was 8.0% + 76.7% = 84.7% of their total volume.  8.0% divided by 84.7% is 9.4%.
[11] https://www.sec.gov/Archives/edgar/data/1444363/000095012310112183/y79727dsv1za.htm
[12] https://www.sec.gov/Archives/edgar/data/1444363/000095012310001290/y75376a4sv1za.htm

| 2010 | 9.4% |

Applying these percentages to the corresponding rows in Table 1 (which were GAIN's highest US retail volume years) and the average percentage (11.23%) to the remaining years and applying the adjustment for the relevant states, we get $179 billion of eligible non-dealing-desk volume for the entire period from December 1, 2007 through December 15, 2015. This is very difficult to reconcile with Netz's $1.1 trillion figure.[13]

The Netz declaration (ECF 420-6) discusses the data obtained from GAIN and FXDD. It also lists the files received from those RFEDs, and the files appear to relate only to customers and their trades – there is no mention of files that would contain transactions between the RFEDs and the Defendants. The discussion of the fields in the files from GAIN and FXDD does not include any field that would indicate which bank, if any, the RFED back-to-backed the trade with. While the declaration discusses many types of filtering and data cleaning Netz performed (e.g. "dropping trades of products not at issue, such as metals and oil," dropping trades outside the class period, and handling various forms of incorrect or invalid data in the customer information files), it makes no mention of any methodology for filtering out dealing-desk trades.

It therefore appears that filtering out dealing desk trades was not an explicit part of the analysis. Because the class payments were pro rata, including ineligible trades would affect all class member payments. This potential error needs to be analyzed and likely cured.

4878-6487-1016.2

4878-6487-1016.4

---

[13] GAIN's filings indicate that they make more profit on their "managed flow", so they have an interest in maximizing the fraction of their flow that is managed. There is a downward trend year-over-year of their offset flow for the years we have publicly available data. As a result, applying that average non-dealing desk volume of 11.23% from 2008-10 to the remainder of the period is conservative.